Christopher J. D'Alessandro, Esq. NJ279852018
Donelson, D'Alessandro & Peterson LLC
3 South Broad St. Suite 3A
Woodbury, New Jersey 08096
(856) 839-6058 chris@ddplawfirm.com
*Attorneys for Plaintiff*

| | |
|---|---|
| WILLIAM BROWN Jr.,<br><br>Plaintiff,<br><br>v.<br><br>MCCARTER & ENGLISH LLP, JOHN DOES 1-10 (FICTITIOUS INDIVIDUALS OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN), ABC CORPORATIONS 1-10 (FICTITIOUS ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN).<br><br>Defendant. | Superior Court of New Jersey<br>Law Division: Civil Part<br>Essex County<br><br>Docket No.:<br><br>CIVIL ACTION<br><br>**COMPLAINT** |

Plaintiff, William Brown Jr. ("Plaintiff"), complaining of Defendants McCarter & English LLP, and John Does 1-10, and ABC Corporations 1-10 collectively referred to hereafter as "Defendants," states as follows:

**<u>PARTIES:</u>**

1. Plaintiff William Dennis Brown Jr. ("Plaintiff") is a veteran of the Global War on Terror, a Navy SEAL who honorably served our nation in combat.
2. Plaintiff is a licensed attorney, outspoken Veteran advocate, and pro-Israel advocate with a significant social media following.
3. Plaintiff furthermore organizes, supervises, and participates in a high-profile veteran's charity event, the annual Navy SEAL Swim across the Hudson River.

4. Defendant McCarter & English, LLP ("Defendant McCarter"), is a limited liability partnership known as New Jersey's oldest law firm, with a primary place of business of Four Gateway Center, 100 Mulberry St, Newark, New Jersey 07102.

5. The Plaintiff reserves the right to amend the Complaint and add additional Defendants in the case future discovery warrants such action.

**JURISDICTION AND VENUE:**

6. The amount in controversy satisfies the Court's jurisdictional requirements.

7. The State of New Jersey has subject matter and personal jurisdiction over this controversy.

8. Venue is proper in this Court, as Defendants maintain a primary place of business located in Essex County, New Jersey.

**FACTS COMMON TO ALL CLAIMS**

9. Plaintiff William Brown Jr. proudly served our nation in the Navy SEALs.

10. Navy SEALs represent the pinnacle of elite military forces and are known throughout the world as consummate professionals.

11. SEALs undergo some of the toughest and most comprehensive military training in the world.

12. The rigorous assessment, selection, and training process Navy SEALs undergo is beyond demanding, known as among the toughest in the history of warfare.

13. Navy SEALs take their name from the elements in which they operate - sea, air and land, and take on and accomplish mission objectives which would

be impossible for conventional forces to achieve, under harsh conditions in austere environments.

14. Navy SEALs are honored by civilian society for their storied tradition among the warrior elite.

15. The Navy SEAL Ethos is one of the basic philosophies of the Navy SEALs.

16. An extract of SEAL Ethos, which is particularly pertinent to the Plaintiff's matter, is as follows, "We expect to lead and be led. In the absence of orders I will take charge, lead my teammates and accomplish the mission. I lead by example in all situations. I will never quit. I persevere and thrive on adversity. My Nation expects me to be physically harder and mentally stronger than my enemies. If knocked down, I will get back up, every time. I will draw on every remaining ounce of strength to protect my teammates and to accomplish our mission. I am never out of the fight."

17. Former Navy SEALs serve in high-profile elected offices throughout local, state, and county governments.

18. Others are high-profile entrepreneurs, leaders of industry, fitness gurus, leadership coaches, and media personalities among other roles.

19. Navy SEALs are also known as prolific writers of books reflecting their experiences in war, articles on military tactics, and leadership guides.

20. An employer hiring a former Navy SEAL knows exactly what they are getting; a motivated, tough, hardworking, plain-speaking worker who will do what it takes to get the job done; an employee who will speak their mind.

21. Joseph Lubertazzi Jr. ("Lubertazzi") is the Chairman of Defendant McCarter's Executive Committee, an Equity Partner of Defendant McCarter,

and a former Practice Group Chair of the Bankruptcy, Restructuring & Litigation Group ("Bankruptcy Group").

22. Joseph T. Boccassini ("Boccassini") is an Equity Partner and Firmwide Managing Partner of Defendant McCarter. Boccassini is also a member of the Firm's Diversity, Equity & Inclusion Committee ("DEI Committee") and a member of the Firm's Social Justice Project.

23. Mark A. Daniele ("Daniele") is an Equity Partner Mark and is the immediate past Practice Group Leader for Defendant McCarter's Tax Group and was a member of the Firm's Executive Committee from 2012 to 2019. He is currently a member of the Firm's Finance Committee.

24. Ward C. Laracy ("Laracy") is an Equity Partner Mark with the Defendant McCarter's Tax Group.

25. Judge Jose L. Linares (retired) ("Linares") is a former United States district judge of the United States District Court for the District of New Jersey.

26. Linares resigned as Chief Judge to return to private practice at Defendant McCarter.

27. Linares is an Equity Partner with Defendant McCarter and chairs Defendant McCarter's Alternative Dispute Resolution Practice Group.

28. Linares is a member of Defendant McCarter's DEI Committee and a member of the Firm's Social Justice Project, and the father-in-law of Guillermo C. Artiles.

29. Judge Natalie S. Watson ("Watson") is a Superior Court Judge of New Jersey Superior Court, Family Division, Monmouth Vicinage (Vicinage 9).

30. Watson is a well-known LGBTQIA+ advocate and was an Equity Partner with Defendant McCarter's Products Liability Practice Group, and a member of the Firm's DEI Committee.

31. Guillermo C. Artiles ("Artiles") is an Equity Partner and Charis the Defendant McCarter's Government Affairs Practice Group.

32. Artiles is also a Delegate/Co-Chair for President Joe Biden and former counsel for Governor Phil Murphy.

33. Artiles is also a member of the Defendant McCarter's DEI Committee and Social Justice Project.

34. Artiles is the son-in-law of Linares.

35. William D. Wallach ("Wallach") is an Equity Partner with Defendant McCarter assigned to the Bankruptcy, Restructuring & Litigation Group.

36. Adam N. Saravay ("Saravay") is an Equity Partner with Defendant McCarter and is the Firm's employment attorney.

37. Saravay is also a member of the Defendant McCarter's Social Justice Project.

38. Christine A. Lydon ("Lydon") is Defendant McCarter's Chief Human Resources Officer and a member of the DEI Committee.

39. Alexander W. Major ("Major") is an Equity Partner of Defendant McCarter and Co-Chairs the Firm's Government Contracts & Global Trade Practice Group.

40. Major is also a member of Defendant McCarter's DEI Committee and a member of the Firm's Social Justice Project

41. Robert A. Mintz ("Mintz") is an Equity Partner Mark of Defendant McCarter and is the Newark Office Managing Partner.

42. Mintz is also a member of Defendant McCarter's Social Justice Project.

43. In March 2017, the Plaintiff was hired as a Career Staff Associate at Defendant McCarter in the Bankruptcy Group.

44. During his employment, the Plaintiff was subjected to a hostile work environment characterized by discriminatory conduct based on his veteran status.

45. In 2019, Daniele sexually harassed the Plaintiff by inappropriately touching him and making suggestive comments.

46. Prior to the COVID-19 pandemic, Defendant McCarter offered free dinners to attorneys in the Newark office working past 7 pm.

