# EXHIBIT 2

THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

*Office of the Secretary*                                                **MEMORANDUM**

DATE:        3/2/2026

TIME:        4:04PM

SUBJECT:     WILLIAM BROWN JR.

             VS THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

CASE NO:     N/A

INDEX NO:    N/A

DOCKET NO.:  ESX-L-8932-24

TYPE:        FIRST AMENDMENT COMPLAINT / SUMMONS

CC:          MEGAN LEE

I, SANDRA SAJOUS, accept this legal document on behalf of the Office of the Secretary, The Port Authority of New York and New Jersey.

**METHOD OF SERVICE:**        Personal: Tamara Jones

_____

**Signature**

PA LAW DEPARTMENT

595192

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com

February 27, 2026

**VIA PERSONAL DELIVERY BY PROFESSIONAL PROCESS SERVER,**
**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED,**
**AND VIA OVERNIGHT COURIER (FEDEX PRIORITY)**

**Office of the General Counsel**
Port Authority of New York & New Jersey
4 World Trade Center
150 Greenwich Street
New York, NY 10007
**Attn: Amy Fisher, Esq.**

AND/OR

**Office of the General Counsel**
Port Authority of New York & New Jersey
2 Montgomery Street, 3rd Floor
Jersey City, NJ 07302
**Attn: Amy Fisher, Esq**



**Re: SUPPLEMENTAL NOTICE OF CLAIM PURSUANT TO N.J.S.A. 32:1-163 & 32:1-164**
*Brown v. McCarter & English LLP et al.*, Docket No. ESX-L-8932-24
**Superior Court of New Jersey, Law Division, Essex County**

**TO THE PORT AUTHORITY OF NEW YORK & NEW JERSEY:**

Pursuant to N.J.S.A. 32:1-163 and N.J.S.A. 32:1-164, the undersigned hereby provides this Supplemental Notice of Claim against the Port Authority of New York & New Jersey ("Port Authority"), Kevin J. O'Toole (individually and in his official capacity as Chairman of the Port Authority), and Patrick Donovan (individually and in his capacity as employee and/or representative of the Port Authority).

This Supplemental Notice is served by personal delivery by professional process server, by certified mail, return receipt requested, and by overnight courier (FedEx Priority), to the Office of the General Counsel at both the Port Authority's New York office and New Jersey office, in compliance with N.J.S.A. 32:1-164, which authorizes service "by delivering same personally, or by registered mail, to the General Counsel of the Port Authority at the office of said General Counsel in the City of New York or in the State of New Jersey."

1

This Supplemental Notice is provided to supplement and confirm the Notice of Claim served on November 18, 2025, by Claimant's then-counsel, Christopher J. D'Alessandro, Esq. of Donelson, D'Alessandro & Peterson LLC, and to ensure that the Port Authority has full and complete notice of all claims asserted in the First Amended Complaint filed on February 16, 2026 in the above-referenced action.

## I. CLAIMANT INFORMATION

**Name of Claimant**: William Brown Jr., Esq.
**Post-Office Address:**
134 Main Street
South Bound Brook
New Jersey 08880
**Telephone:** (862) 415-4880
**Email:** william.brown@parlatorelawgroup.com

Claimant appears pro se in the above-referenced action.

## II. RESPONDENTS

1. The Port Authority of New York & New Jersey, a bi-state governmental agency and body corporate and politic created by compact between the States of New York and New Jersey, with offices at 4 World Trade Center, 150 Greenwich Street, New York, NY 10007, and One Port Authority Plaza, Jersey City, NJ 07306.

2. Kevin J. O'Toole, individually and in his official capacity as Chairman of the Board of Commissioners of the Port Authority of New York & New Jersey. Defendant O'Toole is also the founder and managing partner of O'Toole Scrivo, LLC, the law firm representing Defendant McCarter & English LLP in the above-referenced litigation.

3. Patrick Donovan, individually and in his capacity as the World Trade Center Site Safety Manager at the Port Authority of New York & New Jersey.

## III. NATURE OF THE CLAIMS

Claimant asserts the following claims against the Port Authority, Kevin J. O'Toole, and Patrick Donovan, as set forth in the First Amended Complaint filed February 16, 2026:

**A. Count XII — Deprivation of First Amendment Rights Under 42 U.S.C. § 1983 (First Amendment Retaliation)**

The Port Authority, acting through Chairman O'Toole and employee Donovan, retaliated against Claimant for exercising his First Amendment rights to free speech and to petition the government for redress of grievances (by filing a lawsuit against McCarter & English LLP). Defendants threatened to withdraw all Port Authority support for the Navy SEAL Foundation NYC SEAL Swim — a charity event founded and led by Claimant for seven years benefitting Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters — unless Claimant refrained from making any public statements critical of Chairman O'Toole or

2

O'Toole Scrivo, LLC. The retaliation was undertaken under color of state law and violated Claimant's clearly established constitutional rights.

### B. Count XIII — Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1983

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to deprive Claimant of his First Amendment rights through coordinated retaliatory action, including threatening to withdraw Port Authority support for the NYC SEAL Swim and causing the Navy SEAL Foundation to terminate its contract with Claimant.

### C. Count XIV — Violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2

The Port Authority, O'Toole, and Donovan deprived Claimant of his rights to freedom of speech and to petition the government for redress of grievances through threats, intimidation, and coercion — specifically, by threatening to withdraw Port Authority support and access to the World Trade Center site unless Claimant refrained from exercising his constitutional rights.

### D. Count XV — Tortious Interference with Contract

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's contractual relationship with the Navy SEAL Foundation, which compensated Claimant $40,000 annually for organizing the NYC SEAL Swim. As a direct result of the Port Authority's threats and withdrawal of support, the Navy SEAL Foundation terminated its contract with Claimant, causing him to lose $40,000 in annual income.

### E. Count XVI — Tortious Interference with Prospective Economic Advantage

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's prospective economic relationship with the Navy SEAL Foundation and participants in future NYC SEAL Swim events. The interference was malicious, unjustified, and undertaken for the improper purpose of silencing Claimant's exercise of constitutional rights and protecting McCarter & English LLP in pending litigation.

### F. Count XVII — Intentional Infliction of Emotional Distress

The Port Authority, O'Toole, and Donovan engaged in intentional, extreme, and outrageous conduct by threatening to withdraw Port Authority support for a charity event benefitting Navy SEALs, veterans, Gold Star families, and 9/11 survivors unless Claimant refrained from exercising his constitutional rights, causing Claimant to suffer severe emotional distress.

### G. Count XVIII — Civil Conspiracy

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to injure Claimant through unlawful means, including abusing the Port Authority's governmental power to deprive Claimant of his income from the Navy SEAL Foundation and to retaliate against Claimant for exercising his First Amendment rights.

3

## IV. TIME, PLACE, AND MANNER IN WHICH THE CLAIMS AROSE

### A. Background

Claimant is a decorated Navy SEAL combat veteran of the Global War on Terror who founded and served as the lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River. The event has raised nearly one million dollars over seven years for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters. The Port Authority has historically provided essential support for the event, including access to the World Trade Center site, Hudson River staging areas, and Port Authority personnel and resources.

### B. Filing of Lawsuit and Retention of O'Toole Scrivo

On December 24, 2024, Claimant filed a lawsuit against McCarter & English LLP in the Superior Court of New Jersey, Essex County, Docket No. ESX-L-8932-24, alleging employment discrimination based on veteran status. McCarter & English retained O'Toole Scrivo, LLC — founded and managed by Port Authority Chairman Kevin J. O'Toole — as defense counsel.

### C. Retaliatory Threats by Donovan

In 2025, following the filing of the lawsuit, Defendant Donovan, acting as a representative and agent of the Port Authority, sent Claimant a text message stating: "Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC."

### D. Exclusion from Planning Conference Call

In 2025, Defendant Donovan organized a conference call with all essential supporting assets for the NYC SEAL Swim — including NYPD, NJSP, and other first responder agencies — and deliberately excluded Claimant, the founder and lead organizer of the event, from the call.

### E. Navy SEAL Foundation Withdrawal

Following Defendant Donovan's threats, officials of the Port Authority informed the Navy SEAL Foundation that the Port Authority would not support the 2026 NYC SEAL Swim if Claimant participated in the event. As a direct result, the Navy SEAL Foundation terminated its contract with Claimant and withdrew from the 2026 NYC SEAL Swim.

### F. Coordination with McCarter & English

Upon information and belief, Defendant O'Toole, in his dual capacity as Port Authority Chairman and Managing Partner of O'Toole Scrivo, LLC, directed, ratified, or approved Defendant Donovan's retaliatory threats and the Port Authority's withdrawal of support, in coordination with McCarter & English LLP and its defense counsel, to suppress Claimant's exercise of constitutional rights and protect McCarter & English in the pending litigation.

4

## V. <u>ITEMS OF DAMAGES</u>

As a direct and proximate result of the conduct described above, Claimant has sustained the following damages, as far as presently practicable:

4. Loss of $40,000 in annual income from the Navy SEAL Foundation for 2026, with continuing annual losses of $40,000 in future years unless the relationship is restored or an alternative sponsor is secured.

5. Severe emotional distress, humiliation, anxiety, and mental anguish resulting from being excluded from the charity event Claimant founded and led for seven years.

6. Reputational harm and damage to Claimant's standing in the veteran community and his reputation as a veteran advocate and leader.

7. Loss of the therapeutic and charitable benefits of the NYC SEAL Swim for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters.

8. Costs and expenses incurred in seeking alternative sponsorship and mitigating damages.

9. Punitive damages for willful, wanton, and malicious conduct undertaken with reckless disregard for Claimant's constitutional rights.

10. Treble damages pursuant to N.J.S.A. 10:6-2 (New Jersey Civil Rights Act).

11. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and N.J.S.A. 10:6-2.

12. Pre-judgment and post-judgment interest at the maximum rate permitted by law.

13. Such other and further relief as the Court deems just and proper.

## VI. <u>REFERENCE TO PRIOR NOTICE AND PENDING LITIGATION</u>

This Supplemental Notice is provided to supplement the Notice of Claim served on November 18, 2025, which identified claims for deprivation of First Amendment rights under 42 U.S.C. § 1983, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress. This Supplemental Notice adds the claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (Count XIV of the First Amended Complaint), which arises from the identical facts, identical retaliatory conduct, and identical constitutional deprivations set forth in the original Notice of Claim.

A First Amended Complaint asserting all claims identified herein was filed on February 16, 2026 in the Superior Court of New Jersey, Law Division, Essex County, Docket No. ESX-L-8932-24. A copy of the First Amended Complaint is enclosed herewith.

## VERIFICATION

I, William Brown Jr., hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: March 2, 2026
/s/ William Brown
**William Brown Jr., Esq.**
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com

**Enclosures:**
1. First Amended Complaint, *Brown v. McCarter & English LLP et al.*, ESX-L-8932-24 (filed Feb. 26, 2026)

6

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com

<u>February 27, 2026</u>

**VIA PERSONAL DELIVERY BY PROFESSIONAL PROCESS SERVER,
VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED,
AND VIA OVERNIGHT COURIER (FEDEX PRIORITY)**

**Office of the General Counsel**
Port Authority of New York & New Jersey
4 World Trade Center
150 Greenwich Street
New York, NY 10007
**Attn: Amy Fisher, Esq.**

AND/OR

**Office of the General Counsel**
Port Authority of New York & New Jersey
2 Montgomery Street, 3rd Floor
Jersey City, NJ 07302
**Attn: Amy Fisher, Esq**

**Re: SUPPLEMENTAL NOTICE OF CLAIM PURSUANT TO N.J.S.A. 32:1-163 & 32:1-164**
*Brown v. McCarter & English LLP et al.*, **Docket No. ESX-L-8932-24**
**Superior Court of New Jersey, Law Division, Essex County**

**TO THE PORT AUTHORITY OF NEW YORK & NEW JERSEY:**

Pursuant to N.J.S.A. 32:1-163 and N.J.S.A. 32:1-164, the undersigned hereby provides this Supplemental Notice of Claim against the Port Authority of New York & New Jersey ("Port Authority"), Kevin J. O'Toole (individually and in his official capacity as Chairman of the Port Authority), and Patrick Donovan (individually and in his capacity as employee and/or representative of the Port Authority).

This Supplemental Notice is served by personal delivery by professional process server, by certified mail, return receipt requested, and by overnight courier (FedEx Priority), to the Office of the General Counsel at both the Port Authority's New York office and New Jersey office, in compliance with N.J.S.A. 32:1-164, which authorizes service "by delivering same personally, or by registered mail, to the General Counsel of the Port Authority at the office of said General Counsel in the City of New York or in the State of New Jersey."

1

This Supplemental Notice is provided to supplement and confirm the Notice of Claim served on November 18, 2025, by Claimant's then-counsel, Christopher J. D'Alessandro, Esq. of Donelson, D'Alessandro & Peterson LLC, and to ensure that the Port Authority has full and complete notice of all claims asserted in the First Amended Complaint filed on February 16, 2026 in the above-referenced action.

## I. CLAIMANT INFORMATION

**Name of Claimant**: William Brown Jr., Esq.
**Post-Office Address:**
134 Main Street
South Bound Brook
New Jersey 08880
**Telephone:** (862) 415-4880
**Email:** william.brown@parlatorelawgroup.com

Claimant appears pro se in the above-referenced action.

## II. RESPONDENTS

1. The Port Authority of New York & New Jersey, a bi-state governmental agency and body corporate and politic created by compact between the States of New York and New Jersey, with offices at 4 World Trade Center, 150 Greenwich Street, New York, NY 10007, and One Port Authority Plaza, Jersey City, NJ 07306.

2. Kevin J. O'Toole, individually and in his official capacity as Chairman of the Board of Commissioners of the Port Authority of New York & New Jersey. Defendant O'Toole is also the founder and managing partner of O'Toole Scrivo, LLC, the law firm representing Defendant McCarter & English LLP in the above-referenced litigation.

3. Patrick Donovan, individually and in his capacity as the World Trade Center Site Safety Manager at the Port Authority of New York & New Jersey.

## III. NATURE OF THE CLAIMS

Claimant asserts the following claims against the Port Authority, Kevin J. O'Toole, and Patrick Donovan, as set forth in the First Amended Complaint filed February 16, 2026:

**A. Count XII — Deprivation of First Amendment Rights Under 42 U.S.C. § 1983 (First Amendment Retaliation)**

The Port Authority, acting through Chairman O'Toole and employee Donovan, retaliated against Claimant for exercising his First Amendment rights to free speech and to petition the government for redress of grievances (by filing a lawsuit against McCarter & English LLP). Defendants threatened to withdraw all Port Authority support for the Navy SEAL Foundation NYC SEAL Swim — a charity event founded and led by Claimant for seven years benefitting Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters — unless Claimant refrained from making any public statements critical of Chairman O'Toole or

O'Toole Scrivo, LLC. The retaliation was undertaken under color of state law and violated Claimant's clearly established constitutional rights.

## B. Count XIII — Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1983

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to deprive Claimant of his First Amendment rights through coordinated retaliatory action, including threatening to withdraw Port Authority support for the NYC SEAL Swim and causing the Navy SEAL Foundation to terminate its contract with Claimant.

## C. Count XIV — Violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2

The Port Authority, O'Toole, and Donovan deprived Claimant of his rights to freedom of speech and to petition the government for redress of grievances through threats, intimidation, and coercion — specifically, by threatening to withdraw Port Authority support and access to the World Trade Center site unless Claimant refrained from exercising his constitutional rights.

## D. Count XV — Tortious Interference with Contract

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's contractual relationship with the Navy SEAL Foundation, which compensated Claimant $40,000 annually for organizing the NYC SEAL Swim. As a direct result of the Port Authority's threats and withdrawal of support, the Navy SEAL Foundation terminated its contract with Claimant, causing him to lose $40,000 in annual income.

## E. Count XVI — Tortious Interference with Prospective Economic Advantage

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's prospective economic relationship with the Navy SEAL Foundation and participants in future NYC SEAL Swim events. The interference was malicious, unjustified, and undertaken for the improper purpose of silencing Claimant's exercise of constitutional rights and protecting McCarter & English LLP in pending litigation.

## F. Count XVII — Intentional Infliction of Emotional Distress

The Port Authority, O'Toole, and Donovan engaged in intentional, extreme, and outrageous conduct by threatening to withdraw Port Authority support for a charity event benefitting Navy SEALs, veterans, Gold Star families, and 9/11 survivors unless Claimant refrained from exercising his constitutional rights, causing Claimant to suffer severe emotional distress.

## G. Count XVIII — Civil Conspiracy

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to injure Claimant through unlawful means, including abusing the Port Authority's governmental power to deprive Claimant of his income from the Navy SEAL Foundation and to retaliate against Claimant for exercising his First Amendment rights.

3

## IV. <u>TIME, PLACE, AND MANNER IN WHICH THE CLAIMS AROSE</u>

### A. Background

Claimant is a decorated Navy SEAL combat veteran of the Global War on Terror who founded and served as the lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River. The event has raised nearly one million dollars over seven years for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters. The Port Authority has historically provided essential support for the event, including access to the World Trade Center site, Hudson River staging areas, and Port Authority personnel and resources.

### B. Filing of Lawsuit and Retention of O'Toole Scrivo

On December 24, 2024, Claimant filed a lawsuit against McCarter & English LLP in the Superior Court of New Jersey, Essex County, Docket No. ESX-L-8932-24, alleging employment discrimination based on veteran status. McCarter & English retained O'Toole Scrivo, LLC — founded and managed by Port Authority Chairman Kevin J. O'Toole — as defense counsel.

### C. Retaliatory Threats by Donovan

In 2025, following the filing of the lawsuit, Defendant Donovan, acting as a representative and agent of the Port Authority, sent Claimant a text message stating: "Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC."

### D. Exclusion from Planning Conference Call

In 2025, Defendant Donovan organized a conference call with all essential supporting assets for the NYC SEAL Swim — including NYPD, NJSP, and other first responder agencies — and deliberately excluded Claimant, the founder and lead organizer of the event, from the call.

### E. Navy SEAL Foundation Withdrawal

Following Defendant Donovan's threats, officials of the Port Authority informed the Navy SEAL Foundation that the Port Authority would not support the 2026 NYC SEAL Swim if Claimant participated in the event. As a direct result, the Navy SEAL Foundation terminated its contract with Claimant and withdrew from the 2026 NYC SEAL Swim.

### F. Coordination with McCarter & English

Upon information and belief, Defendant O'Toole, in his dual capacity as Port Authority Chairman and Managing Partner of O'Toole Scrivo, LLC, directed, ratified, or approved Defendant Donovan's retaliatory threats and the Port Authority's withdrawal of support, in coordination with McCarter & English LLP and its defense counsel, to suppress Claimant's exercise of constitutional rights and protect McCarter & English in the pending litigation.

4

## V. <u>ITEMS OF DAMAGES</u>

As a direct and proximate result of the conduct described above, Claimant has sustained the following damages, as far as presently practicable:

4. Loss of $40,000 in annual income from the Navy SEAL Foundation for 2026, with continuing annual losses of $40,000 in future years unless the relationship is restored or an alternative sponsor is secured.

5. Severe emotional distress, humiliation, anxiety, and mental anguish resulting from being excluded from the charity event Claimant founded and led for seven years.

6. Reputational harm and damage to Claimant's standing in the veteran community and his reputation as a veteran advocate and leader.

7. Loss of the therapeutic and charitable benefits of the NYC SEAL Swim for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters.

8. Costs and expenses incurred in seeking alternative sponsorship and mitigating damages.

9. Punitive damages for willful, wanton, and malicious conduct undertaken with reckless disregard for Claimant's constitutional rights.

10. Treble damages pursuant to N.J.S.A. 10:6-2 (New Jersey Civil Rights Act).

11. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and N.J.S.A. 10:6-2.

12. Pre-judgment and post-judgment interest at the maximum rate permitted by law.

13. Such other and further relief as the Court deems just and proper.

## VI. <u>REFERENCE TO PRIOR NOTICE AND PENDING LITIGATION</u>

This Supplemental Notice is provided to supplement the Notice of Claim served on November 18, 2025, which identified claims for deprivation of First Amendment rights under 42 U.S.C. § 1983, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress. This Supplemental Notice adds the claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (Count XIV of the First Amended Complaint), which arises from the identical facts, identical retaliatory conduct, and identical constitutional deprivations set forth in the original Notice of Claim.

A First Amended Complaint asserting all claims identified herein was filed on February 16, 2026 in the Superior Court of New Jersey, Law Division, Essex County, Docket No. ESX-L-8932-24. A copy of the First Amended Complaint is enclosed herewith.

5

## VERIFICATION

I, William Brown Jr., hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: March 2, 2026
/s/ William Brown
**William Brown Jr., Esq.**
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com


**Enclosures:**
1. First Amended Complaint, *Brown v. McCarter & English LLP et al.*, ESX-L-8932-24 (filed Feb. 26, 2026)

6

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
william.brown@parlatorelawgroup.com
*Attorney for Plaintiff*

|  |  |
|---|---|
| WILLIAM BROWN Jr.,<br><br>Plaintiff,<br><br>v.<br><br>MCCARTER & ENGLISH LLP, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; KEVIN J. O'TOOLE (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), PATRICK DONOVAN (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), JOHN DOES 1-10 (FICTITIOUS INDIVIDUALS OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN).<br><br>Defendants. | Superior Court of New Jersey<br>Law Division: Civil Part<br>Essex County<br><br>Docket No.: ESX-L-8932-24 |

## SUMMONS

From The State of New Jersey To The Defendant Named Below:

### THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within **35 days** from the

1

date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within **35 days**, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.

2

A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Michelle Smith

**Michelle Smith, Clerk of the Superior Court**

Dated: March 2, 2026

**Name of Defendant to Be Served:**

**THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY**

**Addresses of Defendant to Be Served:**

**Office of the General Counsel**
Port Authority of New York and New Jersey
4 World Trade Center
150 Greenwich Street, 23rd Floor
New York, NY 10007
**Attn: Amy Fisher, Esq.**

AND/OR

**Office of the General Counsel**
Port Authority of New York & New Jersey
2 Montgomery Street, 3rd Floor
Jersey City, NJ 07302
**Attn: Amy Fisher, Esq.**

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

**Superior Court of New Jersey**
**Law Division: Civil Part**
**Essex County**

| | |
|---|---|
| WILLIAM BROWN Jr.,     Plaintiff, <br><br> v. <br><br> MCCARTER & ENGLISH LLP, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, KEVIN J. O'TOOLE (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), PATRICK DONOVAN (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), JOHN DOES 1-10 (FICTITIOUS INDIVIDUALS OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN). <br><br>         Defendants. | Docket No.: ESX-L-8932-24 <br><br> **FIRST** <br> **AMENDED COMPLAINT** |

Plaintiff, William Brown Jr. ("Plaintiff"), complaining of Defendants McCarter & English LLP, The Port Authority of New York and New Jersey, Kevin J. O'Toole ("Defendant O'Toole"), Patrick Donovan ("Defendant Donovan"), and John Does 1-10, collectively referred to hereafter as "Defendants," states as follows:

1

## PRELIMINARY STATEMENT

1. This action arises from Defendant McCarter & English LLP's systematic discrimination against, and unlawful retaliation against Plaintiff, a decorated Navy SEAL combat veteran of the Global War on Terror, in violation of federal and state law.

2. Between March 2017 and December 27, 2023, Defendant McCarter subjected Plaintiff to a hostile work environment characterized by a pattern and practice of pervasive illegal bias-based harassment and discrimination predicated on military veteran status.

3. Defendant McCarter paid Plaintiff substantially less than similarly situated non-veteran employees, excluded Plaintiff from professional development opportunities afforded to others, purposely assigned Plaintiff morally repugnant work designed to cause emotional distress to pressure Plaintiff's resignation, and ultimately terminated Plaintiff's employment in retaliation for his protected communications alleging unlawful discrimination against, and unequal pay for military veterans.

4. Following Plaintiff's unlawful termination and the filing of this lawsuit, Defendants O'Toole and Donovan engaged in coordinated retaliation against Plaintiff to suppress his exercise of constitutional rights and punish him for filing this lawsuit, resulting in the loss of Plaintiff's $40,000 annual income from the Navy SEAL Foundation. Defendant O'Toole is Port Authority Chairman and founding partner of O'Toole Scrivo, LLC, the firm representing Defendant McCarter in this litigation. Defendant Donovan is the World Trade Center Site Safety Manager at the Port Authority of New York and New Jersey.

5. On November 18, 2025, Plaintiff, through previous counsel, served a written Notice of Claim upon Defendant Port Authority pursuant to N.J.S.A. 32:1-163 and N.J.S.A. 32:1-164, addressed to the Office of the General Counsel at both the Port Authority's New

York office (4 World Trade Center, 150 Greenwich Street, New York, NY 10007) and its New Jersey office (One Port Authority Plaza, Jersey City, NJ 07306). The Notice of Claim identified the name and post-office address of the Claimant and his attorney; the nature of the claims asserted, including deprivation of First Amendment rights under 42 U.S.C. § 1983, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress; the time, place, and manner in which the claims arose; and the items of damages sustained, as far as then practicable. The statutory sixty-day waiting period required by N.J.S.A. 32:1-163 expired on January 17, 2026. This Amended Complaint is filed after expiration of the waiting period and in compliance with the Port Authority's consent-to-suit provisions set forth in N.J.S.A. 32:1-157 to -164

6. Plaintiff's Notice of Claim provided Defendant Port Authority with full notice of the factual basis, legal theories, and retaliatory conduct underlying all claims asserted in this Amended Complaint, including Plaintiff's claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 (Count XIV). The NJCRA claim arises from the identical facts, the identical retaliatory conduct, and the identical constitutional deprivations set forth in the Notice of Claim — specifically, Defendants' use of threats, intimidation, and coercion to suppress Plaintiff's exercise of his First Amendment rights to free speech and to petition the government for redress of grievances. Defendant Port Authority has suffered no prejudice, as the Notice of Claim afforded Defendant full opportunity to investigate the claims, prepare a defense, and explore settlement, thereby satisfying the purposes of the notice requirement. See *Velez v. City of Jersey City*, 180 N.J. 284, 293 (2004) (notice of claim requirements serve the purposes of investigation, defense preparation, and

3

settlement opportunity). To the extent the Notice of Claim's identification of the § 1983 claim rather than the NJCRA constitutes a technical deficiency, Plaintiff's Notice substantially complies with the statutory requirements under the five-factor test set forth in *Galik v. Clara Maass Medical Center*, 167 N.J. 341, 353 (2001): (1) Defendant Port Authority suffered no prejudice, as the NJCRA claim is factually identical to the § 1983 claim expressly noticed; (2) Plaintiff took affirmative steps to comply by serving a detailed written Notice of Claim identifying all parties, all retaliatory conduct, and all constitutional deprivations at issue; (3) the Notice generally complied with the purpose of N.J.S.A. 32:1-163 by providing Defendant with sufficient information to investigate, prepare a defense, and explore settlement; (4) Defendant received reasonable notice of the claim, as the factual and constitutional basis for the NJCRA claim was set forth in the Notice with specificity; and (5) the omission of the NJCRA label is reasonably explained by the fact that the NJCRA is the state-law analog of § 1983, both statutes protect the same constitutional rights, and the Notice expressly identified the First Amendment deprivations that form the basis of both claims.

7. This Amended Complaint asserts claims under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4335; the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -8; common law wrongful discharge in violation of public policy under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980); the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 to -50; the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 to -2; 42 U.S.C. § 1983; intentional infliction of emotional distress; the New Jersey Equal Pay Act; tortious interference with contract and prospective economic

4

advantage; breach of the implied covenant of good faith and fair dealing; and civil conspiracy.

## PARTIES

8. Plaintiff William Dennis Brown Jr. is a veteran of the Global War on Terror who honorably served the United States as a Navy SEAL in combat operations in Iraq.

9. Plaintiff is an outspoken veteran advocate with a significant social media following, a New Jersey licensed attorney in good standing, and the founder and lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River.

10. Defendant McCarter & English LLP ("McCarter" or "Defendant McCarter") is a limited liability partnership organized under the laws of the State of New Jersey, known as New Jersey's oldest law firm, with a principal place of business located at Four Gateway Center, 100 Mulberry Street, Newark, New Jersey 07102.

11. Defendant McCarter employs over 500 attorneys and staff across multiple offices and conducts substantial business in Essex County, New Jersey.

12. Defendant The Port Authority of New York and New Jersey ("Port Authority" or "Defendant Port Authority") is a bi-state governmental agency and body corporate and politic created by compact between the States of New York and New Jersey, with consent of Congress, pursuant to N.J.S.A. 32:1-1 et seq. and N.Y. Unconsol. Law §§ 6401-6425.

13. Defendant Port Authority maintains offices at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007, and conducts substantial operations in New Jersey, including at Newark Liberty International Airport, Port Newark–Elizabeth Marine Terminal, and the World Trade Center site in New York City.

14. Defendant Kevin J. O'Toole ("O'Toole" or "Defendant O'Toole") is an individual residing in New Jersey who serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey.

15. Defendant O'Toole is an individual of considerable political power, having served on the Cedar Grove, New Jersey Town Council and as Mayor, the New Jersey General Assembly (1995-2001), and the State Senate, retiring from the Senate in 2017 to begin a term as a Commissioner of Defendant Port Authority.

16. Defendant O'Toole is also the founder and managing partner of O'Toole Scrivo, LLC, a law firm based in Cedar Grove, New Jersey that represents Defendant McCarter in this litigation.

17. Defendant O'Toole is sued in his individual capacity and in his official capacity as Port Authority Chairman.

18. Defendant Patrick Donovan ("Donovan" or "Defendant Donovan") is an individual residing in New Jersey or New York, serving as the World Trade Center Site Safety Manager at the Port Authority of New York and New Jersey.

19. Defendant Donovan is sued in his individual capacity and in his official capacity as a Port Authority representative.

20. Defendants John Does 1-10 are fictitious individuals or entities, identities currently unknown, who have liability to the Plaintiff for any of the causes of action below, including currently unknown Senior Port Authority Leadership Officials who directed, ratified, or approved the retaliatory conduct alleged herein.

21. Plaintiff reserves the right to add Defendants when discovery reveals the identity of additional individuals or entities liable for damages referenced in this Complaint.

6

## JURISDICTION AND VENUE

22. The amount in controversy satisfies the Court's jurisdictional requirements.

23. The State of New Jersey has subject matter and personal jurisdiction over this controversy.

24. Venue is proper in this Court, as Defendant McCarter maintains a primary place of business located in Essex County, New Jersey.

25. Venue is proper in this Court because Defendant Port Authority is a bi-state agency of New York and New Jersey with substantial business operations in New Jersey.

26. Venue is proper in Essex County pursuant to N.J. Ct. R. 4:3-2(a)(1) because Defendant McCarter maintains its principal place of business in Essex County, New Jersey, and the primary causes of action arose in Essex County.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Military Service and Professional Background

27. Plaintiff William Brown Jr. is a decorated combat veteran who served the United States with distinction as a Navy SEAL during the Global War on Terror.

28. Navy SEALs represent the pinnacle of elite military special operations forces and are known throughout the world as consummate professionals who operate in sea, air, and land environments to accomplish mission objectives that would be impossible for conventional forces to achieve.

29. Navy SEALs undergo some of the most rigorous assessment, selection, and training processes in the history of warfare, known as among the toughest military training in the world.

7

30. The Navy SEAL Ethos, which guides all SEALs, provides in pertinent part: "We expect to lead and be led. In the absence of orders I will take charge, lead my teammates and accomplish the mission. I lead by example in all situations. I will never quit. I persevere and thrive on adversity. My Nation expects me to be physically harder and mentally stronger than my enemies. If knocked down, I will get back up, every time. I will draw on every remaining ounce of strength to protect my teammates and to accomplish our mission. I am never out of the fight."

31. Plaintiff was a Navy SEAL on active duty during the September 11, 2001 terrorist attacks on the United States, when jihadists affiliated with al-Qaeda hijacked four commercial airliners and intentionally crashed them into the World Trade Center towers and the Pentagon, killing 2,977 Americans.

32. The September 11, 2001 attacks had a profound and lasting impact on Plaintiff and the entire Navy SEAL community.

33. Plaintiff served as a Navy SEAL in Iraq during Operation Iraqi Freedom and was a first responder to two suicide bombings committed by jihadist terrorists in Baghdad's Green Zone on October 14, 2004, attacks which killed ten people and wounded dozens more.

34. Plaintiff raced down the street in an attempt to intercept a second suicide bomber but was unable to prevent the terrorist from detonating explosives in the middle of an open street bazaar, resulting in catastrophic loss of life and grievous injuries to innocent civilians.

35. Plaintiff witnessed firsthand the horrific aftermath of jihadist terrorist violence, including the screams of victims with severe burn injuries and the bloody, dismembered remains of those killed in the blasts.

36. During his military service, Plaintiff served with or knew personally Navy SEALs Brian Bill, Danny Dietz, John Faas, Jacques Fontan, Nate Hardy, Michael McGreevy Jr., Thomas Ratzlaff, and Lance Vaccaro, all of whom were subsequently killed in action by Islamist militant terrorists while serving the United States.

37. Plaintiff's experiences in combat and as a first responder to terrorist attacks have profoundly shaped his perspective on the root causes of jihadist violence and the ongoing global threat posed by violent extremism.

38. Following his honorable discharge from the Navy, Plaintiff earned his undergraduate and law degrees from Rutgers University in New Jersey.

39. Plaintiff is a licensed New Jersey attorney in good standing and has built a distinguished career as a veteran advocate, legal professional, and community leader.

40. Plaintiff founded and serves as the lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River, a large-scale, high-profile charity event that raises funds and awareness for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters.

41. Through his role organizing the NYC SEAL Swim, Plaintiff earned approximately $40,000 annually from the Navy SEAL Foundation for his services in planning, coordinating, and executing the event.

42. Plaintiff served as President of the Veteran Alumni of Rutgers University ("VARU"), the official Rutgers University veteran alumni organization, where he worked to establish internships and employment opportunities specifically for student veterans and veteran alumni.

43. Plaintiff has been recognized by NJBIZ as a veteran having a significant impact on the New Jersey business community for his leadership and advocacy on behalf of veterans.

44. Plaintiff is featured in the bestselling books *Can't Hurt Me* and *Never Finished* by David Goggins, which chronicle the experiences and achievements of elite military service members.

45. Prior to his employment with Defendant McCarter, Plaintiff was publicly known for his outspoken views on matters of public concern. Plaintiff engaged in a public debate with New Jersey Governor Chris Christie that went viral on social media, demonstrating Plaintiff's willingness to engage in public discourse on controversial issues.

46. Plaintiff maintains an active presence on social media platforms, including LinkedIn, where he shares his perspectives on issues of public concern, including veteran advocacy, national security, support for Israel, and the protection of constitutional rights.

47. Plaintiff's high-profile advocacy for veterans surrounding the facts and circumstances of this matter played a significant role in the New Jersey Legislature voting unanimously to amend the NJLAD to extend protections to veterans and active-duty service members.

48. Plaintiff organized and led a march of veterans and their families, where they held signs and rallied in support of amending the NJLAD to include veterans as a protected class.

49. Plaintiff spoke at numerous political events and veteran gatherings throughout New Jersey, urging state lawmakers to amend the NJLAD to protect veterans from employment discrimination.

50. Plaintiff sent multiple emails to every member of the New Jersey Legislature, urging them to support the amendment to the NJLAD to include veterans as a protected class.

10

51. Plaintiff made numerous social media posts on New Jersey lawmakers' social media pages, publicly advocating for the NJLAD amendment and mobilizing veteran and public support.

52. Plaintiff made social media posts and Youtube videos about this case in advocating for the amendment of NJLAD to include veterans as a protected class.

53. Plaintiff led a march with veterans that held signs that stated, **"VETERANS SAY SHAME ON MCCARTER & ENGLISH, LLP!"** **"NJ Lawmakers Stop! TREATING VETERANS LIKE SECOND CLASS CITIZENS Amend NJLAD & Include Veterans as a Protected Class"** **"NJ Lawmakers DO THE RIGHT THING! Amend NJLAD & Include Veterans as a Protected Class"** **"Assembly Speaker Coughlin Do Right by Veterans & Stop Sitting on A5048"** **"Senate President Scutari Do Right by Veterans & Stop Sitting on SC3800"**

54. Plaintiff posted YouTube videos of his veteran advocacy and the Veterans March supporting New Jersey Lawmakers amending NJLAD to include veterans as a protected class the social media pages for NJ Lawmakers. A true and correct copy of the Plaintiff's veteran march and advocacy signs mentioning **Defendant McCarter** and depicting and mentioning **NJ Assembly Speaker Coughlin and NJ Senate President Scutari** are reproduced below:





ESX-L-008932-24    02/26/2026 5:29:45 PM    Pg 14 of 119    Trans ID: LCV2026479395









55. After Plaintiff and NJ Gold Star Mom Amy Moore met with Senator Troy Singleton, he became a co-sponsor of S.3800 the next day. A true and correct picture of Plaintiff meeting with NJ Gold Star Mom Amy Moore met with Senator Troy Singleton are reproduced below:



56. Plaintiff was the leading veterans advocate in New Jersey for the amendment of the NJLAD to include veterans as a protected class. Plaintiff's advocacy was the primary driving force behind the Legislature's decision to introduce and pass S.3800/A.5048.

57. In addition to organizing marches, speaking at events, and sending emails to every member of the Legislature, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, meeting with them individually and by telephone to advocate for the NJLAD amendment and to discuss the discrimination he experienced at Defendant McCarter.

58. During these personal communications, Plaintiff provided his case against Defendant McCarter as a specific example of the employment discrimination that necessitated amending the NJLAD to protect veterans. Many New Jersey legislators and their staff were aware of Plaintiff's pending lawsuit against Defendant McCarter and the facts underlying his claims of veteran discrimination.

59. The Legislature's unanimous passage of S.3800 (Senate 37-0, Assembly 71-0) with knowledge of Plaintiff's pending case demonstrates legislative intent to remedy the type of ongoing discrimination that prompted the amendment, including the discrimination alleged in this Complaint.

60. The amendment to the NJLAD extending protection to veterans was signed into law by Governor Phillip Murphy on January 20, 2026, and is now the law of New Jersey.

## II. Defendant McCarter's Hiring of Plaintiff and Discriminatory Employment Practices

## (2017-2023)

61. In March 2017, Defendant McCarter hired Plaintiff as a Career Staff Associate assigned to the firm's Bankruptcy, Restructuring & Litigation Group ("Bankruptcy Group").

62. At the time Defendant McCarter hired Plaintiff, Defendant was aware that Plaintiff was a former Navy SEAL, a combat veteran of the Iraq War, an outspoken advocate for veterans' rights, and an individual with strongly held views on matters of public concern.

63. Defendant McCarter was also aware that Plaintiff maintained an active social media presence and had previously engaged in public advocacy and debate on controversial issues.

64. When Plaintiff was hired, Defendant McCarter did not have a social media policy governing employees' personal social media use. Defendant accepted and encouraged Plaintiff's social media activity, with Dr. Maria Laccotripe Zacharakis, Defendant's Boston Office Managing Partner, specifically requesting that Plaintiff identify himself as a McCarter attorney on his LinkedIn profile to assist with business development.

65. The position of Career Staff Associate to which Plaintiff was assigned was distinct from the position of "regular Associate" at Defendant McCarter.

66. Despite performing substantially similar work as regular Associates—and in some cases performing work at the level of equity partners—Plaintiff was compensated at a rate substantially lower than regular Associates.

67. In 2023, after six years of employment with Defendant McCarter, Plaintiff's base salary was $100,000 (increased to $115,000 following his December 14, 2023 annual review), whereas the base salary for a first-year Associate at Defendant's firm was $170,000—a

20

disparity of $55,000 to $70,000 per year for substantially similar work requiring similar skill, effort, and responsibility.

68. Defendant McCarter hired other non-veteran employees in positions like Plaintiff's Career Associate or Staff Attorney role and promoted several of those non-veteran employees to regular Associate positions and to Special Counsel with commensurate increases in compensation and benefits.

69. Defendant McCarter promoted multiple non-veteran Staff Attorney's to regular Associate and Special Counsel positions and hired Associates after Plaintiff with less experience and lower performance evaluation scores.

70. Defendant McCarter did not promote Plaintiff to a regular Associate position or provide him with equal compensation because of his status as a military veteran, his outspoken advocacy for veterans' rights, and his willingness to express views that conflicted with the political ideology favored by Defendant McCarter's leadership.

71. Defendant McCarter's discriminatory compensation practices violated USERRA's prohibition on denying any "benefit of employment" to a person based on past military service.

72. Throughout Plaintiff's employment, Defendant McCarter's leadership actively promoted controversial progressive political causes through firm-wide communications, including support for Black Lives Matter, Critical Race Theory, narratives of systemic racism, and gender fluidity. Defendant did not restrict or discourage employees from expressing views aligned with these political positions on social media or otherwise.

73. Defendant McCarter publicly promoted the Black Lives Matter movement through its official Social Justice Project, including on its website and social media platforms. A true

21

and correct copy of Defendant McCarter's promotion of Black Lives Matter is reproduced below:



McCarter's Social Justice Project |
McCarter & English, LLP

74. Black Lives Matter is a controversial political movement that was associated with protests resulting in multiple deaths, arson, vandalism, looting, and approximately $2 billion in insured damages nationally. Despite the controversial nature of this political advocacy, Defendant McCarter promoted it publicly and did not discipline any employee or partner for supporting or promoting Black Lives Matter on social media.

75. Defendant McCarter's willingness to publicly promote controversial progressive political causes while terminating Plaintiff for expressing his perspective as a combat veteran on matters of public concern demonstrates that Defendant's social media policy was enforced based on viewpoint discrimination, not content-neutral standards.

22

76. Defendant McCarter's selective enforcement of its workplace conduct standards is further demonstrated by the fact that Lubertazzi, the Chairman of Defendant McCarter's Executive Committee, sent emails to senior firm attorneys making light of one attorney urinating on another at a firm-sponsored cabin retreat. Lubertazzi's email referred to the incident as a "Golden Shower," yet faced no disciplinary action whatsoever. Defendant McCarter's willingness to tolerate crude and degrading communications from its most senior leadership while terminating Plaintiff for a thoughtful LinkedIn post about jihadist violence based on his combat experience confirms that Defendant's social media policy was enforced based on viewpoint discrimination, not content-neutral standards.

77. Crude behavior from leadership was tolerated; veteran advocacy was punished.

78. Defendant McCarter did not begin harassing Plaintiff about his social media posts until Plaintiff's posts began questioning the reasoning behind the progressive political ideology that Defendant's leadership promoted. This demonstrates that Defendant's enforcement of its social media policy was based on viewpoint discrimination— punishing employees whose views conflicted with management's preferred ideology— not content-neutral application of workplace rules.

## III. Pattern of Harassment and Hostile Work Environment Based on Plaintiff's Veteran Status (2019-2023)

79. Acts occurring before December 27, 2021 are time-barred as standalone claims under CEPA's one-year statute of limitations (N.J.S.A. 34:19-5), and acts occurring before December 27, 2022 are time-barred as standalone claims under Pierce and NJLAD's two-year statutes of limitations. However, the following acts are alleged as pattern evidence and background facts demonstrating Defendant's discriminatory animus and are

23

admissible under the continuing violation doctrine. USERRA has no statute of limitations, and all acts alleged herein are timely for USERRA claims.

**A. "How Many People Have You Killed?" (2019)**

80. In 2019, Defendant McCarter's Equity Partner Ward C. Laracy ("Laracy"), a member of the firm's Tax Group, approached Plaintiff in an elevator at Defendant's Newark office and asked Plaintiff, without provocation or context, "How many people have you killed?"

81. Laracy's question was a bias-based, discriminatory comment directed at Plaintiff because of his status as a combat veteran and Navy SEAL.

82. Plaintiff was deeply offended by Laracy's insensitive, unprofessional, and discriminatory question, which reduced Plaintiff's honorable military service to a crude stereotype of veterans as "killers."

83. Plaintiff responded that he was a combat veteran, proud of his military service, and had honorably served the United States.

84. Later that same day, Laracy returned to Plaintiff's office and apologized, stating that he had been "out of line" when he asked Plaintiff how many people he had killed.

85. In 2020, Laracy made a $1,000 donation to the NYC SEAL Swim, the charity event founded and organized by Plaintiff.

86. Laracy's discriminatory remark led Plaintiff to reasonably believe that instead of being respected as an individual who had honorably served the nation in time of war, he was feared, loathed, and discounted by Defendant McCarter's leadership as a mere "killer."

**B. Sexual Harassment by Equity Partner (2019)**

87. In 2019, Defendant McCarter's Equity Partner Mark A. Daniele ("Daniele"), the immediate past Practice Group Leader for Defendant's Tax Group and a former member

24

of the firm's Executive Committee, sexually harassed Plaintiff based on his status as a veteran.

88. During the winter months of 2019, Plaintiff attended a complimentary dinner provided by Defendant McCarter to attorneys working past 7:00 p.m. at the Newark office.

89. While Plaintiff was at the buffet, Daniele approached Plaintiff from behind, grabbed Plaintiff's waist without consent, and stated words to the effect of "you can afford to eat all this because you're a strong healthy man."

90. It was clear Daniele was referring to Plaintiff's physical appearance within the context of Plaintiff's status as a Navy SEAL veteran.

91. Daniele's unwanted physical contact and sexually suggestive comment constituted sexual harassment in violation of Defendant McCarter's policies and New Jersey law.

92. Plaintiff reported Daniele's sexual harassment to a Partner and an Associate at Defendant McCarter.

93. Defendant McCarter took no meaningful disciplinary action against Daniele in response to Plaintiff's complaint.

94. Plaintiff reasonably believed that if he attended future evening dinners at Defendant's Newark office, he would be subjected to further sexual harassment by Daniele.

95. As a result, Plaintiff declined to attend the complimentary dinners thereafter as a reasonable measure to avoid further harassment from Daniele.

96. This benefit of employment—complimentary meals for attorneys working late—was effectively denied to Plaintiff by Daniele's sexually harassing conduct and Defendant McCarter's failure to take corrective action.

## C. Mockery of Military Service and Exposure to Racial Remarks at Cabin Retreats (2019-2023)

97. Joseph Lubertazzi Jr. ("Lubertazzi") is the Chairman of Defendant McCarter's Executive Committee, an Equity Partner, and the former Practice Group Chair of the Bankruptcy Group.

98. Lubertazzi organized annual cabin retreats for members of the Bankruptcy Group and other attorneys at Defendant McCarter.

99. To Plaintiff's knowledge, Plaintiff was the only veteran who attended Lubertazzi's cabin retreats.

100. During these cabin retreats, Plaintiff was exposed to racial remarks and other wildly inappropriate behavior by Defendant McCarter's senior attorneys, including conduct best described as alcohol-fueled events replete with behavior one would expect from stereotypical depictions of fraternity parties.

101. At least one attendee at Lubertazzi's cabin made racial remarks, and upon information and belief Lubertazzi never took any disciplinary action, internal or external, against any of Defendant McCarter's attorneys for their conduct at his cabin.

102. Following one such cabin retreat, Lubertazzi made light of an incident in which one McCarter attorney urinated on another McCarter attorney, referring to the incident as a "Golden Shower."

103. Lubertazzi's "Golden Shower" email was sent to senior attorneys at Defendant McCarter, yet Lubertazzi faced no disciplinary action, no reprimand, and no consequences of any kind for sending an email making light of one attorney urinating on another at a firm-sponsored event.

104.     The tolerance of Lubertazzi's "Golden Shower" email — sent by the Chairman of Defendant McCarter's Executive Committee — while Plaintiff was subsequently terminated for a LinkedIn post sharing his perspective as a combat veteran, demonstrates the pervasive double standard and selective enforcement that characterized Defendant McCarter's workplace. Defendant McCarter tolerated crude, offensive, and degrading communications from its most senior leadership while punishing Plaintiff for exercising his right to share his lived experiences as a Navy SEAL.

105.     Following one such cabin retreat, Lubertazzi sent an email to attendees, including senior members of Defendant McCarter, in which he made a mockery of Plaintiff's military service by referring to hearing "War Stories" at the cabin.

106.     Plaintiff had never disclosed to Lubertazzi or any of the attorneys attending Lubertazzi's cabin retreats any information regarding his military service in Iraq or his combat experiences.

107.     Lubertazzi's reference to "War Stories" in an email copied to senior members of Defendant McCarter was a derogatory, bias-based adverse employment action directed at Plaintiff because of his veteran status, reflecting Lubertazzi's bias-based perception of veterans.

108.     Lubertazzi's email ridiculing Plaintiff's military service, coming from the top of Defendant McCarter's leadership, led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

27

**D. Systematic Exclusion from Diversity, Equity & Inclusion Initiatives (2019-2023)**

109.     Throughout Plaintiff's six-year tenure with Defendant McCarter, Defendant's Diversity, Equity & Inclusion Committee ("DEI Committee") organized and hosted an annual Diversity Retreat for diverse attorneys and summer interns.

110.     Despite Plaintiff's status as a military veteran—a federally protected class that is severely underrepresented in the legal profession and constitutes a tiny minority at Defendant McCarter—Defendant excluded Plaintiff from the annual Diversity Retreat for all six years of his employment. As of January 20, 2026, veterans have been added as a protected class under the NJLAD.

111.     According to 2019 statistics, veterans constitute only 1.67% of the attorney workforce in law firms of 251 or more attorneys.

112.     In New Jersey, less than one percent of one percent of the population serves in the military.

113.     The majority of New Jersey's veteran population consists of Vietnam-era veterans and a rapidly declining population of veterans from earlier conflicts, including the Korean War and World War II.

114.     Consequently, there are few judges, partners, attorneys, and law professors in the New Jersey legal field who have served in the Armed Forces of the United States.

115.     Veterans constitute a tiny minority in the legal profession generally and an even smaller minority in New Jersey based on the state's exceptionally low population of active-duty service members and veterans.

28

116.     Defendant McCarter employed over 500 attorneys and staff during Plaintiff's tenure, and Plaintiff was the only Global War on Terror ("GWOT") combat veteran employed by Defendant McCarter of whom he was aware.

117.     Defendant McCarter's intentional and systematic exclusion of Plaintiff from the annual Diversity Retreats for six consecutive years was a bias-based, discriminatory adverse employment action that disregarded Plaintiff's status as a veteran and a minority in Defendant's workplace.

118.     Defendant McCarter's exclusion of Plaintiff from diversity initiatives signaled to Plaintiff that Defendant devalued his lived experiences as a military combat veteran and disregarded Plaintiff's extensive history of successful veteran advocacy.

119.     A true and correct copy of Defendant McCarter's LinkedIn post promoting its annual Diverse Attorney Retreat — from which Plaintiff was excluded for all six years of his employment — together with Plaintiff's comment requesting inclusion of veteran attorneys, is reproduced below:



McCarter attorneys and summer interns gathered in Philadelphia for our annual Diverse Attorney Retreat hosted by the firm's Diversity, Equity & Inclusion Committee. We connected with old and new colleagues, discussed our practices, business and professional development and pro bono opportunities, and had a great Q&A with firm leadership. #diversity #dei #retreat #diversityandinclusion



Reactions



     

 Like   Comment   Repost   Send



Most relevant ▼

**William Brown** · LL.M. · 1st

The McCarter Diversity, Equity & Inclusion Committee didn't invite veteran attorneys to their annual retreat. Maybe next time they'll consider including veteran attorneys at the firm because we're far underrepresented in all aspects of the legal community and could use the support. us



**Gerald H. Clark, Esq.** · 2nd

What is a diverse attorney? And are non-diverse attorneys not welcome?



120.    Plaintiff's exclusion from Defendant McCarter's Diversity Retreats led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

**E. Defendant McCarter's Participation in Mansfield Certification and Exclusion of Veterans from DEI Metrics (2017-2023)**

121.    During Plaintiff's employment, Defendant McCarter participated in the Mansfield Certification program, a diversity initiative created and administered by Diversity Lab, a for-profit DEI consultancy business.

122.    On January 30, 2026, Federal Trade Commission Chairman Andrew N. Ferguson issued warning letters to 42 law firms, including Defendant McCarter, regarding potentially unfair and anticompetitive employment practices related to their participation in the Mansfield Certification program.

123.    The FTC's warning letter stated that the Mansfield Certification program requires participating law firms to agree to follow certain DEI-based employment standards, and that public information suggests participating firms meet regularly with Diversity Lab and their competitor law firms to discuss common implementation of Diversity Lab's criteria.

124.    According to the FTC, the 42 law firms that received warning letters collectively employ over 50,000 attorneys subject to Diversity Lab's criteria.

125.    The FTC warned that "potentially anticompetitive collusion between law firms on DEI metrics can include quotas by which they agree to compose panels of job candidates based on race, sex, or other personal characteristics other than the candidate's merit, or

by which law firms agree to make final decisions about hiring and promotions based on those personal characteristics."

126.    The Mansfield Certification program requires participating law firms to ensure that talent pools for promotions and leadership opportunities comprise at least 30% "underrepresented" racial and other groups.

127.    Upon information and belief, Defendant McCarter's participation in the Mansfield Certification program and its focus on specific demographic categories for diversity initiatives did not include military veterans as a targeted or measured group, despite veterans being a protected class under USERRA at the time of Plaintiff's employment.

128.    Upon information and belief, Defendant McCarter's systematic exclusion of Plaintiff from diversity initiatives, despite his status as a severely underrepresented military veteran, was consistent with Defendant's participation in the Mansfield Certification program, which did not prioritize or measure veteran representation.

129.    The systematic exclusion of veterans from Defendant McCarter's DEI initiatives, while the firm participated in a program focused on other demographic categories, constituted discriminatory treatment based on Plaintiff's veteran status.

**F. Discriminatory Response to Plaintiff's Advocacy Regarding September 11 Remembrance (October 2022)**

130.    Throughout September and October 2022, Defendant McCarter's DEI Committee sent numerous firm-wide emails promoting, celebrating, and commemorating various causes and historical events.

131.    On September 11, 2022, the twenty-first anniversary of the September 11, 2001 terrorist attacks, Defendant McCarter failed to send any firm-wide email honoring or remembering those who lost their lives in the attacks.

132.    On October 5, 2022, Plaintiff sent a reply email to the DEI Committee's firm-wide email address regarding LGBT History Month, inquiring why Defendant had not sent an email honoring and remembering those lost during the September 11 attacks and asking whether there were any veterans serving on the DEI Committee.

133.    After receiving no response for five days, Plaintiff sent a follow-up email on October 10, 2022, to the DEI Committee, copying all DEI Committee members individually, including Joseph T. Boccassini ("Boccassini"), Defendant McCarter's Firmwide Managing Partner; Judge (Retired) Jose L. Linares ("Linares"), an Equity Partner and former United States District Judge; Guillermo C. Artiles ("Artiles"), an Equity Partner and Chair of the Government Affairs Practice Group; Judge Natalie S. Watson ("Watson"), then an Equity Partner and now a Superior Court Judge; Alexander W. Major ("Major"), an Equity Partner and Co-Chair of the Government Contracts & Global Trade Practice Group; and Mary Gabriel ("Gabriel"), Defendant McCarter's Firmwide Deputy Managing Partner. A true and correct copy of Plaintiff's email to the DEI Committee is attached hereto as **Exhibit A**.

134.    In the follow-up email, Plaintiff stated, "the Firm sent the wrong message by not sending out an email honoring and remembering those lost on 9/11" and again requested to represent veterans on Defendant's DEI Committee and Social Justice Project.

135.    Watson, a member of Defendant's DEI Committee, a well-known LGBTQIA+ advocate, and a board member of the New Jersey Garden State Equality Organization —

33

New Jersey's largest and most prominent LGBTQ+ advocacy organization, sent Plaintiff a derogatory email alleging that Plaintiff was homophobic.

136.     Watson, a member of Defendant's DEI Committee and a well-known LGBTQIA+ advocate, responded to Plaintiff's email with a lengthy reply copied to all DEI Committee members in which she insinuated that Plaintiff's inquiry about 9/11 remembrance was motivated by anti-LGBTQ+ bias.

137.     Watson stated: "I'm a little confused as to why you are writing in October about the posts honoring 9/11, in response to our LGBTQA history acknowledgement" and that "your email timing certainly sends a message to me, as one of the few out attorneys at the firm."

138.     Watson's statement that Plaintiff's "email timing certainly sends a message to me, as one of the few out attorneys at the firm" was a clear insinuation — made publicly to all DEI Committee members — that Plaintiff's inquiry about honoring those lost on 9/11 was motivated by homophobia rather than by his genuine concern as a Navy SEAL who was on active duty during the September 11, 2001 attacks.

139.     Watson further stated that she "take[s] umbrage" with Plaintiff's email and questioned why Plaintiff chose to raise the 9/11 issue "in response to our LGBTQA history acknowledgement (versus directing this to our Firm leadership)" — further implying that Plaintiff's email was an attack on LGBTQ+ recognition rather than a legitimate request for veteran inclusion

140.     Watson's baseless insinuation that Plaintiff was homophobic was an adverse allegation made by a McCarter Equity Partner and leader in the firm's DEI Committee,

34

copied to all DEI Committee members, and had the potential to destroy Plaintiff's legal career and professional reputation.

141.    Watson's accusation was based on nothing more than Plaintiff's status as a veteran and Navy SEAL who had reasonably questioned why Defendant McCarter had not sent an email honoring those lost in the September 11 terrorist attacks — an event that profoundly impacted Plaintiff's life and the lives of his fellow Navy SEALs.

142.    Plaintiff responded to Watson's email on the same day with a professional, respectful reply in which he explicitly stated: "I have no issues with how consenting adults love and care for each other. I understand our nation has come along way and also respect and admire those who advocate for positive change. In South Jersey, I once swam along the Cooper River directly alongside a Gay Rights Parade to show my support. Many noticed the Navy SEAL swimming alongside."

143.    Plaintiff's response demonstrates that Watson's insinuation of homophobia was entirely baseless. Plaintiff had publicly demonstrated his support for LGBTQ+ rights by physically swimming alongside a Gay Rights Parade — an act of visible, public solidarity that directly contradicts Watson's accusation.

144.    Despite Plaintiff's professional, respectful, and explicitly pro-LGBTQ+ response, Watson's public insinuation of homophobia — made to all DEI Committee members — was never retracted or corrected by Watson or by Defendant McCarter.

145.    Watson's insinuation of homophobia carried particular weight and credibility given her status as a board member of the New Jersey Garden State Equality Organization, New Jersey's largest and most prominent LGBTQ+ advocacy organization. An accusation of homophobia from a person of Watson's stature in the LGBTQ+

35

advocacy community — made publicly to all DEI Committee members — had the potential to cause catastrophic and irreparable damage to Plaintiff's professional reputation and career.

146.      Watson knew or should have known that an insinuation of homophobia from a board member of Garden State Equality, directed at a colleague who had simply asked why the firm did not honor those lost on 9/11, would carry devastating weight and could destroy Plaintiff's reputation in the legal community. Watson's reckless use of her position and credibility as an LGBTQ+ advocate to baselessly accuse a Navy SEAL combat veteran of homophobia was an act of bias-based harassment predicated on Plaintiff's veteran status.



147.      Watson's accusation of homophobia was particularly egregious given that Defendant McCarter officially promoted and celebrated Watson's LGBTQ+ advocacy through the firm's Pride Month programming, while simultaneously punishing Plaintiff's veteran advocacy. A true and correct copy of the email exchange between Plaintiff and

36

Watson is attached hereto as **Exhibit A** (incorporated with the existing LGBT History Month email chain).

148.    Defendant McCarter's willingness to officially promote and celebrate Watson's advocacy for the LGBTQ+ community while punishing Plaintiff for advocating for veterans — and allowing Watson to baselessly accuse Plaintiff of homophobia for simply asking why the firm did not honor those lost on September 11 — demonstrates the institutional double standard and viewpoint discrimination that pervaded Defendant's workplace

149.    Watson's baseless insinuation that Plaintiff was homophobic was an adverse allegation made by a McCarter Partner and leader in the firm's DEI Committee and had the potential to destroy Plaintiff's legal career.

150.    Watson's comment was based on nothing more than Plaintiff's status as a veteran and Navy SEAL who had reasonably questioned why Defendant McCarter had not sent an email honoring those lost in the September 11, 2001 terrorist attacks.

151.    Lubertazzi subsequently berated Plaintiff for sending the firm-wide email regarding the September 11 attacks, for stating that the firm was not doing right by veterans, and for requesting a seat on the firm's DEI Committee/Social Justice Project.

152.    Lubertazzi told Plaintiff he "didn't know what he was talking about," justified Defendant McCarter's failure to commemorate September 11 by praising the firm's pro bono program for veterans and stated that "the Firm doesn't have to send out an email to acknowledge the 9/11 attacks."

153.     Lubertazzi's comments were intended to discourage Plaintiff from advocating for veterans and reserve component service members within Defendant's workplace, by marginalizing Plaintiff's veteran status.

154.     Lubertazzi and Watson's discriminatory response to Plaintiff's reasonable inquiry and their rejection of his request to represent veterans on the DEI Committee/Social Justice Project constituted severe and pervasive bias-based discrimination predicated on Plaintiff's status as a veteran. All other protected classes had representation on Defendant McCarter's DEI Committee/Social Justice Project, except veterans.

155.     The message sent by Defendant McCarter by excluding Plaintiff from DEI/Social Justice activities was that veterans are a second-class protected class and unworthy of such participation.

156.     These actions led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

**G. Discriminatory Refusal to Provide Professional Courtesy to Fellow Navy SEAL (September 2022)**

157.     In September 2022, Plaintiff received a phone call from fellow Navy SEAL Shannon Rusch ("Rusch"), who informed Plaintiff that he and his son had been contacted by the Federal Bureau of Investigation ("FBI") regarding their exercise of First Amendment rights to free assembly and free speech at the January 6, 2021 protest in Washington, D.C.

38

158. Plaintiff informed Rusch that federal criminal defense was outside Plaintiff's area of legal expertise, but that Defendant employed several former federal and state prosecutors who might be able to recommend a competent-defense attorney.

159. Throughout Plaintiff's six years of employment at Defendant McCarter, Plaintiff was copied on emails from attorneys at Defendant McCarter seeking recommendations for attorneys for clients, colleagues, family members, and friends — a common professional courtesy within the legal profession.

160. On or around September 27, 2022, Plaintiff sent an email to Defendant's Partners Robert A. Mintz ("Mintz"), Newark Office Managing Partner and a member of Defendant's Social Justice Project, and Geoffrey Rosemond ("Rosemond"), Chair of the Business Litigation Practice and a former Assistant Prosecutor, requesting recommendations for defense attorneys for Rusch and his son.

161. Mintz responded to Plaintiff's email and suggested that Plaintiff contact Major for a possible recommendation.

162. Plaintiff found Mintz's suggestion extremely odd because Major was not a former prosecutor, and his law practice focused on cybersecurity liability, not criminal or civil defense.

163. On or around September 27, 2022, Plaintiff sent an email to Major, a member of Defendant's DEI Committee and Social Justice Project, explaining that Rusch was a friend and former Navy SEAL and that he and his son were seeking a recommendation for a defense attorney after being contacted by the FBI regarding their participation in the January 6 protest in Washington, D.C.

164. Major refused to provide even a referral to a defense attorney for Rusch and his son.

165. Major responded to Plaintiff's request with sanctimonious disdain, stating: "Going to shoot straight. I've lived under oaths my entire adult life, and none is more sacrosanct than my oath to serve. But I'll leave my emotions out of it and simply say I have no interest in providing any assistance."

166. Major's refusal to extend basic professional courtesy to Plaintiff by providing a referral for a fellow Navy SEAL veteran did not align with accepted norms of professional courtesy expected within the legal profession.

167. Major's conduct was particularly hypocritical given that Defendant McCarter represented the Archdiocese of Newark in defense of allegations of child sexual abuse — a representation that Major apparently found consistent with his professed values.

168. Major's refusal to provide Plaintiff, a veteran, with a referral for a fellow veteran in need of a defense attorney was an act of bias-based harassment predicated on Plaintiff's veteran status.

169. Major's bias-based, discriminatory refusal to assist Plaintiff contributed to the severe and pervasive pattern of bias-based adverse employment actions directed at Plaintiff, leading Plaintiff to the reasonable belief that the workplace had become hostile and that the terms and conditions of his employment had been irrevocably altered.

**H. Discriminatory Application of Defendant's Social Media Policies (December 2022)**

170.     On or around December 7, 2022, Plaintiff attended oral arguments before a three-judge panel of the United States Court of Appeals for the Third Circuit at the Federal District Courthouse in Newark, New Jersey.

171.     Plaintiff was the first attorney to participate in a question-and-answer session with three Third Circuit Appellate Judges following oral arguments.

172.     Plaintiff, a GWOT combat veteran and attorney, identified with the paintings in the Newark Federal Courthouse depicting American Revolutionary War veterans and attorneys signing the United States Constitution.

173.     On or around December 7, 2022, Plaintiff made a post on LinkedIn memorializing his visit to the Third Circuit Court of Appeals and his experience observing oral arguments.

174.     The following morning, Defendant's Equity Partner William D. Wallach ("Wallach"), a member of the Bankruptcy Group and supervisor of Kevin O'Toole Jr. (the son of Defendant Kevin O'Toole, Chairman of the Port Authority), approached Plaintiff and stated that Plaintiff's LinkedIn post was "offensive to the Court."

175.     Wallach stated that he and Plaintiff had been "guests" in the Federal Courtroom and that Plaintiff should not have taken pictures of the courtroom or made the LinkedIn post.

176.     Wallach requested that Plaintiff remove the LinkedIn post. A true and correct copy of Plaintiff's LinkedIn post is reproduced below, and the underlying email chain is attached hereto as **Exhibit B**

41

 **Bill Brown** is at Federal District Court, District of New Jersey, Newark Vicinage

17h · Newark · 👥

I had the privilege of observing Third Circuit oral arguments in Newark today. The Courtroom was beautiful and I enjoyed seeing paintings of Paul Revere and the signatories of the Constitution (all who put their lives at risk for thier beliefs and possessed a Lacedonian and Athenian combination to encroachments on their freedoms). It was very insightful to hear oral arguments from four outstanding attorneys (all masters in the art of persuasion). There's no doubt I plan on using a few of their techniques I picked up in a speech I'll be giving in Philadelphia this Thursday (my little persuasive laboratory experiment). I also pounced on the opportunity during an open q&a to ask the three Judge panel (Schwartz, Matey, and Fuentes) a few questions regarding the affect of judicial assignments on oral arguments and on projected evaluations regarding case outcomes based on inquisitive questions from the bench during oral arguments. My big take aways from this experience is that the best strategy during oral arguments is to know your position, answer the Judge's questions directly, and open with your strongest position.



42

177.    Wallach's request was a bias-based, discriminatory adverse employment action directed at Plaintiff because of his veteran status, as the post expressed Plaintiff's admiration for the signatories of the U.S. Constitution, many of whom were veterans who had risked their lives for the nation's freedoms.

178.    On the same day that Wallach directed Plaintiff to remove his LinkedIn post, Artiles made a LinkedIn post depicting the exact same Newark Federal Courtroom, featuring a photograph of Third Circuit Appellate Judge Patty Shwartz.

179.    Neither Wallach nor any other Partner at Defendant McCarter requested Artiles remove his LinkedIn post. A true and correct copy of Artiles LinkedIn post is reproduced below:



180. Artiles's LinkedIn post was "liked" by many Partners at Defendant's firm.

181. Plaintiff reasonably concluded that Defendant afforded Artiles, a well-known politically connected, non-veteran, Delegate/Co-Chair for President Joe Biden, former counsel for Governor Phil Murphy, and the son-in-law of a retired Federal District Judge, greater rights to express his opinions on LinkedIn than Plaintiff, a combat veteran of the GWOT and Navy SEAL.

182. Wallach's inconsistent application of Defendant's social media policy was an act of illegal, bias-based harassment against Plaintiff based on military veteran status.

183. This act of bias-based harassment and disparate treatment by Wallach, a senior leader, led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

184. Defendant's selective enforcement of its social media policy based on whether employees' views aligned with management's political ideology violated USERRA's prohibition on denying benefits of employment based on veteran status, as Plaintiff's willingness to express views that conflicted with Defendant's preferred ideology was directly connected to his experiences and perspective as a Navy SEAL combat veteran.

**I. Discriminatory Disinvitation from Rutgers Law School Event (February 2023)**

185. In February 2023, Elizabeth Acevedo ("Acevedo"), Assistant Dean for Career Development at Rutgers Law School, sent Plaintiff an email inviting him to attend the Rutgers Law School Annual Law Firm Night scheduled for March 30, 2023.

44

186.     Acevedo extended this invitation to Plaintiff based on their professional relationship, which Plaintiff had cultivated in his capacity as President of VARU while working to establish internships and employment opportunities specifically for veteran students and alumni at Rutgers Law School.

187.     On February 8, 2023, Plaintiff sent a reply email to Acevedo, copying Defendant McCarter's Equity Partner Sheila E. Calello ("Calello"), Chair of the Bankruptcy Group and a member of Defendant's Social Justice Project, confirming that he was "happy to attend the Rutgers Law School annual Law Firm Night" and offering to recruit other McCarter colleagues to attend.

188.     On or around February 14, 2023, Acevedo sent an email to Artiles in which she expressed concern that she had upset Sandra Cummins and Christine A. Lydon ("Lydon"), Defendant McCarter's Chief Human Resources Officer and a member of the DEI Committee, by inviting Plaintiff to the Rutgers Law School Annual Law Firm Night.

189.     Acevedo sought Artiles's advice on the matter, stating that she "very much valued" his perspective.

190.     Artiles, who is a member of Defendant's DEI Committee, a member of Defendant's Social Justice Project, a Delegate/Co-Chair for President Joe Biden, former counsel for New Jersey Governor Phil Murphy, an Adjunct Professor at Rutgers Law School, and the son-in-law of Linares, responded to Acevedo via email that she had "nothing to worry about."

191.     On or around February 20, 2023, Plaintiff received an unexpected and concerning email from Acevedo in which she informed Plaintiff that Rutgers Law School was

45

disinviting him from the Rutgers Law School Annual Law Firm Night. A true and correct copy of the email chain regarding the disinvitation is attached hereto as **Exhibit C**.

192. Acevedo explained in her email that she was contacted by Defendant McCarter's HR Department, and that Defendant's recruitment department had expressed "a preference for sending the formal invite to your Chief Human Resources Officer, Christine Lydon, who would then identify who would attend."

193. Acevedo apologized to Plaintiff for the "premature" outreach and stated that she would follow up with Plaintiff once she received an update from Defendant.

194. Lydon directed Rutgers Law School to disinvite Plaintiff from the Rutgers Law School Annual Law Firm Night because of Plaintiff's status as a veteran, his role as President of VARU, and his assertive advocacy for veterans' rights.

195. Defendant McCarter's HR Department did not have Rutgers Law School disinvite any other, non-veteran attorney employees from the Annual Law Firm Night.

196. On or around February 20, 2023, Plaintiff sent an email to Acevedo expressing his humiliation at being the President of VARU, the Rutgers veteran-alumni organization, yet being disinvited from attending the Rutgers Annual Law Firm Night.

197. On or around February 21, 2023, Plaintiff sent an email to Calello, his Practice Group Leader and a member of Defendant's Social Justice Project, in which he expressed the humiliation and emotional distress of being the President of VARU and being disinvited from the Rutgers Annual Law Firm Night, stating: "I understand Rutgers Law is uninviting me from the Rutgers Annual Law Firm Night because my Firm's recruitment department stated they indicated a preference on who Christine Lydon

identifies to attend from my Firm. Being the President of the Veteran Alumni of Rutgers University, this un-invitation especially hurts."

198.     On or around February 21, 2023, Lydon contacted Plaintiff and falsely claimed that the reason for Plaintiff's disinvitation was a "miscommunication" between Defendant's HR Office and Rutgers Law School.

199.     On March 30, 2023, after enduring significant professional and personal embarrassment, Plaintiff attended the Rutgers Law School Annual Law Firm Night. A true and correct copy of Plaintiff's LinkedIn post about the event is reproduced below:



**William Brown** (USA) · You
Former Navy SEAL / Partner at Portatora Law Group LLP
1yr · ⊙

Great time at the Rutgers Annual Law Firm Night after being invited and then uninvited and then re-invited after some form of miscommunication between Rutgers and HR. It was extremely impressive to see so many young and excited law school students. I did my best to encourage all the students to seek internships and clerkships.



200.    Also attending the event were Defendant's Partners Artiles and Omar A. Bareentto ("Bareentto"), Co-Chair of the New Jersey Democratic State Committee Muslim Caucus and a member of Defendant's Social Justice Project.

201.    Lydon's bias-based, discriminatory action in having Rutgers Law School disinvite Plaintiff — the President of VARU — from the Rutgers Law School Annual Law Firm Night was part of a pattern and practice of pervasive bias-based discrimination and

48

harassment that led Plaintiff, a reasonable veteran-attorney employee, to believe the conditions of employment had been altered, and the working environment was hostile and abusive.

**J. Retaliation for Plaintiff's Advocacy for Equal Pay for Veterans (Fall 2023)**

202. In the fall of 2023, Plaintiff posted on the professional social networking site LinkedIn advocating for fair and equal pay for veterans.

203. Plaintiff's LinkedIn post stated: "Sometimes movies reflect reality. The Sheriff who tried to pressure the war Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves."

204. Plaintiff's LinkedIn post included a video clip from the first Rambo film, "First Blood," depicting the character John Rambo, a decorated Vietnam War veteran who upon coming home from war, faces discrimination and harassment from local law enforcement. A true and correct copy of Plaintiff's LinkedIn post is reproduced below:



**William Brown**

Sometimes movies reflect reality. The Sheriff who tried to pressure the War Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves.





205.    The pictures and Plaintiff's accompanying commentary resonated with many veterans who, having led troops in combat and been responsible for millions of dollars in military equipment, returned home from the GWOT only to face difficulty obtaining employment and fair compensation.

206.    The line from First Blood, "Back there I could fly a gunship, I could drive a tank, I was in charge of million-dollar equipment, back here I can't even hold a job parking cars!" is well known within veteran culture, capturing an often-voiced veteran perception of wartime military service: in the combat zone, servicemembers have huge responsibilities, earning respect and military expertise the hard way, but upon coming home, military skills are often devalued, readjustment to civilian life can be trying, and veterans are sometimes distrusted or feared by civilian employers.

207.    The next day following Plaintiff's LinkedIn post advocating for equal pay for veterans, Plaintiff was called into a conference room by Boccassini, Defendant's Firmwide Managing Partner and a member of Defendant's DEI Committee and Social Justice Project, and Adam N. Saravay ("Saravay"), Defendant's employment attorney and a member of Defendant's Social Justice Project.

208.    Boccassini and Saravay represented Defendant McCarter, and their words expressed Defendant McCarter's corporate displeasure with Plaintiff's LinkedIn post advocating for equal pay and opportunities for veterans.

209.    Even though Plaintiff's LinkedIn post displayed no visual depiction of violence and contained no language referencing violence, Boccassini and Saravay exploited the worst possible stereotypes of veterans by questioning whether Plaintiff was mentally sound, and expressing spurious concern that Plaintiff was going to hurt someone.

210.    Plaintiff is a consummate professional who maintained professional decorum at Defendant throughout his employment and never made a threatening comment to anyone in the workplace.

211.    Despite Plaintiff's unblemished history of professional conduct, Boccassini and Saravay implied that Plaintiff was mentally unstable and expressed concern that Plaintiff might hurt someone after Plaintiff simply made a social media post advocating for fair and equal opportunities for veterans.

212.    Boccassini and Saravay's baseless implication of violent intent invoked harmful media stereotypes of veterans as mentally damaged and dangerous, unstable victims of PTSD, and constituted bias-based, discriminatory harassment directed at Plaintiff because of his veteran status.

213.    Boccassini and Saravay chastised Plaintiff in the conference room for making the LinkedIn post advocating fair pay and equal opportunities for veterans.

214.    These were adverse, discriminatory employment actions taken by Defendant's Firmwide Managing Partner and Defendant's employment attorney, directed at Plaintiff because of his veteran status and his advocacy for fair and equal pay for veterans.

215.    Boccassini and Saravay's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

**K. Harassment Through Transmission of Defamatory Article Portraying Iraq Veterans as War Criminals (November 2023)**

216.    On November 6, 2023, Saravay, Defendant's employment attorney and a member of Defendant's Social Justice Project, sent Plaintiff an email containing a link to a New York Times article titled "A Secret War, Strange New Wounds and Silence from the Pentagon."

217.    The New York Times article portrayed Iraq War veterans as mentally "damaged, very damaged" and as war criminals who acted "with savage enthusiasm, often bending the rules to hit not just enemy positions, but also mosques, schools, dams and power plants." A true and correct copy of the text and images from the article are reproduced below:







**⬮ nytimes.com**

𝕮    🎁 Share full article    ↪    🔖    💬 451

The relentless firing was being driven by a small, top-secret Army Delta Force group called Task Force 9. President Donald J. Trump had given the task force broad authority to use heavy firepower, and the task force applied it with savage enthusiasm, often bending the rules to hit not just enemy positions, but also mosques, schools, dams and power plants.

Sometimes, artillery crew members said, the task force ordered them to fire in a grid pattern, not aiming at any specific target but simply hurling rounds toward Raqqa, to keep the enemy on edge.

218.    Saravay's email and the attached article discredited the honorable service of American veterans of the Iraq War.

219.    Saravay sent the email containing the defamatory article to Plaintiff specifically because of Plaintiff's status as a combat veteran and Navy SEAL who served in Iraq during the GWOT, the war the article featured.

220.    Plaintiff is proud of his service to the United States in Iraq and was offended and demoralized by Saravay's email portraying Iraq War veterans as criminals and mentally damaged individuals.

221.    Plaintiff and other veterans are subjected to incessant, inaccurate, stereotypical media and entertainment portrayals of American military veterans as damaged, dupes, killers, war criminals, and worse.

222.     The Navy SEAL Ethos, by which Plaintiff lives his life, provides: "Brave SEALs have fought and died building the proud tradition and feared reputation that I am bound to uphold. In the worst of conditions, the legacy of my teammates steadies my resolve and silently guides my every deed."

223.     Saravay's transmission of the defamatory article was a direct insult to the Ethos by which Plaintiff lives, and to the memory of Plaintiff's fellow SEALs who were killed in action.

224.     Saravay's action served to reinforce inaccurate and damaging stereotypes of American veterans that Plaintiff found inescapable, even in Defendant's workplace ostensibly dedicated to applying the principles of Diversity, Equity, and Inclusion.

225.     No other protected class at Defendant McCarter's workplace was subjected to such bias-based harassment.

226.     Saravay is the employment counsel for Defendant McCarter, and it is reasonable for Plaintiff to believe Saravay exerts authority to set personnel policies, rules and regulations at McCarter, including promotions, pay, and work assignments.

227.     Saravay's pejorative characterization of veterans represented a pervasive pattern and practice of bias-based harassment and discrimination against Plaintiff based on his status as a veteran.

228.     Saravay's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran attorney-employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

## L. Retaliatory Assignment of Morally Repugnant Child Sexual Abuse Defense Work (2021-2023)

229.    After Plaintiff began publicly advocating for fair pay and equal opportunities for veterans, Defendant McCarter inexplicably altered the nature of his work assignments.

230.    Plaintiff's previous work assignments were primarily bankruptcy and commercial litigation matters consistent with his role in the Bankruptcy Group.

231.    Beginning in or around 2021 and continuing through 2023, Defendant assigned Plaintiff a high-volume caseload defending allegations of child sexual abuse against the Catholic Church and its dioceses.

232.    These child sexual abuse defense assignments were unrelated to Plaintiff's role in the Bankruptcy Group and were outside the scope of work assigned to attorneys in that practice group.

233.    Plaintiff informed Lubertazzi and Calello that as the father of a young daughter, while he acknowledged the constitutional right of accused parties to a vigorous defense, he struggled with the moral dilemma of defending child sexual abuse matters.

234.    Plaintiff sent emails to Lubertazzi, Adam M. Swanson ("Swanson"), Lisa S. Bonsall ("Bonsall"), and Wallach, Partners in the Bankruptcy Group, explaining that it was difficult for him to work on child molestation cases and requesting assignments more typical of the Bankruptcy Group's practice.

235.    Lubertazzi, Bonsall, and Wallach did not respond to Plaintiff's email request seeking assignment of typical Bankruptcy Group work.

236.    Swanson's only response was to ask whether Plaintiff's email was intended directly for him.

56

237.    Plaintiff responded to Swanson, clarifying the email was intended for all Partners in the Bankruptcy Group, and that it constituted a request to return to being assigned typical Bankruptcy Group work.

238.    Plaintiff explained his difficulties with child sexual abuse matters due to the conflicting emotions such assignments produced, concerns regarding the morality of the work, and his conflicting role as a father.

239.    While Plaintiff reaffirmed the right of the accused to a vigorous defense, Plaintiff expressed a personal conflict with his values.

240.    Despite Plaintiff's reasonable request, Swanson, Lubertazzi, Bonsall, and Wallach made no further response and did not provide Plaintiff with the bankruptcy work he had requested.

241.    Despite being assigned to the Bankruptcy Group, from 2021 through 2023, Defendants made defense of child sexual abuse matters Plaintiff's primary work responsibility.

242.    No other attorneys in the Bankruptcy Group were assigned child sexual abuse defense matters in comparable volume or frequency.

243.    The assignment of an unusual volume of child sexual abuse cases to Plaintiff, a veteran who had recently complained publicly about pay inequality for veterans at Defendant McCarter, was retaliatory and discriminatory.

244.    The assignment of child sexual abuse cases was intended to pressure Plaintiff to resign from Defendant McCarter rather than continue to advocate for veterans' rights and equal treatment.

245.    The retaliatory practice of assigning Plaintiff child sexual abuse defense cases continued for approximately one and a half years and constituted part of a continuing pattern of adverse employment actions that led Plaintiff to the reasonable conclusion that the workplace had become hostile and that the terms and conditions of his employment had been irrevocably altered.

246.    In his September 27, 2022 email response to Major's refusal to assist with a referral for Navy SEAL Rusch, Plaintiff stated: "So glad you are rooted and strong. Meanwhile I'll keep working on all these child molestation defense cases I've been assigned. Sometimes I wonder if due process and the right to a fair trial is a myth."

247.    This email reflects Plaintiff's distress at the retaliatory work assignments and his perception that Defendant McCarter's professed values (Major's invocation of his "oath to serve") were hypocritical given the firm's defense of institutional child sexual abuse and its refusal to extend professional courtesy to a Navy SEAL veteran.

248.    The change in Plaintiff's work to majority child sexual abuse cases was an act of bias-based harassment for Plaintiff's status as a military veteran.

249.    The assignment of majority child sexual abuse work known by Defendant McCarter to be repugnant to Plaintiff was a discriminatory and harassing adverse employment action designed to make continued employment untenable for Plaintiff.

250.    Defendant McCarter's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran attorney-employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

**M. Denial of Career Advancement and Unequal Pay (2023)**

251.    Throughout Plaintiff's employment with Defendant McCarter, Defendant McCarter failed to provide Plaintiff with a career path to become a regular Associate and earn compensation equal to that of other non-veteran attorneys performing substantially similar work.

252.    On December 14, 2023, Plaintiff attended his annual performance review, during which he met with Calello, Saravay, and Lydon.

253.    During the annual review, Plaintiff received positive feedback regarding his work performance and business development efforts.

254.    Defendant awarded Plaintiff a $15,000 annual salary increase, raising his base salary to $115,000.

255.    Plaintiff expressed his displeasure at being discriminated against by Defendant based on his status as a veteran, explaining that even with the $15,000 raise, a newly hired Associate's base salary was $55,000 higher than his own.

256.    Plaintiff stated to McCarter supervisors that it was a disgrace that he was one of the few veterans at Defendant's firm and that after six years of performing fully and competently in his position, Plaintiff still received substantially less compensation than a non-veteran first-year Associate.

257.    Plaintiff requested that Defendant provide him with specific steps he could take to become a regular Associate to receive fair and equal pay for substantially similar work.

258.    Plaintiff also requested a severance package to help him evaluate his options and determine his next steps.

259.     On December 18, 2023, Saravay came to Plaintiff's office and informed Plaintiff that Defendant McCarter was willing to provide him with a four-month severance package and that Defendant McCarter would "get back to him" about what specific steps Plaintiff could take to become a regular Associate.

260.     Following the December 14, 2023 annual review, Plaintiff sent multiple emails to Saravay requesting the specific steps Saravay had promised to provide regarding how Plaintiff could become a regular Associate and receive equal pay.

261.     Despite Plaintiff's repeated requests, Saravay never responded to Plaintiff's emails and never provided the promised information about steps to become a regular Associate.

262.     On December 27, 2023, when Gabriel and Lydon informed Plaintiff that his employment was being terminated, Lydon stated that it was "a shame" Plaintiff was being fired because she and Saravay had been "working on ways" Plaintiff could become a regular Associate.

263.     Lydon's admission that she and Saravay had been working on a promotion pathway for Plaintiff — made at the moment of Plaintiff's termination — demonstrates that Defendant's stated reason for termination (alleged social media policy violation) was pretextual. If Defendant had legitimate concerns about Plaintiff's December 22, 2023 LinkedIn post, Defendant would not have been simultaneously developing a promotion pathway for him.

264.     The temporal sequence — Saravay's December 18, 2023 promise to provide promotion steps, Plaintiff's repeated follow-up emails, Saravay's failure to respond, Plaintiff's December 23, 2023 complaint about discriminatory treatment, and Plaintiff's

December 27, 2023 termination — establishes that Defendant terminated Plaintiff in retaliation for his protected complaints, not because of any legitimate social media policy concern.

265.    Defendant McCarter did not honor Saravay's representation of a reply and did not offer any specific steps Plaintiff could take to become a regular Associate and receive fair and equal pay.

266.    Defendant had no intention of providing Plaintiff with a pathway to become a regular Associate because Defendant was discriminating against Plaintiff based on his veteran status and his outspoken advocacy for veterans' rights.

267.    Defendant McCarter's Equity Partners Howard M. Berkower ("Berkower") and Veronica H. Montagna ("Montagna"), both of whom Plaintiff worked for directly and from whom Plaintiff received excellent performance evaluations, privately advised Plaintiff that it might be better if he left the firm because they did not believe Defendant McCarter would ever make Plaintiff a regular Associate.

268.    The private admissions by Berkower and Montagna — Equity Partners who had direct knowledge of Plaintiff's work product and performance, and who gave Plaintiff excellent evaluations — confirm that Defendant's refusal to promote Plaintiff and provide equal compensation was a deliberate, institutional decision, not an oversight or a reflection of Plaintiff's performance. Despite performing excellent work as evaluated by the very Partners he worked for, Plaintiff was denied the promotion and equal pay afforded to non-veteran attorneys.

**N. Plaintiff's Protected Communications Under CEPA**

269.     Plaintiff's complaints to Defendant regarding unequal pay, discriminatory treatment, hostile work environment, and denial of professional opportunities based on his veteran status constituted protected "whistleblowing" activity under CEPA.

270.     Plaintiff reasonably believed that Defendant's conduct violated one or more laws, rules, or regulations, or clear mandates of public policy, including but not limited to:

a) The Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301-4335;

b) The New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 to -50. The NJLAD was amended on January 20, 2026 to include veterans as a protected class;

c) The New Jersey Equal Pay Act, N.J.S.A. 10:5-12(t) and N.J.S.A. 34:11-56.1 to -56.14; and

d) Clear mandates of public policy protecting veterans' rights to employment, fair treatment, and freedom of expression.

271.     Plaintiff disclosed his objections and complaints to Defendant McCarter's supervisors and leadership, including:

a) Complaints to Lubertazzi, Calello, and other Bankruptcy Group partners regarding discriminatory work assignments;

b) Complaints to Boccassini, Saravay, and Lydon during his December 14, 2023 annual review regarding unequal pay for veterans;

c) His December 23, 2023 email to Lubertazzi, Calello, Saravay, and Lydon regarding discriminatory work assignments and unequal treatment;

d) His October 2022 emails to the DEI Committee requesting inclusion of veterans in diversity initiatives; and

e) His LinkedIn post in fall 2023 advocating for equal treatment of veterans in the workplace.

272.    Plaintiff's disclosures and objections were made in good faith based on his reasonable belief that Defendant's conduct was unlawful and contrary to public policy.

**O. Plaintiff's December 22, 2023 LinkedIn Post**

273.    On December 22, 2023 — eight days after Plaintiff's annual review and five days before his termination — Plaintiff made a post on LinkedIn reflecting his lived experiences as a Navy SEAL combat veteran in Iraq.

274.    Plaintiff's December 22, 2023 LinkedIn post was made in the context of ongoing jihadist terrorist violence worldwide, including the October 7, 2023 attacks on Israel by the terrorist organization Hamas, which killed over 1,200 people, mostly civilians, and resulted in the abduction of 251 hostages, including children.

275.    The October 7, 2023 attacks on Israel evoked painful memories for Plaintiff regarding his experiences as a first responder to suicide bombings committed by jihadist terrorists in Iraq.

276.    Plaintiff's December 22, 2023 LinkedIn post stated, in pertinent part: "I was a first responder to two suicide bombings in Iraq and those experiences had an impact on my perspective. There are many beautiful and tolerant Muslims but the textual language within the Quran is far from tolerant. In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangsta rap had a huge negative influence on many young and easily impressionable American black youth. The pursuit

of negative values leads to a trap, with the real result being a great loss of not even beginning to maximize one's personal growth potential. It's my opinion that there's also a radical culture within the Islamic world that promotes antisocial values and glorifies violence. This has had a devastating impact on millions of young and very easily influenced lives."

277.    Plaintiff's LinkedIn post continued: "The internet and the ease of travel transversed us all into an increasingly smaller and greater connected global society. As a global society we need to use the internet and our educational institutions to promote unity and self and collective societal improvement. These are the cornerstone steps we need to take in order to maximize our individual and collective growth potential."

278.    A true and correct copy of Plaintiff's December 22, 2023 LinkedIn post — the post Defendant McCarter claims justified Plaintiff's termination — is reproduced below:



**William Brown** · ...

Former Navy SEAL / Partner at Purgatory Law Group LLP
... · Edited · 🌐

I was a first responder to two suicide bombings in Iraq and those experiences had an impact on my perspective. There are many beautiful and tolerant Muslims but the textual language within the Quran is far from tolerant.

In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangsta rap had a huge negative influence on many young and easily impressionable American black youth.

The pursuit of negative values leads to a trap, with the real result being a great loss of not even beginning to maximize one's personal growth potential.

It's my opinion that there's also a radical culture within the Islamic world that promotes antisocial values and glorifies violence. This has had a devastating impact on millions of young and very easily influenced lives.

The internet and the ease of travel transversed us all into an increasingly smaller and greater connected global society. As a global society we need to use the internet and our educational institutions to promote unity and self and collective societal improvement. These are the cornerstone steps we need to take In order to maximize our individual and collective growth potential. The alternative to taking these proactive steps is that as a global society, like the young women depicted in this video we have the potential to destroy ourselves.



**Brides of Allah - Palestinian women jihadists open up about their complicity in attacks in I...**

youtube.com

65

279.     Plaintiff's LinkedIn post was based on his lived experiences as a Navy SEAL combat veteran, his firsthand observations of jihadist terrorist violence, and his informed perspective on the root causes of violent extremism.

280.     Plaintiff's LinkedIn post explicitly acknowledged that "there are many beautiful and tolerant Muslims" and was directed at violent extremist ideology, not at Muslims as a whole or at any racial or ethnic group.

281.     Plaintiff's LinkedIn post did not promote negative stereotypes of Muslims or Black Americans.

**P. Plaintiff's December 23, 2023 Email to McCarter Leadership**

282.     On December 23, 2023, just four days before Plaintiff's termination, Plaintiff sent an email to Lubertazzi, Calello, Saravay, and Lydon regarding his concerns about being assigned a disproportionate volume of child sexual abuse defense cases.

283.     In the December 23, 2023 email, Plaintiff reiterated that he was an Iraq War veteran and Navy SEAL, that he was the President of VARU, that freedom of speech was very important to him, and that he had been discriminated against by Wallach when Wallach requested that he remove his December 7, 2022 LinkedIn post about his visit to the Third Circuit Court of Appeals.

284.     Plaintiff noted in the email that Artiles had made a LinkedIn post depicting the same Newark Federal Courtroom on the same day as Plaintiff's post, yet no one at Defendant McCarter had asked Artiles to remove his post.

285.     Plaintiff stated in the email: "The message I received from this experience is that McCarter & English believes the son-in-law of a Federal District Judge has greater first amendment rights than an Iraq Veteran Navy SEAL."

286. This was a protected communication under CEPA made to upper-level supervisory personnel of Defendant McCarter.

**Q. Plaintiff's Wrongful Termination by McCarter (December 27, 2023)**

287. On December 27, 2023, just four days after Plaintiff sent the email described above and thirteen days after Plaintiff's annual review in which he advocated for equal pay for veterans, Plaintiff was called into a conference room to meet with Gabriel, Defendant McCarter's Firmwide Deputy Managing Partner and a member of the DEI Committee and Social Justice Project, and Lydon, Defendant's Chief Human Resources Officer and a member of the DEI Committee.

288. Gabriel informed Plaintiff that Defendant McCarter had previously warned Plaintiff about making "controversial" posts on social media and that Plaintiff's employment was being terminated because Gabriel believed Plaintiff's December 22, 2023 LinkedIn post "promoted negative stereotypes of Muslim and Black Americans."

289. Defendant's stated reason for Plaintiff's termination was pretextual, designed to obscure the illegal retaliatory nature of the termination.

290. Plaintiff's December 22, 2023 LinkedIn post did not promote negative stereotypes of Muslims or Black Americans, as demonstrated by the plain language of the post itself.

291. Defendant's true motivation for terminating Plaintiff's employment was retaliation for Plaintiff's protected complaints about discrimination, unequal pay, and hostile work environment based on his veteran status.

292. The temporal proximity between Plaintiff's protected complaints during his December 14, 2023 annual review, his December 23, 2023 email to Defendant's leadership, and his December 27, 2023 termination establishes a clear causal connection

between Plaintiff's whistleblowing activity and Defendant McCarter's retaliatory termination.

293.    Defendant McCarter terminated Plaintiff's employment to silence his advocacy for veterans' rights, to punish him for complaining about unlawful discrimination, and to deter other employees from asserting their rights under the law or complaining about conduct they believed violated laws, rules, regulations, or public policy.

294.    Following Plaintiff's termination, a current employee of Defendant McCarter contacted Plaintiff and expressed fear of being terminated from employment simply for "liking" Plaintiff's LinkedIn posts. A true and correct copy of the current employee's message is reproduced below:



Hi William,

I'm employed by McCarter & English, LLP but I've never had the pleasure of working with you. I'm sorry to read what has happened, but I hope that you're happy where you're right now and that you like your new job. I just wanted to let you know that I have been following your posts on LinkedIn for some time, and I agree with you on a lot of topics. Unfortunately, I can't click "like" or comment on them, and express myself publicly because I might lose my job, and with my work position, I'm am aware that it may be harder to get hired if I do share some of the things on the social media platform. I also know how does it feel to be politically oppressed in a workplace. It's not easy for people who have different opinions than democrats/liberals, and we know that "freedom of speech" doesn't exist anymore. This is the sad reality we're living in right now, and hopefully it will change soon. I really do appreciate your courage speaking your mind and a big thank you for your military service!

Case 2:26-cv-02808-JXN-AME   Document 1-2   Filed 03/18/26   Page 86 of 389 PageID: 138

295.    Defendant's termination of Plaintiff has doubtless had the intended chilling effect on other employees' willingness to exercise their rights to free expression and to report unlawful conduct.

296.    Plaintiff's allegations regarding Defendant McCarter's politically oppressive workplace culture have been independently corroborated by former employees. Peter Antonelli, a former McCarter Associate who worked at the firm for nine years (2005-2014), confirmed Plaintiff's allegations. A true and correct copy of Mr. Antonelli's message is reproduced below:

TODAY

 **Peter Antonelli** · · · ·

Bill: I was at McCarter for 9 years as an Associate in the Boston office, from 2005-2014. I could see that the Firm was increasingly focusing on becoming woke, for a variety of reasons. Pro bono initiatives were a big manifestation of that "ism".

Having had my own firm for 7.5 years with a partner and now as a solo, I don't miss big law and it's Wokeism. There is no amount of salary/money I will accept to sell my soul to the devil that is Wokeism.

Everything that you are saying is factual and true and it is destroying people and our country. Some people gloss it over and some are insane enough to believe it is not true or factual.

Keep pushing.

### R. Plaintiff's Damages from Defendant McCarter's Unlawful Conduct

297.    As a direct and proximate result of Defendant McCarter's unlawful discrimination, retaliation, and wrongful termination, Plaintiff suffered substantial damages, including but not limited to:

a)  Lost wages and benefits from the date of termination through the present and continuing into the future;

b)  Lost compensation resulting from Defendant's discriminatory underpayment of Plaintiff throughout his six-year tenure, totaling approximately $472,500 in cumulative lost wages (calculated as $70,000 per year for 6.75 years);

c)  Loss of professional reputation and damage to Plaintiff's career prospects;

d)  Severe emotional distress, humiliation, anxiety, and mental anguish;

e)  Damage to Plaintiff's personal and professional reputation resulting from Defendant's false characterization of Plaintiff as promoting negative stereotypes of Muslims and Black Americans;

f)  Loss of employment benefits, including health insurance, retirement contributions, and other emoluments of employment; and

g)  Costs and expenses incurred in seeking new employment and mitigating damages.

298.    At a New Jersey Jewish Bar Association event where Plaintiff was a speaker, an attorney Aliza Lipschitz Sherman who use to work at McCarter and upon information and belief, was in a personal relationship with a McCarter Partner approached Plaintiff and stated: "You're the attorney who was fired from McCarter for saying bad things about Muslims."

299.     This false characterization has followed Plaintiff in the legal community, damaging his ability to secure employment in the New Jersey Big Law legal community.

300.     Plaintiff has suffered physical symptoms as the result of the emotional distress inflicted on him by Defendant McCarter's illegal, bias-based discrimination and retaliation, including loss of sleep, weight gain and weight loss, headaches, and indigestion.

301.     Plaintiff has sought therapeutic treatment for the emotional distress caused by Defendant McCarter's discrimination and retaliation, including participation in the Equine Immersion Project, an equine-assisted therapy program for veterans with PTSD and trauma.

302.     Plaintiff participates in patriotic athletic events for adventure therapy as a coping mechanism for service-related stress exacerbated by Defendant McCarter's workplace discrimination.

**IV. Post-Termination Retaliation by Port Authority Defendants (2024-2025)**

303.     Following Plaintiff's filing of the original Complaint on December 24, 2024, Defendant McCarter retained the law firm of O'Toole Scrivo, LLC as representation in this litigation.

304.     O'Toole Scrivo, LLC is a law firm founded by Defendant Kevin J. O'Toole.

305.     Defendant O'Toole is the managing partner of O'Toole Scrivo, LLC.

306.     Defendant O'Toole serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey, one of the most powerful government positions in the New York-New Jersey region.

307.    Upon information and belief, Defendant O'Toole has family, business, and political ties to Defendant McCarter.

308.    Upon information and belief, Defendant O'Toole's son, Kevin O'Toole Jr., is an attorney employed by Defendant McCarter and supervised by William D. Wallach, an Equity Partner in McCarter's Bankruptcy Group.

309.    On December 23, 2023, Plaintiff sent an email to McCarter leadership complaining about discriminatory treatment by Wallach, O'Toole Jr.'s direct supervisor. Four days later, on December 27, 2023, Plaintiff was terminated. Upon information and belief, Defendant O'Toole had reason to be concerned about protecting Defendant McCarter from liability in this litigation given his son's employment at the firm and supervision by an Equity Partner whom Plaintiff had complained about shortly before his termination.

310.    Defendant O'Toole has a personal financial interest in protecting Defendant McCarter from liability in this litigation, as an adverse judgment or settlement could negatively impact his son's employment and career prospects.

311.    Defendant O'Toole has a professional interest in protecting Defendant McCarter, as O'Toole Scrivo, LLC derives substantial income from representing Defendant McCarter in this litigation.

312.    Defendant Port Authority has historically provided support and resources for the Navy SEAL Foundation NYC SEAL Swim, including access to the World Trade Center site and other Port Authority facilities.

313.    In 2020, GI Go Fund CEO Jack Fanous spotlighted the importance of the Port Authority support for the event, stating that "The men and women who work at the Port

73

Authority of New York and New Jersey are among the most patriotic I have ever worked with," and "They stepped up to provide volunteers for the event and support at every step of the way. Without them, there simply would not be a SEAL Swim."

314.    Employees of Defendant Port Authority have filled integral roles as planners and organizers, providing crucial support to the event.

315.    One Port Authority employee lists himself on LinkedIn as the "Chief planner & resource manager of the Hudson River Navy SEAL Swim."

**Established Relationship Between Defendant O'Toole and Defendant Donovan Regarding the NYC SEAL Swim**

316.    In September 2024, Defendant Donovan presented Defendant O'Toole with a paddle from the Navy SEAL Foundation and an American flag that Plaintiff had arranged for participating Navy SEALs to sign, at a ceremony at Port Authority offices. A true and correct copy of a photograph of this ceremony is reproduced below:

74



317.     Plaintiff was not informed of this ceremony and was not invited to attend, despite being the founder and lead organizer of the NYC SEAL Swim and the person who arranged for the SEALs to sign the American flag that was presented to Defendant O'Toole.

318.     Upon information and belief, Plaintiff was excluded from this ceremony because Defendant O'Toole was aware at that time that his law firm, O'Toole Scrivo, LLC, would be retained to represent Defendant McCarter in this litigation, and Defendant O'Toole did not want Plaintiff to be aware of his direct involvement with the NYC SEAL Swim.

319.     The September 2024 ceremony establishes that Defendants O'Toole and Donovan had a direct, personal relationship regarding the NYC SEAL Swim, and that Defendant Donovan had direct access to Defendant O'Toole — supporting the inference that

Defendant Donovan's subsequent retaliatory threats to Plaintiff were made at Defendant O'Toole's direction.

**Defendant Donovan's Role and Changed Attitude Following Plaintiff's Lawsuit**

320.     Defendant Donovan's Port Authority responsibilities include the World Trade Center Site, an essential venue for Plaintiff's SEAL Swim.

321.     Defendant Donovan has been involved with the SEAL Swim almost since the start of the event seven years ago.

322.     Defendant Donovan previously assisted with coordinating Port Authority resources for the SEAL Swim without controversy.

323.     It was only after Plaintiff filed suit against Defendant McCarter that Defendant Donovan's attitude towards cooperating with Plaintiff and supporting the swim soured.

**Defendant Donovan's Deliberate Exclusion of Plaintiff from Planning Conference Call (2025)**

324.     In 2025, Defendant Donovan's retaliatory conduct escalated when he organized a conference call with all essential supporting assets for the NYC SEAL Swim — including NYPD, NJSP, and other first responder agencies — and deliberately excluded Plaintiff, the founder and lead SEAL of the event, from the call.

325.     Defendant Donovan invited other participants, including Geoff Leard, James Matier, Jorge Puhlovsky, and others, but did not invite or inform Plaintiff about the conference call.

326.     When Plaintiff learned of the conference call and asserted his right to participate as the founder and lead organizer of the event, Plaintiff stated: "Pat - I'm the founder and

76

lead SEAL of NYC SEAL Swim. I should have been included on this conference call. I will be on tomorrow's call."

327.    Defendant Donovan responded dismissively, stating: "I don't need you on the call tomorrow, I've already spoken to both parties and this is to just iron out the last details. You sometimes bring additional and unnecessary topics and dramatics to these conversations that leaves a bad taste with people."

328.    Plaintiff responded professionally and firmly: "You invited Geoff to this call but excluded me when I am the lead SEAL and founder of the event. I have great relationships with multiple people on that call and they were surprised I wasn't included. As the lead SEAL it's important that I be on the call."

329.    Plaintiff further stated: "I am a combat veteran Navy SEAL and leader in the SEAL Community. This is a NYC SEAL Swim that I founded. I represent the War Fighters. Please respect what I bring to the table as I respect you. I should not have been excluded from this call."

330.    Defendant Donovan's characterization of Plaintiff's input as "dramatics" and "unnecessary" was demeaning and dismissive of Plaintiff's role as the founder and lead organizer of the event and reflected the same pattern of marginalizing Plaintiff that characterized Defendant McCarter's treatment of Plaintiff during his employment.

331.    True and correct copies of the text message exchange between Plaintiff and Defendant Donovan regarding Plaintiff's exclusion from the conference call are reproduced below:





Then just listen and let me handle it

I alerted you and NYPD Leadership when NJSP canceled day before first test swim.

This works when we work together. am a combat veteran Navy SEAL and leader in the SEAL Community. This is a NYC SEAL Swim that I founded. I represent the War Fighters.

Please respect what I bring to the table as I respect you. I should not have been excluded from this call.



**Pat )**

Everyone respects your service and everyone else that has served, that's why everyone supports this event so much.

Please understand that I have more and longer relationships with many of these people and organizations and work with them on other projects besides this swim.

This issue with NJSP is bigger than your swim and it's the last thing they are worried about at the moment.

So like I said let me talk and handle it tomorrow and we will be all good

During the unexpected last minute call with the Mayor's Office you asked to take point for similar reasons and I did.

You should have invited me on the call and asked the same. I have no issues with you taking point. I am a lawyer who works for the firm that represents the Sec Def who has been a champion of this event so I understand the jurisdictional issues involved.

I have had many phone calls with Officers on both sides of the



This issue with NJSP is bigger than your swim and it's the last thing they are worried about at the moment.

So like I said let me talk and handle it tomorrow and we will be all good

Ok

332.    Defendant Donovan's deliberate exclusion of Plaintiff — the founder and lead

organizer of the NYC SEAL Swim — from a planning conference call with all essential

supporting assets was part of a coordinated effort to marginalize Plaintiff and strip him of his role in the charity event he created, in retaliation for Plaintiff's filing of this lawsuit against Defendant McCarter.

333.    Prior to Plaintiff's filing of this lawsuit and Defendant McCarter's retention of O'Toole Scrivo, LLC, Defendant Donovan had never excluded Plaintiff from planning calls or attempted to marginalize Plaintiff's role in the NYC SEAL Swim.

334.    Defendant Donovan's exclusion of Plaintiff from the conference call, combined with his dismissive and demeaning characterization of Plaintiff's participation, constituted an escalation of the retaliatory conduct that culminated in Defendant Donovan's threatening text message.

**Defendant Donovan's Threatening Text Message**

335.    Without the support of Defendant Port Authority, employees such as Defendant Donovan, and resources necessary for the event to succeed become unavailable.

336.    Due to Defendants Port Authority and Donovan having control of access to the 9/11 and Hudson River sites, without the support of Defendant Port Authority's senior leadership, the Swim's primary staging, ceremonial, and logistical areas are unavailable.

337.    The Navy SEAL Foundation is a national nonprofit organization that supports Navy SEALs, their families, and the families of fallen SEALs.

338.    Plaintiff, as founder and lead organizer of the NYC SEAL Swim, had a contractual relationship with the Navy SEAL Foundation, pursuant to which Plaintiff received approximately $40,000 annually for his services in planning, coordinating, and executing the event.

339.    Plaintiff received $40,000 from the Navy SEAL Foundation in 2023, 2024, and 2025 for his work organizing the NYC SEAL Swim.

340.    In 2025, following Plaintiff's filing of the original Complaint, Defendant Donovan, acting as a representative and agent of the Port Authority, sent Plaintiff a text message threatening to withdraw Port Authority support for the NYC SEAL Swim unless Plaintiff refrained from making any public statements critical of Defendant Kevin J. O'Toole, or O'Toole Scrivo, LLC.

341.    Defendant Donovan's text message to Plaintiff stated: "Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC."

342.    A true and correct copy of Defendant Donovan's threatening text message to Plaintiff is reproduced below:

 

Pat

[text message, illegible]

Ok, we aren't sending anything out
about him or posting anything

Very disappointed in the Chairman.

I am not going to blast him publicly
with the swim but it's known as my
boss Tim Parlatore is the attorney for
Secretary of Defense.

I understand
Please be aware though that you
cannot post, send or do anything else
negative towards him or his firm. If
you do I will be out of the event along
with all Port Authority assets and
access to the WTC

Understood. The event does to much
good for Goldstars, SEALs, Veterans,
Law Enforcement Officers and
Firefighters for me to risk.

343.     The message sent was "shut up about O'Toole Scrivo or lose your swim" — as without the support of Defendant Port Authority, the SEAL Swim is impossible to continue in the form it has thrived in for the past seven years, and the veterans, Gold Star families, and disabled veterans that benefitted from the nearly one-million dollars in charity raised by the swim would go without. This was a cause of great concern and emotional distress for Plaintiff, and his sense of duty to those who benefit from the Swim compelled him to speak up, despite the dire nature of the threat.

344.     Commissioner Kevin J. O'Toole's name being invoked by Defendant Donovan, within the context of retaliatory threats premised on Plaintiff's action against Defendant McCarter, is a cause for grave concern, tending to show the retaliation extended to the highest levels of Port Authority leadership.

345.     Invoking the name of the powerful Commissioner of the Port Authority, Kevin J. O'Toole, the founder and senior partner of Defendant McCarter's counsel, O'Toole Scrivo, creates a causal nexus between the retaliation committed by Defendant Donovan and Defendant Port Authority and Plaintiff's lawsuit against Defendant McCarter.

346.     Upon information and belief, Defendant Donovan's threat was made with the knowledge and approval of Defendant Port Authority senior leadership, including Defendant O'Toole.

347.     Upon information and belief, Defendant Donovan informed Joe Palermo, a former employee of Defendant Port Authority, that he was receiving directions from senior Port Authority leadership to withdraw support from the NYC SEAL Swim if Plaintiff participated in the event.

348.    Defendant Donovan's statement to Palermo demonstrates the retaliation against Plaintiff was not the act of a single rogue employee, but rather an institutional decision, aided, abetted, condoned and ratified by senior leadership of Defendant Port Authority.

349.    Upon information and belief, Defendant O'Toole, in his dual capacity as Port Authority Chairman and Managing Partner of O'Toole Scrivo, directed, ratified, or approved Defendant Donovan's threats to Plaintiff.

350.    Upon information and belief, Defendant O'Toole's involvement in directing or approving Defendant Donovan's conduct occurred in the context of: (a) O'Toole Scrivo, LLC representing Defendant McCarter in this litigation and deriving substantial income from that representation; and (b) O'Toole's son being employed by Defendant McCarter and supervised by William D. Wallach, an Equity Partner whom Plaintiff had complained about four days before Plaintiff's termination. Defendant O'Toole's orders to Defendant Donovan were motivated by O'Toole's personal interest in protecting his son's employer (Defendant McCarter) and his professional interest in protecting his law firm's client (Defendant McCarter).

**Consequences of Port Authority Retaliation**

351.    Following Defendant Donovan's threats, officials of Defendant Port Authority informed the Navy SEAL Foundation that it would not support the 2026 NYC SEAL Swim if Plaintiff participated in the event.

352.    As a result of Defendant Port Authority's retaliatory threat, the Navy SEAL Foundation terminated its contract with Plaintiff and withdrew from participating in the 2026 NYC SEAL Swim.

353.    The Navy SEAL Foundation's termination of Plaintiff's contract was a direct and proximate result of the threats and retaliation by Defendants Port Authority, O'Toole, and Donovan, acting in coordination with Defendant McCarter and its defense counsel.

354.    As a direct and proximate result of the Navy SEAL Foundation's withdraw from the NYC SEAL Swim, Plaintiff lost $40,000 in income for 2026.

355.    Upon information and belief, Plaintiff will continue to lose $40,000 annually in future years due to the actions of Port Authority Defendants unless his relationship with the Navy SEAL Foundation is restored or he secures another sponsor for the NYC SEAL Swim.

356.    In addition to the financial loss, Plaintiff has suffered severe emotional distress, humiliation, and reputational harm because of the Navy SEAL Foundation's withdrawal from the charity event Plaintiff founded and has led for seven years.

357.    The Navy SEAL Foundation's withdrawal from the NYC SEAL Swim has severely damaged Plaintiff's standing in the veteran community and his reputation as a veteran advocate and leader; the name of Bill Brown Jr. is synonymous with the Navy SEAL Swim.

**Plaintiff's Mitigation Efforts**

358.    Following the Navy SEAL Foundation's withdrawal from the NYC SEAL Swim, Plaintiff has actively sought to mitigate his financial losses and preserve the positive impact of the swim by meeting with numerous non-profit organizations to identify an alternative sponsor for the event.

359.    Plaintiff's mitigation efforts reflect his deep commitment to continuing the patriotic and therapeutic mission of the NYC SEAL Swim, which provides Adventure

Therapy for Navy SEALs, veterans, police officers, firefighters, Gold Star families, and 9/11 survivors.

360.    Despite Plaintiff's diligent efforts, the unique nature of the Port Authority's support — including access to the World Trade Center site, the Hudson River staging areas, and Port Authority personnel and resources — have made it extremely difficult to identify a replacement sponsorship capable of providing equivalent support.

361.    Plaintiff's inability to fully replace the Port Authority's support and the Navy SEAL Foundation's sponsorship demonstrates the severity and irreparability of the harm caused by Defendants' retaliatory conduct.

362.    The NYC SEAL Swim has raised millions of dollars in charitable funds over its seven-year history, benefitting Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters. Defendants' retaliatory conduct threatens to destroy this charitable legacy and deprive these communities of the therapeutic and financial benefits the swim provides.

**State Action and Conspiracy**

363.    Upon information and belief, Defendants Port Authority, O'Toole, and Donovan's conduct was undertaken under color of state law, and constituted retaliation against Plaintiff for exercising his First Amendment rights to free speech and to petition the government for redress of grievances (by filing this lawsuit).

364.    Defendants Port Authority, O'Toole, and Donovan's conduct was undertaken in conspiracy with Defendant McCarter and O'Toole Scrivo, LLC to deprive Plaintiff of his constitutional rights and to punish him for his assertive public advocacy for his positions, and for veterans' rights, and for filing this lawsuit.

365.     Defendants Port Authority, O'Toole, and Donovan's conduct was willful, wanton, and malicious, and was undertaken with reckless disregard for Plaintiff's constitutional rights qualifying this matter for punitive damages.

### V. Defendant McCarter's Conduct Was Willful

366.     Defendant McCarter is New Jersey's largest law firm, a sophisticated employer with over 500 employees, including a dedicated Labor & Employment practice group.

367.     Defendant McCarter knew or should have known that USERRA prohibits discrimination and retaliation against veterans in terms, conditions, and benefits of employment.

368.     Defendant McCarter's six-year pattern of discrimination against Plaintiff demonstrates willful violations of USERRA.

369.     Defendant McCarter's failure to investigate Plaintiff's complaints about discriminatory work assignments, pay disparity, and hostile work environment demonstrates reckless disregard for Plaintiff's rights under federal and state law.

370.     Defendant McCarter's use of a pretextual reason for termination (alleged violation of a social media policy) while selectively enforcing that policy based on viewpoint demonstrates willful retaliation.

### COUNT I — Discrimination in Violation of USERRA – 38 U.S.C. § 4311(a)

### (Against Defendant McCarter)

371.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

372.     USERRA has no statute of limitations. All acts alleged herein are timely.

373.     USERRA prohibits discrimination against any person based on past military service. 38 U.S.C. § 4311(a).

89

374.     USERRA defines "benefit of employment" broadly to include "terms, conditions, or privileges of employment." 38 U.S.C. § 4303(2).

375.     Under USERRA, an employer is deemed to have engaged in prohibited discrimination if the person's performance of service in the uniformed services is a motivating factor in the employer's action. 38 U.S.C. § 4311(c)(1).

376.     Defendant McCarter discriminated against Plaintiff in violation of USERRA by denying Plaintiff benefits of employment, including: (a) fair and equal compensation; (b) promotion to regular Associate status; (c) inclusion in the firm's annual Diversity Retreat; (d) professional development opportunities; (e) work assignments consistent with his role in the Bankruptcy Group; (f) a workplace free from harassment; and (g) retention in employment.

377.     Defendant cannot prove that its adverse employment actions would not have been taken in the absence of Plaintiff's military service.

378.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

379.     Plaintiff is entitled to compensatory damages, liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C), and reasonable attorneys' fees and costs pursuant to 38 U.S.C. § 4323(h).

## COUNT II — Retaliation in Violation of USERRA – 38 U.S.C. § 4311(b)

### (Against Defendant McCarter)

380.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

381.     USERRA prohibits employers from taking retaliatory action against any person because that person has exercised a right provided under USERRA. 38 U.S.C. § 4311(b).

382.     Plaintiff exercised rights protected under USERRA by complaining about discrimination based on his military veteran status.

383.     Defendant terminated Plaintiff's employment because Plaintiff exercised his rights under USERRA.

384.     Defendant cannot prove that Plaintiff's termination would have occurred in the absence of Plaintiff's protected complaints.

385.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

386.     Plaintiff is entitled to compensatory damages, liquidated damages, and reasonable attorneys' fees and costs.

### COUNT III — Hostile Work Environment in Violation of USERRA

### (Against Defendant McCarter)

387.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

388.     USERRA prohibits discrimination in the "terms, conditions, or privileges of employment" based on military service. 38 U.S.C. § 4311(a).

389.     Throughout Plaintiff's employment, Defendant subjected Plaintiff to severe and pervasive harassment based on his military veteran status, as detailed in Sections III(A) through III(R) above.

390.     This harassment was sufficiently severe and pervasive to create an objectively hostile work environment.

391.     Defendant knew or should have known of the harassment and failed to take remedial action.

392.     Defendant McCarter's conduct was willful ,qualifying this matter for punitive damages.

393.     Plaintiff is entitled to compensatory damages, liquidated damages, and reasonable attorneys' fees and costs.

## COUNT IV — Retaliation in Violation of CEPA – N.J.S.A. 34:19-3

## (Against Defendant McCarter)

394.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

395.     Plaintiff's termination on December 27, 2023 occurred within one year of the filing of the original Complaint on December 24, 2024, and is therefore timely under CEPA's one-year statute of limitations.

396.     Plaintiff engaged in protected whistleblowing activity under CEPA.

397.     Plaintiff's belief that Defendant's conduct violated laws and public policies was objectively reasonable.

398.     On July 11, 2025, this Court (Hon. Joshua D. Sanders, J.S.C.) denied Defendant McCarter's Motion to Dismiss Plaintiff's CEPA claim.

399.     Defendant McCarter terminated Plaintiff's employment in retaliation for Plaintiff's protected whistleblowing activity.

400.     The temporal proximity between Plaintiff's protected complaints and his termination — thirteen days between his annual review complaints and four days between his December 23, 2023 email — creates a strong inference of retaliation.

401.     Defendant McCarter's stated reason for termination was pretextual.

402.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

403.    Plaintiff is entitled to compensatory damages, back pay, front pay, reinstatement, restoration of benefits, punitive damages, and reasonable attorneys' fees and costs pursuant to N.J.S.A. 34:19-5.

## COUNT V — Wrongful Discharge in Violation of Public Policy (Pierce Claim) – Veteran Status

### (Against Defendant McCarter)

404.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

405.    Under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980), an employee has a cause of action for wrongful discharge contrary to a clear mandate of public policy.

406.    New Jersey has a clear mandate of public policy protecting veterans, as evidenced by USERRA, the NJLAD (as amended January 20, 2026, unanimously 108-0), civil service preference laws, and the NJ Judiciary's EEO Policy.

407.    On July 11, 2025, this Court denied Defendant McCarter's Motion to Dismiss Plaintiff's Pierce claim.

408.    The Legislature's unanimous passage of the NJLAD amendment (Senate 37-0, Assembly 71-0) confirms that protection of veterans from employment discrimination has always been a clear mandate of New Jersey public policy.

409.    The NJLAD amendment was enacted in direct response to Plaintiff's extensive advocacy regarding the discrimination alleged in this matter. Prior to the Legislature's passage of S.3800, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, providing his McCarter case as a specific example of the employment discrimination that necessitated amending the NJLAD to protect veterans. The Legislature's unanimous passage with knowledge of Plaintiff's pending case

93

confirms that discrimination against veterans has always been contrary to New Jersey public policy.

410.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

411.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT VI — Wrongful Discharge in Violation of Public Policy (Pierce Claim) – Free Speech

### (Against Defendant McCarter)

412.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

413.    New Jersey has a clear mandate of public policy protecting freedom of speech, as reflected in the New Jersey Constitution, Article I, Paragraph 6.

414.    Defendant terminated Plaintiff for expressing his opinions on matters of public concern based on his lived experiences as a Navy SEAL combat veteran.

415.    Defendant's termination threatens public harm by chilling the speech of veterans and other employees.

416.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

417.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT VII — Discrimination in Violation of the NJLAD

### (Against Defendant McCarter)

418.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

419.    The NJLAD prohibits discrimination in employment based on membership in a protected class or association with members of a protected class. N.J.S.A. 10:5-12(a).

420.    Throughout Plaintiff's employment, Plaintiff was the functional equivalent of a member of a protected class. Plaintiff was discriminated against because of his veteran status and his outspoken advocacy for veterans' rights — characteristics that, while not enumerated in the NJLAD during Plaintiff's employment, were so closely associated with Plaintiff's identity that discrimination based on those characteristics constituted associational discrimination actionable under the NJLAD. *Calabotta v. Phibro Animal Health Corp.*, 460 N.J. Super. 38, 58 (App. Div. 2019).

421.    Alternatively, the NJLAD was amended on January 20, 2026, adding veterans as a protected class (Senate 37-0, Assembly 71-0).

422.    The NJLAD amendment was enacted in direct response to Plaintiff's advocacy as the leading veterans advocate in New Jersey. Prior to the Legislature's passage of S.3800, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, providing his case against Defendant McCarter as a specific example of the employment discrimination that necessitated the amendment. After Plaintiff and NJ Gold Star Mom Amy Moore met with Senator Troy Singleton, he became a co-sponsor of S.3800 the next day. The Legislature's unanimous passage with knowledge of Plaintiff's pending case supports application of the amendment to the conduct alleged in this Complaint.

423. Under the "parties' expectations" exception to the presumption of prospective application, recognized in *Johnson v. Roselle EZ Quick LLC*, 226 N.J. 370, 389 (2016), retroactive application is warranted where the Legislature enacts remedial legislation in direct response to a plaintiff's advocacy about specific ongoing discrimination, with full knowledge of the pending case. The Legislature's unanimous vote in response to Plaintiff's case-specific advocacy creates a reasonable expectation that the amendment applies to the conduct Plaintiff complained of. See also *In re D.C.*, 146 N.J. 31, 54-55 (1996) (finding retroactive legislative intent where "the legislative history demonstrates that the Legislature pointedly intended the amendments to address cases such as" the case before the court, and the problem at issue was "the primary motivating factor behind the Legislature's enactment of these amendments"). Here, Plaintiff was the leading NJ veterans advocate and primary motivating factor in encouraging NJ Lawmakers enactment of S.3800/A.5048, Plaintiff provided his pending case against Defendant McCarter as the specific example of veteran discrimination that necessitated the amendment, and the Legislature passed the amendment unanimously with full knowledge of Plaintiff's pending litigation.

424. Defendant discriminated against Plaintiff in compensation, terms, conditions, and privileges of employment because of Plaintiff's veteran status.

425. Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

426. Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, and equitable relief.

## COUNT VIII — Hostile Work Environment in Violation of the NJLAD

### (Against Defendant McCarter)

427.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

428.     The NJLAD as amended on January 20, 2026 prohibits bias-based harassment and retaliation against veterans.

429.     But for Plaintiff being a veteran, he would not have suffered illegal discrimination, harassment and retaliation.

430.     The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment.

431.     Defendant knew or should have known of the harassment and failed to take remedial action.

432.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

433.     Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, and equitable relief.

## COUNT IX — Violation of New Jersey Equal Pay Laws

### (Against Defendant McCarter)

434.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

435.     The Diane B. Allen Equal Pay Act, N.J.S.A. 10:5-12(t), prohibits paying members of a protected class less for substantially similar work.

436.     Plaintiff, as a veteran, is a member of a protected class under the NJLAD and New Jersey equal pay laws.

437.   Plaintiff performed substantially similar work to regular Associates requiring similar skill, effort, and responsibility.

438.   Defendant paid Plaintiff approximately $70,000 less per year for substantially similar work.

439.   Defendant had no bona fide factors to justify the pay disparity.

440.   As a direct result, Plaintiff suffered lost wages totaling approximately $472,500 over his six-year employment, plus continuing damages.

441.   Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

442.   Plaintiff is entitled to compensatory damages, treble damages, punitive damages, attorneys' fees and costs.

## COUNT X — Intentional Infliction of Emotional Distress

### (Against Defendant McCarter)

443.   Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

444.   Defendant engaged in intentional, extreme, and outrageous conduct directed at Plaintiff, as detailed in Sections III(A) through III(R) and Section Q above.

445.   Defendant's conduct was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society.

446.   Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

447.   Plaintiff is entitled to compensatory damages for severe emotional distress and punitive damages.

## COUNT XI — Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant McCarter)

448. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

449. Under New Jersey law, every employment relationship contains an implied covenant of good faith and fair dealing.

450. Defendant breached the implied covenant by discriminating against Plaintiff, subjecting him to a hostile work environment, retaliating against him, paying him substantially less, denying him advancement, assigning him repugnant work, and terminating him under false pretenses.

451. Plaintiff is entitled to compensatory damages and such other relief as just and equitable.

## COUNT XII — Violation of 42 U.S.C. § 1983 – First Amendment Retaliation

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

452. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

453. Defendants O'Toole and Donovan were acting under color of state law at all relevant times.

454. Plaintiff engaged in protected speech by filing this lawsuit and making public statements regarding his treatment by Defendant McCarter.

455. Defendants retaliated against Plaintiff by threatening to withdraw Port Authority support for the NYC SEAL Swim unless Plaintiff refrained from exercising his First Amendment rights.

456. Defendant Donovan's text message explicitly conditioned Port Authority support on Plaintiff's agreement to refrain from exercising his First Amendment rights.

457.     As a direct result, the Navy SEAL Foundation withdrew from NYC SEAL Swim Plaintiff, causing $40,000 in annual income loss.

458.     Defendants' conduct was willful qualifying this matter for punitive damages.

459.     Plaintiff is entitled to compensatory damages, punitive damages against O'Toole and Donovan individually, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT XIII — Violation of 42 U.S.C. § 1983 – Conspiracy to Violate Civil Rights (Against Defendants Port Authority, Kevin J. O'Toole, Patrick Donovan, and McCarter & English LLP)

460.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

461.     Defendants Port Authority, O'Toole, Donovan, and McCarter conspired and acted in concert to deprive Plaintiff of his First Amendment rights.

462.     Defendant O'Toole, as Port Authority Chairman and founder of O'Toole Scrivo (McCarter's defense counsel), had both personal and professional interests in protecting McCarter.

463.     Defendant O'Toole's son is employed by McCarter and supervised by Wallach, whom Plaintiff complained about four days before termination.

464.     Defendant O'Toole, acting in concert with McCarter and O'Toole Scrivo, directed Donovan to threaten Plaintiff.

465.     Defendants reached an understanding to deprive Plaintiff of his constitutional rights through coordinated action.

466.     Defendants acted in concert to: (a) silence Plaintiff's speech; (b) punish Plaintiff for filing this lawsuit; (c) deter Plaintiff from pursuing claims; (d) protect McCarter from liability; and (e) protect McCarter in this litigation, in which O'Toole Scrivo serves as

100

defense counsel and derives substantial income, and in which Plaintiff had complained about an Equity Partner who supervises O'Toole's son four days before termination.

467. Defendants' conduct was willful qualifying this matter for punitive damages.

468. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT XIV — Violation of the New Jersey Civil Rights Act – N.J.S.A. 10:6-1 to -2

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

469. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

470. The NJCRA provides a cause of action for deprivation of constitutional rights through threats, intimidation, or coercion.

471. Defendants deprived Plaintiff of his rights to freedom of speech and to petition the government for redress of grievances.

472. Defendants accomplished this through threats to withdraw Port Authority support unless Plaintiff refrained from exercising his constitutional rights.

473. Defendants' conduct was willful qualifying this matter for punitive damages.

474. Plaintiff is entitled to compensatory damages, punitive damages, treble damages, and attorneys' fees and costs pursuant to N.J.S.A. 10:6-2.

## COUNT XV — Tortious Interference with Contract

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

475. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

476. Plaintiff had a valid contractual relationship with the Navy SEAL Foundation ($40,000 annually, documented by payments in 2023, 2024, and 2025).

477. Defendants knew of Plaintiff's contractual relationship.

478.    Defendants intentionally and improperly interfered by threatening to withdraw Port Authority support unless the Navy SEAL Foundation disinvited Plaintiff.

479.    Defendants' interference was without justification and motivated by malice.

480.    Defendants' conduct was willful qualifying this matter for punitive damages.

481.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

### COUNT XVI — Tortious Interference with Prospective Economic Advantage

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

482.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

483.    Plaintiff had a reasonable expectation of continuing economic advantage from his relationship with the Navy SEAL Foundation ($40,000 annually).

484.    Defendants intentionally and improperly interfered with Plaintiff's prospective economic advantage.

485.    Defendants' interference was without justification and motivated by malice.

486.    Defendants' conduct was willful qualifying this matter for punitive damages.

487.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

### COUNT XVII — Intentional Infliction of Emotional Distress

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

488.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

489.    Defendants engaged in intentional, extreme, and outrageous conduct by threatening to withdraw Port Authority support for a charity event benefitting Navy

SEALs, veterans, Gold Star families, and 9/11 survivors unless Plaintiff refrained from exercising his constitutional rights.

490.    Defendants' conduct was extreme and outrageous, particularly given that: (a) Plaintiff is a decorated Navy SEAL who founded the swim; (b) Defendants used governmental power to punish Plaintiff; (c) Defendants' actions resulted in Plaintiff being excluded from his own charity event; and (d) Defendants' actions were coordinated with McCarter's defense counsel.

491.    Defendants' conduct was willful qualifying this matter for punitive damages.

492.    Plaintiff is entitled to compensatory damages for severe emotional distress and punitive damages.

## COUNT XVIII — Civil Conspiracy

### (Against All Defendants)

493.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

494.    Defendants McCarter, Port Authority, O'Toole, and Donovan conspired and acted in concert to injure Plaintiff through unlawful means.

495.    Defendant O'Toole, as Port Authority Chairman, founder of O'Toole Scrivo (McCarter's defense counsel), and father of an attorney employed by McCarter, had both personal and professional interests in protecting McCarter.

496.    Defendants reached an understanding to retaliate against Plaintiff by abusing the Port Authority's governmental power to deprive Plaintiff of his income from the Navy SEAL Foundation.

497.    Defendants acted in concert to: (a) silence Plaintiff's speech; (b) punish Plaintiff for filing this lawsuit; (c) deter Plaintiff from pursuing claims; (d) protect McCarter from

liability; and (e) protect McCarter in this litigation, in which O'Toole Scrivo serves as defense counsel and derives substantial income, and in which Plaintiff had complained about an Equity Partner who supervises O'Toole's son four days before termination.

498.   In furtherance of the conspiracy, Defendants: (a) threatened to withdraw Port Authority support; (b) caused the Navy SEAL Foundation to withdrew from NYC SEAL Swim; (c) deprived Plaintiff of his income; and (d) retaliated against Plaintiff for exercising his First Amendment rights.

499.   Defendants' conduct was willful qualifying this matter for punitive damages.

500.   Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff William Brown Jr. respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

**A. On Count I (USERRA Discrimination):** Compensatory damages, liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C), attorneys' fees pursuant to 38 U.S.C. § 4323(h), and reinstatement or front pay;

**B. On Count II (USERRA Retaliation):** Compensatory damages, liquidated damages, attorneys' fees, and equitable relief;

**C. On Count III (USERRA Hostile Work Environment):** Compensatory damages, liquidated damages, attorneys' fees, and equitable relief;

**D. On Count IV (CEPA):** Compensatory damages, back pay, front pay, reinstatement, restoration of benefits, punitive damages, attorneys' fees pursuant to N.J.S.A. 34:19-5, and injunctive relief;

**E. On Count V (Pierce – Veteran Status):** Compensatory damages, punitive damages, and equitable relief;

**F. On Count VI (Pierce – Free Speech):** Compensatory damages, punitive damages, and equitable relief;

**G. On Count VII (NJLAD Discrimination):** Compensatory damages, punitive damages, attorneys' fees, and equitable relief;

**H. On Count VIII (NJLAD Hostile Work Environment):** Compensatory damages, punitive damages, attorneys' fees, and equitable relief;

**I. On Count IX (NJ Equal Pay):** Compensatory damages of approximately $472,500 plus continuing damages, treble damages, punitive damages, and attorneys' fees;

**J. On Count X (IIED – McCarter):** Compensatory damages for severe emotional distress and punitive damages;

**K. On Count XI (Breach of Implied Covenant):** Compensatory damages and equitable relief;

**L. On Count XII (§ 1983 First Amendment Retaliation):** Compensatory damages, punitive damages against O'Toole and Donovan individually, and attorneys' fees pursuant to 42 U.S.C. § 1988;

**M. On Count XIII (§ 1983 Conspiracy):** Compensatory damages, punitive damages against individual Defendants, and attorneys' fees pursuant to 42 U.S.C. § 1988;

**N. On Count XIV (NJCRA):** Compensatory damages, punitive damages, treble damages, and attorneys' fees pursuant to N.J.S.A. 10:6-2;

**O. On Count XV (Tortious Interference with Contract):** Compensatory damages, punitive damages, and equitable relief;

**P. On Count XVI (Tortious Interference with Prospective Economic Advantage):** Compensatory damages, punitive damages, and equitable relief;

**Q. On Count XVII (IIED – Port Authority Defendants):** Compensatory damages for severe emotional distress and punitive damages;

**R. On Count XVIII (Civil Conspiracy):** Compensatory damages, punitive damages, and equitable relief;

**S. Pre-judgment and post-judgment interest at the maximum rate permitted by law;**

**T. Costs and expenses of this action; and**

**U. Such other and further relief as the Court deems just and proper.**

**WHEREFORE** Plaintiff demands judgment jointly and severally against Defendants for reinstatement, seniority level, back pay and front pay, restoration of all seniority and all employee benefits that Plaintiff may have lost, compensatory damages for pain and suffering as well as loss of earnings and other employee benefits, damages for reputational and career development injury, consequential damages, incidental damages, punitive damages, attorney fees and costs of suit, injunctive relief requiring remediation of Defendants' retaliation and discrimination through affirmative action, and any other relief deemed by the Court to be equitable and just.

Dated: February 16, 2026

/s/ William Brown

_____

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## CERTIFICATION OF NO OTHER ACTIONS

I certify that the dispute about which I am suing is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit. In addition, I recognize my continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

Dated: February 16, 2026

/s/ William Brown

_____

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## JURY DEMAND

The plaintiff demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35-1(a).

Dated: February 16, 2026

/s/ William Brown

_____

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## CERTIFICATION PURSUANT TO RULE 1:38-7

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Dated: February 16, 2026

/s/ William Brown

---

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## DESIGNATION OF TRIAL COUNSEL

William Brown, Esq. is hereby designated as trial counsel for Plaintiff William Brown Jr. in the above matter.

Dated: February 16, 2026

/s/ William Brown

---

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## EXHIBITS

The following documents are incorporated by reference and attached hereto:

**Exhibit A:** Email chain re: LGBT History Month / 9/11 Remembrance (October 5-10, 2022)

**Exhibit B:** Email chain re: Newark Federal Courthouse LinkedIn Post (December 7, 2022)

**Exhibit C:** Email chain re: Rutgers Annual Law Firm Night Disinvitation (February 8-20, 2023)

ESX-L-008932-24   02/26/2026 5:29:45 PM   Pg 110 of 119   Trans ID: LCV2026479395

**Exhibit A: Email chain re: LGBT History Month / 9/11 Remembrance (October 5-10, 2022)**

**From:** Brown, William
**Sent:** Monday, October 10, 2022 12:12 PM
**To:** Watson, Natalie <nwatson@mccarter.com>
**Cc:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@mccarter.com>; Boccassini, Joseph T. <jboccassini@mccarter.com>;
Linares, Jose <jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>;
Major, Alexander <amajor@mccarter.com>; Adejemilua, Onome
<oadejemilua@mccarter.com>; Clarke, Marcie <mclarke@mccarter.com>; Freebery,
James J. <jfreebery@mccarter.com>; Gulati, Maneesh <mgulati@mccarter.com>;
Lydon, Christine <clydon@mccarter.com>; Pallak Movahed, Michelle
<mmovahed@mccarter.com>; Ogilvie, Moyahoena <mogilvie@mccarter.com>; Wilson-
Brito, Simone <swilsonbrito@mccarter.com>; Windfelder, Makenzie
<mwindfelder@mccarter.com>; Gabriel, Mary <mgabriel@mccarter.com>
**Subject:** RE: LGBT History Month

Good afternoon Natalie,

I salute your families service to our nation and your advocacy.
Open and respectful dialog is the best way to move forward and I appreciate your
response.

The firm did not send an email honoring and remembering those lost on 9/11 this year
or last year.
Please forward me any email the firm sent out this year or last year honoring and
remembering those lost on 9/11 and I will immediately apologize.
I was a Navy SEAL on 9/11 (this was a serious life changing event for me) and any
email the firm sent out would have been noticed. Previously, when the firm did not send
out an email honoring those lost on 9/11, I took the initiative and sent a firm wide email
honoring those lost on 9/11.

I responded to the LGBT email because this was the fourth email the D&I Committee
sent out this month honoring and respecting various groups and it disappointed me that
the firm did not also honor those lost on 9/11 last month or the year before. Please
know that I have no issues with how consenting adults love and care for each other. I
understand our nation has come along way and also respect and admire those who
advocate for positive change. In South Jersey, I once swam along
the Cooper River directly alongside a Gay Rights Parade to show my support. Many
noticed the Navy SEAL swimming alongside.

I am available to call and talk with you anytime.

110

Thank you for all the good work you do.
Bill Brown
President of Veteran Alumni Rutgers University


**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Watson, Natalie <NWatson@McCarter.com>
**Sent:** Monday, October 10, 2022 11:30 AM
**To:** Brown, William <wibrown@mccarter.com>
**Cc:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@McCarter.com>; Boccassini, Joseph T. <JBoccassini@McCarter.com>;
Linares, Jose <jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>;
Major, Alexander <amajor@mccarter.com>; Adejemilua, Onome
<oadejemilua@mccarter.com>; Clarke, Marcie <mclarke@mccarter.com>; Freebery,
James J. <JFreebery@McCarter.com>; Gulati, Maneesh <MGulati@McCarter.com>;
Lydon, Christine <CLydon@mccarter.com>; Pallak Movahed, Michelle
<mmovahed@mccarter.com>; Ogilvie, Moyahoena <MOgilvie@McCarter.com>;
Wilson-Brito, Simone <swilsonbrito@McCarter.com>; Windfelder, Makenzie
<MWindfelder@McCarter.com>; Gabriel, Mary <mgabriel@McCarter.com>
**Subject:** Re: LGBT History Month

Bill,

I am writing in my own capacity here and not on behalf of the Committee.

First, I am disappointed and a bit confused by your email. I come from a Navy family. A
Watson has fought in every war on behalf of this county since we first arrived in 1716.
More than one of us is buried at Arlington. Honoring 9/11 is a deeply important event
(and separate, in my view, from honoring the folks who served or who died in service to
our Nation). I am proud that the Firm recognizes 9/11, and Veteran's Day, and
Memorial Day. and other critical events on behalf of the whole Firm and not just through
an individual committee. I have found their messages to the community on those days
comforting and heartwarming. As such, I'm a little confused as to why it seems that you
think those critically important remembrances are not being honored. It is hard to tell
because you do not give examples of what you found wrong with those emails and
instead seem just to be targeting this one, as if it takes away from our separate
honoring of all service members. As someone who would not work for an organization
that disrespects veterans, I take umbrage with your email and hope it arises from a
misunderstanding and that you simply missed earlier emails.

111

Second, I am a little confused as to why you are writing in October about the posts honoring 9/11, in response to our LGBTQA history acknowledgement (versus directing this to our Firm leadership, if you think the Firm does not support you enough- or to one of our other history month posts, like our recent Italian American History Month post from a week ago). You speak about sending messages (unintentionally or not) and your email timing certainly sends a message to me, as one of the few out attorneys at the firm.

I am sure that you are aware that there are plenty of folks who have served our Nation proudly who are members of the LGBTQA community. Indeed, there are many folks who fought and died and were not granted equal treatment for their service. And yet your email seems to distinguish between vets and affinity groups, when there are vets in all affinity groups (and sometimes multiple intersecting groups).

Again, I do not speak for the Committee here or for the Firm.  I speak as a colleague who is very confused by your email, particularly when I have supported your work around veterans affairs. I would appreciate the opportunity to speak with you about this to try to understand your thinking here in more detail.  Of course, I want to try to understand your position better, particularly with respect to your response here to our LGBTQA history post versus other posts (and, frankly, why you selected certain people to CC versus others), and I am hopeful you will be open to listening to my points of view as well. I have court appearances this week, but perhaps you and I can line up a call next week at your convenience.

Thanks,
Natalie
███████

Sent from my iPhone

**From:** Clarke, Marcie <mclarke@mccarter.com>
**Sent:** Monday, October 10, 2022 10:57 AM
**To:** Brown, William <wibrown@mccarter.com>
**Subject:** Automatic reply: LGBT History Month


Thank you for your email. I am out of the office for Indigenous Peoples' Day. Although I will be checking email during this time, I will not have regular email access and may be slower than normal to respond.

Please contact docket@mccarter.com and rlecesse@mccarter.com if you need immediate assistance during this time.

Otherwise, I will respond as soon as I am able.

Have a wonderful day!

Best regards,
Marcie

112

**From:** Brown, William
**Sent:** Monday, October 10, 2022 10:57 AM
**To:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@mccarter.com>
**Cc:** Boccassini, Joseph T. <jboccassini@mccarter.com>; Linares, Jose
<jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>; Major, Alexander
<amajor@mccarter.com>; Adejemilua, Onome <oadejemilua@mccarter.com>; Clarke, Marcie
<mclarke@mccarter.com>; Freebery, James J. <jfreebery@mccarter.com>; Gulati, Maneesh
<mgulati@mccarter.com>; Lydon, Christine <clydon@mccarter.com>; Pallak Movahed,
Michelle <mmovahed@mccarter.com>; Ogilvie, Moyahoena <mogilvie@mccarter.com>;
Watson, Natalie <nwatson@mccarter.com>; Wilson-Brito, Simone
<swilsonbrito@mccarter.com>; Windfelder, Makenzie <mwindfelder@mccarter.com>; Gabriel,
Mary <mgabriel@mccarter.com>
**Subject:** RE: LGBT History Month

Good morning McCarter D&I Committee,

Understand you are all very busy. I wanted to follow up on the below email I sent you last week
but haven't received a response from.

I believe I can help adequately represent veterans in the firm's D&I Committee. I am a Iraq
veteran Navy SEAL and renowned veterans advocate.

With my inclusion on the D&I Committee I would ensure veterans issues and concerns are
represented.

Sometime the things we do and even the things we don't do send a message. In my opinion, the
firm sent the wrong message by not sending out an email honoring and remembering those lost
on 9/11.

I always try to operate on the win, win philosophy. There are different tactics for committees to
react to uncomfortable issues raised. One tactic is to just ignore the issue raised and continue to
move forward.

This tactic sends a negative message and I don't believe that's the right way for educated and
intelligent people to act. If my concerns are deemed invalid, please tell me the reasons why.

I hope you take this veterans' thoughts into consideration.

Thank you for all the good work you do.

Bill Brown

President of Veteran Alumni Rutgers University

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Brown, William <wibrown@mccarter.com>
**Sent:** Wednesday, October 5, 2022 5:34 AM
**To:** M&E Diversity & Inclusion Committee <M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila <scalello@McCarter.com>
**Subject:** Re: LGBT History Month

Good morning McCarter D&I Committee,

I appreciate all the emails this month. They are all worth acknowledging and respecting.

Are there are any veterans in the McCarter D&I Committee?

I didn't see a firm wide email go out about honoring and remembering those lost on 9/11. I was a Navy SEAL on 9/11 and went to war for our nation following 9/11 and was surprised when the firm didn't acknowledge those lost on 9/11 this year in an email.

I hope you take this veterans' thoughts into consideration.

Thank you for all the good work you do.

Bill Brown

President of Veteran Alumni Rutgers University

Sent from my iPhone

On Oct 4, 2022, at 2:17 PM, M&E Diversity & Inclusion Committee <M&EDiversity&InclusionCommittee@mccarter.com> wrote:

In 1994, due to the efforts of a coalition of education-based organizations, October was designated as national Lesbian, Gay, Bisexual and Transgender History Month (LGBT History Month). The goal of the observance is to highlight the important contributions of LGBT individuals throughout the history of the United States — contributions that, due to bigotry, prejudices and fears, have often gone unnoticed or have not been acknowledged.

Recognizing the need for and the value in teaching LGBT history, LGBT History Month was created in 1994 by a high school history teacher in Missouri named Rodney Wilson. He believed a month should be dedicated to the celebration and teaching of gay and lesbian history, and gathered other teachers and community leaders to help advance the cause. The month of October was initially chosen because it includes National Coming Out Day on

October 11 and the anniversary of the first march on Washington by LGBT individuals on October 14, 1979. The month now also includes Spirit Day on October 20, on which people around the country wear purple in support of LGBT youth;Ally Week, during which allies against LGBT bullying are celebrated; and the anniversary of 21-year-old Matthew Shepard's murder on October 12, 1998, which sparked the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act.

The early years of the celebration were a commemoration and a call to action. But, since then, LGBT History Month has developed into a national effort to highlight role models from the LGBT community and to teach LGBT history. Accordingly, most recent celebrations during the month involve celebrating the achievements of lesbian, gay, bisexual or transgender icons. Each year since 2006, Equality Forum, a nonprofit 501(c)(3) organization whose mission is to advance national and international lesbian, gay, bisexual and transgender civil rights with an educational focus, has taken the charge to advance the education component of the celebration by highlighting the lives and achievements of 31 LGBT icons, one for each day of the month. The organization provides a video, biography, bibliography, downloadable images and other downloadable educational resources about the life and accomplishments of each icon who is celebrated. The information for this year's icons can be found at: https://equalityforum.com. Individuals like Robina Asti, advocate for women's and transgender rights (her advocacy changed government rules to allow transgender people to receive Social Security survivor benefits), Hans Christian Anderson, fairy tale author, Sue Bird, WNBA athlete and Raphael Bostic, CEO of the Federal Reserve Bank are just some of the extraordinary individuals brought to the spotlight and celebrated in this year's celebration. By celebrating the achievements of these individuals and encouraging knowledge and tolerance through education, the month long celebration hopes to provide role models, build community, enhance pride, and teach about the extraordinary national and international contributions made by LGBT individuals.

This LGBT History Month, McCarter & English, LLP, joins in recognizing the important impact that LGBT individuals have had on history locally, nationally and internationally.





Onome Adejemilua | Guillermo C. Artiles | Richard A. Beran | Joseph T. Boccassini | Marcie Clarke | James Freebery | Maneesh Gulati | Jose L. Linares | Christine A. Lydon | Michelle Pallak Movahed | Moy N. Ogilvie | Natalie S. Watson | Simone Wilson-Brito | Makenzie Windfelder

**Exhibit B: Email chain re: Newark Federal Courthouse LinkedIn Post (December 7, 2022)**

**From:** Brown, William
**Sent:** Wednesday, December 7, 2022 2:37 PM
**To:** Calello, Sheila <scalello@mccarter.com>
**Cc:** Wallach, William <wwallach@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>
**Subject:** Pics Newark Fed. Crt Rm

Hi Sheila,

I posted two pictures of the Newark Federal Court Room yesterday on social media describing lessons learned from my experience observing Third Circuit Oral Arguments.

Please note, I was really excited by this opportunity because I had the chance to observe excellent attorneys and also had the chance to talk directly with the panel of Judges.

I wanted to share this experience with my family and friends. None of the pictures I posted depicted a Judge.

Bill Wallach was contacted about the pictures I posted on LinkedIn from a Partner at Gibbons and I've been asked by Bill to take the pictures down as a courtesy to the Court.

This was an awesome experience for me but I will honor Bill's request out of respect for him and the Court.

It is fair to point out that I do not believe my social media post set a bad precedence for the firm as Guillermo Artiles who I respect and admire also made the below pictures on LinkedIn yesterday containing the exact same Federal Court Room and Third Circuit Judge Patty Shwartz. Many Partners and Associates at McCarter & English liked Guillermo's post (*only one liked mine*).

Out of respect I copied both Bill and Guillermo on this email.

Thank you,

Bill


**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wjbrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**Exhibit C: Email chain re: Rutgers Annual Law Firm Night Disinvitation (February 8-20, 2023)**

**From:** Brown, William
**Sent:** Monday, February 20, 2023 11:17 PM
**To:** 'elizabeth.acevedo@rutgers.edu' <elizabeth.acevedo@rutgers.edu>
**Subject:** FW: Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

Hi Beth,

I understand Rutgers Law is uninviting me from the Rutgers Annual Law Firm Night because my firm's recruitment department stated they indicated a preference on who Christine Lydon identifies to attend from my firm. Being the President of the Veteran Alumni of Rutgers University this un-invitation especially hurts.

Thank you for your kind words regarding the NYC SEAL Swim and the docuseries.

Best,

Bill

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>
**Sent:** Monday, February 20, 2023 11:00 PM
**To:** Brown, William <wibrown@mccarter.com>
**Subject:** Re: Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

**\*\*External Message\*\***

Hi Bill,

My apologies, we apparently reached out prematurely as I was asked by your recruitment department last week to discontinue our soft outreach to alumni with our "save the date" requests. They indicated a preference for sending the formal invite to your Chief Human Resources Officer, Christine Lydon, who would then identify who would attend. I will follow up with you as soon as I am able once I receive an update from your firm.

Thanks for sharing this information about the docuseries you are creating. I watched the videos linked in your email below and found your work both impressive and moving.

All my best,

Beth

**From:** Brown, William <wibrown@mccarter.com>
**Sent:** Wednesday, February 8, 2023 10:52 AM
**To:** Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>; Wendi Taylor <wltaylor@rutgers.edu>
**Cc:** Calello, Sheila <scalello@McCarter.com>
**Subject:** Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

Hi Beth,

Happy to attend the Rutgers Law School annual Law Firm Night scheduled for March 30th (4-6 pm). I will also put the word out and see if I can recruit any other McCarter & English colleagues in attending.

I am putting together a docuseries to share some of the stories of the Veterans, Police Officers, Firefighters, and First Responders that participate in the NYC SEAL Swim. Doing this grass roots and looking for help with fund raising.

Hope you get a chance to see the trailer and let me know what you think.

**One Foot in the Water**

Docuseries Trailer:

https://youtu.be/rcWJq_zcb2A

118

GoFundMe Page and QR Code:

https://gofund.me/bd8c8c24

*If veterans don't look out for each other, no one will.*

Bill

President Veteran Alumni Rutgers University

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wjbrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>
**Sent:** Wednesday, February 8, 2023 7:56 AM
**To:** Brown, William <wjbrown@mccarter.com>
**Cc:** Wendi Taylor <wltaylor@rutgers.edu>
**Subject:** Re: McCarter & English Seeks to Hire RU Law Vet Students & Alumni

**\*\*External Message\*\***

Hi Bill,

Just wanted to make sure to send you a save the date note about our annual Law Firm Night scheduled for March 30th (4-6pm). We would love to have you attend with your McCarter & English colleagues. Please let me know if you're interested in attending and Wendi Taylor, our Recruiting Manager, copied here, will add you to our invite list.

All my best,

Beth

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com

February 27, 2026

**VIA PERSONAL DELIVERY BY PROFESSIONAL PROCESS SERVER,
VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED,
AND VIA OVERNIGHT COURIER (FEDEX PRIORITY)**

**Office of the General Counsel**
Port Authority of New York & New Jersey
4 World Trade Center
150 Greenwich Street
New York, NY 10007
**Attn: Amy Fisher, Esq.**

AND/OR

**Office of the General Counsel**
Port Authority of New York & New Jersey
2 Montgomery Street, 3rd Floor
Jersey City, NJ 07302
**Attn: Amy Fisher, Esq**

*(Port Authority stamp: 2026 MAR -2 P 4: 04 — PORT AUTHORITY OF NJ & NY OFFICE OF THE SECRETARY)*

**Re: SUPPLEMENTAL NOTICE OF CLAIM PURSUANT TO N.J.S.A. 32:1-163 & 32:1-164**
*Brown v. McCarter & English LLP et al.*, **Docket No. ESX-L-8932-24**
**Superior Court of New Jersey, Law Division, Essex County**

**TO THE PORT AUTHORITY OF NEW YORK & NEW JERSEY:**

Pursuant to N.J.S.A. 32:1-163 and N.J.S.A. 32:1-164, the undersigned hereby provides this Supplemental Notice of Claim against the Port Authority of New York & New Jersey ("Port Authority"), Kevin J. O'Toole (individually and in his official capacity as Chairman of the Port Authority), and Patrick Donovan (individually and in his capacity as employee and/or representative of the Port Authority).

This Supplemental Notice is served by personal delivery by professional process server, by certified mail, return receipt requested, and by overnight courier (FedEx Priority), to the Office of the General Counsel at both the Port Authority's New York office and New Jersey office, in compliance with N.J.S.A. 32:1-164, which authorizes service "by delivering same personally, or by registered mail, to the General Counsel of the Port Authority at the office of said General Counsel in the City of New York or in the State of New Jersey."

1

This Supplemental Notice is provided to supplement and confirm the Notice of Claim served on November 18, 2025, by Claimant's then-counsel, Christopher J. D'Alessandro, Esq. of Donelson, D'Alessandro & Peterson LLC, and to ensure that the Port Authority has full and complete notice of all claims asserted in the First Amended Complaint filed on February 16, 2026 in the above-referenced action.

## I. CLAIMANT INFORMATION

**Name of Claimant**: William Brown Jr., Esq.
**Post-Office Address:**
134 Main Street
South Bound Brook
New Jersey 08880
**Telephone:** (862) 415-4880
**Email:** william.brown@parlatorelawgroup.com

Claimant appears pro se in the above-referenced action.

## II. RESPONDENTS

1. The Port Authority of New York & New Jersey, a bi-state governmental agency and body corporate and politic created by compact between the States of New York and New Jersey, with offices at 4 World Trade Center, 150 Greenwich Street, New York, NY 10007, and One Port Authority Plaza, Jersey City, NJ 07306.

2. Kevin J. O'Toole, individually and in his official capacity as Chairman of the Board of Commissioners of the Port Authority of New York & New Jersey. Defendant O'Toole is also the founder and managing partner of O'Toole Scrivo, LLC, the law firm representing Defendant McCarter & English LLP in the above-referenced litigation.

3. Patrick Donovan, individually and in his capacity as the World Trade Center Site Safety Manager at the Port Authority of New York & New Jersey.

## III. NATURE OF THE CLAIMS

Claimant asserts the following claims against the Port Authority, Kevin J. O'Toole, and Patrick Donovan, as set forth in the First Amended Complaint filed February 16, 2026:

**A. Count XII — Deprivation of First Amendment Rights Under 42 U.S.C. § 1983 (First Amendment Retaliation)**

The Port Authority, acting through Chairman O'Toole and employee Donovan, retaliated against Claimant for exercising his First Amendment rights to free speech and to petition the government for redress of grievances (by filing a lawsuit against McCarter & English LLP). Defendants threatened to withdraw all Port Authority support for the Navy SEAL Foundation NYC SEAL Swim — a charity event founded and led by Claimant for seven years benefitting Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters — unless Claimant refrained from making any public statements critical of Chairman O'Toole or

2

O'Toole Scrivo, LLC. The retaliation was undertaken under color of state law and violated Claimant's clearly established constitutional rights.

## B. Count XIII — Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1983

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to deprive Claimant of his First Amendment rights through coordinated retaliatory action, including threatening to withdraw Port Authority support for the NYC SEAL Swim and causing the Navy SEAL Foundation to terminate its contract with Claimant.

## C. Count XIV — Violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2

The Port Authority, O'Toole, and Donovan deprived Claimant of his rights to freedom of speech and to petition the government for redress of grievances through threats, intimidation, and coercion — specifically, by threatening to withdraw Port Authority support and access to the World Trade Center site unless Claimant refrained from exercising his constitutional rights.

## D. Count XV — Tortious Interference with Contract

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's contractual relationship with the Navy SEAL Foundation, which compensated Claimant $40,000 annually for organizing the NYC SEAL Swim. As a direct result of the Port Authority's threats and withdrawal of support, the Navy SEAL Foundation terminated its contract with Claimant, causing him to lose $40,000 in annual income.

## E. Count XVI — Tortious Interference with Prospective Economic Advantage

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's prospective economic relationship with the Navy SEAL Foundation and participants in future NYC SEAL Swim events. The interference was malicious, unjustified, and undertaken for the improper purpose of silencing Claimant's exercise of constitutional rights and protecting McCarter & English LLP in pending litigation.

## F. Count XVII — Intentional Infliction of Emotional Distress

The Port Authority, O'Toole, and Donovan engaged in intentional, extreme, and outrageous conduct by threatening to withdraw Port Authority support for a charity event benefitting Navy SEALs, veterans, Gold Star families, and 9/11 survivors unless Claimant refrained from exercising his constitutional rights, causing Claimant to suffer severe emotional distress.

## G. Count XVIII — Civil Conspiracy

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to injure Claimant through unlawful means, including abusing the Port Authority's governmental power to deprive Claimant of his income from the Navy SEAL Foundation and to retaliate against Claimant for exercising his First Amendment rights.

3

## IV. TIME, PLACE, AND MANNER IN WHICH THE CLAIMS AROSE

### A. Background

Claimant is a decorated Navy SEAL combat veteran of the Global War on Terror who founded and served as the lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River. The event has raised nearly one million dollars over seven years for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters. The Port Authority has historically provided essential support for the event, including access to the World Trade Center site, Hudson River staging areas, and Port Authority personnel and resources.

### B. Filing of Lawsuit and Retention of O'Toole Scrivo

On December 24, 2024, Claimant filed a lawsuit against McCarter & English LLP in the Superior Court of New Jersey, Essex County, Docket No. ESX-L-8932-24, alleging employment discrimination based on veteran status. McCarter & English retained O'Toole Scrivo, LLC — founded and managed by Port Authority Chairman Kevin J. O'Toole — as defense counsel.

### C. Retaliatory Threats by Donovan

In 2025, following the filing of the lawsuit, Defendant Donovan, acting as a representative and agent of the Port Authority, sent Claimant a text message stating: "Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC."

### D. Exclusion from Planning Conference Call

In 2025, Defendant Donovan organized a conference call with all essential supporting assets for the NYC SEAL Swim — including NYPD, NJSP, and other first responder agencies — and deliberately excluded Claimant, the founder and lead organizer of the event, from the call.

### E. Navy SEAL Foundation Withdrawal

Following Defendant Donovan's threats, officials of the Port Authority informed the Navy SEAL Foundation that the Port Authority would not support the 2026 NYC SEAL Swim if Claimant participated in the event. As a direct result, the Navy SEAL Foundation terminated its contract with Claimant and withdrew from the 2026 NYC SEAL Swim.

### F. Coordination with McCarter & English

Upon information and belief, Defendant O'Toole, in his dual capacity as Port Authority Chairman and Managing Partner of O'Toole Scrivo, LLC, directed, ratified, or approved Defendant Donovan's retaliatory threats and the Port Authority's withdrawal of support, in coordination with McCarter & English LLP and its defense counsel, to suppress Claimant's exercise of constitutional rights and protect McCarter & English in the pending litigation.

4

## V. ITEMS OF DAMAGES

As a direct and proximate result of the conduct described above, Claimant has sustained the following damages, as far as presently practicable:

4. Loss of $40,000 in annual income from the Navy SEAL Foundation for 2026, with continuing annual losses of $40,000 in future years unless the relationship is restored or an alternative sponsor is secured.

5. Severe emotional distress, humiliation, anxiety, and mental anguish resulting from being excluded from the charity event Claimant founded and led for seven years.

6. Reputational harm and damage to Claimant's standing in the veteran community and his reputation as a veteran advocate and leader.

7. Loss of the therapeutic and charitable benefits of the NYC SEAL Swim for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters.

8. Costs and expenses incurred in seeking alternative sponsorship and mitigating damages.

9. Punitive damages for willful, wanton, and malicious conduct undertaken with reckless disregard for Claimant's constitutional rights.

10. Treble damages pursuant to N.J.S.A. 10:6-2 (New Jersey Civil Rights Act).

11. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and N.J.S.A. 10:6-2.

12. Pre-judgment and post-judgment interest at the maximum rate permitted by law.

13. Such other and further relief as the Court deems just and proper.

## VI. REFERENCE TO PRIOR NOTICE AND PENDING LITIGATION

This Supplemental Notice is provided to supplement the Notice of Claim served on November 18, 2025, which identified claims for deprivation of First Amendment rights under 42 U.S.C. § 1983, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress. This Supplemental Notice adds the claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (Count XIV of the First Amended Complaint), which arises from the identical facts, identical retaliatory conduct, and identical constitutional deprivations set forth in the original Notice of Claim.

A First Amended Complaint asserting all claims identified herein was filed on February 16, 2026 in the Superior Court of New Jersey, Law Division, Essex County, Docket No. ESX-L-8932-24. A copy of the First Amended Complaint is enclosed herewith.

5

## VERIFICATION

I, William Brown Jr., hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: March 2, 2026
/s/ William Brown
**William Brown Jr., Esq.**
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com


**Enclosures:**
1. First Amended Complaint, *Brown v. McCarter & English LLP et al.*, ESX-L-8932-24 (filed Feb. 26, 2026)

6

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

**Superior Court of New Jersey**
**Law Division: Civil Part**
**Essex County**

| | |
|---|---|
| WILLIAM BROWN Jr.,<br>     Plaintiff,<br><br>  v.<br>MCCARTER & ENGLISH LLP, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, KEVIN J. O'TOOLE (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), PATRICK DONOVAN (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), JOHN DOES 1-10 (FICTITIOUS INDIVIDUALS OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN).<br>     Defendants. | Docket No.: ESX-L-8932-24<br><br>**FIRST**<br>**AMENDED COMPLAINT** |

Plaintiff, William Brown Jr. ("Plaintiff"), complaining of Defendants McCarter & English LLP, The Port Authority of New York and New Jersey, Kevin J. O'Toole ("Defendant O'Toole"), Patrick Donovan ("Defendant Donovan"), and John Does 1-10, collectively referred to hereafter as "Defendants," states as follows:

2026 MAR -2  P 4: 04
PORT AUTHORITY OF NJ & NY
OFFICE OF THE SECRETARY

1

## PRELIMINARY STATEMENT

1. This action arises from Defendant McCarter & English LLP's systematic discrimination against, and unlawful retaliation against Plaintiff, a decorated Navy SEAL combat veteran of the Global War on Terror, in violation of federal and state law.

2. Between March 2017 and December 27, 2023, Defendant McCarter subjected Plaintiff to a hostile work environment characterized by a pattern and practice of pervasive illegal bias-based harassment and discrimination predicated on military veteran status.

3. Defendant McCarter paid Plaintiff substantially less than similarly situated non-veteran employees, excluded Plaintiff from professional development opportunities afforded to others, purposely assigned Plaintiff morally repugnant work designed to cause emotional distress to pressure Plaintiff's resignation, and ultimately terminated Plaintiff's employment in retaliation for his protected communications alleging unlawful discrimination against, and unequal pay for military veterans.

4. Following Plaintiff's unlawful termination and the filing of this lawsuit, Defendants O'Toole and Donovan engaged in coordinated retaliation against Plaintiff to suppress his exercise of constitutional rights and punish him for filing this lawsuit, resulting in the loss of Plaintiff's $40,000 annual income from the Navy SEAL Foundation. Defendant O'Toole is Port Authority Chairman and founding partner of O'Toole Scrivo, LLC, the firm representing Defendant McCarter in this litigation. Defendant Donovan is the World Trade Center Site Safety Manager at the Port Authority of New York and New Jersey.

5. On November 18, 2025, Plaintiff, through previous counsel, served a written Notice of Claim upon Defendant Port Authority pursuant to N.J.S.A. 32:1-163 and N.J.S.A. 32:1-164, addressed to the Office of the General Counsel at both the Port Authority's New

York office (4 World Trade Center, 150 Greenwich Street, New York, NY 10007) and its New Jersey office (One Port Authority Plaza, Jersey City, NJ 07306). The Notice of Claim identified the name and post-office address of the Claimant and his attorney; the nature of the claims asserted, including deprivation of First Amendment rights under 42 U.S.C. § 1983, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress; the time, place, and manner in which the claims arose; and the items of damages sustained, as far as then practicable. The statutory sixty-day waiting period required by N.J.S.A. 32:1-163 expired on January 17, 2026. This Amended Complaint is filed after expiration of the waiting period and in compliance with the Port Authority's consent-to-suit provisions set forth in N.J.S.A. 32:1-157 to -164

6. Plaintiff's Notice of Claim provided Defendant Port Authority with full notice of the factual basis, legal theories, and retaliatory conduct underlying all claims asserted in this Amended Complaint, including Plaintiff's claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 (Count XIV). The NJCRA claim arises from the identical facts, the identical retaliatory conduct, and the identical constitutional deprivations set forth in the Notice of Claim — specifically, Defendants' use of threats, intimidation, and coercion to suppress Plaintiff's exercise of his First Amendment rights to free speech and to petition the government for redress of grievances. Defendant Port Authority has suffered no prejudice, as the Notice of Claim afforded Defendant full opportunity to investigate the claims, prepare a defense, and explore settlement, thereby satisfying the purposes of the notice requirement. See *Velez v. City of Jersey City*, 180 N.J. 284, 293 (2004) (notice of claim requirements serve the purposes of investigation, defense preparation, and

settlement opportunity). To the extent the Notice of Claim's identification of the § 1983 claim rather than the NJCRA constitutes a technical deficiency, Plaintiff's Notice substantially complies with the statutory requirements under the five-factor test set forth in *Galik v. Clara Maass Medical Center*, 167 N.J. 341, 353 (2001): (1) Defendant Port Authority suffered no prejudice, as the NJCRA claim is factually identical to the § 1983 claim expressly noticed; (2) Plaintiff took affirmative steps to comply by serving a detailed written Notice of Claim identifying all parties, all retaliatory conduct, and all constitutional deprivations at issue; (3) the Notice generally complied with the purpose of N.J.S.A. 32:1-163 by providing Defendant with sufficient information to investigate, prepare a defense, and explore settlement; (4) Defendant received reasonable notice of the claim, as the factual and constitutional basis for the NJCRA claim was set forth in the Notice with specificity; and (5) the omission of the NJCRA label is reasonably explained by the fact that the NJCRA is the state-law analog of § 1983, both statutes protect the same constitutional rights, and the Notice expressly identified the First Amendment deprivations that form the basis of both claims.

7. This Amended Complaint asserts claims under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4335; the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -8; common law wrongful discharge in violation of public policy under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980); the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 to -50; the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 to -2; 42 U.S.C. § 1983; intentional infliction of emotional distress; the New Jersey Equal Pay Act; tortious interference with contract and prospective economic

advantage; breach of the implied covenant of good faith and fair dealing; and civil conspiracy.

## PARTIES

8. Plaintiff William Dennis Brown Jr. is a veteran of the Global War on Terror who honorably served the United States as a Navy SEAL in combat operations in Iraq.

9. Plaintiff is an outspoken veteran advocate with a significant social media following, a New Jersey licensed attorney in good standing, and the founder and lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River.

10. Defendant McCarter & English LLP ("McCarter" or "Defendant McCarter") is a limited liability partnership organized under the laws of the State of New Jersey, known as New Jersey's oldest law firm, with a principal place of business located at Four Gateway Center, 100 Mulberry Street, Newark, New Jersey 07102.

11. Defendant McCarter employs over 500 attorneys and staff across multiple offices and conducts substantial business in Essex County, New Jersey.

12. Defendant The Port Authority of New York and New Jersey ("Port Authority" or "Defendant Port Authority") is a bi-state governmental agency and body corporate and politic created by compact between the States of New York and New Jersey, with consent of Congress, pursuant to N.J.S.A. 32:1-1 et seq. and N.Y. Unconsol. Law §§ 6401-6425.

13. Defendant Port Authority maintains offices at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007, and conducts substantial operations in New Jersey, including at Newark Liberty International Airport, Port Newark–Elizabeth Marine Terminal, and the World Trade Center site in New York City.

14. Defendant Kevin J. O'Toole ("O'Toole" or "Defendant O'Toole") is an individual residing in New Jersey who serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey.

15. Defendant O'Toole is an individual of considerable political power, having served on the Cedar Grove, New Jersey Town Council and as Mayor, the New Jersey General Assembly (1995-2001), and the State Senate, retiring from the Senate in 2017 to begin a term as a Commissioner of Defendant Port Authority.

16. Defendant O'Toole is also the founder and managing partner of O'Toole Scrivo, LLC, a law firm based in Cedar Grove, New Jersey that represents Defendant McCarter in this litigation.

17. Defendant O'Toole is sued in his individual capacity and in his official capacity as Port Authority Chairman.

18. Defendant Patrick Donovan ("Donovan" or "Defendant Donovan") is an individual residing in New Jersey or New York, serving as the World Trade Center Site Safety Manager at the Port Authority of New York and New Jersey.

19. Defendant Donovan is sued in his individual capacity and in his official capacity as a Port Authority representative.

20. Defendants John Does 1-10 are fictitious individuals or entities, identities currently unknown, who have liability to the Plaintiff for any of the causes of action below, including currently unknown Senior Port Authority Leadership Officials who directed, ratified, or approved the retaliatory conduct alleged herein.

21. Plaintiff reserves the right to add Defendants when discovery reveals the identity of additional individuals or entities liable for damages referenced in this Complaint.

6

## JURISDICTION AND VENUE

22. The amount in controversy satisfies the Court's jurisdictional requirements.

23. The State of New Jersey has subject matter and personal jurisdiction over this controversy.

24. Venue is proper in this Court, as Defendant McCarter maintains a primary place of business located in Essex County, New Jersey.

25. Venue is proper in this Court because Defendant Port Authority is a bi-state agency of New York and New Jersey with substantial business operations in New Jersey.

26. Venue is proper in Essex County pursuant to N.J. Ct. R. 4:3-2(a)(1) because Defendant McCarter maintains its principal place of business in Essex County, New Jersey, and the primary causes of action arose in Essex County.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Military Service and Professional Background

27. Plaintiff William Brown Jr. is a decorated combat veteran who served the United States with distinction as a Navy SEAL during the Global War on Terror.

28. Navy SEALs represent the pinnacle of elite military special operations forces and are known throughout the world as consummate professionals who operate in sea, air, and land environments to accomplish mission objectives that would be impossible for conventional forces to achieve.

29. Navy SEALs undergo some of the most rigorous assessment, selection, and training processes in the history of warfare, known as among the toughest military training in the world.

30. The Navy SEAL Ethos, which guides all SEALs, provides in pertinent part: "We expect to lead and be led. In the absence of orders I will take charge, lead my teammates and accomplish the mission. I lead by example in all situations. I will never quit. I persevere and thrive on adversity. My Nation expects me to be physically harder and mentally stronger than my enemies. If knocked down, I will get back up, every time. I will draw on every remaining ounce of strength to protect my teammates and to accomplish our mission. I am never out of the fight."

31. Plaintiff was a Navy SEAL on active duty during the September 11, 2001 terrorist attacks on the United States, when jihadists affiliated with al-Qaeda hijacked four commercial airliners and intentionally crashed them into the World Trade Center towers and the Pentagon, killing 2,977 Americans.

32. The September 11, 2001 attacks had a profound and lasting impact on Plaintiff and the entire Navy SEAL community.

33. Plaintiff served as a Navy SEAL in Iraq during Operation Iraqi Freedom and was a first responder to two suicide bombings committed by jihadist terrorists in Baghdad's Green Zone on October 14, 2004, attacks which killed ten people and wounded dozens more.

34. Plaintiff raced down the street in an attempt to intercept a second suicide bomber but was unable to prevent the terrorist from detonating explosives in the middle of an open street bazaar, resulting in catastrophic loss of life and grievous injuries to innocent civilians.

35. Plaintiff witnessed firsthand the horrific aftermath of jihadist terrorist violence, including the screams of victims with severe burn injuries and the bloody, dismembered remains of those killed in the blasts.

36. During his military service, Plaintiff served with or knew personally Navy SEALs Brian Bill, Danny Dietz, John Faas, Jacques Fontan, Nate Hardy, Michael McGreevy Jr., Thomas Ratzlaff, and Lance Vaccaro, all of whom were subsequently killed in action by Islamist militant terrorists while serving the United States.

37. Plaintiff's experiences in combat and as a first responder to terrorist attacks have profoundly shaped his perspective on the root causes of jihadist violence and the ongoing global threat posed by violent extremism.

38. Following his honorable discharge from the Navy, Plaintiff earned his undergraduate and law degrees from Rutgers University in New Jersey.

39. Plaintiff is a licensed New Jersey attorney in good standing and has built a distinguished career as a veteran advocate, legal professional, and community leader.

40. Plaintiff founded and serves as the lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River, a large-scale, high-profile charity event that raises funds and awareness for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters.

41. Through his role organizing the NYC SEAL Swim, Plaintiff earned approximately $40,000 annually from the Navy SEAL Foundation for his services in planning, coordinating, and executing the event.

42. Plaintiff served as President of the Veteran Alumni of Rutgers University ("VARU"), the official Rutgers University veteran alumni organization, where he worked to establish internships and employment opportunities specifically for student veterans and veteran alumni.

43. Plaintiff has been recognized by NJBIZ as a veteran having a significant impact on the New Jersey business community for his leadership and advocacy on behalf of veterans.

44. Plaintiff is featured in the bestselling books *Can't Hurt Me* and *Never Finished* by David Goggins, which chronicle the experiences and achievements of elite military service members.

45. Prior to his employment with Defendant McCarter, Plaintiff was publicly known for his outspoken views on matters of public concern. Plaintiff engaged in a public debate with New Jersey Governor Chris Christie that went viral on social media, demonstrating Plaintiff's willingness to engage in public discourse on controversial issues.

46. Plaintiff maintains an active presence on social media platforms, including LinkedIn, where he shares his perspectives on issues of public concern, including veteran advocacy, national security, support for Israel, and the protection of constitutional rights.

47. Plaintiff's high-profile advocacy for veterans surrounding the facts and circumstances of this matter played a significant role in the New Jersey Legislature voting unanimously to amend the NJLAD to extend protections to veterans and active-duty service members.

48. Plaintiff organized and led a march of veterans and their families, where they held signs and rallied in support of amending the NJLAD to include veterans as a protected class.

49. Plaintiff spoke at numerous political events and veteran gatherings throughout New Jersey, urging state lawmakers to amend the NJLAD to protect veterans from employment discrimination.

50. Plaintiff sent multiple emails to every member of the New Jersey Legislature, urging them to support the amendment to the NJLAD to include veterans as a protected class.

51. Plaintiff made numerous social media posts on New Jersey lawmakers' social media pages, publicly advocating for the NJLAD amendment and mobilizing veteran and public support.

52. Plaintiff made social media posts and Youtube videos about this case in advocating for the amendment of NJLAD to include veterans as a protected class.

53. Plaintiff led a march with veterans that held signs that stated, "**VETERANS SAY SHAME ON MCCARTER & ENGLISH, LLP!**" "**NJ Lawmakers Stop! TREATING VETERANS LIKE SECOND CLASS CITIZENS Amend NJLAD & Include Veterans as a Protected Class**" "**NJ Lawmakers DO THE RIGHT THING! Amend NJLAD & Include Veterans as a Protected Class**" "**Assembly Speaker Coughlin Do Right by Veterans & Stop Sitting on A5048**" "**Senate President Scutari Do Right by Veterans & Stop Sitting on SC3800**"

54. Plaintiff posted YouTube videos of his veteran advocacy and the Veterans March supporting New Jersey Lawmakers amending NJLAD to include veterans as a protected class the social media pages for NJ Lawmakers. A true and correct copy of the Plaintiff's veteran march and advocacy signs mentioning **Defendant McCarter** and depicting and mentioning **NJ Assembly Speaker Coughlin and NJ Senate President Scutari** are reproduced below:



ESX-L-008932-24    02/26/2026 5:29:45 PM    Pg 13 of 119    Trans ID: LCV2026479395











55. After Plaintiff and NJ Gold Star Mom Amy Moore met with Senator Troy Singleton, he became a co-sponsor of S.3800 the next day. A true and correct picture of Plaintiff meeting with NJ Gold Star Mom Amy Moore met with Senator Troy Singleton are reproduced below:



56. Plaintiff was the leading veterans advocate in New Jersey for the amendment of the NJLAD to include veterans as a protected class. Plaintiff's advocacy was the primary driving force behind the Legislature's decision to introduce and pass S.3800/A.5048.

57. In addition to organizing marches, speaking at events, and sending emails to every member of the Legislature, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, meeting with them individually and by telephone to advocate for the NJLAD amendment and to discuss the discrimination he experienced at Defendant McCarter.

58. During these personal communications, Plaintiff provided his case against Defendant McCarter as a specific example of the employment discrimination that necessitated amending the NJLAD to protect veterans. Many New Jersey legislators and their staff were aware of Plaintiff's pending lawsuit against Defendant McCarter and the facts underlying his claims of veteran discrimination.

59. The Legislature's unanimous passage of S.3800 (Senate 37-0, Assembly 71-0) with knowledge of Plaintiff's pending case demonstrates legislative intent to remedy the type of ongoing discrimination that prompted the amendment, including the discrimination alleged in this Complaint.

60. The amendment to the NJLAD extending protection to veterans was signed into law by Governor Phillip Murphy on January 20, 2026, and is now the law of New Jersey.

## II. Defendant McCarter's Hiring of Plaintiff and Discriminatory Employment Practices

### (2017-2023)

61. In March 2017, Defendant McCarter hired Plaintiff as a Career Staff Associate assigned to the firm's Bankruptcy, Restructuring & Litigation Group ("Bankruptcy Group").

62. At the time Defendant McCarter hired Plaintiff, Defendant was aware that Plaintiff was a former Navy SEAL, a combat veteran of the Iraq War, an outspoken advocate for veterans' rights, and an individual with strongly held views on matters of public concern.

63. Defendant McCarter was also aware that Plaintiff maintained an active social media presence and had previously engaged in public advocacy and debate on controversial issues.

64. When Plaintiff was hired, Defendant McCarter did not have a social media policy governing employees' personal social media use. Defendant accepted and encouraged Plaintiff's social media activity, with Dr. Maria Laccotripe Zacharakis, Defendant's Boston Office Managing Partner, specifically requesting that Plaintiff identify himself as a McCarter attorney on his LinkedIn profile to assist with business development.

65. The position of Career Staff Associate to which Plaintiff was assigned was distinct from the position of "regular Associate" at Defendant McCarter.

66. Despite performing substantially similar work as regular Associates—and in some cases performing work at the level of equity partners—Plaintiff was compensated at a rate substantially lower than regular Associates.

67. In 2023, after six years of employment with Defendant McCarter, Plaintiff's base salary was $100,000 (increased to $115,000 following his December 14, 2023 annual review), whereas the base salary for a first-year Associate at Defendant's firm was $170,000—a

disparity of $55,000 to $70,000 per year for substantially similar work requiring similar skill, effort, and responsibility.

68. Defendant McCarter hired other non-veteran employees in positions like Plaintiff's Career Associate or Staff Attorney role and promoted several of those non-veteran employees to regular Associate positions and to Special Counsel with commensurate increases in compensation and benefits.

69. Defendant McCarter promoted multiple non-veteran Staff Attorney's to regular Associate and Special Counsel positions and hired Associates after Plaintiff with less experience and lower performance evaluation scores.

70. Defendant McCarter did not promote Plaintiff to a regular Associate position or provide him with equal compensation because of his status as a military veteran, his outspoken advocacy for veterans' rights, and his willingness to express views that conflicted with the political ideology favored by Defendant McCarter's leadership.

71. Defendant McCarter's discriminatory compensation practices violated USERRA's prohibition on denying any "benefit of employment" to a person based on past military service.

72. Throughout Plaintiff's employment, Defendant McCarter's leadership actively promoted controversial progressive political causes through firm-wide communications, including support for Black Lives Matter, Critical Race Theory, narratives of systemic racism, and gender fluidity. Defendant did not restrict or discourage employees from expressing views aligned with these political positions on social media or otherwise.

73. Defendant McCarter publicly promoted the Black Lives Matter movement through its official Social Justice Project, including on its website and social media platforms. A true

21

and correct copy of Defendant McCarter's promotion of Black Lives Matter is reproduced below:



McCarter's Social Justice Project |
McCarter & English, LLP

**Visit >**

74. Black Lives Matter is a controversial political movement that was associated with protests resulting in multiple deaths, arson, vandalism, looting, and approximately $2 billion in insured damages nationally. Despite the controversial nature of this political advocacy, Defendant McCarter promoted it publicly and did not discipline any employee or partner for supporting or promoting Black Lives Matter on social media.

75. Defendant McCarter's willingness to publicly promote controversial progressive political causes while terminating Plaintiff for expressing his perspective as a combat veteran on matters of public concern demonstrates that Defendant's social media policy was enforced based on viewpoint discrimination, not content-neutral standards.

76. Defendant McCarter's selective enforcement of its workplace conduct standards is further demonstrated by the fact that Lubertazzi, the Chairman of Defendant McCarter's Executive Committee, sent emails to senior firm attorneys making light of one attorney urinating on another at a firm-sponsored cabin retreat. Lubertazzi's email referred to the incident as a "Golden Shower," yet faced no disciplinary action whatsoever. Defendant McCarter's willingness to tolerate crude and degrading communications from its most senior leadership while terminating Plaintiff for a thoughtful LinkedIn post about jihadist violence based on his combat experience confirms that Defendant's social media policy was enforced based on viewpoint discrimination, not content-neutral standards.

77. Crude behavior from leadership was tolerated; veteran advocacy was punished.

78. Defendant McCarter did not begin harassing Plaintiff about his social media posts until Plaintiff's posts began questioning the reasoning behind the progressive political ideology that Defendant's leadership promoted. This demonstrates that Defendant's enforcement of its social media policy was based on viewpoint discrimination—punishing employees whose views conflicted with management's preferred ideology—not content-neutral application of workplace rules.

## III. Pattern of Harassment and Hostile Work Environment Based on Plaintiff's Veteran Status (2019-2023)

79. Acts occurring before December 27, 2021 are time-barred as standalone claims under CEPA's one-year statute of limitations (N.J.S.A. 34:19-5), and acts occurring before December 27, 2022 are time-barred as standalone claims under Pierce and NJLAD's two-year statutes of limitations. However, the following acts are alleged as pattern evidence and background facts demonstrating Defendant's discriminatory animus and are

23

admissible under the continuing violation doctrine. USERRA has no statute of limitations, and all acts alleged herein are timely for USERRA claims.

**A. "How Many People Have You Killed?" (2019)**

80. In 2019, Defendant McCarter's Equity Partner Ward C. Laracy ("Laracy"), a member of the firm's Tax Group, approached Plaintiff in an elevator at Defendant's Newark office and asked Plaintiff, without provocation or context, "How many people have you killed?"

81. Laracy's question was a bias-based, discriminatory comment directed at Plaintiff because of his status as a combat veteran and Navy SEAL.

82. Plaintiff was deeply offended by Laracy's insensitive, unprofessional, and discriminatory question, which reduced Plaintiff's honorable military service to a crude stereotype of veterans as "killers."

83. Plaintiff responded that he was a combat veteran, proud of his military service, and had honorably served the United States.

84. Later that same day, Laracy returned to Plaintiff's office and apologized, stating that he had been "out of line" when he asked Plaintiff how many people he had killed.

85. In 2020, Laracy made a $1,000 donation to the NYC SEAL Swim, the charity event founded and organized by Plaintiff.

86. Laracy's discriminatory remark led Plaintiff to reasonably believe that instead of being respected as an individual who had honorably served the nation in time of war, he was feared, loathed, and discounted by Defendant McCarter's leadership as a mere "killer."

**B. Sexual Harassment by Equity Partner (2019)**

87. In 2019, Defendant McCarter's Equity Partner Mark A. Daniele ("Daniele"), the immediate past Practice Group Leader for Defendant's Tax Group and a former member

24

of the firm's Executive Committee, sexually harassed Plaintiff based on his status as a veteran.

88. During the winter months of 2019, Plaintiff attended a complimentary dinner provided by Defendant McCarter to attorneys working past 7:00 p.m. at the Newark office.

89. While Plaintiff was at the buffet, Daniele approached Plaintiff from behind, grabbed Plaintiff's waist without consent, and stated words to the effect of "you can afford to eat all this because you're a strong healthy man."

90. It was clear Daniele was referring to Plaintiff's physical appearance within the context of Plaintiff's status as a Navy SEAL veteran.

91. Daniele's unwanted physical contact and sexually suggestive comment constituted sexual harassment in violation of Defendant McCarter's policies and New Jersey law.

92. Plaintiff reported Daniele's sexual harassment to a Partner and an Associate at Defendant McCarter.

93. Defendant McCarter took no meaningful disciplinary action against Daniele in response to Plaintiff's complaint.

94. Plaintiff reasonably believed that if he attended future evening dinners at Defendant's Newark office, he would be subjected to further sexual harassment by Daniele.

95. As a result, Plaintiff declined to attend the complimentary dinners thereafter as a reasonable measure to avoid further harassment from Daniele.

96. This benefit of employment—complimentary meals for attorneys working late—was effectively denied to Plaintiff by Daniele's sexually harassing conduct and Defendant McCarter's failure to take corrective action.

ESX-L-008932-24   02/26/2026 5:29:45 PM   Pg 26 of 119   Trans ID: LCV2026479395

### C. Mockery of Military Service and Exposure to Racial Remarks at Cabin Retreats (2019-2023)

97. Joseph Lubertazzi Jr. ("Lubertazzi") is the Chairman of Defendant McCarter's Executive Committee, an Equity Partner, and the former Practice Group Chair of the Bankruptcy Group.

98. Lubertazzi organized annual cabin retreats for members of the Bankruptcy Group and other attorneys at Defendant McCarter.

99. To Plaintiff's knowledge, Plaintiff was the only veteran who attended Lubertazzi's cabin retreats.

100. During these cabin retreats, Plaintiff was exposed to racial remarks and other wildly inappropriate behavior by Defendant McCarter's senior attorneys, including conduct best described as alcohol-fueled events replete with behavior one would expect from stereotypical depictions of fraternity parties.

101. At least one attendee at Lubertazzi's cabin made racial remarks, and upon information and belief Lubertazzi never took any disciplinary action, internal or external, against any of Defendant McCarter's attorneys for their conduct at his cabin.

102. Following one such cabin retreat, Lubertazzi made light of an incident in which one McCarter attorney urinated on another McCarter attorney, referring to the incident as a "Golden Shower."

103. Lubertazzi's "Golden Shower" email was sent to senior attorneys at Defendant McCarter, yet Lubertazzi faced no disciplinary action, no reprimand, and no consequences of any kind for sending an email making light of one attorney urinating on another at a firm-sponsored event.

104.     The tolerance of Lubertazzi's "Golden Shower" email — sent by the Chairman of Defendant McCarter's Executive Committee — while Plaintiff was subsequently terminated for a LinkedIn post sharing his perspective as a combat veteran, demonstrates the pervasive double standard and selective enforcement that characterized Defendant McCarter's workplace. Defendant McCarter tolerated crude, offensive, and degrading communications from its most senior leadership while punishing Plaintiff for exercising his right to share his lived experiences as a Navy SEAL.

105.     Following one such cabin retreat, Lubertazzi sent an email to attendees, including senior members of Defendant McCarter, in which he made a mockery of Plaintiff's military service by referring to hearing "War Stories" at the cabin.

106.     Plaintiff had never disclosed to Lubertazzi or any of the attorneys attending Lubertazzi's cabin retreats any information regarding his military service in Iraq or his combat experiences.

107.     Lubertazzi's reference to "War Stories" in an email copied to senior members of Defendant McCarter was a derogatory, bias-based adverse employment action directed at Plaintiff because of his veteran status, reflecting Lubertazzi's bias-based perception of veterans.

108.     Lubertazzi's email ridiculing Plaintiff's military service, coming from the top of Defendant McCarter's leadership, led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

27

## D. Systematic Exclusion from Diversity, Equity & Inclusion Initiatives (2019-2023)

109.     Throughout Plaintiff's six-year tenure with Defendant McCarter, Defendant's Diversity, Equity & Inclusion Committee ("DEI Committee") organized and hosted an annual Diversity Retreat for diverse attorneys and summer interns.

110.     Despite Plaintiff's status as a military veteran—a federally protected class that is severely underrepresented in the legal profession and constitutes a tiny minority at Defendant McCarter—Defendant excluded Plaintiff from the annual Diversity Retreat for all six years of his employment. As of January 20, 2026, veterans have been added as a protected class under the NJLAD.

111.     According to 2019 statistics, veterans constitute only 1.67% of the attorney workforce in law firms of 251 or more attorneys.

112.     In New Jersey, less than one percent of one percent of the population serves in the military.

113.     The majority of New Jersey's veteran population consists of Vietnam-era veterans and a rapidly declining population of veterans from earlier conflicts, including the Korean War and World War II.

114.     Consequently, there are few judges, partners, attorneys, and law professors in the New Jersey legal field who have served in the Armed Forces of the United States.

115.     Veterans constitute a tiny minority in the legal profession generally and an even smaller minority in New Jersey based on the state's exceptionally low population of active-duty service members and veterans.

116. Defendant McCarter employed over 500 attorneys and staff during Plaintiff's tenure, and Plaintiff was the only Global War on Terror ("GWOT") combat veteran employed by Defendant McCarter of whom he was aware.

117. Defendant McCarter's intentional and systematic exclusion of Plaintiff from the annual Diversity Retreats for six consecutive years was a bias-based, discriminatory adverse employment action that disregarded Plaintiff's status as a veteran and a minority in Defendant's workplace.

118. Defendant McCarter's exclusion of Plaintiff from diversity initiatives signaled to Plaintiff that Defendant devalued his lived experiences as a military combat veteran and disregarded Plaintiff's extensive history of successful veteran advocacy.

119. A true and correct copy of Defendant McCarter's LinkedIn post promoting its annual Diverse Attorney Retreat — from which Plaintiff was excluded for all six years of his employment — together with Plaintiff's comment requesting inclusion of veteran attorneys, is reproduced below:



120.     Plaintiff's exclusion from Defendant McCarter's Diversity Retreats led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

**E. Defendant McCarter's Participation in Mansfield Certification and Exclusion of Veterans from DEI Metrics (2017-2023)**

121.     During Plaintiff's employment, Defendant McCarter participated in the Mansfield Certification program, a diversity initiative created and administered by Diversity Lab, a for-profit DEI consultancy business.

122.     On January 30, 2026, Federal Trade Commission Chairman Andrew N. Ferguson issued warning letters to 42 law firms, including Defendant McCarter, regarding potentially unfair and anticompetitive employment practices related to their participation in the Mansfield Certification program.

123.     The FTC's warning letter stated that the Mansfield Certification program requires participating law firms to agree to follow certain DEI-based employment standards, and that public information suggests participating firms meet regularly with Diversity Lab and their competitor law firms to discuss common implementation of Diversity Lab's criteria.

124.     According to the FTC, the 42 law firms that received warning letters collectively employ over 50,000 attorneys subject to Diversity Lab's criteria.

125.     The FTC warned that "potentially anticompetitive collusion between law firms on DEI metrics can include quotas by which they agree to compose panels of job candidates based on race, sex, or other personal characteristics other than the candidate's merit, or

31

by which law firms agree to make final decisions about hiring and promotions based on those personal characteristics."

126. The Mansfield Certification program requires participating law firms to ensure that talent pools for promotions and leadership opportunities comprise at least 30% "underrepresented" racial and other groups.

127. Upon information and belief, Defendant McCarter's participation in the Mansfield Certification program and its focus on specific demographic categories for diversity initiatives did not include military veterans as a targeted or measured group, despite veterans being a protected class under USERRA at the time of Plaintiff's employment.

128. Upon information and belief, Defendant McCarter's systematic exclusion of Plaintiff from diversity initiatives, despite his status as a severely underrepresented military veteran, was consistent with Defendant's participation in the Mansfield Certification program, which did not prioritize or measure veteran representation.

129. The systematic exclusion of veterans from Defendant McCarter's DEI initiatives, while the firm participated in a program focused on other demographic categories, constituted discriminatory treatment based on Plaintiff's veteran status.

**F. Discriminatory Response to Plaintiff's Advocacy Regarding September 11 Remembrance (October 2022)**

130. Throughout September and October 2022, Defendant McCarter's DEI Committee sent numerous firm-wide emails promoting, celebrating, and commemorating various causes and historical events.

131.     On September 11, 2022, the twenty-first anniversary of the September 11, 2001 terrorist attacks, Defendant McCarter failed to send any firm-wide email honoring or remembering those who lost their lives in the attacks.

132.     On October 5, 2022, Plaintiff sent a reply email to the DEI Committee's firm-wide email address regarding LGBT History Month, inquiring why Defendant had not sent an email honoring and remembering those lost during the September 11 attacks and asking whether there were any veterans serving on the DEI Committee.

133.     After receiving no response for five days, Plaintiff sent a follow-up email on October 10, 2022, to the DEI Committee, copying all DEI Committee members individually, including Joseph T. Boccassini ("Boccassini"), Defendant McCarter's Firmwide Managing Partner; Judge (Retired) Jose L. Linares ("Linares"), an Equity Partner and former United States District Judge; Guillermo C. Artiles ("Artiles"), an Equity Partner and Chair of the Government Affairs Practice Group; Judge Natalie S. Watson ("Watson"), then an Equity Partner and now a Superior Court Judge; Alexander W. Major ("Major"), an Equity Partner and Co-Chair of the Government Contracts & Global Trade Practice Group; and Mary Gabriel ("Gabriel"), Defendant McCarter's Firmwide Deputy Managing Partner. A true and correct copy of Plaintiff's email to the DEI Committee is attached hereto as **Exhibit A**.

134.     In the follow-up email, Plaintiff stated, "the Firm sent the wrong message by not sending out an email honoring and remembering those lost on 9/11" and again requested to represent veterans on Defendant's DEI Committee and Social Justice Project.

135.     Watson, a member of Defendant's DEI Committee, a well-known LGBTQIA+ advocate, and a board member of the New Jersey Garden State Equality Organization —

New Jersey's largest and most prominent LGBTQ+ advocacy organization, sent Plaintiff a derogatory email alleging that Plaintiff was homophobic.

136. Watson, a member of Defendant's DEI Committee and a well-known LGBTQIA+ advocate, responded to Plaintiff's email with a lengthy reply copied to all DEI Committee members in which she insinuated that Plaintiff's inquiry about 9/11 remembrance was motivated by anti-LGBTQ+ bias.

137. Watson stated: "I'm a little confused as to why you are writing in October about the posts honoring 9/11, in response to our LGBTQA history acknowledgement" and that "your email timing certainly sends a message to me, as one of the few out attorneys at the firm."

138. Watson's statement that Plaintiff's "email timing certainly sends a message to me, as one of the few out attorneys at the firm" was a clear insinuation — made publicly to all DEI Committee members — that Plaintiff's inquiry about honoring those lost on 9/11 was motivated by homophobia rather than by his genuine concern as a Navy SEAL who was on active duty during the September 11, 2001 attacks.

139. Watson further stated that she "take[s] umbrage" with Plaintiff's email and questioned why Plaintiff chose to raise the 9/11 issue "in response to our LGBTQA history acknowledgement (versus directing this to our Firm leadership)" — further implying that Plaintiff's email was an attack on LGBTQ+ recognition rather than a legitimate request for veteran inclusion

140. Watson's baseless insinuation that Plaintiff was homophobic was an adverse allegation made by a McCarter Equity Partner and leader in the firm's DEI Committee,

copied to all DEI Committee members, and had the potential to destroy Plaintiff's legal career and professional reputation.

141.    Watson's accusation was based on nothing more than Plaintiff's status as a veteran and Navy SEAL who had reasonably questioned why Defendant McCarter had not sent an email honoring those lost in the September 11 terrorist attacks — an event that profoundly impacted Plaintiff's life and the lives of his fellow Navy SEALs.

142.    Plaintiff responded to Watson's email on the same day with a professional, respectful reply in which he explicitly stated: "I have no issues with how consenting adults love and care for each other. I understand our nation has come along way and also respect and admire those who advocate for positive change. In South Jersey, I once swam along the Cooper River directly alongside a Gay Rights Parade to show my support. Many noticed the Navy SEAL swimming alongside."

143.    Plaintiff's response demonstrates that Watson's insinuation of homophobia was entirely baseless. Plaintiff had publicly demonstrated his support for LGBTQ+ rights by physically swimming alongside a Gay Rights Parade — an act of visible, public solidarity that directly contradicts Watson's accusation.

144.    Despite Plaintiff's professional, respectful, and explicitly pro-LGBTQ+ response, Watson's public insinuation of homophobia — made to all DEI Committee members — was never retracted or corrected by Watson or by Defendant McCarter.

145.    Watson's insinuation of homophobia carried particular weight and credibility given her status as a board member of the New Jersey Garden State Equality Organization, New Jersey's largest and most prominent LGBTQ+ advocacy organization. An accusation of homophobia from a person of Watson's stature in the LGBTQ+

advocacy community — made publicly to all DEI Committee members — had the potential to cause catastrophic and irreparable damage to Plaintiff's professional reputation and career.

146.    Watson knew or should have known that an insinuation of homophobia from a board member of Garden State Equality, directed at a colleague who had simply asked why the firm did not honor those lost on 9/11, would carry devastating weight and could destroy Plaintiff's reputation in the legal community. Watson's reckless use of her position and credibility as an LGBTQ+ advocate to baselessly accuse a Navy SEAL combat veteran of homophobia was an act of bias-based harassment predicated on Plaintiff's veteran status.



147.    Watson's accusation of homophobia was particularly egregious given that Defendant McCarter officially promoted and celebrated Watson's LGBTQ+ advocacy through the firm's Pride Month programming, while simultaneously punishing Plaintiff's veteran advocacy. A true and correct copy of the email exchange between Plaintiff and

Watson is attached hereto as **Exhibit A** (incorporated with the existing LGBT History Month email chain).

148. Defendant McCarter's willingness to officially promote and celebrate Watson's advocacy for the LGBTQ+ community while punishing Plaintiff for advocating for veterans — and allowing Watson to baselessly accuse Plaintiff of homophobia for simply asking why the firm did not honor those lost on September 11 — demonstrates the institutional double standard and viewpoint discrimination that pervaded Defendant's workplace

149. Watson's baseless insinuation that Plaintiff was homophobic was an adverse allegation made by a McCarter Partner and leader in the firm's DEI Committee and had the potential to destroy Plaintiff's legal career.

150. Watson's comment was based on nothing more than Plaintiff's status as a veteran and Navy SEAL who had reasonably questioned why Defendant McCarter had not sent an email honoring those lost in the September 11, 2001 terrorist attacks.

151. Lubertazzi subsequently berated Plaintiff for sending the firm-wide email regarding the September 11 attacks, for stating that the firm was not doing right by veterans, and for requesting a seat on the firm's DEI Committee/Social Justice Project.

152. Lubertazzi told Plaintiff he "didn't know what he was talking about," justified Defendant McCarter's failure to commemorate September 11 by praising the firm's pro bono program for veterans and stated that "the Firm doesn't have to send out an email to acknowledge the 9/11 attacks."

153. Lubertazzi's comments were intended to discourage Plaintiff from advocating for veterans and reserve component service members within Defendant's workplace, by marginalizing Plaintiff's veteran status.

154. Lubertazzi and Watson's discriminatory response to Plaintiff's reasonable inquiry and their rejection of his request to represent veterans on the DEI Committee/Social Justice Project constituted severe and pervasive bias-based discrimination predicated on Plaintiff's status as a veteran. All other protected classes had representation on Defendant McCarter's DEI Committee/Social Justice Project, except veterans.

155. The message sent by Defendant McCarter by excluding Plaintiff from DEI/Social Justice activities was that veterans are a second-class protected class and unworthy of such participation.

156. These actions led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

**G. Discriminatory Refusal to Provide Professional Courtesy to Fellow Navy SEAL (September 2022)**

157. In September 2022, Plaintiff received a phone call from fellow Navy SEAL Shannon Rusch ("Rusch"), who informed Plaintiff that he and his son had been contacted by the Federal Bureau of Investigation ("FBI") regarding their exercise of First Amendment rights to free assembly and free speech at the January 6, 2021 protest in Washington, D.C.

158.    Plaintiff informed Rusch that federal criminal defense was outside Plaintiff's area of legal expertise, but that Defendant employed several former federal and state prosecutors who might be able to recommend a competent defense attorney.

159.    Throughout Plaintiff's six years of employment at Defendant McCarter, Plaintiff was copied on emails from attorneys at Defendant McCarter seeking recommendations for attorneys for clients, colleagues, family members, and friends — a common professional courtesy within the legal profession.

160.    On or around September 27, 2022, Plaintiff sent an email to Defendant's Partners Robert A. Mintz ("Mintz"), Newark Office Managing Partner and a member of Defendant's Social Justice Project, and Geoffrey Rosemond ("Rosemond"), Chair of the Business Litigation Practice and a former Assistant Prosecutor, requesting recommendations for defense attorneys for Rusch and his son.

161.    Mintz responded to Plaintiff's email and suggested that Plaintiff contact Major for a possible recommendation.

162.    Plaintiff found Mintz's suggestion extremely odd because Major was not a former prosecutor, and his law practice focused on cybersecurity liability, not criminal or civil defense.

163.    On or around September 27, 2022, Plaintiff sent an email to Major, a member of Defendant's DEI Committee and Social Justice Project, explaining that Rusch was a friend and former Navy SEAL and that he and his son were seeking a recommendation for a defense attorney after being contacted by the FBI regarding their participation in the January 6 protest in Washington, D.C.

164.    Major refused to provide even a referral to a defense attorney for Rusch and his son.

165.    Major responded to Plaintiff's request with sanctimonious disdain, stating: "Going to shoot straight. I've lived under oaths my entire adult life, and none is more sacrosanct than my oath to serve. But I'll leave my emotions out of it and simply say I have no interest in providing any assistance."

166.    Major's refusal to extend basic professional courtesy to Plaintiff by providing a referral for a fellow Navy SEAL veteran did not align with accepted norms of professional courtesy expected within the legal profession.

167.    Major's conduct was particularly hypocritical given that Defendant McCarter represented the Archdiocese of Newark in defense of allegations of child sexual abuse — a representation that Major apparently found consistent with his professed values.

168.    Major's refusal to provide Plaintiff, a veteran, with a referral for a fellow veteran in need of a defense attorney was an act of bias-based harassment predicated on Plaintiff's veteran status.

169.    Major's bias-based, discriminatory refusal to assist Plaintiff contributed to the severe and pervasive pattern of bias-based adverse employment actions directed at Plaintiff, leading Plaintiff to the reasonable belief that the workplace had become hostile and that the terms and conditions of his employment had been irrevocably altered.

**H. Discriminatory Application of Defendant's Social Media Policies (December 2022)**

170.    On or around December 7, 2022, Plaintiff attended oral arguments before a three-judge panel of the United States Court of Appeals for the Third Circuit at the Federal District Courthouse in Newark, New Jersey.

171.    Plaintiff was the first attorney to participate in a question-and-answer session with three Third Circuit Appellate Judges following oral arguments.

172.    Plaintiff, a GWOT combat veteran and attorney, identified with the paintings in the Newark Federal Courthouse depicting American Revolutionary War veterans and attorneys signing the United States Constitution.

173.    On or around December 7, 2022, Plaintiff made a post on LinkedIn memorializing his visit to the Third Circuit Court of Appeals and his experience observing oral arguments.

174.    The following morning, Defendant's Equity Partner William D. Wallach ("Wallach"), a member of the Bankruptcy Group and supervisor of Kevin O'Toole Jr. (the son of Defendant Kevin O'Toole, Chairman of the Port Authority), approached Plaintiff and stated that Plaintiff's LinkedIn post was "offensive to the Court."

175.    Wallach stated that he and Plaintiff had been "guests" in the Federal Courtroom and that Plaintiff should not have taken pictures of the courtroom or made the LinkedIn post.

176.    Wallach requested that Plaintiff remove the LinkedIn post. A true and correct copy of Plaintiff's LinkedIn post is reproduced below, and the underlying email chain is attached hereto as **Exhibit B**

41



**Bill Brown** is at Federal District Court,
District of New Jersey, Newark Vicinage.

I had the privilege of observing Third Circuit oral
arguments in Newark today. The Courtroom was
beautiful and I enjoyed seeing paintings of Paul Revere
and the signatories of the Constitution (all who put their
lives at risk for thier beliefs and possessed a Lacedonian
and Athenian combination to encroachments on their
freedoms). It was very insightful to hear oral arguments
from four outstanding attorneys (all masters in the art of
persuasion). There's no doubt I plan on using a few of
their techniques I picked up in a speech I'll be giving in
Philadelphia this Thursday (my little persuasive
laboratory experiment). I also pounced on the
opportunity during an open q&a to ask the three Judge
panel (Schwartz, Matey, and Fuentes) a few questions
regarding the affect of judicial assignments on oral
arguments and on projected evaluations regarding case
outcomes based on inquisitive questions from the bench
during oral arguments. My big take aways from this
experience is that the best strategy during oral
arguments is to know your position, answer the Judge's
questions directly, and open with your strongest
position



ESX-L-008932-24   02/26/2026 5:29:45 PM   Pg 43 of 119   Trans ID: LCV2026479395

177.    Wallach's request was a bias-based, discriminatory adverse employment action directed at Plaintiff because of his veteran status, as the post expressed Plaintiff's admiration for the signatories of the U.S. Constitution, many of whom were veterans who had risked their lives for the nation's freedoms.

178.    On the same day that Wallach directed Plaintiff to remove his LinkedIn post, Artiles made a LinkedIn post depicting the exact same Newark Federal Courtroom, featuring a photograph of Third Circuit Appellate Judge Patty Shwartz.

179.    Neither Wallach nor any other Partner at Defendant McCarter requested Artiles remove his LinkedIn post. A true and correct copy of Artiles LinkedIn post is reproduced below:



43

180. Artiles's LinkedIn post was "liked" by many Partners at Defendant's firm.

181. Plaintiff reasonably concluded that Defendant afforded Artiles, a well-known politically connected, non-veteran, Delegate/Co-Chair for President Joe Biden, former counsel for Governor Phil Murphy, and the son-in-law of a retired Federal District Judge, greater rights to express his opinions on LinkedIn than Plaintiff, a combat veteran of the GWOT and Navy SEAL.

182. Wallach's inconsistent application of Defendant's social media policy was an act of illegal, bias-based harassment against Plaintiff based on military veteran status.

183. This act of bias-based harassment and disparate treatment by Wallach, a senior leader, led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

184. Defendant's selective enforcement of its social media policy based on whether employees' views aligned with management's political ideology violated USERRA's prohibition on denying benefits of employment based on veteran status, as Plaintiff's willingness to express views that conflicted with Defendant's preferred ideology was directly connected to his experiences and perspective as a Navy SEAL combat veteran.

**I. Discriminatory Disinvitation from Rutgers Law School Event (February 2023)**

185. In February 2023, Elizabeth Acevedo ("Acevedo"), Assistant Dean for Career Development at Rutgers Law School, sent Plaintiff an email inviting him to attend the Rutgers Law School Annual Law Firm Night scheduled for March 30, 2023.

186.     Acevedo extended this invitation to Plaintiff based on their professional relationship, which Plaintiff had cultivated in his capacity as President of VARU while working to establish internships and employment opportunities specifically for veteran students and alumni at Rutgers Law School.

187.     On February 8, 2023, Plaintiff sent a reply email to Acevedo, copying Defendant McCarter's Equity Partner Sheila E. Calello ("Calello"), Chair of the Bankruptcy Group and a member of Defendant's Social Justice Project, confirming that he was "happy to attend the Rutgers Law School annual Law Firm Night" and offering to recruit other McCarter colleagues to attend.

188.     On or around February 14, 2023, Acevedo sent an email to Artiles in which she expressed concern that she had upset Sandra Cummins and Christine A. Lydon ("Lydon"), Defendant McCarter's Chief Human Resources Officer and a member of the DEI Committee, by inviting Plaintiff to the Rutgers Law School Annual Law Firm Night.

189.     Acevedo sought Artiles's advice on the matter, stating that she "very much valued" his perspective.

190.     Artiles, who is a member of Defendant's DEI Committee, a member of Defendant's Social Justice Project, a Delegate/Co-Chair for President Joe Biden, former counsel for New Jersey Governor Phil Murphy, an Adjunct Professor at Rutgers Law School, and the son-in-law of Linares, responded to Acevedo via email that she had "nothing to worry about."

191.     On or around February 20, 2023, Plaintiff received an unexpected and concerning email from Acevedo in which she informed Plaintiff that Rutgers Law School was

disinviting him from the Rutgers Law School Annual Law Firm Night. A true and correct copy of the email chain regarding the disinvitation is attached hereto as **Exhibit C**.

192.     Acevedo explained in her email that she was contacted by Defendant McCarter's HR Department, and that Defendant's recruitment department had expressed "a preference for sending the formal invite to your Chief Human Resources Officer, Christine Lydon, who would then identify who would attend."

193.     Acevedo apologized to Plaintiff for the "premature" outreach and stated that she would follow up with Plaintiff once she received an update from Defendant.

194.     Lydon directed Rutgers Law School to disinvite Plaintiff from the Rutgers Law School Annual Law Firm Night because of Plaintiff's status as a veteran, his role as President of VARU, and his assertive advocacy for veterans' rights.

195.     Defendant McCarter's HR Department did not have Rutgers Law School disinvite any other, non-veteran attorney employees from the Annual Law Firm Night.

196.     On or around February 20, 2023, Plaintiff sent an email to Acevedo expressing his humiliation at being the President of VARU, the Rutgers veteran-alumni organization, yet being disinvited from attending the Rutgers Annual Law Firm Night.

197.     On or around February 21, 2023, Plaintiff sent an email to Calello, his Practice Group Leader and a member of Defendant's Social Justice Project, in which he expressed the humiliation and emotional distress of being the President of VARU and being disinvited from the Rutgers Annual Law Firm Night, stating: "I understand Rutgers Law is uninviting me from the Rutgers Annual Law Firm Night because my Firm's recruitment department stated they indicated a preference on who Christine Lydon

identifies to attend from my Firm. Being the President of the Veteran Alumni of Rutgers University, this un-invitation especially hurts."

198.    On or around February 21, 2023, Lydon contacted Plaintiff and falsely claimed that the reason for Plaintiff's disinvitation was a "miscommunication" between Defendant's HR Office and Rutgers Law School.

199.    On March 30, 2023, after enduring significant professional and personal embarrassment, Plaintiff attended the Rutgers Law School Annual Law Firm Night. A true and correct copy of Plaintiff's LinkedIn post about the event is reproduced below:



William Brown

Great time at the Rutgers Annual Law Firm Night after being invited and then uninvited and then re-invited after some form of miscommunication between Rutgers and HR. It was extremely impressive to see so many young and excited law school students. I did my best to encourage all the students to seek internships and clerkships.



200.    Also attending the event were Defendant's Partners Artiles and Omar A. Bareentto ("Bareentto"), Co-Chair of the New Jersey Democratic State Committee Muslim Caucus and a member of Defendant's Social Justice Project.

201.    Lydon's bias-based, discriminatory action in having Rutgers Law School disinvite Plaintiff — the President of VARU — from the Rutgers Law School Annual Law Firm Night was part of a pattern and practice of pervasive bias-based discrimination and

48

harassment that led Plaintiff, a reasonable veteran-attorney employee, to believe the conditions of employment had been altered, and the working environment was hostile and abusive.

**J. Retaliation for Plaintiff's Advocacy for Equal Pay for Veterans (Fall 2023)**

202.    In the fall of 2023, Plaintiff posted on the professional social networking site LinkedIn advocating for fair and equal pay for veterans.

203.    Plaintiff's LinkedIn post stated: "Sometimes movies reflect reality. The Sheriff who tried to pressure the war Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves."

204.    Plaintiff's LinkedIn post included a video clip from the first Rambo film, "First Blood," depicting the character John Rambo, a decorated Vietnam War veteran who upon coming home from war, faces discrimination and harassment from local law enforcement. A true and correct copy of Plaintiff's LinkedIn post is reproduced below:



**William Brown**

Sometimes movies reflect reality. The Sheriff who tried to pressure the War Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves.







205.     The pictures and Plaintiff's accompanying commentary resonated with many veterans who, having led troops in combat and been responsible for millions of dollars in military equipment, returned home from the GWOT only to face difficulty obtaining employment and fair compensation.

206.     The line from First Blood, "Back there I could fly a gunship, I could drive a tank, I was in charge of million-dollar equipment, back here I can't even hold a job parking cars!" is well known within veteran culture, capturing an often-voiced veteran perception of wartime military service: in the combat zone, servicemembers have huge responsibilities, earning respect and military expertise the hard way, but upon coming home, military skills are often devalued, readjustment to civilian life can be trying, and veterans are sometimes distrusted or feared by civilian employers.

207.     The next day following Plaintiff's LinkedIn post advocating for equal pay for veterans, Plaintiff was called into a conference room by Boccassini, Defendant's Firmwide Managing Partner and a member of Defendant's DEI Committee and Social Justice Project, and Adam N. Saravay ("Saravay"), Defendant's employment attorney and a member of Defendant's Social Justice Project.

208.     Boccassini and Saravay represented Defendant McCarter, and their words expressed Defendant McCarter's corporate displeasure with Plaintiff's LinkedIn post advocating for equal pay and opportunities for veterans.

209.     Even though Plaintiff's LinkedIn post displayed no visual depiction of violence and contained no language referencing violence, Boccassini and Saravay exploited the worst possible stereotypes of veterans by questioning whether Plaintiff was mentally sound, and expressing spurious concern that Plaintiff was going to hurt someone.

51

210.    Plaintiff is a consummate professional who maintained professional decorum at Defendant throughout his employment and never made a threatening comment to anyone in the workplace.

211.    Despite Plaintiff's unblemished history of professional conduct, Boccassini and Saravay implied that Plaintiff was mentally unstable and expressed concern that Plaintiff might hurt someone after Plaintiff simply made a social media post advocating for fair and equal opportunities for veterans.

212.    Boccassini and Saravay's baseless implication of violent intent invoked harmful media stereotypes of veterans as mentally damaged and dangerous, unstable victims of PTSD, and constituted bias-based, discriminatory harassment directed at Plaintiff because of his veteran status.

213.    Boccassini and Saravay chastised Plaintiff in the conference room for making the LinkedIn post advocating fair pay and equal opportunities for veterans.

214.    These were adverse, discriminatory employment actions taken by Defendant's Firmwide Managing Partner and Defendant's employment attorney, directed at Plaintiff because of his veteran status and his advocacy for fair and equal pay for veterans.

215.    Boccassini and Saravay's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

**K. Harassment Through Transmission of Defamatory Article Portraying Iraq Veterans as War Criminals (November 2023)**

216.    On November 6, 2023, Saravay, Defendant's employment attorney and a member of Defendant's Social Justice Project, sent Plaintiff an email containing a link to a New York Times article titled "A Secret War, Strange New Wounds and Silence from the Pentagon."

217.    The New York Times article portrayed Iraq War veterans as mentally "damaged, very damaged" and as war criminals who acted "with savage enthusiasm, often bending the rules to hit not just enemy positions, but also mosques, schools, dams and power plants." A true and correct copy of the text and images from the article are reproduced below:

■ nytimes.com



## 'Damaged, very damaged'



🔒 nytimes.com

𝕮          🎁 Share full article          ⤳    🔖    💬 451

The relentless firing was being driven by a small, top-secret Army Delta Force group called Task Force 9. President Donald J. Trump had given the task force broad authority to use heavy firepower, and the task force applied it with savage enthusiasm, often bending the rules to hit not just enemy positions, but also mosques, schools, dams and power plants.

Sometimes, artillery crew members said, the task force ordered them to fire in a grid pattern, not aiming at any specific target but simply hurling rounds toward Raqqa, to keep the enemy on edge.

218.    Saravay's email and the attached article discredited the honorable service of American veterans of the Iraq War.

219.    Saravay sent the email containing the defamatory article to Plaintiff specifically because of Plaintiff's status as a combat veteran and Navy SEAL who served in Iraq during the GWOT, the war the article featured.

220.    Plaintiff is proud of his service to the United States in Iraq and was offended and demoralized by Saravay's email portraying Iraq War veterans as criminals and mentally damaged individuals.

221.    Plaintiff and other veterans are subjected to incessant, inaccurate, stereotypical media and entertainment portrayals of American military veterans as damaged, dupes, killers, war criminals, and worse.

54

222. The Navy SEAL Ethos, by which Plaintiff lives his life, provides: "Brave SEALs have fought and died building the proud tradition and feared reputation that I am bound to uphold. In the worst of conditions, the legacy of my teammates steadies my resolve and silently guides my every deed."

223. Saravay's transmission of the defamatory article was a direct insult to the Ethos by which Plaintiff lives, and to the memory of Plaintiff's fellow SEALs who were killed in action.

224. Saravay's action served to reinforce inaccurate and damaging stereotypes of American veterans that Plaintiff found inescapable, even in Defendant's workplace ostensibly dedicated to applying the principles of Diversity, Equity, and Inclusion.

225. No other protected class at Defendant McCarter's workplace was subjected to such bias-based harassment.

226. Saravay is the employment counsel for Defendant McCarter, and it is reasonable for Plaintiff to believe Saravay exerts authority to set personnel policies, rules and regulations at McCarter, including promotions, pay, and work assignments.

227. Saravay's pejorative characterization of veterans represented a pervasive pattern and practice of bias-based harassment and discrimination against Plaintiff based on his status as a veteran.

228. Saravay's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran attorney-employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

55

**L. Retaliatory Assignment of Morally Repugnant Child Sexual Abuse Defense Work (2021-2023)**

229.    After Plaintiff began publicly advocating for fair pay and equal opportunities for veterans, Defendant McCarter inexplicably altered the nature of his work assignments.

230.    Plaintiff's previous work assignments were primarily bankruptcy and commercial litigation matters consistent with his role in the Bankruptcy Group.

231.    Beginning in or around 2021 and continuing through 2023, Defendant assigned Plaintiff a high-volume caseload defending allegations of child sexual abuse against the Catholic Church and its dioceses.

232.    These child sexual abuse defense assignments were unrelated to Plaintiff's role in the Bankruptcy Group and were outside the scope of work assigned to attorneys in that practice group.

233.    Plaintiff informed Lubertazzi and Calello that as the father of a young daughter, while he acknowledged the constitutional right of accused parties to a vigorous defense, he struggled with the moral dilemma of defending child sexual abuse matters.

234.    Plaintiff sent emails to Lubertazzi, Adam M. Swanson ("Swanson"), Lisa S. Bonsall ("Bonsall"), and Wallach, Partners in the Bankruptcy Group, explaining that it was difficult for him to work on child molestation cases and requesting assignments more typical of the Bankruptcy Group's practice.

235.    Lubertazzi, Bonsall, and Wallach did not respond to Plaintiff's email request seeking assignment of typical Bankruptcy Group work.

236.    Swanson's only response was to ask whether Plaintiff's email was intended directly for him.

237.    Plaintiff responded to Swanson, clarifying the email was intended for all Partners in the Bankruptcy Group, and that it constituted a request to return to being assigned typical Bankruptcy Group work.

238.    Plaintiff explained his difficulties with child sexual abuse matters due to the conflicting emotions such assignments produced, concerns regarding the morality of the work, and his conflicting role as a father.

239.    While Plaintiff reaffirmed the right of the accused to a vigorous defense, Plaintiff expressed a personal conflict with his values.

240.    Despite Plaintiff's reasonable request, Swanson, Lubertazzi, Bonsall, and Wallach made no further response and did not provide Plaintiff with the bankruptcy work he had requested.

241.    Despite being assigned to the Bankruptcy Group, from 2021 through 2023, Defendants made defense of child sexual abuse matters Plaintiff's primary work responsibility.

242.    No other attorneys in the Bankruptcy Group were assigned child sexual abuse defense matters in comparable volume or frequency.

243.    The assignment of an unusual volume of child sexual abuse cases to Plaintiff, a veteran who had recently complained publicly about pay inequality for veterans at Defendant McCarter, was retaliatory and discriminatory.

244.    The assignment of child sexual abuse cases was intended to pressure Plaintiff to resign from Defendant McCarter rather than continue to advocate for veterans' rights and equal treatment.

245. The retaliatory practice of assigning Plaintiff child sexual abuse defense cases continued for approximately one and a half years and constituted part of a continuing pattern of adverse employment actions that led Plaintiff to the reasonable conclusion that the workplace had become hostile and that the terms and conditions of his employment had been irrevocably altered.

246. In his September 27, 2022 email response to Major's refusal to assist with a referral for Navy SEAL Rusch, Plaintiff stated: "So glad you are rooted and strong. Meanwhile I'll keep working on all these child molestation defense cases I've been assigned. Sometimes I wonder if due process and the right to a fair trial is a myth."

247. This email reflects Plaintiff's distress at the retaliatory work assignments and his perception that Defendant McCarter's professed values (Major's invocation of his "oath to serve") were hypocritical given the firm's defense of institutional child sexual abuse and its refusal to extend professional courtesy to a Navy SEAL veteran.

248. The change in Plaintiff's work to majority child sexual abuse cases was an act of bias-based harassment for Plaintiff's status as a military veteran.

249. The assignment of majority child sexual abuse work known by Defendant McCarter to be repugnant to Plaintiff was a discriminatory and harassing adverse employment action designed to make continued employment untenable for Plaintiff.

250. Defendant McCarter's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran attorney-employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

**M. Denial of Career Advancement and Unequal Pay (2023)**

251. Throughout Plaintiff's employment with Defendant McCarter, Defendant McCarter failed to provide Plaintiff with a career path to become a regular Associate and earn compensation equal to that of other non-veteran attorneys performing substantially similar work.

252. On December 14, 2023, Plaintiff attended his annual performance review, during which he met with Calello, Saravay, and Lydon.

253. During the annual review, Plaintiff received positive feedback regarding his work performance and business development efforts.

254. Defendant awarded Plaintiff a $15,000 annual salary increase, raising his base salary to $115,000.

255. Plaintiff expressed his displeasure at being discriminated against by Defendant based on his status as a veteran, explaining that even with the $15,000 raise, a newly hired Associate's base salary was $55,000 higher than his own.

256. Plaintiff stated to McCarter supervisors that it was a disgrace that he was one of the few veterans at Defendant's firm and that after six years of performing fully and competently in his position, Plaintiff still received substantially less compensation than a non-veteran first-year Associate.

257. Plaintiff requested that Defendant provide him with specific steps he could take to become a regular Associate to receive fair and equal pay for substantially similar work.

258. Plaintiff also requested a severance package to help him evaluate his options and determine his next steps.

259.     On December 18, 2023, Saravay came to Plaintiff's office and informed Plaintiff that Defendant McCarter was willing to provide him with a four-month severance package and that Defendant McCarter would "get back to him" about what specific steps Plaintiff could take to become a regular Associate.

260.     Following the December 14, 2023 annual review, Plaintiff sent multiple emails to Saravay requesting the specific steps Saravay had promised to provide regarding how Plaintiff could become a regular Associate and receive equal pay.

261.     Despite Plaintiff's repeated requests, Saravay never responded to Plaintiff's emails and never provided the promised information about steps to become a regular Associate.

262.     On December 27, 2023, when Gabriel and Lydon informed Plaintiff that his employment was being terminated, Lydon stated that it was "a shame" Plaintiff was being fired because she and Saravay had been "working on ways" Plaintiff could become a regular Associate.

263.     Lydon's admission that she and Saravay had been working on a promotion pathway for Plaintiff — made at the moment of Plaintiff's termination — demonstrates that Defendant's stated reason for termination (alleged social media policy violation) was pretextual. If Defendant had legitimate concerns about Plaintiff's December 22, 2023 LinkedIn post, Defendant would not have been simultaneously developing a promotion pathway for him.

264.     The temporal sequence — Saravay's December 18, 2023 promise to provide promotion steps, Plaintiff's repeated follow-up emails, Saravay's failure to respond, Plaintiff's December 23, 2023 complaint about discriminatory treatment, and Plaintiff's

December 27, 2023 termination — establishes that Defendant terminated Plaintiff in retaliation for his protected complaints, not because of any legitimate social media policy concern.

265.    Defendant McCarter did not honor Saravay's representation of a reply and did not offer any specific steps Plaintiff could take to become a regular Associate and receive fair and equal pay.

266.    Defendant had no intention of providing Plaintiff with a pathway to become a regular Associate because Defendant was discriminating against Plaintiff based on his veteran status and his outspoken advocacy for veterans' rights.

267.    Defendant McCarter's Equity Partners Howard M. Berkower ("Berkower") and Veronica H. Montagna ("Montagna"), both of whom Plaintiff worked for directly and from whom Plaintiff received excellent performance evaluations, privately advised Plaintiff that it might be better if he left the firm because they did not believe Defendant McCarter would ever make Plaintiff a regular Associate.

268.    The private admissions by Berkower and Montagna — Equity Partners who had direct knowledge of Plaintiff's work product and performance, and who gave Plaintiff excellent evaluations — confirm that Defendant's refusal to promote Plaintiff and provide equal compensation was a deliberate, institutional decision, not an oversight or a reflection of Plaintiff's performance. Despite performing excellent work as evaluated by the very Partners he worked for, Plaintiff was denied the promotion and equal pay afforded to non-veteran attorneys.

**N. Plaintiff's Protected Communications Under CEPA**

269.     Plaintiff's complaints to Defendant regarding unequal pay, discriminatory treatment, hostile work environment, and denial of professional opportunities based on his veteran status constituted protected "whistleblowing" activity under CEPA.

270.     Plaintiff reasonably believed that Defendant's conduct violated one or more laws, rules, or regulations, or clear mandates of public policy, including but not limited to:

a)  The Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301-4335;

b)  The New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 to -50. The NJLAD was amended on January 20, 2026 to include veterans as a protected class;

c)  The New Jersey Equal Pay Act, N.J.S.A. 10:5-12(t) and N.J.S.A. 34:11-56.1 to -56.14; and

d)  Clear mandates of public policy protecting veterans' rights to employment, fair treatment, and freedom of expression.

271.     Plaintiff disclosed his objections and complaints to Defendant McCarter's supervisors and leadership, including:

a)  Complaints to Lubertazzi, Calello, and other Bankruptcy Group partners regarding discriminatory work assignments;

b)  Complaints to Boccassini, Saravay, and Lydon during his December 14, 2023 annual review regarding unequal pay for veterans;

c)  His December 23, 2023 email to Lubertazzi, Calello, Saravay, and Lydon regarding discriminatory work assignments and unequal treatment;

d) His October 2022 emails to the DEI Committee requesting inclusion of veterans in diversity initiatives; and

.e) His LinkedIn post in fall 2023 advocating for equal-treatment of veterans in the workplace.

272. Plaintiff's disclosures and objections were made in good faith based on his reasonable belief that Defendant's conduct was unlawful and contrary to public policy.

**O. Plaintiff's December 22, 2023 LinkedIn Post**

273. On December 22, 2023 — eight days after Plaintiff's annual review and five days before his termination — Plaintiff made a post on LinkedIn reflecting his lived experiences as a Navy SEAL combat veteran in Iraq.

274. Plaintiff's December 22, 2023 LinkedIn post was made in the context of ongoing jihadist terrorist violence worldwide, including the October 7, 2023 attacks on Israel by the terrorist organization Hamas, which killed over 1,200 people, mostly civilians, and resulted in the abduction of 251 hostages, including children.

275. The October 7, 2023 attacks on Israel evoked painful memories for Plaintiff regarding his experiences as a first responder to suicide bombings committed by jihadist terrorists in Iraq.

276. Plaintiff's December 22, 2023 LinkedIn post stated, in pertinent part: "I was a first responder to two suicide bombings in Iraq and those experiences had an impact on my perspective. There are many beautiful and tolerant Muslims but the textual language within the Quran is far from tolerant. In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangsta rap had a huge negative influence on many young and easily impressionable American black youth. The pursuit

63

of negative values leads to a trap, with the real result being a great loss of not even beginning to maximize one's personal growth potential. It's my opinion that there's also a radical culture within the Islamic world that promotes antisocial values and glorifies violence. This has had a devastating impact on millions of young and very easily influenced lives."

277.    Plaintiff's LinkedIn post continued: "The internet and the ease of travel transversed us all into an increasingly smaller and greater connected global society. As a global society we need to use the internet and our educational institutions to promote unity and self and collective societal improvement. These are the cornerstone steps we need to take in order to maximize our individual and collective growth potential."

278.    A true and correct copy of Plaintiff's December 22, 2023 LinkedIn post — the post Defendant McCarter claims justified Plaintiff's termination — is reproduced below:



**William Brown** · ...

Former Navy SEAL / Partner at Purgatore Law Group LLP

... · Edited · 🌐

I was a first responder to two suicide bombings in Iraq and those experiences had an impact on my perspective. There are many beautiful and tolerant Muslims but the textual language within the Quran is far from tolerant.

In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangsta rap had a huge negative influence on many young and easily impressionable American black youth.

The pursuit of negative values leads to a trap, with the real result being a great loss of not even beginning to maximize one's personal growth potential.

It's my opinion that there's also a radical culture within the Islamic world that promotes antisocial values and glorifies violence. This has had a devastating impact on millions of young and very easily influenced lives.

The internet and the ease of travel transversed us all into an increasingly smaller and greater connected global society. As a global society we need to use the internet and our educational institutions to promote unity and self and collective societal improvement.  These are the cornerstone steps we need to take In order to maximize our individual and collective growth potential. The alternative to taking these proactive steps is that as a global society, like the young women depicted in this video we have the potential to destroy ourselves.



**Brides of Allah - Palestinian women jihadists open up about their complicity in attacks in I...**

youtube.com

65

279.     Plaintiff's LinkedIn post was based on his lived experiences as a Navy SEAL combat veteran, his firsthand observations of jihadist terrorist violence, and his informed perspective on the root causes of violent extremism.

280.     Plaintiff's LinkedIn post explicitly acknowledged that "there are many beautiful and tolerant Muslims" and was directed at violent extremist ideology, not at Muslims as a whole or at any racial or ethnic group.

281.     Plaintiff's LinkedIn post did not promote negative stereotypes of Muslims or Black Americans.

**P. Plaintiff's December 23, 2023 Email to McCarter Leadership**

282.     On December 23, 2023, just four days before Plaintiff's termination, Plaintiff sent an email to Lubertazzi, Calello, Saravay, and Lydon regarding his concerns about being assigned a disproportionate volume of child sexual abuse defense cases.

283.     In the December 23, 2023 email, Plaintiff reiterated that he was an Iraq War veteran and Navy SEAL, that he was the President of VARU, that freedom of speech was very important to him, and that he had been discriminated against by Wallach when Wallach requested that he remove his December 7, 2022 LinkedIn post about his visit to the Third Circuit Court of Appeals.

284.     Plaintiff noted in the email that Artiles had made a LinkedIn post depicting the same Newark Federal Courtroom on the same day as Plaintiff's post, yet no one at Defendant McCarter had asked Artiles to remove his post.

285.     Plaintiff stated in the email: "The message I received from this experience is that McCarter & English believes the son-in-law of a Federal District Judge has greater first amendment rights than an Iraq Veteran Navy SEAL."

286. This was a protected communication under CEPA made to upper-level supervisory personnel of Defendant McCarter.

**Q. Plaintiff's Wrongful Termination by McCarter (December 27, 2023)**

287. On December 27, 2023, just four days after Plaintiff sent the email described above and thirteen days after Plaintiff's annual review in which he advocated for equal pay for veterans, Plaintiff was called into a conference room to meet with Gabriel, Defendant McCarter's Firmwide Deputy Managing Partner and a member of the DEI Committee and Social Justice Project, and Lydon, Defendant's Chief Human Resources Officer and a member of the DEI Committee.

288. Gabriel informed Plaintiff that Defendant McCarter had previously warned Plaintiff about making "controversial" posts on social media and that Plaintiff's employment was being terminated because Gabriel believed Plaintiff's December 22, 2023 LinkedIn post "promoted negative stereotypes of Muslim and Black Americans."

289. Defendant's stated reason for Plaintiff's termination was pretextual, designed to obscure the illegal retaliatory nature of the termination.

290. Plaintiff's December 22, 2023 LinkedIn post did not promote negative stereotypes of Muslims or Black Americans, as demonstrated by the plain language of the post itself.

291. Defendant's true motivation for terminating Plaintiff's employment was retaliation for Plaintiff's protected complaints about discrimination, unequal pay, and hostile work environment based on his veteran status. .

292. The temporal proximity between Plaintiff's protected complaints during his December 14, 2023 annual review, his December 23, 2023 email to Defendant's leadership, and his December 27, 2023 termination establishes a clear causal connection

between Plaintiff's whistleblowing activity and Defendant McCarter's retaliatory termination.

293.    Defendant McCarter terminated Plaintiff's employment to silence his advocacy for veterans' rights, to punish him for complaining about unlawful discrimination, and to deter other employees from asserting their rights under the law or complaining about conduct they believed violated laws, rules, regulations, or public policy.

294.    Following Plaintiff's termination, a current employee of Defendant McCarter contacted Plaintiff and expressed fear of being terminated from employment simply for "liking" Plaintiff's LinkedIn posts. A true and correct copy of the current employee's message is reproduced below:



TODAY

Hi William,

I'm employed by McCarter & English, LLP but I've never had the pleasure of working with you, I'm sorry to read what has happened, but I hope that you're happy where you're right now and that you like your new job. I just wanted to let you know that I have been following your posts on LinkedIn for some time, and I agree with you on a lot of topics. Unfortunately, I can't click "like" or comment on them, and express myself publicly because I might lose my job, and with my work position, I'm am aware that it may be harder to get hired if I do share some of the things on the social media platform. I also know how does it feel to be politically oppressed in a workplace. It's not easy for people who have different opinions than democrats/liberals, and we know that "freedom of speech" doesn't exist anymore. This is the sad reality we're living in right now, and hopefully it will change soon. I really do appreciate your courage speaking your mind and a big thank you for your military service!

295.    Defendant's termination of Plaintiff has doubtless had the intended chilling effect on other employees' willingness to exercise their rights to free expression and to report unlawful conduct.

296.    Plaintiff's allegations regarding Defendant McCarter's politically oppressive workplace culture have been independently corroborated by former employees. Peter Antonelli, a former McCarter Associate who worked at the firm for nine years (2005-2014), confirmed Plaintiff's allegations. A true and correct copy of Mr. Antonelli's message is reproduced below:

TODAY

 **Peter Antonelli** · 

Bill: I was at McCarter for 9 years as an Associate in the Boston office, from 2005-2014. I could see that the Firm was increasingly focusing on becoming woke, for a variety of reasons. Pro bono initiatives were a big manifestation of that "ism".

Having had my own firm for 7.5 years with a partner and now as a solo, I don't miss big law and it's Wokeism. There is no amount of salary/money I will accept to sell my soul to the devil that is Wokeism.

Everything that you are saying is factual and true and it is destroying people and our country. Some people gloss it over and some are insane enough to believe it is not true or factual.

Keep pushing.

ESX-L-008932-24  02/26/2026 5:29:45 PM  Pg 71 of 119  Trans ID: LCV2026479395

### R. Plaintiff's Damages from Defendant McCarter's Unlawful Conduct

297.    As a direct and proximate result of Defendant McCarter's unlawful discrimination, retaliation, and wrongful termination, Plaintiff suffered substantial damages, including but not limited to:

a) Lost wages and benefits from the date of termination through the present and continuing into the future;

b) Lost compensation resulting from Defendant's discriminatory underpayment of Plaintiff throughout his six-year tenure, totaling approximately $472,500 in cumulative lost wages (calculated as $70,000 per year for 6.75 years);

c) Loss of professional reputation and damage to Plaintiff's career prospects;

d) Severe emotional distress, humiliation, anxiety, and mental anguish;

e) Damage to Plaintiff's personal and professional reputation resulting from Defendant's false characterization of Plaintiff as promoting negative stereotypes of Muslims and Black Americans;

f) Loss of employment benefits, including health insurance, retirement contributions, and other emoluments of employment; and

g) Costs and expenses incurred in seeking new employment and mitigating damages.

298.    At a New Jersey Jewish Bar Association event where Plaintiff was a speaker, an attorney Aliza Lipschitz Sherman who use to work at McCarter and upon information and belief, was in a personal relationship with a McCarter Partner approached Plaintiff and stated: "You're the attorney who was fired from McCarter for saying bad things about Muslims."

71

299.    This false characterization has followed Plaintiff in the legal community, damaging his ability to secure employment in the New Jersey Big Law legal community.

300.    Plaintiff has suffered physical symptoms as the result of the emotional distress inflicted on him by Defendant McCarter's illegal, bias-based discrimination and retaliation, including loss of sleep, weight gain and weight loss, headaches, and indigestion.

301.    Plaintiff has sought therapeutic treatment for the emotional distress caused by Defendant McCarter's discrimination and retaliation, including participation in the Equine Immersion Project, an equine-assisted therapy program for veterans with PTSD and trauma.

302.    Plaintiff participates in patriotic athletic events for adventure therapy as a coping mechanism for service-related stress exacerbated by Defendant McCarter's workplace discrimination.

**IV. Post-Termination Retaliation by Port Authority Defendants (2024-2025)**

303.    Following Plaintiff's filing of the original Complaint on December 24, 2024, Defendant McCarter retained the law firm of O'Toole Scrivo, LLC as representation in this litigation.

304.    O'Toole Scrivo, LLC is a law firm founded by Defendant Kevin J. O'Toole.

305.    Defendant O'Toole is the managing partner of O'Toole Scrivo, LLC.

306.    Defendant O'Toole serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey, one of the most powerful government positions in the New York-New Jersey region.

307. Upon information and belief, Defendant O'Toole has family, business, and political ties to Defendant McCarter.

308. Upon information and belief, Defendant O'Toole's son, Kevin O'Toole Jr., is an attorney employed by Defendant McCarter and supervised by William D. Wallach, an Equity Partner in McCarter's Bankruptcy Group.

309. On December 23, 2023, Plaintiff sent an email to McCarter leadership complaining about discriminatory treatment by Wallach, O'Toole Jr.'s direct supervisor. Four days later, on December 27, 2023, Plaintiff was terminated. Upon information and belief, Defendant O'Toole had reason to be concerned about protecting Defendant McCarter from liability in this litigation given his son's employment at the firm and supervision by an Equity Partner whom Plaintiff had complained about shortly before his termination.

310. Defendant O'Toole has a personal financial interest in protecting Defendant McCarter from liability in this litigation, as an adverse judgment or settlement could negatively impact his son's employment and career prospects.

311. Defendant O'Toole has a professional interest in protecting Defendant McCarter, as O'Toole Scrivo, LLC derives substantial income from representing Defendant McCarter in this litigation.

312. Defendant Port Authority has historically provided support and resources for the Navy SEAL Foundation NYC SEAL Swim, including access to the World Trade Center site and other Port Authority facilities.

313. In 2020, GI Go Fund CEO Jack Fanous spotlighted the importance of the Port Authority support for the event, stating that "The men and women who work at the Port

Authority of New York and New Jersey are among the most patriotic I have ever worked with," and "They stepped up to provide volunteers for the event and support at every step of the way. Without them, there simply would not be a SEAL Swim."

314.    Employees of Defendant Port Authority have filled integral roles as planners and organizers, providing crucial support to the event.

315.    One Port Authority employee lists himself on LinkedIn as the "Chief planner & resource manager of the Hudson River Navy SEAL Swim."

**Established Relationship Between Defendant O'Toole and Defendant Donovan Regarding the NYC SEAL Swim**

316.    In September 2024, Defendant Donovan presented Defendant O'Toole with a paddle from the Navy SEAL Foundation and an American flag that Plaintiff had arranged for participating Navy SEALs to sign, at a ceremony at Port Authority offices. A true and correct copy of a photograph of this ceremony is reproduced below:

74



317.     Plaintiff was not informed of this ceremony and was not invited to attend, despite being the founder and lead organizer of the NYC SEAL Swim and the person who arranged for the SEALs to sign the American flag that was presented to Defendant O'Toole.

318.     Upon information and belief, Plaintiff was excluded from this ceremony because Defendant O'Toole was aware at that time that his law firm, O'Toole Scrivo, LLC, would be retained to represent Defendant McCarter in this litigation, and Defendant O'Toole did not want Plaintiff to be aware of his direct involvement with the NYC SEAL Swim.

319.     The September 2024 ceremony establishes that Defendants O'Toole and Donovan had a direct, personal relationship regarding the NYC SEAL Swim, and that Defendant Donovan had direct access to Defendant O'Toole — supporting the inference that

Defendant Donovan's subsequent retaliatory threats to Plaintiff were made at Defendant O'Toole's direction.

**Defendant Donovan's Role and Changed Attitude Following Plaintiff's Lawsuit**

320. Defendant Donovan's Port Authority responsibilities include the World Trade Center Site, an essential venue for Plaintiff's SEAL Swim.

321. Defendant Donovan has been involved with the SEAL Swim almost since the start of the event seven years ago.

322. Defendant Donovan previously assisted with coordinating Port Authority resources for the SEAL Swim without controversy.

323. It was only after Plaintiff filed suit against Defendant McCarter that Defendant Donovan's attitude towards cooperating with Plaintiff and supporting the swim soured.

**Defendant Donovan's Deliberate Exclusion of Plaintiff from Planning Conference Call (2025)**

324. In 2025, Defendant Donovan's retaliatory conduct escalated when he organized a conference call with all essential supporting assets for the NYC SEAL Swim — including NYPD, NJSP, and other first responder agencies — and deliberately excluded Plaintiff, the founder and lead SEAL of the event, from the call.

325. Defendant Donovan invited other participants, including Geoff Leard, James Matier, Jorge Puhlovsky, and others, but did not invite or inform Plaintiff about the conference call.

326. When Plaintiff learned of the conference call and asserted his right to participate as the founder and lead organizer of the event, Plaintiff stated: "Pat - I'm the founder and

lead SEAL of NYC SEAL Swim. I should have been included on this conference call. I will be on tomorrow's call."

327.   Defendant Donovan responded dismissively, stating: "I don't need you on the call tomorrow, I've already spoken to both parties and this is to just iron out the last details. You sometimes bring additional and unnecessary topics and dramatics to these conversations that leaves a bad taste with people."

328.   Plaintiff responded professionally and firmly: "You invited Geoff to this call but excluded me when I am the lead SEAL and founder of the event. I have great relationships with multiple people on that call and they were surprised I wasn't included. As the lead SEAL it's important that I be on the call."

329.   Plaintiff further stated: "I am a combat veteran Navy SEAL and leader in the SEAL Community. This is a NYC SEAL Swim that I founded. I represent the War Fighters. Please respect what I bring to the table as I respect you. I should not have been excluded from this call."

330.   Defendant Donovan's characterization of Plaintiff's input as "dramatics" and "unnecessary" was demeaning and dismissive of Plaintiff's role as the founder and lead organizer of the event and reflected the same pattern of marginalizing Plaintiff that characterized Defendant McCarter's treatment of Plaintiff during his employment.

331.   True and correct copies of the text message exchange between Plaintiff and Defendant Donovan regarding Plaintiff's exclusion from the conference call are reproduced below:

ESX-L-008932-24  02/26/2026 5:29:45 PM  Pg 78 of 119  Trans ID: LCV2026479395



ESX-L-008932-24   02/26/2026 5:29:45 PM   Pg 79 of 119   Trans ID: LCV2026479395



< 361     **PD**     ▭

**Pat**

mayors office

> Pat - you did a great job on the calm with the unexpected call with the Mayor's office last year, and with coordinating with the first responders.
>
> You invited Geoff to this call but excluded me when I am the lead SEAL and founder of the event. I have great relationships with multiple people on that call and they were surprised I wasn't included.
>
> As the lead SEAL it's important that I be on the call.  Will be on the call.

Then just listen and let me handle it

> I alerted you and NYPD Leadership when NJSP canceled day before first test swim.
>
> This works when we work together. am a combat veteran Navy SEAL and leader in the SEAL Community. This is a NYC SEAL Swim that I founded. I represent the War Fighters.
>
> Please respect what I bring to the table as I respect you. I should not have been excluded from this call.



**Pat**

Everyone respects your service and everyone else that has served, that's why everyone supports this event so much.

Please understand that I have more and longer relationships with many of these people and organizations and work with them on other projects besides this swim.

This issue with NJSP is bigger than your swim and it's the last thing they are worried about at the moment.

So like I said let me talk and handle it tomorrow and we will be all good

During the unexpected last minute call with the Mayor's Office you asked to take point for similar reasons and I did.

You should have invited me on the call and asked the same. I have no issues with you taking point. I am a lawyer who works for the firm that represents the Sec Def who has been a champion of this event so I understand the jurisdictional issues involved.

I have had many phone calls with Officers on both sides of the

+

ESX-L-008932-24 02/26/2026 5:29:45 PM Pg 81 of 119 Trans ID: LCV2026479395



**12:00**

< 361     PD     ▢

projects besides the **Pat**

This issue with NJSP is bigger than your swim and it's the last thing they are worried about at the moment.

So like I said let me talk and handle it tomorrow and we will be all good

> During the unexpected last minute call with the Mayor's Office you asked to take point for similar reasons and I did.
>
> You should have invited me on the call and asked the same. I have no issues with you taking point. I am a lawyer who works for the firm that represents the Sec Def who has been a champion of this event so I understand the jurisdictional issues involved.
>
> I have had many phone calls with Officers on both sides of the Hudson regarding the same.
>
> I've always been honest and respectful for how you helped in this event. I am the lead SEAL and founder of this event. I will be on the call.

Ok

332.     Defendant Donovan's deliberate exclusion of Plaintiff — the founder and lead

organizer of the NYC SEAL Swim — from a planning conference call with all essential

81

supporting assets was part of a coordinated effort to marginalize Plaintiff and strip him of his role in the charity event he created, in retaliation for Plaintiff's filing of this lawsuit against Defendant McCarter.

333.    Prior to Plaintiff's filing of this lawsuit and Defendant McCarter's retention of O'Toole Scrivo, LLC, Defendant Donovan had never excluded Plaintiff from planning calls or attempted to marginalize Plaintiff's role in the NYC SEAL Swim.

334.    Defendant Donovan's exclusion of Plaintiff from the conference call, combined with his dismissive and demeaning characterization of Plaintiff's participation, constituted an escalation of the retaliatory conduct that culminated in Defendant Donovan's threatening text message.

**Defendant Donovan's Threatening Text Message**

335.    Without the support of Defendant Port Authority, employees such as Defendant Donovan, and resources necessary for the event to succeed become unavailable.

336.    Due to Defendants Port Authority and Donovan having control of access to the 9/11 and Hudson River sites, without the support of Defendant Port Authority's senior leadership, the Swim's primary staging, ceremonial, and logistical areas are unavailable.

337.    The Navy SEAL Foundation is a national nonprofit organization that supports Navy SEALs, their families, and the families of fallen SEALs.

338.    Plaintiff, as founder and lead organizer of the NYC SEAL Swim, had a contractual relationship with the Navy SEAL Foundation, pursuant to which Plaintiff received approximately $40,000 annually for his services in planning, coordinating, and executing the event.

339. Plaintiff received $40,000 from the Navy SEAL Foundation in 2023, 2024, and 2025 for his work organizing the NYC SEAL Swim.

340. In 2025, following Plaintiff's filing of the original Complaint, Defendant Donovan, acting as a representative and agent of the Port Authority, sent Plaintiff a text message threatening to withdraw Port Authority support for the NYC SEAL Swim unless Plaintiff refrained from making any public statements critical of Defendant Kevin J. O'Toole, or O'Toole Scrivo, LLC.

341. Defendant Donovan's text message to Plaintiff stated: "Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC."

342. A true and correct copy of Defendant Donovan's threatening text message to Plaintiff is reproduced below:

 

Pat

at tried to get me to quit by signing me a massive amount of real child molestation defenses and then gave me shit when I asked why the firm's DEI committee can't send out a firm wide email on honoring and remembering all

Ok, we aren't sending anything out about him or posting anything

Very disappointed in the Chairman.

I am not going to blast him publicly with the swim but it's known as my boss Tim Parlatore is the attorney for Secretary of Defense.

I understand
Please be aware though that you cannot post, send or do anything else negative towards him or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC

Understood. The event does to much good for Goldstars, SEALs, Veterans, Law Enforcement Officers and Firefighters for me to risk.

343.     The message sent was "shut up about O'Toole Scrivo or lose your swim" — as without the support of Defendant Port Authority, the SEAL Swim is impossible to continue in the form it has thrived in for the past seven years, and the veterans, Gold Star families, and disabled veterans that benefitted from the nearly one-million dollars in charity raised by the swim would go without. This was a cause of great concern and emotional distress for Plaintiff, and his sense of duty to those who benefit from the Swim compelled him to speak up, despite the dire nature of the threat.

344.     Commissioner Kevin J. O'Toole's name being invoked by Defendant Donovan, within the context of retaliatory threats premised on Plaintiff's action against Defendant McCarter, is a cause for grave concern, tending to show the retaliation extended to the highest levels of Port Authority leadership.

345.     Invoking the name of the powerful Commissioner of the Port Authority, Kevin J. O'Toole, the founder and senior partner of Defendant McCarter's counsel, O'Toole Scrivo, creates a causal nexus between the retaliation committed by Defendant Donovan and Defendant Port Authority and Plaintiff's lawsuit against Defendant McCarter.

346.     Upon information and belief, Defendant Donovan's threat was made with the knowledge and approval of Defendant Port Authority senior leadership, including Defendant O'Toole.

347.     Upon information and belief, Defendant Donovan informed Joe Palermo, a former employee of Defendant Port Authority, that he was receiving directions from senior Port Authority leadership to withdraw support from the NYC SEAL Swim if Plaintiff participated in the event.

348.     Defendant Donovan's statement to Palermo demonstrates the retaliation against Plaintiff was not the act of a single rogue employee, but rather an institutional decision, aided, abetted, condoned and ratified by senior leadership of Defendant Port Authority.

349.     Upon information and belief, Defendant O'Toole, in his dual capacity as Port Authority Chairman and Managing Partner of O'Toole Scrivo, directed, ratified, or approved Defendant Donovan's threats to Plaintiff.

350.     Upon information and belief, Defendant O'Toole's involvement in directing or approving Defendant Donovan's conduct occurred in the context of: (a) O'Toole Scrivo, LLC representing Defendant McCarter in this litigation and deriving substantial income from that representation; and (b) O'Toole's son being employed by Defendant McCarter and supervised by William D. Wallach, an Equity Partner whom Plaintiff had complained about four days before Plaintiff's termination. Defendant O'Toole's orders to Defendant Donovan were motivated by O'Toole's personal interest in protecting his son's employer (Defendant McCarter) and his professional interest in protecting his law firm's client (Defendant McCarter).

**Consequences of Port Authority Retaliation**

351.     Following Defendant Donovan's threats, officials of Defendant Port Authority informed the Navy SEAL Foundation that it would not support the 2026 NYC SEAL Swim if Plaintiff participated in the event.

352.     As a result of Defendant Port Authority's retaliatory threat, the Navy SEAL Foundation terminated its contract with Plaintiff and withdrew from participating in the 2026 NYC SEAL Swim.

353.    The Navy SEAL Foundation's termination of Plaintiff's contract was a direct and proximate result of the threats and retaliation by Defendants Port Authority, O'Toole, and Donovan, acting in coordination with Defendant McCarter and its defense counsel.

354.    As a direct and proximate result of the Navy SEAL Foundation's withdraw from the NYC SEAL Swim, Plaintiff lost $40,000 in income for 2026.

355.    Upon information and belief, Plaintiff will continue to lose $40,000 annually in future years due to the actions of Port Authority Defendants unless his relationship with the Navy SEAL Foundation is restored or he secures another sponsor for the NYC SEAL Swim.

356.    In addition to the financial loss, Plaintiff has suffered severe emotional distress, humiliation, and reputational harm because of the Navy·SEAL Foundation's withdrawal from the charity event Plaintiff founded and has led for seven years.

357.    The Navy SEAL Foundation's withdrawal from the NYC SEAL Swim has severely damaged Plaintiff's standing in the veteran community and his reputation as a veteran advocate and leader; the name of Bill Brown Jr. is synonymous with the Navy SEAL Swim.

**Plaintiff's Mitigation Efforts**

358.    Following the Navy SEAL Foundation's withdrawal from the NYC SEAL Swim, Plaintiff has actively sought to mitigate his financial losses and preserve the positive impact of the swim by meeting with numerous non-profit organizations to identify an alternative sponsor for the event.

359.    Plaintiff's mitigation efforts reflect his deep commitment to continuing the patriotic and therapeutic mission of the NYC SEAL Swim, which provides Adventure

Therapy for Navy SEALs, veterans, police officers, firefighters, Gold Star families, and 9/11 survivors.

360.    Despite Plaintiff's diligent efforts, the unique nature of the Port Authority's support — including access to the World Trade Center site, the Hudson River staging areas, and Port Authority personnel and resources — have made it extremely difficult to identify a replacement sponsorship capable of providing equivalent support.

361.    Plaintiff's inability to fully replace the Port Authority's support and the Navy SEAL Foundation's sponsorship demonstrates the severity and irreparability of the harm caused by Defendants' retaliatory conduct.

362.    The NYC SEAL Swim has raised millions of dollars in charitable funds over its seven-year history, benefitting Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters. Defendants' retaliatory conduct threatens to destroy this charitable legacy and deprive these communities of the therapeutic and financial benefits the swim provides.

**State Action and Conspiracy**

363.    Upon information and belief, Defendants Port Authority, O'Toole, and Donovan's conduct was undertaken under color of state law, and constituted retaliation against Plaintiff for exercising his First Amendment rights to free speech and to petition the government for redress of grievances (by filing this lawsuit).

364.    Defendants Port Authority, O'Toole, and Donovan's conduct was undertaken in conspiracy with Defendant McCarter and O'Toole Scrivo, LLC to deprive Plaintiff of his constitutional rights and to punish him for his assertive public advocacy for his positions, and for veterans' rights, and for filing this lawsuit.

365.    Defendants Port Authority, O'Toole, and Donovan's conduct was willful, wanton, and malicious, and was undertaken with reckless disregard for Plaintiff's constitutional rights qualifying this matter for punitive damages.

## V. Defendant McCarter's Conduct Was Willful

366.    Defendant McCarter is New Jersey's largest law firm, a sophisticated employer with over 500 employees, including a dedicated Labor & Employment practice group.

367.    Defendant McCarter knew or should have known that USERRA prohibits discrimination and retaliation against veterans in terms, conditions, and benefits of employment.

368.    Defendant McCarter's six-year pattern of discrimination against Plaintiff demonstrates willful violations of USERRA.

369.    Defendant McCarter's failure to investigate Plaintiff's complaints about discriminatory work assignments, pay disparity, and hostile work environment demonstrates reckless disregard for Plaintiff's rights under federal and state law.

370.    Defendant McCarter's use of a pretextual reason for termination (alleged violation of a social media policy) while selectively enforcing that policy based on viewpoint demonstrates willful retaliation.

## COUNT I — Discrimination in Violation of USERRA – 38 U.S.C. § 4311(a)

### (Against Defendant McCarter)

371.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

372.    USERRA has no statute of limitations. All acts alleged herein are timely.

373.    USERRA prohibits discrimination against any person based on past military service. 38 U.S.C. § 4311(a).

374.     USERRA defines "benefit of employment" broadly to include "terms, conditions, or privileges of employment." 38 U.S.C. § 4303(2).

375.     Under USERRA, an employer is deemed to have engaged in prohibited discrimination if the person's performance of service in the uniformed services is a motivating factor in the employer's action. 38 U.S.C. § 4311(c)(1).

376.     Defendant McCarter discriminated against Plaintiff in violation of USERRA by denying Plaintiff benefits of employment, including: (a) fair and equal compensation; (b) promotion to regular Associate status; (c) inclusion in the firm's annual Diversity Retreat; (d) professional development opportunities; (e) work assignments consistent with his role in the Bankruptcy Group; (f) a workplace free from harassment; and (g) retention in employment.

377.     Defendant cannot prove that its adverse employment actions would not have been taken in the absence of Plaintiff's military service.

378.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

379.     Plaintiff is entitled to compensatory damages, liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C), and reasonable attorneys' fees and costs pursuant to 38 U.S.C. § 4323(h).

## COUNT II — Retaliation in Violation of USERRA – 38 U.S.C. § 4311(b)
## (Against Defendant McCarter)

380.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

381.     USERRA prohibits employers from taking retaliatory action against any person because that person has exercised a right provided under USERRA. 38 U.S.C. § 4311(b).

382.    Plaintiff exercised rights protected under USERRA by complaining about discrimination based on his military veteran status.

383.    Defendant terminated Plaintiff's employment because Plaintiff exercised his rights under USERRA.

384.    Defendant cannot prove that Plaintiff's termination would have occurred in the absence of Plaintiff's protected complaints.

385.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

386.    Plaintiff is entitled to compensatory damages, liquidated damages, and reasonable attorneys' fees and costs.

### COUNT III — Hostile Work Environment in Violation of USERRA

### (Against Defendant McCarter)

387.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

388.    USERRA prohibits discrimination in the "terms, conditions, or privileges of employment" based on military service. 38 U.S.C. § 4311(a).

389.    Throughout Plaintiff's employment, Defendant subjected Plaintiff to severe and pervasive harassment based on his military veteran status, as detailed in Sections III(A) through III(R) above.

390.    This harassment was sufficiently severe and pervasive to create an objectively hostile work environment.

391.    Defendant knew or should have known of the harassment and failed to take remedial action.

392.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

393.    Plaintiff is entitled to compensatory damages, liquidated damages, and reasonable attorneys' fees and costs.

## COUNT IV — Retaliation in Violation of CEPA – N.J.S.A. 34:19-3

### (Against Defendant McCarter)

394.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

395.    Plaintiff's termination on December 27, 2023 occurred within one year of the filing of the original Complaint on December 24, 2024, and is therefore timely under CEPA's one-year statute of limitations.

396.    Plaintiff engaged in protected whistleblowing activity under CEPA.

397.    Plaintiff's belief that Defendant's conduct violated laws and public policies was objectively reasonable.

398.    On July 11, 2025, this Court (Hon. Joshua D. Sanders, J.S.C.) denied Defendant McCarter's Motion to Dismiss Plaintiff's CEPA claim.

399.    Defendant McCarter terminated Plaintiff's employment in retaliation for Plaintiff's protected whistleblowing activity.

400.    The temporal proximity between Plaintiff's protected complaints and his termination — thirteen days between his annual review complaints and four days between his December 23, 2023 email — creates a strong inference of retaliation.

401.    Defendant McCarter's stated reason for termination was pretextual.

402.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

403.    Plaintiff is entitled to compensatory damages, back pay, front pay, reinstatement, restoration of benefits, punitive damages, and reasonable attorneys' fees and costs pursuant to N.J.S.A. 34:19-5.

## COUNT V — Wrongful Discharge in Violation of Public Policy (Pierce Claim) – Veteran

## Status

## (Against Defendant McCarter)

404.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

405.    Under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980), an employee has a cause of action for wrongful discharge contrary to a clear mandate of public policy.

406.    New Jersey has a clear mandate of public policy protecting veterans, as evidenced by USERRA, the NJLAD (as amended January 20, 2026, unanimously 108-0), civil service preference laws, and the NJ Judiciary's EEO Policy.

407.    On July 11, 2025, this Court denied Defendant McCarter's Motion to Dismiss Plaintiff's Pierce claim.

408.    The Legislature's unanimous passage of the NJLAD amendment (Senate 37-0, Assembly 71-0) confirms that protection of veterans from employment discrimination has always been a clear mandate of New Jersey public policy.

409.    The NJLAD amendment was enacted in direct response to Plaintiff's extensive advocacy regarding the discrimination alleged in this matter. Prior to the Legislature's passage of S.3800, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, providing his McCarter case as a specific example of the employment discrimination that necessitated amending the NJLAD to protect veterans. The Legislature's unanimous passage with knowledge of Plaintiff's pending case

confirms that discrimination against veterans has always been contrary to New Jersey public policy.

410. Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

411. Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT VI — Wrongful Discharge in Violation of Public Policy (Pierce Claim) – Free Speech

### (Against Defendant McCarter)

412. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

413. New Jersey has a clear mandate of public policy protecting freedom of speech, as reflected in the New Jersey Constitution, Article I, Paragraph 6.

414. Defendant terminated Plaintiff for expressing his opinions on matters of public concern based on his lived experiences as a Navy SEAL combat veteran.

415. Defendant's termination threatens public harm by chilling the speech of veterans and other employees.

416. Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

417. Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT VII — Discrimination in Violation of the NJLAD

### (Against Defendant McCarter)

418.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

419.    The NJLAD prohibits discrimination in employment based on membership in a protected class or association with members of a protected class. N.J.S.A. 10:5-12(a).

420.    Throughout Plaintiff's employment, Plaintiff was the functional equivalent of a member of a protected class. Plaintiff was discriminated against because of his veteran status and his outspoken advocacy for veterans' rights — characteristics that, while not enumerated in the NJLAD during Plaintiff's employment, were so closely associated with Plaintiff's identity that discrimination based on those characteristics constituted associational discrimination actionable under the NJLAD. *Calabotta v. Phibro Animal Health Corp.*, 460 N.J. Super. 38, 58 (App. Div. 2019).

421.    Alternatively, the NJLAD was amended on January 20, 2026, adding veterans as a protected class (Senate 37-0, Assembly 71-0).

422.    The NJLAD amendment was enacted in direct response to Plaintiff's advocacy as the leading veterans advocate in New Jersey. Prior to the Legislature's passage of S.3800, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, providing his case against Defendant McCarter as a specific example of the employment discrimination that necessitated the amendment. After Plaintiff and NJ Gold Star Mom Amy Moore met with Senator Troy Singleton, he became a co-sponsor of S.3800 the next day. The Legislature's unanimous passage with knowledge of Plaintiff's pending case supports application of the amendment to the conduct alleged in this Complaint.

423.     Under the "parties' expectations" exception to the presumption of prospective application, recognized in *Johnson v. Roselle EZ Quick LLC*, 226 N.J. 370, 389 (2016), retroactive application is warranted where the Legislature enacts remedial legislation in direct response to a plaintiff's advocacy about specific ongoing discrimination, with full knowledge of the pending case. The Legislature's unanimous vote in response to Plaintiff's case-specific advocacy creates a reasonable expectation that the amendment applies to the conduct Plaintiff complained of. See also *In re D.C.*, 146 N.J. 31, 54-55 (1996) (finding retroactive legislative intent where "the legislative history demonstrates that the Legislature pointedly intended the amendments to address cases such as" the case before the court, and the problem at issue was "the primary motivating factor behind the Legislature's enactment of these amendments"). Here, Plaintiff was the leading NJ veterans advocate and primary motivating factor in encouraging NJ Lawmakers enactment of S.3800/A.5048, Plaintiff provided his pending case against Defendant McCarter as the specific example of veteran discrimination that necessitated the amendment, and the Legislature passed the amendment unanimously with full knowledge of Plaintiff's pending litigation.

424.     Defendant discriminated against Plaintiff in compensation, terms, conditions, and privileges of employment because of Plaintiff's veteran status.

425.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

426.     Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, and equitable relief.

## COUNT VIII — Hostile Work Environment in Violation of the NJLAD

### (Against Defendant McCarter)

427.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

428.    The NJLAD as amended on January 20, 2026 prohibits bias-based harassment and retaliation against veterans.

429.    But for Plaintiff being a veteran, he would not have suffered illegal discrimination, harassment and retaliation.

430.    The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment.

431.    Defendant knew or should have known of the harassment and failed to take remedial action.

432.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

433.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, and equitable relief.

## COUNT IX — Violation of New Jersey Equal Pay Laws

### (Against Defendant McCarter)

434.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

435.    The Diane B. Allen Equal Pay Act, N.J.S.A. 10:5-12(t), prohibits paying members of a protected class less for substantially similar work.

436.    Plaintiff, as a veteran, is a member of a protected class under the NJLAD and New Jersey equal pay laws.

437.   Plaintiff performed substantially similar work to regular Associates requiring similar skill, effort, and responsibility.

438.   Defendant paid Plaintiff approximately $70,000 less per year for substantially similar work.

439.   Defendant had no bona fide factors to justify the pay disparity.

440.   As a direct result, Plaintiff suffered lost wages totaling approximately $472,500 over his six-year employment, plus continuing damages.

441.   Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

442.   Plaintiff is entitled to compensatory damages, treble damages, punitive damages, attorneys' fees and costs.

### COUNT X — Intentional Infliction of Emotional Distress

### (Against Defendant McCarter)

443.   Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

444.   Defendant engaged in intentional, extreme, and outrageous conduct directed at Plaintiff, as detailed in Sections III(A) through III(R) and Section Q above.

445.   Defendant's conduct was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society.

446.   Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

447.   Plaintiff is entitled to compensatory damages for severe emotional distress and punitive damages.

## COUNT XI — Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant McCarter)

448.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

449.     Under New Jersey law, every employment relationship contains an implied covenant of good faith and fair dealing.

450.     Defendant breached the implied covenant by discriminating against Plaintiff, subjecting him to a hostile work environment, retaliating against him, paying him substantially less, denying him advancement, assigning him repugnant work, and terminating him under false pretenses.

451.     Plaintiff is entitled to compensatory damages and such other relief as just and equitable.

## COUNT XII — Violation of 42 U.S.C. § 1983 – First Amendment Retaliation

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

452.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

453.     Defendants O'Toole and Donovan were acting under color of state law at all relevant times.

454.     Plaintiff engaged in protected speech by filing this lawsuit and making public statements regarding his treatment by Defendant McCarter.

455.     Defendants retaliated against Plaintiff by threatening to withdraw Port Authority support for the NYC SEAL Swim unless Plaintiff refrained from exercising his First Amendment rights.

456.     Defendant Donovan's text message explicitly conditioned Port Authority support on Plaintiff's agreement to refrain from exercising his First Amendment rights.

457.    As a direct result, the Navy SEAL Foundation withdrew from NYC SEAL Swim Plaintiff, causing $40,000 in annual income loss.

458.    Defendants' conduct was willful qualifying this matter for punitive damages.

459.    Plaintiff is entitled to compensatory damages, punitive damages against O'Toole and Donovan individually, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT XIII — Violation of 42 U.S.C. § 1983 – Conspiracy to Violate Civil Rights (Against Defendants Port Authority, Kevin J. O'Toole, Patrick Donovan, and McCarter & English LLP)

460.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

461.    Defendants Port Authority, O'Toole, Donovan, and McCarter conspired and acted in concert to deprive Plaintiff of his First Amendment rights.

462.    Defendant O'Toole, as Port Authority Chairman and founder of O'Toole Scrivo (McCarter's defense counsel), had both personal and professional interests in protecting McCarter.

463.    Defendant O'Toole's son is employed by McCarter and supervised by Wallach, whom Plaintiff complained about four days before termination.

464.    Defendant O'Toole, acting in concert with McCarter and O'Toole Scrivo, directed Donovan to threaten Plaintiff.

465.    Defendants reached an understanding to deprive Plaintiff of his constitutional rights through coordinated action.

466.    Defendants acted in concert to: (a) silence Plaintiff's speech; (b) punish Plaintiff for filing this lawsuit; (c) deter Plaintiff from pursuing claims; (d) protect McCarter from liability; and (e) protect McCarter in this litigation, in which O'Toole Scrivo serves as

defense counsel and derives substantial income, and in which Plaintiff had complained about an Equity Partner who supervises O'Toole's son four days before termination.

467. Defendants' conduct was willful qualifying this matter for punitive damages.

468. Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT XIV — Violation of the New Jersey Civil Rights Act – N.J.S.A. 10:6-1 to -2

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

469. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

470. The NJCRA provides a cause of action for deprivation of constitutional rights through threats, intimidation, or coercion.

471. Defendants deprived Plaintiff of his rights to freedom of speech and to petition the government for redress of grievances.

472. Defendants accomplished this through threats to withdraw Port Authority support unless Plaintiff refrained from exercising his constitutional rights.

473. Defendants' conduct was willful qualifying this matter for punitive damages.

474. Plaintiff is entitled to compensatory damages, punitive damages, treble damages, and attorneys' fees and costs pursuant to N.J.S.A. 10:6-2.

## COUNT XV — Tortious Interference with Contract

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

475. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

476. Plaintiff had a valid contractual relationship with the Navy SEAL Foundation ($40,000 annually, documented by payments in 2023, 2024, and 2025).

477. Defendants knew of Plaintiff's contractual relationship.

478.    Defendants intentionally and improperly interfered by threatening to withdraw Port Authority support unless the Navy SEAL Foundation disinvited Plaintiff.

479.    Defendants' interference was without justification and motivated by malice.

480.    Defendants' conduct was willful qualifying this matter for punitive damages.

481.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT XVI — Tortious Interference with Prospective Economic Advantage

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

482.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

483.    Plaintiff had a reasonable expectation of continuing economic advantage from his relationship with the Navy SEAL Foundation ($40,000 annually).

484.    Defendants intentionally and improperly interfered with Plaintiff's prospective economic advantage.

485.    Defendants' interference was without justification and motivated by malice.

486.    Defendants' conduct was willful qualifying this matter for punitive damages.

487.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT XVII — Intentional Infliction of Emotional Distress

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

488.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

489.    Defendants engaged in intentional, extreme, and outrageous conduct by threatening to withdraw Port Authority support for a charity event benefitting Navy

SEALs, veterans, Gold Star families, and 9/11 survivors unless Plaintiff refrained from exercising his constitutional rights.

490.    Defendants' conduct was extreme and outrageous, particularly given that: (a) Plaintiff is a decorated Navy SEAL who founded the swim; (b) Defendants used governmental power to punish Plaintiff; (c) Defendants' actions resulted in Plaintiff being excluded from his own charity event; and (d) Defendants' actions were coordinated with McCarter's defense counsel.

491.    Defendants' conduct was willful qualifying this matter for punitive damages.

492.    Plaintiff is entitled to compensatory damages for severe emotional distress and punitive damages.

## COUNT XVIII — Civil Conspiracy

### (Against All Defendants)

493.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

494.    Defendants McCarter, Port Authority, O'Toole, and Donovan conspired and acted in concert to injure Plaintiff through unlawful means.

495.    Defendant O'Toole, as Port Authority Chairman, founder of O'Toole Scrivo (McCarter's defense counsel), and father of an attorney employed by McCarter, had both personal and professional interests in protecting McCarter.

496.    Defendants reached an understanding to retaliate against Plaintiff by abusing the Port Authority's governmental power to deprive Plaintiff of his income from the Navy SEAL Foundation.

497.    Defendants acted in concert to: (a) silence Plaintiff's speech; (b) punish Plaintiff for filing this lawsuit; (c) deter Plaintiff from pursuing claims; (d) protect McCarter from

liability; and (e) protect McCarter in this litigation, in which O'Toole Scrivo serves as defense counsel and derives substantial income, and in which Plaintiff had complained about an Equity Partner who supervises O'Toole's son four days before termination.

498.    In furtherance of the conspiracy, Defendants: (a) threatened to withdraw Port Authority support; (b) caused the Navy SEAL Foundation to withdrew from NYC SEAL Swim; (c) deprived Plaintiff of his income; and (d) retaliated against Plaintiff for exercising his First Amendment rights.

499.    Defendants' conduct was willful qualifying this matter for punitive damages.

500.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff William Brown Jr. respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

**A. On Count I (USERRA Discrimination):** Compensatory damages, liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C), attorneys' fees pursuant to 38 U.S.C. § 4323(h), and reinstatement or front pay;

**B. On Count II (USERRA Retaliation):** Compensatory damages, liquidated damages, attorneys' fees, and equitable relief;

**C. On Count III (USERRA Hostile Work Environment):** Compensatory damages, liquidated damages, attorneys' fees, and equitable relief;

**D. On Count IV (CEPA):** Compensatory damages, back pay, front pay, reinstatement, restoration of benefits, punitive damages, attorneys' fees pursuant to N.J.S.A. 34:19-5, and injunctive relief;

**E. On Count V (Pierce – Veteran Status):** Compensatory damages, punitive damages, and equitable relief;

**F. On Count VI (Pierce – Free Speech):** Compensatory damages, punitive damages, and equitable relief;

**G. On Count VII (NJLAD Discrimination):** Compensatory damages, punitive damages, attorneys' fees, and equitable relief;

**H. On Count VIII (NJLAD Hostile Work Environment):** Compensatory damages, punitive damages, attorneys' fees, and equitable relief;

**I. On Count IX (NJ Equal Pay):** Compensatory damages of approximately \$472,500 plus continuing damages, treble damages, punitive damages, and attorneys' fees;

**J. On Count X (IIED – McCarter):** Compensatory damages for severe emotional distress and punitive damages;

**K. On Count XI (Breach of Implied Covenant):** Compensatory damages and equitable relief;

**L. On Count XII (§ 1983 First Amendment Retaliation):** Compensatory damages, punitive damages against O'Toole and Donovan individually, and attorneys' fees pursuant to 42 U.S.C. § 1988;

**M. On Count XIII (§ 1983 Conspiracy):** Compensatory damages, punitive damages against individual Defendants, and attorneys' fees pursuant to 42 U.S.C. § 1988;

**N. On Count XIV (NJCRA):** Compensatory damages, punitive damages, treble damages, and attorneys' fees pursuant to N.J.S.A. 10:6-2;

**O. On Count XV (Tortious Interference with Contract):** Compensatory damages, punitive damages, and equitable relief;

**P. On Count XVI (Tortious Interference with Prospective Economic Advantage):** Compensatory damages, punitive damages, and equitable relief;

**Q. On Count XVII (IIED – Port Authority Defendants):** Compensatory damages for severe emotional distress and punitive damages;

**R. On Count XVIII (Civil Conspiracy):** Compensatory damages, punitive damages, and equitable relief;

**S. Pre-judgment and post-judgment interest at the maximum rate permitted by law;**

**T. Costs and expenses of this action; and**

**U. Such other and further relief as the Court deems just and proper.**

**WHEREFORE** Plaintiff demands judgment jointly and severally against Defendants for reinstatement, seniority level, back pay and front pay, restoration of all seniority and all employee benefits that Plaintiff may have lost, compensatory damages for pain and suffering as well as loss of earnings and other employee benefits, damages for reputational and career development injury, consequential damages, incidental damages, punitive damages, attorney fees and costs of suit, injunctive relief requiring remediation of Defendants' retaliation and discrimination through affirmative action, and any other relief deemed by the Court to be equitable and just.

Dated: February 16, 2026

/s/ William Brown

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## CERTIFICATION OF NO OTHER ACTIONS

I certify that the dispute about which I am suing is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit. In addition, I recognize my continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

Dated: February 16, 2026

/s/ William Brown

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## JURY DEMAND

The plaintiff demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35-1(a).

Dated: February 16, 2026

/s/ William Brown

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## CERTIFICATION PURSUANT TO RULE 1:38-7

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Dated: February 16, 2026

/s/ William Brown

_____

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## DESIGNATION OF TRIAL COUNSEL

William Brown, Esq. is hereby designated as trial counsel for Plaintiff William Brown Jr. in the above matter.

Dated: February 16, 2026

/s/ William Brown

_____

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## EXHIBITS

The following documents are incorporated by reference and attached hereto:

**Exhibit A:** Email chain re: LGBT History Month / 9/11 Remembrance (October 5-10, 2022)

**Exhibit B:** Email chain re: Newark Federal Courthouse LinkedIn Post (December 7, 2022)

**Exhibit C:** Email chain re: Rutgers Annual Law Firm Night Disinvitation (February 8-20, 2023)

**Exhibit A: Email chain re: LGBT History Month / 9/11 Remembrance (October 5-10, 2022)**

**From:** Brown, William
**Sent:** Monday, October 10, 2022 12:12 PM
**To:** Watson, Natalie <nwatson@mccarter.com>
**Cc:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@mccarter.com>; Boccassini, Joseph T. <jboccassini@mccarter.com>;
Linares, Jose <jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>;
Major, Alexander <amajor@mccarter.com>; Adejemilua, Onome
<oadejemilua@mccarter.com>; Clarke, Marcie <mclarke@mccarter.com>; Freebery,
James J. <jfreebery@mccarter.com>; Gulati, Maneesh <mgulati@mccarter.com>;
Lydon, Christine <clydon@mccarter.com>; Pallak Movahed, Michelle
<mmovahed@mccarter.com>; Ogilvie, Moyahoena <mogilvie@mccarter.com>; Wilson-
Brito, Simone <swilsonbrito@mccarter.com>; Windfelder, Makenzie
<mwindfelder@mccarter.com>; Gabriel, Mary <mgabriel@mccarter.com>
**Subject:** RE: LGBT History Month

Good afternoon Natalie,

I salute your families service to our nation and your advocacy.
Open and respectful dialog is the best way to move forward and I appreciate your
response.

The firm did not send an email honoring and remembering those lost on 9/11 this year
or last year.
Please forward me any email the firm sent out this year or last year honoring and
remembering those lost on 9/11 and I will immediately apologize.
I was a Navy SEAL on 9/11 (this was a serious life changing event for me) and any
email the firm sent out would have been noticed. Previously, when the firm did not send
out an email honoring those lost on 9/11, I took the initiative and sent a firm wide email
honoring those lost on 9/11.

I responded to the LGBT email because this was the fourth email the D&I Committee
sent out this month honoring and respecting various groups and it disappointed me that
the firm did not also honor those lost on 9/11 last month or the year before. Please
know that I have no issues with how consenting adults love and care for each other. I
understand our nation has come along way and also respect and admire those who
advocate for positive change. In South Jersey, I once swam along
the Cooper River directly alongside a Gay Rights Parade to show my support. Many
noticed the Navy SEAL swimming alongside.

I am available to call and talk with you anytime.

110

Thank you for all the good work you do.
Bill Brown
President of Veteran Alumni Rutgers University


**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Watson, Natalie <NWatson@McCarter.com>
**Sent:** Monday, October 10, 2022 11:30 AM
**To:** Brown, William <wibrown@mccarter.com>
**Cc:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@McCarter.com>; Boccassini, Joseph T. <JBoccassini@McCarter.com>;
Linares, Jose <jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>;
Major, Alexander <amajor@mccarter.com>; Adejemilua, Onome
<oadejemilua@mccarter.com>; Clarke, Marcie <mclarke@mccarter.com>; Freebery,
James J. <JFreebery@McCarter.com>; Gulati, Maneesh <MGulati@McCarter.com>;
Lydon, Christine <CLydon@mccarter.com>; Pallak Movahed, Michelle
<mmovahed@mccarter.com>; Ogilvie, Moyahoena <MOgilvie@McCarter.com>;
Wilson-Brito, Simone <swilsonbrito@McCarter.com>; Windfelder, Makenzie
<MWindfelder@McCarter.com>; Gabriel, Mary <mgabriel@McCarter.com>
**Subject:** Re: LGBT History Month

Bill,

I am writing in my own capacity here and not on behalf of the Committee.

First, I am disappointed and a bit confused by your email. I come from a Navy family. A Watson has fought in every war on behalf of this county since we first arrived in 1716. More than one of us is buried at Arlington. Honoring 9/11 is a deeply important event (and separate, in my view, from honoring the folks who served or who died in service to our Nation). I am proud that the Firm recognizes 9/11, and Veteran's Day, and Memorial Day. and other critical events on behalf of the whole Firm and not just through an individual committee. I have found their messages to the community on those days comforting and heartwarming. As such, I'm a little confused as to why it seems that you think those critically important remembrances are not being honored. It is hard to tell because you do not give examples of what you found wrong with those emails and instead seem just to be targeting this one, as if it takes away from our separate honoring of all service members. As someone who would not work for an organization that disrespects veterans, I take umbrage with your email and hope it arises from a misunderstanding and that you simply missed earlier emails.

111

Second, I am a little confused as to why you are writing in October about the posts honoring 9/11, in response to our LGBTQA history acknowledgement (versus directing this to our Firm leadership, if you think the Firm does not support you enough- or to one of our other history month posts, like our recent Italian American History Month post from a week ago). You speak about sending messages (unintentionally or not) and your email timing certainly sends a message to me, as one of the few out attorneys at the firm.

I am sure that you are aware that there are plenty of folks who have served our Nation proudly who are members of the LGBTQA community. Indeed, there are many folks who fought and died and were not granted equal treatment for their service. And yet your email seems to distinguish between vets and affinity groups, when there are vets in all affinity groups (and sometimes multiple intersecting groups).

Again, I do not speak for the Committee here or for the Firm.  I speak as a colleague who is very confused by your email, particularly when I have supported your work around veterans affairs. I would appreciate the opportunity to speak with you about this to try to understand your thinking here in more detail.  Of course, I want to try to understand your position better, particularly with respect to your response here to our LGBTQA history post versus other posts (and, frankly, why you selected certain people to CC versus others), and I am hopeful you will be open to listening to my points of view as well. I have court appearances this week, but perhaps you and I can line up a call next week at your convenience.

Thanks,
Natalie

Sent from my iPhone

**From:** Clarke, Marcie <mclarke@mccarter.com>
**Sent:** Monday, October 10, 2022 10:57 AM
**To:** Brown, William <wibrown@mccarter.com>
**Subject:** Automatic reply: LGBT History Month

Thank you for your email. I am out of the office for Indigenous Peoples' Day. Although I will be checking email during this time, I will not have regular email access and may be slower than normal to respond.

Please contact docket@mccarter.com and rlecesse@mccarter.com if you need immediate assistance during this time.

Otherwise, I will respond as soon as I am able.

Have a wonderful day!

Best regards,
Marcie

112

ESX-L-008932-24  02/26/2026 5:29:45 PM  Pg 113 of 119  Trans ID: LCV2026479395

**From:** Brown, William
**Sent:** Monday, October 10, 2022 10:57 AM
**To:** M&E Diversity & Inclusion Committee <M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila <scalello@mccarter.com>
**Cc:** Boccassini, Joseph T. <jboccassini@mccarter.com>; Linares, Jose <jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>; Major, Alexander <amajor@mccarter.com>; Adejemilua, Onome <oadejemilua@mccarter.com>; Clarke, Marcie <mclarke@mccarter.com>; Freebery, James J. <jfreebery@mccarter.com>; Gulati, Maneesh <mgulati@mccarter.com>; Lydon, Christine <clydon@mccarter.com>; Pallak Movahed, Michelle <mmovahed@mccarter.com>; Ogilvie, Moyahoena <mogilvie@mccarter.com>; Watson, Natalie <nwatson@mccarter.com>; Wilson-Brito, Simone <swilsonbrito@mccarter.com>; Windfelder, Makenzie <mwindfelder@mccarter.com>; Gabriel, Mary <mgabriel@mccarter.com>
**Subject:** RE: LGBT History Month

Good morning McCarter D&I Committee,

Understand you are all very busy. I wanted to follow up on the below email I sent you last week but haven't received a response from.

I believe I can help adequately represent veterans in the firm's D&I Committee. I am a Iraq veteran Navy SEAL and renowned veterans advocate.

With my inclusion on the D&I Committee I would ensure veterans issues and concerns are represented.

Sometime the things we do and even the things we don't do send a message. In my opinion, the firm sent the wrong message by not sending out an email honoring and remembering those lost on 9/11.

I always try to operate on the win, win philosophy. There are different tactics for committees to react to uncomfortable issues raised. One tactic is to just ignore the issue raised and continue to move forward.

This tactic sends a negative message and I don't believe that's the right way for educated and intelligent people to act. If my concerns are deemed invalid, please tell me the reasons why.

I hope you take this veterans' thoughts into consideration.

Thank you for all the good work you do.

Bill Brown

President of Veteran Alumni Rutgers University

113

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Brown, William <wibrown@mccarter.com>
**Sent:** Wednesday, October 5, 2022 5:34 AM
**To:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@McCarter.com>
**Subject:** Re: LGBT History Month

Good morning McCarter D&I Committee,

I appreciate all the emails this month. They are all worth acknowledging and respecting.

Are there are any veterans in the McCarter D&I Committee?

I didn't see a firm wide email go out about honoring and remembering those lost on 9/11. I was a Navy SEAL on 9/11 and went to war for our nation following 9/11 and was surprised when the firm didn't acknowledge those lost on 9/11 this year in an email.

I hope you take this veterans' thoughts into consideration.

Thank you for all the good work you do.

Bill Brown

President of Veteran Alumni Rutgers University

Sent from my iPhone

On Oct 4, 2022, at 2:17 PM, M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com> wrote:

In 1994, due to the efforts of a coalition of education-based organizations, October was designated as national Lesbian, Gay, Bisexual and Transgender History Month (LGBT History Month). The goal of the observance is to highlight the important contributions of LGBT individuals throughout the history of the United States — contributions that, due to bigotry, prejudices and fears, have often gone unnoticed or have not been acknowledged.

Recognizing the need for and the value in teaching LGBT history, LGBT History Month was created in 1994 by a high school history teacher in Missouri named Rodney Wilson. He believed a month should be dedicated to the celebration and teaching of gay and lesbian history, and gathered other teachers and community leaders to help advance the cause. The month of October was initially chosen because it includes National Coming Out Day on

114

ESX-L-008932-24   02/26/2026 5:29:45 PM   Pg 115 of 119   Trans ID: LCV2026479395

October 11 and the anniversary of the first march on Washington by LGBT individuals on October 14, 1979. The month now also includes Spirit Day on October 20, on which people around the country wear purple in support of LGBT youth;Ally Week, during which allies against LGBT bullying are celebrated; and the anniversary of 21-year-old Matthew Shepard's murder on October 12, 1998, which sparked the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act.

The early years of the celebration were a commemoration and a call to action. But, since then, LGBT History Month has developed into a national effort to highlight role models from the LGBT community and to teach LGBT history.  Accordingly, most recent celebrations during the month involve celebrating the achievements of lesbian, gay, bisexual or transgender icons. Each year since 2006, Equality Forum, a nonprofit 501(c)(3) organization whose mission is to advance national and international lesbian, gay, bisexual and transgender civil rights with an educational focus, has taken the charge to advance the education component of the celebration by highlighting the lives and achievements of 31 LGBT icons, one for each day of the month.  The organization provides a video, biography, bibliography, downloadable images and other downloadable educational resources about the life and accomplishments of each icon who is celebrated. The information for this year's icons can be found at: https://equalityforum.com. Individuals like Robina Asti, advocate for women's and transgender rights (her advocacy changed government rules to allow transgender people to receive Social Security survivor benefits), Hans Christian Anderson, fairy tale author, Sue Bird, WNBA athlete and Raphael Bostic, CEO of the Federal Reserve Bank are just some of the extraordinary individuals brought to the spotlight and celebrated in this year's celebration. By celebrating the achievements of these individuals and encouraging knowledge and tolerance through education, the month long celebration hopes to provide role models, build community, enhance pride, and teach about the extraordinary national and international contributions made by LGBT individuals.

This LGBT History Month, McCarter & English, LLP, joins in recognizing the important impact that LGBT individuals have had on history locally, nationally and internationally.





Onome Adejemilua | Guillermo C. Artiles | Richard A. Beran | Joseph T. Boccassini | Marcie Clarke | James Freebery | Maneesh Gulati | Jose L. Linares | Christine A. Lydon | Michelle Pallak Movahed | Moy N. Ogilvie | Natalie S. Watson | Simone Wilson-Brito | Makenzie Windfelder

**Exhibit B: Email chain re: Newark Federal Courthouse LinkedIn Post (December 7, 2022)**

**From:** Brown, William
**Sent:** Wednesday, December 7, 2022 2:37 PM
**To:** Calello, Sheila <scalello@mccarter.com>
**Cc:** Wallach, William <wwallach@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>
**Subject:** Pics Newark Fed. Crt Rm

Hi Sheila,

I posted two pictures of the Newark Federal Court Room yesterday on social media describing lessons learned from my experience observing Third Circuit Oral Arguments.

Please note, I was really excited by this opportunity because I had the chance to observe excellent attorneys and also had the chance to talk directly with the panel of Judges.

I wanted to share this experience with my family and friends. None of the pictures I posted depicted a Judge.

Bill Wallach was contacted about the pictures I posted on LinkedIn from a Partner at Gibbons and I've been asked by Bill to take the pictures down as a courtesy to the Court.

This was an awesome experience for me but I will honor Bill's request out of respect for him and the Court.

It is fair to point out that I do not believe my social media post set a bad precedence for the firm as Guillermo Artiles who I respect and admire also made the below pictures on LinkedIn yesterday containing the exact same Federal Court Room and Third Circuit Judge Patty Shwartz. Many Partners and Associates at McCarter & English liked Guillermo's post (*only one liked mine*).

Out of respect I copied both Bill and Guillermo on this email.

Thank you,

Bill

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

116

**Exhibit C: Email chain re: Rutgers Annual Law Firm Night Disinvitation (February 8-20, 2023)**

**From:** Brown, William
**Sent:** Monday, February 20, 2023 11:17 PM
**To:** 'elizabeth.acevedo@rutgers.edu' <elizabeth.acevedo@rutgers.edu>
**Subject:** FW: Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

Hi Beth,

I understand Rutgers Law is uninviting me from the Rutgers Annual Law Firm Night because my firm's recruitment department stated they indicated a preference on who Christine Lydon identifies to attend from my firm. Being the President of the Veteran Alumni of Rutgers University this un-invitation especially hurts.

Thank you for your kind words regarding the NYC SEAL Swim and the docuseries.

Best,

Bill

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

117

From: Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>
Sent: Monday, February 20, 2023 11:00 PM
To: Brown, William <wibrown@mccarter.com>
Subject: Re: Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

**External Message**

Hi Bill,

My apologies, we apparently reached out prematurely as I was asked by your recruitment department last week to discontinue our soft outreach to alumni with our "save the date" requests. They indicated a preference for sending the formal invite to your Chief Human Resources Officer, Christine Lydon, who would then identify who would attend. I will follow up with you as soon as I am able once I receive an update from your firm.

Thanks for sharing this information about the docuseries you are creating. I watched the videos linked in your email below and found your work both impressive and moving.

All my best,

Beth

From: Brown, William <wibrown@mccarter.com>
Sent: Wednesday, February 8, 2023 10:52 AM
To: Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>; Wendi Taylor <wltaylor@rutgers.edu>
Cc: Calello, Sheila <scalello@McCarter.com>
Subject: Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

Hi Beth,

Happy to attend the Rutgers Law School annual Law Firm Night scheduled for March 30th (4-6 pm). I will also put the word out and see if I can recruit any other McCarter & English colleagues in attending.

I am putting together a docuseries to share some of the stories of the Veterans, Police Officers, Firefighters, and First Responders that participate in the NYC SEAL Swim. Doing this grass roots and looking for help with fund raising.

Hope you get a chance to see the trailer and let me know what you think.

**One Foot in the Water**

Docuseries Trailer:

https://youtu.be/rcWJq_zcb2A

118

GoFundMe Page and QR Code:

https://gofund.me/bd8c8c24

*If veterans don't look out for each other, no one will.*

Bill

President Veteran Alumni Rutgers University

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wjbrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>
**Sent:** Wednesday, February 8, 2023 7:56 AM
**To:** Brown, William <wjbrown@mccarter.com>
**Cc:** Wendi Taylor <wltaylor@rutgers.edu>
**Subject:** Re: McCarter & English Seeks to Hire RU Law Vet Students & Alumni

**\*\*External Message\*\***

Hi Bill,

Just wanted to make sure to send you a save the date note about our annual Law Firm Night scheduled for March 30th (4-6pm). We would love to have you attend with your McCarter & English colleagues. Please let me know if you're interested in attending and Wendi Taylor, our Recruiting Manager, copied here, will add you to our invite list.

All my best,

Beth

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com

February 27, 2026

**VIA PERSONAL DELIVERY BY PROFESSIONAL PROCESS SERVER,
VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED,
AND VIA OVERNIGHT COURIER (FEDEX PRIORITY)**

**Office of the General Counsel**
Port Authority of New York & New Jersey
4 World Trade Center
150 Greenwich Street
New York, NY 10007
**Attn: Amy Fisher, Esq.**

AND/OR

**Office of the General Counsel**
Port Authority of New York & New Jersey
2 Montgomery Street, 3rd Floor
Jersey City, NJ 07302
**Attn: Amy Fisher, Esq**

**Re: SUPPLEMENTAL NOTICE OF CLAIM PURSUANT TO N.J.S.A. 32:1-163 & 32:1-164**
*Brown v. McCarter & English LLP et al.*, **Docket No. ESX-L-8932-24**
**Superior Court of New Jersey, Law Division, Essex County**

**TO THE PORT AUTHORITY OF NEW YORK & NEW JERSEY:**

Pursuant to N.J.S.A. 32:1-163 and N.J.S.A. 32:1-164, the undersigned hereby provides this Supplemental Notice of Claim against the Port Authority of New York & New Jersey ("Port Authority"), Kevin J. O'Toole (individually and in his official capacity as Chairman of the Port Authority), and Patrick Donovan (individually and in his capacity as employee and/or representative of the Port Authority).

This Supplemental Notice is served by personal delivery by professional process server, by certified mail, return receipt requested, and by overnight courier (FedEx Priority), to the Office of the General Counsel at both the Port Authority's New York office and New Jersey office, in compliance with N.J.S.A. 32:1-164, which authorizes service "by delivering same personally, or by registered mail, to the General Counsel of the Port Authority at the office of said General Counsel in the City of New York or in the State of New Jersey."

1

This Supplemental Notice is provided to supplement and confirm the Notice of Claim served on November 18, 2025, by Claimant's then-counsel, Christopher J. D'Alessandro, Esq. of Donelson, D'Alessandro & Peterson LLC, and to ensure that the Port Authority has full and complete notice of all claims asserted in the First Amended Complaint filed on February 16, 2026 in the above-referenced action.

## I. CLAIMANT INFORMATION

**Name of Claimant**: William Brown Jr., Esq.
**Post-Office Address:**
134 Main Street
South Bound Brook
New Jersey 08880
**Telephone:** (862) 415-4880
**Email:** william.brown@parlatorelawgroup.com

Claimant appears pro se in the above-referenced action.

## II. RESPONDENTS

1. The Port Authority of New York & New Jersey, a bi-state governmental agency and body corporate and politic created by compact between the States of New York and New Jersey, with offices at 4 World Trade Center, 150 Greenwich Street, New York, NY 10007, and One Port Authority Plaza, Jersey City, NJ 07306.

2. Kevin J. O'Toole, individually and in his official capacity as Chairman of the Board of Commissioners of the Port Authority of New York & New Jersey. Defendant O'Toole is also the founder and managing partner of O'Toole Scrivo, LLC, the law firm representing Defendant McCarter & English LLP in the above-referenced litigation.

3. Patrick Donovan, individually and in his capacity as the World Trade Center Site Safety Manager at the Port Authority of New York & New Jersey.

## III. NATURE OF THE CLAIMS

Claimant asserts the following claims against the Port Authority, Kevin J. O'Toole, and Patrick Donovan, as set forth in the First Amended Complaint filed February 16, 2026:

**A. Count XII — Deprivation of First Amendment Rights Under 42 U.S.C. § 1983 (First Amendment Retaliation)**

The Port Authority, acting through Chairman O'Toole and employee Donovan, retaliated against Claimant for exercising his First Amendment rights to free speech and to petition the government for redress of grievances (by filing a lawsuit against McCarter & English LLP). Defendants threatened to withdraw all Port Authority support for the Navy SEAL Foundation NYC SEAL Swim — a charity event founded and led by Claimant for seven years benefitting Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters — unless Claimant refrained from making any public statements critical of Chairman O'Toole or

2

O'Toole Scrivo, LLC. The retaliation was undertaken under color of state law and violated Claimant's clearly established constitutional rights.

### B. Count XIII — Conspiracy to Violate Civil Rights Under 42 U.S.C. § 1983

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to deprive Claimant of his First Amendment rights through coordinated retaliatory action, including threatening to withdraw Port Authority support for the NYC SEAL Swim and causing the Navy SEAL Foundation to terminate its contract with Claimant.

### C. Count XIV — Violation of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2

The Port Authority, O'Toole, and Donovan deprived Claimant of his rights to freedom of speech and to petition the government for redress of grievances through threats, intimidation, and coercion — specifically, by threatening to withdraw Port Authority support and access to the World Trade Center site unless Claimant refrained from exercising his constitutional rights.

### D. Count XV — Tortious Interference with Contract

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's contractual relationship with the Navy SEAL Foundation, which compensated Claimant $40,000 annually for organizing the NYC SEAL Swim. As a direct result of the Port Authority's threats and withdrawal of support, the Navy SEAL Foundation terminated its contract with Claimant, causing him to lose $40,000 in annual income.

### E. Count XVI — Tortious Interference with Prospective Economic Advantage

The Port Authority, O'Toole, and Donovan intentionally and improperly interfered with Claimant's prospective economic relationship with the Navy SEAL Foundation and participants in future NYC SEAL Swim events. The interference was malicious, unjustified, and undertaken for the improper purpose of silencing Claimant's exercise of constitutional rights and protecting McCarter & English LLP in pending litigation.

### F. Count XVII — Intentional Infliction of Emotional Distress

The Port Authority, O'Toole, and Donovan engaged in intentional, extreme, and outrageous conduct by threatening to withdraw Port Authority support for a charity event benefitting Navy SEALs, veterans, Gold Star families, and 9/11 survivors unless Claimant refrained from exercising his constitutional rights, causing Claimant to suffer severe emotional distress.

### G. Count XVIII — Civil Conspiracy

The Port Authority, O'Toole, Donovan, and McCarter & English LLP conspired and acted in concert to injure Claimant through unlawful means, including abusing the Port Authority's governmental power to deprive Claimant of his income from the Navy SEAL Foundation and to retaliate against Claimant for exercising his First Amendment rights.

3

## IV. TIME, PLACE, AND MANNER IN WHICH THE CLAIMS AROSE

### A. Background

Claimant is a decorated Navy SEAL combat veteran of the Global War on Terror who founded and served as the lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River. The event has raised nearly one million dollars over seven years for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters. The Port Authority has historically provided essential support for the event, including access to the World Trade Center site, Hudson River staging areas, and Port Authority personnel and resources.

### B. Filing of Lawsuit and Retention of O'Toole Scrivo

On December 24, 2024, Claimant filed a lawsuit against McCarter & English LLP in the Superior Court of New Jersey, Essex County, Docket No. ESX-L-8932-24, alleging employment discrimination based on veteran status. McCarter & English retained O'Toole Scrivo, LLC — founded and managed by Port Authority Chairman Kevin J. O'Toole — as defense counsel.

### C. Retaliatory Threats by Donovan

In 2025, following the filing of the lawsuit, Defendant Donovan, acting as a representative and agent of the Port Authority, sent Claimant a text message stating: "Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC."

### D. Exclusion from Planning Conference Call

In 2025, Defendant Donovan organized a conference call with all essential supporting assets for the NYC SEAL Swim — including NYPD, NJSP, and other first responder agencies — and deliberately excluded Claimant, the founder and lead organizer of the event, from the call.

### E. Navy SEAL Foundation Withdrawal

Following Defendant Donovan's threats, officials of the Port Authority informed the Navy SEAL Foundation that the Port Authority would not support the 2026 NYC SEAL Swim if Claimant participated in the event. As a direct result, the Navy SEAL Foundation terminated its contract with Claimant and withdrew from the 2026 NYC SEAL Swim.

### F. Coordination with McCarter & English

Upon information and belief, Defendant O'Toole, in his dual capacity as Port Authority Chairman and Managing Partner of O'Toole Scrivo, LLC, directed, ratified, or approved Defendant Donovan's retaliatory threats and the Port Authority's withdrawal of support, in coordination with McCarter & English LLP and its defense counsel, to suppress Claimant's exercise of constitutional rights and protect McCarter & English in the pending litigation.

## V. ITEMS OF DAMAGES

As a direct and proximate result of the conduct described above, Claimant has sustained the following damages, as far as presently practicable:

4. Loss of $40,000 in annual income from the Navy SEAL Foundation for 2026, with continuing annual losses of $40,000 in future years unless the relationship is restored or an alternative sponsor is secured.

5. Severe emotional distress, humiliation, anxiety, and mental anguish resulting from being excluded from the charity event Claimant founded and led for seven years.

6. Reputational harm and damage to Claimant's standing in the veteran community and his reputation as a veteran advocate and leader.

7. Loss of the therapeutic and charitable benefits of the NYC SEAL Swim for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters.

8. Costs and expenses incurred in seeking alternative sponsorship and mitigating damages.

9. Punitive damages for willful, wanton, and malicious conduct undertaken with reckless disregard for Claimant's constitutional rights.

10. Treble damages pursuant to N.J.S.A. 10:6-2 (New Jersey Civil Rights Act).

11. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and N.J.S.A. 10:6-2.

12. Pre-judgment and post-judgment interest at the maximum rate permitted by law.

13. Such other and further relief as the Court deems just and proper.

## VI. REFERENCE TO PRIOR NOTICE AND PENDING LITIGATION

This Supplemental Notice is provided to supplement the Notice of Claim served on November 18, 2025, which identified claims for deprivation of First Amendment rights under 42 U.S.C. § 1983, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress. This Supplemental Notice adds the claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2 (Count XIV of the First Amended Complaint), which arises from the identical facts, identical retaliatory conduct, and identical constitutional deprivations set forth in the original Notice of Claim.

A First Amended Complaint asserting all claims identified herein was filed on February 16, 2026 in the Superior Court of New Jersey, Law Division, Essex County, Docket No. ESX-L-8932-24. A copy of the First Amended Complaint is enclosed herewith.

5

## **VERIFICATION**

I, William Brown Jr., hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: March 2, 2026
/s/ William Brown
**William Brown Jr., Esq.**
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com

**Enclosures:**
1. First Amended Complaint, *Brown v. McCarter & English LLP et al.*, ESX-L-8932-24 (filed Feb. 26, 2026)

6

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
william.brown@parlatorelawgroup.com
*Attorney for Plaintiff*

---

|  |  |
|---|---|
| WILLIAM BROWN Jr.,<br><br>Plaintiff,<br><br>v.<br><br>MCCARTER & ENGLISH LLP, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; KEVIN J. O'TOOLE (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), PATRICK DONOVAN (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), JOHN DOES 1-10 (FICTITIOUS INDIVIDUALS OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN).<br><br>Defendants. | Superior Court of New Jersey<br>Law Division: Civil Part<br>Essex County<br><br>Docket No.: ESX-L-8932-24 |

PORT AUTHORITY OF NJ & NY
OFFICE OF THE SECRETARY
2026 MAR -2 P 4: 04

## SUMMONS

From The State of New Jersey To The Defendant Named Below:

### KEVIN J. O'TOOLE (In His Personal and Professional Capacities)

The plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within **35 days** from the

1

date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.) A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within **35 days**, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services.

2

A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.njcourts.gov.

/s/ Michelle Smith

**Michelle Smith, Clerk of the Superior Court**

Date: Mach 2, 2026

**Name of Defendant to Be Served:**

**KEVIN J. O'TOOLE (In His Personal and Professional Capacities)**

**Address of Defendant to Be Served:**

**Office of the General Counsel**
Port Authority of New York and New Jersey
2 Montgomery Street, 3rd Floor
Jersey City, New Jersey 07302
**Attn: Amy Fisher, Esq., and Kevin J. O'Toole, Esq.**

AND/OR

**Office of the General Counsel**
Port Authority of New York and New Jersey
4 World Trade Center
150 Greenwich Street, 23rd Floor
New York, New York 10007
**Attn: Amy Fisher, Esq., and Kevin J. O'Toole, Esq.**

3

ESX-L-008932-24   02/26/2026 5:29:45 PM   Pg 1 of 119   Trans ID: LCV2026479395

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

**Superior Court of New Jersey**
**Law Division: Civil Part**
**Essex County**

|  |  |
|---|---|
| WILLIAM BROWN Jr.,<br><br>Plaintiff,<br><br>v.<br><br>MCCARTER & ENGLISH LLP, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; KEVIN J. O'TOOLE (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), PATRICK DONOVAN (IN HIS PERSONAL AND PROFESSIONAL CAPACITIES), JOHN DOES 1-10 (FICTITIOUS INDIVIDUALS OR ENTITIES WHO HAVE LIABILITY TO PLAINTIFF FOR ANY OF THE CAUSES OF ACTION CONTAINED HEREIN).<br><br>Defendants. | Docket No.: ESX-L-8932-24<br><br>**FIRST**<br>**AMENDED COMPLAINT** |

Plaintiff, William Brown Jr. ("Plaintiff"), complaining of Defendants McCarter & English LLP, The Port Authority of New York and New Jersey, Kevin J. O'Toole ("Defendant O'Toole"), Patrick Donovan ("Defendant Donovan"), and John Does 1-10, collectively referred to hereafter as "Defendants," states as follows:

1

## PRELIMINARY STATEMENT

1. This action arises from Defendant McCarter & English LLP's systematic discrimination against, and unlawful retaliation against Plaintiff, a decorated Navy SEAL combat veteran of the Global War on Terror, in violation of federal and state law.

2. Between March 2017 and December 27, 2023, Defendant McCarter subjected Plaintiff to a hostile work environment characterized by a pattern and practice of pervasive illegal bias-based harassment and discrimination predicated on military veteran status.

3. Defendant McCarter paid Plaintiff substantially less than similarly situated non-veteran employees, excluded Plaintiff from professional development opportunities afforded to others, purposely assigned Plaintiff morally repugnant work designed to cause emotional distress to pressure Plaintiff's resignation, and ultimately terminated Plaintiff's employment in retaliation for his protected communications alleging unlawful discrimination against, and unequal pay for military veterans.

4. Following Plaintiff's unlawful termination and the filing of this lawsuit, Defendants O'Toole and Donovan engaged in coordinated retaliation against Plaintiff to suppress his exercise of constitutional rights and punish him for filing this lawsuit, resulting in the loss of Plaintiff's $40,000 annual income from the Navy SEAL Foundation. Defendant O'Toole is Port Authority Chairman and founding partner of O'Toole Scrivo, LLC, the firm representing Defendant McCarter in this litigation. Defendant Donovan is the World Trade Center Site Safety Manager at the Port Authority of New York and New Jersey.

5. On November 18, 2025, Plaintiff, through previous counsel, served a written Notice of Claim upon Defendant Port Authority pursuant to N.J.S.A. 32:1-163 and N.J.S.A. 32:1-164, addressed to the Office of the General Counsel at both the Port Authority's New

York office (4 World Trade Center, 150 Greenwich Street, New York, NY 10007) and its New Jersey office (One Port Authority Plaza, Jersey City, NJ 07306). The Notice of Claim identified the name and post-office address of the Claimant and his attorney; the nature of the claims asserted, including deprivation of First Amendment rights under 42 U.S.C. § 1983, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress; the time, place, and manner in which the claims arose; and the items of damages sustained, as far as then practicable. The statutory sixty-day waiting period required by N.J.S.A. 32:1-163 expired on January 17, 2026. This Amended Complaint is filed after expiration of the waiting period and in compliance with the Port Authority's consent-to-suit provisions set forth in N.J.S.A. 32:1-157 to -164

6. Plaintiff's Notice of Claim provided Defendant Port Authority with full notice of the factual basis, legal theories, and retaliatory conduct underlying all claims asserted in this Amended Complaint, including Plaintiff's claim under the New Jersey Civil Rights Act, N.J.S.A. 10:6-2 (Count XIV). The NJCRA claim arises from the identical facts, the identical retaliatory conduct, and the identical constitutional deprivations set forth in the Notice of Claim — specifically, Defendants' use of threats, intimidation, and coercion to suppress Plaintiff's exercise of his First Amendment rights to free speech and to petition the government for redress of grievances. Defendant Port Authority has suffered no prejudice, as the Notice of Claim afforded Defendant full opportunity to investigate the claims, prepare a defense, and explore settlement, thereby satisfying the purposes of the notice requirement. See *Velez v. City of Jersey City*, 180 N.J. 284, 293 (2004) (notice of claim requirements serve the purposes of investigation, defense preparation, and

settlement opportunity). To the extent the Notice of Claim's identification of the § 1983 claim rather than the NJCRA constitutes a technical deficiency, Plaintiff's Notice substantially complies with the statutory requirements under the five-factor test set forth in *Galik v. Clara Maass Medical Center*, 167 N.J. 341, 353 (2001): (1) Defendant Port Authority suffered no prejudice, as the NJCRA claim is factually identical to the § 1983 claim expressly noticed; (2) Plaintiff took affirmative steps to comply by serving a detailed written Notice of Claim identifying all parties, all retaliatory conduct, and all constitutional deprivations at issue; (3) the Notice generally complied with the purpose of N.J.S.A. 32:1-163 by providing Defendant with sufficient information to investigate, prepare a defense, and explore settlement; (4) Defendant received reasonable notice of the claim, as the factual and constitutional basis for the NJCRA claim was set forth in the Notice with specificity; and (5) the omission of the NJCRA label is reasonably explained by the fact that the NJCRA is the state-law analog of § 1983, both statutes protect the same constitutional rights, and the Notice expressly identified the First Amendment deprivations that form the basis of both claims.

7. This Amended Complaint asserts claims under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301-4335; the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 to -8; common law wrongful discharge in violation of public policy under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980); the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 to -50; the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1 to -2; 42 U.S.C. § 1983; intentional infliction of emotional distress; the New Jersey Equal Pay Act; tortious interference with contract and prospective economic

advantage; breach of the implied covenant of good faith and fair dealing; and civil conspiracy.

### PARTIES

8. Plaintiff William Dennis Brown Jr. is a veteran of the Global War on Terror who honorably served the United States as a Navy SEAL in combat operations in Iraq.

9. Plaintiff is an outspoken veteran advocate with a significant social media following, a New Jersey licensed attorney in good standing, and the founder and lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River.

10. Defendant McCarter & English LLP ("McCarter" or "Defendant McCarter") is a limited liability partnership organized under the laws of the State of New Jersey, known as New Jersey's oldest law firm, with a principal place of business located at Four Gateway Center, 100 Mulberry Street, Newark, New Jersey 07102.

11. Defendant McCarter employs over 500 attorneys and staff across multiple offices and conducts substantial business in Essex County, New Jersey.

12. Defendant The Port Authority of New York and New Jersey ("Port Authority" or "Defendant Port Authority") is a bi-state governmental agency and body corporate and politic created by compact between the States of New York and New Jersey, with consent of Congress, pursuant to N.J.S.A. 32:1-1 et seq. and N.Y. Unconsol. Law §§ 6401-6425.

13. Defendant Port Authority maintains offices at 4 World Trade Center, 150 Greenwich Street, New York, New York 10007, and conducts substantial operations in New Jersey, including at Newark Liberty International Airport, Port Newark–Elizabeth Marine Terminal, and the World Trade Center site in New York City.

14. Defendant Kevin J. O'Toole ("O'Toole" or "Defendant O'Toole") is an individual residing in New Jersey who serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey.

15. Defendant O'Toole is an individual of considerable political power, having served on the Cedar Grove, New Jersey Town Council and as Mayor, the New Jersey General Assembly (1995-2001), and the State Senate, retiring from the Senate in 2017 to begin a term as a Commissioner of Defendant Port Authority.

16. Defendant O'Toole is also the founder and managing partner of O'Toole Scrivo, LLC, a law firm based in Cedar Grove, New Jersey that represents Defendant McCarter in this litigation.

17. Defendant O'Toole is sued in his individual capacity and in his official capacity as Port Authority Chairman.

18. Defendant Patrick Donovan ("Donovan" or "Defendant Donovan") is an individual residing in New Jersey or New York, serving as the World Trade Center Site Safety Manager at the Port Authority of New York and New Jersey.

19. Defendant Donovan is sued in his individual capacity and in his official capacity as a Port Authority representative.

20. Defendants John Does 1-10 are fictitious individuals or entities, identities currently unknown, who have liability to the Plaintiff for any of the causes of action below, including currently unknown Senior Port Authority Leadership Officials who directed, ratified, or approved the retaliatory conduct alleged herein.

21. Plaintiff reserves the right to add Defendants when discovery reveals the identity of additional individuals or entities liable for damages referenced in this Complaint.

## JURISDICTION AND VENUE

22. The amount in controversy satisfies the Court's jurisdictional requirements.

23. The State of New Jersey has subject matter and personal jurisdiction over this controversy.

24. Venue is proper in this Court, as Defendant McCarter maintains a primary place of business located in Essex County, New Jersey.

25. Venue is proper in this Court because Defendant Port Authority is a bi-state agency of New York and New Jersey with substantial business operations in New Jersey.

26. Venue is proper in Essex County pursuant to N.J. Ct. R. 4:3-2(a)(1) because Defendant McCarter maintains its principal place of business in Essex County, New Jersey, and the primary causes of action arose in Essex County.

## FACTUAL ALLEGATIONS

### I. Plaintiff's Military Service and Professional Background

27. Plaintiff William Brown Jr. is a decorated combat veteran who served the United States with distinction as a Navy SEAL during the Global War on Terror.

28. Navy SEALs represent the pinnacle of elite military special operations forces and are known throughout the world as consummate professionals who operate in sea, air, and land environments to accomplish mission objectives that would be impossible for conventional forces to achieve.

29. Navy SEALs undergo some of the most rigorous assessment, selection, and training processes in the history of warfare, known as among the toughest military training in the world.

30. The Navy SEAL Ethos, which guides all SEALs, provides in pertinent part: "We expect to lead and be led. In the absence of orders I will take charge, lead my teammates and accomplish the mission. I lead by example in all situations. I will never quit. I persevere and thrive on adversity. My Nation expects me to be physically harder and mentally stronger than my enemies. If knocked down, I will get back up, every time. I will draw on every remaining ounce of strength to protect my teammates and to accomplish our mission. I am never out of the fight."

31. Plaintiff was a Navy SEAL on active duty during the September 11, 2001 terrorist attacks on the United States, when jihadists affiliated with al-Qaeda hijacked four commercial airliners and intentionally crashed them into the World Trade Center towers and the Pentagon, killing 2,977 Americans.

32. The September 11, 2001 attacks had a profound and lasting impact on Plaintiff and the entire Navy SEAL community.

33. Plaintiff served as a Navy SEAL in Iraq during Operation Iraqi Freedom and was a first responder to two suicide bombings committed by jihadist terrorists in Baghdad's Green Zone on October 14, 2004, attacks which killed ten people and wounded dozens more.

34. Plaintiff raced down the street in an attempt to intercept a second suicide bomber but was unable to prevent the terrorist from detonating explosives in the middle of an open street bazaar, resulting in catastrophic loss of life and grievous injuries to innocent civilians.

35. Plaintiff witnessed firsthand the horrific aftermath of jihadist terrorist violence, including the screams of victims with severe burn injuries and the bloody, dismembered remains of those killed in the blasts.

36. During his military service, Plaintiff served with or knew personally Navy SEALs Brian Bill, Danny Dietz, John Faas, Jacques Fontan, Nate Hardy, Michael McGreevy Jr., Thomas Ratzlaff, and Lance Vaccaro, all of whom were subsequently killed in action by Islamist militant terrorists while serving the United States.

37. Plaintiff's experiences in combat and as a first responder to terrorist attacks have profoundly shaped his perspective on the root causes of jihadist violence and the ongoing global threat posed by violent extremism.

38. Following his honorable discharge from the Navy, Plaintiff earned his undergraduate and law degrees from Rutgers University in New Jersey.

39. Plaintiff is a licensed New Jersey attorney in good standing and has built a distinguished career as a veteran advocate, legal professional, and community leader.

40. Plaintiff founded and serves as the lead organizer of the annual Navy SEAL Foundation NYC SEAL Swim across the Hudson River, a large-scale, high-profile charity event that raises funds and awareness for Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters.

41. Through his role organizing the NYC SEAL Swim, Plaintiff earned approximately $40,000 annually from the Navy SEAL Foundation for his services in planning, coordinating, and executing the event.

42. Plaintiff served as President of the Veteran Alumni of Rutgers University ("VARU"), the official Rutgers University veteran alumni organization, where he worked to establish internships and employment opportunities specifically for student veterans and veteran alumni.

43. Plaintiff has been recognized by NJBIZ as a veteran having a significant impact on the New Jersey business community for his leadership and advocacy on behalf of veterans.

44. Plaintiff is featured in the bestselling books *Can't Hurt Me* and *Never Finished* by David Goggins, which chronicle the experiences and achievements of elite military service members.

45. Prior to his employment with Defendant McCarter, Plaintiff was publicly known for his outspoken views on matters of public concern. Plaintiff engaged in a public debate with New Jersey Governor Chris Christie that went viral on social media, demonstrating Plaintiff's willingness to engage in public discourse on controversial issues.

46. Plaintiff maintains an active presence on social media platforms, including LinkedIn, where he shares his perspectives on issues of public concern, including veteran advocacy, national security, support for Israel, and the protection of constitutional rights.

47. Plaintiff's high-profile advocacy for veterans surrounding the facts and circumstances of this matter played a significant role in the New Jersey Legislature voting unanimously to amend the NJLAD to extend protections to veterans and active-duty service members.

48. Plaintiff organized and led a march of veterans and their families, where they held signs and rallied in support of amending the NJLAD to include veterans as a protected class.

49. Plaintiff spoke at numerous political events and veteran gatherings throughout New Jersey, urging state lawmakers to amend the NJLAD to protect veterans from employment discrimination.

50. Plaintiff sent multiple emails to every member of the New Jersey Legislature, urging them to support the amendment to the NJLAD to include veterans as a protected class.

51. Plaintiff made numerous social media posts on New Jersey lawmakers' social media pages, publicly advocating for the NJLAD amendment and mobilizing veteran and public support.

52. Plaintiff made social media posts and Youtube videos about this case in advocating for the amendment of NJLAD to include veterans as a protected class.

53. Plaintiff led a march with veterans that held signs that stated, "**VETERANS SAY SHAME ON MCCARTER & ENGLISH, LLP!**" "**NJ Lawmakers Stop! TREATING VETERANS LIKE SECOND CLASS CITIZENS Amend NJLAD & Include Veterans as a Protected Class**" "**NJ Lawmakers DO THE RIGHT THING! Amend NJLAD & Include Veterans as a Protected Class**" "**Assembly Speaker Coughlin Do Right by Veterans & Stop Sitting on A5048**" "**Senate President Scutari Do Right by Veterans & Stop Sitting on SC3800**"

54. Plaintiff posted YouTube videos of his veteran advocacy and the Veterans March supporting New Jersey Lawmakers amending NJLAD to include veterans as a protected class the social media pages for NJ Lawmakers. A true and correct copy of the Plaintiff's veteran march and advocacy signs mentioning **Defendant McCarter** and depicting and mentioning **NJ Assembly Speaker Coughlin and NJ Senate President Scutari** are reproduced below:

11













55. After Plaintiff and NJ Gold Star Mom Amy Moore met with Senator Troy Singleton, he became a co-sponsor of S.3800 the next day. A true and correct picture of Plaintiff meeting with NJ Gold Star Mom Amy Moore met with Senator Troy Singleton are reproduced below:



56. Plaintiff was the leading veterans advocate in New Jersey for the amendment of the NJLAD to include veterans as a protected class. Plaintiff's advocacy was the primary driving force behind the Legislature's decision to introduce and pass S.3800/A.5048.

57. In addition to organizing marches, speaking at events, and sending emails to every member of the Legislature, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, meeting with them individually and by telephone to advocate for the NJLAD amendment and to discuss the discrimination he experienced at Defendant McCarter.

58. During these personal communications, Plaintiff provided his case against Defendant McCarter as a specific example of the employment discrimination that necessitated amending the NJLAD to protect veterans. Many New Jersey legislators and their staff were aware of Plaintiff's pending lawsuit against Defendant McCarter and the facts underlying his claims of veteran discrimination.

59. The Legislature's unanimous passage of S.3800 (Senate 37-0, Assembly 71-0) with knowledge of Plaintiff's pending case demonstrates legislative intent to remedy the type of ongoing discrimination that prompted the amendment, including the discrimination alleged in this Complaint.

60. The amendment to the NJLAD extending protection to veterans was signed into law by Governor Phillip Murphy on January 20, 2026, and is now the law of New Jersey.

## II. Defendant McCarter's Hiring of Plaintiff and Discriminatory Employment Practices

### (2017-2023)

61. In March 2017, Defendant McCarter hired Plaintiff as a Career Staff Associate assigned to the firm's Bankruptcy, Restructuring & Litigation Group ("Bankruptcy Group").

62. At the time Defendant McCarter hired Plaintiff, Defendant was aware that Plaintiff was a former Navy SEAL, a combat veteran of the Iraq War, an outspoken advocate for veterans' rights, and an individual with strongly held views on matters of public concern.

63. Defendant McCarter was also aware that Plaintiff maintained an active social media presence and had previously engaged in public advocacy and debate on controversial issues.

64. When Plaintiff was hired, Defendant McCarter did not have a social media policy governing employees' personal social media use. Defendant accepted and encouraged Plaintiff's social media activity, with Dr. Maria Laccotripe Zacharakis, Defendant's Boston Office Managing Partner, specifically requesting that Plaintiff identify himself as a McCarter attorney on his LinkedIn profile to assist with business development.

65. The position of Career Staff Associate to which Plaintiff was assigned was distinct from the position of "regular Associate" at Defendant McCarter.

66. Despite performing substantially similar work as regular Associates—and in some cases performing work at the level of equity partners—Plaintiff was compensated at a rate substantially lower than regular Associates.

67. In 2023, after six years of employment with Defendant McCarter, Plaintiff's base salary was $100,000 (increased to $115,000 following his December 14, 2023 annual review), whereas the base salary for a first-year Associate at Defendant's firm was $170,000—a

20

disparity of $55,000 to $70,000 per year for substantially similar work requiring similar skill, effort, and responsibility.

68. Defendant McCarter hired other non-veteran employees in positions like Plaintiff's Career Associate or Staff Attorney role and promoted several of those non-veteran employees to regular Associate positions and to Special Counsel with commensurate increases in compensation and benefits.

69. Defendant McCarter promoted multiple non-veteran Staff Attorney's to regular Associate and Special Counsel positions and hired Associates after Plaintiff with less experience and lower performance evaluation scores.

70. Defendant McCarter did not promote Plaintiff to a regular Associate position or provide him with equal compensation because of his status as a military veteran, his outspoken advocacy for veterans' rights, and his willingness to express views that conflicted with the political ideology favored by Defendant McCarter's leadership.

71. Defendant McCarter's discriminatory compensation practices violated USERRA's prohibition on denying any "benefit of employment" to a person based on past military service.

72. Throughout Plaintiff's employment, Defendant McCarter's leadership actively promoted controversial progressive political causes through firm-wide communications, including support for Black Lives Matter, Critical Race Theory, narratives of systemic racism, and gender fluidity. Defendant did not restrict or discourage employees from expressing views aligned with these political positions on social media or otherwise.

73. Defendant McCarter publicly promoted the Black Lives Matter movement through its official Social Justice Project, including on its website and social media platforms. A true

21

and correct copy of Defendant McCarter's promotion of Black Lives Matter is reproduced below:



McCarter's Social Justice Project |
McCarter & English, LLP

74. Black Lives Matter is a controversial political movement that was associated with protests resulting in multiple deaths, arson, vandalism, looting, and approximately $2 billion in insured damages nationally. Despite the controversial nature of this political advocacy, Defendant McCarter promoted it publicly and did not discipline any employee or partner for supporting or promoting Black Lives Matter on social media.

75. Defendant McCarter's willingness to publicly promote controversial progressive political causes while terminating Plaintiff for expressing his perspective as a combat veteran on matters of public concern demonstrates that Defendant's social media policy was enforced based on viewpoint discrimination, not content-neutral standards.

22

76. Defendant McCarter's selective enforcement of its workplace conduct standards is further demonstrated by the fact that Lubertazzi, the Chairman of Defendant McCarter's Executive Committee, sent emails to senior firm attorneys making light of one attorney urinating on another at a firm-sponsored cabin retreat. Lubertazzi's email referred to the incident as a "Golden Shower," yet faced no disciplinary action whatsoever. Defendant McCarter's willingness to tolerate crude and degrading communications from its most senior leadership while terminating Plaintiff for a thoughtful LinkedIn post about jihadist violence based on his combat experience confirms that Defendant's social media policy was enforced based on viewpoint discrimination, not content-neutral standards.

77. Crude behavior from leadership was tolerated; veteran advocacy was punished.

78. Defendant McCarter did not begin harassing Plaintiff about his social media posts until Plaintiff's posts began questioning the reasoning behind the progressive political ideology that Defendant's leadership promoted. This demonstrates that Defendant's enforcement of its social media policy was based on viewpoint discrimination— punishing employees whose views conflicted with management's preferred ideology— not content-neutral application of workplace rules.

## III. Pattern of Harassment and Hostile Work Environment Based on Plaintiff's Veteran Status (2019-2023)

79. Acts occurring before December 27, 2021 are time-barred as standalone claims under CEPA's one-year statute of limitations (N.J.S.A. 34:19-5), and acts occurring before December 27, 2022 are time-barred as standalone claims under Pierce and NJLAD's two-year statutes of limitations. However, the following acts are alleged as pattern evidence and background facts demonstrating Defendant's discriminatory animus and are

admissible under the continuing violation doctrine. USERRA has no statute of limitations, and all acts alleged herein are timely for USERRA claims.

### A. "How Many People Have You Killed?" (2019)

80. In 2019, Defendant McCarter's Equity Partner Ward C. Laracy ("Laracy"), a member of the firm's Tax Group, approached Plaintiff in an elevator at Defendant's Newark office and asked Plaintiff, without provocation or context, "How many people have you killed?"

81. Laracy's question was a bias-based, discriminatory comment directed at Plaintiff because of his status as a combat veteran and Navy SEAL.

82. Plaintiff was deeply offended by Laracy's insensitive, unprofessional, and discriminatory question, which reduced Plaintiff's honorable military service to a crude stereotype of veterans as "killers."

83. Plaintiff responded that he was a combat veteran, proud of his military service, and had honorably served the United States.

84. Later that same day, Laracy returned to Plaintiff's office and apologized, stating that he had been "out of line" when he asked Plaintiff how many people he had killed.

85. In 2020, Laracy made a $1,000 donation to the NYC SEAL Swim, the charity event founded and organized by Plaintiff.

86. Laracy's discriminatory remark led Plaintiff to reasonably believe that instead of being respected as an individual who had honorably served the nation in time of war, he was feared, loathed, and discounted by Defendant McCarter's leadership as a mere "killer."

### B. Sexual Harassment by Equity Partner (2019)

87. In 2019, Defendant McCarter's Equity Partner Mark A. Daniele ("Daniele"), the immediate past Practice Group Leader for Defendant's Tax Group and a former member

24

of the firm's Executive Committee, sexually harassed Plaintiff based on his status as a veteran.

88. During the winter months of 2019, Plaintiff attended a complimentary dinner provided by Defendant McCarter to attorneys working past 7:00 p.m. at the Newark office.

89. While Plaintiff was at the buffet, Daniele approached Plaintiff from behind, grabbed Plaintiff's waist without consent, and stated words to the effect of "you can afford to eat all this because you're a strong healthy man."

90. It was clear Daniele was referring to Plaintiff's physical appearance within the context of Plaintiff's status as a Navy SEAL veteran.

91. Daniele's unwanted physical contact and sexually suggestive comment constituted sexual harassment in violation of Defendant McCarter's policies and New Jersey law.

92. Plaintiff reported Daniele's sexual harassment to a Partner and an Associate at Defendant McCarter.

93. Defendant McCarter took no meaningful disciplinary action against Daniele in response to Plaintiff's complaint.

94. Plaintiff reasonably believed that if he attended future evening dinners at Defendant's Newark office, he would be subjected to further sexual harassment by Daniele.

95. As a result, Plaintiff declined to attend the complimentary dinners thereafter as a reasonable measure to avoid further harassment from Daniele.

96. This benefit of employment—complimentary meals for attorneys working late—was effectively denied to Plaintiff by Daniele's sexually harassing conduct and Defendant McCarter's failure to take corrective action.

25

## C. Mockery of Military Service and Exposure to Racial Remarks at Cabin Retreats (2019-2023)

97. Joseph Lubertazzi Jr. ("Lubertazzi") is the Chairman of Defendant McCarter's Executive Committee, an Equity Partner, and the former Practice Group Chair of the Bankruptcy Group.

98. Lubertazzi organized annual cabin retreats for members of the Bankruptcy Group and other attorneys at Defendant McCarter.

99. To Plaintiff's knowledge, Plaintiff was the only veteran who attended Lubertazzi's cabin retreats.

100. During these cabin retreats, Plaintiff was exposed to racial remarks and other wildly inappropriate behavior by Defendant McCarter's senior attorneys, including conduct best described as alcohol-fueled events replete with behavior one would expect from stereotypical depictions of fraternity parties.

101. At least one attendee at Lubertazzi's cabin made racial remarks, and upon information and belief Lubertazzi never took any disciplinary action, internal or external, against any of Defendant McCarter's attorneys for their conduct at his cabin.

102. Following one such cabin retreat, Lubertazzi made light of an incident in which one McCarter attorney urinated on another McCarter attorney, referring to the incident as a "Golden Shower."

103. Lubertazzi's "Golden Shower" email was sent to senior attorneys at Defendant McCarter, yet Lubertazzi faced no disciplinary action, no reprimand, and no consequences of any kind for sending an email making light of one attorney urinating on another at a firm-sponsored event.

104.    The tolerance of Lubertazzi's "Golden Shower" email — sent by the Chairman of Defendant McCarter's Executive Committee — while Plaintiff was subsequently terminated for a LinkedIn post sharing his perspective as a combat veteran, demonstrates the pervasive double standard and selective enforcement that characterized Defendant McCarter's workplace. Defendant McCarter tolerated crude, offensive, and degrading communications from its most senior leadership while punishing Plaintiff for exercising his right to share his lived experiences as a Navy SEAL.

105.    Following one such cabin retreat, Lubertazzi sent an email to attendees, including senior members of Defendant McCarter, in which he made a mockery of Plaintiff's military service by referring to hearing "War Stories" at the cabin.

106.    Plaintiff had never disclosed to Lubertazzi or any of the attorneys attending Lubertazzi's cabin retreats any information regarding his military service in Iraq or his combat experiences.

107.    Lubertazzi's reference to "War Stories" in an email copied to senior members of Defendant McCarter was a derogatory, bias-based adverse employment action directed at Plaintiff because of his veteran status, reflecting Lubertazzi's bias-based perception of veterans.

108.    Lubertazzi's email ridiculing Plaintiff's military service, coming from the top of Defendant McCarter's leadership, led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

27

**D. Systematic Exclusion from Diversity, Equity & Inclusion Initiatives (2019-2023)**

109.    Throughout Plaintiff's six-year tenure with Defendant McCarter, Defendant's Diversity, Equity & Inclusion Committee ("DEI Committee") organized and hosted an annual Diversity Retreat for diverse attorneys and summer interns.

110.    Despite Plaintiff's status as a military veteran—a federally protected class that is severely underrepresented in the legal profession and constitutes a tiny minority at Defendant McCarter—Defendant excluded Plaintiff from the annual Diversity Retreat for all six years of his employment. As of January 20, 2026, veterans have been added as a protected class under the NJLAD.

111.    According to 2019 statistics, veterans constitute only 1.67% of the attorney workforce in law firms of 251 or more attorneys.

112.    In New Jersey, less than one percent of one percent of the population serves in the military.

113.    The majority of New Jersey's veteran population consists of Vietnam-era veterans and a rapidly declining population of veterans from earlier conflicts, including the Korean War and World War II.

114.    Consequently, there are few judges, partners, attorneys, and law professors in the New Jersey legal field who have served in the Armed Forces of the United States.

115.    Veterans constitute a tiny minority in the legal profession generally and an even smaller minority in New Jersey based on the state's exceptionally low population of active-duty service members and veterans.

116.    Defendant McCarter employed over 500 attorneys and staff during Plaintiff's tenure, and Plaintiff was the only Global War on Terror ("GWOT") combat veteran employed by Defendant McCarter of whom he was aware.

117.    Defendant McCarter's intentional and systematic exclusion of Plaintiff from the annual Diversity Retreats for six consecutive years was a bias-based, discriminatory adverse employment action that disregarded Plaintiff's status as a veteran and a minority in Defendant's workplace.

118.    Defendant McCarter's exclusion of Plaintiff from diversity initiatives signaled to Plaintiff that Defendant devalued his lived experiences as a military combat veteran and disregarded Plaintiff's extensive history of successful veteran advocacy.

119.    A true and correct copy of Defendant McCarter's LinkedIn post promoting its annual Diverse Attorney Retreat — from which Plaintiff was excluded for all six years of his employment — together with Plaintiff's comment requesting inclusion of veteran attorneys, is reproduced below:



McCarter attorneys and summer interns gathered in Philadelphia for our annual Diverse Attorney Retreat hosted by the firm's Diversity, Equity & Inclusion Committee. We connected with old and new colleagues, discussed our practices, business and professional development and pro bono opportunities, and had a great Q&A with firm leadership. #diversity #dei #retreat #diversityandinclusion





Reactions

  

William Brown
The McCarter Diversity, Equity & Inclusion Committee didn't invite veteran attorneys to their annual retreat. Maybe next time they consider including veteran attorneys at the firm because we're far under-represented in all aspects of the legal community and could use the support. us



Gerald H. Clark, Esq.
What is a diverse attorney? And are non-diverse attorneys not welcome?



120.     Plaintiff's exclusion from Defendant McCarter's Diversity Retreats led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

**E. Defendant McCarter's Participation in Mansfield Certification and Exclusion of Veterans from DEI Metrics (2017-2023)**

121.     During Plaintiff's employment, Defendant McCarter participated in the Mansfield Certification program, a diversity initiative created and administered by Diversity Lab, a for-profit DEI consultancy business.

122.     On January 30, 2026, Federal Trade Commission Chairman Andrew N. Ferguson issued warning letters to 42 law firms, including Defendant McCarter, regarding potentially unfair and anticompetitive employment practices related to their participation in the Mansfield Certification program.

123.     The FTC's warning letter stated that the Mansfield Certification program requires participating law firms to agree to follow certain DEI-based employment standards, and that public information suggests participating firms meet regularly with Diversity Lab and their competitor law firms to discuss common implementation of Diversity Lab's criteria.

124.     According to the FTC, the 42 law firms that received warning letters collectively employ over 50,000 attorneys subject to Diversity Lab's criteria.

125.     The FTC warned that "potentially anticompetitive collusion between law firms on DEI metrics can include quotas by which they agree to compose panels of job candidates based on race, sex, or other personal characteristics other than the candidate's merit, or

by which law firms agree to make final decisions about hiring and promotions based on those personal characteristics."

126. The Mansfield Certification program requires participating law firms to ensure that talent pools for promotions and leadership opportunities comprise at least 30% "underrepresented" racial and other groups.

127. Upon information and belief, Defendant McCarter's participation in the Mansfield Certification program and its focus on specific demographic categories for diversity initiatives did not include military veterans as a targeted or measured group, despite veterans being a protected class under USERRA at the time of Plaintiff's employment.

128. Upon information and belief, Defendant McCarter's systematic exclusion of Plaintiff from diversity initiatives, despite his status as a severely underrepresented military veteran, was consistent with Defendant's participation in the Mansfield Certification program, which did not prioritize or measure veteran representation.

129. The systematic exclusion of veterans from Defendant McCarter's DEI initiatives, while the firm participated in a program focused on other demographic categories, constituted discriminatory treatment based on Plaintiff's veteran status.

**F. Discriminatory Response to Plaintiff's Advocacy Regarding September 11 Remembrance (October 2022)**

130. Throughout September and October 2022, Defendant McCarter's DEI Committee sent numerous firm-wide emails promoting, celebrating, and commemorating various causes and historical events.

131.    On September 11, 2022, the twenty-first anniversary of the September 11, 2001 terrorist attacks, Defendant McCarter failed to send any firm-wide email honoring or remembering those who lost their lives in the attacks.

132.    On October 5, 2022, Plaintiff sent a reply email to the DEI Committee's firm-wide email address regarding LGBT History Month, inquiring why Defendant had not sent an email honoring and remembering those lost during the September 11 attacks and asking whether there were any veterans serving on the DEI Committee.

133.    After receiving no response for five days, Plaintiff sent a follow-up email on October 10, 2022, to the DEI Committee, copying all DEI Committee members individually, including Joseph T. Boccassini ("Boccassini"), Defendant McCarter's Firmwide Managing Partner; Judge (Retired) Jose L. Linares ("Linares"), an Equity Partner and former United States District Judge; Guillermo C. Artiles ("Artiles"), an Equity Partner and Chair of the Government Affairs Practice Group; Judge Natalie S. Watson ("Watson"), then an Equity Partner and now a Superior Court Judge; Alexander W. Major ("Major"), an Equity Partner and Co-Chair of the Government Contracts & Global Trade Practice Group; and Mary Gabriel ("Gabriel"), Defendant McCarter's Firmwide Deputy Managing Partner. A true and correct copy of Plaintiff's email to the DEI Committee is attached hereto as **Exhibit A**.

134.    In the follow-up email, Plaintiff stated, "the Firm sent the wrong message by not sending out an email honoring and remembering those lost on 9/11" and again requested to represent veterans on Defendant's DEI Committee and Social Justice Project.

135.    Watson, a member of Defendant's DEI Committee, a well-known LGBTQIA+ advocate, and a board member of the New Jersey Garden State Equality Organization —

New Jersey's largest and most prominent LGBTQ+ advocacy organization, sent Plaintiff a derogatory email alleging that Plaintiff was homophobic.

136.     Watson, a member of Defendant's DEI Committee and a well-known LGBTQIA+ advocate, responded to Plaintiff's email with a lengthy reply copied to all DEI Committee members in which she insinuated that Plaintiff's inquiry about 9/11 remembrance was motivated by anti-LGBTQ+ bias.

137.     Watson stated: "I'm a little confused as to why you are writing in October about the posts honoring 9/11, in response to our LGBTQA history acknowledgement" and that "your email timing certainly sends a message to me, as one of the few out attorneys at the firm."

138.     Watson's statement that Plaintiff's "email timing certainly sends a message to me, as one of the few out attorneys at the firm" was a clear insinuation — made publicly to all DEI Committee members — that Plaintiff's inquiry about honoring those lost on 9/11 was motivated by homophobia rather than by his genuine concern as a Navy SEAL who was on active duty during the September 11, 2001 attacks.

139.     Watson further stated that she "take[s] umbrage" with Plaintiff's email and questioned why Plaintiff chose to raise the 9/11 issue "in response to our LGBTQA history acknowledgement (versus directing this to our Firm leadership)" — further implying that Plaintiff's email was an attack on LGBTQ+ recognition rather than a legitimate request for veteran inclusion

140.     Watson's baseless insinuation that Plaintiff was homophobic was an adverse allegation made by a McCarter Equity Partner and leader in the firm's DEI Committee,

34

copied to all DEI Committee members, and had the potential to destroy Plaintiff's legal career and professional reputation.

141.    Watson's accusation was based on nothing more than Plaintiff's status as a veteran and Navy SEAL who had reasonably questioned why Defendant McCarter had not sent an email honoring those lost in the September 11 terrorist attacks — an event that profoundly impacted Plaintiff's life and the lives of his fellow Navy SEALs.

142.    Plaintiff responded to Watson's email on the same day with a professional, respectful reply in which he explicitly stated: "I have no issues with how consenting adults love and care for each other. I understand our nation has come along way and also respect and admire those who advocate for positive change. In South Jersey, I once swam along the Cooper River directly alongside a Gay Rights Parade to show my support. Many noticed the Navy SEAL swimming alongside."

143.    Plaintiff's response demonstrates that Watson's insinuation of homophobia was entirely baseless. Plaintiff had publicly demonstrated his support for LGBTQ+ rights by physically swimming alongside a Gay Rights Parade — an act of visible, public solidarity that directly contradicts Watson's accusation.

144.    Despite Plaintiff's professional, respectful, and explicitly pro-LGBTQ+ response, Watson's public insinuation of homophobia — made to all DEI Committee members — was never retracted or corrected by Watson or by Defendant McCarter.

145.    Watson's insinuation of homophobia carried particular weight and credibility given her status as a board member of the New Jersey Garden State Equality Organization, New Jersey's largest and most prominent LGBTQ+ advocacy organization. An accusation of homophobia from a person of Watson's stature in the LGBTQ+

35

advocacy community — made publicly to all DEI Committee members — had the potential to cause catastrophic and irreparable damage to Plaintiff's professional reputation and career.

146. Watson knew or should have known that an insinuation of homophobia from a board member of Garden State Equality, directed at a colleague who had simply asked why the firm did not honor those lost on 9/11, would carry devastating weight and could destroy Plaintiff's reputation in the legal community. Watson's reckless use of her position and credibility as an LGBTQ+ advocate to baselessly accuse a Navy SEAL combat veteran of homophobia was an act of bias-based harassment predicated on Plaintiff's veteran status.



147. Watson's accusation of homophobia was particularly egregious given that Defendant McCarter officially promoted and celebrated Watson's LGBTQ+ advocacy through the firm's Pride Month programming, while simultaneously punishing Plaintiff's veteran advocacy. A true and correct copy of the email exchange between Plaintiff and

Watson is attached hereto as **Exhibit A** (incorporated with the existing LGBT History Month email chain).

148.    Defendant McCarter's willingness to officially promote and celebrate Watson's advocacy for the LGBTQ+ community while punishing Plaintiff for advocating for veterans — and allowing Watson to baselessly accuse Plaintiff of homophobia for simply asking why the firm did not honor those lost on September 11 — demonstrates the institutional double standard and viewpoint discrimination that pervaded Defendant's workplace

149.    Watson's baseless insinuation that Plaintiff was homophobic was an adverse allegation made by a McCarter Partner and leader in the firm's DEI Committee and had the potential to destroy Plaintiff's legal career.

150.    Watson's comment was based on nothing more than Plaintiff's status as a veteran and Navy SEAL who had reasonably questioned why Defendant McCarter had not sent an email honoring those lost in the September 11, 2001 terrorist attacks.

151.    Lubertazzi subsequently berated Plaintiff for sending the firm-wide email regarding the September 11 attacks, for stating that the firm was not doing right by veterans, and for requesting a seat on the firm's DEI Committee/Social Justice Project.

152.    Lubertazzi told Plaintiff he "didn't know what he was talking about," justified Defendant McCarter's failure to commemorate September 11 by praising the firm's pro bono program for veterans and stated that "the Firm doesn't have to send out an email to acknowledge the 9/11 attacks."

153. .Lubertazzi's comments were intended to discourage Plaintiff from advocating for veterans and reserve component service members within Defendant's workplace, by marginalizing Plaintiff's veteran status.

154. Lubertazzi and Watson's discriminatory response to Plaintiff's reasonable inquiry and their rejection of his request to represent veterans on the DEI Committee/Social Justice Project constituted severe and pervasive bias-based discrimination predicated on Plaintiff's status as a veteran. All other protected classes had representation on Defendant McCarter's DEI Committee/Social Justice Project, except veterans.

155. The message sent by Defendant McCarter by excluding Plaintiff from DEI/Social Justice activities was that veterans are a second-class protected class and unworthy of such participation.

156. These actions led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

**G. Discriminatory Refusal to Provide Professional Courtesy to Fellow Navy SEAL (September 2022)**

157. In September 2022, Plaintiff received a phone call from fellow Navy SEAL Shannon Rusch ("Rusch"), who informed Plaintiff that he and his son had been contacted by the Federal Bureau of Investigation ("FBI") regarding their exercise of First Amendment rights to free assembly and free speech at the January 6, 2021 protest in Washington, D.C.

158.    Plaintiff informed Rusch that federal criminal defense was outside Plaintiff's area of legal expertise, but that Defendant employed several former federal and state prosecutors who might be able to recommend a competent defense attorney.

159.    Throughout Plaintiff's six years of employment at Defendant McCarter, Plaintiff was copied on emails from attorneys at Defendant McCarter seeking recommendations for attorneys for clients, colleagues, family members, and friends — a common professional courtesy within the legal profession.

160.    On or around September 27, 2022, Plaintiff sent an email to Defendant's Partners Robert A. Mintz ("Mintz"), Newark Office Managing Partner and a member of Defendant's Social Justice Project, and Geoffrey Rosemond ("Rosemond"), Chair of the Business Litigation Practice and a former Assistant Prosecutor, requesting recommendations for defense attorneys for Rusch and his son.

161.    Mintz responded to Plaintiff's email and suggested that Plaintiff contact Major for a possible recommendation.

162.    Plaintiff found Mintz's suggestion extremely odd because Major was not a former prosecutor, and his law practice focused on cybersecurity liability, not criminal or civil defense.

163.    On or around September 27, 2022, Plaintiff sent an email to Major, a member of Defendant's DEI Committee and Social Justice Project, explaining that Rusch was a friend and former Navy SEAL and that he and his son were seeking a recommendation for a defense attorney after being contacted by the FBI regarding their participation in the January 6 protest in Washington, D.C.

164. Major refused to provide even a referral to a defense attorney for Rusch and his son.

165. Major responded to Plaintiff's request with sanctimonious disdain, stating: "Going to shoot straight. I've lived under oaths my entire adult life, and none is more sacrosanct than my oath to serve. But I'll leave my emotions out of it and simply say I have no interest in providing any assistance."

166. Major's refusal to extend basic professional courtesy to Plaintiff by providing a referral for a fellow Navy SEAL veteran did not align with accepted norms of professional courtesy expected within the legal profession.

167. Major's conduct was particularly hypocritical given that Defendant McCarter represented the Archdiocese of Newark in defense of allegations of child sexual abuse — a representation that Major apparently found consistent with his professed values.

168. Major's refusal to provide Plaintiff, a veteran, with a referral for a fellow veteran in need of a defense attorney was an act of bias-based harassment predicated on Plaintiff's veteran status.

169. Major's bias-based, discriminatory refusal to assist Plaintiff contributed to the severe and pervasive pattern of bias-based adverse employment actions directed at Plaintiff, leading Plaintiff to the reasonable belief that the workplace had become hostile and that the terms and conditions of his employment had been irrevocably altered.

**H. Discriminatory Application of Defendant's Social Media Policies (December 2022)**

170.     On or around December 7, 2022, Plaintiff attended oral arguments before a three-judge panel of the United States Court of Appeals for the Third Circuit at the Federal District Courthouse in Newark, New Jersey.

171.     Plaintiff was the first attorney to participate in a question-and-answer session with three Third Circuit Appellate Judges following oral arguments.

172.     Plaintiff, a GWOT combat veteran and attorney, identified with the paintings in the Newark Federal Courthouse depicting American Revolutionary War veterans and attorneys signing the United States Constitution.

173.     On or around December 7, 2022, Plaintiff made a post on LinkedIn memorializing his visit to the Third Circuit Court of Appeals and his experience observing oral arguments.

174.     The following morning, Defendant's Equity Partner William D. Wallach ("Wallach"), a member of the Bankruptcy Group and supervisor of Kevin O'Toole Jr. (the son of Defendant Kevin O'Toole, Chairman of the Port Authority), approached Plaintiff and stated that Plaintiff's LinkedIn post was "offensive to the Court."

175.     Wallach stated that he and Plaintiff had been "guests" in the Federal Courtroom and that Plaintiff should not have taken pictures of the courtroom or made the LinkedIn post.

176.     Wallach requested that Plaintiff remove the LinkedIn post. A true and correct copy of Plaintiff's LinkedIn post is reproduced below, and the underlying email chain is attached hereto as **Exhibit B**

 Bill Brown is at Federal District Court, District of New Jersey, Newark Vicinage.

17h ·

I had the privilege of observing Third Circuit oral arguments in Newark today. The Courtroom was beautiful and I enjoyed seeing paintings of Paul Revere and the signatories of the Constitution (all who put their lives at risk for thier beliefs and possessed a Lacedonian and Athenian combination to encroachments on their freedoms). It was very insightful to hear oral arguments from four outstanding attorneys (all masters in the art of persuasion). There's no doubt I plan on using a few of their techniques I picked up in a speech I'll be giving in Philadelphia this Thursday (my little persuasive laboratory experiment). I also pounced on the opportunity during an open q&a to ask the three Judge panel (Schwartz, Matey, and Fuentes) a few questions regarding the affect of judicial assignments on oral arguments and on projected evaluations regarding case outcomes based on inquisitive questions from the bench during oral arguments. My big take aways from this experience is that the best strategy during oral arguments is to know your position, answer the Judge's questions directly, and open with your strongest position.



177.    Wallach's request was a bias-based, discriminatory adverse employment action directed at Plaintiff because of his veteran status, as the post expressed Plaintiff's admiration for the signatories of the U.S. Constitution, many of whom were veterans who had risked their lives for the nation's freedoms.

178.    On the same day that Wallach directed Plaintiff to remove his LinkedIn post, Artiles made a LinkedIn post depicting the exact same Newark Federal Courtroom, featuring a photograph of Third Circuit Appellate Judge Patty Shwartz.

179.    Neither Wallach nor any other Partner at Defendant McCarter requested Artiles remove his LinkedIn post. A true and correct copy of Artiles LinkedIn post is reproduced below:



180. Artiles's LinkedIn post was "liked" by many Partners at Defendant's firm.

181. Plaintiff reasonably concluded that Defendant afforded Artiles, a well-known politically connected, non-veteran, Delegate/Co-Chair for President Joe Biden, former counsel for Governor Phil Murphy, and the son-in-law of a retired Federal District Judge, greater rights to express his opinions on LinkedIn than Plaintiff, a combat veteran of the GWOT and Navy SEAL.

182. Wallach's inconsistent application of Defendant's social media policy was an act of illegal, bias-based harassment against Plaintiff based on military veteran status.

183. This act of bias-based harassment and disparate treatment by Wallach, a senior leader, led Plaintiff, a reasonable veteran-attorney employee, to believe that the conditions of employment had been altered, and the working environment was hostile and abusive.

184. Defendant's selective enforcement of its social media policy based on whether employees' views aligned with management's political ideology violated USERRA's prohibition on denying benefits of employment based on veteran status, as Plaintiff's willingness to express views that conflicted with Defendant's preferred ideology was directly connected to his experiences and perspective as a Navy SEAL combat veteran.

**I. Discriminatory Disinvitation from Rutgers Law School Event (February 2023)**

185. In February 2023, Elizabeth Acevedo ("Acevedo"), Assistant Dean for Career Development at Rutgers Law School, sent Plaintiff an email inviting him to attend the Rutgers Law School Annual Law Firm Night scheduled for March 30, 2023.

186. Acevedo extended this invitation to Plaintiff based on their professional relationship, which Plaintiff had cultivated in his capacity as President of VARU while working to establish internships and employment opportunities specifically for veteran students and alumni at Rutgers Law School.

187. On February 8, 2023, Plaintiff sent a reply email to Acevedo, copying Defendant McCarter's Equity Partner Sheila E. Calello ("Calello"), Chair of the Bankruptcy Group and a member of Defendant's Social Justice Project, confirming that he was "happy to attend the Rutgers Law School annual Law Firm Night" and offering to recruit other McCarter colleagues to attend.

188. On or around February 14, 2023, Acevedo sent an email to Artiles in which she expressed concern that she had upset Sandra Cummins and Christine A. Lydon ("Lydon"), Defendant McCarter's Chief Human Resources Officer and a member of the DEI Committee, by inviting Plaintiff to the Rutgers Law School Annual Law Firm Night.

189. Acevedo sought Artiles's advice on the matter, stating that she "very much valued" his perspective.

190. Artiles, who is a member of Defendant's DEI Committee, a member of Defendant's Social Justice Project, a Delegate/Co-Chair for President Joe Biden, former counsel for New Jersey Governor Phil Murphy, an Adjunct Professor at Rutgers Law School, and the son-in-law of Linares, responded to Acevedo via email that she had "nothing to worry about."

191. On or around February 20, 2023, Plaintiff received an unexpected and concerning email from Acevedo in which she informed Plaintiff that Rutgers Law School was

disinviting him from the Rutgers Law School Annual Law Firm Night. A true and correct copy of the email chain regarding the disinvitation is attached hereto as **Exhibit C**.

192.    Acevedo explained in her email that she was contacted by Defendant McCarter's HR Department, and that Defendant's recruitment department had expressed "a preference for sending the formal invite to your Chief Human Resources Officer, Christine Lydon, who would then identify who would attend."

193.    Acevedo apologized to Plaintiff for the "premature" outreach and stated that she would follow up with Plaintiff once she received an update from Defendant.

194.    Lydon directed Rutgers Law School to disinvite Plaintiff from the Rutgers Law School Annual Law Firm Night because of Plaintiff's status as a veteran, his role as President of VARU, and his assertive advocacy for veterans' rights.

195.    Defendant McCarter's HR Department did not have Rutgers Law School disinvite any other, non-veteran attorney employees from the Annual Law Firm Night.

196.    On or around February 20, 2023, Plaintiff sent an email to Acevedo expressing his humiliation at being the President of VARU, the Rutgers veteran-alumni organization, yet being disinvited from attending the Rutgers Annual Law Firm Night.

197.    On or around February 21, 2023, Plaintiff sent an email to Calello, his Practice Group Leader and a member of Defendant's Social Justice Project, in which he expressed the humiliation and emotional distress of being the President of VARU and being disinvited from the Rutgers Annual Law Firm Night, stating: "I understand Rutgers Law is uninviting me from the Rutgers Annual Law Firm Night because my Firm's recruitment department stated they indicated a preference on who Christine Lydon

46

identifies to attend from my Firm. Being the President of the Veteran Alumni of Rutgers University, this un-invitation especially hurts."

198.     On or around February 21, 2023, Lydon contacted Plaintiff and falsely claimed that the reason for Plaintiff's disinvitation was a "miscommunication" between Defendant's HR Office and Rutgers Law School.

199.     On March 30, 2023, after enduring significant professional and personal embarrassment, Plaintiff attended the Rutgers Law School Annual Law Firm Night. A true and correct copy of Plaintiff's LinkedIn post about the event is reproduced below:

**William Brown** (USA) · You
Former Navy SEAL / Partner at Portatore Law Group LLP
1yr · ⊙

Great time at the Rutgers Annual Law Firm Night after being invited and then uninvited and then re-invited after some form of miscommunication between Rutgers and HR. It was extremely impressive to see so many young and excited law school students. I did my best to encourage all the students to seek internships and clerkships.



200.     Also attending the event were Defendant's Partners Artiles and Omar A. Bareentto ("Bareentto"), Co-Chair of the New Jersey Democratic State Committee Muslim Caucus and a member of Defendant's Social Justice Project.

201.     Lydon's bias-based, discriminatory action in having Rutgers Law School disinvite Plaintiff — the President of VARU — from the Rutgers Law School Annual Law Firm Night was part of a pattern and practice of pervasive bias-based discrimination and

48

harassment that led Plaintiff, a reasonable veteran-attorney employee, to believe the conditions of employment had been altered, and the working environment was hostile and abusive.

**J. Retaliation for Plaintiff's Advocacy for Equal Pay for Veterans (Fall 2023)**

202.    In the fall of 2023, Plaintiff posted on the professional social networking site LinkedIn advocating for fair and equal pay for veterans.

203.    Plaintiff's LinkedIn post stated: "Sometimes movies reflect reality. The Sheriff who tried to pressure the war Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves."

204.    Plaintiff's LinkedIn post included a video clip from the first Rambo film, "First Blood," depicting the character John Rambo, a decorated Vietnam War veteran who upon coming home from war, faces discrimination and harassment from local law enforcement. A true and correct copy of Plaintiff's LinkedIn post is reproduced below:



**William Brown** (USA) · You
Former Navy SEAL / Partner at Parlatore Law Group LLP
1yr · Edited · ⊕

Sometimes movies reflect reality. The Sheriff who tried to pressure the War Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves. 🫡



] €2♡ 92                                    12 comments · 2 reposts

205.    The pictures and Plaintiff's accompanying commentary resonated with many veterans who, having led troops in combat and been responsible for millions of dollars in military equipment, returned home from the GWOT only to face difficulty obtaining employment and fair compensation.

206.    The line from First Blood, "Back there I could fly a gunship, I could drive a tank, I was in charge of million-dollar equipment, back here I can't even hold a job parking cars!" is well known within veteran culture, capturing an often-voiced veteran perception of wartime military service: in the combat zone, servicemembers have huge responsibilities, earning respect and military expertise the hard way, but upon coming home, military skills are often devalued, readjustment to civilian life can be trying, and veterans are sometimes distrusted or feared by civilian employers.

207.    The next day following Plaintiff's LinkedIn post advocating for equal pay for veterans, Plaintiff was called into a conference room by Boccassini, Defendant's Firmwide Managing Partner and a member of Defendant's DEI Committee and Social Justice Project, and Adam N. Saravay ("Saravay"), Defendant's employment attorney and a member of Defendant's Social Justice Project.

208.    Boccassini and Saravay represented Defendant McCarter, and their words expressed Defendant McCarter's corporate displeasure with Plaintiff's LinkedIn post advocating for equal pay and opportunities for veterans.

209.    Even though Plaintiff's LinkedIn post displayed no visual depiction of violence and contained no language referencing violence, Boccassini and Saravay exploited the worst possible stereotypes of veterans by questioning whether Plaintiff was mentally sound, and expressing spurious concern that Plaintiff was going to hurt someone.

210.    Plaintiff is a consummate professional who maintained professional decorum at Defendant throughout his employment and never made a threatening comment to anyone in the workplace.

211.    Despite Plaintiff's unblemished history of professional conduct, Boccassini and Saravay implied that Plaintiff was mentally unstable and expressed concern that Plaintiff might hurt someone after Plaintiff simply made a social media post advocating for fair and equal opportunities for veterans.

212.    Boccassini and Saravay's baseless implication of violent intent invoked harmful media stereotypes of veterans as mentally damaged and dangerous, unstable victims of PTSD, and constituted bias-based, discriminatory harassment directed at Plaintiff because of his veteran status.

213.    Boccassini and Saravay chastised Plaintiff in the conference room for making the LinkedIn post advocating fair pay and equal opportunities for veterans.

214.    These were adverse, discriminatory employment actions taken by Defendant's Firmwide Managing Partner and Defendant's employment attorney, directed at Plaintiff because of his veteran status and his advocacy for fair and equal pay for veterans.

215.    Boccassini and Saravay's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

**K. Harassment Through Transmission of Defamatory Article Portraying Iraq Veterans as War Criminals (November 2023)**

216.    On November 6, 2023, Saravay, Defendant's employment attorney and a member of Defendant's Social Justice Project, sent Plaintiff an email containing a link to a New York Times article titled "A Secret War, Strange New Wounds and Silence from the Pentagon."

217.    The New York Times article portrayed Iraq War veterans as mentally "damaged, very damaged" and as war criminals who acted "with savage enthusiasm, often bending the rules to hit not just enemy positions, but also mosques, schools, dams and power plants." A true and correct copy of the text and images from the article are reproduced below:



# 'Damaged, very damaged'





nytimes.com

𝕿    Share full article    ➥    🔖    💬 451

The relentless firing was being driven by a small, top-secret Army Delta Force group called Task Force 9. President Donald J. Trump had given the task force broad authority to use heavy firepower, and the task force applied it with savage enthusiasm, often bending the rules to hit not just enemy positions, but also mosques, schools, dams and power plants.

Sometimes, artillery crew members said, the task force ordered them to fire in a grid pattern, not aiming at any specific target but simply hurling rounds toward Raqqa, to keep the enemy on edge.

218.     Saravay's email and the attached article discredited the honorable service of American veterans of the Iraq War.

219.     Saravay sent the email containing the defamatory article to Plaintiff specifically because of Plaintiff's status as a combat veteran and Navy SEAL who served in Iraq during the GWOT, the war the article featured.

220.     Plaintiff is proud of his service to the United States in Iraq and was offended and demoralized by Saravay's email portraying Iraq War veterans as criminals and mentally damaged individuals.

221.     Plaintiff and other veterans are subjected to incessant, inaccurate, stereotypical media and entertainment portrayals of American military veterans as damaged, dupes, killers, war criminals, and worse.

222.    The Navy SEAL Ethos, by which Plaintiff lives his life, provides: "Brave SEALs have fought and died building the proud tradition and feared reputation that I am bound to uphold. In the worst of conditions, the legacy of my teammates steadies my resolve and silently guides my every deed."

223.    Saravay's transmission of the defamatory article was a direct insult to the Ethos by which Plaintiff lives, and to the memory of Plaintiff's fellow SEALs who were killed in action.

224.    Saravay's action served to reinforce inaccurate and damaging stereotypes of American veterans that Plaintiff found inescapable, even in Defendant's workplace ostensibly dedicated to applying the principles of Diversity, Equity, and Inclusion.

225.    No other protected class at Defendant McCarter's workplace was subjected to such bias-based harassment.

226.    Saravay is the employment counsel for Defendant McCarter, and it is reasonable for Plaintiff to believe Saravay exerts authority to set personnel policies, rules and regulations at McCarter, including promotions, pay, and work assignments.

227.    Saravay's pejorative characterization of veterans represented a pervasive pattern and practice of bias-based harassment and discrimination against Plaintiff based on his status as a veteran.

228.    . Saravay's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran attorney-employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

## L. Retaliatory Assignment of Morally Repugnant Child Sexual Abuse Defense Work (2021-2023)

229.   After Plaintiff began publicly advocating for fair pay and equal opportunities for veterans, Defendant McCarter inexplicably altered the nature of his work assignments.

230.   Plaintiff's previous work assignments were primarily bankruptcy and commercial litigation matters consistent with his role in the Bankruptcy Group.

231.   Beginning in or around 2021 and continuing through 2023, Defendant assigned Plaintiff a high-volume caseload defending allegations of child sexual abuse against the Catholic Church and its dioceses.

232.   These child sexual abuse defense assignments were unrelated to Plaintiff's role in the Bankruptcy Group and were outside the scope of work assigned to attorneys in that practice group.

233.   Plaintiff informed Lubertazzi and Calello that as the father of a young daughter, while he acknowledged the constitutional right of accused parties to a vigorous defense, he struggled with the moral dilemma of defending child sexual abuse matters.

234.   Plaintiff sent emails to Lubertazzi, Adam M. Swanson ("Swanson"), Lisa S. Bonsall ("Bonsall"), and Wallach, Partners in the Bankruptcy Group, explaining that it was difficult for him to work on child molestation cases and requesting assignments more typical of the Bankruptcy Group's practice.

235.   Lubertazzi, Bonsall, and Wallach did not respond to Plaintiff's email request seeking assignment of typical Bankruptcy Group work.

236.   Swanson's only response was to ask whether Plaintiff's email was intended directly for him.

237. Plaintiff responded to Swanson, clarifying the email was intended for all Partners in the Bankruptcy Group, and that it constituted a request to return to being assigned typical Bankruptcy Group work.

238. Plaintiff explained his difficulties with child sexual abuse matters due to the conflicting emotions such assignments produced, concerns regarding the morality of the work, and his conflicting role as a father.

239. While Plaintiff reaffirmed the right of the accused to a vigorous defense, Plaintiff expressed a personal conflict with his values.

240. Despite Plaintiff's reasonable request, Swanson, Lubertazzi, Bonsall, and Wallach made no further response and did not provide Plaintiff with the bankruptcy work he had requested.

241. Despite being assigned to the Bankruptcy Group, from 2021 through 2023, Defendants made defense of child sexual abuse matters Plaintiff's primary work responsibility.

242. No other attorneys in the Bankruptcy Group were assigned child sexual abuse defense matters in comparable volume or frequency.

243. The assignment of an unusual volume of child sexual abuse cases to Plaintiff, a veteran who had recently complained publicly about pay inequality for veterans at Defendant McCarter, was retaliatory and discriminatory.

244. The assignment of child sexual abuse cases was intended to pressure Plaintiff to resign from Defendant McCarter rather than continue to advocate for veterans' rights and equal treatment.

245. The retaliatory practice of assigning Plaintiff child sexual abuse defense cases continued for approximately one and a half years and constituted part of a continuing pattern of adverse employment actions that led Plaintiff to the reasonable conclusion that the workplace had become hostile and that the terms and conditions of his employment had been irrevocably altered.

246. In his September 27, 2022 email response to Major's refusal to assist with a referral for Navy SEAL Rusch, Plaintiff stated: "So glad you are rooted and strong. Meanwhile I'll keep working on all these child molestation defense cases I've been assigned. Sometimes I wonder if due process and the right to a fair trial is a myth."

247. This email reflects Plaintiff's distress at the retaliatory work assignments and his perception that Defendant McCarter's professed values (Major's invocation of his "oath to serve") were hypocritical given the firm's defense of institutional child sexual abuse and its refusal to extend professional courtesy to a Navy SEAL veteran.

248. The change in Plaintiff's work to majority child sexual abuse cases was an act of bias-based harassment for Plaintiff's status as a military veteran.

249. The assignment of majority child sexual abuse work known by Defendant McCarter to be repugnant to Plaintiff was a discriminatory and harassing adverse employment action designed to make continued employment untenable for Plaintiff.

250. Defendant McCarter's actions were severe and pervasive enough to lead a reasonable, similarly situated veteran attorney-employee to believe that the terms and conditions of employment had been irrevocably altered based on discrimination and bias-based harassment for military service.

## M. Denial of Career Advancement and Unequal Pay (2023)

251.    Throughout Plaintiff's employment with Defendant McCarter, Defendant McCarter failed to provide Plaintiff with a career path to become a regular Associate and earn compensation equal to that of other non-veteran attorneys performing substantially similar work.

252.    On December 14, 2023, Plaintiff attended his annual performance review, during which he met with Calello, Saravay, and Lydon.

253.    During the annual review, Plaintiff received positive feedback regarding his work performance and business development efforts.

254.    Defendant awarded Plaintiff a $15,000 annual salary increase, raising his base salary to $115,000.

255.    Plaintiff expressed his displeasure at being discriminated against by Defendant based on his status as a veteran, explaining that even with the $15,000 raise, a newly hired Associate's base salary was $55,000 higher than his own.

256.    Plaintiff stated to McCarter supervisors that it was a disgrace that he was one of the few veterans at Defendant's firm and that after six years of performing fully and competently in his position, Plaintiff still received substantially less compensation than a non-veteran first-year Associate.

257.    Plaintiff requested that Defendant provide him with specific steps he could take to become a regular Associate to receive fair and equal pay for substantially similar work.

258.    Plaintiff also requested a severance package to help him evaluate his options and determine his next steps.

259.     On December 18, 2023, Saravay came to Plaintiff's office and informed Plaintiff that Defendant McCarter was willing to provide him with a four-month severance package and that Defendant McCarter would "get back to him" about what specific steps Plaintiff could take to become a regular Associate.

260.     Following the December 14, 2023 annual review, Plaintiff sent multiple emails to Saravay requesting the specific steps Saravay had promised to provide regarding how Plaintiff could become a regular Associate and receive equal pay.

261.     Despite Plaintiff's repeated requests, Saravay never responded to Plaintiff's emails and never provided the promised information about steps to become a regular Associate.

262.     On December 27, 2023, when Gabriel and Lydon informed Plaintiff that his employment was being terminated, Lydon stated that it was "a shame" Plaintiff was being fired because she and Saravay had been "working on ways" Plaintiff could become a regular Associate.

263.     Lydon's admission that she and Saravay had been working on a promotion pathway for Plaintiff — made at the moment of Plaintiff's termination — demonstrates that Defendant's stated reason for termination (alleged social media policy violation) was pretextual. If Defendant had legitimate concerns about Plaintiff's December 22, 2023 LinkedIn post, Defendant would not have been simultaneously developing a promotion pathway for him.

264.     The temporal sequence — Saravay's December 18, 2023 promise to provide promotion steps, Plaintiff's repeated follow-up emails, Saravay's failure to respond, Plaintiff's December 23, 2023 complaint about discriminatory treatment, and Plaintiff's

December 27, 2023 termination — establishes that Defendant terminated Plaintiff in retaliation for his protected complaints, not because of any legitimate social media policy concern.

265.    Defendant McCarter did not honor Saravay's representation of a reply and did not offer any specific steps Plaintiff could take to become a regular Associate and receive fair and equal pay.

266.    Defendant had no intention of providing Plaintiff with a pathway to become a regular Associate because Defendant was discriminating against Plaintiff based on his veteran status and his outspoken advocacy for veterans' rights.

267.    Defendant McCarter's Equity Partners Howard M. Berkower ("Berkower") and Veronica H. Montagna ("Montagna"), both of whom Plaintiff worked for directly and from whom Plaintiff received excellent performance evaluations, privately advised Plaintiff that it might be better if he left the firm because they did not believe Defendant McCarter would ever make Plaintiff a regular Associate.

268.    The private admissions by Berkower and Montagna — Equity Partners who had direct knowledge of Plaintiff's work product and performance, and who gave Plaintiff excellent evaluations — confirm that Defendant's refusal to promote Plaintiff and provide equal compensation was a deliberate, institutional decision, not an oversight or a reflection of Plaintiff's performance. Despite performing excellent work as evaluated by the very Partners he worked for, Plaintiff was denied the promotion and equal pay afforded to non-veteran attorneys.

## N. Plaintiff's Protected Communications Under CEPA

269.    Plaintiff's complaints to Defendant regarding unequal pay, discriminatory treatment, hostile work environment, and denial of professional opportunities based on his veteran status constituted protected "whistleblowing" activity under CEPA.

270.    Plaintiff reasonably believed that Defendant's conduct violated one or more laws, rules, or regulations, or clear mandates of public policy, including but not limited to:

a)  The Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301-4335;

b)  The New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 to -50. The NJLAD was amended on January 20, 2026 to include veterans as a protected class;

c)  The New Jersey Equal Pay Act, N.J.S.A. 10:5-12(t) and N.J.S.A. 34:11-56.1 to -56.14; and

d)  Clear mandates of public policy protecting veterans' rights to employment, fair treatment, and freedom of expression.

271.    Plaintiff disclosed his objections and complaints to Defendant McCarter's supervisors and leadership, including:

a)  Complaints to Lubertazzi, Calello, and other Bankruptcy Group partners regarding discriminatory work assignments;

b)  Complaints to Boccassini, Saravay, and Lydon during his December 14, 2023 annual review regarding unequal pay for veterans;

c)  His December 23, 2023 email to Lubertazzi, Calello, Saravay, and Lydon regarding discriminatory work assignments and unequal treatment;

d) His October 2022 emails to the DEI Committee requesting inclusion of veterans in diversity initiatives; and

e) His LinkedIn post in fall 2023 advocating for equal treatment of veterans in the workplace.

272.    Plaintiff's disclosures and objections were made in good faith based on his reasonable belief that Defendant's conduct was unlawful and contrary to public policy.

**O. Plaintiff's December 22, 2023 LinkedIn Post**

273.    On December 22, 2023 — eight days after Plaintiff's annual review and five days before his termination — Plaintiff made a post on LinkedIn reflecting his lived experiences as a Navy SEAL combat veteran in Iraq.

274.    Plaintiff's December 22, 2023 LinkedIn post was made in the context of ongoing jihadist terrorist violence worldwide, including the October 7, 2023 attacks on Israel by the terrorist organization Hamas, which killed over 1,200 people, mostly civilians, and resulted in the abduction of 251 hostages, including children.

275.    The October 7, 2023 attacks on Israel evoked painful memories for Plaintiff regarding his experiences as a first responder to suicide bombings committed by jihadist terrorists in Iraq.

276.    Plaintiff's December 22, 2023 LinkedIn post stated, in pertinent part: "I was a first responder to two suicide bombings in Iraq and those experiences had an impact on my perspective. There are many beautiful and tolerant Muslims but the textual language within the Quran is far from tolerant. In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangsta rap had a huge negative influence on many young and easily impressionable American black youth. The pursuit

63

of negative values leads to a trap, with the real result being a great loss of not even beginning to maximize one's personal growth potential. It's my opinion that there's also a radical culture within the Islamic world that promotes antisocial values and glorifies violence. This has had a devastating impact on millions of young and very easily influenced lives."

277.    Plaintiff's LinkedIn post continued: "The internet and the ease of travel transversed us all into an increasingly smaller and greater connected global society. As a global society we need to use the internet and our educational institutions to promote unity and self and collective societal improvement. These are the cornerstone steps we need to take in order to maximize our individual and collective growth potential."

278.    A true and correct copy of Plaintiff's December 22, 2023 LinkedIn post — the post Defendant McCarter claims justified Plaintiff's termination — is reproduced below:



**William Brown** · · ·...
Former N... SEAL - Partner at Parsator Law Group LLF
·... · Edited · ⦿

I was a first responder to two suicide bombings in Iraq and those experiences had an impact on my perspective. There are many beautiful and tolerant Muslims but the textual language within the Quran is far from tolerant.

In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangsta rap had a huge negative influence on many young and easily impressionable American black youth.

The pursuit of negative values leads to a trap, with the real result being a great loss of not even beginning to maximize one's personal growth potential.

It's my opinion that there's also a radical culture within the Islamic world that promotes antisocial values and glorifies violence. This has had a devastating impact on millions of young and very easily influenced lives.

The internet and the ease of travel transversed us all into an increasingly smaller and greater connected global society. As a global society we need to use the internet and our educational institutions to promote unity and self and collective societal improvement. These are the cornerstone steps we need to take In order to maximize our individual and collective growth potential. The alternative to taking these proactive steps is that as a global society, like the young women depicted in this video we have the potential to destroy ourselves.



**Brides of Allah - Palestinian women jihadists open up about their complicity in attacks in I...**

youtube.com

65

279. Plaintiff's LinkedIn post was based on his lived experiences as a Navy SEAL combat veteran, his firsthand observations of jihadist terrorist violence, and his informed perspective on the root causes of violent extremism.

280. Plaintiff's LinkedIn post explicitly acknowledged that "there are many beautiful and tolerant Muslims" and was directed at violent extremist ideology, not at Muslims as a whole or at any racial or ethnic group.

281. Plaintiff's LinkedIn post did not promote negative stereotypes of Muslims or Black Americans.

**P. Plaintiff's December 23, 2023 Email to McCarter Leadership**

282. On December 23, 2023, just four days before Plaintiff's termination, Plaintiff sent an email to Lubertazzi, Calello, Saravay, and Lydon regarding his concerns about being assigned a disproportionate volume of child sexual abuse defense cases.

283. In the December 23, 2023 email, Plaintiff reiterated that he was an Iraq War veteran and Navy SEAL, that he was the President of VARU, that freedom of speech was very important to him, and that he had been discriminated against by Wallach when Wallach requested that he remove his December 7, 2022 LinkedIn post about his visit to the Third Circuit Court of Appeals.

284. Plaintiff noted in the email that Artiles had made a LinkedIn post depicting the same Newark Federal Courtroom on the same day as Plaintiff's post, yet no one at Defendant McCarter had asked Artiles to remove his post.

285. Plaintiff stated in the email: "The message I received from this experience is that McCarter & English believes the son-in-law of a Federal District Judge has greater first amendment rights than an Iraq Veteran Navy SEAL."

66

286. This was a protected communication under CEPA made to upper-level supervisory personnel of Defendant McCarter.

**Q. Plaintiff's Wrongful Termination by McCarter (December 27, 2023)**

287. On December 27, 2023, just four days after Plaintiff sent the email described above and thirteen days after Plaintiff's annual review in which he advocated for equal pay for veterans, Plaintiff was called into a conference room to meet with Gabriel, Defendant McCarter's Firmwide Deputy Managing Partner and a member of the DEI Committee and Social Justice Project, and Lydon, Defendant's Chief Human Resources Officer and a member of the DEI Committee.

288. Gabriel informed Plaintiff that Defendant McCarter had previously warned Plaintiff about making "controversial" posts on social media and that Plaintiff's employment was being terminated because Gabriel believed Plaintiff's December 22, 2023 LinkedIn post "promoted negative stereotypes of Muslim and Black Americans."

289. Defendant's stated reason for Plaintiff's termination was pretextual, designed to obscure the illegal retaliatory nature of the termination.

290. Plaintiff's December 22, 2023 LinkedIn post did not promote negative stereotypes of Muslims or Black Americans, as demonstrated by the plain language of the post itself.

291. Defendant's true motivation for terminating Plaintiff's employment was retaliation for Plaintiff's protected complaints about discrimination, unequal pay, and hostile work environment based on his veteran status.

292. The temporal proximity between Plaintiff's protected complaints during his December 14, 2023 annual review, his December 23, 2023 email to Defendant's leadership, and his December 27, 2023 termination establishes a clear causal connection

67

between Plaintiff's whistleblowing activity and Defendant McCarter's retaliatory termination.

293.    Defendant McCarter terminated Plaintiff's employment to silence his advocacy for veterans' rights, to punish him for complaining about unlawful discrimination, and to deter other employees from asserting their rights under the law or complaining about conduct they believed violated laws, rules, regulations, or public policy.

294.    Following Plaintiff's termination, a current employee of Defendant McCarter contacted Plaintiff and expressed fear of being terminated from employment simply for "liking" Plaintiff's LinkedIn posts. A true and correct copy of the current employee's message is reproduced below:



TODAY

Hi William,

I'm employed by McCarter & English, LLP but I've never had the pleasure of working with you. I'm sorry to read what has happened, but I hope that you're happy where you're right now and that you like your new job. I just wanted to let you know that I have been following your posts on LinkedIn for some time, and I agree with you on a lot of topics. Unfortunately, I can't click "like" or comment on them, and express myself publicly because I might lose my job, and with my work position, I'm am aware that it may be harder to get hired if I do share some of the things on the social media platform. I also know how does it feel to be politically oppressed in a workplace. It's not easy for people who have different opinions than democrats/liberals, and we know that "freedom of speech" doesn't exist anymore. This is the sad reality we're living in right now, and hopefully it will change soon. I really do appreciate your courage speaking your mind and a big thank you for your military service!



🔒

295.    Defendant's termination of Plaintiff has doubtless had the intended chilling effect on other employees' willingness to exercise their rights to free expression and to report unlawful conduct.

296.    Plaintiff's allegations regarding Defendant McCarter's politically oppressive workplace culture have been independently corroborated by former employees. Peter Antonelli, a former McCarter Associate who worked at the firm for nine years (2005-2014), confirmed Plaintiff's allegations. A true and correct copy of Mr. Antonelli's message is reproduced below:

TODAY

 **Peter Antonelli** - ·. ·ı ·

Bill: I was at McCarter for 9 years as an Associate in the Boston office, from 2005-2014. I could see that the Firm was increasingly focusing on becoming woke, for a variety of reasons. Pro bono initiatives were a big manifestation of that "ism".

Having had my own firm for 7.5 years with a partner and now as a solo, I don't miss big law and it's Wokeism. There is no amount of salary/money I will accept to sell my soul to the devil that is Wokeism.

Everything that you are saying is factual and true and it is destroying people and our country. Some people gloss it over and some are insane enough to believe it is not true or factual.

Keep pushing.

**R. Plaintiff's Damages from Defendant McCarter's Unlawful Conduct**

297.     As a direct and proximate result of Defendant McCarter's unlawful discrimination, retaliation, and wrongful termination, Plaintiff suffered substantial damages, including but not limited to:

a)  Lost wages and benefits from the date of termination through the present and continuing into the future;

b)  Lost compensation resulting from Defendant's discriminatory underpayment of Plaintiff throughout his six-year tenure, totaling approximately $472,500 in cumulative lost wages (calculated as $70,000 per year for 6.75 years);

c)  Loss of professional reputation and damage to Plaintiff's career prospects;

d)  Severe emotional distress, humiliation, anxiety, and mental anguish;

e)  Damage to Plaintiff's personal and professional reputation resulting from Defendant's false characterization of Plaintiff as promoting negative stereotypes of Muslims and Black Americans;

f)  Loss of employment benefits, including health insurance, retirement contributions, and other emoluments of employment; and

g)  Costs and expenses incurred in seeking new employment and mitigating damages.

298.     At a New Jersey Jewish Bar Association event where Plaintiff was a speaker, an attorney Aliza Lipschitz Sherman who use to work at McCarter and upon information and belief, was in a personal relationship with a McCarter Partner approached Plaintiff and stated: "You're the attorney who was fired from McCarter for saying bad things about Muslims."

299.     This false characterization has followed Plaintiff in the legal community, damaging his ability to secure employment in the New Jersey Big Law legal community.

300.     Plaintiff has suffered physical symptoms as the result of the emotional distress inflicted on him by Defendant McCarter's illegal, bias-based discrimination and retaliation, including loss of sleep, weight gain and weight loss, headaches, and indigestion.

301.     Plaintiff has sought therapeutic treatment for the emotional distress caused by Defendant McCarter's discrimination and retaliation, including participation in the Equine Immersion Project, an equine-assisted therapy program for veterans with PTSD and trauma.

302.     Plaintiff participates in patriotic athletic events for adventure therapy as a coping mechanism for service-related stress exacerbated by Defendant McCarter's workplace discrimination.

**IV. Post-Termination Retaliation by Port Authority Defendants (2024-2025)**

303.     Following Plaintiff's filing of the original Complaint on December 24, 2024, Defendant McCarter retained the law firm of O'Toole Scrivo, LLC as representation in this litigation.

304.     O'Toole Scrivo, LLC is a law firm founded by Defendant Kevin J. O'Toole.

305.     Defendant O'Toole is the managing partner of O'Toole Scrivo, LLC.

306.     Defendant O'Toole serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey, one of the most powerful government positions in the New York-New Jersey region.

307. Upon information and belief, Defendant O'Toole has family, business, and political ties to Defendant McCarter.

308. Upon information and belief, Defendant O'Toole's son, Kevin O'Toole Jr., is an attorney employed by Defendant McCarter and supervised by William D. Wallach, an Equity Partner in McCarter's Bankruptcy Group.

309. On December 23, 2023, Plaintiff sent an email to McCarter leadership complaining about discriminatory treatment by Wallach, O'Toole Jr.'s direct supervisor. Four days later, on December 27, 2023, Plaintiff was terminated. Upon information and belief, Defendant O'Toole had reason to be concerned about protecting Defendant McCarter from liability in this litigation given his son's employment at the firm and supervision by an Equity Partner whom Plaintiff had complained about shortly before his termination.

310. Defendant O'Toole has a personal financial interest in protecting Defendant McCarter from liability in this litigation, as an adverse judgment or settlement could negatively impact his son's employment and career prospects.

311. Defendant O'Toole has a professional interest in protecting Defendant McCarter, as O'Toole Scrivo, LLC derives substantial income from representing Defendant McCarter in this litigation.

312. Defendant Port Authority has historically provided support and resources for the Navy SEAL Foundation NYC SEAL Swim, including access to the World Trade Center site and other Port Authority facilities.

313. In 2020, GI Go Fund CEO Jack Fanous spotlighted the importance of the Port Authority support for the event, stating that "The men and women who work at the Port

Authority of New York and New Jersey are among the most patriotic I have ever worked with," and "They stepped up to provide volunteers for the event and support at every step of the way. Without them, there simply would not be a SEAL Swim."

314.    Employees of Defendant Port Authority have filled integral roles as planners and organizers, providing crucial support to the event.

315.    One Port Authority employee lists himself on LinkedIn as the "Chief planner & resource manager of the Hudson River Navy SEAL Swim."

**Established Relationship Between Defendant O'Toole and Defendant Donovan Regarding the NYC SEAL Swim**

316.    In September 2024, Defendant Donovan presented Defendant O'Toole with a paddle from the Navy SEAL Foundation and an American flag that Plaintiff had arranged for participating Navy SEALs to sign, at a ceremony at Port Authority offices. A true and correct copy of a photograph of this ceremony is reproduced below:



317.    Plaintiff was not informed of this ceremony and was not invited to attend, despite being the founder and lead organizer of the NYC SEAL Swim and the person who arranged for the SEALs to sign the American flag that was presented to Defendant O'Toole.

318.    Upon information and belief, Plaintiff was excluded from this ceremony because Defendant O'Toole was aware at that time that his law firm, O'Toole Scrivo, LLC, would be retained to represent Defendant McCarter in this litigation, and Defendant O'Toole did not want Plaintiff to be aware of his direct involvement with the NYC SEAL Swim.

319.    The September 2024 ceremony establishes that Defendants O'Toole and Donovan had a direct, personal relationship regarding the NYC SEAL Swim, and that Defendant Donovan had direct access to Defendant O'Toole — supporting the inference that

Defendant Donovan's subsequent retaliatory threats to Plaintiff were made at Defendant O'Toole's direction.

**Defendant Donovan's Role and Changed Attitude Following Plaintiff's Lawsuit**

320.    Defendant Donovan's Port Authority responsibilities include the World Trade Center Site, an essential venue for Plaintiff's SEAL Swim.

321.    Defendant Donovan has been involved with the SEAL Swim almost since the start of the event seven years ago.

322.    Defendant Donovan previously assisted with coordinating Port Authority resources for the SEAL Swim without controversy.

323.    It was only after Plaintiff filed suit against Defendant McCarter that Defendant Donovan's attitude towards cooperating with Plaintiff and supporting the swim soured.

**Defendant Donovan's Deliberate Exclusion of Plaintiff from Planning Conference Call (2025)**

324.    In 2025, Defendant Donovan's retaliatory conduct escalated when he organized a conference call with all essential supporting assets for the NYC SEAL Swim — including NYPD, NJSP, and other first responder agencies — and deliberately excluded Plaintiff, the founder and lead SEAL of the event, from the call.

325.    Defendant Donovan invited other participants, including Geoff Leard, James Matier, Jorge Puhlovsky, and others, but did not invite or inform Plaintiff about the conference call.

326.    When Plaintiff learned of the conference call and asserted his right to participate as the founder and lead organizer of the event, Plaintiff stated: "Pat - I'm the founder and

76

lead SEAL of NYC SEAL Swim. I should have been included on this conference call. I will be on tomorrow's call."

327. Defendant Donovan responded dismissively, stating: "I don't need you on the call tomorrow, I've already spoken to both parties and this is to just iron out the last details. You sometimes bring additional and unnecessary topics and dramatics to these conversations that leaves a bad taste with people."

328. Plaintiff responded professionally and firmly: "You invited Geoff to this call but excluded me when I am the lead SEAL and founder of the event. I have great relationships with multiple people on that call and they were surprised I wasn't included. As the lead SEAL it's important that I be on the call."

329. Plaintiff further stated: "I am a combat veteran Navy SEAL and leader in the SEAL Community. This is a NYC SEAL Swim that I founded. I represent the War Fighters. Please respect what I bring to the table as I respect you. I should not have been excluded from this call."

330. Defendant Donovan's characterization of Plaintiff's input as "dramatics" and "unnecessary" was demeaning and dismissive of Plaintiff's role as the founder and lead organizer of the event and reflected the same pattern of marginalizing Plaintiff that characterized Defendant McCarter's treatment of Plaintiff during his employment.

331. True and correct copies of the text message exchange between Plaintiff and Defendant Donovan regarding Plaintiff's exclusion from the conference call are reproduced below:

77





Then just listen and let me handle it

I alerted you and NYPD Leadership when NJSP canceled day before first test swim.

This works when we work together. am a combat veteran Navy SEAL and leader in the SEAL Community. This is a NYC SEAL Swim that I founded. I represent the War Fighters.

Please respect what I bring to the table as I respect you. I should not have been excluded from this call.



**‹ 361**    **Pat ›**    ◻️

Everyone respects your service
and everyone else that has served,
that's why everyone supports this
event so much.

Please understand that I have more
and longer relationships with many
of these people and organizations
and work with them on other
projects besides this swim.

This issue with NJSP is bigger than
your swim and it's the last thing
they are worried about at the
moment.

So like I said let me talk and handle
it tomorrow and we will be all good

During the unexpected last minute
call with the Mayor's Office you
asked to take point for similar
reasons and I did.

You should have invited me on the
call and asked the same. I have no
issues with you taking point. I am a
lawyer who works for the firm that
represents the Sec Def who has
been a champion of this event so I
understand the jurisdictional issues
involved.

I have had many phone calls with
Officers on both sides of the

+

80



12:00

< 361         Pat ?

projects besides th.  **Pat ?**

This issue with NJSP is bigger than your swim and it's the last thing they are worried about at the moment.

So like I said let me talk and handle it tomorrow and we will be all good

During the unexpected last minute call with the Mayor's Office you asked to take point for similar reasons and I did.

You should have invited me on the call and asked the same. I have no issues with you taking point. I am a lawyer who works for the firm that represents the Sec. Def who has been a champion of this event so I understand the jurisdictional issues involved.

I have had many phone calls with Officers on both sides of the Hudson regarding the same.

I've always been honest and respectful for how you helped in this event. I am the lead SEAL and founder of this event. I will be on the call.

Ok

332.    Defendant Donovan's deliberate exclusion of Plaintiff — the founder and lead

organizer of the NYC SEAL Swim — from a planning conference call with all essential

supporting assets was part of a coordinated effort to marginalize Plaintiff and strip him of his role in the charity event he created, in retaliation for Plaintiff's filing of this lawsuit against Defendant McCarter.

333.    Prior to Plaintiff's filing of this lawsuit and Defendant McCarter's retention of O'Toole Scrivo, LLC, Defendant Donovan had never excluded Plaintiff from planning calls or attempted to marginalize Plaintiff's role in the NYC SEAL Swim.

334.    Defendant Donovan's exclusion of Plaintiff from the conference call, combined with his dismissive and demeaning characterization of Plaintiff's participation, constituted an escalation of the retaliatory conduct that culminated in Defendant Donovan's threatening text message.

**Defendant Donovan's Threatening Text Message**

335.    Without the support of Defendant Port Authority, employees such as Defendant Donovan, and resources necessary for the event to succeed become unavailable.

336.    Due to Defendants Port Authority and Donovan having control of access to the 9/11 and Hudson River sites, without the support of Defendant Port Authority's senior leadership, the Swim's primary staging, ceremonial, and logistical areas are unavailable.

337.    The Navy SEAL Foundation is a national nonprofit organization that supports Navy SEALs, their families, and the families of fallen SEALs.

338.    Plaintiff, as founder and lead organizer of the NYC SEAL Swim, had a contractual relationship with the Navy SEAL Foundation, pursuant to which Plaintiff received approximately $40,000 annually for his services in planning, coordinating, and executing the event.

339.	Plaintiff received $40,000 from the Navy SEAL Foundation in 2023, 2024, and 2025 for his work organizing the NYC SEAL Swim.

340.	In 2025, following Plaintiff's filing of the original Complaint, Defendant Donovan, acting as a representative and agent of the Port Authority, sent Plaintiff a text message threatening to withdraw Port Authority support for the NYC SEAL Swim unless Plaintiff refrained from making any public statements critical of Defendant Kevin J. O'Toole, or O'Toole Scrivo, LLC.

341.	Defendant Donovan's text message to Plaintiff stated: "Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC."

342.	A true and correct copy of Defendant Donovan's threatening text message to Plaintiff is reproduced below:

Case 2:26-cv-02808-JXN-AME   Document 1-2   Filed 03/18/26   Page 354 of 389 PageID: 406



Pat



Ok, we aren't sending anything out
about him or posting anything



I understand
Please be aware though that you
cannot post, send or do anything else
negative towards him or his firm. If
you do I will be out of the event along
with all Port Authority assets and
access to the WTC

Understood. The event does to much
good for Goldstars, SEALs, Veterans,
Law Enforcement Officers and
Firefighters for me to risk.

84

343.    The message sent was "shut up about O'Toole Scrivo or lose your swim" — as without the support of Defendant Port Authority, the SEAL Swim is impossible to continue in the form it has thrived in for the past seven years, and the veterans, Gold Star families, and disabled veterans that benefitted from the nearly one-million dollars in charity raised by the swim would go without. This was a cause of great concern and emotional distress for Plaintiff, and his sense of duty to those who benefit from the Swim compelled him to speak up, despite the dire nature of the threat.

344.    Commissioner Kevin J. O'Toole's name being invoked by Defendant Donovan, within the context of retaliatory threats premised on Plaintiff's action against Defendant McCarter, is a cause for grave concern, tending to show the retaliation extended to the highest levels of Port Authority leadership.

345.    Invoking the name of the powerful Commissioner of the Port Authority, Kevin J. O'Toole, the founder and senior partner of Defendant McCarter's counsel, O'Toole Scrivo, creates a causal nexus between the retaliation committed by Defendant Donovan and Defendant Port Authority and Plaintiff's lawsuit against Defendant McCarter.

346.    Upon information and belief, Defendant Donovan's threat was made with the knowledge and approval of Defendant Port Authority senior leadership, including Defendant O'Toole.

347.    Upon information and belief, Defendant Donovan informed Joe Palermo, a former employee of Defendant Port Authority, that he was receiving directions from senior Port Authority leadership to withdraw support from the NYC SEAL Swim if Plaintiff participated in the event.

348.    Defendant Donovan's statement to Palermo demonstrates the retaliation against Plaintiff was not the act of a single rogue employee, but rather an institutional decision, aided, abetted, condoned and ratified by senior leadership of Defendant Port Authority.

349.    Upon information and belief, Defendant O'Toole, in his dual capacity as Port Authority Chairman and Managing Partner of O'Toole Scrivo, directed, ratified, or approved Defendant Donovan's threats to Plaintiff.

350.    Upon information and belief, Defendant O'Toole's involvement in directing or approving Defendant Donovan's conduct occurred in the context of: (a) O'Toole Scrivo, LLC representing Defendant McCarter in this litigation and deriving substantial income from that representation; and (b) O'Toole's son being employed by Defendant McCarter and supervised by William D. Wallach, an Equity Partner whom Plaintiff had complained about four days before Plaintiff's termination. Defendant O'Toole's orders to Defendant Donovan were motivated by O'Toole's personal interest in protecting his son's employer (Defendant McCarter) and his professional interest in protecting his law firm's client (Defendant McCarter).

**Consequences of Port Authority Retaliation**

351.    Following Defendant Donovan's threats, officials of Defendant Port Authority informed the Navy SEAL Foundation that it would not support the 2026 NYC SEAL Swim if Plaintiff participated in the event.

352.    As a result of Defendant Port Authority's retaliatory threat, the Navy SEAL Foundation terminated its contract with Plaintiff and withdrew from participating in the 2026 NYC SEAL Swim.

353. The Navy SEAL Foundation's termination of Plaintiff's contract was a direct and proximate result of the threats and retaliation by Defendants Port Authority, O'Toole, and Donovan, acting in coordination with Defendant McCarter and its defense counsel.

354. As a direct and proximate result of the Navy SEAL Foundation's withdraw from the NYC SEAL Swim, Plaintiff lost $40,000 in income for 2026.

355. Upon information and belief, Plaintiff will continue to lose $40,000 annually in future years due to the actions of Port Authority Defendants unless his relationship with the Navy SEAL Foundation is restored or he secures another sponsor for the NYC SEAL Swim.

356. In addition to the financial loss, Plaintiff has suffered severe emotional distress, humiliation, and reputational harm because of the Navy SEAL Foundation's withdrawal from the charity event Plaintiff founded and has led for seven years.

357. The Navy SEAL Foundation's withdrawal from the NYC SEAL Swim has severely damaged Plaintiff's standing in the veteran community and his reputation as a veteran advocate and leader; the name of Bill Brown Jr. is synonymous with the Navy SEAL Swim.

**Plaintiff's Mitigation Efforts**

358. Following the Navy SEAL Foundation's withdrawal from the NYC SEAL Swim, Plaintiff has actively sought to mitigate his financial losses and preserve the positive impact of the swim by meeting with numerous non-profit organizations to identify an alternative sponsor for the event.

359. Plaintiff's mitigation efforts reflect his deep commitment to continuing the patriotic and therapeutic mission of the NYC SEAL Swim, which provides Adventure

Therapy for Navy SEALs, veterans, police officers, firefighters, Gold Star families, and 9/11 survivors.

360.    Despite Plaintiff's diligent efforts, the unique nature of the Port Authority's support — including access to the World Trade Center site, the Hudson River staging areas, and Port Authority personnel and resources — have made it extremely difficult to identify a replacement sponsorship capable of providing equivalent support.

361.    Plaintiff's inability to fully replace the Port Authority's support and the Navy SEAL Foundation's sponsorship demonstrates the severity and irreparability of the harm caused by Defendants' retaliatory conduct.

362.    The NYC SEAL Swim has raised millions of dollars in charitable funds over its seven-year history, benefitting Navy SEALs, veterans, Gold Star families, 9/11 survivors, police officers, and firefighters. Defendants' retaliatory conduct threatens to destroy this charitable legacy and deprive these communities of the therapeutic and financial benefits the swim provides.

**State Action and Conspiracy**

363.    Upon information and belief, Defendants Port Authority, O'Toole, and Donovan's conduct was undertaken under color of state law, and constituted retaliation against Plaintiff for exercising his First Amendment rights to free speech and to petition the government for redress of grievances (by filing this lawsuit).

364.    Defendants Port Authority, O'Toole, and Donovan's conduct was undertaken in conspiracy with Defendant McCarter and O'Toole Scrivo, LLC to deprive Plaintiff of his constitutional rights and to punish him for his assertive public advocacy for his positions, and for veterans' rights, and for filing this lawsuit.

365. Defendants Port Authority, O'Toole, and Donovan's conduct was willful, wanton, and malicious, and was undertaken with reckless disregard for Plaintiff's constitutional rights qualifying this matter for punitive damages.

### V. Defendant McCarter's Conduct Was Willful

366. Defendant McCarter is New Jersey's largest law firm, a sophisticated employer with over 500 employees, including a dedicated Labor & Employment practice group.

367. Defendant McCarter knew or should have known that USERRA prohibits discrimination and retaliation against veterans in terms, conditions, and benefits of employment.

368. Defendant McCarter's six-year pattern of discrimination against Plaintiff demonstrates willful violations of USERRA.

369. Defendant McCarter's failure to investigate Plaintiff's complaints about discriminatory work assignments, pay disparity, and hostile work environment demonstrates reckless disregard for Plaintiff's rights under federal and state law.

370. Defendant McCarter's use of a pretextual reason for termination (alleged violation of a social media policy) while selectively enforcing that policy based on viewpoint demonstrates willful retaliation.

### COUNT I — Discrimination in Violation of USERRA – 38 U.S.C. § 4311(a)

### (Against Defendant McCarter)

371. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

372. USERRA has no statute of limitations. All acts alleged herein are timely.

373. USERRA prohibits discrimination against any person based on past military service. 38 U.S.C. § 4311(a).

374. USERRA defines "benefit of employment" broadly to include "terms, conditions, or privileges of employment." 38 U.S.C. § 4303(2).

375. Under USERRA, an employer is deemed to have engaged in prohibited discrimination if the person's performance of service in the uniformed services is a motivating factor in the employer's action. 38 U.S.C. § 4311(c)(1).

376. Defendant McCarter discriminated against Plaintiff in violation of USERRA by denying Plaintiff benefits of employment, including: (a) fair and equal compensation; (b) promotion to regular Associate status; (c) inclusion in the firm's annual Diversity Retreat; (d) professional development opportunities; (e) work assignments consistent with his role in the Bankruptcy Group; (f) a workplace free from harassment; and (g) retention in employment.

377. Defendant cannot prove that its adverse employment actions would not have been taken in the absence of Plaintiff's military service.

378. Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

379. Plaintiff is entitled to compensatory damages, liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C), and reasonable attorneys' fees and costs pursuant to 38 U.S.C. § 4323(h).

### COUNT II — Retaliation in Violation of USERRA – 38 U.S.C. § 4311(b)

### (Against Defendant McCarter)

380. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

381. USERRA prohibits employers from taking retaliatory action against any person because that person has exercised a right provided under USERRA. 38 U.S.C. § 4311(b).

382.    Plaintiff exercised rights protected under USERRA by complaining about discrimination based on his military veteran status.

383.    Defendant terminated Plaintiff's employment because Plaintiff exercised his rights under USERRA.

384.    Defendant cannot prove that Plaintiff's termination would have occurred in the absence of Plaintiff's protected complaints.

385.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

386.    Plaintiff is entitled to compensatory damages, liquidated damages, and reasonable attorneys' fees and costs.

## COUNT III — Hostile Work Environment in Violation of USERRA

### (Against Defendant McCarter)

387.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

388.    USERRA prohibits discrimination in the "terms, conditions, or privileges of employment" based on military service. 38 U.S.C. § 4311(a).

389.    Throughout Plaintiff's employment, Defendant subjected Plaintiff to severe and pervasive harassment based on his military veteran status, as detailed in Sections III(A) through III(R) above.

390.    This harassment was sufficiently severe and pervasive to create an objectively hostile work environment.

391.    Defendant knew or should have known of the harassment and failed to take remedial action.

392.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

393.    Plaintiff is entitled to compensatory damages, liquidated damages, and reasonable attorneys' fees and costs.

## COUNT IV — Retaliation in Violation of CEPA – N.J.S.A. 34:19-3

### (Against Defendant McCarter)

394.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

395.    Plaintiff's termination on December 27, 2023 occurred within one year of the filing of the original Complaint on December 24, 2024, and is therefore timely under CEPA's one-year statute of limitations.

396.    Plaintiff engaged in protected whistleblowing activity under CEPA.

397.    Plaintiff's belief that Defendant's conduct violated laws and public policies was objectively reasonable.

398.    On July 11, 2025, this Court (Hon. Joshua D. Sanders, J.S.C.) denied Defendant McCarter's Motion to Dismiss Plaintiff's CEPA claim.

399.    Defendant McCarter terminated Plaintiff's employment in retaliation for Plaintiff's protected whistleblowing activity.

400.    The temporal proximity between Plaintiff's protected complaints and his termination — thirteen days between his annual review complaints and four days between his December 23, 2023 email — creates a strong inference of retaliation.

401.    Defendant McCarter's stated reason for termination was pretextual.

402.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

92

403.    Plaintiff is entitled to compensatory damages, back pay, front pay, reinstatement, restoration of benefits, punitive damages, and reasonable attorneys' fees and costs pursuant to N.J.S.A. 34:19-5.

## COUNT V — Wrongful Discharge in Violation of Public Policy (Pierce Claim) – Veteran Status

### (Against Defendant McCarter)

404.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

405.    Under *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980), an employee has a cause of action for wrongful discharge contrary to a clear mandate of public policy.

406.    New Jersey has a clear mandate of public policy protecting veterans, as evidenced by USERRA, the NJLAD (as amended January 20, 2026, unanimously 108-0), civil service preference laws, and the NJ Judiciary's EEO Policy.

407.    On July 11, 2025, this Court denied Defendant McCarter's Motion to Dismiss Plaintiff's Pierce claim.

408.    The Legislature's unanimous passage of the NJLAD amendment (Senate 37-0, Assembly 71-0) confirms that protection of veterans from employment discrimination has always been a clear mandate of New Jersey public policy.

409.    The NJLAD amendment was enacted in direct response to Plaintiff's extensive advocacy regarding the discrimination alleged in this matter. Prior to the Legislature's passage of S.3800, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, providing his McCarter case as a specific example of the employment discrimination that necessitated amending the NJLAD to protect veterans. The Legislature's unanimous passage with knowledge of Plaintiff's pending case

confirms that discrimination against veterans has always been contrary to New Jersey public policy.

410. Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

411. Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT VI — Wrongful Discharge in Violation of Public Policy (Pierce Claim) – Free Speech

### (Against Defendant McCarter)

412. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

413. New Jersey has a clear mandate of public policy protecting freedom of speech, as reflected in the New Jersey Constitution, Article I, Paragraph 6.

414. Defendant terminated Plaintiff for expressing his opinions on matters of public concern based on his lived experiences as a Navy SEAL combat veteran.

415. Defendant's termination threatens public harm by chilling the speech of veterans and other employees.

416. Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

417. Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## COUNT VII — Discrimination in Violation of the NJLAD

### (Against Defendant McCarter)

418.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

419.     The NJLAD prohibits discrimination in employment based on membership in a protected class or association with members of a protected class. N.J.S.A. 10:5-12(a).

420.     Throughout Plaintiff's employment, Plaintiff was the functional equivalent of a member of a protected class. Plaintiff was discriminated against because of his veteran status and his outspoken advocacy for veterans' rights — characteristics that, while not enumerated in the NJLAD during Plaintiff's employment, were so closely associated with Plaintiff's identity that discrimination based on those characteristics constituted associational discrimination actionable under the NJLAD. *Calabotta v. Phibro Animal Health Corp.*, 460 N.J. Super. 38, 58 (App. Div. 2019).

421.     Alternatively, the NJLAD was amended on January 20, 2026, adding veterans as a protected class (Senate 37-0, Assembly 71-0).

422.     The NJLAD amendment was enacted in direct response to Plaintiff's advocacy as the leading veterans advocate in New Jersey. Prior to the Legislature's passage of S.3800, Plaintiff personally spoke and communicated with many New Jersey lawmakers and their legislative staff, providing his case against Defendant McCarter as a specific example of the employment discrimination that necessitated the amendment. After Plaintiff and NJ Gold Star Mom Amy Moore met with Senator Troy Singleton, he became a co-sponsor of S.3800 the next day. The Legislature's unanimous passage with knowledge of Plaintiff's pending case supports application of the amendment to the conduct alleged in this Complaint.

95

423.    Under the "parties' expectations" exception to the presumption of prospective application, recognized in *Johnson v. Roselle EZ Quick LLC*, 226 N.J. 370, 389 (2016), retroactive application is warranted where the Legislature enacts remedial legislation in direct response to a plaintiff's advocacy about specific ongoing discrimination, with full knowledge of the pending case. The Legislature's unanimous vote in response to Plaintiff's case-specific advocacy creates a reasonable expectation that the amendment applies to the conduct Plaintiff complained of. See also *In re D.C.*, 146 N.J. 31, 54-55 (1996) (finding retroactive legislative intent where "the legislative history demonstrates that the Legislature pointedly intended the amendments to address cases such as" the case before the court, and the problem at issue was "the primary motivating factor behind the Legislature's enactment of these amendments"). Here, Plaintiff was the leading NJ veterans advocate and primary motivating factor in encouraging NJ Lawmakers enactment of S.3800/A.5048, Plaintiff provided his pending case against Defendant McCarter as the specific example of veteran discrimination that necessitated the amendment, and the Legislature passed the amendment unanimously with full knowledge of Plaintiff's pending litigation.

424.    Defendant discriminated against Plaintiff in compensation, terms, conditions, and privileges of employment because of Plaintiff's veteran status.

425.    Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

426.    Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, and equitable relief.

## COUNT VIII — Hostile Work Environment in Violation of the NJLAD

### (Against Defendant McCarter)

427.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

428.     The NJLAD as amended on January 20, 2026 prohibits bias-based harassment and retaliation against veterans.

429.     But for Plaintiff being a veteran, he would not have suffered illegal discrimination, harassment and retaliation.

430.     The harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment.

431.     Defendant knew or should have known of the harassment and failed to take remedial action.

432.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

433.     Plaintiff is entitled to compensatory damages, punitive damages, attorneys' fees and costs, and equitable relief.

## COUNT IX — Violation of New Jersey Equal Pay Laws

### (Against Defendant McCarter)

434.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

435.     The Diane B. Allen Equal Pay Act, N.J.S.A. 10:5-12(t), prohibits paying members of a protected class less for substantially similar work.

436.     Plaintiff, as a veteran, is a member of a protected class under the NJLAD and New Jersey equal pay laws.

437.     Plaintiff performed substantially similar work to regular Associates requiring similar skill, effort, and responsibility.

438.     Defendant paid Plaintiff approximately $70,000 less per year for substantially similar work.

439.     Defendant had no bona fide factors to justify the pay disparity.

440.     As a direct result, Plaintiff suffered lost wages totaling approximately $472,500 over his six-year employment, plus continuing damages.

441.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

442.     Plaintiff is entitled to compensatory damages, treble damages, punitive damages, attorneys' fees and costs.

## COUNT X — Intentional Infliction of Emotional Distress

### (Against Defendant McCarter)

443.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

444.     Defendant engaged in intentional, extreme, and outrageous conduct directed at Plaintiff, as detailed in Sections III(A) through III(R) and Section Q above.

445.     Defendant's conduct was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society.

446.     Defendant McCarter's conduct was willful qualifying this matter for punitive damages.

447.     Plaintiff is entitled to compensatory damages for severe emotional distress and punitive damages.

## COUNT XI — Breach of the Implied Covenant of Good Faith and Fair Dealing

## (Against Defendant McCarter)

448.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

449.    Under New Jersey law, every employment relationship contains an implied covenant of good faith and fair dealing.

450.    Defendant breached the implied covenant by discriminating against Plaintiff, subjecting him to a hostile work environment, retaliating against him, paying him substantially less, denying him advancement, assigning him repugnant work, and terminating him under false pretenses.

451.    Plaintiff is entitled to compensatory damages and such other relief as just and equitable.

## COUNT XII — Violation of 42 U.S.C. § 1983 – First Amendment Retaliation

## (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

452.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

453.    Defendants O'Toole and Donovan were acting under color of state law at all relevant times.

454.    Plaintiff engaged in protected speech by filing this lawsuit and making public statements regarding his treatment by Defendant McCarter.

455.    Defendants retaliated against Plaintiff by threatening to withdraw Port Authority support for the NYC SEAL Swim unless Plaintiff refrained from exercising his First Amendment rights.

456.    Defendant Donovan's text message explicitly conditioned Port Authority support on Plaintiff's agreement to refrain from exercising his First Amendment rights.

457.    As a direct result, the Navy SEAL Foundation withdrew from NYC SEAL Swim Plaintiff, causing $40,000 in annual income loss.

458.    Defendants' conduct was willful qualifying this matter for punitive damages.

459.    Plaintiff is entitled to compensatory damages, punitive damages against O'Toole and Donovan individually, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT XIII — Violation of 42 U.S.C. § 1983 – Conspiracy to Violate Civil Rights (Against Defendants Port Authority, Kevin J. O'Toole, Patrick Donovan, and McCarter & English LLP)

460.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

461.    Defendants Port Authority, O'Toole, Donovan, and McCarter conspired and acted in concert to deprive Plaintiff of his First Amendment rights.

462.    Defendant O'Toole, as Port Authority Chairman and founder of O'Toole Scrivo (McCarter's defense counsel), had both personal and professional interests in protecting McCarter.

463.    Defendant O'Toole's son is employed by McCarter and supervised by Wallach, whom Plaintiff complained about four days before termination.

464.    Defendant O'Toole, acting in concert with McCarter and O'Toole Scrivo, directed Donovan to threaten Plaintiff.

465.    Defendants reached an understanding to deprive Plaintiff of his constitutional rights through coordinated action.

466.    Defendants acted in concert to: (a) silence Plaintiff's speech; (b) punish Plaintiff for filing this lawsuit; (c) deter Plaintiff from pursuing claims; (d) protect McCarter from liability; and (e) protect McCarter in this litigation, in which O'Toole Scrivo serves as

defense counsel and derives substantial income, and in which Plaintiff had complained about an Equity Partner who supervises O'Toole's son four days before termination.

467.    Defendants' conduct was willful qualifying this matter for punitive damages.

468.    Plaintiff is entitled to compensatory damages, punitive damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT XIV — Violation of the New Jersey Civil Rights Act – N.J.S.A. 10:6-1 to -2

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

469.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

470.    The NJCRA provides a cause of action for deprivation of constitutional rights through threats, intimidation, or coercion.

471.    Defendants deprived Plaintiff of his rights to freedom of speech and to petition the government for redress of grievances.

472.    Defendants accomplished this through threats to withdraw Port Authority support unless Plaintiff refrained from exercising his constitutional rights.

473.    Defendants' conduct was willful qualifying this matter for punitive damages.

474.    Plaintiff is entitled to compensatory damages, punitive damages, treble damages, and attorneys' fees and costs pursuant to N.J.S.A. 10:6-2.

## COUNT XV — Tortious Interference with Contract

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

475.    Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

476.    Plaintiff had a valid contractual relationship with the Navy SEAL Foundation ($40,000 annually, documented by payments in 2023, 2024, and 2025).

477.    Defendants knew of Plaintiff's contractual relationship.

478.     Defendants intentionally and improperly interfered by threatening to withdraw Port Authority support unless the Navy SEAL Foundation disinvited Plaintiff.

479.     Defendants' interference was without justification and motivated by malice.

480.     Defendants' conduct was willful qualifying this matter for punitive damages.

481.     Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

### COUNT XVI — Tortious Interference with Prospective Economic Advantage

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

482.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

483.     Plaintiff had a reasonable expectation of continuing economic advantage from his relationship with the Navy SEAL Foundation ($40,000 annually).

484.     Defendants intentionally and improperly interfered with Plaintiff's prospective economic advantage.

485.     Defendants' interference was without justification and motivated by malice.

486.     Defendants' conduct was willful qualifying this matter for punitive damages.

487.     Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

### COUNT XVII — Intentional Infliction of Emotional Distress

### (Against Defendants Port Authority, Kevin J. O'Toole, and Patrick Donovan)

488.     Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

489.     Defendants engaged in intentional, extreme, and outrageous conduct by threatening to withdraw Port Authority support for a charity event benefitting Navy

SEALs, veterans, Gold Star families, and 9/11 survivors unless Plaintiff refrained from exercising his constitutional rights.

490. Defendants' conduct was extreme and outrageous, particularly given that: (a) Plaintiff is a decorated Navy SEAL who founded the swim; (b) Defendants used governmental power to punish Plaintiff; (c) Defendants' actions resulted in Plaintiff being excluded from his own charity event; and (d) Defendants' actions were coordinated with McCarter's defense counsel.

491. Defendants' conduct was willful qualifying this matter for punitive damages.

492. Plaintiff is entitled to compensatory damages for severe emotional distress and punitive damages.

## COUNT XVIII — Civil Conspiracy

### (Against All Defendants)

493. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

494. Defendants McCarter, Port Authority, O'Toole, and Donovan conspired and acted in concert to injure Plaintiff through unlawful means.

495. Defendant O'Toole, as Port Authority Chairman, founder of O'Toole Scrivo (McCarter's defense counsel), and father of an attorney employed by McCarter, had both personal and professional interests in protecting McCarter.

496. Defendants reached an understanding to retaliate against Plaintiff by abusing the Port Authority's governmental power to deprive Plaintiff of his income from the Navy SEAL Foundation.

497. Defendants acted in concert to: (a) silence Plaintiff's speech; (b) punish Plaintiff for filing this lawsuit; (c) deter Plaintiff from pursuing claims; (d) protect McCarter from

liability; and (e) protect McCarter in this litigation, in which O'Toole Scrivo serves as defense counsel and derives substantial income, and in which Plaintiff had complained about an Equity Partner who supervises O'Toole's son four days before termination.

498.    In furtherance of the conspiracy, Defendants: (a) threatened to withdraw Port Authority support; (b) caused the Navy SEAL Foundation to withdrew from NYC SEAL Swim; (c) deprived Plaintiff of his income; and (d) retaliated against Plaintiff for exercising his First Amendment rights.

499.    Defendants' conduct was willful qualifying this matter for punitive damages.

500.    Plaintiff is entitled to compensatory damages, punitive damages, and such other relief as just and equitable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff William Brown Jr. respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

**A. On Count I (USERRA Discrimination):** Compensatory damages, liquidated damages pursuant to 38 U.S.C. § 4323(d)(1)(C), attorneys' fees pursuant to 38 U.S.C. § 4323(h), and reinstatement or front pay;

**B. On Count II (USERRA Retaliation):** Compensatory damages, liquidated damages, attorneys' fees, and equitable relief;

**C. On Count III (USERRA Hostile Work Environment):** Compensatory damages, liquidated damages, attorneys' fees, and equitable relief;

**D. On Count IV (CEPA):** Compensatory damages, back pay, front pay, reinstatement, restoration of benefits, punitive damages, attorneys' fees pursuant to N.J.S.A. 34:19-5, and injunctive relief;

**E. On Count V (Pierce – Veteran Status):** Compensatory damages, punitive damages, and equitable relief;

**F. On Count VI (Pierce – Free Speech):** Compensatory damages, punitive damages, and equitable relief;

**G. On Count VII (NJLAD Discrimination):** Compensatory damages, punitive damages, attorneys' fees, and equitable relief;

**H. On Count VIII (NJLAD Hostile Work Environment):** Compensatory damages, punitive damages, attorneys' fees, and equitable relief;

**I. On Count IX (NJ Equal Pay):** Compensatory damages of approximately $472,500 plus continuing damages, treble damages, punitive damages, and attorneys' fees;

**J. On Count X (IIED – McCarter):** Compensatory damages for severe emotional distress and punitive damages;

**K. On Count XI (Breach of Implied Covenant):** Compensatory damages and equitable relief;

**L. On Count XII (§ 1983 First Amendment Retaliation):** Compensatory damages, punitive damages against O'Toole and Donovan individually, and attorneys' fees pursuant to 42 U.S.C. § 1988;

**M. On Count XIII (§ 1983 Conspiracy):** Compensatory damages, punitive damages against individual Defendants, and attorneys' fees pursuant to 42 U.S.C. § 1988;

**N. On Count XIV (NJCRA):** Compensatory damages, punitive damages, treble damages, and attorneys' fees pursuant to N.J.S.A. 10:6-2;

**O. On Count XV (Tortious Interference with Contract):** Compensatory damages, punitive damages, and equitable relief;

**P. On Count XVI (Tortious Interference with Prospective Economic Advantage):** Compensatory damages, punitive damages, and equitable relief;

**Q. On Count XVII (IIED – Port Authority Defendants):** Compensatory damages for severe emotional distress and punitive damages;

**R. On Count XVIII (Civil Conspiracy):** Compensatory damages, punitive damages, and equitable relief;

**S. Pre-judgment and post-judgment interest at the maximum rate permitted by law;**

**T. Costs and expenses of this action; and**

**U. Such other and further relief as the Court deems just and proper.**

**WHEREFORE** Plaintiff demands judgment jointly and severally against Defendants for reinstatement, seniority level, back pay and front pay, restoration of all seniority and all employee benefits that Plaintiff may have lost, compensatory damages for pain and suffering as well as loss of earnings and other employee benefits, damages for reputational and career development injury, consequential damages, incidental damages, punitive damages, attorney fees and costs of suit, injunctive relief requiring remediation of Defendants' retaliation and discrimination through affirmative action, and any other relief deemed by the Court to be equitable and just.

Dated: February 16, 2026

/s/ William Brown

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## CERTIFICATION OF NO OTHER ACTIONS

I certify that the dispute about which I am suing is not the subject of any other action pending in any other court or a pending arbitration proceeding to the best of my knowledge and belief. Also, to the best of my knowledge and belief no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this complaint, I know of no other parties that should be made a part of this lawsuit. In addition, I recognize my continuing obligation to file and serve on all parties and the court an amended certification if there is a change in the facts stated in this original certification.

Dated: February 16, 2026

/s/ William Brown

_____

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## JURY DEMAND

The plaintiff demands trial by a jury on all of the triable issues of this complaint, pursuant to New Jersey Court Rules 1:8-2(b) and 4:35-1(a).

Dated: February 16, 2026

/s/ William Brown

_____

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## CERTIFICATION PURSUANT TO RULE 1:38-7

I certify that confidential personal identifiers have been redacted from documents now submitted to the Court and will be redacted from all documents submitted in the future in accordance with Rule 1:38-7(b).

Dated: February 16, 2026

/s/ William Brown

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## DESIGNATION OF TRIAL COUNSEL

William Brown, Esq. is hereby designated as trial counsel for Plaintiff William Brown Jr. in the above matter.

Dated: February 16, 2026

/s/ William Brown

William Brown Jr., Esq.
Plaintiff Pro Se
134 Main Street
South Bound Brook, New Jersey 08880
(862) 415-4880
william.brown@parlatorelawgroup.com
NJ Bar ID: NJ145932015

## EXHIBITS

The following documents are incorporated by reference and attached hereto:

**Exhibit A:** Email chain re: LGBT History Month / 9/11 Remembrance (October 5-10, 2022)

**Exhibit B:** Email chain re: Newark Federal Courthouse LinkedIn Post (December 7, 2022)

**Exhibit C:** Email chain re: Rutgers Annual Law Firm Night Disinvitation (February 8-20, 2023)

**Exhibit A**: **Email chain re: LGBT History Month / 9/11 Remembrance (October 5-10, 2022)**

**From:** Brown, William
**Sent:** Monday, October 10, 2022 12:12 PM
**To:** Watson, Natalie <nwatson@mccarter.com>
**Cc:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@mccarter.com>; Boccassini, Joseph T. <jboccassini@mccarter.com>;
Linares, Jose <jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>;
Major, Alexander <amajor@mccarter.com>; Adejemilua, Onome
<oadejemilua@mccarter.com>; Clarke, Marcie <mclarke@mccarter.com>; Freebery,
James J. <jfreebery@mccarter.com>; Gulati, Maneesh <mgulati@mccarter.com>;
Lydon, Christine <clydon@mccarter.com>; Pallak Movahed, Michelle
<mmovahed@mccarter.com>; Ogilvie, Moyahoena <mogilvie@mccarter.com>; Wilson-
Brito, Simone <swilsonbrito@mccarter.com>; Windfelder, Makenzie
<mwindfelder@mccarter.com>; Gabriel, Mary <mgabriel@mccarter.com>
**Subject:** RE: LGBT History Month

Good afternoon Natalie,

I salute your families service to our nation and your advocacy.
Open and respectful dialog is the best way to move forward and I appreciate your
response.

The firm did not send an email honoring and remembering those lost on 9/11 this year
or last year.
Please forward me any email the firm sent out this year or last year honoring and
remembering those lost on 9/11 and I will immediately apologize.
I was a Navy SEAL on 9/11 (this was a serious life changing event for me) and any
email the firm sent out would have been noticed. Previously, when the firm did not send
out an email honoring those lost on 9/11, I took the initiative and sent a firm wide email
honoring those lost on 9/11.

I responded to the LGBT email because this was the fourth email the D&I Committee
sent out this month honoring and respecting various groups and it disappointed me that
the firm did not also honor those lost on 9/11 last month or the year before. Please
know that I have no issues with how consenting adults love and care for each other. I
understand our nation has come along way and also respect and admire those who
advocate for positive change. In South Jersey, I once swam along
the Cooper River directly alongside a Gay Rights Parade to show my support. Many
noticed the Navy SEAL swimming alongside.

I am available to call and talk with you anytime.

110

Thank you for all the good work you do.
Bill Brown
President of Veteran Alumni Rutgers University


**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Watson, Natalie <NWatson@McCarter.com>
**Sent:** Monday, October 10, 2022 11:30 AM
**To:** Brown, William <wibrown@mccarter.com>
**Cc:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@McCarter.com>; Boccassini, Joseph T. <JBoccassini@McCarter.com>;
Linares, Jose <jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>;
Major, Alexander <amajor@mccarter.com>; Adejemilua, Onome
<oadejemilua@mccarter.com>; Clarke, Marcie <mclarke@mccarter.com>; Freebery,
James J. <JFreebery@McCarter.com>; Gulati, Maneesh <MGulati@McCarter.com>;
Lydon, Christine <CLydon@mccarter.com>; Pallak Movahed, Michelle
<mmovahed@mccarter.com>; Ogilvie, Moyahoena <MOgilvie@McCarter.com>;
Wilson-Brito, Simone <swilsonbrito@McCarter.com>; Windfelder, Makenzie
<MWindfelder@McCarter.com>; Gabriel, Mary <mgabriel@McCarter.com>
**Subject:** Re: LGBT History Month

Bill,

I am writing in my own capacity here and not on behalf of the Committee.

First, I am disappointed and a bit confused by your email. I come from a Navy family. A Watson has fought in every war on behalf of this county since we first arrived in 1716. More than one of us is buried at Arlington. Honoring 9/11 is a deeply important event (and separate, in my view, from honoring the folks who served or who died in service to our Nation). I am proud that the Firm recognizes 9/11, and Veteran's Day, and Memorial Day. and other critical events on behalf of the whole Firm and not just through an individual committee. I have found their messages to the community on those days comforting and heartwarming. As such, I'm a little confused as to why it seems that you think those critically important remembrances are not being honored. It is hard to tell because you do not give examples of what you found wrong with those emails and instead seem just to be targeting this one, as if it takes away from our separate honoring of all service members. As someone who would not work for an organization that disrespects veterans, I take umbrage with your email and hope it arises from a misunderstanding and that you simply missed earlier emails.

111

Second, I am a little confused as to why you are writing in October about the posts honoring 9/11, in response to our LGBTQA history acknowledgement (versus directing this to our Firm leadership, if you think the Firm does not support you enough- or to one of our other history month posts, like our recent Italian American History Month post from a week ago). You speak about sending messages (unintentionally or not) and your email timing certainly sends a message to me, as one of the few out attorneys at the firm.

I am sure that you are aware that there are plenty of folks who have served our Nation proudly who are members of the LGBTQA community. Indeed, there are many folks who fought and died and were not granted equal treatment for their service. And yet your email seems to distinguish between vets and affinity groups, when there are vets in all affinity groups (and sometimes multiple intersecting groups).

Again, I do not speak for the Committee here or for the Firm.  I speak as a colleague who is very confused by your email, particularly when I have supported your work around veterans affairs. I would appreciate the opportunity to speak with you about this to try to understand your thinking here in more detail.  Of course, I want to try to understand your position better, particularly with respect to your response here to our LGBTQA history post versus other posts (and, frankly, why you selected certain people to CC versus others), and I am hopeful you will be open to listening to my points of view as well. I have court appearances this week, but perhaps you and I can line up a call next week at your convenience.

Thanks,
Natalie

Sent from my iPhone

**From:** Clarke, Marcie <mclarke@mccarter.com>
**Sent:** Monday, October 10, 2022 10:57 AM
**To:** Brown, William <wibrown@mccarter.com>
**Subject:** Automatic reply: LGBT History Month

Thank you for your email. I am out of the office for Indigenous Peoples' Day. Although I will be checking email during this time, I will not have regular email access and may be slower than normal to respond.

Please contact docket@mccarter.com and rlecesse@mccarter.com if you need immediate assistance during this time.

Otherwise, I will respond as soon as I am able.

Have a wonderful day!

Best regards,
Marcie

**From:** Brown, William
**Sent:** Monday, October 10, 2022 10:57 AM
**To:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@mccarter.com>
**Cc:** Boccassini, Joseph T. <jboccassini@mccarter.com>; Linares, Jose
<jlinares@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>; Major, Alexander
<amajor@mccarter.com>; Adejemilua, Onome <oadejemilua@mccarter.com>; Clarke, Marcie
<mclarke@mccarter.com>; Freebery, James J. <jfreebery@mccarter.com>; Gulati, Maneesh
<mgulati@mccarter.com>; Lydon, Christine <clydon@mccarter.com>; Pallak Movahed,
Michelle <mmovahed@mccarter.com>; Ogilvie, Moyahoena <mogilvie@mccarter.com>;
Watson, Natalie <nwatson@mccarter.com>; Wilson-Brito, Simone
<swilsonbrito@mccarter.com>; Windfelder, Makenzie <mwindfelder@mccarter.com>; Gabriel,
Mary <mgabriel@mccarter.com>
**Subject:** RE: LGBT History Month

Good morning McCarter D&I Committee,

Understand you are all very busy.  I wanted to follow up on the below email I sent you last week
but haven't received a response from.

I believe I can help adequately represent veterans in the firm's D&I Committee.  I am a Iraq
veteran Navy SEAL and renowned veterans advocate.

With my inclusion on the D&I Committee I would ensure veterans issues and concerns are
represented.

Sometime the things we do and even the things we don't do send a message.  In my opinion, the
firm sent the wrong message by not sending out an email honoring and remembering those lost
on 9/11.

I always try to operate on the win, win philosophy.  There are different tactics for committees to
react to uncomfortable issues raised.  One tactic is to just ignore the issue raised and continue to
move forward.

This tactic sends a negative message and I don't believe that's the right way for educated and
intelligent people to act.  If my concerns are deemed invalid, please tell me the reasons why.

I hope you take this veterans' thoughts into consideration.

Thank you for all the good work you do.

Bill Brown

President of Veteran Alumni Rutgers University

113

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wibrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Brown, William <wibrown@mccarter.com>
**Sent:** Wednesday, October 5, 2022 5:34 AM
**To:** M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com>; Calello, Sheila
<scalello@McCarter.com>
**Subject:** Re: LGBT History Month

Good morning McCarter D&I Committee,

I appreciate all the emails this month. They are all worth acknowledging and respecting.

Are there are any veterans in the McCarter D&I Committee?

I didn't see a firm wide email go out about honoring and remembering those lost on 9/11. I was a Navy SEAL on 9/11 and went to war for our nation following 9/11 and was surprised when the firm didn't acknowledge those lost on 9/11 this year in an email.

I hope you take this veterans' thoughts into consideration.

Thank you for all the good work you do.

Bill Brown

President of Veteran Alumni Rutgers University

Sent from my iPhone

On Oct 4, 2022, at 2:17 PM, M&E Diversity & Inclusion Committee
<M&EDiversity&InclusionCommittee@mccarter.com> wrote:

In 1994, due to the efforts of a coalition of education-based organizations, October was designated as national Lesbian, Gay, Bisexual and Transgender History Month (LGBT History Month). The goal of the observance is to highlight the important contributions of LGBT individuals throughout the history of the United States — contributions that, due to bigotry, prejudices and fears, have often gone unnoticed or have not been acknowledged.

Recognizing the need for and the value in teaching LGBT history, LGBT History Month was created in 1994 by a high school history teacher in Missouri named Rodney Wilson. He believed a month should be dedicated to the celebration and teaching of gay and lesbian history, and gathered other teachers and community leaders to help advance the cause. The month of October was initially chosen because it includes National Coming Out Day on

October 11 and the anniversary of the first march on Washington by LGBT individuals on October 14, 1979. The month now also includes Spirit Day on October 20, on which people around the country wear purple in support of LGBT youth;Ally Week, during which allies against LGBT bullying are celebrated; and the anniversary of 21-year-old Matthew Shepard's murder on October 12, 1998, which sparked the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act.

The early years of the celebration were a commemoration and a call to action. But, since then, LGBT History Month has developed into a national effort to highlight role models from the LGBT community and to teach LGBT history. Accordingly, most recent celebrations during the month involve celebrating the achievements of lesbian, gay, bisexual or transgender icons. Each year since 2006, Equality Forum, a nonprofit 501(c)(3) organization whose mission is to advance national and international lesbian, gay, bisexual and transgender civil rights with an educational focus, has taken the charge to advance the education component of the celebration by highlighting the lives and achievements of 31 LGBT icons, one for each day of the month. The organization provides a video, biography, bibliography, downloadable images and other downloadable educational resources about the life and accomplishments of each icon who is celebrated. The information for this year's icons can be found at: https://equalityforum.com. Individuals like Robina Asti, advocate for women's and transgender rights (her advocacy changed government rules to allow transgender people to receive Social Security survivor benefits), Hans Christian Anderson, fairy tale author, Sue Bird, WNBA athlete and Raphael Bostic, CEO of the Federal Reserve Bank are just some of the extraordinary individuals brought to the spotlight and celebrated in this year's celebration. By celebrating the achievements of these individuals and encouraging knowledge and tolerance through education, the month long celebration hopes to provide role models, build community, enhance pride, and teach about the extraordinary national and international contributions made by LGBT individuals.

This LGBT History Month, McCarter & English, LLP, joins in recognizing the important impact that LGBT individuals have had on history locally, nationally and internationally.





Onome Adejemilua | Guillermo C. Artiles | Richard A. Beran | Joseph T. Boccassini | Marcie Clarke | James Freebery | Maneesh Gulati | Jose L. Linares | Christine A. Lydon | Michelle Pallak Movahed | Moy N. Ogilvie | Natalie S. Watson | Simone Wilson-Brito | Makenzie Windfelder

**Exhibit B: Email chain re: Newark Federal Courthouse LinkedIn Post (December 7, 2022)**

**From:** Brown, William
**Sent:** Wednesday, December 7, 2022 2:37 PM
**To:** Calello, Sheila <scalello@mccarter.com>
**Cc:** Wallach, William <wwallach@mccarter.com>; Artiles, Guillermo <gartiles@mccarter.com>
**Subject:** Pics Newark Fed. Crt 'Rm

Hi Sheila,

I posted two pictures of the Newark Federal Court Room yesterday on social media describing lessons learned from my experience observing Third Circuit Oral Arguments.

Please note, I was really excited by this opportunity because I had the chance to observe excellent attorneys and also had the chance to talk directly with the panel of Judges.

I wanted to share this experience with my family and friends. None of the pictures I posted depicted a Judge.

Bill Wallach was contacted about the pictures I posted on LinkedIn from a Partner at Gibbons and I've been asked by Bill to take the pictures down as a courtesy to the Court.

This was an awesome experience for me but I will honor Bill's request out of respect for him and the Court.

It is fair to point out that I do not believe my social media post set a bad precedence for the firm as Guillermo Artiles who I respect and admire also made the below pictures on LinkedInyesterday containing the exact same Federal Court Room and Third Circuit Judge Patty Shwartz. Many Partners and Associates at McCarter & English liked Guillermo's post (*only one liked mine*).

Out of respect I copied both Bill and Guillermo on this email.

Thank you,

Bill

> **William D. Brown, Jr. | Associate**
> McCarter & English, LLP
> Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102
>
> wibrown@mccarter.com | www.mccarter.com | V-Card
> T 973.639.8488   M 862.229.5957
>
> Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

116

**Exhibit C: Email chain re: Rutgers Annual Law Firm Night Disinvitation (February 8-20, 2023)**

**From:** Brown, William
**Sent:** Monday, February 20, 2023 11:17 PM
**To:** 'elizabeth.acevedo@rutgers.edu' <elizabeth.acevedo@rutgers.edu>
**Subject:** FW: Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

Hi Beth,

I understand Rutgers Law is uninviting me from the Rutgers Annual Law Firm Night because my firm's recruitment department stated they indicated a preference on who Christine Lydon identifies to attend from my firm. Being the President of the Veteran Alumni of Rutgers University this un-invitation especially hurts.

Thank you for your kind words regarding the NYC SEAL Swim and the docuseries.

Best,

Bill

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wjbrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>
**Sent:** Monday, February 20, 2023 11:00 PM
**To:** Brown, William <wibrown@mccarter.com>
**Subject:** Re: Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

**\*\*External Message\*\***

Hi Bill,

My apologies, we apparently reached out prematurely as I was asked by your recruitment department last week to discontinue our soft outreach to alumni with our "save the date" requests.  They indicated a preference for sending the formal invite to your Chief Human Resources Officer, Christine Lydon, who would then identify who would attend.  I will follow up with you as soon as I am able once I receive an update from your firm.

Thanks for sharing this information about the docuseries you are creating.  I watched the videos linked in your email below and found your work both impressive and moving.

All my best,

Beth

**From:** Brown, William <wibrown@mccarter.com>
**Sent:** Wednesday, February 8, 2023 10:52 AM
**To:** Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>; Wendi Taylor <wltaylor@rutgers.edu>
**Cc:** Calello, Sheila <scalello@McCarter.com>
**Subject:** Rutgers Annual Law Firm Night scheduled for March 30th (4-6pm).

Hi Beth,

Happy to attend the Rutgers Law School annual Law Firm Night scheduled for March 30th (4-6 pm).  I will also put the word out and see if I can recruit any other McCarter & English colleagues in attending.

I am putting together a docuseries to share some of the stories of the Veterans, Police Officers, Firefighters, and First Responders that participate in the NYC SEAL Swim.  Doing this grass roots and looking for help with fund raising.

Hope you get a chance to see the trailer and let me know what you think.

**One Foot in the Water**

Docuseries Trailer:

https://youtu.be/rcWJq_zcb2A

118

GoFundMe Page and QR Code:

https://gofund.me/bd8c8c24

*If veterans don't look out for each other, no one will.*

Bill

<u>President Veteran Alumni Rutgers University</u>

**William D. Brown, Jr. | Associate**
McCarter & English, LLP
Four Gateway Center, 100 Mulberry Street | Newark, NJ 07102

wjbrown@mccarter.com | www.mccarter.com | V-Card
T 973.639.8488   M 862.229.5957

Boston | East Brunswick | Hartford | Indianapolis | Miami | Newark | New York | Philadelphia | Stamford | Washington, DC | Wilmington

**From:** Elizabeth Acevedo <elizabeth.acevedo@rutgers.edu>
**Sent:** Wednesday, February 8, 2023 7:56 AM
**To:** Brown, William <wjbrown@mccarter.com>
**Cc:** Wendi Taylor <wltaylor@rutgers.edu>
**Subject:** Re: McCarter & English Seeks to Hire RU Law Vet Students & Alumni

**\*\*External Message\*\***

Hi Bill,

Just wanted to make sure to send you a save the date note about our annual Law Firm Night scheduled for March 30th (4-6pm). We would love to have you attend with your McCarter & English colleagues. Please let me know if you're interested in attending and Wendi Taylor, our Recruiting Manager, copied here, will add you to our invite list.

All my best,

Beth