

**William Brown, Esq.**
**Partner**
260 Madison Avenue, 17th Floor
New York, NY 10016*
william.brown@parlatorelawgroup.com
Direct: 862-415-4880

March 28, 2026

**VIA CM/ECF**

The Honorable Julien Xavier Neals, U.S.D.J.
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

**Re: Brown v. McCarter & English LLP et al.**
**Case No. 2:26-cv-02808-JXN-AME**

**Supplemental Letter in Support of Request for Expedited Pre-Motion Conference; New Evidence of Civil Rights Violations, Government Abuse of Power, and Apparent Cover-Up; Notice of Intended FBI Criminal Referral and Port Authority Inspector General Complaint; Pending Public Records Requests; McCarter's Fourteen-Month Pattern of Delay and Coordinated Removal**

Dear Judge Neals:

Plaintiff William Brown Jr. respectfully submits this supplemental letter to advise the Court of significant new evidence obtained since Plaintiff's March 25, 2026 letter (ECF Doc. 16), to renew his request for an expedited pre-motion conference pursuant to the Court's Individual Rules and Procedures, and to advise the Court of the following: (1) a sworn Declaration from Captain Eileen O'Toole — Defendant Kevin J. O'Toole's own sister and a 25-year law enforcement veteran — signed on March 27, 2026, independently corroborating the pattern of government abuse at the center of this case; (2) Plaintiff's intent to submit a criminal referral to the Federal Bureau of Investigation and a formal complaint to the Port Authority Office of Inspector General; (3) multiple pending public records requests expected to produce additional evidence; and (4) the full scope of McCarter's fourteen-month pattern of delay culminating in the coordinated removal of this case on the very day Plaintiff filed the most damaging evidence against Defendants.

Licensed to Practice by the State of New Jersey
*Parlatore Law Group is a nationwide cloud-based firm. Please send all correspondence electronically. If physical mail is required, please use the central mailing address below.

www.parlatorelawgroup.com          1440 N Edgewood Street, Floor 4, Arlington, VA 22201

I.   **CAPTAIN EILEEN O'TOOLE'S SWORN DECLARATION — SIGNED TODAY — INDEPENDENTLY CORROBORATES THE PATTERN OF GOVERNMENT ABUSE**

On March 27, 2026, Captain Eileen O'Toole executed a sworn Declaration pursuant to 28 U.S.C. § 1746, attached hereto as Exhibit A.[1] Captain O'Toole is Defendant Kevin J. O'Toole's own sister. She served as a sworn law enforcement officer for over 25 years — first with the Essex County Sheriff's Department beginning in 1999, and then with the Cedar Grove Police Department beginning in approximately 2004. She is the first female Captain in the history of the Cedar Grove Police Department. (Exhibit A, ¶¶ 1-3).

Captain O'Toole is also the plaintiff in O'Toole v. Township of Cedar Grove, Docket No. ESX-L-004164-22, an active lawsuit pending in the Superior Court of New Jersey, Essex County.

Captain O'Toole reached out to Plaintiff voluntarily on March 23, 2026, after reading about this case. (Exhibit A, ¶ 42). She was not solicited by Plaintiff. Her decision to come forward — knowing the risks of publicly opposing her own brother, a man she describes as having a "**hold**" that is "**strong in Essex County**" (Exhibit A, ¶ 41) — underscores the gravity of the conduct at issue.

### A. O'Toole Has Used Police as Personal Protection "Many Times"

Captain O'Toole states under oath: "**Upon information and belief, Kevin O'Toole has used the Port Authority Police as personal protection on many occasions, to the point of overnight postings of officers outside of his house and his law firm. Upon further information and belief, he has also contacted Cedar Grove Police supervisors directly**." (Exhibit A, ¶ 10). She further states that "**the use of police resources for Kevin O'Toole's personal benefit was not related to any apparent legitimate law enforcement function**." (Exhibit A, ¶ 11).

O'Toole Scrivo, LLC is headquartered at 14 Village Park Road, Cedar Grove, New Jersey — the same small town where O'Toole lives, the same town whose police department was deployed to stop the process server, and the same town whose officials Captain O'Toole alleges O'Toole has used for personal retaliation. O'Toole's residence, his law firm, and the police department he uses as his personal enforcement arm are all located in the same municipality.

### B. O'Toole Made Lt. Rivers Swear Loyalty to Him

Captain O'Toole states under oath: "**Upon information and belief, Kevin O'Toole has also been in direct contact with Cedar Grove officers to the point of making Officer Rivers swear his loyalty to him if he was hired on the force. He went as far as to have Officer Rivers go to Vermont to get a specialty pack of beer for his son's high school teacher to get a better grade for the semester and to prove his allegiance**." (Exhibit A, ¶ 12).

This is the same Lt. Jason Rivers, Badge #5748, who stopped Plaintiff's process server on February 28, 2026 — acting on instructions relayed from the Port Authority through Cedar Grove Police Chief Pumphrey.

---

[1] The date on the signature page of the Declaration contains an obvious typographical error reading 'March 27, 2024' and should read March 27, 2026.

**C. O'Toole Had His Own Brother Arrested Through Chief Pumphrey**

Captain O'Toole states under oath: "**Kevin O'Toole's most recent abuse of power was directed at our younger brother, John, who resides in Pennsylvania. Upon information and belief, Kevin O'Toole had John arrested in Pennsylvania based upon charges filed by the Cedar Grove Police Department — which were handled directly through Chief Pumphrey — and Port Authority Inspector Hugh Johnson.**" (Exhibit A, ¶ 38).

This is the same Chief Pumphrey who received the call from the Port Authority on February 28, 2026 and dispatched Lt. Rivers to stop Plaintiff's process server.

**D. O'Toole's Pattern of Threatening Text Messages, Fabricated Justifications, and Retaliation**

Captain O'Toole states under oath that following a family dispute in November 2021, Kevin O'Toole "**sent a barrage of threatening text messages**" including threats of "**personal and professional retaliation.**" (Exhibit A, ¶¶ 16-17). O'Toole threatened: "I will be sending a request to the Caldwell Township to schedule an internal investigation." (Exhibit A, ¶ 20). O'Toole demanded "**a psychological exam for you and your current common law wife.**" (Exhibit A, ¶ 22). O'Toole texted: "**Eileen, I got each and every job, and you can't acknowledge it**." (Exhibit A, ¶ 21).

Critically, when O'Toole blocked Captain O'Toole's promised promotion to Chief of Police, he fabricated the justification. O'Toole told their father that Captain O'Toole was not being promoted because she was "**insubordinate**" and had "**misappropriated the Chief of Police's vehicle.**" (Exhibit A, ¶ 28). Captain O'Toole states under oath: "**The allegations were false. There are no written charges of insubordination or any other charges or discipline in my personnel file. Neither Tucci nor anyone else at the Township ever informed me that I had 'misappropriated police property' or been 'insubordinate.'**" (Exhibit A, ¶ 30).

