UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILLIAM BROWN JR.,<br><br>      Plaintiff,<br><br>  v.<br><br>MCCARTER & ENGLISH LLP, THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, KEVIN J. O'TOOLE (in his personal and professional capacities), PATRICK DONOVAN (in his personal and professional capacities), JOHN DOES 1-10,<br><br>      Defendants. | Civil Action No. 2:26-cv-02808-JXN-AME<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO DISQUALIFY O'TOOLE SCRIVO, LLC AS COUNSEL FOR DEFENDANT MCCARTER & ENGLISH LLP**<br><br>Judge: Hon. Julien Xavier Neals, U.S.D.J.<br>Magistrate Judge: Hon. André M. Espinosa, U.S.M.J. |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………….…………………. ii

I. INTRODUCTION …………………………………………………………………….…. 1

II.  PROCEDURAL BACKGROUND……………………………………………………….. 2

III. FACTUAL BACKGROUND …………………………..…………………………………… 4

A. O'Toole's Dual Role and Personal Financial Interests ……………………………………. 4

B. The Port Authority Called the Cedar Grove Police to Stop African American
   Process Server ..………… ……………………………..…………………………………….. 5

C. O'Toole Orchestrated Cedar Grove Police to Stop African American
   Process Server through the Port Authority…………………………………………………….5

D. Captain Eileen O'Toole's Sworn Declaration Confirms the Pattern …………..……………. ..8

E. Donovan's Threatening Text Message and the Destruction of the NYC SEAL Swim ……...11

F. The FBI Criminal Referral and Port Authority Inspector General Complaint ………...…,…. 11

G. The Port Authority's Retention of Separate Counsel Confirms the Conflict ……………..… 12

H. McCarter Engaged with the Disqualification Motion — Then Coordinated the Removal to
   Evade the Hearing After the Evidence Turned Against It ……………….…………………… 12

I. The Cover-Up: Backdated Incident Report, Edited Body-Worn Camera Footage, and Cedar
   Grove's Obstruction of Plaintiff's Investigation ………………………………...…………….. 13

J. McCarter's Fourteen-Month Pattern of Delay and O'Toole's Structural Control Over All
   Defendants' Litigation ……………………………….…………………………………… 17

IV. LEGAL STANDARD ………………………………………………………….…… 18

V. ARGUMENT ……………………………………………………………………….. 21

A. Plaintiff Has Standing to Move for Disqualification …………………………………….. 21

B. O'Toole Scrivo Has an Irreconcilable Concurrent Conflict of Interest Under RPC 1.7(a)(2). 21

C. The Conflict Is Non-Waivable Under RPC 1.7(b) …………………………………….….. 23

D. The Ethical Screen Has Demonstrably Failed …………………………...…………… 23

E. The Coordinated Removal Is Independent Evidence of the Conflict………………………….27

F. The Opposition's Own Case Law Supports Disqualification Here ……………...………... 28

G. The Robin King Certification Is Contradicted by Multiple Independent Sources …….……. 29

H. This Motion Is Timely and Is Not a Litigation Tactic ………………………….………… 29

I. The Opposition's "Prematurity" Argument Is Untenable ………………..………….……...30

VI. CONCLUSION AND REQUEST FOR REFERRAL…..……………….….……………. 31

**TABLE OF AUTHORITIES**

**Cases**

Alexander v. Primerica Holdings, Inc., 822 F. Supp. 1099 (D.N.J. 1993) …………..…...…18, 30

Allstate N.J. Ins. Co. v. Carteret Comprehensive Med. Care, PC, No. A-1575-23 (N.J. App. Div. Jan. 9, 2025)……………………………………………………………...…………24

Camden Iron & Metal, Inc. v. Klehr, Harrison, Harvey, Branzberg & Ellers, LLP, 384 N.J. Super. 172 (App. Div. 2006)……………………………………………………..……27

Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB, 944 F. Supp. 341 (D.N.J. 1996) ……... 18

City of Atl. City v. Trupos, 201 N.J. 447 (2010) ……………………………………………. 19

DelConte v. Monroe Twp. Bd. of Educ., No. 1:19-cv-13731, 2020 WL 6119859 (D.N.J. Oct. 16, 2020) ……………………………………………………………… 23, 28, 32

Est. of Beczo v. Port Lumber Corp., No. 3:23-cv-01338, 2024 WL 1743061 (D.N.J. Apr. 23, 2024) …………………………………………………………….…… 23, 28

Halligan v. O'Connor, No. A-0819-17T1 (N.J. App. Div. Oct. 5, 2018)……………………24, 28

Harish v. Arbit, No. 2:21-cv-11088-EP-AME (D.N.J. Jan. 31, 2025).
……………………………………………………………1, 2, 18, 19, 21, 22, 23, 25, 28

In re Corn Derivatives Antitrust Litig., 748 F.2d 157 (3d Cir. 1984) ………….…………21, 30

In re Estate of Krivulka, Nos. A-0863-20, A-0803-21 (N.J. App. Div. Aug. 26, 2022)…....……30

In re Simon, 206 N.J. 306 (2011)……………………………………………….………20, 31

In re Talc Based Powder Prods. Litig., No. A-0215-24 (N.J. App. Div. Feb. 6, 2026)……..…..28

Infosphere Consulting, Inc. v. Habibi Life, LLC, No. 2:19-cv-15577, 2020 WL 4559138 (D.N.J. Aug. 7, 2020) ……………………………………………..……………………………. 21

Maldonado v. New Jersey, 225 F.R.D. 120 (D.N.J. 2004) …………………………………….. 18

Mauer v. State of New Jersey, No. A-0108-24 (N.J. App. Div. Mar. 28, 2025)…………...……25

Nobrega v. Troy-Bilt, LLC, No. 2:22-cv-04204 (D.N.J. Dec. 18, 2023) ………….……..…. 20

O Builders & Assocs., Inc. v. Yuna Corp. of NJ, 206 N.J. 109 (2011) …………………...…..24

Stahlberg v. Walter R. Earle Transit, LLC, No. A-2373-23 (N.J. App. Div. Oct. 2, 2024) …………………………………………………….… 20, 22, 23, 24, 28, 31

State ex rel. S.G., 175 N.J. 132 (2003) ………………..…………………..………. 20, 23

State v. Dalal, 221 N.J. 601 (2015)…………………………………………….…..…..27

State v. Daishon I. Smith, No. A-0291-23 (N.J. App. Div. Feb. 21, 2024)………………..…..26

Twenty-First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264 (2012)…………….1, 29, 30

United States v. Miller, 624 F.2d 1198 (3d Cir. 1980) …………………………...…..…18

United States v. Self, 681 F.3d 190 (3d Cir. 2012)…………………………..………1, 19, 26

Wilkes v. Passaic Cnty., No. 12-6498, 2016 WL 852602 (D.N.J. Mar. 4, 2016) ……………… 28

**Rules of Professional Conduct**

N.J. R. Prof'l Conduct 1.7(a) ………………………………………………...……..19, 20

N.J. R. Prof'l Conduct 1.7(a)(2) ………………………………………….………21, 24

N.J. R. Prof'l Conduct 1.7(b) ……………………………………………….……...………23

N.J. R. Prof'l Conduct 1.7(b)(3) ……………………………………………….. 23

N.J. R. Prof'l Conduct 1.10(a) …………………………………………………......…20, 25

**Federal Statutes**

18 U.S.C. § 241 …………………………………………..……………………………. 11

18 U.S.C. § 242 …………………………………………...…………………………. 11

18 U.S.C. § 1001 ……………………………………………………………………….. 11

18 U.S.C. § 1512 ………………………………………………………………………... 11

18 U.S.C. § 1519 ………………………………………………………………………... 11

28 U.S.C. § 1446(b) ………………………………………..…………………………… 13

28 U.S.C. § 1746 ……………………………………………………………….……….. 8

**State Statutes**

N.J.S.A. 47:1A-5(i) …………………………………………………………………… 16

**Court Rules**

L. Civ. R. 103.1(a) ………………………………………….………………………….. 18

**Other Authorities**

Port Authority By-Laws, Art. III, § F………………………………………………………17

Port Authority By-Laws, Art. III, § J ………………………….……………………….. 17

Port Authority By-Laws, Art. XI, ¶ 4………………………………...………………..12

## I.   **<u>INTRODUCTION</u>**

The conflict is no longer speculative. It is documented in a Cedar Grove Police Department incident report (Case #26-04573), corroborated by body-worn camera footage, confirmed by the process server's own video recordings, and independently verified by a sworn Declaration from Captain Eileen O'Toole — Defendant O'Toole's own sister and a 25-year law enforcement veteran — who states under oath that the conduct alleged in this case is "entirely consistent with what I believe to be the pattern of retaliatory conduct I have personally experienced and witnessed over many years." (E. O'Toole Decl. ¶ 43.)

