# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

WILLIAM BROWN JR.,

                    Plaintiff,

      v.

MCCARTER & ENGLISH, LLP; THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; KEVIN J. O'TOOLE (in his personal and professional capacities); PATRICK DONOVAN (in his personal and professional capacities); JOHN DOES 1-10 (fictitious individuals or entities who have liability to Plaintiff for any of the causes of action contained herein),

                    Defendants.

Civil Action No.
2:26-cv-02808-JXN-AME

## BRIEF IN SUPPORT OF DEFENDANT KEVIN J. O'TOOLE'S MOTION TO DISMISS COUNTS XII THROUGH XVIII OF <u>THE FIRST AMENDED COMPLAINT</u>

Thomas R. Calcagni
Walter R. Krzastek
Luke J. O'Brien
**CALCAGNI & KANEFSKY LLP**
1085 Raymond Blvd., 18th Floor
Newark, New Jersey 07102
(862) 397-1796
tcalcagni@ck-litigation.com

*Attorneys for Defendant Kevin J. O'Toole*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT ......................................................................................... 1

SUMMARY OF RELEVANT ALLEGATIONS AND FACTS OF PUBLIC RECORD ............. 3

    A.  Background ............................................................................................... 3

    B.  Plaintiff's Amended Complaint ................................................................. 4

    C.  Factual Allegations Against Chairman O'Toole ....................................... 4

ARGUMENT .................................................................................................................. 7

    I.  PLAINTIFF'S CONCLUSORY ALLEGATIONS FAIL TO STATE A CLAIM AGAINST CHAIRMAN O'TOOLE ................................................................. 7

    II.  PLAINTIFF'S 42 U.S.C. § 1983 AND NEW JERSEY CIVIL RIGHTS ACT CLAIMS AGAINST CHAIRMAN O'TOOLE FAIL AS A MATTER OF LAW .............................. 9

    A.  Chairman O'Toole Is Entitled to Qualified Immunity for Plaintiff's § 1983 and New Jersey Civil Rights Act Claims ........................................................... 9

    B.  Plaintiff Fails to Plead a Plausible 42 U.S.C. § 1983 or New Jersey Civil Rights Act Claim Against Chairman O'Toole ..................................................... 14

    III.  PLAINTIFF'S 42 U.S.C. § 1983 CONSPIRACY CLAIMS AGAINST CHAIRMAN O'TOOLE FAIL AS A MATTER OF LAW ....................................................... 17

    A.  Chairman O'Toole is Entitled to Qualified Immunity for Plaintiff's § 1983 Conspiracy Claim ................................................................................. 18

    B.  Plaintiff Does Not Plausibly Allege a Predicate Constitutional Violation .......... 18

    C.  Plaintiff Does Not Plausibly Allege a Conspiratorial Agreement ..................... 19

    IV.  PLAINTIFF'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIMS AGAINST CHAIRMAN O'TOOL FAIL AS A MATTER OF LAW ................................................ 20

    A.  Plaintiff Fails to Plausibly Allege Chairman O'Toole Knew About His Alleged Contract with the NSF and Thus Necessarily Fails to Allege Any Intentional Interference with That Contract or Relationship ............................................. 21

    B.  Plaintiff Has Not Alleged Any Breach of His Contract with the NSF, As Opposed to the NSF Validly Exercising Contractual Termination Rights ......................... 22

    C.  Plaintiff Fails to Plausibly Allege That Chairman O'Toole Acted with "Malice" ........... 24

V. PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM AGAINST CHAIRMAN O'TOOLE FAILS AS A MATTER OF LAW ........................... 24

A. Plaintiff Has Not Alleged That Chairman O'Toole "Intentionally or Recklessly" Caused Him Emotional Distress ...................................................................................... 25

B. Plaintiff Has Not Alleged "Extreme and Outrageous" Conduct ......................................... 26

C. Plaintiff Has Not Alleged the Requisite "Severe" Emotional Distress .............................. 28

VI. PLAINTIFF'S CIVIL CONSPIRACY CLAIM AGAINST CHAIRMAN O'TOOLE FAILS AS A MATTER OF LAW ...................................................................................... 29

A. Plaintiff Has Not Plausibly Alleged Any Underlying Tort .................................................. 29

B. Plaintiff Has Not Plausibly Alleged a Conspiratorial Agreement....................................... 30

CONCLUSION.................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Aruanno v. Allen*, 2011 WL 2161351 (D.N.J. May 31, 2011)..................................................... 7, 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .............................................................................. passim

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963)...................................................... 12

*Baron v. Port Auth. of N.Y. & N.J.*, 977 F. Supp. 646 (S.D.N.Y. 1997) ...................................... 9

*Bell Atl. v. Twombly,* 550 U.S. 544 (2007) ................................................................ 7

*Bernard v. Webb-McRae,* 2025 WL 2395142
    (N.J. Super. Ct. App. Div. Aug. 19, 2025)............................................................... 14

*Bishop v. Okidata, Inc.*, 864 F. Supp. 416 (D.N.J. 1994) ................................................ 26

*Borbely v. Nationwide Mut. Ins.*, 547 F. Supp. 959 (D.N.J. 1981)........................................ 23, 24

*Borecki v. E. Int'l Mgmt. Corp.*, 694 F. Supp. 47 (D.N.J. 1988)...................................... 28

*Brown v. State*, 230 N.J. 84 (2017) .................................................................. 10

*Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355 (1988) ...................................... 25, 26, 28, 29

*Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180 (3d Cir. 2009)........................................ 18

*Chicarelli v. Plymouth Garden Apartments*, 551 F. Supp. 532 (E.D. Pa. 1982) .......................... 19

*Clayton v. City of Atlantic City,* 722 F. Supp. 2d 581 (D.N.J. 2010)........................................ 14

*Cox v. Keystone Carbon Co.*, 861 F.2d 390 (3d Cir. 1988)............................................ 28

*Crabtree v. Muchmore*, 904 F.2d 1475 (10th Cir. 1990)............................................ 18

*Curley v. Monmouth Cty. Bd. of Chosen Freeholders*,
    816 F. App'x 670 (3d Cir. 2020)........................................................................ 17

*Cuvo v. DeBiasi*, 169 F. App'x 688 (3d Cir. 2006) ................................................ 10

*D'Agostino v. Gesher LLC*, 2014 WL 7475209 (N.J. Super. Ct. App. Div. Jan. 7, 2015)........... 23

*Dill v. Yellin*, 725 F. Supp. 3d 471 (D.N.J. 2024)....................................................... 29

*Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460 (D.N.J. 1998)........................................ 29

*Fregara v. Jet Aviation Business Jets*, 764 F. Supp. 940 (D.N.J. 1991)..................................... 26

*Galicki v. New Jersey*, 2015 WL 3970297 (D.N.J. June 29, 2015) ............................................. 30

*Granillo v. FCA US LLC*, 2016 WL 9405772 (D.N.J. Aug. 29, 2016) ..................................... 9, 15

*Harley v. City of New Jersey City,* 2017 WL 2779466 (D.N.J. June 27, 2017) .......................... 30

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ................................................................................. 9

*Hauptmann v. Wilentz*, 570 F. Supp. 351 (D.N.J. 1983) ........................................................... 19

*Hotaling & Co. v. Berry Sols. Inc.*, 2022 WL 4550145 (D.N.J. Sept. 29, 2022).................... 23, 24

*Hunter v. Bryant*, 502 U.S. 224 (1991)..................................................................................... 10

*Ingraham v. Ortho-McNeil Pharm.*, 422 N.J. Super. 12 (App. Div. 2011) ............................ 26, 27

*Ippolito v. Aherne*, 2015 WL 6447153 (E.D. Pa. Oct. 26, 2015).............................................. 18

*Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113 (D.N.J. 2017)....................................... 10

*Jutrowski v. Twp. of Riverdale*, 904 F.3d 280 (3d Cir. 2018)................................................... 19

*Kennedy v. Am. Airlines*, 195 F. Supp. 3d 646 (D.N.J. 2016) ................................................... 29

*Kentucky v. Graham,* 473 U.S. 159 (1985)............................................................................... 10

*Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296 (D.N.J. 2021) ............................ 18

*loanDepot.com v. CrossCountry Mortg.*, 399 F. Supp. 3d 226 (D.N.J. 2019) ........................... 23

*Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*,
    729 F. Supp. 1035 (D.N.J. 1990) ....................................................................................... 21

*Matrix Essentials v. Cosmetic Gallery, Inc.*, 870 F. Supp. 1237 (D.N.J. 1994)..................... 22, 23

*McClain v. United States*, 2021 WL 2224270 (D.N.J. June 2, 2021)......................................... 30

*McLaughlin v. Watson*, 271 F.3d 566 (3d Cir. 2001) ............................................... 11, 12, 13, 14

