

**William (SEAL) Brown, Esq.**
Partner
260 Madison Avenue, 17th Floor
New York, NY 10016*
william.brown@parlatorelawgroup.com
Direct: 862-415-4880

April 10, 2026

**VIA CM/ECF**

The Honorable André M. Espinosa, U.S.M.J.
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

**Re: Brown v. McCarter & English LLP et al., Case No. 2:26-cv-02808-JXN-AME**
**Response to McCarter's April 9, 2026 Letter Regarding Motion to Disqualify**

Dear Judge Espinosa:

Plaintiff William Brown Jr., appearing pro se, respectfully submits this letter in response to the April 9, 2026 letter filed by O'Toole Scrivo, LLC on behalf of McCarter & English LLP (ECF Doc. 27). McCarter's letter asks the Court to administratively dismiss Plaintiff's federal Motion to Disqualify (ECF Doc. 19) and to exclude the OPRA records, body-worn camera footage, and process server evidence from the state court reply brief. Both requests should be denied.

## I.     THE FEDERAL MOTION RENDERS McCARTER'S OBJECTION MOOT

McCarter's entire letter is directed at the wrong target. The federal Motion to Disqualify (ECF Doc. 19) is a comprehensive, standalone filing — a 37-page memorandum of law with a 260-page declaration and exhibits — that presents all of the evidence McCarter seeks to exclude as part of the initial moving papers. The OPRA records, body-worn camera transcript, Captain Eileen O'Toole's Declaration, the process server's video transcripts, O'Toole's threatening text messages to his own family, the FBI Criminal Referral, and the Port Authority Inspector General Complaint are all attached as exhibits to the Declaration of William Brown Jr. (ECF Doc. 19-2). They are not presented in a reply brief — they are presented in the opening submission.

Even if the Court were to disregard the state court reply brief entirely, the federal motion presents the same evidence — and substantially more — as part of the initial moving papers. McCarter's objection about the state court reply is therefore moot. The Court can simply decide the federal motion on its own papers.

Licensed to Practice by the State of New Jersey
*Parlatore Law Group is a nationwide cloud-based firm. Please send all correspondence electronically. If physical mail is required, please use the central mailing address below.

www.parlatorelawgroup.com          1440 N Edgewood Street, Floor 4, Arlington, VA 22201

## II. McCARTER'S LETTER CITES NO LEGAL AUTHORITY — AND THAT FAILURE IS FATAL

McCarter's letter asks the Court to take two extraordinary actions — administratively dismiss a pending motion and exclude evidence from the record — yet it does not cite a single case, rule, or statute in support of either request. Courts have consistently held that a party's failure to support its position with legal authority is itself grounds for rejection. See Sackman v. New Jersey Mfrs. Ins. Co., 445 N.J. Super. 278, 297, 137 A.3d 1204 (App. Div. 2016) (**"the parties may not escape their initial obligation to justify their positions by specific reference to legal authority. Paucity of such reference suggests a like paucity of authority helpful to the party."**) (quoting State v. Hild, 148 N.J. Super. 294, 296 (App. Div. 1977)). Just weeks ago, the Appellate Division reaffirmed this principle in Amtrust North America v. Liberty Mutual Insurance Co., No. A-2587-24 (App. Div. Mar. 27, 2026), quoting Sackman in imposing sanctions on an attorney who submitted unsupported legal citations. McCarter's failure to cite any authority is not an oversight — it is because no authority supports its position.

## III. McCARTER'S LETTER IS ITSELF AN EXERCISE OF THE CONFLICTED REPRESENTATION

Before addressing the remaining substance of McCarter's arguments, the Court should recognize what McCarter's letter represents. O'Toole Scrivo — the firm Plaintiff seeks to disqualify — is making strategic decisions about what evidence the Court should consider on the disqualification motion. Counsel whose managing partner faces personal liability in this case has a structural incentive to limit the record to exclude evidence of that managing partner's conduct. An unconflicted counsel for McCarter would have no reason to exclude evidence of a co-defendant's misconduct.

The very act of filing this letter — asking the Court to limit the record to exclude evidence documenting the Port Authority's interference with this litigation through the agency O'Toole chairs — demonstrates the conflict. See In re Congoleum Corp., 426 F.3d 675, 694-95 (3d Cir. 2005) (**"it was not a proper exercise of the bankruptcy court's discretion to fail to consider and appraise the conduct of the parties and counsel"**).

