

**THOMAS R. CALCAGNI** PARTNER

📞 862.397.1796   ✉ tcalcagni@ck-litigation.com   🌐 ck-litigation.com



April 17, 2026

<u>**Via ECF**</u>
Hon. Julien Xavier Neals, U.S.D.J.
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

> Re:   *Brown v. McCarter & English, LLP* et al., Case No. 2:26-cv-2808-JXN-AME,
> <u>**Response to Plaintiff's Repeated Distortions Regarding Service of Process**</u>

Dear Judge Neals:

This firm represents defendant Kevin J. O'Toole, Chairman of the Port Authority of New York and New Jersey, in the above-referenced matter.  On Wednesday, *pro se* Plaintiff gratuitously filed with the Court yet another letter (his eighth[1]), further highlighting his malintent to blanket the docket with groundless and harassing allegations against Chairman O'Toole that have nothing whatsoever to do with the subject matter of his lawsuit.  (ECF No. 31).  Because Plaintiff claims his specious allegations as to service of process are "at the center" of his pending disqualification motion, *id.*, we are constrained to briefly respond to correct the record.

To begin with, Plaintiff is a licensed attorney who, of course, knows better than to try to pass off a Channel 4 "I-Team" segment as evidentiary.  (ECF No. 31 at 1.)[2]  It is particularly unseemly here where the "independent[] investigat[ion]" he touts (*id.*) is so plainly a sensationalized reporting of his own baseless allegations.  That Plaintiff, himself, is dressed for the camera and featured prominently in a staged interview calling for the removal of the Chairman, leaves no doubt as to Plaintiff's orchestration of and malicious purpose behind the hit piece, which unsurprisingly never approaches the truth of the matter.

As the materials appended to Plaintiff's disqualification motion show, an individual parked outside of and approached Chairman O'Toole's family home, rang the doorbell, and asked for a person named "Donovan." (ECF No. 19-2, Ex. E).  The individual, who was unknown to Chairman O'Toole, did not give his name or otherwise identify himself in any way.  He never even identified himself as a process server or showed Chairman O'Toole the papers he held in his hand.  Instead, and without any explanation, he repeatedly asked for someone named Donovan.  Chairman O'Toole, for his part, was cordial and fully responded to the individual's questions.  Despite being told that no one by that name lived there, the individual lingered nearby and several minutes later re-approached the family home, repeatedly knocking on the door and ringing the doorbell.  When he did not get a response, the still unidentified individual sneeringly muttered "Oh, I see.  Okay" and said he was going to "come back" yet again.  (*Id.*, Ex. E).  The process server never identified himself or his purpose, notwithstanding his blatantly false affidavit claiming he "said out loud, Mr. O'Toole, I have important documents for you" (*id.*, Ex. I) – the video shows he said no such thing,

---

[1] *See* ECF Nos. 14-17, 26, 28, 30-31.
[2] *See, e.g.*, *Weller v. Ransom-Garnet*, 338 F. App'x 249, 252-53 (3d Cir. 2009) (affirming district court's rejection of plaintiff's reliance on newspaper articles – which are "classic, inadmissible hearsay" – in opposition to summary judgment in § 1983 suit (quoting *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005)).

Letter to the Honorable Julien Xavier Neals, U.S.D.J., Friday, April 17, 2026
Page 2 of 3

as Plaintiff's transcripts of the videos confirm. (*Id.*, Exs. E-F.)

To be sure, Chairman O'Toole may have suspected the individual could be a process server (despite his failure to identify himself as such). But any homeowner – particularly a parent and public official who (and whose family) has been the target of repeated violent threats – would be justified in proceeding cautiously when an unknown, unidentified person lingers about and repeatedly approaches their family's home for no stated reason, and then threatens to come back yet again. Reporting such behavior is far from an abuse of power. In a world understandably on high alert, where CEOs and public servants alike are hunted down and assassinated in the street and within their own homes, exercising caution and engaging law enforcement in these scenarios is now common-sense protocol. Still, hellbent on creating a conspiracy in the absence of credible claims that can stand on their own, Plaintiff shamefully mischaracterizes Chairman O'Toole's actions as part of an effort to "obstruct service of process" and "interfere with this litigation." (ECF No. 19-1 at 25, 29). These are but more of his absurd and insulting allegations against Chairman O'Toole having no foundation in the factual record or, for that matter, anywhere else in the realm of reasonableness. As Plaintiff must concede, "[o]n the very same day" Chairman O'Toole was purportedly interfering with the litigation and obstructing the service of process, the Port Authority's General Counsel affirmatively reached out to Plaintiff and accepted service on behalf of Chairman O'Toole, Patrick Donovan, and the agency. (ECF No. 19-2 at ¶ 21). That, of course, is the exact opposite of obstruction and interference. It also would have happened even sooner if Plaintiff were less interested in engineering a caught-on-camera moment and had simply asked the Port Authority to accept service (which, of course, Plaintiff – a Partner in the New York office of a Virginia-based litigation firm – knows is the customary practice) rather than deploy a process server equipped with a bodycam to the individual defendants' homes on a weekend.[3]

In fact, Plaintiff continued sending out his process server even *after* the Port Authority accepted service. Plaintiff unabashedly admits that the day after the Port Authority accepted service, "March 1, 2026, the process server attempted to serve Patrick Donovan at his home." (ECF No. 19-1 at 7.) Rather than apologize for the unwarranted intrusion onto Mr. Donovan's property or his unprofessional and harassing attempt to serve a party whose lawyer had already accepted service, Plaintiff promotes his wild conspiracy theory claiming that Donovan, by not answering the door (assuming he was even home), was evading service – even though service had already been accepted – as part of a "coordinated evasion" with Chairman O'Toole. (*Id.* at 8.) In reality, it is more of the same spurious sideshow that Plaintiff has fabricated, having absolutely nothing to do with Plaintiff's employment claims against McCarter & English, LLP ("McCarter"), O'Toole Scrivo, LLC's legal representation of McCarter, or Plaintiff's claims against the Port Authority defendants regarding the loss of his alleged contractual relationship with the Navy SEAL Foundation.

---

[3] Rule 4(d) even incentivizes plaintiffs to request a waiver of service before seeking to effectuate personal service of process – through cost-shifting that penalizes defendants who refuse to waive service "without good cause," Fed. R. Civ. P. 4(d)(2) – and the express "aims of the provision are to eliminate the costs of service . . . and to foster cooperation among adversaries and counsel." Fed. R. Civ. P. 4, advisory committee's notes to 1993 amendment.

Letter to the Honorable Julien Xavier Neals, U.S.D.J., Friday, April 17, 2026
Page 3 of 3

We appreciate the Court's consideration of this submission.

Very truly yours,

*/s/ Thomas R. Calcagni*
Thomas R. Calcagni
Calcagni & Kanefsky LLP

c.      Plaintiff and all counsel of record (via ECF)