47. In the winter months of 2019, the Plaintiff went to the 7 pm meal at Defendant McCarter's Newark Office and was at the buffet when Daniele came up behind the Plaintiff, grabbed the Plaintiff's waist and said words to the effect "you can afford to eat all this because you're a strong healthy man."

48. The Plaintiff reported this incident to a Partner and an Associate of Defendant McCarter.

49. The Plaintiff reasonably believed if he were to attend the evening dinner at Defendant McCarter's Newark office in the future, he would expose himself to further sexual harassment from Daniele.

50. The Plaintiff declined these meals thereafter as a reasonable measure to avoid further harassment from Daniele; this benefit of employment had been effectively denied to the Plaintiff by Daniele's sexually harassing conduct.

51. The actions of Danielle are in opposition to public policy of non-discrimination and harassment of veterans and military service members, as well as strong public policy against sexual harassment in the workplace.

52. Laracy contributed to the hostile environment by making offensive remarks about the Plaintiff's military service, questioning whether he had killed anyone while serving as a Navy SEAL.

53. In 2019, the Plaintiff was in the elevator at Defendant's Newark Office with Laracy, when Laracy unexpectedly asked the Plaintiff how many people he had killed.

54. This was a bias-based discriminatory comment made by an Equity Partner at Defendant McCarter based on the Plaintiff's veteran status.

55. Laracy exhibited discriminatory intent based on the Plaintiff's veteran status when he asked the Plaintiff, a combat veteran, how many people the Plaintiff had killed.

56. This bias-based discriminatory action goes against the clear public policy of fair treatment and support for military service members and veterans.

57. The Plaintiff was deeply offended when Laracy, asked this insensitive, unprofessional and biased question regarding military service to our nation.

58. The Plaintiff replied that he was a combat veteran, proud of his military service, and honorably served our nation.

59. Later during that same day Laracy unexpectedly came into the Plaintiff's office and apologized.

60. Laracy told the Plaintiff he was out of line when he asked me how many people the Plaintiff had killed.

61. In 2020, Laracy made a $1,000 donation to the NYC SEAL Swim, a large-scale, high-profile charity event founded and organized yearly by the Plaintiff.

62. Laracy's discriminatory remark regarding the Plaintiff's military service led the Plaintiff to reasonably believe the terms and conditions of his employment had been irrevocably altered, as instead of being perceived as an individual who had honorably served our nation in time of war, the Plaintiff came to realize he was feared, loathed, and discounted as a mere "killer."

63. The Plaintiff came to learn that openly expressed discriminatory beliefs, ideals, and language was the norm in Defendant McCarter's workplace among ranking members of the firm, rather than the exception.

64. During annual cabin retreats organized by Lubertazzi, the Plaintiff was exposed to racial slurs and other inappropriate behavior by Defendant's senior attorneys, further contributing to the hostile work environment.

65. Some of this behavior was wildly inappropriate, best described as alcohol sodden events replete with the conduct one would expect from stereotypical depictions of frat parties.

66. To the Plaintiff's knowledge, an attendee at Lubertazzi's cabin used racial slurs and Lubertazzi never took disciplinary action, internal or external,

against any of Defendant McCarter's attorneys for their conduct at his cabin.

67. The Plaintiff, to his knowledge, was the only veteran who attended Lubertazzi's cabin retreats.

68. Lubertazzi sent emails to those who attended his cabin retreats referring to several incidents at the cabin.

69. In one such email, Lubertazzi made a mockery of the Plaintiff's service and talked about hearing "War Stories".[1]

70. Lubertazzi's remark about hearing "War Stories" was perceived by the Plaintiff as a derogatory comment made by Lubertazzi, McCarter's Executive Chairmen, on an email with senior members of Defendant McCarter's firm copied, that was bias-based on the Plaintiff's veteran status.

71. Lubertazzi exhibited discriminatory intent based on the Plaintiff's veteran status when he sent out an email with senior members of McCarter copied and described hearing "War Stories" at the cabin retreat.

72. This action goes against the clear public policy of non-discrimination and fair treatment of military service members and veterans.

73. Lubertazzi's email copying senior Partners at McCarter ridiculing the Plaintiff's military service, and the inappropriate behavior by several attorneys attending his cabin retreats, led the Plaintiff to believe the terms and conditions of his employment had been irrevocably altered.

[1] The Plaintiff never disclosed to Lubertazzi or any of the McCarter attorneys attending Lubertazzi's annual cabin retreats any information regarding his military service in Iraq.

74. According to 2019 statistics, veterans are significantly underrepresented in the legal community making up just 1.67% of the attorney workforce in law firms of 251 or more.

75. In New Jersey, less than one percent of one percent (<0.01%) of the population serves in the military.

76. The majority of New Jersey's veteran population are Vietnam era veterans along with a rapidly declining population of veterans of earlier wars including the Korean War, and WWII.

77. Translated into practical terms, this means the vast majority of the population of New Jersey do not serve in the military, have no family members in the military, and are unlikely to know any military personnel, or veterans, directly.

78. Consequently, there are few Judges, Partners, attorneys and law professors in the New Jersey legal field who have served in the armed forces of the United States.

79. Veterans are a tiny minority in the legal profession to begin with and more so in New Jersey based on a low population of veterans.

80. For example, on information and belief, Defendant McCarter has over 500 employees, and the Plaintiff was the only veteran of the Iraq war he was aware at the Firm.

81. Veterans are a tiny minority at Defendant McCarter, and their numbers declined further with the Plaintiff's termination.

82. The Plaintiff is a well-known veteran advocate, Navy SEAL, Iraq war combat veteran, but also had the dubious distinction of being among the lowest paid attorneys at Defendant McCarter.

83. Defendant McCarter further exhibited bias-based, discriminatory intent based on the Plaintiff's veteran status by excluding him for six years from the firm's Annual Diversity Retreat.

84. This was an adverse employment action by Defendant McCarter that intentionally disregarded Plaintiff's status as a veteran and a minority in Defendant's workplace.

85. This action goes against the clear public policy of non-discrimination against, and fair treatment of military servicemembers and veterans.

86. Defendant McCarter's purposeful exclusion of the Plaintiff from the annual diversity retreats signaled to the Plaintiff that the Firm devalued his lived experiences as a military combat veteran and disregarded the Plaintiff's extensive history of highly successful veteran advocacy.

87. The severe and pervasive pattern and practice of discrimination based on military service continued throughout the Plaintiff's six-year tenure in Defendant McCarter's employ was enough to bring the Plaintiff to the reasonable belief the bias-based discrimination had irrevocably altered the terms and conditions of the Plaintiff's employment, and the workplace had become hostile.

88. Lubertazzi and Watson contributed to the hostile work environment by berating the Plaintiff for inquiring why Defendant McCarter's DEI Committee

failed to publish an email or other communication honoring and remembering those lost in the 9/11/01 terrorist attacks.

89. The hostile work environment only intensified after the Plaintiff formally requested to represent veteran's interests on the Defendant's DEI Committee and Social Justice Project.

90. The Plaintiff served as a Navy SEAL during the Jihadist attacks on September 11, 2001 ("9/11 attacks") when Jihadists hijacked/weaponized four commercial airliners intentionally crashing into the twin towers in the World Trade Center and the Pentagon killing 2,977 Americans.

91. The 9/11 attacks had a profound impact on the Plaintiff and the Navy SEAL community as a whole.

92. Throughout the months of September and October 2022 the DEI Committee sent numerous Firm-wide emails promoting, celebrating, and recalling various causes and historical events, but failed to send out an email on September 11, 2022, honoring and remembering those lost during the 9/11 attacks.