This is the same pattern documented in the Cedar Grove Police incident report: fabricate a justification after the fact to provide cover for retaliatory conduct. O'Toole fabricated "**insubordination**" and "**misappropriation**" to justify blocking his sister's promotion. The Port Authority fabricated "refusing to leave the property" to justify deploying police against Plaintiff's process server. In both cases, the fabricated justification is contradicted by the record.

This is the identical pattern alleged in this case. Port Authority employee Patrick Donovan sent Plaintiff a text message stating: "**Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC.**"

Captain O'Toole confirms: "**the actions Kevin O'Toole has taken against Mr. Brown — including the use of a Port Authority employee to send threatening text messages, the withdrawal of Port Authority support from a charity event for veterans and 9/11 survivors, and the use of the Cedar Grove Police to stop a process server at Kevin O'Toole's residence — are entirely consistent with what I believe to be the pattern of retaliatory conduct I have personally experienced and witnessed over many years.**" (Exhibit A, ¶ 43).

**E. She Reported O'Toole to the Attorney General — Twice**

Captain O'Toole states: "**I have reported Kevin O'Toole's abuse of police resources and governmental power to the New Jersey Attorney General's Office. The Attorney General's Office called me in on two separate occasions to interview me about Kevin O'Toole's actions.**" (Exhibit A, ¶ 14).

### F. O'Toole's Retaliation Has Extended to Multiple Family Members

Her husband, a Caldwell police officer, "**has been a target of Kevin O'Toole for years**." (Exhibit A, ¶ 13). Three internal affairs complaints have been filed against her husband — "**all of which I believe were instigated by or at the direction of Kevin O'Toole**." (Exhibit A, ¶ 34). O'Toole's retaliatory conduct has also "**affected the careers of my two sons-in-law**." (Exhibit A, ¶ 35). Captain O'Toole's pension "**is still being withheld**." (Exhibit A, ¶ 36).

### G. O'Toole's Influence Has a Chilling Effect

"**It was nearly impossible to retain an attorney to represent me in my case against Cedar Grove because, upon information and belief, attorneys do not want to take on a case against my brother, Kevin O'Toole**." (Exhibit A, ¶ 40). People who reached out to support Captain O'Toole "**spoke to me on the condition of anonymity because they were afraid if Kevin O'Toole could do what he did to me — his own sister, a Captain in the police department — he could do that to anyone**." (Exhibit A, ¶ 39).

## II. THE INCIDENT REPORT AND BODY-WORN CAMERA FOOTAGE REVEAL SERIOUS CIVIL RIGHTS VIOLATIONS AND AN APPARENT COVER-UP

A true and correct copy of the incident report is attached hereto as Exhibit B. A true and correct transcript of the body-worn camera footage is attached hereto as Exhibit C.

### A. Lt. Rivers Instructed the Process Server to Falsify a Sworn Legal Document

The body-worn camera transcript records Lt. Rivers stating to the process server: "**Okay, then say you did it because — go through the attorneys**." (Exhibit C at 00:01:14).

An affidavit of service is a sworn legal document filed with the court. It is the mechanism by which a court determines whether a party has been properly served and whether the court has jurisdiction over that party. A police officer instructing a citizen to falsely represent that service of process has been completed — when it has not — is an instruction to forge a legal document and to commit fraud upon the court.

### B. The Stated Justification for the Police Stop Was False

The incident report states that the Port Authority told Chief Pumphrey "**a process server was refusing to leave the property**." (Exhibit B, p. 2). The body-worn camera footage proves this statement was false:

- Lt. Rivers found the process server in his vehicle on a public road — not on anyone's property. (Exhibit B, p. 2; Exhibit C at 00:00:02).
- The process server told Lt. Rivers: **"I'm not going to try to trespass and knock those doors down**." (Exhibit C at 00:00:56).
- Lt. Rivers acknowledged he was "**just passing it on**." (Exhibit C at 00:01:45).
- Lt. Rivers acknowledged the encounter was "**a civil thing**." (Exhibit C at 00:00:02).
- Lt. Rivers told the process server: "**just give me a favor, back away from the stop sign. Just back up a little bit, make it legal**" — confirming the process server was on a public street. (Exhibit C at 00:03:37).

The false justification in the incident report mirrors the pattern documented in Captain O'Toole's Declaration: O'Toole fabricated "**insubordination**" and "**misappropriation**" to justify blocking his sister's promotion; the Port Authority fabricated "**refusing to leave the property**" to justify deploying police against the process server. In both cases, the fabricated justification is contradicted by the record.

**C. O'Toole Personally Answered the Door — Then Hid — And Donovan Was Also Hiding from the Process Server**

True and correct transcripts of the process server's videos are attached hereto as Exhibit D (first visit) and Exhibit E (second visit).

The first video shows the process server approaching the door and knocking. A male answered the door. The process server initially asked for "**Patrick Donovan**" — the wrong name. The male stated no one by that name lived there and that he had lived at the residence for twenty years. (Exhibit D at 00:00:57-00:01:16). After the process server left and returned, no one answered. The process server called out: "**If you can hear me, Mr. O'Toole, I have to come back anyway.**" No one responded. (Exhibit E at 00:00:55).

Chairman O'Toole personally answered the door, spoke with the process server, then hid while his agency called the police.

Notably, O'Toole was not the only Port Authority defendant evading service. The following day, March 1, 2026, the process server attempted to serve Patrick Donovan at his home. The process server's sworn Affidavit of Non-Service states: "**I arrived at the location, noticed a black Infiniti crossover vehicle and a white pickup in the driveway. I walked to the front door and rang the video doorbell as well knocked on the front door. I heard the dog barking at the door, and I heard other voices inside of the residence but no one came to the door, I then looked over to window to the livingroom and saw someone trying to duck out of sight.**" Both Port Authority defendants — O'Toole and Donovan — were evading service of process in the same lawsuit. O'Toole answered the door and then hid; Donovan ducked out of sight behind a window. This coordinated evasion is consistent with the coordinated retaliation alleged throughout this case.

**D. The Incident Report Was Likely Not Created Until After the OPRA Request — And the Evidence Shows Why**

The incident report bears a "**Date Reported**" of 02/28/26. However, the report contains a critical admission: "**A CAD entry was not made at the time due to me responding directly from the previous call which resulted in this incident report.**" (Exhibit B, p. 2).

It is reasonable to believe — and the evidence strongly supports — that the incident report was not written on February 28, 2026, but was created only after Plaintiff's OPRA request was filed on March 6, 2026, which put the Township on notice that the incident was being investigated:

**First**, Lt. Rivers created no contemporaneous record. He did not create a CAD entry. He did not identify the process server. He did not run the process server's identification or vehicle registration. He acknowledged the encounter was "**a civil thing.**" Every aspect of Lt. Rivers' conduct on February 28 is consistent with an officer who intended to leave no record of the encounter whatsoever.