On March 30, 2026, Plaintiff submitted a criminal referral to the Federal Bureau of Investigation and a formal complaint to the Port Authority Office of Inspector General regarding the conduct at issue. O'Toole Scrivo's managing partner is now the subject of a federal criminal referral and an Inspector General complaint — in the very case his firm is defending.

The Third Circuit has held that where a law firm partner's conflict creates a "**serious potential for conflict,**" the entire firm must be disqualified — and that "**no workable 'Chinese Wall' could be erected**" in a small firm to cure the conflict. <u>United States v. Self</u>, 681 F.3d 190, 196 (3d Cir. 2012). The Third Circuit has further held that a court must consider counsel's litigation conduct — including procedural maneuvers — when evaluating conflicts of interest, and that failure to do so is an abuse of discretion. <u>Century Indemnity Co. v. Congoleum Corp</u>., 426 F.3d 675, 695 (3d Cir. 2005). The New Jersey Supreme Court has held that "**waiver is an insufficient basis**" for denying a disqualification motion "**in the absence of extraordinary circumstances.**" <u>Twenty-First Century Rail Corp. v. N.J. Transit Corp</u>., 210 N.J. 264, 278 n.6 (2012). And Magistrate Judge Espinosa recently granted a motion to disqualify defense counsel in <u>Harish v. Arbit,</u> No. 2:21-cv-11088-EP-AME (D.N.J. Jan. 31, 2025), where a third party's

interests dominated the representation and the conflict was "**real, current, and non-speculative.**" The conflict here is at least as severe — and in many respects far more severe — than the conflict that compelled disqualification in Harish.

For the reasons set forth below, the Court should disqualify O'Toole Scrivo, LLC from representing Defendant McCarter & English LLP, direct McCarter to retain new counsel, and refer O'Toole Scrivo to the Office of Attorney Ethics for investigation.

## II. PROCEDURAL BACKGROUND

This action was commenced in the Superior Court of New Jersey, Law Division, Essex County (Docket No. ESX-L-8932-24) on December 24, 2024. (Brown Decl. ¶ 3.) O'Toole Scrivo entered an appearance on behalf of McCarter on February 18, 2025. (Brown Decl. ¶ 5.) On July 11, 2025, the Honorable Joshua D. Sanders, J.S.C. partially denied McCarter's Motion to Dismiss in a detailed 30-page written opinion, finding Plaintiff's claims under the New Jersey Conscientious Employee Protection Act and for wrongful discharge under Pierce v. Ortho Pharmaceutical Corp. as to USERRA viable. (Brown Decl. ¶ 4; Exhibit A.)

Following the July 11, 2025 Order, McCarter never filed an Answer. Instead, McCarter's counsel at O'Toole Scrivo obtained four consent orders extending McCarter's time to answer over a period of more than seven months — without ever answering. The case was dismissed for lack of prosecution twice. (Brown Decl. ¶¶ 4-5.) Every consent order on the state court docket was initiated and filed by McCarter's counsel at O'Toole Scrivo.

On September 30, 2025, the parties entered into a mediation agreement and retained mediator Michael F. O'Neill. (Brown Decl. ¶ 38; Exhibit L.) O'Toole Scrivo participated in the mediation on McCarter's behalf. A joint mediation session was held on December 10, 2025. The mediation did not result in a resolution. (Id.) Through the mediation, O'Toole Scrivo gained

2

access to McCarter's confidential settlement posture, litigation strategy, and case assessment — deepening the firm's involvement in the case and making the transition to new counsel more complex, but also more necessary.

On February 16, 2026, Plaintiff filed an eighteen-count First Amended Complaint naming Kevin J. O'Toole as a co-defendant on seven counts. (Brown Decl. ¶ 6.) On February 17, 2026, O'Toole Scrivo claims to have implemented an ethical screen. (DiGiulio Cert. ¶ 2, filed in state court proceedings.)

On March 2, 2026, Plaintiff filed a Motion to Disqualify O'Toole Scrivo in the state court. (Brown Decl. ¶ 8.) On March 17, 2026, at 2:41 PM, O'Toole Scrivo filed a 25-page opposition brief engaging with the state court on the merits. (Brown Decl. ¶ 8.) On March 18, 2026, at 6:33 AM — less than sixteen hours after filing its opposition — Plaintiff filed his Reply Brief containing OPRA records proving the Port Authority called the Cedar Grove Police to stop Plaintiff's process server. (Brown Decl. ¶ 9.)

That same day, at approximately 6:19 PM — twelve hours after Plaintiff's Reply Brief and less than twenty-eight hours after filing a full opposition brief engaging with the state court on the merits — the Port Authority Defendants filed a Notice of Removal (ECF Doc. 1), and McCarter filed its own Notice of Removal (ECF Doc. 2) and a consent letter (ECF Doc. 3). (Brown Decl. ¶ 10.) The removal eliminated the state court's scheduled March 27, 2026 hearing on the Motion to Disqualify. (Brown Decl. ¶ 11.)

After the removal, Plaintiff was unable to access PACER or CM/ECF from March 18 through March 24, 2026. During that period, both sets of Defendants filed papers unopposed, including requests for extensions of time to answer. (Brown Decl. ¶ 10.)

## III. FACTUAL BACKGROUND

**A. O'Toole's Dual Role and Personal Financial Interests**

Kevin J. O'Toole is the founder and managing partner of O'Toole Scrivo, LLC. (First Am. Compl. ¶ 16.) He simultaneously serves as Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey. (First Am. Compl. ¶ 14.) O'Toole is an individual of considerable political power in Cedar Grove and Essex County. He served on the Cedar Grove Town Council, as Mayor of Cedar Grove, in the New Jersey General Assembly (1995-2001), and in the New Jersey State Senate, before becoming a Commissioner and ultimately Chairman of the Port Authority. (E. O'Toole Decl. ¶ 8.) O'Toole Scrivo, LLC is headquartered at 14 Village Park Road, Cedar Grove, New Jersey — the same municipality where O'Toole lives, the same municipality whose police department was deployed to stop the process server, and the same municipality whose officials Captain O'Toole alleges O'Toole has used for personal retaliation for years.

O'Toole's son, Kevin O'Toole Jr., is an attorney employed by McCarter and supervised by William D. Wallach — the Equity Partner whom Plaintiff complained about four days before his termination. (First Am. Compl. ¶¶ 174, 308-309; Brown Decl. ¶ 14.) Wallach is not a peripheral figure in this litigation. The Amended Complaint alleges that Wallach directed Plaintiff to remove a LinkedIn post about his visit to the Third Circuit Court of Appeals — while allowing a non-veteran, politically connected colleague to post identical content about the same courtroom without consequence. (First Am. Compl. ¶¶ 174-182.) Plaintiff's December 23, 2023 email to McCarter leadership specifically complained about this discriminatory treatment by Wallach — four days before Plaintiff was terminated. (First Am. Compl. ¶¶ 282-285.)