*MedWell, LLC v. Cigna Corp.*, 2023 WL 4045089 (D.N.J. June 16, 2023)........................... 20, 23

*Melton v. Novak*, 2025 WL 1288574 (N.J. Super. Ct. App. Div. May 5, 2025)......................... 22

*Mesadieu v. City of Elizabeth*, 2019 WL 4926884 (D.N.J. Oct. 4, 2019) .................................. 19

*Mirabella v. Villard*, 853 F.3d 641 (3d Cir. 2017) .................................................................. 16

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................................. 10

*Murphy v. Middlesex Cty.*, 361 F. Supp. 3d 376 (D.N.J. 2019)................................................. 19

*Nat'l Auto Div. v. Collector's All.*, 2017 WL 410241
(N.J. Super. Ct. App. Div. Jan. 31, 2017) ................................................. 24

*Ne. Women's Ctr., Inc. v. McMonagle*, 670 F. Supp. 1300 (E.D. Pa. 1987) ................................. 13

*Neals v. Cortes,* 2022 WL 980685 (D.N.J. Mar. 31, 2022) ....................................... 18, 20

*Nostrame v. Santiago*, 213 N.J. 109 (2013) ............................................................. 23, 24

*Pearson v. Callahan*, 555 U.S. 223 (2009) .................................................................. 9, 11

*Pollard v. Paterson Bd. of Educ.*, 1992 WL 97971 (D.N.J. May 4, 1992) .............................. 26, 28

*Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J.*,
2017 WL 4403310 (S.D.N.Y. 2017) ..................................................................... 10

*R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir. 1984) .............................. 12, 14

*Reichle v. Howards,* 566 U.S. 658 (2012) .................................................................. 10, 11

*Rink v. Ne. Educ. Intermediate Unit 19,* 717 F. App'x 126 (3d Cir. 2017) .................................. 18

*Robertson v. Sichel,* 127 U.S. 507 (1888) .................................................................. 16

*Rode v. Dellarciprete*, 845 F.2d 1195 (3d Cir. 1988) .................................................... 15

*Shaw by Strain v. Strackhouse*, 920 F.2d 1135 (3d Cir. 1990) ....................................... 15

*Siegert v. Gilley*, 500 U.S. 226 (1991) .................................................................. 10

*Smith v. School Dist. of Phila.*, 112 F. Supp. 2d 417 (E.D. Pa. 2000) ........................................ 13

*Stokes v. City of Phila.*, 2023 WL 362006 (E.D. Pa. 2023) .......................................... 18

*Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246 (E.D. Pa. 2020) .............................. 6

*Suarez Corp. v. McGraw*, 202 F.3d 676 (4th Cir. 2000) .............................................. 13

*Taylor v. Metzger*, 152 N.J. 490 (1998) .................................................................. 28

*Velop, Inc. v. Kaplan*, 693 A.2d 917 (N.J. Super. Ct. App. Div. 1997) ...................................... 20

*Werner v. Werner*, 267 F.3d 288 (3d Cir. 2001) .......................................................... 17

*X–Men Sec., Inc. v. Pataki*, 196 F.3d 56 (2d Cir. 1999) .............................................. 13

*Zaloga v. Borough of Moosic*, 841 F.3d 170 (3d Cir. 2016) .............................. passim

**<u>Statutes</u>**

42 U.S.C. § 1983 .................................................................................................... passim

New Jersey Civil Rights Act ................................................................................... passim

**<u>Other Authorities</u>**

New Jersey's *Model Civil Jury Charges* ................................................................ 22, 23

*Restatement (Second) of Torts* .............................................................................. passim

Defendant Kevin J. O'Toole ("Chairman O'Toole") respectfully submits this brief in support of his motion to dismiss all claims against him in the First Amended Complaint ("FAC").

## PRELIMINARY STATEMENT

As it relates to Chairman O'Toole, the FAC is no more than a fictional narrative concocted by Plaintiff William Brown, Jr. ("Plaintiff") as part of his ill-intentioned effort to salvage his failing lawsuit by disrupting the O'Toole Scrivo law firm's representation of Defendant McCarter & English LLP ("McCarter"). It is a frivolous and bad faith filing full of contrived conspiracy theories devoid of any factual basis. Were there any question about Plaintiff's malintent in recasting his feeble complaint to include Chairman O'Toole, the Court need look no further than Plaintiff's incessant filings, including his predictable motion to disqualify O'Toole Scrivo, LLC, which gratuitously litter the public docket with irrelevant matters and baseless accusations serving only to harass Chairman O'Toole and smear his good character. Plaintiff has even threatened criminal referrals against Chairman O'Toole in plain violation of RPC 3.4(g).

None of these dishonorable tactics, however, change the fact that Chairman O'Toole does not belong in this case, which started in December 2024 as a garden variety employment discrimination lawsuit between Plaintiff and his former employer, McCarter. After litigating the matter for over a year and losing the majority of his claims, Plaintiff, unwilling to accept the reality of his woefully-deficient allegations, discharged his legal counsel, took over his case on a *pro se* basis, and filed the FAC alleging an elaborate and far-fetched conspiracy purportedly involving the Port Authority of New York New Jersey (the "PANYNJ"), Kevin O'Toole – the Chairman of the PANYNJ Board of Commissioners, Patrick Donovan ("Donovan") – the PANYNJ World Trade Center Site Safety Manager (collectively the "Port Authority Defendants"), and McCarter. As per Plaintiff's imaginary and implausible conspiracy theory, the Port Authority Defendants and McCarter allegedly retaliated against Plaintiff for filing his employment lawsuit and exercising his

right to free speech by influencing an unrelated third-party, the Navy SEAL Foundation (the "NSF"), to terminate its alleged contract with Plaintiff concerning a 2026 charitable event.

Though lengthy, the FAC does not offer even a wisp of factual support that Chairman O'Toole (or any defendant) had anything to do with the NSF's independent decision-making. The FAC, in fact, does not specifically allege *any* actions by Chairman O'Toole, himself, related to this purported conspiracy. Still, Plaintiff, in conclusory and speculative fashion, claims that Chairman O'Toole violated his constitutional rights, tortiously interfered with his agreement with the NSF, and participated in a sweeping broad-based conspiracy with the other defendants. He even goes so far as to allege that Chairman O'Toole intentionally caused him emotional distress.

Fundamentally, his claims all fail as a matter of law because Plaintiff's speculative allegations against Chairman O'Toole lack facial plausibility. Plaintiff simply does not allege sufficient facts even remotely suggesting that Chairman O'Toole had any involvement in the NSF's termination of its alleged contract with Plaintiff or that Chairman O'Toole otherwise committed any constitutional violations or tortious acts.

In addition to the FAC's clear factual deficiencies, Plaintiff's claims are also legally deficient. The 42 U.S.C. § 1983 and New Jersey Civil Rights Act ("NJCRA") claims fail because Chairman O'Toole is entitled to qualified immunity. These claims also fail because, among other reasons, Plaintiff has not pled sufficient facts to plausibly establish that Chairman O'Toole personally took any adverse action against him. Plaintiff's conspiracy claims fail to allege a predicate constitutional violation or tortious act and also fail to plausibly allege a conspiratorial agreement. The tortious interference claims fail because Plaintiff has not alleged that Chairman O'Toole even knew about Plaintiff's alleged contract with the NSF or that the contract was actually breached, let alone that Chairman O'Toole intentionally and maliciously interfered with the

2

contract. And lastly, the intentional infliction of emotional distress claim fails because Plaintiff has not alleged Chairman O'Toole engaged in extreme and outrageous conduct or that Plaintiff suffered the requisite severe emotional distress.

For the foregoing reasons and the reasons set forth herein,[1] Plaintiff does not plausibly state a single viable claim against Chairman O'Toole. The FAC's glaring factual and legal deficiencies cannot be overcome through amendment any more than through Plaintiff's shameful, serial letter-writing and mudslinging campaign. Accordingly, we respectfully submit that the Court should dismiss all claims against Chairman O'Toole in the FAC with prejudice.

### SUMMARY OF RELEVANT ALLEGATIONS AND FACTS OF PUBLIC RECORD

#### A. Background

Plaintiff, a former Navy SEAL, was employed by defendant McCarter as a career staff associate from March 2017 until December 27, 2023. FAC ¶¶ 1, 2, 61. Having been already "warned . . . about making 'controversial' posts on social media," he was terminated by McCarter on December 27, 2023, after posting material on LinkedIn that was deemed to "promote[] negative stereotypes of Muslim and Black Americans." *Id.* ¶¶ 287-88.