## IV. THE FEDERAL MOTION IS NOT A DUPLICATE — IT CONTAINS SUBSTANTIAL NEW EVIDENCE

McCarter argues that the federal Motion to Disqualify (ECF Doc. 19) is an "**unnecessary duplicate**" of the state court motion. It is not. The federal motion contains substantial evidence not available when the state court papers were filed:

1. Captain Eileen O'Toole's Declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 (signed March 27, 2026) — O'Toole's own sister, a 25-year law enforcement veteran, confirming the pattern of government abuse under oath;

2. O'Toole's threatening text messages to his own family (Exhibit H) — now part of the federal record for the first time;

3. The Mediation Agreement showing O'Toole Scrivo's deeper involvement in this litigation (Exhibit L);

4. The FBI Criminal Referral (March 30, 2026);

5. The Port Authority Inspector General Complaint (March 30, 2026);

6. Cedar Grove's March 30, 2026 letter stalling on supplemental OPRA requests (Exhibit K);

7. Updated procedural history documenting the coordinated removal.

None of this evidence was before the state court. McCarter cites no authority — because none exists — prohibiting a party from filing a motion in federal court after removal that incorporates newly obtained evidence. To the contrary, upon removal, the federal court acquires full jurisdiction and federal procedure governs all further proceedings. See Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 437 (1974); Tehan v. Disability Mgmt. Servs., Inc., 111 F. Supp. 2d 542, 547-48 (D.N.J. 2000) (**state court orders become "federalized" upon removal and the district court is "free to treat the order as it would any such interlocutory order it might itself have entered"**).

V.   **THE TIMING OF THE COORDINATED REMOVAL SPEAKS FOR ITSELF**

McCarter's own conduct necessitated the re-filing. The record establishes the following timeline:

On March 2, 2026, Plaintiff filed the Motion to Disqualify in state court. On March 6, 2026, Plaintiff informed the state court of the process server incident and the pending OPRA request. On March 12, 2026, Plaintiff advised the state court that OPRA records were expected before the March 27 hearing. On March 17, 2026 at 2:41 PM, O'Toole Scrivo filed its opposition — arguing the conflict was "**speculative.**" Later that same day, the Township of Cedar Grove produced the OPRA records, including the police incident report confirming the Port Authority called the Cedar Grove Police Chief to stop Plaintiff's process server.

On March 18, 2026 at 6:33 AM, Plaintiff filed his Reply Brief with the OPRA records, body-worn camera transcript, and process server video transcripts — evidence proving the Port Authority called the Cedar Grove Police on a false pretense. Approximately twelve hours later, at 6:17 PM, McCarter filed its Notice of Removal. Two minutes after that, at 6:19 PM, the Port Authority defendants filed their own Notice of Removal. The two-minute gap between filings confirms pre-coordination: McCarter's Notice states that the Port Authority defendants **"indicated that they intend to file written consent to removal by McCarter"** (ECF Doc. 2 ¶ 19), and the Port Authority's Notice states that **"Counsel for McCarter & English have confirmed that they consent to this notice of removal"** (ECF Doc. 1 ¶ 15).

The removal eliminated the state court's scheduled March 27, 2026 hearing on the disqualification motion — just nine days away.

Critically, McCarter's own Notice of Removal admits that removability was **"first ascertainable on February 16, 2026"** — the date the Amended Complaint was filed. (ECF Doc. 2 ¶ 8.) McCarter waited the maximum 30 days permitted under 28 U.S.C. § 1446(b)(3) and filed on the last possible day — which happened to be the morning after Plaintiff filed the OPRA evidence and nine days before the scheduled hearing. The timing of the removal correlates not with the Amended Complaint filed a month earlier, but with the OPRA evidence filed twelve hours earlier.

Having forum-shopped to avoid the state court hearing, McCarter cannot now complain that Plaintiff re-filed the motion in the new forum with updated evidence. Congress designed the removal and remand framework **"to prevent a party to a state lawsuit from using federal removal provisions and appeals as a tool to introduce substantial delay into a state action."** Hudson United Bank v. LiTenda Mortgage Corp., 142 F.3d 151, 156 (3d Cir. 1998).