93. On October 5, 2022, the Plaintiff was advocating for veterans and those lost during the 9/11 attacks when he sent a reply email to DEI Committee's Firm's email address regarding LGBT History Month asking why the Firm didn't send out an email honoring and remembering those lost during the 9/11 attacks and asking if there were any veterans on the DEI Committee.

94. After inexplicably receiving no response for five days from Defendant's DEI Committee, the Plaintiff sent a follow-up email to the DEI Committee and

copied all the DEI Committee members individually (Boccassini, Calello, Linares, Artiles, Watson, Major, and Mary Gabriel "Gabriel").

95. In the follow-up email the Plaintiff stated: "*the Firm sent the wrong message by not sending out an email honoring and remembering those lost on 9/11*" and again requested to represent veterans on Defendant's DEI Committee.

96. Watson[2] sent the Plaintiff a derogatory email in which she made an allegation by inference that the Plaintiff may be homophobic.

97. The comment imply bias against LGBT persons was an adverse allegation by a McCarter Partner and leader in the Firm's DEI Committee and had the possibility of destroying the Plaintiff's legal career.

98. The comment was based on nothing more than the Plaintiff's status as a veteran and Navy SEAL, who had reasonably questioned why Defendant McCarter had not sent out an email honoring those lost in the 9/11 terrorist attacks.

99. Lubertazzi berated the Plaintiff for sending the Firm wide email regarding the 9/11 attacks, for stating the Firm wasn't doing right by veterans, and requesting a seat on the Firm's DEI Committee and Social Justice Project.

100. Lubertazzi stated the Plaintiff didn't know what he was talking about and justified the lapse by praising the Firm's pro-bono program for Veterans.

101. Lubertazzi also stated the Firm doesn't have to send out an email to acknowledge the 9/11 attacks.

[2] Watson was a member of McCarter's DEI Committee and is a well-known LGBTQIA+ advocate.

102. Lubertazzi comments to the Plaintiff were intended to discourage the Plaintiff from advocating for veterans and reserve component service members within the workplace.

103. These actions go against the public policy of non-discrimination against, and support for miliary servicemembers and veterans.

104. This was an adverse employment action taken by the Chairmen of McCarter's Executive Committee and was based on the Plaintiff's veteran status and his inquiry as to why Defendant McCarter's DEI Committee did not send an email honoring and remembering those lost during the 9/11 attacks, and the Plaintiff's reasonable request to be on Defendant McCarter's DEI Committee and Social Justice Project.

105. Lubertazzi and Watson's discriminatory speculation as to the Plaintiff's motives for simply inquiring why the Firm did not send out an email honoring and remembering those lost on 9/11 and rejection of his request to represent veterans in the Firm's DEI Committee and Social Justice Project, was part of a severe and pervasive pattern of bias-based discriminatory predicated on the Plaintiff's status as a veteran that would lead a reasonable, similarly situated veteran employee to the conclusion the terms and conditions of employment had been irrevocably altered, and the workplace had become hostile.

106. Boccassini and Saravay discriminated against the Plaintiff and his status as a Veteran by berating him after he made a post on LinkedIn advocating for equal pay and opportunities for veterans.

107. Defendant McCarter is the oldest and largest law Firm in the state of New Jersey with over 500 attorneys.

108. The Plaintiff was one of the few veteran attorneys at McCarter and in fact believes he was the only Iraq war veteran at the firm.

109. The Plaintiff was hired as a Career Staff Associate at Defendant McCarter but did the same work as other associates and, in some cases, did the same work as Partners, yet received substantially less pay than a first-year hire.

110. The Plaintiff's base pay in 2023 was $100,000 following his six years at McCarter whereas a first day hire associate's base pay at McCarter was $170,000.

111. In the fall of 2023, the Plaintiff made a post on the social networking site LinkedIn advocating for fair and equal pay for veterans, stating the following:

> *Sometimes movies reflect reality. The Sheriff who tried to pressure the war Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves.* us"

112. The next day the Plaintiff was called into a conference room by Boccassini[3] and Saravay[4] in reference to the LinkedIn post.

113. Boccassini and Saravay represented Defendant McCarter, and their words and actions made it clear Defendant McCarter was unhappy with the

[3] Boccassini is McCarter's Firmwide Manger and member of McCarter's DEI Committee and member of McCarter's Social Justice Project.

[4] Saravay is McCarter's Employment Lawyer and a member of McCarter's Social Justice Project.

Plaintiff's LinkedIn post advocating for equal pay and opportunities for veterans.

114. The LinkedIn post displayed no visual depiction or language that was violent or even referenced violence, yet Boccassini and Saravay played on the worst possible stereotypes of veterans and leveraged the Plaintiff's status as a veteran asking the Plaintiff if he was mentally sound and expressing spurious concern the Plaintiff was going to hurt someone.

115. The Plaintiff, a Navy SEAL, is a consummate professional, had maintained professional decorum at Defendant McCarter throughout his employment, and never made a threatening comment to anyone in the workplace.

116. Despite his history of professional conduct, the Defendants implied the Plaintiff was mentally unstable, and expressed concern the Plaintiff might hurt someone after simply making a post advocating for fair and equal opportunities for veterans.

117. Most combat veterans would instantly recognize the video as a clip from a Rambo movie which strikes true with many veterans who having taken on important missions, led troops in combat, and been responsible for multi-millions in equipment, come home from war only to find it hard to get a job.

118. The implication of violent intent by Defendants, plays into the worst media stereotypes of veterans as mentally damaged and dangerous, and was bias-based, discriminatory conduct based on the Plaintiff's veteran status.

119. Boccassini and Saravay chastised the Plaintiff in the conference for making the LinkedIn post advocating for fair pay and equal opportunities for veterans.

120. These were adverse discriminatory employment actions made by Defendant McCarter's Firmwide Managing Partner and McCarter's Employment Attorney based on the Plaintiff's veteran status and his advocacy for fair and equal pay for veterans.

121. These actions go against the strong public policy of non-discrimination, fair treatment and support for veterans and military service members.

122. Boccassini and Saravay's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran employee to believe the terms and conditions so employment had been irrevocably altered based on discrimination for military service.

123. Wallach discriminated against the Plaintiff by requesting he remove a LinkedIn post mentioning the Plaintiff's visit to the Third Circuit Appellate Court, and the signers of the U.S. Constitution; men who had put it all on the line for our nation and freedoms.

124. Wallach contributed to the hostile work environment when he directed the Plaintiff to remove a LinkedIn post describing the Plaintiff's experience at Third Circuit Appellate Oral Arguments in the Federal District Courthouse in Newark.

125. The Plaintiff's LinkedIn post was based on lived experience as a Navy SEAL, combat veteran, and attorney.

126. In the LinkedIn post the Plaintiff mentioned that many of the signers of the United States Constitution were veterans who had put their lives on the line for our nation and freedoms.

127. The Plaintiff was proud of his experience at the Third Circuit Court of Appeals[5] and on or around December 7, 2022, he made the LinkedIn post memorializing his visit to a Newark Federal Courtroom.