**Second**, Lt. Rivers' own body-worn camera reveals why he intended to leave no record. He knew the stop had no law enforcement purpose. He told the process server it was "**a civil thing.**" He admitted he was "**just passing it on.**" He never identified the process server. An officer who knows he is acting as a personal messenger for a powerful political figure has every reason to avoid creating a paper trail.

**Third**, the OPRA request changed the calculus. On March 6, 2026, Plaintiff filed an OPRA request specifically seeking incident reports, CAD records, and body-worn camera footage. Once the Township received that request, the absence of any record became a problem — because the body-worn camera footage existed and would have to be produced, and that footage would show Lt. Rivers stopping a process server on a public road, relaying instructions from the Port Authority, and instructing the process server to falsify a legal document. Without an incident report to provide an official narrative, the body-worn camera footage would speak for itself.

**Fourth**, the incident report — when it was produced on March 17, 2026 — contains the false justification that the process server was "**refusing to leave the property**." This false statement serves a clear purpose: it provides a retroactive law enforcement justification for a stop that Lt. Rivers himself acknowledged had none.

**Fifth**, Captain O'Toole — a 25-year law enforcement veteran — has independently flagged this CAD timing discrepancy as suspicious, noting that the case number sequence can be cross-referenced against the CAD log to determine when the case number was actually generated. (See ECF Doc. 15 at 1-2).

**Sixth**, the incident report records the race of the resident, Kevin O'Toole, as "**1B**" — but leaves the race field blank for the process server, Joshua T. Lee, a Black American man. An officer writing a report contemporaneously would have recorded the race of both individuals. The omission is consistent with a report written after the fact by an officer reconstructing the encounter from memory.

**Seventh**, the Township of Cedar Grove has actively resisted disclosure of who initiated the police response. In its March 17, 2026 OPRA response, the Township denied Plaintiff's request for the identity of the caller (Item 4), claiming it was "**a request for information, not records**" under MAG Entertainment, LLC v. Div. of Alcoholic Beverage Control, 375 N.J. Super. 534 (App. Div. 2005). The Township also claimed Plaintiff's requests for communications between residents of 75 Skytop Road and the Cedar Grove Police Department (Item 5) and communications between the Cedar Grove Police Department and external parties including the Port Authority (Item 6) were "**overly broad**." The Township's resistance to identifying who called the police — when the incident report itself confirms the Port Authority called Chief Pumphrey — supports the inference that the Township is protecting the individuals involved in the chain of abuse.

### E. Lt. Rivers Never Identified the Process Server

The incident report states: "**I advised the driver, whom I never identified because he admitted that he was a process server**." (Exhibit B, p. 2). The failure to identify the process server is consistent with a stop that had no law enforcement purpose — and with an officer who intended to leave no record of the encounter.

### F. The Police Stop Was Entirely Unnecessary

On February 28, 2026 — the very same day — Amy Fisher, Esq., General Counsel of the Port Authority, emailed Plaintiff and stated that the Port Authority would accept service for O'Toole, Donovan, and the agency. A two-sentence email. The Port Authority called the Cedar Grove Police Chief, who dispatched a police officer to stop a Black American process server on a public road — when the correct course of action was a two-sentence email that the Port Authority's own General Counsel sent the same day.

### III.   HOW EACH ACTOR VIOLATED THE CIVIL RIGHTS OF THE BLACK AMERICAN PROCESS SERVER AND ABUSED GOVERNMENT POWER

Joshua T. Lee is a Black American man. He is a professional process server performing a function essential to the administration of justice. He was performing this function on a public road when he was stopped by police based on a false report, told not to do his job, and instructed to falsify a sworn legal document.

### A. Chairman Kevin J. O'Toole — Orchestrator

O'Toole personally answered the door and spoke with the process server. After the process server left and returned, O'Toole refused to answer. Between the two visits, someone — upon information and belief, O'Toole himself — activated a chain of governmental power: from the Port Authority to the Cedar Grove Police Chief to a patrol officer. O'Toole did not simply decline to accept service. He answered the door, spoke with the process server, then hid behind his door and had a bi-state governmental agency call the local police to stop a Black American man from performing his lawful professional duties on a public road.

Captain O'Toole confirms: "**Kevin O'Toole uses whatever institutional power is available to him — whether it is his influence over Cedar Grove officials, the Cedar Grove Police Department, the Port Authority of New York and New Jersey, Essex County Prosecutor's Office or other governmental agencies — to punish anyone who opposes him or falls out of his favor.**" (Exhibit A, ¶¶ 45-46).

### B. The Port Authority — The Instrument

The Port Authority called the Cedar Grove Police Chief, provided a false justification, gave specific instructions about where to redirect service, and identified the process server's vehicle — demonstrating real-time surveillance or communication from someone at or near the residence. The Port Authority's own General Counsel accepted service by email the same day — proving the police stop was entirely unnecessary.

### C. Chief Pumphrey — The Willing Instrument

Chief Pumphrey dispatched Lt. Rivers without verifying whether the process server was actually "**refusing to leave the property**." Captain O'Toole's Declaration establishes that Chief Pumphrey has a pattern of carrying out O'Toole's personal directives — including the arrest of O'Toole's own brother. Chief Pumphrey was promoted to Captain — and then to Chief — after Captain O'Toole's promised promotion was blocked at O'Toole's direction. (Exhibit A, ¶ 33).

### D. Lt. Jason Rivers — The Officer Who Carried Out the Abuse

Lt. Rivers' conduct violated Mr. Lee's civil rights in the following specific ways:

**Unlawful seizure**. Lt. Rivers stopped Mr. Lee on a public road without reasonable articulable suspicion of criminal activity — and he knew it. He acknowledged the encounter was "**a civil thing**."

**Interference with lawful professional activity**. Lt. Rivers told Mr. Lee not to return to the residence — "**don't go to that house**" — and repeated this instruction multiple times. Process service is a lawful professional activity protected by law.

**Instruction to falsify a sworn legal document**. Lt. Rivers told Mr. Lee: "**Okay, then say you did it because — go through the attorneys.**" This is an instruction to forge an affidavit of service.

**Intimidation**. Mr. Lee is a Black American man stopped by an armed police officer on a public road, told not to perform his job, and instructed to falsify a legal document. Mr. Lee has communicated to Plaintiff that he believes part of the reason he was stopped and treated this way was because he is Black.

**Failure to identify**. Lt. Rivers never asked for Mr. Lee's name, identification, or credentials. This is not how a legitimate police encounter is conducted. This is how an off-the-books errand is conducted.

**Failure to create a contemporaneous record**. Lt. Rivers created no CAD entry and authored an incident report that was likely not created until after the OPRA request.