4

O'Toole has three independent personal financial motives for protecting McCarter: (1) his law firm derives substantial income from representing McCarter; (2) his son is employed by McCarter and could be adversely affected by a judgment against the firm; and (3) his son is supervised by a partner whose discriminatory conduct is at the center of Plaintiff's claims. (First Am. Compl. ¶¶ 308-311; Brown Decl. ¶ 15.)

**B. The Port Authority Called the Cedar Grove Police to Stop African American Process Server**

On February 28, 2026, Joshua T. Lee — a Black American professional process server — attempted to serve a Summons and Amended Complaint on Chairman O'Toole at his personal residence in Cedar Grove, New Jersey. (Brown Decl. ¶ 16; Exhibit B.) O'Toole personally answered the door and spoke with Mr. Lee. (Brown Decl. ¶ 17; Exhibit E.) After Mr. Lee left and returned, O'Toole refused to answer. (Brown Decl. ¶ 17; Exhibit F.)

**C. O'Toole Orchestrated Cedar Grove Police to Stop African American Process Server through the Port Authority**.

Rather than have counsel accept service — as the Port Authority's own General Counsel would do later that same day with a two-sentence email (Brown Decl. ¶ 21) — the Port Authority called Cedar Grove Police Chief Pumphrey. The Cedar Grove Police Department incident report (Case #26-04573) states: "**Chief Pumphrey advised me that he had received a call from the Port Authority of NY/NJ, and it was reported that a process server was refusing to leave the property**." (Brown Decl. ¶ 18; Exhibit B at p. 2.) The Port Authority directed: "**the Port Authority of NY/NJ asked us to inform the process server that he should serve the paperwork through the legal department of their agency, which is headquartered in the World Trade Center**." (Brown Decl. ¶ 18; Exhibit B at p. 2.) The Port Authority did not merely report a concern — it directed a local police department on what to tell the process server and where to redirect service.

The justification that Lt. Rivers recorded on the official incident report — that the process server was "**refusing to leave the property**" — was a lie. The officer's own body-worn camera footage proves the opposite: (a) Lt. Rivers found Mr. Lee in his vehicle on a public road at the intersection of Skytop Road and Fairview Avenue — not on anyone's property; (b) Mr. Lee told Lt. Rivers he was "**not going to try to trespass and knock those doors down**"; (c) Lt. Rivers acknowledged the encounter was "**a civil thing**" and he was "**just passing it on**"; (d) Lt. Rivers received real-time instructions from the Port Authority through Chief Pumphrey, stating: "Deputy inspector through the Port Authority says you got to serve it through the legal department"; and (e) Lt. Rivers told Mr. Lee to "**back away from the stop sign. Just back up a little bit, make it legal**" — confirming Mr. Lee was parked on a public street. (Brown Decl. ¶ 19; Exhibit C.) Lt. Rivers wrote on the official police incident report that the process server was "**refusing to leave the property**." The body-worn camera footage proves Mr. Lee was never on anyone's property. Lt. Rivers lied on an official law enforcement document to provide a retroactive justification for a police stop that was orchestrated by the Port Authority to obstruct service of process in this litigation.

Lt. Rivers then instructed Mr. Lee to lie about the attempted service. On his body-worn camera, Lt. Rivers told Mr. Lee: "**Okay, then say you did it because — go through the attorneys.**" (Brown Decl. ¶ 20; Exhibit C at 00:01:14.) An affidavit of service is a sworn legal document filed with the court. Lt. Rivers instructed a professional process server to falsely represent to a court that service of process had been completed — when it had not. This was an instruction to forge a sworn legal document and to commit fraud upon the court.

6

Mr. Lee is a Black American man. The incident report records the race of the resident, Kevin O'Toole, as "**1B**" — but leaves the race field blank for Mr. Lee. (Exhibit B at p. 1.) Lt. Rivers did not identify Mr. Lee — stating in the report: "**I advised the driver, whom I never identified because he admitted that he was a process server.**" (Exhibit B at p. 2.) Lt. Rivers did not run Mr. Lee's identification or vehicle registration. Mr. Lee has communicated to Plaintiff that he believes part of the reason he was stopped and treated this way was because he is Black. (Brown Decl. ¶ 17.)

A professional process server — a Black American man simply doing his job — was stopped by police on a public road based on a false report called in by a governmental agency chaired by a named defendant in this lawsuit. He was told not to perform his lawful professional duties. He was instructed by a police officer to lie on a sworn legal document. The officer then lied on the official incident report to justify the stop. And the correct and proper way to handle service of process — having counsel accept service — is exactly what the Port Authority's own General Counsel did later that same day with a two-sentence email. (Brown Decl. ¶ 21.) Instead of sending that email before the service attempt, the Port Authority called the Cedar Grove Police Chief, who dispatched a police officer to stop a Black American process server on a public road.

Notably, O'Toole was not the only Port Authority defendant evading service. The following day, March 1, 2026, the process server attempted to serve Patrick Donovan at his home. The process server's sworn Affidavit of Non-Service states: "**I arrived at the location, noticed a black Infiniti crossover vehicle and a white pickup in the driveway. I walked to the front door and rang the video doorbell as well knocked on the front door. I heard the dog barking at the door, and I heard other voices inside of the residence but no one came to**

**the door, I then looked over to window to the livingroom and saw someone trying to duck out of sight."** (Brown Decl. ¶ 42; <u>Exhibit O</u>.) Both Port Authority defendants — O'Toole and Donovan — were evading service of process in the same lawsuit on consecutive days. O'Toole answered the door and then hid; Donovan ducked out of sight behind a window. This coordinated evasion is consistent with the coordinated retaliation alleged throughout this case.

This incident occurred eleven days after O'Toole Scrivo claims to have implemented an ethical screen. (Brown Decl. ¶ 22.)

**D. Captain Eileen O'Toole's Sworn Declaration Confirms the Pattern**

On March 27, 2026, Captain Eileen O'Toole — Defendant O'Toole's own sister, a 25-year law enforcement veteran, and the first female Captain in the history of the Cedar Grove Police Department — executed a sworn Declaration pursuant to 28 U.S.C. § 1746. (Brown Decl. ¶ 23; <u>Exhibit D</u>.) Captain O'Toole reached out to Plaintiff voluntarily on March 23, 2026, after reading about this case. She was not solicited by Plaintiff. Her decision to come forward — knowing the risks of publicly opposing her own brother, a man she describes as having a "**hold**" that is "**strong in Essex County**" (E. O'Toole Decl. ¶ 41) — underscores the gravity of the conduct at issue.

Captain O'Toole states under oath that O'Toole "**has used the Port Authority Police as personal protection on many occasions, to the point of overnight postings of officers outside of his house and his law firm,**" and that "**the use of police resources for Kevin O'Toole's personal benefit was not related to any apparent legitimate law enforcement function.**" (E. O'Toole Decl. ¶¶ 10-11.)

Captain O'Toole states that O'Toole made "**Officer Rivers swear his loyalty to him if he was hired on the force. He went as far as to have Officer Rivers go to Vermont to get a specialty pack of beer for his son's high school teacher to get a better grade for the semester and to prove his allegiance.**" (E. O'Toole Decl. ¶ 12.) This is the same Lt. Jason Rivers, Badge #5748, who stopped Plaintiff's process server on February 28, 2026, lied on the official incident report about the justification for the stop, and instructed the process server to lie on a sworn legal document.