On December 24, 2024, Plaintiff filed a lawsuit against McCarter in Essex County Superior Court alleging employment discrimination based on veteran status. *Id.* ¶ 303. McCarter retained O'Toole Scrivo, LLC, as defense counsel. *Id.* Chairman O'Toole is the managing partner of O'Toole Scrivo, LLC, and also serves as the Chairman of the PANYNJ Board of Commissioners. *Id.* ¶¶ 305-06. Chairman O'Toole's son, Kevin O'Toole, Jr., is an associate attorney at McCarter. *Id.* ¶ 308.

---

[1] To the extent applicable, Chairman O'Toole also adopts and incorporates by reference all arguments set forth in his co-defendants' motions to dismiss the FAC.

### B. Plaintiff's Amended Complaint

After over a year of litigation with McCarter, and after having the bulk of his claims dismissed, Plaintiff filed an amended complaint adding the PANYNJ, Chairman O'Toole, and Donovan as defendants. As Plaintiff's story goes, the Port Authority Defendants allegedly "engaged in coordinated retaliation against Plaintiff to suppress his exercise of constitutional rights and punish him for filing this lawsuit" against McCarter. *Id.* ¶ 4. The so-called "coordinated retaliation" involved unidentified individuals informing the non-party NSF "that the [PANYNJ] would not support the 2026 NYC SEAL Swim if Plaintiff participated in the event." *Id.* ¶ 351. Plaintiff further alleges that as a result of this action, "the Navy SEAL Foundation terminated its contract with Plaintiff and withdrew from participating in the 2026 NYC SEAL Swim." *Id.* ¶ 352.

### C. Factual Allegations Against Chairman O'Toole

Although the FAC is over 100 pages long, it contains virtually no facts pled against Chairman O'Toole. The first specific, non-background and non-conclusory reference to Chairman O'Toole is not until page 74 and relates to his participation in a ceremony in September 2024 (three months prior to Plaintiff filing his lawsuit against McCarter) where he accepted, on behalf of the PANYNJ, "a paddle from the Navy SEAL Foundation" as a token for the PANYNJ's support of the NYC SEAL Swim. *Id.* ¶ 316. The FAC includes a photograph of Donovan handing Chairman O'Toole the paddle. *Id.* While Chairman O'Toole's participation in a public ceremony is a routine part of his role, Plaintiff speculatively attaches a conspiratorial motive to the event. Without any foundation whatsoever, he fantasizes that "[u]pon information and belief, Plaintiff was excluded from this ceremony because Defendant O'Toole was aware at that time that his law firm, O'Toole Scrivo, LLC, would be retained to represent Defendant McCarter in [his yet to be filed] litigation, and Defendant O'Toole did not want Plaintiff to be aware of his direct involvement with the NYC SEAL Swim." *Id.* ¶ 318. Beyond being completely absurd, Plaintiff's conspiracy

4

theory falsely portrays Chairman O'Toole's role within the PANYNJ, speciously assumes the Chairman of the PANYNJ Board of Commissioners provided input into the invitation list and purposely excluded Plaintiff, and improperly imputes Chairman O'Toole with knowledge of yet-to-happen events and imaginary motivations that make no sense.

The only other specific reference to Chairman O'Toole does not involve any actions or inactions on his part. Rather, Chairman O'Toole's name was referenced in a text message exchange between Plaintiff and Donovan. *See id.* ¶¶ 341-42. According to Plaintiff, Donovan excluded him from a conference call regarding the 2025 NYC SEAL Swim event. After Plaintiff requested to be included on the call, Donovan advised him that he was not needed and that he "sometimes bring[s] additional and unnecessary topics and dramatics to these conversations that leaves a bad taste with people." *Id.* ¶ 327. As part of a lengthy text exchange on the topic, Donovan explained that the call had very little to do with the swim event:

> Everyone respects your service and everyone else that has served, that's why everyone supports this event so much.
>
> Please understand that I have more and longer relationships with many of these people and organizations and work with them on other projects besides this swim.
>
> This issue with NJSP is bigger than your swim and it's the last thing they are worried about at the moment.
>
> So like I said let me talk and handle it tomorrow and we will be all good

*Id.* ¶ 331.

While nothing in this exchange has anything to do with Plaintiff's lawsuit against McCarter, Plaintiff nevertheless claims that his perceived "deliberate exclusion" from the call "was part of a coordinated effort to marginalize Plaintiff and strip him of his role in the charity event he created, in retaliation for Plaintiff's filing of this lawsuit against Defendant McCarter." *Id.* ¶ 332.

In his text exchange with Donovan, Plaintiff later remarks that he is "[v]ery disappointed

5

in the Chairman" but states that he is "not going to blast him publicly with the swim." *Id.* ¶ 342. Donovan then responds: "I understand[.] Please be aware though that you cannot post, send or do anything else negative towards him or his firm. If you do I will be out of the event along with all Port Authority assets and access to the WTC." *Id.* Plaintiff alleges that Donovan's remark constitutes a retaliatory threat for his filing of the lawsuit and postulates that "[u]pon information and belief, Defendant Donovan's threat was made with the knowledge and approval of Defendant Port Authority senior leadership, including Defendant O'Toole." *Id.* ¶ 346. This, of course, is rank speculation. Despite lacking any factual predicate or basis to claim that Donovan's text was made with Chairman O'Toole's knowledge or approval, Plaintiff furthers the fallacy by speculatively alleging that Chairman O'Toole "order[ed]" Donovan's conduct due to his "personal interest in protecting his son's employer (Defendant McCarter) and his professional interest in protecting his law firm's client (Defendant McCarter)." *Id.* ¶ 350. Then, as a final falsehood to his outlandish conspiracy theory, Plaintiff alleges without the slightest factual basis that unidentified PANYNJ officials informed the NSF that it would not support the 2026 swim event if Plaintiff participated in it, causing the NSF to terminate its alleged contract with Plaintiff. *Id.* ¶ 351-52.

While not part of the motion to dismiss record, but as seen in Plaintiff's pending motion to disqualify O'Toole Scrivo, LLC, and further highlighting the spuriousness of Plaintiff's manufactured narrative, the NSF's CEO, Robin King, submitted a sworn certification in the State Court unequivocally attesting that the NSF's decision-making "was not influenced by or at all the result of any pressure, request, or interaction with the Port Authority." *See* ECF 19-1, p. 29.[2]

---

[2] Courts may take judicial notice of public records, including court-filed documents, to establish their existence. *See Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246, 257 (E.D. Pa. 2020).

## ARGUMENT

### I.   PLAINTIFF'S CONCLUSORY ALLEGATIONS FAIL TO STATE A CLAIM AGAINST CHAIRMAN O'TOOLE

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for *more than a sheer possibility* that a defendant has acted unlawfully." *Id.* (emphasis added). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the court to draw on its judicial experience and common sense." *Id.* at 679.

While "detailed factual allegations" are not required, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Bell Atl. v. Twombly,* 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, under *Iqbal*, allegations that are "no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Indeed, a court is not required to accept conclusory terms "like 'conspiracy,' or even 'agreement' . . . as a sufficient basis for a complaint." *Twombly*, 550 U.S. at 557 (citation and internal quotation marks omitted). A plaintiff, instead, must allege actual facts sufficient to support the use of such conclusory terms. *Aruanno v. Allen*, 2011 WL 2161351, at *8 (D.N.J. May 31, 2011) ("A statement of facts is similar to a newspaper article. Facts simply and specifically describe who did what to whom, and when and where, and in what sequence it

7

was done."). If a plaintiff fails to do so, "Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679. Here, Plaintiff has woefully failed to allege sufficient facts against Chairman O'Toole.

Stripped to its essence, Plaintiff's lengthy complaint only alleges two actual facts about Chairman O'Toole: (1) Chairman O'Toole, in his role as the Chairman, accepted a paddle from the NSF in recognition of the PANYNJ's support of the 2024 NYC SEAL Swim – three months prior to Plaintiff's filing of his complaint against McCarter (FAC ¶¶ 317-18); and (2) Chairman O'Toole was referenced in Donovan's text exchange with Plaintiff (*id.* ¶ 342). The rest of the allegations against Chairman O'Toole are "upon information and belief" (*id.* ¶¶ 307-09, 318, 346-47, 349-50, 363); naked, conclusory allegations without any factual enhancement (*id.* ¶¶ 310-11, 353, 364); or simply alleged background facts.