Once the case was removed, the state court was divested of jurisdiction and all further proceedings — including the resolution of the disqualification motion — must occur in federal court. See 28 U.S.C. § 1446(d).

## VI.    THE STATE COURT REPLY BRIEF EVIDENCE WAS PROPERLY INCLUDED

Even though the federal motion renders this objection moot, McCarter's argument that the state court reply brief improperly introduced "**new allegations and arguments**" fails for four independent reasons.

### A. The OPRA Records Were Genuinely Unavailable When the Motion Was Filed

The OPRA records were obtained after the opposition was filed and could not have been raised earlier. McCarter filed its opposition on March 17, 2026 at 2:41 PM. The OPRA records were produced later that same day. Plaintiff's reply was filed on March 18, 2026 at 6:33 AM. The rule against new arguments in reply briefs applies to new legal theories — not to newly obtained evidence that directly responds to arguments raised in the opposition. See Elizabethtown Water Co. v. Hartford Cas. Ins. Co., 998 F. Supp. 447, 458 (D.N.J. 1998) (**reply briefs properly "respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted"**).

New Jersey courts have consistently held that where a litigant seeks to present evidence that was genuinely unavailable at the time of the initial filing, the court should consider it. In M.S. v. T.S., No. A-2507-22 (N.J. Super. Ct. App. Div. Apr. 5, 2024), the Appellate Division held that **"if a litigant wishes to bring new or additional information to the [c]ourt's attention which it could not have provided on the first application, the [c]ourt should, in the interest of justice (and in the exercise of sound discretion), consider the evidence"** (quoting Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996)). The court distinguished this from situations where **"a party — either for strategic reasons or because the party overlooked the significance of a document — withheld the document from evidence."** Id. at 12-13. Here, the OPRA records were produced by a government agency in response to a formal records request — they did not exist in Plaintiff's possession until March 17, 2026.

Moreover, the fairness concern underlying the rule against new evidence in reply is that the opposing party lacks notice and a meaningful opportunity to respond. See Alston v. Forsyth, 379 F. App'x 126, 128 (3d Cir. 2010) (**"Fundamental fairness demands that [the non-movant] should have had notice and a meaningful opportunity to respond."**). That concern is absent here: McCarter was on notice that the OPRA records were forthcoming (Plaintiff informed the Court and McCarter on March 6 and March 12, 2026), and McCarter has now had a full opportunity to respond — indeed, its April 9 letter is itself a response.

### B. McCarter's Own Opposition Introduced New Evidence

McCarter's own opposition introduced new evidence — the sworn certification of Robin King, CEO of the Navy SEAL Foundation — that was not part of the original motion papers. McCarter cannot introduce new evidence in its opposition and then object when Plaintiff responds with newly obtained evidence in the reply. The cases McCarter cites — In re Bell Atl.-N.J., Inc., 342 N.J. Super. 439 (App. Div. 2001) and City of Hoboken v. Exxon Mobil Corp., 558 F. Supp. 3d 191 (D.N.J. 2021) — involved new legal theories, not newly obtained evidence responding to opposition arguments. They are inapposite.

### C. The OPRA Records Directly Responded to McCarter's Central Argument

McCarter's opposition argued the conflict was "**speculative**" and "**future-oriented**." The OPRA records — produced the same day as the opposition — proved the conflict was documented, concrete, and had already occurred.

### D. The Federal Motion Renders the Objection Moot

As set forth in Section I above, the federal Motion to Disqualify (ECF Doc. 19) presents the same evidence as initial moving papers, rendering the objection moot.

## VII.   McCARTER'S OWN CITED AUTHORITY SUPPORTS PLAINTIFF

McCarter cites Murray v. Pinnacle Foods Corp. and Doe v. United Services Life Ins. Co. for the proposition that the federal court **"takes the case on removal exactly as the case stood in state court"** and that **"[m]otions pending in state court at the time of removal survive removal."** These cases support Plaintiff. The disqualification motion was pending and unresolved in state court — including the reply brief with the OPRA records. The federal court takes it as it stood. See GGC Int'l Ltd. v. Ver, No. 1:24-cv-01533, slip op. at 2 (S.D.N.Y. Jan. 13, 2025) **("Because motions pending in state court at the time of removal survive removal, these motions are now ripe for decision.")** (citing Doe v. United Servs. Life Ins. Co., 123 F.R.D. 437, 438 (S.D.N.Y. 1988)); accord Wright & Miller, Federal Practice and Procedure § 3733.