128. The Plaintiff's LinkedIn post stated the following:

> "I had the privilege of observing Third Circuit oral arguments in Newark today. The Courtroom was beautiful, and I enjoyed seeing paintings of Paul Revere and the dignitaries of the Constitution (all who put their lives at risk for their beliefs and possessed a Lacadoninan and Athenian combination to encroachments on their freedoms). It was very insightful to hear oral arguments from four outstanding attorneys (all masters in the art of the art of persuasion). There's no doubt I plan on using a few of their techniques I picked up in a speech I'll be giving in. Philadelphia this Thursday (my little persuasive laboratory experiment). I also pounced on the opportunity during an open q & a to ask the three Judge panel (Schwartz, Matey, and Fuentes) a few questions regarding the affect of judicial assignments on oral arguments and on projected evaluations regarding case outcomes based on inquisitive questions from the bench during oral arguments. My big take aways from this experience is that the best strategy during oral arguments is to know your position, answer the Judge's questions directly, and open with your strongest position."

129. The next morning, Wallach approached the Plaintiff and stated his LinkedIn post was offensive to the Court.

130. Wallach stated he and the Plaintiff had been guests in the Federal Court Room and the Plaintiff shouldn't have taken pictures of the Court Room and made the LinkedIn post.

131. Wallach requested the Plaintiff remove the LinkedIn post.

132. This was an adverse discriminatory employment action made by an Equity Partner at Defendant McCarter based on the Plaintiff's veteran status as the

---

[5] The Plaintiff was the first attorney to participate in a question and answers period with three Third-Circuit Appellate Judges. Plaintiff, an Iraq veteran and attorney identified with the painting in the Newark Federal courthouse that depicted American Revolution war veterans and attorneys signing the U.S. Constitution.

post is clear that Plaintiff admired the dignitaries of the U.S. Constitution, many who were veterans like himself and had put their lives at risk for their freedoms.

133. Wallach's request for the Plaintiff to remove his LinkedIn post goes against the public policy of fair treatment of, non-discrimination against, and support for veterans and military service members.

134. In a stunning display of hubris, on the same day Artiles[6] made a LinkedIn post depicting the same Newark federal court room.

135. Artiles' LinkedIn post also depicted Third Circuit Appellate Judge Patty Shwartz.

136. Neither Wallach nor any Partner at Defendant McCarter asked Artiles to take down his post as it was "liked" by many Partners at the Firm.

137. Wallach's discriminatory request for the Plaintiff to take down his LinkedIn post regarding his visit to the Third Circuit Appellate Court and Revolutionary war veterans, was part of a pattern of severe and pervasive discriminatory, bias-based action predicated on the Plaintiff's military status, that was enough to lead the Plaintiff to the reasonable belief the terms and conditions of Plaintiff's employment had been irrevocably altered, and the workplace had become hostile.

138. The Plaintiff came to the reasonable conclusion that Defendant McCarter afforded Artiles, politically connected and the son-in-law of a retired Federal

---

[6] Artiles was a Delegate/Co-Chair for President Joe Biden and former counsel for Governor Phil Murphy. Artiles is also a member of the Firm's DEI Committee and a member of the Firm's Social Justice Project. Artiles is the former Counsel for NJ Governor Phil Murphy. Artiles is also the Son-in-law of Linares, a former United States District Judge.

District Judge, greater rights to express his opinions on LinkedIn than the Plaintiff, a combat veteran of the Iraq War, and Navy SEAL.

139. Lydon discriminated against the Plaintiff as a Veteran and the President of Veteran Alumni of Rutgers University by having him dis-invited from the Rutgers Law School Annual Law Night.

140. Lydon[7] contributed to the hostile work environment by having Rutgers Law School disinvite the Plaintiff from the Rutgers Annual Law Night.

141. The Plaintiff was, at the time, President of Veteran Alumni of Rutgers University ("VARU"), the Rutgers University veteran alumni organization.

142. As President of VARU the Plaintiff had built a relationship with Dean Elizabeth Acevedo ("Acevedo"), Assistant Dean for Career Development at Rutgers Law School while trying to establish internships specifically for veterans.

143. On or around February 8, 2023, Acevedo sent the Plaintiff an email inviting him to attend the Rutgers Law School Annual Law Firm Night.

144. On February 8, 2023, the Plaintiff sent a reply email to Acevedo copying Defendant McCarter's Equity Partner and Bankruptcy Group Leader Calello stating he was "Happy to attend the Rutgers Law School annual Law Firm Night".

145. On or around February 14, 2023, Acevedo sent an email to Artiles[8] where she stated she was afraid she upset Sandra Cummins and Lydon by inviting

[7] Lydon is a member of the McCarter's DEI Committee.

[8] Guillermo Artiles and Lydon are both on McCarter's DEI Committee. Guillermo is a member of McCarter's Social Justice Project. Guillermo is also an Adjunct Professor at Rutgers Law School.

the Plaintiff to the Rutgers Law School Annual Law Firm Night, was seeking his advice and very much valued Artiles's perspective on this.

146. On the same date Artiles informed Acevedo via email that Acevedo had nothing to worry about.

147. On or around February 20, 2023, the Plaintiff received an unexpected email from Dean Acevedo where Rutgers Law School disinvited the Plaintiff from attending the Rutgers Law School Annual Law Firm Night after being contacted by Defendant McCarter's Chief Human Resources Officer, and DEI Committee Member, Lydon.

148. Dean Acevedo[9] indicated in her email that Defendant McCarter's HR Department had a preference on who Lydon identifies to attend from the Firm.

149. Dean Acevedo stated in her February 20, 2023 email:

> "My apologies, we apparently reached out prematurely as I was asked by your recruitment department last week to discontinue our soft outreach to alumni with our "save the date" requests. They indicated a preference for sending the formal invite to your Chief Human Resources Officer, Christine Lydon, who would then identify who would attend. I will follow up with you as soon as I am able once I receive an update from your Firm."

150. Defendant McCarter's HR Department did not have Rutgers Law School dis-invite any other firm attorneys from the Annual Firm Night.

151. Plaintiff is a well-known veteran advocate and was one of the few veteran attorneys at McCarter.

---

[9] On or around February 14, 2024, Acevedo sent an email to Guillermo Artiles where she stated she was afraid she upset Sandra Cummins and Lydon by inviting the Plaintiff to the Rutgers Annual Law Firm Night and was seeking his advice and very much valued Guillermo's perspective on this.

152. Disinviting the Plaintiff from the Rutgers Law School Annual Law Firm Night was an adverse, bias-based, discriminatory adverse employment action made by Defendant McCarter's HR Department based on the Plaintiff's veteran status.

153. These actions go against the strong public policy of fair treatment for, non-discrimination against, and support for veterans and military service members.

154. On or around February 20, 2023, the Plaintiff sent an email to Dean Acevedo where the Plaintiff expressed humiliation of being the President of VARU yet being dis-invited from attending the Rutgers Annual Law Firm Night.

155. On or around February 21, 2023, the Plaintiff also sent an email to Calello, his Practice Group Leader, and member of Defendant McCarter's Social Justice Project where he expressed the humiliation and emotional distress of being the President of VARU and being disinvited from attending the Rutgers Annual Law Firm Night:

> "I understand Rutgers Law is uninviting me from the Rutgers Annual Law Firm Night because my Firm's recruitment department stated they indicated a preference on who Christine Lydon identifies to attend from my Firm. Being the President of the Veteran Alumni of Rutgers University this un-invitation especially hurts."

156. On or around February 21, 2023, the Plaintiff was contacted by Lydon who claimed the reason for the Plaintiff's disinvite to the Rutgers Annual Law Firm Night was because of a miscommunication between Defendant McCarter's HR Office and Rutgers Law School.

157. On or around March 30, 2023, after having endured the professional and personal embarrassment of being disinvited, the Plaintiff attended the Rutgers Law School Night.