**Acting as a personal agent**. Lt. Rivers received real-time instructions from the Port Authority through Chief Pumphrey. Even Rivers appeared uncertain, asking: "**is this, is this a Port Authority issue?**" Captain O'Toole's Declaration establishes that Rivers was required to "**swear his loyalty**" to O'Toole as a condition of being hired. (Exhibit A, ¶ 12).

**E. The Cedar Grove Police Department — Institutional Complicity**

The Department's Chief dispatched an officer based on an unverified report. The responding officer stopped a citizen without reasonable suspicion, relayed instructions from a governmental agency, instructed the citizen to falsify a legal document, and created no contemporaneous record. No supervisory review or internal affairs inquiry has been disclosed. Captain O'Toole's Declaration establishes that the Department has been used by O'Toole for personal purposes on multiple occasions. (Exhibit A, ¶¶ 10, 38).

## IV.   THE ROBIN KING CERTIFICATION IS CONTRADICTED BY THE EVIDENCE

In the state court proceedings, the opposition submitted a certification from Robin King, CEO of the Navy SEAL Foundation, stating the Foundation's decision was "**not influenced by or at all the result of any pressure, request, or interaction with the Port Authority**." This certification is contradicted by: (1) Donovan's own text message threatening to withdraw Port Authority support; (2) the Navy SEAL Foundation's own Athletic Director, Geoff Leard privately coordinating with Donovan; (3) Geoff Leard informing Plaintiff that Donovan told him the Port Authority would not support the swim if Plaintiff participated; (4) Joe Palermo's statement that Donovan told him the event would not happen if Plaintiff was involved and that Donovan was being pressured from Port Authority leadership; (5) Plaintiff's October 1, 2025 email to Ms. King — which Ms. King did not dispute — stating Leard "**participated in meetings with Pat Donovan from that Port Authority where he knew in advance the intent was to exclude me**"; and (6) the OPRA records confirming the Port Authority was willing to call local police to interfere with this litigation.

## V.   THE PATTERN IS IDENTICAL: THE PROCESS SERVER STOP AND THE NYC SEAL SWIM THREAT

The Port Authority's use of the Cedar Grove Police to stop Plaintiff's process server is the same pattern of retaliatory government abuse that destroyed the NYC SEAL Swim — a charity event that provides Adventure Therapy for 9/11 survivors, families of those lost on 9/11, Gold Star families, Navy SEALs, veterans, police officers, and firefighters.

In both instances: O'Toole used the Port Authority to punish Plaintiff for filing this lawsuit; a Port Authority employee delivered the threat or carried out the retaliation; the retaliation was directed at suppressing Plaintiff's exercise of constitutional rights; and the retaliation caused concrete harm.

## VI.   MCCARTER'S FOURTEEN-MONTH PATTERN OF DELAY AND THE COORDINATED REMOVAL

McCarter & English LLP has never filed an Answer or any responsive pleading in over fourteen months of litigation:

- **July 11, 2025:** Superior Court partially denied McCarter's Motion to Dismiss. The Honorable Joshua D. Sanders, J.S.C. issued a detailed 30-page written opinion analyzing CEPA, Pierce, USERRA, and the NJLAD — a substantial investment of judicial resources that would have to be duplicated if this case remains in federal court. Plaintiff's CEPA and Pierce claims as to USERRA survived.
- **August 15, 2025:** McCarter's counsel filed first Consent Order extending time.
- **August 20, 2025:** Second Consent Order.
- **October 4, 2025:** First Lack of Prosecution Dismissal.
- **October 8, 2025:** Third Consent Order.
- **October 23, 2025:** Order Vacating Default.
- **December 27, 2025:** Another Dismissal Warning.
- **January 9, 2026:** Fourth Consent Order.
- **February 28, 2026:** Second Lack of Prosecution Dismissal.

Every consent order was filed by McCarter's counsel at O'Toole Scrivo. The case was dismissed for lack of prosecution twice.

**The Coordinated Removal — And McCarter's Bad Faith**

On March 12, 2026, McCarter filed a letter with the state court requesting that the reinstatement order "**be entered at the Court's earliest convenience so this matter can proceed.**"

**Six days later, on March 18, McCarter coordinated with the Port Authority to remove the case to federal court — stripping the state court of the very jurisdiction McCarter had just asked it to exercise.**

**McCarter asked the state court to act quickly on reinstatement while simultaneously planning to remove the case and eliminate the scheduled disqualification hearing**.

On March 18, 2026, at 6:33 AM, Plaintiff filed his Reply Brief containing the OPRA records. That same day, at approximately 6:19 PM, the Port Authority filed its Notice of Removal (ECF Doc. 1). McCarter filed its own Notice of Removal (ECF Doc. 2) and a consent letter (ECF Doc. 3) the same day — twelve hours after Plaintiff's Reply Brief.

**The Port Authority had until April 1 to remove but chose March 18 — the very day the OPRA records were filed, nine days before the scheduled disqualification hearing.**

McCarter's Notice of Removal confirms the coordination: "**Counsel for McCarter & English have confirmed that they consent to this notice of removal and will be filing their own notice of removal**." (ECF Doc. 1, ¶ 15).

Both sets of Defendants' first acts in this forum were to request extensions — McCarter to April 8 (ECF Doc. 12) and the Port Authority the same day (ECF Doc. 13).

**The strategy is clear: delay in state court for seven months, coordinate removal to evade the disqualification hearing, then request more time in the new forum**.

**Plaintiff Was Locked Out of CM/ECF for Six Days After Removal**

Plaintiff was unable to access PACER or CM/ECF from March 18 through March 24, 2026. (See ECF Doc. 16 at 1-2). During this period, both sets of Defendants filed papers unopposed.

VII.   **PENDING PUBLIC RECORDS REQUESTS**

**A. Supplemental OPRA to Cedar Grove (March 25, 2026)** — seeking CAD timing records, Chief Pumphrey's phone records, records of police postings at O'Toole's residence and O'Toole Scrivo's offices, records related to John O'Toole's arrest, and communications about Plaintiff's original OPRA request. Response expected on or about April 3, 2026.

**B. Second Supplemental OPRA to Cedar Grove** — seeking complete unedited BWC footage including pre-activation buffer, GPS/AVL records for Lt. Rivers' vehicle, system audit trails and metadata for the incident report, and records reflecting whether the incident report was ever marked confidential.

**C. Port Authority FOI (March 25, 2026)** — seeking communications between O'Toole, Donovan, and Cedar Grove PD; records identifying who called Chief Pumphrey; Port Authority police deployments to Cedar Grove; communications about the removal; ethical screen records; and Inspector General records.

**D. Battery Park City Authority FOIL (March 25, 2026)** — seeking communications between BPCA and Port Authority personnel regarding the NYC SEAL Swim; internal BPCA communications regarding the decision not to respond to Plaintiff's March 5 permit emails; and records reflecting whether any external party directed BPCA to decline cooperation. BPCA has cooperated with the swim for seven consecutive years. As of

this date, BPCA has not responded — while Liberty State Park and the Coast Guard have responded without issue.