Captain O'Toole states that O'Toole "**had [their brother] John arrested in Pennsylvania based upon charges filed by the Cedar Grove Police Department — which were handled directly through Chief Pumphrey — and Port Authority Inspector Hugh Johnson.**" (E. O'Toole Decl. ¶ 38.) This is the same Chief Pumphrey who dispatched Lt. Rivers to stop Plaintiff's process server at O'Toole's direction.

Captain O'Toole states that following a family dispute in November 2021, O'Toole "**sent a barrage of threatening text messages**" including threats of "**personal and professional retaliation,**" demands for "**a psychological exam,**" and threats to "**schedule an internal investigation.**" (E. O'Toole Decl. ¶¶ 16-22.) The actual text messages — attached as Exhibit H — reveal the specific language O'Toole uses when threatening to weaponize governmental power against those who oppose him. O'Toole texted: "**I will be sending a request to the Caldwell Township to schedule an internal investigation on your collaboration of the bullying of my daughter — please preserve all texts and emails**." (Brown Decl. ¶ 30; Exhibit H.) O'Toole demanded: "**this outburst and bullying of Ryan (and others) will require a psychological exam for you and you current common law wife.**" (Id.) O'Toole ordered Captain O'Toole's husband to surrender his livelihood: "**Michael please quit your job in**

9

**Caldwell that we secured for you.**" (Id.) And O'Toole claimed credit for Captain O'Toole's entire career: "**Eileen I got each and every job and you can't acknowledge it.**" (Id.)

The parallels between O'Toole's threatening texts to his own family and the conduct alleged in this case are unmistakable. O'Toole threatened to initiate a governmental investigation against his sister's husband through the Caldwell Township — just as the Port Authority called the Cedar Grove Police to stop Plaintiff's process server. O'Toole demanded psychological examinations of his sister and her husband — just as McCarter's partners Boccassini and Saravay questioned Plaintiff's mental stability after he posted on LinkedIn advocating for veterans' rights. O'Toole ordered his sister's husband to quit his job — just as Donovan threatened to withdraw "**all Port Authority assets and access to the WTC**" unless Plaintiff stayed silent. And O'Toole claimed credit for his sister's career to control her — just as O'Toole uses his positions as Port Authority Chairman and managing partner of O'Toole Scrivo to control the defense of all three defendants in this litigation.

The pattern is identical. The only difference is the target.

Captain O'Toole reported O'Toole's abuse to the New Jersey Attorney General's Office, which "**called me in on two separate occasions to interview me about Kevin O'Toole's actions.**" (E. O'Toole Decl. ¶ 14.)

Captain O'Toole confirms: "**the actions Kevin O'Toole has taken against Mr. Brown — including the use of a Port Authority employee to send threatening text messages, the withdrawal of Port Authority support from a charity event for veterans and 9/11 survivors, and the use of the Cedar Grove Police to stop a process server at Kevin O'Toole's residence — are entirely consistent with what I believe to be the pattern of retaliatory conduct I have personally experienced and witnessed over many years.**" (E. O'Toole Decl. ¶ 43.) She further

states: "**Kevin O'Toole uses whatever institutional power is available to him — whether it is his influence over Cedar Grove officials, the Cedar Grove Police Department, the Port Authority of New York and New Jersey, Essex County Prosecutor's Office or other governmental agencies — to punish anyone who opposes him or falls out of his favor**." (E. O'Toole Decl. ¶¶ 45-46.)

**E. Donovan's Threatening Text Message and the Destruction of the NYC SEAL Swim**

Following McCarter's retention of O'Toole Scrivo, Port Authority employee Patrick Donovan sent Plaintiff a text message stating: "**Please be aware though that you cannot post, send or do anything else negative towards him [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC.**" (First Am. Compl. ¶ 341; Brown Decl. ¶ 40; Exhibit G.)

Following Donovan's threats, the Navy SEAL Foundation terminated its contract with Plaintiff and withdrew from the 2026 NYC SEAL Swim — the charity event Plaintiff founded and led for seven years for Gold Star families, Navy SEALs, veterans, 9/11 survivors, police officers, and firefighters — causing Plaintiff to lose $40,000 in annual income. (First Am. Compl. ¶¶ 352-354; Brown Decl. ¶ 26.) Joe Palermo — a former Port Authority employee, now Senior Director at Amtrak — informed Plaintiff that Donovan told him directly that if Plaintiff was part of the NYC SEAL Swim, the event would not happen, and that Donovan was worried about his own job and was being pressured from Port Authority leadership. (Brown Decl. ¶ 27.)

**F. The FBI Criminal Referral and Port Authority Inspector General Complaint**

On March 30, 2026, Plaintiff submitted a criminal referral to the FBI Newark Field Office requesting investigation of potential violations of 18 U.S.C. §§ 242 (deprivation of rights under color of law), 1512 (obstruction of justice), 241 (conspiracy against rights), 1001 (false statements), and 1519 (tampering with evidence). (Brown Decl. ¶ 33; Exhibit Q.) On the same

11

date, Plaintiff filed a formal complaint with the Port Authority Office of Inspector General requesting investigation of Chairman O'Toole's use of Port Authority resources for personal purposes. (Brown Decl. ¶ 34; Exhibit R.) The Port Authority By-Laws, Art. XI, ¶ 4, provide that the Port Authority "**shall not indemnify and save harmless or pay under this Article XI where the injury or damage resulted from actual fraud, actual malice, willful misconduct or intentional wrongdoing.**"

### G. The Port Authority's Retention of Separate Counsel Confirms the Conflict

The Port Authority retained its own in-house Law Department to represent O'Toole, Donovan, and the agency — separately from O'Toole Scrivo. (Brown Decl. ¶ 32.) The Port Authority's decision to retain separate counsel for O'Toole, rather than allowing O'Toole Scrivo to represent him, is a recognition by the very entity O'Toole chairs that the conflict between O'Toole's personal interests and McCarter's defense is real. If O'Toole's own government agency recognizes the conflict, this Court should as well.

### H. McCarter Engaged with the Disqualification Motion — Then Coordinated the Removal to Evade the Hearing After the Evidence Turned Against It

On March 12, 2026, McCarter filed a letter with the state court requesting that the reinstatement order "b**e entered at the Court's earliest convenience so this matter can proceed**." (Brown Decl. ¶ 11.) On March 17, 2026, at 2:41 PM, O'Toole Scrivo filed a 25-page opposition brief — engaging fully with the state court on the merits. The opposition argued the conflict was "**speculative**," that the motion was "premature," and that McCarter "intends to move to dismiss" the conspiracy claims.

On March 18, 2026, at 6:33 AM — less than sixteen hours after filing its opposition — Plaintiff filed his Reply Brief containing OPRA records that fundamentally altered the landscape of the motion. That same day, at approximately 6:19 PM — twelve hours after Plaintiff's Reply

12

Brief — the Port Authority Defendants filed a Notice of Removal (ECF Doc. 1). McCarter filed its own Notice of Removal (ECF Doc. 2) and a consent letter (ECF Doc. 3) the same day. McCarter's Notice of Removal confirms the coordination: "**Counsel for McCarter & English have confirmed that they consent to this notice of removal and will be filing their own notice of removal.**" (ECF Doc. 1, ¶ 15.)

The Port Authority had until April 1, 2026 — fourteen full days after service — to file a notice of removal under 28 U.S.C. § 1446(b). It chose March 18 — the very day the OPRA records were filed, nine days before the scheduled disqualification hearing, and less than twenty-eight hours after McCarter filed a full opposition brief engaging with the state court on the merits.

McCarter did not remove this case because of federal jurisdiction. McCarter removed this case because the OPRA records proved the conflict was real — and McCarter's counsel could not allow the state court to rule on the disqualification motion with that evidence in the record.

## I. The Cover-Up: Backdated Incident Report, Edited Body-Worn Camera Footage, and Cedar Grove's Obstruction of Plaintiff's Investigation

The process server stop is not the only evidence of the conflict. The evidence produced by the Township of Cedar Grove — and the evidence the Township has withheld — reveals an apparent cover-up that further demonstrates the scope of O'Toole's influence and the reality of the conflict.