Among his attenuated allegations, Plaintiff imagines that, "upon information and belief," Chairman O'Toole, "motivated by [his] personal interest in protecting his son's employer (Defendant McCarter) and his professional interest in protecting his law firm's client (Defendant McCarter)," directed or approved threats from Donovan and other unnamed individuals that the PANYNJ would "withdraw support from the NYC SEAL Swim if Plaintiff participated in the event" leading to the termination of his alleged contract with the NSF. *Id.* ¶¶ 347, 350. This is pure fantasy, as the FAC is entirely lacking in any factual nexus between, on the one hand, Plaintiff's 2023 termination from McCarter and his 2024 employment lawsuit, and, on the other hand, the NSF's decision not to participate in the 2026 NYC SEAL Swim. But most glaringly, the FAC is devoid of any factual nexus at all involving Chairman O'Toole. Plaintiff has not pled (and cannot plead) sufficient facts that plausibly demonstrate that Chairman O'Toole: (i) directed, approved, or ratified any alleged threats; (ii) directed or encouraged third party NSF to sever its relationship

with Plaintiff or, for that matter, that anyone from the PANYNJ communicated with NSF about Plaintiff or the 2026 NYC SEAL Swim at all; or (iii) reached some understanding or agreement, or plotted, planned, and conspired together with others at the PANYNJ or McCarter to retaliate against Plaintiff. Accordingly, Plaintiff's farfetched and conclusory, "upon information and belief" allegations to the contrary are woefully deficient and not entitled to a presumption of truth. *See, e.g.*, *Granillo v. FCA US LLC*, 2016 WL 9405772, at *7 (D.N.J. Aug. 29, 2016) (pleading upon information and belief is only permissible "so long as there are no boilerplate and conclusory allegations and plaintiffs accompany their legal theory with factual allegations that make their theoretically viable claim plausible") (internal quotations omitted)). Because Plaintiff has not pled any facts to substantiate his fanciful allegations that Chairman O'Toole had anything to do with any purported adverse actions taken against him, Plaintiff's FAC against Chairman O'Toole should be dismissed in its entirety. *See, e.g., Aruanno,* 2011 WL 2161351 at *7 (dismissing First Amendment retaliation claim where plaintiff "asserted nothing substantiating the conclusion that [protected activity] was the motivating factor in the allegedly adverse actions" taken against him).

II.    **PLAINTIFF'S 42 U.S.C. § 1983 AND NEW JERSEY CIVIL RIGHTS ACT CLAIMS AGAINST CHAIRMAN O'TOOLE FAIL AS A MATTER OF LAW**

   A.   **Chairman O'Toole Is Entitled to Qualified Immunity for Plaintiff's § 1983 and New Jersey Civil Rights Act Claims**

"The doctrine of qualified immunity protects government officials," like Chairman O'Toole, "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Baron v. Port Auth. of N.Y. & N.J.*, 977 F. Supp. 646, 652-53 (S.D.N.Y. 1997) (dismissing § 1983 claims against PANYNJ Commissioners in their individual capacities on

9

qualified immunity grounds). [3] "[T]rack[ing] the federal standard," New Jersey law applies qualified immunity to protect government actors from NJCRA suits. *Brown v. State*, 230 N.J. 84, 98 (2017).

"One of the purposes of [qualified] immunity . . . is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "The standard for qualified immunity is tilted in favor of shielding government actors and 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotation marks omitted)).

To defeat an assertion of qualified immunity, the alleged constitutional right must be so clearly established that "every reasonable official would [have understood] that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (alteration in original) (internal citation and quotation marks omitted). This is an "exacting standard" and

---

[3] Qualified immunity applies to claims brought against public officials in their individual capacity. To the extent Plaintiff asserts claims against Chairman O'Toole in his official capacity, such claims are duplicative of Plaintiff's claims against the PANYNJ and should be dismissed as redundant. *See Kentucky v. Graham,* 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." (citation omitted)); *see also Cuvo v. DeBiasi*, 169 F. App'x 688, 693 (3d Cir. 2006) (affirming dismissal of claims against public officials in their official capacities as "redundant" of "suit against the public entity"); *Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 131-32 (D.N.J. 2017) (same); *Port Auth. Police Benevolent Ass'n v. Port Auth. of N.Y. & N.J.*, 2017 WL 4403310, at *8 & n. 16 (S.D.N.Y. 2017) (same).

requires that the right be established in a "'particularized sense'" rather than as a "'broad general proposition.'" *Zaloga*, 841 F.3d at 175 (quoting *Reichle*, 566 U.S. at 665). It is "too high a level of abstraction," under this framework, to stop with the general principal that "there is a well-known right against government retaliation for exercising one's right to free speech." *Id.* Nor can a court "stop with a conclusory statement that [a government actor's] alleged use of 'influence with plaintiffs' employer' violated the first amendment." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001). Instead, the court "must go one step further" and consider the context to "determine whether the facts alleged by plaintiff[] violated a 'clearly established right.'" *Id.* "[T]here must be sufficient precedent at the time of action, *factually similar to the plaintiff's allegations,* to put defendant on notice that his or her conduct is constitutionally prohibited." *Id.* (emphasis added).

Here, Third Circuit precedent, particularly *McLaughlin* and *Zaloga*, effectively precludes Plaintiff from arguing that Chairman O'Toole's alleged actions "violate[d] clearly established law." *Pearson*, 555 U.S. at 243. Like this matter, both cases involved allegations that a public official caused a third party to take adverse action in retaliation for the plaintiff's speech.

In *McLaughlin*, the plaintiffs, who were agents of the Pennsylvania Attorney General's office, alleged that the U.S. Attorney for the Eastern District of Pennsylvania retaliated against them for exercising their constitutional rights by "act[ing] administratively to influence the Pennsylvania Attorney General to take adverse employment-related action against them." 271 F.3d at 572. In dismissing plaintiffs' claims, the Third Circuit found that the defendant had "no reason to believe that requesting or influencing another's employer to take adverse personnel action violated first amendment rights" and, as such, was entitled to qualified immunity. *Id.* at 573-74. The court reasoned:

> When a public official is sued for allegedly causing a third party to
> take some type of adverse action against plaintiff's speech, we have

11

> held that a defendant's conduct must be of a particularly virulent character. It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must "threaten" or "coerce" the third party to act.

*Id.* at 573.

In reaching its conclusion, the Third Circuit relied on its prior decision in *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir. 1984). There, the Borough of New Hope council requested that a third party, Citibank, take down plaintiff's commercial billboards that were located on its property and threatened litigation, administrative action, and zoning changes if Citibank refused. *See id.* at 86-88. Citibank, having plans to develop the site in the future and wanting to stay in the Borough's "good graces," agreed to remove the plaintiff's billboards. *Id.* at 87. In rejecting plaintiff's claim, the Third Circuit held that "[t]he quantum of governmental authority brought to bear against Citibank" did not rise to the level of coercion required to trigger a constitutional violation. *Id.* at 88. More is needed. *Id.* (citing the threats of criminal prosecution and menacing visits to plaintiff's business by uniformed police officers in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), as an example of constitutionally impermissible coercion).

The Third Circuit reaffirmed these principles again in *Zaloga*. *Zaloga* involved a suit against a public official who allegedly, in retaliation for "political attacks" and criticism, applied "political pressure" and urged other government officials not to renew a contract with plaintiff's medical services company. 841 F.3d at 172-73. In finding the defendant was entitled to qualified immunity, the Third Circuit observed that "it has never been established that a governmental official who does not himself retaliate but instead pressures another individual to retaliate . . . can be held personally liable." *Id.* at 177. As such, the court reasoned that the defendant "would not necessarily understand that mere political pushback could be unlawful" and therefore the "threat[s]

12

to withdraw political support" did not meet the "high standard for 'clearly established law'" necessary to defeat qualified immunity. *Id.* at 176-77.

Furthermore, when alleged retaliatory conduct itself is in the form of speech, the public official's "own First Amendment speech rights are implicated." *See McLaughlin*, 271 F.3d at 573 (quoting *Suarez Corp. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)); *see also X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 68-70 (2d Cir. 1999) (noting that public official's own right to free speech must also be considered and that such rights are not necessarily subordinate to plaintiffs' free speech rights); *Smith v. School Dist. of Phila.*, 112 F. Supp. 2d 417, 431 (E.D. Pa. 2000) (school district's urging Home and School Association to remove plaintiff as president of that association was itself a "protected right to free speech"); *Ne. Women's Ctr., Inc. v. McMonagle*, 670 F. Supp. 1300, 1308 (E.D. Pa. 1987) ("[a]ttempts to persuade another to action are clearly within the scope of the First Amendment"). As the Third Circuit recognized, its "cases do not provide government officials with clear guidance as to when a government official's own speech can nevertheless constitute unconstitutional retaliation," which further supports affording public officials the protection of qualified immunity in such cases. *Zaloga*, 841 F.3d at 176.