## VIII.   THE COURT HAS AN INDEPENDENT OBLIGATION TO CONSIDER ALL RELEVANT EVIDENCE

Disqualification motions implicate the Court's inherent authority to supervise the conduct of attorneys appearing before it. See In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984). The Court has an independent obligation to protect the integrity of the proceedings — an obligation that exists regardless of procedural technicalities. See In re Congoleum Corp., 426 F.3d at 694-95 (Third Circuit holding that a court's failure to **"consider and appraise the conduct of the parties and counsel"** was **"not a proper exercise of [its] discretion"**). The OPRA records, body-worn camera footage, Captain O'Toole's Declaration, and the FBI Criminal Referral are all directly relevant to the integrity of these proceedings. Excluding them on procedural grounds would be an abdication of the Court's supervisory responsibility.

## IX.   SIGNIFICANT POST-FILING DEVELOPMENTS CONFIRM THE CONFLICT

Since the federal motion was filed, four significant developments have occurred that further confirm the conflict and that the Court should consider:

### A. The Port Authority Withdrew from O'Toole's Defense

On April 8, 2026, the Port Authority Law Department withdrew from Chairman O'Toole's defense. The Port Authority attorneys who had represented O'Toole — Cheryl Alterman and Megan Lee — were terminated as his counsel. (ECF Doc. 22.) O'Toole retained private personal counsel at Calcagni & Kanefsky LLP. (ECF Docs. 20, 21.) Under the Port Authority By-Laws, Art. XI, paragraph 4, the Port Authority is not required to indemnify or defend an officer where the conduct involved **"actual fraud, actual malice, willful misconduct or intentional wrongdoing."** The Port Authority's withdrawal is the second recognition of the conflict — the first being its decision to retain separate counsel rather than allowing O'Toole Scrivo to represent O'Toole.

### B. The Battery Park City Authority Denied the NYC SEAL Swim Permit

On April 7, 2026, the Battery Park City Authority denied the permit for the 2026 NYC SEAL Swim. In seven years of organizing this event, BPCA has never denied a permit. Nidia Blake, BPCA's Director of Event Coordination and Management, emailed Plaintiff stating that BPCA is **"not able to accommodate the event in 2026 due to ongoing Lower Manhattan Resiliency construction."** A copy of Nidia Blake's email is attached hereto as Exhibit A. Critically, Patrick Donovan — the Port Authority employee who sent Plaintiff the threatening text message and a named defendant in this action — was copied on the denial email, despite not being on Plaintiff's original permit request emails to BPCA or on Commander Jimmy May's emails to BPCA. This is precisely the retaliatory influence Plaintiff predicted in his court filings and FOIL request to BPCA. The Port Authority's retaliatory influence has now extended to the agency that works most closely with the Port Authority at the World Trade Center site — denying a charity event for 9/11 survivors, Gold Star families, veterans, police officers, and firefighters access to the very site where 2,977 Americans were murdered.

5

**C. O'Toole Scrivo Filed a Motion to Dismiss While the Disqualification Motion Remains Pending**

On April 8, 2026, O'Toole Scrivo filed a 47-page Motion to Dismiss on McCarter's behalf (ECF Doc. 23) while the disqualification motion remains pending. O'Toole's personal Motion to Dismiss (ECF Doc. 25) expressly **"adopts and incorporates by reference all arguments set forth in his co-defendants' motions to dismiss."** This coordination confirms the structural control documented in the Motion to Disqualify.

**D. McCarter's Motion to Dismiss Proves the Conflict**

Rather than distancing McCarter from O'Toole's conduct — which is what an unconflicted counsel would do — O'Toole Scrivo argues that there is no factual basis for the conspiracy at all. (ECF Doc. 23-1 at 38-40.) This argument protects O'Toole by denying the existence of any retaliatory conduct, rather than arguing that even if the Port Authority retaliated, McCarter had no involvement. An unconflicted counsel for McCarter might take a fundamentally different approach: concede that the Port Authority's conduct was O'Toole's independent action and argue that McCarter had nothing to do with it — a defense that would serve McCarter's interests but expose O'Toole to greater personal liability. O'Toole Scrivo will never make that argument because it would implicate its own managing partner. That is the conflict.