158. Also attending the event were Defendant McCarter's Partners Artiles and Omar A. Bareentto ("Bareentto")[10].

159. Lydon's bias-based, discriminatory request to have Rutgers Law School dis-invite the Plaintiff, the President of Veterans Alumni of Rutgers University from the Rutgers Law School Annual Law Firm was severe and pervasive enough to lead the Plaintiff to the reasonable belief Defendant's work environment had become hostile, and terms and conditions of Plaintiff's employment had been irrevocably altered.

160. Defendant McCarter and Major contributed to a hostile working environment by ridiculing the Plaintiff and refusing to recommend a defense attorney for Plaintiff's fellow Navy SEAL, Shannon Rusch.

161. In September 2022, the Plaintiff received a phone call from fellow Navy SEAL Shannon Rusch ("Rusch") who was contacted by the Federal Bureau of Investigation ("FBI") regarding his and his son's exercise of their first Amendment rights to free assembly and free speech at the January 6, 2021, protest in Washington D.C.

162. The Plaintiff informed Rusch that federal criminal defense was outside his legal expertise, and even though he perceived Defendant McCarter to adopt

[10] Bareentto is Co-chair of the New Jersey Democratic State Committee Muslim Caucus and member of Defendant McCarter's Social Justice Project.

left-leaning political philosophy[11], the Firm had several former federal and state prosecutors that might be able to recommend a good defense attorney.

163. Throughout his six years of employment at Defendant McCarter, the Plaintiff had been copied on multiple emails, from numerous attorneys at Defendant McCarter, seeking recommendations for attorneys for clients, colleagues, family, and friends

164. On or around September 27, 2022, the Plaintiff sent an email to Defendant McCarter's Partners Mintz and Rosemond requesting recommendations for defense attorneys for Rusch and his son.

165. Mintz, who is on the Defendant McCarter's Social Justice Project responded back to the Plaintiff's email and suggested he should contact Major for a possible recommendation for a defense attorney for Rusch and his son.[12]

166. On or around September 27, 2022, the Plaintiff emailed Major who is on Defendant McCarter's DEI Committee and Social Justice Project, explaining Rusch was a friend and former Navy SEAL and that he and his son were seeking a recommendation for a defense attorney after being contacted by the FBI for their participation in the January 6th march in Washington D.C.

---

[11] While at McCarter, Plaintiff observed both New Jersey Democrat Governor Phil Murphy and Newark Democrat Mayor Ras Baraka come and speak at the Firm's Newark office. Plaintiff believes NJ Democrat Governor Phil Murphy had a fundraiser at McCarter while he was running for office in 2027. In a show of ideological solidarity both Governor Phil Murphy and Newark Democrat Mayor Ras Baraka received standing ovations by Partners of the Firm.

[12] The Plaintiff thought Mintz's suggestion to reach out to Major was extremely odd because Major was not a former prosecutor, and his law practice focuses on cybersecurity liability and not criminal or civil defense.

167. Major[13] refused to even recommend a defense attorney for Rusch and his son.

168. Major contributed to a hostile work environment by exhibiting sanctimonious disdain for the Plaintiff when Major stated the following:

> "Going to shoot straight. I've lived under oaths my entire adult life, and none is more sacrosanct than my oath to serve. But I'll leave my emotions out of it and simply say I have no interest in providing any assistance."

169. Major's ridicule of the Plaintiff's advocacy for a fellow Navy SEAL veteran, and refusal to provide the courtesy of a referral did not align with accepted norms of professional courtesy expected within the legal profession.

170. At Defendant McCarter there were clearly separate standards of acceptable conduct in interactions with those employees who adhered to political left orthodoxy, and those who committed political heresy by supporting the rights of the accused who happened to not endorse the same leftist worldview.

171. The workplace had become so hostile to the Plaintiff that he could not even get the professional courtesy of a referral to a defense attorney for a fellow Navy SEAL.

172. The Plaintiff also notes (as he will expand on later) that the sanctimony expressed by Major was inconsistent with Defendant McCarter's defense of the Archdiocese of Newark against allegations of child sexual abuse.

---

[13] Major Co-Chairs Defendant McCarter's Government Contracts & Global Trade Practice Group. Major is also a member of Defendant McCarter's DEI Committee and a member of Defendant McCarter's Social Justice Project.

173. While finding it acceptable to represent an organization accused of a decades-long pattern of child sexual abuse, Defendant McCarter's partner Major recoiled from referring a defense attorney for a Navy SEAL.

174. The professional discourtesy of Major contributed to a severe and pervasive pattern of biased-based adverse employment actions towards the Plaintiff, leading the Plaintiff to the reasonable belief that based on discrimination for his status as a veteran, the workplace had become hostile, and the terms and conditions of his employment had been irrevocably altered.

175. Saravay engaged in bias-based harassment of the Plaintiff predicate on the Plaintiff's status as a veteran by e-mailing him a New York Times Article portraying Iraq War veterans as "damaged, very damaged" outlaws and war criminals who targeted "mosques, schools, dams and power plants."

176. On November 6, 2023, Saravay[14] sent the Plaintiff an email with a link to a New York Times article ("NYT article") titled "A Secret War, Strange New Wounds and Silence from the Pentagon"[15] that portrayed Iraq Veterans as war criminals and portrayed Trump as a warmonger

177. The Plaintiff perceived Saravay's email attaching the NYT article as discrediting the honorable service of veterans of the war in Iraq.

178. Saravay's email and the NYT article claimed veterans of the Global War on Terror are mentally "damaged, very damaged" and war criminals who "with

[14] Saravay is McCarter's Employment Lawyer and a member of McCarter's Social Justice Project.
[15] See: A Secret War, Strange New Wounds and Silence From the Pentagon https://www.nytimes.com/2023/11/05/us/us-army-marines-artillery-isis-pentagon.html?searchResultPosition=2.

savage enthusiasm, often bending the rules to hit not just enemy positions, but also mosques, schools, dams and power plants."

179. The Plaintiff is proud of his service to our nation in Iraq and was extremely offended after receiving the email from Saravay portraying Iraq veterans as criminals.

180. The Plaintiff and other veterans are subjected to incessant, inaccurate stereotypical media and entertainment portrayals of American military veterans as damaged, dupes, killers, war criminals, and worse.

181. From absurd movie depictions of the war in Iraq, to John Kerry's infamous comments that if you "…study hard and you do your homework and you make an effort to be smart, you can do well. If you don't, you get stuck in Iraq," Iraq War veterans have been portrayed negatively in popular culture.

182. Saravay's email to the Plaintiff with the NYT article discredited the honorable service of American veterans and was sent to the Plaintiff specifically because of his status as a combat veteran, a Navy SEAL no less, of the Global War on Terror.

183. Another excerpt from the SEAL Ethos read "Brave SEALs have fought and died building the proud tradition and feared reputation that I am bound to uphold. In the worst of conditions, the legacy of my teammates steadies my resolve and silently guides my every deed."

184. To emphasize the impact of Saravay's email, it was a direct insult to the very Ethos by which the Plaintiff lives his life.

185. Saravay's action served to reinforce the inaccurate and damaging stereotypes of American veterans the Plaintiff found inescapable, even in a

workplace ostensibly dedicated to applying the precepts of Diversity, Equity and Inclusion to the practice of law.

186. No other protected class was subjected to such treatment within the Defendant's workplace, which was replete with a robust DEI and Social Justice structure which wholly neglected the tiny minority of veterans within their own ranks at the firm.