**VIII.   NOTICE OF INTENDED FBI CRIMINAL REFERRAL**

Plaintiff intends to submit a criminal referral to the FBI requesting investigation of:

**A.   Deprivation of Rights Under Color of Law — 18 U.S.C. § 242**
(https://www.law.cornell.edu/uscode/text/18/242) Lt. Rivers and Chief Pumphrey, acting under color of law, deprived Mr. Lee of his constitutional rights. Private individuals who conspire with law enforcement may also be charged. See United States v. Price, 383 U.S. 787 (1966) (https://www.congress.gov/crs-product/LSB10495).

**B.   Obstruction of Justice — 18 U.S.C. § 1512** (https://www.law.cornell.edu/uscode/text/18/1512). The Port Authority called police to stop service of process in pending litigation. Lt. Rivers instructed the process server to falsify a sworn legal document.

**C. Conspiracy Against Rights — 18 U.S.C. § 241.** Coordinated effort involving the Port Authority, Chief Pumphrey, and Lt. Rivers.

**D. False Statements — 18 U.S.C. § 1001.** The claim that the process server was "**refusing to leave the property**" is contradicted by every piece of evidence.

**IX.   NOTICE OF INTENDED PORT AUTHORITY INSPECTOR GENERAL COMPLAINT**

Plaintiff intends to file a formal complaint with the Port Authority Office of Inspector General. N.Y. Unconsol. Law § 7107-a (https://www.nysenate.gov/legislation/laws/PNY/1); Port Authority By-Laws, Art. III, § J. The complaint will request investigation of: O'Toole's use of Port Authority resources for personal purposes; the identity of the Port Authority employee who called Chief Pumphrey; Donovan's threatening text message; overnight police postings; the coordinated removal; and whether the ethical screen was violated.

**X.   THE CONFLICT OF INTEREST IS NOW PROVEN**

O'Toole Scrivo cannot provide McCarter with undivided loyalty when: its managing partner is a co-defendant on seven counts; its managing partner's agency called police to stop a process server in this very case on a false pretense; its managing partner personally answered the door then hid while his agency called the police; its managing partner's own sister confirmed the pattern under oath and stated the officer was required to swear loyalty to O'Toole; its managing partner's son works at McCarter; the ethical screen failed; counsel coordinated the removal on the day the most damaging evidence was filed; and the conduct is now the subject of an intended FBI referral and IG complaint.

The opposition itself conceded the conflict exists as long as the conspiracy claims are pending. In its brief opposing the Motion to Disqualify in state court, O'Toole Scrivo argued the motion was "**premature**" because McCarter "**intends to move to dismiss**" the conspiracy claims, and that "[**d]ismissal of these claims would eliminate any semblance of divergent interests between McCarter and Defendant O'Toole.**" This is an admission that the conflict exists as long as the conspiracy claims are pending — which they are. And even if the conspiracy claims were dismissed, O'Toole remains a co-defendant on multiple independent counts — including § 1983, NJCRA, tortious interference, and IIED.

XI.    **REQUEST FOR EXPEDITED PRE-MOTION CONFERENCE**

Plaintiff respectfully requests the pre-motion conference at the earliest available date. The Motion to Remand is urgent because the removal was designed to evade the disqualification hearing — and because the state court invested substantial judicial resources in this case, including a detailed 30-page written opinion by Judge Sanders on the Motion to Dismiss, oral argument, and extensive motion practice on the Motion to Disqualify. The Motion to Disqualify is urgent because O'Toole's personal interests are driving the defense strategy. The FBI referral and IG complaint make the conflict even more acute. Multiple records requests are pending. No substantive deadlines should be entered until the remand motion is decided.

XII.    **CONCLUSION**

The Chairman of the Port Authority is using the governmental agency he chairs to obstruct this litigation, to retaliate against Plaintiff, and to protect McCarter & English LLP — the client of his own law firm and the employer of his own son. His own sister has confirmed under oath that this is his pattern — a pattern that has extended to her, her husband, her sons-in-law, and their younger brother John. The officer who stopped the process server was required to swear loyalty to O'Toole. The stated justification was false — fabricated after the fact, just as O'Toole fabricated justifications for blocking his sister's promotion. The incident report was likely not created until after the OPRA request. The officer instructed the process server to falsify a sworn legal document. The officer's own body-worn camera proves he knew the encounter had no law enforcement purpose. The Port Authority's own General Counsel accepted service by email the same day. The Township has actively resisted identifying who called the police. Both Port Authority defendants — O'Toole and Donovan — were evading service of process. And McCarter's counsel asked the state court to act quickly on reinstatement while simultaneously planning to coordinate with the Port Authority to remove the case to federal court — after fourteen months without filing a single responsive pleading.

Plaintiff respectfully requests that the Court schedule the pre-motion conference at the earliest available date.

Respectfully submitted,
/s/ William Brown
William Brown Jr., Esq.
Plaintiff Pro Se
william.brown@parlatorelawgroup.com

Enclosures:

**Exhibit A** — Declaration of Captain Eileen O'Toole Pursuant to 28 U.S.C. § 1746, signed March 27, 2026

**Exhibit B** — Cedar Grove Police Department Incident Report, Case #26-04573, dated February 28, 2026 (produced pursuant to OPRA) (residential address redacted)

**Exhibit C** — Transcript of Body-Worn Camera Footage of Lt. Jason Rivers, Badge #5748, Cedar Grove Police Department, February 28, 2026 (produced pursuant to OPRA)

**Exhibit D** — Transcript of Video of Process Server's Initial Interaction with Chairman O'Toole at Residence, February 28, 2026 (recorded by process server Joshua T. Lee)

**Exhibit E** — Transcript of Video of Process Server's Second Attempt to Serve Chairman O'Toole at Residence, February 28, 2026 (recorded by process server Joshua T. Lee)

cc: Thomas P. Scrivo, Esq. / Michael J. Dee, Esq. / Joseph R. Marsico, Esq.
O'Toole Scrivo, LLC — via CM/ECF

Megan Lee, Esq. / Cheryl Alterman, Esq.
Port Authority Law Department — via CM/ECF

**Exhibit A** — Declaration of Captain Eileen O'Toole Pursuant to 28 U.S.C. § 1746, signed on March 27, 2026

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM BROWN JR., <br>               Plaintiff, <br><br>     v. <br><br> McCARTER & ENGLISH LLP; THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; KEVIN J. O'TOOLE (in his personal and professional capacities); PATRICK DONOVAN (in his personal and professional capacities); JOHN DOES 1-10 (Fictitious Individuals or Entities Who Have Liability to Plaintiff for Any of the Causes of Action Contained Herein), <br>               Defendants. | Civil Action No. 2:26-cv-02808-JXN-AME <br><br> DECLARATION OF CAPTAIN EILEEN O'TOOLE IN SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY O'TOOLE SCRIVO, LLC AND IN SUPPORT OF PLAINTIFF'S CLAIMS AGAINST THE PORT AUTHORITY DEFENDANTS <br><br> (Pursuant to 28 U.S.C. § 1746) |

I, Eileen O'Toole, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

### IDENTITY AND QUALIFICATIONS

1. I was a Captain in the Cedar Grove Police Department, Township of Cedar Grove, Essex County, New Jersey. I have served as a sworn law enforcement officer with the Cedar Grove Police Department since approximately 2004. Prior to that I was an officer in the Essex County Sheriff's Department since 1999 for a total of over 25 years of service.