### 1. Lt. Rivers Lied on the Official Incident Report

As set forth above, Lt. Rivers recorded on the official Cedar Grove Police Department incident report that the process server was "**refusing to leave the property.**" (Exhibit B at p. 2.) The body-worn camera footage proves this was false — Mr. Lee was in his vehicle on a public road, told the officer he would not trespass, and the officer himself confirmed the encounter was

"a civil thing." Lt. Rivers fabricated the justification for the stop on an official law enforcement document to provide retroactive cover for a police stop that was orchestrated by the Port Authority to obstruct service of process.

### 2. The Incident Report Was Likely Backdated

The incident report bears a "**Date Reported**" of 02/28/26. However, the report contains a critical admission: "**A CAD entry was not made at the time due to me responding directly from the previous call which resulted in this incident report**." (Exhibit B at p. 2.) Lt. Rivers created no contemporaneous record of the encounter. He did not create a CAD entry. He did not identify the process server. He did not run the process server's identification or vehicle registration. He acknowledged the encounter was "a civil thing." Every aspect of Lt. Rivers' conduct on February 28 is consistent with an officer who intended to leave no record of the encounter whatsoever.

On March 6, 2026, Plaintiff filed an OPRA request specifically seeking incident reports, CAD records, and body-worn camera footage. The incident report was produced on March 17, 2026 — eleven days after the OPRA request. The absence of a contemporaneous CAD entry, combined with the fact that the report was produced only after the OPRA request put the Township on notice that the incident was being investigated, raises a substantial question about whether the report was actually written on February 28 or was created after the OPRA request to provide a retroactive official narrative. (Brown Decl. ¶ 18.)

Two law enforcement professionals have independently concluded that the incident report was likely backdated. Captain Eileen O'Toole — a 25-year veteran of the Cedar Grove Police Department with intimate knowledge of the Department's records management systems — has independently flagged the CAD timing discrepancy as suspicious, noting that the case

14

number sequence can be cross-referenced against the CAD log to determine when the case number was actually generated. (ECF Doc. 15 at 1-2.) Sergeant Michael Kraynanski of the Caldwell Police Department has independently reached the same conclusion. (Brown Decl. ¶ 23.)

### 3. The Body-Worn Camera Footage Was Likely Edited

The body-worn camera footage produced by the Township appears to begin mid-encounter. The footage opens with Lt. Rivers already searching for the process server's vehicle: "**No, there's a black SUV. No, that was a girl driving. Yeah, he's right here. Got him**." (Exhibit C at 00:00:02.) Rivers already knows he is looking for a process server in a specific vehicle — information he could only have received from Chief Pumphrey's phone call. But that phone call — the direct evidence of the chain of command from the Port Authority to Chief Pumphrey to Lt. Rivers — is not in the produced footage.

The incident report confirms Rivers received the phone call from Pumphrey while at a crash scene on Reservoir Drive, where Rivers was assisting Ptl. Antonuccio. (Exhibit B at p. 2.) If Rivers' BWC was activated at the crash scene — as standard procedure requires during a crash investigation — the BWC would have recorded the entire phone call from Pumphrey, including the Port Authority's instructions, the vehicle description, and the directive to respond. None of this is in the produced footage. The pre-activation video buffer — typically 30 to 60 seconds of video recorded before audio activation — is also absent.

Captain Eileen O'Toole and Sergeant Michael Kraynanski have both independently concluded that the body-worn camera footage was likely edited before production to remove the phone call from Chief Pumphrey dispatching Lt. Rivers to stop the process server. (Brown Decl. ¶ 23; ECF Doc. 17 at 5-6.) Both have identified the missing phone call and the absent pre-

15

activation buffer as evidence of editing. Sergeant Kraynanski has filed a formal internal affairs complaint with the Cedar Grove Police Department regarding Lt. Rivers' conduct. (Brown Decl. ¶ 23.)

### 4. Cedar Grove Is Stalling

On March 30, 2026, the Township of Cedar Grove responded to Plaintiff's two supplemental OPRA requests — not by producing records, but by demanding that Plaintiff answer three questions that he already answered on March 9, 2026: (1) whether he has been convicted of an indictable offense; (2) whether the records are for a commercial purpose; and (3) whether the records are sought in connection with a legal proceeding. (Brown Decl. ¶ 37; Exhibit K.) The Township stated that "**the response deadlines will not commence until we are in receipt of your answers**" and threatened to treat the requests as "**abandoned**" if Plaintiff did not respond by April 13, 2026. (Brown Decl. ¶ 37; Exhibit K.) Under N.J.S.A. 47:1A-5(i), the seven-business-day response period commences upon receipt of the request — not upon the custodian's satisfaction with the requestor's answers to supplemental questions.

### 5. The Cover-Up Confirms the Conflict Is Real

The lies on the incident report, the likely backdating, the likely editing of the BWC footage, and the stalling of records production are not collateral matters. They are direct evidence that O'Toole orchestrated the police stop of Plaintiff's process server through the Port Authority, and that his influence extends to the Cedar Grove Police Department — the same municipality where O'Toole lives, where O'Toole Scrivo is headquartered, and where Captain O'Toole alleges O'Toole has used officials for personal retaliation for years. A screen that does not prevent the screened partner from orchestrating a police stop of a process server through his governmental agency — and that does not prevent the local police from lying on official reports,

backdating records, editing footage, and stalling records production — is not a screen at all. It is a fiction.

**J. McCarter's Fourteen-Month Pattern of Delay and O'Toole's Structural Control Over All Defendants' Litigation**

McCarter & English LLP has never filed an Answer or any responsive pleading in over fourteen months of litigation. Following the Court's July 11, 2025 Order partially denying McCarter's Motion to Dismiss, McCarter's counsel at O'Toole Scrivo obtained a series of consent orders extending McCarter's time to answer — without ever answering. The case was dismissed for lack of prosecution twice — both times because McCarter failed to file an Answer. (Brown Decl. ¶¶ 4-5.)

O'Toole occupies a unique and irreconcilable position in this litigation. He is simultaneously: (1) the founder and managing partner of O'Toole Scrivo, LLC — the law firm representing Defendant McCarter, controlling McCarter's defense strategy, discovery responses, and settlement posture; (2) a named co-defendant on seven counts, facing compensatory and punitive damages in his individual capacity; and (3) the Chairman of the Board of Commissioners of the Port Authority of New York and New Jersey — the governmental agency that provides defense counsel for the Port Authority Defendants (including O'Toole himself) through its in-house Law Department. (See Port Authority By-Laws, Art. III, § F.) Notably, the Port Authority's Inspector General — the very office to which Plaintiff filed a complaint regarding O'Toole's conduct — operates "**under the general direction of the Chairman and the Executive Director.**" (Port Authority By-Laws, Art. III, § J.) O'Toole thus has supervisory authority over the office now charged with investigating him.

17

O'Toole thus retains influence over both sides of the defense. His law firm controls McCarter's defense. The agency he chairs provides counsel for the Port Authority Defendants. Disqualification of O'Toole Scrivo would sever O'Toole's direct control over McCarter's defense — forcing McCarter to retain independent counsel who would owe undivided loyalty to McCarter, not to O'Toole's personal interests. Independent counsel for McCarter might conclude that McCarter's strongest defense to the post-termination retaliation claims is to blame O'Toole — a defense O'Toole Scrivo will never advance because it would expose its own managing partner.

### IV. LEGAL STANDARD

In the District of New Jersey, issues regarding professional ethics are governed by L. Civ. R. 103.1(a), which provides that the Rules of Professional Conduct of the American Bar Association, as revised by the New Jersey Supreme Court, govern the conduct of members of the bar admitted to practice in this District. Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB, 944 F. Supp. 341, 344-45 (D.N.J. 1996).