Measured by these standards, Chairman O'Toole is plainly entitled to qualified immunity. Even were the Court to credit Plaintiff's "upon information and belief," conclusory allegations, as specious as they are, Chairman O'Toole would have had no reason to believe under Third Circuit authority that influencing the NSF to take adverse action against Plaintiff (i.e., terminate their alleged contract) violated Plaintiff's First Amendment rights. Indeed, Third Circuit authority in *R.C. Maxwell*, *McLaughlin,* and *Zaloga* indicates the contrary. Alleged threats to withdraw PANYNJ support for the 2026 NYC SEAL Swim (even if made) are akin to, and indeed far less threatening than, the type of alleged coercive conduct toward a third party that the Third Circuit

13

has already found does not trigger a constitutional violation. *See R.C. Maxwell Co.,* 735 F.2d at 87 (threats of civil and administrative action and zoning changes); *McLaughlin,* 271 F.3d at 572 (employing administrative influence as U.S. Attorney); *Zaloga,* 841 F.3d at 172-73 (threats of withdrawal of political support). Thus, Chairman O'Toole is entitled to qualified immunity and Plaintiff's 42 U.S.C. § 1983 and New Jersey Civil Rights Act claims must be dismissed.

**B. Plaintiff Fails to Plead a Plausible 42 U.S.C. § 1983 or New Jersey Civil Rights Act Claim Against Chairman O'Toole**

To state a § 1983 First Amendment retaliation claim, a plaintiff must show: "(1) he engaged in protected speech, (2) the defendant took adverse action sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the adverse action was prompted by plaintiff's protected speech." *Clayton v. City of Atlantic City,* 722 F. Supp. 2d 581, 589-90 (D.N.J. 2010). The same standard applies to NJCRA claims. *See Bernard v. Webb-McRae,* 2025 WL 2395142, at *6-7 (N.J. Super. Ct. App. Div. Aug. 19, 2025).

1. *Plaintiff Does Not Allege a Retaliatory Act that Violates the First Amendment*

As set forth above, Plaintiff's allegations that Chairman O'Toole caused a third party to take some type of adverse action against him, do not implicate a "clearly established right" required to defeat qualified immunity. Nor do the allegations state any actionable retaliatory act at all under Third Circuit authority. *See, e.g., Zaloga*, 841 F.3d at 177 ("it has never been established that a governmental official who does not himself retaliate but instead pressures another individual to retaliate . . . can be held personally liable"). Accordingly, Plaintiff's § 1983 and NJCRA claims against Chairman O'Toole should be dismissed.

2. *Plaintiff Does Not Allege Sufficient Facts to Plausibly Establish that Chairman O'Toole Took Adverse Action*

Not only does Plaintiff fail to allege any actionable retaliatory act, Plaintiff utterly fails to plead any facts that plausibly demonstrate that Chairman O'Toole had any personal involvement

14

in the alleged adverse action. It is well established that "[o]nly those defendants whose inactions or actions personally caused [a plaintiff's] injury may be held liable under § 1983." *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

Plaintiff fails to plead with "appropriate particularity" that Chairman O'Toole's actions or inactions personally caused his alleged injuries. Citing an allegedly threatening text message from PANYNJ employee Patrick Donovan, Plaintiff alleges, "upon information and belief," that O'Toole directed and/or approved Donovan's communication. *Id.* ¶ 346 ("[u]pon information and belief, Defendant Donovan's threat was made with the knowledge and approval of Defendant Port Authority senior leadership, including Defendant O'Toole."); ¶ 349 ("upon information and belief, Defendant O'Toole . . . directed, ratified, or approved Defendant Donovan's threats to Plaintiff"). From that feeble footing, Plaintiff further alleges that as a result of the threat "the Navy SEAL Foundation withdrew from NYC SEAL Swim." *Id.* ¶¶ 455-57. Plaintiff, however, alleges no actual facts supporting his rank speculation that Chairman O'Toole had anything to do with Donovan's text message or the NSF's decision to terminate its relationship with Plaintiff.

"[B]oilerplate and conclusory allegations," like those made against Chairman O'Toole, do not support a pleading upon information and belief. *Granillo*, 2016 WL 9405772, at *7. Plaintiff must instead provide sufficient "factual allegations that make [his] theoretically viable claim plausible." *Id.* No such facts have been pled. Speculation that Chairman O'Toole may have been motivated to retaliate against Plaintiff because his son is an associate attorney at McCarter and his firm may derive income from representing McCarter, on its face, is absurd and, in any event, does

15

not create a reasonable inference that Chairman O'Toole had any involvement at all in Donovan's communication or the NSF's independent decision-making. As such, Plaintiff has not alleged sufficient facts to plausibly establish that Chairman O'Toole had personal involvement in the alleged retaliatory action. Plaintiff also cannot bring a claim against Chairman O'Toole on a *respondeat superior* theory. *See Iqbal*, 556 U.S. at 676 (citing *Robertson v. Sichel,* 127 U.S. 507, 515-16 (1888)). Therefore, Plaintiff's § 1983 and NJCRA claims against Chairman O'Toole fail.

3.     *Plaintiff Does Not Allege Sufficient Facts to Plausibly Establish a Causal Link Between the Alleged Adverse Action and Plaintiff's Protected Conduct*

"The third element of a retaliation claim requires a causal link between a plaintiff's constitutionally protected activity and the retaliatory act." *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017). "The required link is 'but-for' causation." *Id.* To meet this element, Plaintiff must plead facts demonstrating that the alleged injury would not have occurred absent the defendant's conduct. Here, Plaintiff does not plead adequate facts supporting his distorted notion that the alleged retaliatory act was prompted by his protected activity or that his alleged injury would not have occurred but-for Chairman O'Toole's alleged actions.

Plaintiff characterizes his protected conduct as "engag[ing] in protected speech by filing this lawsuit and making public statements regarding his treatment by Defendant McCarter." FAC ¶ 454. The text exchange with Donovan that Plaintiff cites, however, never mentions anything about a lawsuit or McCarter, and the FAC is devoid of any facts suggesting that Donovan (or any defendant, for that matter) ever demanded that Plaintiff discontinue his lawsuit or cease making public statements about McCarter.

Further undercutting any causal link is the significant temporal gap between the claimed protected activity and the alleged retaliatory action. Here, Plaintiff filed his lawsuit against McCarter in December 2024 while the alleged retaliatory act did not occur until much later. In

16

fact, despite Plaintiff filing his lawsuit, the PANYNJ participated in and supported the 2025 NYC SEAL Swim, which took place on August 16, 2025[4] – eight months *after* Plaintiff engaged in his claimed protected activity. This torpedoes Plaintiff's baseless conjecture that his lawsuit against McCarter had anything at all to do with the PANYNJ's support for the NYC SEAL Swim. *See Curley v. Monmouth Cty. Bd. of Chosen Freeholders*, 816 F. App'x 670, 674 (3d Cir. 2020) ("Absent factual allegations that could support a finding of causation, a significant period of time between the alleged protected conduct and retaliatory acts is fatal to the retaliation claim.").

"[I]f the scales are even and the plaintiff has pleaded facts that indicate a 'mere possibility of' a causal connection, dismissal is appropriate." *Id.* at 674-75 (quoting *Iqbal*, 556 U.S. at 679). Here, the scales are not remotely even, as the FAC is devoid of any facts that would plausibly demonstrate a causal link between Plaintiff's purported protected conduct and any alleged retaliatory act by Chairman O'Toole. Accordingly, Plaintiff's § 1983 and NJCRA claims against Chairman O'Toole should be dismissed.

III.    **PLAINTIFF'S 42 U.S.C. § 1983 CONSPIRACY CLAIMS AGAINST CHAIRMAN O'TOOLE FAIL AS A MATTER OF LAW**

"The elements of a [civil rights] conspiracy are that two or more persons conspire to deprive a person of constitutional rights, one or more of the conspirators performs any overt act in furtherance of the conspiracy, and the overt act injures the plaintiff or deprives him of any rights or privileges of a citizen of the United States while the conspirators acted under color of state law."

---

[4]    The Court may take judicial notice of the event's date, of which there is ample and undisputed public evidence. *E.g.*, Navy Seal Foundation, NYC Seal Swim, https://www.navysealfoundation.org/event/new-york-city-seal-swim/ (accessed Apr. 8, 2026); New York Post, *Navy SEAL Almost Killed in Firefight with Al Qaeda Recalls Physical and Emotional Tolls Before Grueling Hudson River Swim*, Aug. 14, 2025, https://nypost.com/2025/08/14/lifestyle/war-hero-jason-redman-prepares-for-new-york-city-seal-swim-2025/ (referring to upcoming event on "Saturday," i.e., Saturday, August 16, 2025); *see Werner v. Werner*, 267 F.3d 288, 295 (3d Cir. 2001) ("A court may take judicial notice of an adjudicative fact if that fact is not subject to reasonable dispute.").

*Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 317 (D.N.J. 2021). "'[T]he rule is clear that'" the plaintiff "'must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action.'" *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009) (quoting *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)).