X.  **IF McCARTER RECEIVES A SUR-REPLY, PLAINTIFF REQUESTS EQUAL OPPORTUNITY**

If the Court grants McCarter's request for a five-page sur-reply, Plaintiff respectfully requests an equal opportunity to file a responsive submission addressing the post-filing developments set forth above.

XI.  **CONCLUSION**

McCarter's letter cites no authority for its requests, relies on cases that support Plaintiff's position, and seeks to limit the record to exclude evidence that directly refutes McCarter's "**speculative**" argument. The federal Motion to Disqualify (ECF Doc. 19) presents all of the challenged evidence as part of the initial moving papers, rendering McCarter's objection about the state court reply brief moot. The Court should deny McCarter's requests and proceed to decide the disqualification motion on the full record — including the federal motion (ECF Doc. 19), the state court papers (ECF Doc. 2-1), and the significant post-filing developments set forth herein.

Plaintiff also respectfully renews his request, set forth in ECF Doc. 26, that the Court resolve the disqualification motion before entertaining the Motions to Dismiss filed by conflicted counsel. The Third Circuit has recognized that **"[o]rdinarily, it will be the better practice to rule on the disqualification motion first."** In re School Asbestos Litig., 977 F.2d 764, 781 n.26 (3d Cir. 1992). More recently, the Third Circuit adopted the principle that a conflict of interest **"calls into question the integrity of the process in which the allegedly conflicted counsel participates,"** and therefore the court **"must resolve the motion to disqualify 'before it turns to the merits of any dispositive motion.'"** Tymiak v. Comm'r Soc. Sec., No. 19-3496, slip op. at 16 (3d Cir. Jan. 26, 2021) (quoting Grimes v. District of Columbia, 794 F.3d 83, 86 (D.C. Cir. 2015)). Accord Bowers v. Ophthalmology Group, 733 F.3d 647, 654 (6th Cir. 2013) (**"A district court must rule on a motion for disqualification of counsel prior to ruling on a dispositive motion because the success of a disqualification motion has the potential to change the proceedings entirely."**).

> Respectfully submitted,
> /s/ William Brown
> William (SEAL) Brown Jr., Esq.
> Plaintiff Pro Se
> william.brown@parlatorelawgroup.com

Enclosure: <u>Exhibit A</u> — Email from Nidia Blake, BPCA Director of Event Coordination and Management, dated April 7, 2026

cc: Thomas P. Scrivo, Esq. / Michael J. Dee, Esq. / Joseph R. Marsico, Esq.
O'Toole Scrivo, LLC — via CM/ECF

Thomas R. Calcagni, Esq. / Walter R. Krzastek, Esq. / Luke J. O'Brien, Esq.

Calcagni & Kanefsky LLP — via CM/ECF

Cheryl Alterman, Esq. / Megan Lee, Esq. — via CM/ECF

## EXHIBIT A

---------- Forwarded message ---------
From: **Nidia Blake** <Nidia.Blake@bpca.ny.gov>
Date: Tue, Apr 7, 2026 at 5:04 PM
Subject: NYC SEAL Swim 2026 — Sponsor Introductions, Logistics Planning & Permit Request
To: William Brown <wibrown32099@gmail.com>
Cc: Brett Kobell <brett.kobell@sunbeltrentals.com>, Ed <golfer7171@gmail.com>, Ill, Frederick J. (FDNY) <frederick.ill@fdny.nyc.gov>, drew@beyondthebrotherhood.org <drew@beyondthebrotherhood.org>, Patrick Donovan <pdonovan@panynj.gov>, Jahmeliah Nathan <jahmeliah.nathan@bpca.ny.gov>, jimmy@maydayexec.com <jimmy@maydayexec.com>


Hi William,

Thank you for your continued interest in hosting the NYC SEAL Swim in Battery Park City.

Following a thorough internal review, we are not able to accommodate the event in 2026 due to ongoing Lower Manhattan Resiliency construction, which will significantly impact access to and use of the Esplanade and South Cove boardwalk.

As previously communicated, ongoing construction makes it not feasible to hold events at this time.

We value our longstanding relationship and appreciate the collaboration over the years. While we are unable to host the event in Battery Park City in 2026, we are available to connect, if helpful, to discuss potential alternative locations outside of BPCA's jurisdiction.