187. Saravay's email and the pejorative opinion of veterans it represents contributed to creating a hostile work environment for the Plaintiff, part of a severe and pervasive pattern of bias-based, adverse employment actions predicated on the Plaintiff's veteran status that brought the Plaintiff to the reasonable conclusion the workplace had become hostile, and the terms and conditions of his employment were irrevocably altered.

188. Defendant McCarter retaliated against the Plaintiff for advocating for fair pay and equal opportunities for veterans by assigning him an inordinate number of cases defending claims of child sexual abuse against the Catholic Church.

189. After the Plaintiff started advocating fair pay and equal opportunities for veterans and service members within Defendant's Firm, the Plaintiff noted a stark change in the work he was assigned.

190. The Plaintiff's previous work was primarily bankruptcy assignments, but after advocating for equal opportunities and fair pay for veterans and service members, the Plaintiff was assigned to defense of child sexual abuse matters, unrelated to the Plaintiff's role in the Bankruptcy Group.

191. The Plaintiff informed Lupertazzi and Sheila E. Calello ("Calello")[16], that as a father of a little girl, while he acknowledged the right of accused parties to a vigorous defense, he struggled with the moral dilemma of defending child sexual abuse matters.

192. The Plaintiff sent emails to Lubertazzi, Adam M. Swanson ("Swanson") Lisa S. Bonsall ("Bonsall"), Farley, and Wallach (all partners in the Bankruptcy Group) explaining that it was difficult for him to work on the child molestation cases and requesting more typical Bankruptcy Group assignments.

193. Lubertazzi, Bonsall, Farley, and Wallach never responded to the Plaintiff's email request seeking typical Bankruptcy Group assignments.

194. Swanson's sole reply was to ask if the Plaintiff's email was meant directly for Swanson.

195. The Plaintiff responded to Swanson that his email was intended for all the Firm's Partners within the Bankruptcy Group, and that it was a request for a return to being assigned typical Bankruptcy Group assignments.

196. The Plaintiff explained that he was having a hard time working on the child sexual abuse matters due to conflicting emotions such assignments produced through the lens of his moral compass.

197. While again the Plaintiff acknowledged the right of the accused to a vigorous defense, the Plaintiff sensed a conflict with his values.

[16] Calello is the Chair of McCarter's Bankruptcy Group and member of McCarter's Social Justice Project.

198. Swanson, Lubertazzi, Bonsall, Farley, or Wallach made no further response nor provided the Plaintiff with the Bankruptcy work he had requested.

199. Despite being in the Bankruptcy Group, from 2021 to 2023, defense of child sexual abuse matters became the majority of work assigned to the Plaintiff by Defendant McCarter.

200. The inexplicably large volume of child sexual abuse assignments to the Plaintiff, a veteran who had recently complained of pay inequality for veterans at the Firm, was retaliatory and discriminatory, as no other attorneys in the Bankruptcy Group were assigned these matters.

201. The child sexual abuse case assignments were intended to pressure the Plaintiff to resign from the Firm rather than engage in the morally reprehensible defense of child sexual abuse matters.

202. The retaliatory practice of assigning the Plaintiff child sexual abuse cases was continuous for almost a year and a half, part of a continuing patters of adverse employment actions serving to lead the Plaintiff to the reasonable conclusion the workplace had become hostile, and that the terms and conditions of his employment had been irrevocably altered.

203. Defendant McCarter discriminated against the Plaintiff based on his status as a veteran by not providing the Plaintiff with a career path to become a regular Associate Attorney at Defendant's firm and denying the Plaintiff the opportunity to earn fair and equal pay.

204. On December 14, 2023, during the Plaintiff's annual review he met with Calello, Saravay, and Lydon and again advocated for fair and equal pay for

himself, and by extension for all veterans who work, or may work in the future for the Defendants.

205. The comments in Plaintiff's annual review regarding his work and business development were very good, and the Plaintiff received a $15,000 annual raise.

206. The Plaintiff expressed his displeasure for being discriminated against by Defendants for being a veteran, explaining to the Defendants that even with the $15,000 raise, a newly hired Associate's base pay was $55,000 higher.

207. The Plaintiff stated to his superiors that it was a disgrace he was one of the few veterans at Defendants' Firm, and after six-years of performing fully in his position, the Plaintiff still received substantially less pay than a first-year associate.

208. At the review, the Plaintiff requested Defendant McCarter provide him with specific steps the Plaintiff could take to become a regular Associate to receive fair and equal pay for the same work, and a severance package to help him determine his next best steps.

209. On December 18, 2023, Saravay came to the Plaintiff's glass walled office and stated Defendant McCarter was willing to give him four months' severance package and that he would get back to him about what specific steps he could take in-order to become a regular associate with the Firm to receive fair and equal pay for the same work.

210. Privately, other Defendants' Partners had advised the Plaintiff he should consider leaving because in their option, Defendants would never make the Plaintiff a regular associate to receive fair pay and equal pay.

211. Defendant McCarter never informed the Plaintiff what specific steps he could take to become a regular Associate to receive fair and equal pay.

212. The Plaintiff perceived this was because Defendants did not want to admit by implication they were discriminating against a veteran, and that there were no actions the Plaintiff could take to become a regular associate to receive fair and equal pay.

213. The Plaintiff complaining of Defendant's unfair, unequal pay for veterans was based upon the Plaintiff's reasonable belief that the Defendant's failure to do so represented a violation of the law, a rule, or regulation, or clear public policy regarding veterans' rights and equal pay and represented a protected communication under the New Jersey Conscientious Employee Protection Act. ("CEPA")

214. The Plaintiff's attempts to earn fair and equal pay, as well as his complaints regarding the Defendants' violation of the law, became moot when the Plaintiff was wrongfully terminated only a few days after advocating for fair and equal pay and opportunities for veterans during his annual review.

215. Defendant McCarter wrongfully terminated the Plaintiff in close temporal proximity to his protected communication advocating for fair and equal pay for veterans in his annual review.

216. The Plaintiff's termination represents an unlawful, retaliatory adverse employment action by Defendants in violation of CEPA.

217. Defendants predicated Plaintiff's termination based on the pretext of objectionable social media posts constituting an alleged violation of Defendants' social media policy.

218. On December 22, 2023, the Plaintiff made a post reflecting his lived experience of serving as Navy SEAL in Iraq when describing continued patterns of Jihadist motivated violence.

219. Jihadist terrorism, insurgency, and violence came to prominence after the 9/11 attacks on the United States and has been a worldwide security threat for decades continuing to date.

220. The Global War on Terror began in 2001 with the invasion of Afghanistan, and officially ended in 2021 with the final, chaotic withdrawal of United States forces from Afghanistan.

221. Although the Global War on Terror has officially ended, the fight against the jihadi terrorist menace continues under Operation Inherent Resolve in Syria, Iraq, and other nations plagued by jihadi violence.

222. In the seas of the Middle East, the United States Navy currently fights an intense battle against Houthi militiamen maliciously firing salvo after salvo of missiles and drones against shipping in the Red Sea in an effort to disrupt international trade.

223. United States forces assist in the protection of our Israeli allies as they defend against large scale missile and drone attacks by Iran and Iranian proxies, terrorist organizations Hezbollah and Hamas.

224. From the Horn of Africa to the Philippines and beyond, American troops are battling jihadis in every corner of the globe.

225. Close to home, this past year over 1,000 members of the Army New Jersey National Guard. 44th Infantry Brigade Combat Team, served in Syria and Iraq supporting and conducting ongoing combat missions against ISIS.