2. I am the first female Captain in the history of the Cedar Grove Police Department.

3. During my tenure, I have held supervisory positions for approximately nine years, including Supervisor of Patrol, Administrative Lieutenant, and Officer in Charge.

4. Prior to the falling out with my brother, my employment record with the Cedar Grove Police Department was unblemished. I have never been disciplined or warned regarding my performance as a police officer. I have received excellent annual evaluations, salary

1

increases, promotions, and accolades from my peers, supervisors, members of other police departments, the Attorney General's Office, and the community of Cedar Grove.

5. Kevin J. O'Toole, Esq. is my brother. He is a resident of Cedar Grove, New Jersey. He serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey. He is also the founder and managing partner of O'Toole Scrivo, LLC, a law firm headquartered at 14 Village Park Road, Cedar Grove, New Jersey.

6. I am not a party to the above-captioned action. I make this Certification voluntarily, based upon my personal knowledge.

## KEVIN O'TOOLE'S PATTERN OF USING GOVERNMENTAL POWER FOR PERSONAL RETALIATION

7. Based on my personal experience over many years, I have observed a pattern of using whatever institutional power is available to him to retaliate against anyone who opposes him or falls out of his favor. Upon information and belief, the actions he has taken against Plaintiff William Brown Jr. appear to be consistent with this pattern.

8. Kevin O'Toole is an individual of considerable political power. He has served on the Cedar Grove Town Council, as Mayor of Cedar Grove, in the New Jersey General Assembly (1995–2001), and in the New Jersey State Senate, before becoming a Commissioner and ultimately Chairman of the Port Authority of New York and New Jersey.

9. Kevin O'Toole has cultivated relationships with Cedar Grove officials and law enforcement that, upon information and belief, he may have used for personal purposes unrelated to any apparent legitimate governmental function.

2

**KEVIN O'TOOLE'S USE OF POLICE AS PERSONAL PROTECTION**

10. Upon information and belief, Kevin O'Toole has used the Port Authority Police as personal protection on many occasions, to the point of overnight postings of officers outside of his house and his law firm. Upon further information and belief, he has also contacted Cedar Grove Police supervisors directly.

11. Upon information and belief, the use of police resources for Kevin O'Toole's personal benefit was not related to any apparent legitimate law enforcement function.

12. Upon information and belief, Kevin O'Toole has also been in direct contact with Cedar Grove officers to the point of making Officer Rivers swear his loyalty to him if he was hired on the force. He went as far as to have Officer Rivers go to Vermont to get a specialty pack of beer for his son's high school teacher to get a better grade for the semester and to prove his allegiance.

13. My husband, Michael Kraynanski, who is a police officer with the Caldwell Police Department, has been a target of Kevin O'Toole for years due to his speaking out at town council meetings.

14. I have reported Kevin O'Toole's abuse of police resources and governmental power to the New Jersey Attorney General's Office. The Attorney General's Office called me in on two separate occasions to interview me about Kevin O'Toole's actions.

**THE FAMILY DISPUTE AND KEVIN O'TOOLE'S RETALIATORY RESPONSE**

15. In November 2021, a family dispute arose between myself and Kevin O'Toole in connection with my daughter's wedding. Kevin O'Toole and his wife, Bethany O'Toole, did not attend the wedding ceremony.

16. Upon information and belief, as a result of the dispute, Kevin O'Toole informed other guests assigned to sit at his table at the wedding not to attend the wedding ceremony. Several guests who had been assigned to Kevin O'Toole's table abruptly left the wedding ceremony.

17. Following the family dispute, Kevin O'Toole sent a barrage of threatening text messages to my husband, Michael Kraynanski. These text messages threatened personal and professional retaliation against both of us.

18. In these text messages, Kevin O'Toole falsely suggested that I had a drinking problem.

19. Kevin O'Toole told my husband in a text message to "quit [his] job in Caldwell that [Kevin] secured for [him]."

20. Kevin O'Toole threatened my husband in a text message, stating: "[Kevin] will be sending a request to the Caldwell Township to schedule an internal investigation."

21. Kevin O'Toole texted my husband "Eileen, I got each and every job, and you can't acknowledge it," claiming credit for my career advancement and implying that my promotions were the result of his influence rather than my qualifications and performance.

22. Kevin O'Toole demanded "a psychological exam for you and your current common law wife" — referring to me and my husband, both sworn law enforcement officers at the time.

**KEVIN O'TOOLE'S INTERFERENCE WITH MY PROMOTION TO CHIEF OF POLICE**

23. Prior to the family dispute, I was advised that I had been selected for the position of Chief of Police by Cedar Grove Township Manager Thomas Tucci. This promise was made publicly, in the presence of members of the Cedar Grove Town Council, my father,

4

members of law enforcement, and other community members, during the retirement ceremony of the outgoing Chief of Police, Joseph Cirasa, on or about June 25, 2021.

24. Tucci advised me that I was going to be the next Chief of Police. Tucci and I negotiated my salary as Captain as well as my salary when I would be named Chief.

25. Members of the Town Council, including Councilpersons Peter Tanella and Joseph Zichelli, informed me and others that I was going to be the next Chief of Police. Knowledge of my promotion was well known among members of the Cedar Grove Police Department and the community.

26. On January 12, 2022, Tucci summoned me to his office and advised me that "This was not going to be a good meeting." Tucci described in detail that numerous outside sources were "not happy" with me and informed me that I was not going to be the next Chief of Police as he had promised.

27. Tucci told me "the Town Council is disgusted with you" and laid out three specific reasons why the Council was allegedly "disgusted" with me and why I would not be promoted. These reasons were false and Tucci knew they were false.

28. Upon information and belief, Kevin O'Toole had conferred with Tucci and had discussed the plan not to promote me to the position of Chief of Police. Upon further information and belief, Kevin O'Toole was informed of the false reasons for my non-promotion.

29. Around this time, Kevin O'Toole told our dad that I was not going to be promoted to Chief of Police. When our dad asked Kevin for a reason, Kevin told him that I was not being promoted because I was "insubordinate" and had "misappropriated the Chief of Police's vehicle."