"**The district court's power to disqualify an attorney derives from its inherent authority to supervise the professional conduct of attorneys appearing before it**." United States v. Miller, 624 F.2d 1198, 1201 (3d Cir. 1980), cited in Harish v. Arbit, No. 2:21-cv-11088-EP-AME, slip op. at 9 (D.N.J. Jan. 31, 2025). "**As a general rule, the exercise of this authority is committed to the sound discretion of the district court**." Miller, 624 F.2d at 1201.

Courts disfavor motions to disqualify because they are "**drastic measure[s] which courts should hesitate to impose except when absolutely necessary**." Carlyle Towers, 944 F. Supp. at 345. The party seeking disqualification must carry a "**heavy burden**" and must meet a

"**high standard of proof**." Alexander v. Primerica Holdings, Inc., 822 F. Supp. 1099, 1114 (D.N.J. 1993). However, "**although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a 'heavy burden**.'" Maldonado v. New Jersey, 225 F.R.D. 120, 136-37 (D.N.J. 2004).

When presented with a motion to disqualify counsel, the Court must balance the deference owed to a party's choice of counsel against the need to maintain high professional standards. Harish, slip op. at 9 (citing City of Atl. City v. Trupos, 201 N.J. 447, 462 (2010)). "**Disqualification questions are intensely fact-specific, and it is essential to approach such problems with a keen sense of practicality as well as a precise picture of the underlying facts**." Carlyle Towers, 944 F. Supp. at 345. Where the conflict is real, current, and non-speculative, disqualification is required. Harish, slip op. at 30-31.

The Third Circuit has held that where a law firm partner's conflict creates a "**serious potential for conflict**," the entire firm must be disqualified. United States v. Self, 681 F.3d 190, 196 (3d Cir. 2012). In Self, the Third Circuit affirmed disqualification even after the conflicted partner withdrew, holding that "**no workable 'Chinese Wall' could be erected**" in a small firm. Id.

The Third Circuit has further held that a court must consider counsel's conduct — including procedural maneuvers — when evaluating conflicts of interest. Century Indemnity Co. v. Congoleum Corp., 426 F.3d 675, 695 (3d Cir. 2005) ("**it was not a proper exercise of the bankruptcy court's discretion to fail to consider and appraise the conduct of the parties and counsel pre-petition**"). A court "**needs to be fully informed about the circumstances surrounding the [pre-litigation] negotiations in order to determine whether the process has**

19

been tainted by conflicts of interest or self-interested actions by the participants." Id. at 694 n.19.

RPC 1.7(a) provides that a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict exists if: **"(1) the representation of one client will be directly adverse to another client; or (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer**." N.J. R. Prof'l Conduct 1.7(a). RPC 1.7 embodies "**the fundamental understanding that an attorney will give 'complete and undivided loyalty to the client'** [and] '**should be able to advise the client in such a way as to protect the client's interests**.'" State ex rel. S.G., 175 N.J. 132, 139 (2003), cited in Nobrega v. Troy-Bilt, LLC, No. 2:22-cv-04204, slip op. at 8 (D.N.J. Dec. 18, 2023); Stahlberg v. Walter R. Earle Transit, LLC, No. A-2373-23, slip op. at 12 (N.J. App. Div. Oct. 2, 2024).

Under RPC 1.10(a), "**while lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so**." RPC 1.10(a) contains an exception: a lawyer's conflict is not imputed if "**the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.**" As demonstrated below, this exception does not apply here.

Where a court finds that counsel has violated the RPCs, the court has authority to refer the matter to the Office of Attorney Ethics for investigation. In re Simon, 206 N.J. 306, 323-24 (2011) (trial judge referred matter to OAE after disqualifying attorney for RPC 1.7 violation; Supreme Court imposed reprimand).

20

## V. ARGUMENT

### A. Plaintiff Has Standing to Move for Disqualification

As a threshold matter, Plaintiff has standing to bring this motion. This Court has held that "**[a]dversaries, as well as former clients, may raise conflict of interest concerns**." Infosphere Consulting, Inc. v. Habibi Life, LLC, No. 2:19-cv-15577, 2020 WL 4559138, at *3 (D.N.J. Aug. 7, 2020).

Magistrate Judge Espinosa confirmed this principle in Harish v. Arbit, holding that "**adversaries do not lack standing to bring motions to disqualify**" and that "**[c]onflicts of interest raised by adversaries may also be especially appropriate in situations where it is unlikely that any of the parties other than the adversaries would raise the issue.**" Harish, slip op. at 12. Moreover, the Court has "**an obligation to protect the professional integrity and ethics of the attorneys who practice before it.**" Id. (citing In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984)).

Here, Plaintiff is the adversary most directly harmed by O'Toole Scrivo's conflicted representation. It is unlikely that McCarter — whose defense is being controlled by O'Toole through O'Toole Scrivo — would raise the conflict itself.

### B. O'Toole Scrivo Has an Irreconcilable Concurrent Conflict of Interest Under RPC 1.7(a)(2)

21

There is a "**significant risk**" that O'Toole Scrivo's representation of McCarter is "**materially limited**" by the "**personal interest**" of Kevin J. O'Toole. N.J. R. Prof'l Conduct 1.7(a)(2). The evidence establishes nine independent bases for this conclusion:

**First,** O'Toole faces personal liability on seven counts, including 42 U.S.C. § 1983 First Amendment retaliation (Count XII), conspiracy to violate civil rights (Count XIII), the New Jersey Civil Rights Act (Count XIV), tortious interference with contract (Count XV), tortious interference with prospective economic advantage (Count XVI), intentional infliction of emotional distress (Count XVII), and civil conspiracy (Count XVIII). He faces compensatory and punitive damages.

**Second**, McCarter's optimal defense requires blaming O'Toole. McCarter's strongest defense to the post-termination retaliation claims (Counts XII-XVIII) is to argue that the Port Authority's retaliatory conduct was O'Toole's independent action, not directed or coordinated by McCarter. But O'Toole Scrivo cannot advance this defense because it would expose its own managing partner to greater personal liability. As the Appellate Division held in <u>Stahlberg</u>, "**a lawyer representing [both] will have to make strategic determinations on how to present a defense and that will involve conflicts.**" <u>Stahlberg</u>, slip op. at 15. The Appellate Division affirmed disqualification where co-defendants' defense theories were in direct opposition. <u>Id</u>. at 14-15.

The opposition argued in state court that "**all parties are fully aligned**." This purported alignment is itself evidence of the conflict. The parties appear aligned because O'Toole's personal interests are driving the defense strategy. As Magistrate Judge Espinosa held in <u>Harish</u>, where a third party's interests dominated defense counsel's representation, the conflict was "**real, current, and non-speculative.**" <u>Harish</u>, slip op. at 30.

22

**Third**, O'Toole's son works at McCarter under the Equity Partner whom Plaintiff complained about four days before his termination.

**Fourth**, O'Toole Scrivo derives income from the McCarter representation, creating a financial interest in maintaining the attorney-client relationship.

**Fifth**, the Amended Complaint alleges O'Toole directed the retaliation to protect McCarter. If true, O'Toole Scrivo was not merely counsel — it was an instrumentality of the alleged conspiracy.

**Sixth**, the OPRA records prove the conflict is not speculative. The incident report confirms the Port Authority called the Cedar Grove Police Chief to stop Plaintiff's process server — eleven days after the ethical screen was implemented. DelConte v. Monroe Twp. Bd. of Educ., No. 1:19-cv-13731, 2020 WL 6119859, at 4 (D.N.J. Oct. 16, 2020) (denying disqualification where conflict was "**based on conjecture**"); Est. of Beczo v. Port Lumber Corp., No. 3:23-cv-01338, 2024 WL 1743061, at 10 (D.N.J. Apr. 23, 2024) (denying disqualification where interests were "**speculative**"). Here, the conflict is proven, not speculative.