Here, Plaintiff's § 1983 conspiracy claim against Chairman O'Toole fails for at least three reasons: (i) like Plaintiff's direct § 1983 claim, Chairman O'Toole is immune from Plaintiff's related conspiracy claim, (ii) Plaintiff does not adequately allege a viable underlying predicate constitutional violation, and (iii) the FAC does not contain any specific factual matter that plausibly suggests defendants reached an understanding to deny Plaintiff any constitutional rights.

### A. Chairman O'Toole is Entitled to Qualified Immunity for Plaintiff's § 1983 Conspiracy Claim

As set forth above, Chairman O'Toole is entitled to qualified immunity for Plaintiff's direct § 1983 and NJCRA claims. He is likewise entitled to qualified immunity for Plaintiff's related conspiracy claim. "[A]n official who is immune from suit for a § 1983 violation is also immune from liability for a conspiracy claim based on the same underlying conduct." *Stokes v. City of Phila.*, 2023 WL 362006, at *5 (E.D. Pa. 2023) (*citing Ippolito v. Aherne*, 2015 WL 6447153, at *6 (E.D. Pa. Oct. 26, 2015)).

### B. Plaintiff Does Not Plausibly Allege a Predicate Constitutional Violation

A § 1983 civil rights conspiracy requires a predicate federal civil rights violation. *See Neals v. Cortes,* 2022 WL 980685, at * 6 (D.N.J. Mar. 31, 2022) ("plaintiff must establish the 'predicate' constitutional tort to succeed on a claim for civil conspiracy"). A conspiracy claim cannot survive if the underlying substantive constitutional claims fail, as the conspiracy must be directed toward violating a federally protected right. *See Rink v. Ne. Educ. Intermediate Unit 19,* 717 F. App'x 126, 141 (3d Cir. 2017) ("There can be no civil conspiracy to commit an unlawful act under § 1983

18

where the plaintiff has not proven a deprivation of a constitutional or federal statutory right or privilege."). Here, Plaintiff cannot maintain a § 1983 civil rights conspiracy claim because, as set forth above, he has not pled a plausible underlying 42 U.S.C. § 1983 claim.

### C. Plaintiff Does Not Plausibly Allege a Conspiratorial Agreement

"To show agreement, [Plaintiff] must demonstrate that 'the state actors named as defendants in the complaint somehow reached an understanding to deny [Plaintiff] his rights.'" *Mesadieu v. City of Elizabeth*, 2019 WL 4926884, at *9 (D.N.J. Oct. 4, 2019) (quoting *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 295 (3d Cir. 2018) (cleaned up)). There must be a showing of "an understanding or 'meeting of the minds'" among the conspirators. *Murphy v. Middlesex Cty.*, 361 F. Supp. 3d 376, 389 (D.N.J. 2019). The Court need not accept conclusory terms "like 'conspiracy,' or even 'agreement'" as sufficient for his conspiracy claims. *Twombly*, 550 U.S. at 557 (citation and internal quotation marks omitted). Plaintiff "must allege with sufficient particularity that [Defendants] reached some understanding or agreement, or plotted, planned and conspired together, to deprive [Plaintiff] of a federal right.'" *Hauptmann v. Wilentz*, 570 F. Supp. 351, 374 (D.N.J. 1983) (quoting *Chicarelli v. Plymouth Garden Apartments*, 551 F. Supp. 532, 539 (E.D. Pa. 1982)). "This requirement is necessary to protect defendants from the unwarranted expense, vexation, and possible notoriety which defense against frivolous claims entails." *Id.*

Here, like his other claims, Plaintiff's sweeping allegation of a broad civil rights conspiracy between the Port Authority Defendants and McCarter is devoid of factual detail. For instance, Plaintiff does not allege with required particularity (i) how the alleged conspirators came to an agreement, (ii) when the agreement was made, (iii) who were the specific parties to the agreement, (iv) how long the agreement was in effect, or even (v) what precisely the agreement's object was. Nothing is alleged about the claimed conspiracy other than "Defendants reached an understanding

19

to deprive Plaintiff of his constitutional rights through coordinated action." FAC ¶ 465.

Plaintiff's bald allegation of a general unlawful agreement is nothing more than a formulaic recitation of the elements of a cause of action. That is not enough. A "bare allegation [that merely] recites the elements of a conspiracy with no factual support . . . is not entitled to the presumption of truth." *Neals*, 2022 WL 980685, at *6. As such, Plaintiff's bare allegations of conspiracy are too conclusory to state a plausible claim for relief and must be dismissed.

## IV.   PLAINTIFF'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIMS AGAINST CHAIRMAN O'TOOL FAIL AS A MATTER OF LAW

Plaintiff alleges that the Port Authority Defendants (i) tortiously interfered with his "valid contractual relationship with the Navy SEAL Foundation ($40,000 annually, documented by payments in 2023, 2024, and 2025)" (Count XV) and (ii) tortiously "interfered with Plaintiff's prospective economic advantage" with respect to his "reasonable expectation of continuing economic advantage from his relationship with the Navy SEAL Foundation ($40,000 annually)" (Count XVI). FAC ¶¶ 475-87. Both claims fail as a matter of law for multiple reasons.

To adequately plead tortious interference, a plaintiff must plausibly allege "(1) the existence of the contract or the prospective economic relationship; (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages." *MedWell, LLC v. Cigna Corp.*, 2023 WL 4045089, at *2 (D.N.J. June 16, 2023) (quoting *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997)). Tortious interference with contract and tortious interference with prospective economic advantage differ only as to the first element: "For tortious interference with contract, the first element requires allegations that show an enforceable contract," whereas "[f]or tortious interference with prospective economic advantage, the first element only requires allegations that show a reasonable expectation of economic advantage." *Id.*

20

Here, Plaintiff has failed to adequately plead the required elements, necessitating dismissal.

**A. Plaintiff Fails to Plausibly Allege Chairman O'Toole Knew About His Alleged Contract with the NSF and Thus Necessarily Fails to Allege Any Intentional Interference with That Contract or Relationship**

Both tortious interference claims fail because Plaintiff has not adequately alleged intentional interference. "[A] person cannot intentionally interfere with a contract [or prospective economic relationship] that he knows nothing about. In order to subject someone to liability under this tort, the individual must have knowledge of the contract [or prospective economic relationship] with which he has allegedly interfered." *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1051 (D.N.J. 1990) (citing *Restatement (Second) of Torts*, § 766 cmt. i). Plaintiff's tortious interference claims fail because the FAC does not plausibly allege that Chairman O'Toole (or any defendant) knew that Plaintiff had a contract – or any sort of prospective *economic* relationship – with the NSF.

To be sure, the FAC alleges that "Defendants knew of Plaintiff's contractual relationship." FAC ¶ 477. But this is a "[t]hreadbare recital[]of [an] element[] of a cause of action" and, thus, "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678-79. Moreover, the FAC does not support this conclusory allegation with specific facts that would allow the Court to reasonably infer that any defendant – let alone Chairman O'Toole, whom Plaintiff has never met – knew Plaintiff had a contract (or any prospective *economic* relationship) with the NSF. True, Plaintiff's involvement with the NYC SEAL Swim – and the NSF's sponsorship of the event – may have been public information. But as alleged, the NYC SEAL Swim is a one-day "*charity* event"; the NSF is "a national *nonprofit* organization"; Port Authority employees have worked as "*volunteers* for the event"; and Plaintiff himself has been a "licensed attorney" in private practice for as long as the NYC SEAL Swim has existed. FAC ¶¶ 9, 40, 313, 337 (emphases added)). It is unclear why anyone familiar with these facts would have had reason to believe Plaintiff's involvement with the

21

one-day charity event was part of a lucrative *commercial* relationship he had with the event's non-profit sponsor, and Plaintiff does not supply any facts to support an inference that Chairman O'Toole knew that it was. *Cf. Matrix Essentials v. Cosmetic Gallery, Inc.*, 870 F. Supp. 1237, 1247 (D.N.J. 1994) (defendants' "general knowledge of [company's] distribution scheme" insufficient to imply "knowledge of the existence or contents of salon agreements" that made up part of distribution scheme), *aff'd*, 85 F.3d 612 (3d Cir. 1996).

And beyond not plausibly alleging Chairman O'Toole knew about Plaintiff's contractual relationship, Plaintiff has also not plausibly alleged Chairman O'Toole took any action to intentionally interfere with Plaintiff's contract. Because the FAC fails to plausibly allege Chairman O'Toole's knowledge of Plaintiff's contractual/commercial relationship with the NSF or any act of interference on his part, Plaintiff has necessarily also failed to plausibly plead that Chairman O'Toole intentionally interfered with that commercial relationship. On that basis alone, both tortious interference claims fail as a matter of law and should be dismissed.