Thank you for your understanding.

Best,


**Nidia X. Blake**
Director of Event Coordination and Management
NYS Employment Assistant Program Coordinator

**Battery Park City Authority**
200 Liberty Street, 24th Floor, New York, NY 10281
(212) 417-2278 | nidia.blake@bpca.ny.gov
bpca.ny.gov
English/Spanish
NYS Work-Life Services: Employee Assistance EAP Program Promotional Video 2022
Find an EAP Coordinator | Office of Employee Relations

---------- Forwarded message ---------
From: **Jimmy May** <jimmy@maydayexec.com>
Date: Thu, Mar 5, 2026 at 12:56 PM
Subject: Re: NYC SEAL Swim 2026 — Sponsor Introductions, Logistics Planning & Permit Request |
To: William Brown <wibrown32099@gmail.com>
Cc: Nidia' <nidia.blake@bpca.ny.gov>, Yves Veve <yves.veve@bpca.ny.gov>, <Jonathan.Park@bpca.ny.gov>, Lashay Singleton <Lashay.Singleton@bpca.ny.gov>, Mark McGinnis <mark@seallegacy.org>, Christopher Brownell <tlmark1@aol.com>, Drew Forsberg <drew@beyondthebrotherhood.org>, Ill, Frederick J. (FDNY) <Frederick.Ill@fdny.nyc.gov>, Joseph Patrick Landy <patrick.landy@donjon.com>, Shane McKenzie <shane.mckenzie@sunbeltrentals.com>, Brett Kobell <brett.kobell@sunbeltrentals.com>

**Great summary Bill.  Thank you.**

**Nidia,**

**    You are the first step in planning, so please let me know if you have time for a call early next week to discuss availability.  Text is best for coordination and my info is in the signature block below.  I will hit you up SEPCOR on a plan to meet.**

**Captain Fred,**

**    Wow - no words.  I am so sorry.  Thank you for being a force for good, it is the best way to build a legacy for our fallen loved ones.**

**    Once I get the plan figured out with Nidia, I will reach out to you for guidance.  I will be in NYC at the end of June and hopefully we can meet over coffee or a beer.**

Humbly,

Jimmy May
CEO, Mayday Executive Services
CDR, USN (ret)
LinkedIn
757-291-9678

From: **William Brown** <wibrown32099@gmail.com>
Date: Thu, Mar 5, 2026 at 11:57 AM
Subject: NYC SEAL Swim 2026 — Sponsor Introductions, Logistics Planning & Permit Request |
To: Nidia' <nidia.blake@bpca.ny.gov>, Yves Veve <yves.veve@bpca.ny.gov>, <Jonathan.Park@bpca.ny.gov>, Lashay Singleton <Lashay.Singleton@bpca.ny.gov>
Cc: Mark McGinnis <mark@seallegacy.org>, Christopher Brownell <tlmark1@aol.com>, Jimmy May <jimmy@maydayexec.com>, Drew Forsberg <drew@beyondthebrotherhood.org>, Ill, Frederick J. (FDNY) <Frederick.Ill@fdny.nyc.gov>, Joseph Patrick Landy <patrick.landy@donjon.com>, Shane McKenzie <shane.mckenzie@sunbeltrentals.com>, Brett Kobell <brett.kobell@sunbeltrentals.com>

Good morning Nidia,

Thank you for the update on the Lower Manhattan Resiliency Construction and for flagging the potential impact on the Esplanade and South Cove. I appreciate you looking into this with your Design and Construction team, and I want to work with you and your team to find a solution that works for everyone.

Before I get into logistics, I want to introduce you to the leadership of the two organizations co-sponsoring this year's NYC SEAL Swim:

**SEAL Legacy Foundation** ("SLF"):

·      **Mark McGinnis** — Navy SEAL Commander (ret), CEO of SLF (mark@seallegacy.org)

·      **Christopher "Brownie" Brownell** — Navy SEAL Command Master Chief (ret) with over 32 years of service, Board Member of SLF (tlmark1@aol.com)

**Beyond the Brotherhood** ("BTB"):

·      **Jimmy May** — Navy SEAL Commander (ret), Founder and CEO of BTB (jimmy@maydayexec.com)

·      **Drew Forsberg** — Navy SEAL Chief Warrant Officer (ret), Executive Director of BTB (drew@beyondthebrotherhood.org)

SLF and BTB are co-sponsoring the 2026 NYC SEAL Swim.