226. The Plaintiff has extensive knowledge as well as first-hand experience with the tactics, techniques and procedures of Jihadist violence, as he was a Navy SEAL during the 9/11 attacks, and a first responder to two suicide bombings committed in 2004 by Jihadists in Baghdad, Iraq, attacks which killed 10 people ("American café & bazaar attacks").

227. The October 7, 2023 ("10/7 attacks"), attacks on Israel by the jihadist terrorist group Hamas killed 1,200 civilians, including more than 40 American citizens, and resulted in 251 more innocent people being held hostage, including 12 Americans, some of which remain hostages to this day.

228. The Plaintiff notes that as Defendant McCarter's implicit political position by not sending out an email honoring and remembering those lost on the 9/11 attacks, Defendant McCarter expressed a similar implied position by remaining notably silent regarding an ideological position on the 10/7 attacks on Israel.

229. The Plaintiff found this surprising because on the day of Defendant McCarter's annual Holiday Party, there was a large Pro-Hamas rally that ended outside of the Firm's Newark Office.[17]

230. The 10/7 attacks against Israel evoked harsh memories for the Plaintiff regarding his experiences in Iraq with Jihadists, and while employed by Defendants he considered himself the most public supporter of Israel within the Firm.

[17] The pro-Hamas supporters included Rutgers Law Faculty and students. The pro-Hamas supporters promoted the genocide of Israel by shouting "To the River to the Sea."

231. On December 27, 2023, just days after the Plaintiff advocated for fair and equal pay for veterans and military service members, he was called into a conference room to meet with Gabriel[18] and Lydon[19] where he was wrongfully terminated.

232. Gabriel stated that Defendant McCarter had warned the Plaintiff about making what Defendants described as "controversial" posts on social media, and the Plaintiff's employment was being terminated because Gabriel believed one of Plaintiff's LinkedIn posts, dated December 22, 2023, promoted negative stereotypes of Muslim and Black Americans.

233. Defendant McCarter's website and social media posts conveyed controversial perspectives to include promoting Black Lives Matter, a host of controversial DEI issues, and a strong anti-Donald Trump bias in their legal analysis of the various indictments of former President Trump.

234. The Plaintiff's LinkedIn post shared his personal perspective reflecting his lived experiences as an Iraq war veteran regarding root causes of Jihadism.

235. The language in the Plaintiff's LinkedIn post is clear and unambiguous that it did not promote negative stereotypes of Muslims.

236. The Plaintiff's LinkedIn post specifically stated, "*There are many beautiful and tolerant Muslims*".

237. The language in the Plaintiff's LinkedIn post is clear and unambiguous in that it did not promote negative stereotypes of Black Americans.

[18] Gabriel is McCarter's Firmwide Deputy Managing Partner. Gabriel and Boccassini are both members of the DEI Committee and McCarter's Social Justice Project.

[19] Lydon is McCarter's Chief Human Resources Officer and a member of McCarter's DEI Committee.

238. The Plaintiff's LinkedIn post specifically stated, "*In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangster rap had a huge negative influence on many young and easily impressionable American black youth.*"

239. The Meriam Webster Dictionary defines "gangsta rap" as "hip-hop music with lyrics explicitly portraying the violence and drug use of American inner-city gang life."

240. Gangsta rap is notorious for profanity, crudely explicit depictions of sex, misogyny, violence against women, drug use and drug crime, and glorification of criminal gang lifestyles, particularly gun violence; the genre is also infamous for art imitating life, with violence spilling into the lives of the recording artists themselves.

241. The 1990s gangsta rap scene for instance, culminated in the high-profile murders of two of the genre's biggest stars, the Notorious B.I.G. and Tupac Shukur, who despite fame and immense wealth, were both ended their lives on the street as victims of gun violence.

242. Defendants claim that criticism of jihadis is a general indictment of Islam lacks merit.

243. That gangsta rap wielded a negative influence is self-authenticated by the very definition of the musical genre and would require willful ignorance of the world-wide negative impact of the glorification of crime and violence innate to gangsta rap.

244. The Plaintiff's LinkedIn post shared his experiences as a Navy SEAL in Iraq and offered his personal perspective regarding those experiences on the

root cause of jihadist violence and resulting negative impact on societies in the context of global security.

245. Defendant McCarter wrongfully terminated the Plaintiff not for stating the obvious fact that Jihadism and gangsta rap are innately negative aspects of society, but because they needed a pretext to terminate a veteran who protested receiving unequal pay for equal work, and had strongly advocated for fair and equal treatment of veterans and service members at the firm.

246. Defendant McCarter wrongfully terminated the Plaintiff because Defendants sought to stifle and deter internal dissent by making an example of the Plaintiff.

247. Defendants were motivated by a desire to deter other Firm employees from asserting their rights under the law or complaining about acts of Defendants they believed to be opposed to laws, rules, regulations, or public policy.

248. The Plaintiff based this belief on the fact an employee of Defendant McCarter later expressed to the Plaintiff a fear of being terminated from employment for even liking the Plaintiff's LinkedIn Post.

249. The Plaintiff, one of the few veterans at Defendant McCarter, was systematically excluded from the firm's Annual Diversity Retreat during all six years of his employment, despite his active role in veteran advocacy.[20]

[20] In 2023, the Plaintiff was recognized by NJBIZ for being a Veteran having a significant impact on the New Jersey business community for his leadership.

250. The Plaintiff, one of the few veterans at Defendant McCarter, was systematically excluded from the firm's DEI Committee and Social Justice Project despite his active role as a veteran advocacy.

251. The Plaintiff was assigned cases outside his expertise, specifically a high volume of child sexual abuse defense cases, which Defendants knew were morally repugnant to the Plaintiff and unrelated to his role in the Bankruptcy Group.

252. The Plaintiff's requests for assignments aligned with his expertise were ignored, and he was paid substantially less than his peers, despite having similar qualifications, and performing similar work.

253. The Plaintiff had been informed by Defendant McCarter's Partners there was no career path for the Plaintiff, a veteran, to become a regular associate with the firm and receive the same pay as other attorneys.

254. The Plaintiff was advised by multiple Partners at McCarter the firm would never make him a regular associate.

255. The Plaintiff's exclusion from professional opportunities and disparate treatment were motivated by his veteran status and advocacy efforts.

256. The Defendants' focus on the relatively innocuous LinkedIn post of the Plaintiff as pretext to terminate employment, is inconsistent with reasonable employers expectations of the personality traits inherent to a Navy SEAL.

257. The Defendants were fully aware when they hired the Plaintiff that he was a former SEAL and knew or should have known that coming from a background as a member of the most elite special operations fighting force

in world history, the Plaintiff would have the strong personality, penchant for assertive advocacy, and plainly spoken opinions to match.

**FIRST COUNT**

**CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA)**

258. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

259. The Plaintiff complained to the Defendants that he was receiving unequal pay for work being done by newly hired associates at a far higher pay rate.

260. The Plaintiff communicated to the Defendants his belief that the unequal pay was based on bias-based discrimination for his status as a military veteran.

261. The Plaintiff reasonably believed that Defendant McCarter's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy.

262. Specifically, the Plaintiff contemplated violations of, but not limited to violations of:

263. The New Jersey Law Against Discrimination which protects members of the Armed Forces of the United States from liability for military services, protects persons from discrimination based on actual or perceived disabilities, such as PTSD, and protects against a hostile work environment based on same;

264. The Uniformed Services Employment and Reemployment Rights Act, commonly known as "USERRA" the federal law protecting veterans and service members from discrimination in the workplace;

265. And, the New Jersey Equal Pay Act which mandates equal pay for person subject to liability for military service in the armed forces of the United States.