5

30. The allegations were false. There are no written charges of insubordination or any other charges or discipline in my personnel file. Neither Tucci nor anyone else at the Township ever informed me that I had "misappropriated police property" or been "insubordinate."

31. In Tucci's 33-year tenure as Town Manager — 25 years of which as Town Manager — no woman other than myself has ever served in a supervisory capacity in the Cedar Grove Police Department, and no woman has ever been promoted to Chief of Police. During that same period, Tucci promoted dozens of male police officers to supervisory roles, including the Chief of Police.

32. Following my non-promotion, Chief Kennedy then stripped me of most of the duties I had been performing while serving as Captain and OIC of the department.

33. Tucci promoted another male police officer, Pumphrey, to serve as Captain which was a newly created position. Tucci then allowed that Captain to serve as Officer in Charge at all times when the current Chief of Police is absent — a title that had previously been given to me.

**CONTINUED RETALIATION AND THE CHILLING EFFECT OF KEVIN O'TOOLE'S POWER**

34. Since the family dispute, Kevin O'Toole's attacks on me and my husband have not stopped. My husband and I have been subjected to ongoing retaliation, including three internal affairs complaints filed against my husband — all of which I believe were instigated by or at the direction of Kevin O'Toole.

35. Upon information and belief, Kevin O'Toole's retaliatory conduct has also affected the careers of my two sons-in-law.

6

36. My pension is still being withheld as a result of, upon information and belief, the allegations that Kevin O'Toole fabricated against me.

37. After I filed my lawsuit against Cedar Grove, the retaliation worsened. Chief Kennedy — who was appointed after my promised promotion had been blocked — refused to speak to me and only communicated with me by email. Chief Kennedy's actions, namely, questioning me about my weapons qualification knowing I had a hand injury; failing to advise me of promotions or promotion ceremonies; and blocking my entrance to the building in order to instigate a confrontation and intimidate me created a hostile work environment.

38. Kevin O'Toole's most recent abuse of power was directed at our younger brother, John, who resides in Pennsylvania. Upon information and belief, Kevin O'Toole had John arrested in Pennsylvania based upon charges filed by the Cedar Grove Police Department — which were handled directly through Chief Pumphrey – and Port Authority Inspector Hugh Johnson.

39. When my situation became public, people reached out to me to offer support. However, some people spoke to me on the condition of anonymity because they were afraid if Kevin O'Toole could do what he did to me — his own sister, a Captain in the police department — he could do that to anyone.

40. It was nearly impossible to retain an attorney to represent me in my case against Cedar Grove because, upon information and belief, attorneys do not want to take on a case against my brother, Kevin O'Toole.

41. I believe that Kevin O'Toole's hold is strong in Essex County.

**RELEVANCE TO PLAINTIFF WILLIAM BROWN'S CASE**

42. I recently learned of Plaintiff William Brown Jr.'s lawsuit against McCarter & English LLP and the Port Authority Defendants. I reached out to Mr. Brown voluntarily on March 23, 2026, after reading about his case.

43. Upon information and belief, the actions Kevin O'Toole has taken against Mr. Brown — including the use of a Port Authority employee to send threatening text messages, the withdrawal of Port Authority support from a charity event for veterans and 9/11 survivors, and the use of the Cedar Grove Police to stop a process server at Kevin O'Toole's residence — are entirely consistent with what I believe to be the pattern of retaliatory conduct I have personally experienced and witnessed over many years.

44. Specifically, the Cedar Grove Police incident report (Case #26-04573) confirming that the Port Authority called the Cedar Grove Police Chief to stop Mr. Brown's process server is, upon information and belief, consistent with Kevin O'Toole's long-standing practice of using the Port Authority Police and Cedar Grove police for personal purposes.

45. I have read the text messages sent by Port Authority employee Patrick Donovan to Mr. Brown. This pattern of behavior, upon information and belief, is consistent with the threatening text messages Kevin O'Toole sent to me and my husband following our family dispute, in which Kevin O'Toole threatened professional retaliation, demanded psychological examinations, and threatened to initiate internal investigations.

46. It is my opinion that Kevin O'Toole uses whatever institutional power is available to him — whether it is his influence over Cedar Grove officials, the Cedar Grove Police Department, the Port Authority of New York and New Jersey, Essex County Prosecutor's

8

Office or other governmental agencies — to punish anyone who opposes him or falls out of his favor.

47. I am willing to provide additional testimony, documents, and evidence in support of Mr. Brown's case, including copies of the threatening text messages Kevin O'Toole sent to me and my husband.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

_____
Eileen O'Toole

Date:   March 27 2024

9

**Exhibit B** — Cedar Grove Police Department Incident Report, Case #26-04573, dated February 28, 2026 (produced pursuant to OPRA) (residential address redacted)



# Cedar Grove Police Department
### 525 Pompton Ave., Cedar Grove, NJ 07009
### Phone: 973-239-4100  Fax: 973-239-7541  Mun. Code: 0705
### Incident Report



## Incident Details:

| Case Number | Time Reported | Date Reported | Time Occurred | Date Occurred | Occurrence Between Date / Time of | Time Occurred | Date Occurred | 911 | Completed |
|---|---|---|---|---|---|---|---|---|---|
| 26-04573 | 14:44 | 02/28/26 | 14:44 | 02/28/26 | | | | | X |

## Incident Type:

Officer-Requested

## Incident Location:

| Street # | Street Name | Apt # | Intersection / Cross Street of: |
|---|---|---|---|
| ▮ | ▮ | | |
| Business / Common Location Name | | | |

## Contact Information: Victim  Suspect  Complainant  Witness  Driver  Arrest  Passenger  Missing  Involved  Other

| Code | Contact Name #1 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| R | Otoole, Kevin | | | 61 | M | 1B | ▮1964 | | ▮ |
| **Address** | | | | | **Phone / Email** | | | **Other Phone** | |
| ▮ Cedar Grove, NJ 07009-1321 | | | | | ▮ | | | | |

| Code | Contact Name #2 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| Z1 | Lee, Joshua | T | | 45 | M | | ▮1980 | | ▮ |
| **Address** | | | | | **Phone / Email Address** | | | **Other Phone** | |
| ▮ Iselin, NJ 08830-2037 | | | | | | | | | |

| Code | Contact Name #3 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Address** | | | | | **Phone / Email Address** | | | **Other Phone** | |

| Code | Contact Name #4 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Address** | | | | | **Phone / Email Address** | | | **Other Phone** | |

| Code | Contact Name #5 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Address** | | | | | **Phone / Email Address** | | | **Other Phone** | |

| Code | Contact Name #6 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Address** | | | | | **Phone / Email** | | | **Other Phone** | |

| Code | Contact Name #7 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Address** | | | | | **Phone / Email Address** | | | **Other Phone** | |

| Code | Contact Name #8 | MI | Suffix | Age | Sex | Race | DOB | | SSN |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| **Address** | | | | | **Phone / Email Address** | | | **Other Phone** | |