**Seventh**, Captain Eileen O'Toole's Declaration confirms the pattern of using governmental power for personal retaliation.

**Eighth**, the Port Authority retained separate counsel for O'Toole — a tacit acknowledgment that the conflict is real.

**Ninth**, O'Toole is now the subject of an FBI Criminal Referral and a Port Authority Inspector General complaint. O'Toole Scrivo cannot provide McCarter with undivided loyalty when its managing partner faces potential criminal exposure in the very case the firm is defending. Harish, slip op. at 9 (quoting State ex rel. S.G., 175 N.J. at 139).

23

## C. The Conflict Is Non-Waivable Under RPC 1.7(b)

This conflict cannot be cured by informed consent under RPC 1.7(b). Moreover, RPC 1.7(b)(3) prohibits waiver where the representation "**involves the assertion of a claim by one client against another client represented by the lawyer in the same litigation**." As the Appellate Division held in <u>Stahlberg</u>, "**when [jointly represented parties'] interests become adverse, counsel is required to completely withdraw from the representation of each client**." <u>Stahlberg,</u> slip op. at 12.

Joint representation is permissible "**only if 'there is a substantial identity of interests between them in terms of defending the claims that have been brought against all defendants.'**" <u>O Builders & Assocs., Inc. v. Yuna Corp. of NJ</u>, 206 N.J. 109, 129 (2011). No such substantial identity exists here.

The Appellate Division recently confirmed in <u>Allstate New Jersey Insurance Co. v. Carteret Comprehensive Medical Care, PC,</u> No. A-1575-23 (N.J. App. Div. Jan. 9, 2025), that where co-defendants face joint liability and their interests in apportioning fault diverge, there is a "**significant risk**" of conflicts under RPC 1.7(a)(2), and the firm must withdraw absent written informed consents. In <u>Halligan v. O'Connor</u>, No. A-0819-17T1 (N.J. App. Div. Oct. 5, 2018), the Appellate Division affirmed disqualification for an "**actual and unwaivable conflict of interest**" between co-parties with directly adverse interests.

## D. The Ethical Screen Has Demonstrably Failed and Cannot Prevent Imputation Under RPC 1.10

O'Toole Scrivo claims to have implemented an ethical screen on February 17, 2026 — one day after Plaintiff filed the Amended Complaint naming O'Toole as a defendant. (DiGiulio Cert. ¶ 2.) The screen was reactive, not proactive — implemented a full year after O'Toole

24

Scrivo began representing McCarter and six months after the conflict was publicly identified on LinkedIn. (Brown Decl. ¶¶ 39-41.)

### 1. The Screen Has Demonstrably Failed

Eleven days after the screen was implemented, O'Toole orchestrated a police stop of Plaintiff's process server through the Port Authority. A screen that does not prevent the screened partner from using his governmental agency to call local police to obstruct service of process — and that does not prevent the responding officer from lying on the official incident report and instructing the process server to lie on a sworn legal document — is not a screen at all.

As Magistrate Judge Espinosa held in <u>Harish</u>, where a third party's interests dominated defense counsel's representation, the conflict was not cured by consent agreements because the third party was "**directing, regulating, and interfering with Defense Counsel's professional judgment.**" <u>Harish</u>, slip op. at 26.

### 2. The Personal Interest Exception Under RPC 1.10(a) Does Not Apply

O'Toole Scrivo may argue that O'Toole's conflict is a "**personal interest**" not imputed to the firm under RPC 1.10(a). The Appellate Division recently addressed this exception in <u>Mauer v. State of New Jersey,</u> No. A-0108-24 (N.J. App. Div. Mar. 28, 2025), affirming the denial of a disqualification motion where a partner's indictment was for conduct entirely unrelated to the underlying litigation. The <u>Mauer</u> court held that even assuming a personal interest conflict existed, it would not be imputed because the plaintiff "**made no such showing**" that the personal interest "**present[ed] a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm**." <u>Mauer</u>, slip op. at 18-19.

<u>Mauer</u> is distinguishable in every material respect. In <u>Mauer</u>, the indicted partner's criminal conduct was entirely unrelated to the plaintiff's claims; the partner performed no

25

substantive work on the case; and the plaintiff failed to make any showing of material limitation. Here, by contrast: (a) O'Toole is a named co-defendant on seven counts in the very case his firm is defending; (b) O'Toole orchestrated a police stop of Plaintiff's process server through his governmental agency eleven days after the screen was implemented; (c) O'Toole's son works at McCarter under the partner whose discriminatory conduct triggered the complaint that preceded Plaintiff's termination; (d) O'Toole derives substantial income from the McCarter representation; (e) O'Toole controls the Port Authority's defense through his chairmanship; and (f) the OPRA records, BWC footage, and Captain O'Toole's Declaration prove the screen failed.

### 3. No Screen Can Cure This Conflict

O'Toole's conflict does not operate through case files or internal communications — it operates through the governmental power of the Port Authority, through threatening text messages from Port Authority employees, through phone calls from the Port Authority to local police chiefs, through a police officer who lied on an official incident report and instructed a process server to lie on a sworn legal document, and through the personal and financial interests that O'Toole has in protecting McCarter because his son is employed there. No written procedure can screen O'Toole from his own agency. No ethical wall can prevent the Chairman of the Port Authority from using the Port Authority's resources and relationships to interfere with litigation.

The Third Circuit's holding in Self is directly on point: where a law firm partner's conflict creates a "**serious potential for conflict**," the entire firm must be disqualified, and "**no workable 'Chinese Wall' could be erected**" in a small firm. Self, 681 F.3d at 196.

In State v. Daishon I. Smith, No. A-0291-23 (N.J. App. Div. Feb. 21, 2024), the Appellate Division held that screening can prevent imputation only when the conflicted

26

individual is "**completely screened from and has no oversight of the matter**." <u>Smith,</u> slip op. at 2. O'Toole cannot be "**completely screened**" from a case in which he is a named defendant, in which he orchestrated a police stop of the process server through his governmental agency, and in which his personal financial interests are driving the defense strategy.

**E. The Coordinated Removal Is Independent Evidence of the Conflict**

The Third Circuit has held that a court must consider counsel's litigation conduct when evaluating conflicts of interest. <u>Century Indemnity Co. v. Congoleum Corp</u>., 426 F.3d 675, 695 (3d Cir. 2005) ("**it was not a proper exercise of the bankruptcy court's discretion to fail to consider and appraise the conduct of the parties and counsel pre-petition**").

The coordinated removal is evidence of the conflict on three independent grounds.

**First**, the removal demonstrates O'Toole's structural control over all defendants' litigation. The Port Authority — chaired by O'Toole — filed the removal. McCarter consented and filed its own removal the same day. McCarter had no independent reason to remove. It had been litigating in state court for fourteen months, had just filed a 25-page opposition brief, and had requested the state court to reinstate the case six days earlier. The only party who benefited from the removal was O'Toole — whose firm would have been disqualified at the March 27 hearing.

**Second**, the removal demonstrates that O'Toole's personal interests are driving McCarter's defense. As the Appellate Division held in <u>Camden Iron & Metal, Inc. v. Klehr, Harrison, Harvey, Branzberg & Ellers, LLP</u>, 384 N.J. Super. 172, 180 (App. Div. 2006), courts will scrutinize procedural tactics that appear designed to gain an unfair strategic advantage in a

27

disqualification dispute, finding "**fundamental unfairness**" in forum manipulation. Here, defense counsel changed the forum to evade the disqualification hearing.