### B. Plaintiff Has Not Alleged Any Breach of His Contract with the NSF, As Opposed to the NSF Validly Exercising Contractual Termination Rights

Plaintiff's tortious interference with contract claim suffers from another fatal flaw: the FAC does not allege – not even conclusorily – that his alleged contract with the NSF was actually breached. To the contrary, Plaintiff alleges that the NSF "terminated its contract with Plaintiff" (FAC ¶ 352), but he does not say that the termination was a breach or otherwise wrongful – thus implying the NSF simply exercised contractual termination rights. This dooms the claim.

While the third element of a tortious interference claim is sometimes phrased as "*loss* or breach" (emphasis added), case law, New Jersey's *Model Civil Jury Charges*,[5] and the *Restatement*

---

[5]    While not binding, the *Model Civil Jury Charges* are regularly relied on by New Jersey courts as persuasive authority. *See, e.g.*, *Melton v. Novak*, 2025 WL 1288574, at *11 (N.J. Super. Ct. App. Div. May 5, 2025) (citing Model Civil Jury Charges (Civil), 3.13)).

*(Second) of Torts* (the "*Restatement*") – which is "controlling" in New Jersey as to tortious interference[6] – make clear that an actual breach of the contract is required. The *Restatement*, for example, defines tortious interference with contract as "intentionally and improperly interfering with the performance of a contract . . . by inducing or otherwise causing the third person not to perform [i.e., to breach] the contract." *Restatement (Second) of Torts* § 766; *accord Nostrame v. Santiago*, 213 N.J. 109, 122 (2013). Similarly, Model Civil Jury Charge 3.30B – for tortious interference with contractual relations – instructs that the claim requires proof of defendant "inducing, procuring or causing a breach."[7] And courts, likewise, regularly dismiss tortious interference with contract claims where plaintiffs have not adequately alleged breach of a contract. *See, e.g.*, *MedWell*, 2023 WL 4045089, at *4 (holding "Plaintiff fails to plead tortious interference with contract, even if Plaintiff adequately alleges an existing contract," as allegations "are too vague to set forth a specific breach of a contract" (citation omitted)); *Hotaling & Co. v. Berry Sols. Inc.*, 2022 WL 4550145, at *5 (D.N.J. Sept. 29, 2022) (dismissing tortious interference claim "[g]iven the insufficiency of [counterclaimants'] allegations regarding a breach"); *loanDepot.com v. CrossCountry Mortg.*, 399 F. Supp. 3d 226, 237 (D.N.J. 2019) (dismissing tortious interference claim where plaintiff failed to allege "specific breach"); *see also Matrix*, 870 F. Supp. at 1247 ("plaintiff may not maintain a tortious interference action 'where there is no specific contractual provision barring the behavior at issue'" (citation omitted)); *Borbely v. Nationwide Mut. Ins.*, 547 F. Supp. 959, 976 (D.N.J. 1981) ("termination of a contract in accordance with its express terms"

---

6    *D'Agostino v. Gesher LLC*, 2014 WL 7475209, at *5 n.6 (N.J. Super. Ct. App. Div. Jan. 7, 2015) ("The Second Restatement is controlling as to tortious interference."); *see also, e.g.*, *Matrix*, 870 F. Supp. at 1247 ("New Jersey has adopted the Restatement (Second) of Torts definition of tortious interference with an existing contract.").

7    *Model Civil Jury Charges*, 3.30B, Tortious Interference with Contractual Relations, at 2, https://www.njcourts.gov/sites/default/files/charges/3.30B.pdf.

"cannot result in imposition of tort liability" (citations omitted)).

Here, Plaintiff has not claimed that his alleged contract with the NSF was breached, and indeed the FAC's terse description of NSF's "termination" of the contract implies it was "in accordance with [the contract's] express terms." *Borbely*, 547 F. Supp. at 976. Accordingly, Plaintiff has not adequately alleged tortious interference with contract.

### C. Plaintiff Fails to Plausibly Allege That Chairman O'Toole Acted with "Malice"

Finally, another fatal pleading deficiency shared by both tortious interference claims is that Plaintiff has not plausibly alleged that Chairman O'Toole acted with malice. The FAC's conclusory allegation that the Port Authority Defendants were "motivated by malice" (FAC ¶¶ 479, 485) does not suffice. "[M]alice in the legal sense is the intentional doing of a wrongful act without justification or excuse," *Hotaling*, 2022 WL 4550145, at *4 (citation omitted), and "wrongful act" in this context means "conduct that amounts to fraud, defamation, misrepresentation, violence, intimidation, criminal or civil threats, or other violations of law." *Nat'l Auto Div. v. Collector's All.*, 2017 WL 410241, at *3 (N.J. Super. Ct. App. Div. Jan. 31, 2017) (citing *Nostrame*, 213 N.J. at 124). As discussed above, Plaintiff has not plausibly alleged Chairman O'Toole took *any* action, let alone that he engaged in actionable retaliation or any other conduct amounting to a "violation[] of law." *Id.* For this reason, too, Plaintiff's tortious interference claims fail as a matter of law.

### V.    PLAINTIFF'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM AGAINST CHAIRMAN O'TOOLE FAILS AS A MATTER OF LAW

Plaintiff's intentional infliction of emotional distress ("IIED") claim against Chairman O'Toole likewise fails. The FAC alleges the Port Authority Defendants, including Chairman O'Toole, committed IIED "by threatening to withdraw Port Authority support" for the NYC SEAL Swim "unless Plaintiff refrained from exercising his constitutional rights." FAC ¶ 489. But to

24

adequately plead an IIED claim, a plaintiff must plausibly allege that:

- defendant acted "intentionally or recklessly" – i.e., that defendant either intended "to produce emotional distress" or "act[ed] recklessly in deliberate disregard of a high degree of probability that emotional distress will follow," *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366 (1988);

- "defendant's conduct [was] extreme and outrageous," *id.*;

- defendant's conduct was "the proximate cause of the plaintiff's emotional distress," *id.*; and

- plaintiff suffered "emotional distress . . . 'so severe that no reasonable [person] could be expected to endure it.'" *Id.* at 366-67 (quoting *Restatement (Second) of Torts*, § 46 cmt. j).

Here, Plaintiff's IIED claim must be dismissed because the FAC fails to plausibly allege that Chairman O'Toole "intentionally or recklessly" caused Plaintiff emotional distress, that he engaged in any "extreme and outrageous" conduct, or that Plaintiff has suffered sufficiently "severe" emotional distress due to the Port Authority Defendants' alleged conduct.

### A. Plaintiff Has Not Alleged That Chairman O'Toole "Intentionally or Recklessly" Caused Him Emotional Distress

The FAC does not contain *any* allegations – not even conclusory ones – that Chairman O'Toole possessed the intent necessary to have committed the tort of IIED.

Critically, to establish an IIED claim, a plaintiff must do more than show that the defendant intended to engage in the conduct that allegedly caused plaintiff emotional distress. Instead, a plaintiff must plead and prove that the defendant specifically intended "to produce emotional distress" – or, alternatively, that defendant "act[ed] recklessly in deliberate disregard of a high degree of probability that emotional distress will follow." *Buckley*, 111 N.J. at 366.

The FAC contains no such allegations. Plaintiff alleges only that the Port Authority Defendants' conduct was "intentional." FAC ¶ 489. Plaintiff does not allege, as he must, that Chairman O'Toole – or any defendant, for that matter – intended to cause Plaintiff emotional distress or acted in reckless disregard of a high probability that his actions would cause such

25

distress. For this reason alone, the IIED claim fails as a matter of law and must be dismissed.

### B. Plaintiff Has Not Alleged "Extreme and Outrageous" Conduct

Plaintiff also fails to adequately allege that Chairman O'Toole engaged in any "extreme and outrageous" conduct. The "extreme and outrageous" conduct element of an IIED claim is "an 'elevated threshold' that is satisfied only in extreme cases." *Ingraham v. Ortho-McNeil Pharm.*, 422 N.J. Super. 12, 21 (App. Div. 2011). Plaintiff falls far short of satisfying that threshold here.

To meet the "elevated threshold" imposed by the "extreme and outrageous" conduct element of an IIED claim, a plaintiff must allege conduct that "was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Buckley*, 111 N.J. at 366 (quoting *Restatement (Second) of Torts*, § 46 cmt. d). Liability for IIED will only lie "where 'the recitation of the facts to an average member of the community would arouse his resentment against the act and lead him to exclaim, 'outrageous!'" *Pollard v. Paterson Bd. of Educ.*, 1992 WL 97971, at *3 (D.N.J. May 4, 1992) (quoting *Restatement (Second) of Torts* § 46 cmt. d)). Liability for IIED "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.* (quoting *Restatement (Second) of Torts* § 46 cmt. d)). "[T]he limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct." *Fregara v. Jet Aviation Business Jets*, 764 F. Supp. 940, 956 (D.N.J. 1991) (citation and quotation marks omitted).