**Jimmy May ([jimmy@maydayexec.com](mailto:jimmy@maydayexec.com)) will be the primary point of contact for both SLF and BTB** going forward. Please feel free to reach out to Jimmy directly for any coordination needs.

Also copied on this email is **FDNY Captain Fred J. Ill, III**, whose father, FDNY Captain Fred J. Ill, Jr., was killed in the line of duty on September 11, 2001. Captain Ill has been our point of contact for the placement of FDNY decontamination stations at Battery Park in previous years and will continue in that role for the 2026 swim.

I am also copying **Patrick Landy from Donjon Marine Co., Inc.** ([patrick.landy@donjon.com](mailto:patrick.landy@donjon.com)). Donjon Marine provides the marine support for the NYC SEAL Swim, including the support vessels and the ladders that swimmers use to climb out of the Hudson River onto the Esplanade at the extraction point. I am working with Pat to discuss alternative extraction points in light of the construction, and he is available to coordinate directly with your team on marine logistics.

I am also copying **Shane McKenzie**, Navy SEAL Command Master Chief (ret) and Director of the Veteran Program at **Sunbelt Rentals** ([shane.mckenzie@sunbeltrentals.com](mailto:shane.mckenzie@sunbeltrentals.com)), and **Brett Kobell**, Operations Manager of Veterans Programs at Sunbelt Rentals ([brett.kobell@sunbeltrentals.com](mailto:brett.kobell@sunbeltrentals.com)). Sunbelt Rentals provides equipment for the NYC SEAL Swim at Battery Park, and Shane and Brett will be coordinating equipment needs for the 2026 event. Once we confirm the extraction point and event layout, Shane and Brett will work with your team on equipment placement.

**Swim Date & Timing**

We have worked with Liberty State Park to confirm the date for this year's swim: **Saturday, August 15, 2026**. Based on current NOAA tide and current predictions, we estimate swimmers will enter the Hudson River by approximately 8:00 AM. This means all swimmers should be out of the water and at Battery Park by approximately 10:00 AM.

This is an earlier timeline than previous years, which I believe works in everyone's favor — **the swim will be completed well before the park sees heavy visitor traffic, significantly reducing the impact on the City and on users of the Esplanade.** Our entire footprint at Battery Park will be concentrated in the early morning hours before peak visitor traffic, which should also help minimize any conflict with construction activity or public access schedules.

**Regarding the Construction — We Are Flexible**

I understand the Resiliency Construction is a major undertaking and I want to assure you that we are flexible and committed to working around it. I have reviewed the construction impacts you described and want to lay out our position on each issue, along with alternatives we can offer:

**1. Volleyball Court Area — No Impact**

We have no plans to use the volleyball court area, so the scheduled closure in April 2026 does not affect our event.

**2. Swimmer Extraction Point — South Cove Alternatives**

South Cove has been our primary extraction point where swimmers exit the Hudson River and climb ladders placed by Donjon Marine onto the Esplanade. I understand you are checking with your Design and Planning team on whether South Cove will be accessible in August. This is the most important logistical piece for us, so I want to proactively lay out every alternative we can work with.

**We have done this before.** In 2020, a storm damaged South Cove Marina and we successfully pivoted to **North Cove Marina** as our extraction point. The swim went off without a hitch. We are confident we can adapt again.

Here are all of the possible extraction points at Battery Park that we are open to — we will make any of them work:

· **South Cove Marina** *(preferred, if accessible)* — Our traditional extraction point. Donjon Marine places ladders here for swimmers to climb out of the water onto the Esplanade. If South Cove is available, it remains our first choice.

· **North Cove Marina** *(proven alternative)* — We used North Cove successfully in 2020 when South Cove was damaged. North Cove has established marina and dock infrastructure, and Donjon Marine can place

ladders and position support vessels there just as they have at South Cove. This is our preferred alternative if South Cove is unavailable.

·      **Pier A / Wagner Park Waterfront** — This area is south of North Cove and closer to the original South Cove location. If this waterfront area is accessible and unaffected by construction, it could serve as an extraction point with minimal change to the swim course. Donjon Marine can place ladders at any accessible waterfront point along this stretch.