266. The Plaintiff performed a "whistle blowing" activity described in N.J. Stat. Ann. § 34:19-3 as described in the paragraphs above when he brought his reasonable objections to the Defendants' attention, disclosing to his supervisors practices he believed were in violation of a law, or a rule or regulation promulgated pursuant to law.

267. The Plaintiff received a raise, but even with the raise, he estimated that after six years employed by Defendants, he earned $55,000 less than a first-day Associate.

268. The Plaintiff requested Defendants prepare a severance package and provide the Plaintiff with a clear path to becoming a regular Associate at the firm, so he could receive equal pay to that of first-year Associates.

269. The Defendants did provide the Plaintiff with a severance package as he requested, but did not provide the Plaintiff with a career path that could lead to him becoming a regular Associate at the Defendants' firm.

270. On December 27, 2023, Defendants wrongfully and illegally terminated the Plaintiff's employment in violation of CEPA based on the pretext of violation of the firms social media policy.

271. On December 27, 2023, The Plaintiff was wrongfully terminated, purportedly for social media posts, but this explanation was pretextual, designed to mask Defendants' retaliation for Plaintiff's protected communications regarding advocacy for veterans and military service

members, and complaints about discrimination against veterans in violation of the law.

272. The Plaintiff's termination was a pretext to silence his advocacy and to prevent further exposure of the discriminatory practices at McCarter.

273. Defendant McCarter made an example of The Plaintiff and limit his ability to earn a livelihood in the legal community by wrongfully terminating the Plaintiff under the pretext the Plaintiff promoted negative stereotypes of Muslims and Black Americans.[21]

274. Plaintiff's wrongful termination was an adverse employment action taken against him.

275. There is a direct causal relationship between the Plaintiff's whistleblowing activity and his wrongful termination.

276. The temporal proximity of the termination to the Plaintiff's protected whistleblower activity alone creates an unmistakable inference of retaliation.

277. When viewed within the totality of the circumstances of the ongoing hostile work environment predicated on the Plaintiff's status as a military veteran, it is clear the Plaintiff is the victim of unlawful retaliation as defined by CEPA.

[21] The Plaintiff attended a New Jersey Jewish Bar Association event where he was one of the speakers and had an attorney who is in a personal relationship with a McCarter Partner come up and state to him, "*You're the attorney who was fired from McCarter for saying bad things about Muslims*."

278. The Plaintiff's termination was the culmination of a years-long pattern and practice of bias-based discrimination predicated on the Plaintiff's status as a military veteran.

279. The Plaintiff's wrongful termination caused humiliation, financial insecurity, and the false allegations of promoting negative stereotypes of Muslim and Black Americans resulted in significant reputational harm to the Plaintiff.

280. Attorney's time and reputation are their stock in trade, and Defendant's pretextual allegations implying racism and Islamophobia on the part of the Plaintiff have harmed his professional reputation as an attorney.

281. The Plaintiff perceived no reasonable alternative other than to get ahead of the allegations and mount a vigorous defense of himself and his professional reputation through the media.

282. But for the Defendants' unlawful, retaliatory termination of the Plaintiff's employment, the Plaintiff would not have suffered damages.

283. The Defendants are liable to the Plaintiff for damages.

**COUNT TWO**

**UNLAWFUL TERMINATION (PIERCE CLAIM)**

284. Plaintiff incorporates by reference each and every allegation made previously herein.

285. The decision to terminate Plaintiff based on social media postings reflecting his lived experience as a Navy SEAL combat veteran of the war in Iraq, is in direct opposition to the strong public policy of New Jersey supporting the

rights of veterans and service members to employment and freedom of speech.

286. The Plaintiff's termination based on alleged violations of Defendants' social media policy is also in opposition to a strong public policy of allowing veterans to freely express themselves and share their lived experiences gained while deployed to the theatre of combat.

287. The Plaintiff's unlawful termination is in direct opposition to the stated public policy positions of the State of New Jersey which strongly support the rights of veterans, going so far as to create a permanent tribute in New Jersey law to the "…brave men and women are true patriots who gallantly protect America from potential enemies to ensure our freedom and our way of life," located at the very State House from which the public policy of New Jersey is promulgated.

288. As a direct result of the tortious actions of Defendants, Plaintiff has been unlawfully deprived of his employment rights and other rights, has lost wages and benefits, and other emoluments of the position.

289. Plaintiff has sustained injury to his professional reputation and employability.

290. Plaintiff has also suffered emotional distress, financial insecurity, and loss of personal reputation due to his unlawful termination.

291. Further, Plaintiff has been compelled to retain an attorney to vindicate his rights.

**WHEREFORE** Plaintiff demands judgment jointly and severally against Defendants for reinstatement, seniority level, back pay and front pay, restoration of all seniority and all employee benefits that Plaintiff may have lost, compensatory damages for pain and suffering as well as loss of earnings and other employee benefits, damages for reputational and career development injury, consequential damages, incidental damages, punitive damages, attorney fees and costs of suit, injunctive relief requiring remediation of Defendants' retaliation and discrimination through affirmative action, and any other relief deemed by the Court to be equitable and just.

Date: December 26, 2024 By: ___________________________________

Christopher J. D'Alessandro, Esq.

**CERTIFICATION OF NO OTHER ACTIONS**

I certify that the dispute about which I am suing is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit. In addition, I recognize my continuing obligation to file and

serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

Date: December 26, 2024 ________________________________

Christopher J. D'Alessandro, Esq.

**JURY DEMAND**

The plaintiff demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35-1(a).

Date: December 26, 2024 ________________________________

Christopher J. D'Alessandro, Esq.

**CERTIFICATION PURSUANT TO RULE 1:38-7**

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:39-7(b).

Date: December 26, 2024

______________________________________

Christopher J. D'Alessandro, Esq.

**DESIGNATION OF TRIAL COUNSEL**

Christopher J. D'Alessandro, Esq. is hereby designated as trial counsel for Plaintiff William Brown Jr. in the above matter.

Dated: December 26, 2024

______________________________

Christopher J. D'Alessandro, Esq.
Donelson, D'Alessandro & Peterson, LLC
3 South Broad Street
Suite 3A
Woodbury New Jersey 08096
(856) 839-6058
chris@ddplawfirm.com
Attorneys for Plaintiff, William Brown Jr.

# Civil Case Information Statement

## Case Details: ESSEX | Civil Part Docket# L-008932-24

**Case Caption:** BROWN WILLIAM VS MCCARTER & ENGLISH L LP
**Case Initiation Date:** 12/24/2024
**Attorney Name:** CHRISTOPHER J D'ALESSANDRO
**Firm Name:** DONELSON, D'ALESSANDRO & PETERSON, LLC
**Address:** 3 S BROAD ST
WOODBURY NJ 08096
**Phone:** 8565375793
**Name of Party:** PLAINTIFF : Brown, William
**Name of Defendant's Primary Insurance Company** (if known): None

**Case Type:** WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA)
**Document Type:** Complaint with Jury Demand
**Jury Demand:** YES - 6 JURORS
**Is this a professional malpractice case?** NO
**Related cases pending:** NO
**If yes, list docket numbers:**
**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO
**Does this case involve claims related to COVID-19? NO**

**Are sexual abuse claims alleged by: William Brown? NO**

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
**If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** NO **Title 59?** NO **Consumer Fraud?** NO **Medical Debt Claim?** NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

12/24/2024
Dated

/s/ CHRISTOPHER J D'ALESSANDRO
Signed