## Property Information:

| | Value of Stolen Property | Currency | Jewelry | Furs | Clothing | Auto | Misc. | Total |
|---|---|---|---|---|---|---|---|---|
| **Property Recovered** | | | | | | | | |

## Automobile Information:

| | Vehicle Code | Year | Make | Body Type | Model | Color | Registration | State | VIN |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Known | 23 | Kia | WAGON | SOR | Red | ▮ | NJ | ▮ 76300 |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |

| Officer of Record: | Date: | Reviewed By: | BWC: | Case #: | Page |
|---|---|---|---|---|---|
| Lt. Jason Rivers 5748 | 02/28/26 | jrivers | X | 26-04573 | Page 1 |



# Cedar Grove Police Department

**525 Pompton Ave., Cedar Grove, NJ 07009**
**Phone: 973-239-4100  Fax: 973-239-7541  Mun. Code: 0705**
**Incident Report**



On the reporting date and time I was the shift commander and actively involved in assisting Ptl. Antonuccio with a crash investigation on Reservoir Drive. I received a phone call from Chief Pumphrey who requested that I send a unit to ▮▮▮▮▮▮▮ for an unknown party. Chief Pumphrey advised me that he had received a call from the Port Authority of NY/NJ, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ and it was reported that a process server was refusing to leave the property. At the time the shift was at minimum and the other patrol unit was on a separate call so I elected to handle the call myself. It was relayed to me that the individual was operating a small red SUV which I observed on Skytop at the intersection of Fairview Avenue. I pulled onto ▮▮▮▮▮▮, next to NJ Registration R49SDA, rolled my window down, and identified myself and told the driver why I was there. I advised the driver, whom I never identified because he admitted that he was a process server attempting a service at ▮▮▮▮▮▮, that the resident did not want him on his property. The server responded by telling me that he was required to make three attempts at serving the documents and I reiterated that the resident does not want him on his property. Chief Pumphrey advised me that the Port Authority of NY/NJ asked us to inform the process server that he should serve the paperwork through the legal department of their agency, which is headquartered in the World Trade Center. I relayed the same to the process server and he advised me that he would not return to ▮▮▮▮▮▮ The individual requested my name and badge number, which I provided. I left the scene. Note: A CAD entry was not made at the time due to me responding directly from the previous call which resulted in this incident report.

| Officer of Record: | Date: | Reviewed By: | BWC: | Case #: | Page 2 |
|---|---|---|---|---|---|
| Lt. Jason Rivers 5748 | 02/28/26 | jrivers | X | 26-04573 | |

**Exhibit C** — Transcript of Body-Worn Camera Footage of Lt. Jason Rivers, Badge #5748, Cedar Grove Police Department, February 28, 2026 (produced pursuant to OPRA)

[00:00:02.14] - Speaker 1
No, there's a black SUV. No, that was a girl driving. Yeah, he's right here. Got him. How are you, sir? I understand you're trying to serve somebody. There's nobody there. Supposed to serve the attorney. Serve the attorney. Don't go to that house. All right, I know, I know, but it's, it's a civil thing. Go through the attorneys. I understand. Okay, then say you did it because— go through the attorneys. 5748. Yep. All right. Yeah, just because Yeah, they're not there. They're not going to answer the door if they were.

[00:00:56.08] - Speaker 3
So I get what you're doing, right? But now my thing is I'm not going to try to trespass and knock those doors down, you know. Now if they're gonna answer the door, I'm gonna do it. Just knock on the door, take my pictures, put my notes in.

[00:01:14.02] - Speaker 1
Okay, put your notes in and say They don't want you on the property. I mean, just go through the attorneys.

[00:01:24.08] - Speaker 4
It doesn't work that way. You know, you're a police officer, you know what I— right.

[00:01:24.17] - Speaker 1
And I'm, and I'm saying they don't want anybody on their property. That's, that's, that's it. So that's what— 58746? No, 5748. 5748. Yeah, they don't want anybody on the property.

[00:01:38.29] - Speaker 2
All right.

[00:01:45.22] - Speaker 1
Yeah, it's fine. Yeah, just they don't want anybody on the property. I don't want anybody on my property either. I know what you do. I know what you do. I'm just passing it on. They don't want anybody in the property. They're not going to answer the door. You're wasting your time. That's all I'm saying. You do— dude, you got it, dude. No, 557-48. Hold on, this is my Hey, chief. Good. 5— 5— I, I can't see that. 5748. 5748. Yeah, Rivers, last name. All right, ma'am. That's the process server. Yeah, yeah, serve it. Deputy inspector through the Port Authority says you got to serve it through the legal department. Okay, Port Authority. Yeah, is this, is this a Port Authority issue? Yeah, you got to serve it through the legal department. At the Port Authority.

[00:03:09.28] - Speaker 4
Where exactly?

[00:03:10.01] - Speaker 1
Just so I know. Uh, dude, I don't know. Wherever they are. New York. New York. It's their main offices are in One World Trade Center.

[00:03:24.27] - Speaker 2
All right, man. All right.

[00:03:27.16] - Speaker 4
All right.

[00:03:27.22] - Speaker 1
I already did. Yeah, I already did.

[00:03:29.25] - Speaker 2
All right.

[00:03:33.17] - Speaker 1
Oh my God, actually, I have beautiful—

[00:03:33.21] - Speaker 4
I'm not going back.

[00:03:33.23] - Speaker 1
Yeah, don't, don't go on the— don't, don't go on the property.

[00:03:36.21] - Speaker 2
Okay.

[00:03:37.17] - Speaker 1
All right. Yeah, just give me a favor, back away from the stop sign. Just back up a little bit, make it legal.

[00:03:43.05] - Speaker 2
All right, all right, no problem.

[00:03:52.14] - Speaker 1
Romeo 49 SDA.

**<u>Exhibit D</u>** — Transcript of Video of Process Server's Initial Interaction with Chairman O'Toole at Residence, February 28, 2026 (recorded by process server Joshua T. Lee)

[00:00:57.23] - Speaker 1
Hey, how you doing? Hey, is it Donovan? No. Um, is he home? Donovan's in the wrong house.

[00:01:03.19] - Speaker 1
██████, right? Not Donovan. No. Patrick Donovan? No.

[00:01:07.18] - Speaker 1
Okay. No. Did he used to live here? No. Okay.

[00:01:11.13] - Speaker 1
Okay. Okay. For 20 years. Okay. Okay.

[00:01:16.28] - Speaker 1
Thanks.

**Exhibit E** — Transcript of Video of Process Server's Second Attempt to Serve Chairman O'Toole at Residence, February 28, 2026 (recorded by process server Joshua T. Lee)

[00:00:32.26] - Speaker 1
Oh, I see. Okay.

[00:00:55.25] - Speaker 2
If you can hear me, Mr. O2, I have to come back anyway. All right.