**Third**, the removal demonstrates the screen has failed. The New Jersey Supreme Court has held that courts must examine the "**timing**" and "**strategic purpose**" behind procedural actions. State v. Dalal, 221 N.J. 601, 609-10 (2015). The timing here is dispositive: the removal was filed twelve hours after the OPRA records were filed, nine days before the scheduled hearing, and less than twenty-eight hours after McCarter filed a full opposition brief engaging with the state court.

The Appellate Division recently confirmed that strategic conduct and collaboration can be imputed to a law firm and serve as the basis for disqualification. In re Talc Based Powder Prods. Litig., No. A-0215-24, slip op. at 26-27 (N.J. App. Div. Feb. 6, 2026). Here, O'Toole Scrivo ratified O'Toole's conflicted conduct by coordinating with the Port Authority to remove the case to evade the disqualification hearing.

**F. The Opposition's Own Case Law Supports Disqualification Here**

In the state court proceedings, the opposition relied on DelConte, Est. of Beczo, and Richardson v. DeFazio for the proposition that the conflict was "**speculative**." Each is distinguishable because the alleged conflict was based entirely on conjecture. Here, the conflict is documented in a police incident report containing a false justification written by the responding officer, corroborated by body-worn camera footage that was likely edited, confirmed by the process server's own video recordings, independently verified by Captain O'Toole's sworn Declaration, and now the subject of an FBI Criminal Referral and an Inspector General complaint.

The cases that support disqualification are directly on point. In Harish, Magistrate Judge Espinosa granted disqualification where the conflict was "**real, current, and non-speculative**."

28

<u>Harish</u>, slip op. at 30. In <u>Stahlberg</u>, the Appellate Division affirmed disqualification where co-defendants' defense theories were in direct opposition. <u>Stahlberg</u>, slip op. at 14-15. In <u>Halligan</u>, the Appellate Division affirmed disqualification for an "**actual and unwaivable conflict**." <u>Halligan</u>, slip op. at 12. In <u>Wilkes v. Passaic Cnty.</u>, No. 12-6498, 2016 WL 852602, at *2 (D.N.J. Mar. 4, 2016), the court granted disqualification where there were "**plain and interwoven conflicts.**"

**G. The Robin King Certification Is Contradicted by Multiple Independent Sources**

The opposition's centerpiece in the state court proceedings was a certification from Robin King, CEO of the Navy SEAL Foundation, stating the Foundation's decision was "**not influenced by or at all the result of any pressure, request, or interaction with the Port Authority.**" (King Cert. ¶¶ 10-12.) This certification is contradicted by: (1) Donovan's own text message threatening to withdraw Port Authority support; (2) the Navy SEAL Foundation's own Athletic Director, Geoff Leard, privately coordinating with Donovan; (3) Leard informing Plaintiff that Donovan told him the Port Authority would not support the swim if Plaintiff participated; (4) Joe Palermo's statement that Donovan told him the event would not happen if Plaintiff was involved and that Donovan was "**being pressured from Port Authority leadership**"; (5) Plaintiff's October 1, 2025 email to Ms. King — which Ms. King did not dispute — stating Leard "**participated in meetings with Pat Donovan from that Port Authority where he knew in advance the intent was to exclude me**"; and (6) the OPRA records confirming the Port Authority was willing to call local police to interfere with this litigation. (Brown Decl. ¶¶ 16-22.)

**H. This Motion Is Timely and Is Not a Litigation Tactic**

The New Jersey Supreme Court has held that "**waiver is an insufficient basis**" for denying a disqualification motion "**in the absence of extraordinary circumstances**." <u>Twenty-</u>

29

First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264, 278 n.6 (2012). There are no extraordinary circumstances here.

Plaintiff filed the original Motion to Disqualify in state court within fourteen days of filing the Amended Complaint naming O'Toole as a defendant. The coordinated removal eliminated the state court hearing. Plaintiff filed pre-motion letters with this Court (ECF Docs. 14, 15, 16, and 17) within days of gaining access to CM/ECF. This motion is filed at the earliest practicable opportunity.

The Appellate Division confirmed in In re Estate of Krivulka, Nos. A-0863-20, A-0803-21 (N.J. App. Div. Aug. 26, 2022), that delay is justified when "**crucial evidence**" demonstrating the full scope of the conflict was not known to the movant until shortly before the motion was filed. Krivulka, slip op. at 40. Here, the full scope of the conflict was not confirmed until the OPRA records were produced on March 17, 2026.

Even under the five-factor test from Alexander v. Primerica Holdings, Inc., 822 F. Supp. 1099, 1115 (D.N.J. 1993) — which the New Jersey Supreme Court has expressly disapproved, Twenty-First Century Rail, 210 N.J. at 278 n.6 — all five factors favor Plaintiff: (1) the delay was fourteen days from the Amended Complaint to the state court motion; (2) the full scope of the conflict was not known until March 17, 2026; (3) Plaintiff is pro se; (4) the delay occurred because the coordinated removal eliminated the state court hearing; and (5) McCarter has never filed an Answer in fourteen months — there is no prejudice from requiring new counsel.

The court has an independent obligation to protect the integrity of the proceedings regardless of timeliness. In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984).

**I. The Opposition's "Prematurity" Argument Is Untenable**

Even if the conspiracy claims were dismissed, O'Toole remains a co-defendant on multiple independent counts. The conflict does not disappear with a partial dismissal. Moreover, the OPRA records confirm conduct that cannot be undismissed — the Port Authority called the Cedar Grove Police to stop a Black American process server on a public road in this very case, the responding officer lied on the official incident report about the justification for the stop, and the officer instructed the process server to lie on a sworn legal document.

As the Appellate Division held in <u>Stahlberg</u>, once a conflict develops, "**an attorney must withdraw from the representation of both parties**." <u>Stahlberg</u>, slip op. at 12. The conflict here has already materialized — in text messages, in police reports containing false statements, in body-worn camera footage that was likely edited, in video recordings, in a terminated contract, in a $40,000 annual income loss, in a likely backdated incident report, and in a coordinated removal designed to evade judicial scrutiny. There is nothing premature about this motion.

### VI. CONCLUSION AND REQUEST FOR REFERRAL

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1. Disqualify O'Toole Scrivo, LLC from representing Defendant McCarter & English LLP in this action;

2. Direct McCarter to retain new counsel and file a notice of appearance of substituted counsel within a time period to be set by the Court;

3. Toll all deadlines applicable to Defendant McCarter & English LLP for a reasonable period to permit retention of new counsel; and

4. Refer O'Toole Scrivo, LLC to the Office of Attorney Ethics for investigation of its continued representation of McCarter & English LLP in violation of RPC 1.7 and RPC 1.10.

The New Jersey Supreme Court has held that an attorney's violation of the RPCs "**may jeopardize that attorney's right to collect fees for services rendered.**" In re Simon, 206 N.J. 306, 328 (2011). In In re Simon, the trial judge referred the matter to the Office of Attorney Ethics after disqualifying the attorney for an RPC 1.7 violation, and the Supreme Court ultimately imposed a reprimand. Id. at 323-24, 330. Here, O'Toole Scrivo's continued representation of McCarter — despite a documented, multi-layered conflict of interest that has resulted in the Port Authority orchestrating a police stop of a Black American process server on a public road based on a false report, a responding officer lying on the official incident report and instructing the process server to lie on a sworn legal document, the likely backdating of the incident report and editing of body-worn camera footage, a coordinated removal to evade a disqualification hearing, and a fourteen-month pattern of delay — warrants referral to the OAE for investigation.

Dated: Newark, New Jersey
March 31, 2026

> Respectfully submitted,
> William (SEAL) Brown Jr., Esq.
> Plaintiff Pro Se
> 134 Main Street
> South Bound Brook, New Jersey 08880
> (862) 415-4880
> william.brown@parlatorelawgroup.com

32