"It is for the court to determine whether the plaintiff has alleged sufficiently extreme and outrageous conduct to allow a jury to grant her recovery." *Bishop v. Okidata, Inc.*, 864 F. Supp. 416, 427 (D.N.J. 1994) (*citing Buckley*, 111 N.J. at 367). Uniformly, allegations held to satisfy this "elevated threshold" are facially extreme; they include, for example, (i) "a county sheriff's using an atrocious racial slur to refer to an African-American employee"; (ii) "a defendant teacher's false report that the plaintiff teacher, a practicing non-violent Buddhist, had threatened to kill her

students, and arranging to have the plaintiff removed publicly from the school, allegedly in retaliation for rebuking the defendant's sexual advance"; (iii) "a supervisor and two co-workers at a military facility surrounding the plaintiff and making comments and gestures to suggest that she was to perform a sexual act on the supervisor while the others watched, followed by a threatening telephone call implying that the Mafia would become involved if the plaintiff pursued the investigation"; (iv) "a landlord's intentional shutting off heat, running water, and security in a rent-controlled building in an effort to induce the tenants to vacate"; and (v) "a doctor's allegedly telling parents that their child was suffering from a rare disease which may be cancerous knowing that the child has nothing more than a mildly infected appendix." *Ingraham*, 422 N.J. Super. at 21 (citations and internal quotation marks omitted).

Equally instructive are the kinds of allegations courts have held *not* "sufficiently extreme and outrageous" to qualify for IIED. *Id.* at 22. Those include, for example, allegations that (i) "the decedent's children from an earlier marriage were not informed about and thus excluded from a viewing at the funeral home after the decedent was murdered"; (ii) "a supervisor expressed doubt that the plaintiff had been diagnosed with breast cancer, and then came near her 'on the verge of physically bumping into [the plaintiff's] breast area as if to see' if she truly had a mastectomy"; (iii) "managers at an appliance retailer brought theft charges against the plaintiff sales manager for selling a television to his brother-in-law below cost"; (iv) "the plaintiff's co-workers treated her rudely and unprofessionally, called her names, and gestured in a physically intimidating manner"; and (v) "derogatory gender-based comments were made to the plaintiff along with allegations that her fiancé was a 'cheat' and a 'liar.'" *Id.* (citations omitted).

Guided by this case law, the Court's application of the "elevated threshold" test can only lead to the conclusion that, here, Plaintiff has not alleged "extreme and outrageous" conduct by

27

Chairman O'Toole. As discussed above, the FAC does not specifically allege *any* actions by Chairman O'Toole himself – let alone any actions that could qualify as "extreme and outrageous" conduct. Even if the Court were to accept Plaintiff's implausible and conclusory "upon information and belief" allegation that Chairman O'Toole "directed, ratified, or approved" Donovan's alleged "threats to Plaintiff" (FAC ¶ 349) – and even further accepting Plaintiff's baseless speculation that Donovan's alleged threats caused the NSF to terminate its relationship with Plaintiff – this alleged conduct would still not rise to the level of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley*, 111 N.J. at 366 (citation omitted); *see also, e.g.*, *Taylor v. Metzger*, 152 N.J. 490, 509 (1998) ("[IIED] liability clearly does not extend to . . . threats." (citation omitted)); *cf. Pollard*, 1992 WL 97971, at *4 ("Generally, decisions to discharge an employee have not been found to constitute intentional infliction of emotional distress . . . .") (quoting *Borecki v. E. Int'l Mgmt. Corp.*, 694 F. Supp. 47, 61 (D.N.J. 1988)); *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988) ("[I]t is extremely rare to find conduct in the employment context which will rise to the level of outrageousness necessary [for IIED claim].").

Accordingly, for this independently dispositive reason, the IIED claim must be dismissed.

### C.  Plaintiff Has Not Alleged the Requisite "Severe" Emotional Distress

Finally, Plaintiff does not plausibly allege, as he must, that he suffered emotional distress "so severe that no reasonable [person] could be expected to endure it." *Buckley*, 111 N.J. at 366 (quoting *Restatement (Second) of Torts*, § 46 cmt. j). Whether Plaintiff has plausibly alleged sufficiently severe emotional distress is a question of law for the Court to decide. *See id.* at 367.

Here, the FAC's only allegations of emotional distress resulting from the Port Authority Defendants' alleged conduct are that (i) "Plaintiff has suffered severe emotional distress, humiliation, and reputational harm because of the [NSF's] withdrawal from the charity event

28

Plaintiff founded and has led for seven years"; and (ii) "[t]he [NSF's] withdrawal from the NYC SEAL Swim has severely damaged Plaintiff's standing in the veteran community and his reputation as a veteran advocate and leader." FAC ¶¶ 356-57. These are just the kind of generic, conclusory allegations of emotional distress that courts regularly reject as insufficient as a matter of law. *See, e.g.*, *Buckley*, 111 N.J. at 368-99 (allegations "insufficient as a matter of law" where plaintiff's "complaints amount to nothing more than aggravation, embarrassment, an unspecified number of headaches, and loss of sleep" and plaintiff did "not claim any interference with his every day routine as a result of his mental distress"); *Kennedy v. Am. Airlines*, 195 F. Supp. 3d 646, 659 (D.N.J. 2016) ("find[ing] Plaintiff's generic and conclusory allegations of emotional distress inadequate to meet the severity requirement for emotional distress claims" where he "provide[d] no explanation concerning 'how [his] life has been affected by [his] distress, how [his] daily routine had changed, [or] how intensity of [his] distress has impacted [his] life'") (citation omitted).

## VI. PLAINTIFF'S CIVIL CONSPIRACY CLAIM AGAINST CHAIRMAN O'TOOLE FAILS AS A MATTER OF LAW

The elements of a civil conspiracy claim under New Jersey law are "(1) combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose to be achieved by unlawful means; and (4) special damages." *Eli Lilly & Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 496-97 (D.N.J. 1998). Here, Plaintiff's civil conspiracy claim fails for substantially the same reasons his § 1983 conspiracy claim fails: the FAC does not plausibly allege any underlying tort, as required, and the allegations regarding a conspiratorial "agreement" are entirely conclusory.

### A. Plaintiff Has Not Plausibly Alleged Any Underlying Tort

"Civil conspiracy claims under New Jersey law require the plaintiff to plead a viable underlying tort." *Dill v. Yellin*, 725 F. Supp. 3d 471, 484 (D.N.J. 2024). Because, as discussed

29

above, Plaintiff has failed to plausibly allege any underlying tort involving Chairman O'Toole, the civil conspiracy claim necessarily fails as well.

### B.  Plaintiff Has Not Plausibly Alleged a Conspiratorial Agreement

Even if Plaintiff had plausibly alleged an underlying tort (he has not), the civil conspiracy claim still fails because Plaintiff has not plausibly alleged a conspiratorial agreement.

"[A] plaintiff who seeks to plead a conspiracy will not plead a plausible claim for relief through bare allegations of a conspiracy, he must instead plead facts showing actual agreement between the alleged conspirators and concerted action towards the object of the conspiracy." *McClain v. United States*, 2021 WL 2224270, at *3 (D.N.J. June 2, 2021). The requisite elements of conspiracy must be alleged "with sufficient particularity," *Harley v. City of New Jersey City,* 2017 WL 2779466, at *12 (D.N.J. June 27, 2017), with plaintiff plausibly and specifically setting forth "the who, what, when, where, and how of the conspiracy." *Galicki v. New Jersey*, 2015 WL 3970297, at *9 (D.N.J. June 29, 2015).

Here, the supposed "agreement" between and among Chairman O'Toole and the other defendants is alleged in entirely conclusory terms. The FAC alleges that the defendants "conspired and acted in concert to injure Plaintiff through unlawful means" and that "Defendants reached an understanding to retaliate against Plaintiff" (FAC ¶¶ 494, 496), but as discussed in Section III.C above, Plaintiff does not allege any specific facts from which the Court could reasonably infer an actual agreement. This is especially so as to Chairman O'Toole, since the FAC contains no allegations regarding any specific actions taken by him personally. Therefore, like the § 1983 conspiracy claim, the civil conspiracy claim must be dismissed.

### CONCLUSION

For the foregoing reasons, Chairman O'Toole respectfully submits that the Court should grant this motion and dismiss Counts XII through XVIII of the FAC with prejudice.

Dated:  April 8, 2026            Respectfully submitted,

By:    */s/ Thomas R. Calcagni*
          Thomas R. Calcagni
          Walter R. Krzastek
          Luke J. O'Brien
          **CALCAGNI & KANEFSKY LLP**
          1085 Raymond Boulevard, 18th Floor
          Newark, New Jersey 07102
          (862) 397-1796
          tcalcagni@ck-litigation.com

          *Attorneys for Defendant Kevin J. O'Toole*

31