·      **Nelson A. Rockefeller Park Waterfront** — Located in the northern section of Battery Park City, Rockefeller Park has waterfront access along the Esplanade. If the southern waterfront is entirely closed due to construction, this could serve as a northern extraction point. The swim course would need adjustment, but our team can accommodate that.

·      **Brookfield Place Waterfront (North Cove adjacent)** — Another option if North Cove Marina itself is impacted. The Brookfield Place waterfront has dock access and could potentially serve as an extraction point, though I understand this may involve coordination with Brookfield Properties.

·      **The Battery (formerly Historic Battery Park)** — If all Battery Park City waterfront locations are unavailable, we could explore using The Battery as an extraction point. I understand this would fall under NYC Parks jurisdiction and would require a separate permit, but I want to put it on the table as a contingency.

Nidia, **we are open to all of these options — or any other location you recommend.** If you could let us know which extraction point would work best given the construction timeline, we will adapt our plans accordingly. Pat Landy at Donjon Marine can place ladders and position support vessels at any accessible waterfront point, and Shane McKenzie and Brett Kobell at Sunbelt Rentals can adjust equipment placement to match. Our team has the experience to make any of these work.

### 3. Flag Run Route — Multiple Alternatives Available

If the Esplanade is impacted by construction on August 15, we have the ability to do an alternate route for the flag run. Here are the options we can work with:

·      **Interior BPC Pedestrian Paths** — Route the flag run along the interior pedestrian paths within Battery Park City, avoiding the Esplanade waterfront entirely.

·       **West Street / Route 9A Pedestrian Path** — Use the wide pedestrian and bike path along West Street, which is publicly accessible and should not be affected by waterfront construction.

·       **Shortened Ceremonial Route** — If space is limited, we can shorten the flag run to a ceremonial loop near the extraction point, keeping the entire event footprint compact.

We are happy to work with you and your team on whatever routing makes the most sense given the construction timeline. Please let us know your preference or propose a route, and we will make it work.

### 4. FDNY Decontamination Stations & Equipment

Captain Fred J. Ill, III (copied) has coordinated the placement of FDNY decontamination stations at Battery Park in previous years. Shane McKenzie and Brett Kobell at Sunbelt Rentals (both copied) coordinate the equipment provided for the event at Battery Park. Once we confirm the extraction point and event layout, Captain Ill, Shane, and Brett will coordinate directly with your team on decon station and equipment placement for 2026.

### <u>Permit Application</u>

Nidia, could you please send us the permit application for the 2026 event at your earliest convenience? We want to get that submitted promptly to lock in the date.

**Jimmy May (<u>jimmy@maydayexec.com</u>) will be the point of contact for the application on behalf of SLF and BTB.**

### <u>NYC SEAL Swim – Adventure Therapu Book</u>

Lastly, See link for a copy of the <u>NYC SEAL Swim – Adventure Therapy Book</u> that is getting ready to be released. for your review. In the book, I made sure to give Battery Park City love for their incredible support of the NYC SEAL Swim and the positive patriotic message of unity that this event sends every year. BPCA has been an outstanding partner, and we are grateful.

### Summary

To make this as easy as possible for your team, here is what we need from BPCA:

1.      **South Cove status** — Confirmation on whether South Cove will be accessible on August 15, 2026, and if not, which alternative

extraction point BPCA recommends (we are open to all options listed above)

2.    **Esplanade status** — Confirmation on whether the Esplanade will be accessible for the flag run, and if not, BPCA's preferred alternative route

3.    **Permit application** — Please send at your earliest convenience so we can submit promptly

4.    **Site walk-through** — Once we have clarity on the extraction point and route, we would like to schedule a site walk-through with your team

We are flexible, we are early risers, and we will make this work. Thank you,

Nidia. Together, we've done a lot of good. The NYC SEAL Swim helps 9/11 survivors and the families of those lost on 9/11. It also helps Gold Star families, SEALs, Veterans, Police Officers, and Firefighters. Together, for seven years we've sent a positive patriotic message of unity for our entire nation to see. This is way I need your help and the help of BPCA to ensure the NYC SEAL Swim continues.

Looking forward to working with you and the BPCA team again this year.

Please do not hesitate to reach out with any questions.



Thank you,
Bill