



**William (SEAL) Brown, Esq.**
Partner
260 Madison Avenue, 17th Floor
New York, NY 10016*
william.brown@parlatorelawgroup.com
Direct: 862-415-4880

April 18, 2026

**VIA CM/ECF**

The Honorable Julien Xavier Neals, U.S.D.J.
United States District Court
District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

**Re: Brown v. McCarter & English LLP et al.**
**Case No. 2:26-cv-02808-JXN-AME**
**Response to Defendant O'Toole's April 17, 2026 Letter (ECF Doc. 33)**

Dear Judge Neals:

Plaintiff respectfully submits this response to the April 17, 2026 letter filed by Defendant O'Toole's counsel (ECF Doc. 33). That letter attacks the credibility of Joshua T. Lee — the Black American professional process server whose civil rights were violated on February 28, 2026 — while ignoring the documented misconduct of the Cedar Grove Police Department and the Port Authority.

Every material assertion in Defendant O'Toole's letter is contradicted by the record. Plaintiff also writes to advise the Court of significant new developments directly relevant to the pending motions.

As a preliminary matter, Defendant O'Toole's counsel characterizes Plaintiff's filings as a "**serial letter-writing campaign**." (ECF Doc. 33 at 1.) Plaintiff is a pro se party simultaneously opposing three law firms — O'Toole Scrivo, the Port Authority Law Department, and now Calcagni & Kanefsky — across three Motions to Dismiss, a Motion to Disqualify, and related proceedings. Every letter Plaintiff has filed has been in response to a development the Court needed to know about or in direct response to a letter filed by opposing counsel. Defendant O'Toole's own counsel has filed two letters of his own (ECF Docs. 29, 33) without similar self-criticism — including ECF Doc. 33, which was filed on the same day the Court issued its text order setting the comprehensive briefing schedule. If the implicit message of the Court's order was to brief the motions rather than exchange letters, Defendant O'Toole's counsel did not follow that directive either. Plaintiff will continue to keep the Court informed of material developments as they arise.

Licensed to Practice by the State of New Jersey
*Parlatore Law Group is a nationwide cloud-based firm. Please send all correspondence electronically. If physical mail is required, please use the central mailing address below.

www.parlatorelawgroup.com    1440 N Edgewood Street, Floor 4, Arlington, VA 22201

## I. HOW JOSHUA LEE'S CIVIL RIGHTS WERE VIOLATED

Joshua T. Lee is a Black American professional process server who was lawfully performing his duties on a public road when the Port Authority — the agency chaired by Defendant O'Toole — called the Cedar Grove Police Chief to stop him. Under New Jersey law, process servers have the legal right to approach a residence and attempt service. Knocking on a door and ringing a doorbell to serve legal papers is not trespassing, harassment, or threatening behavior — it is the lawful performance of a function essential to the judicial system. Defendant O'Toole's counsel's characterization of standard process service as conduct justifying a police response misrepresents the law and misrepresents what happened.

Mr. Lee's civil rights were violated in the following specific ways:

**Unlawful seizure in violation of the Fourth Amendment**.

Lt. Rivers stopped Mr. Lee on a public road — at the intersection of Skytop Road and Fairview Avenue — without reasonable articulable suspicion of any criminal activity. Under Terry v. Ohio, 392 U.S. 1, 30 (1968), a police officer may conduct a brief investigatory stop only when the officer has "**reasonable suspicion supported by articulable facts that criminal activity may be afoot.**" Lt. Rivers acknowledged on his own body-worn camera that the encounter was "**a civil thing**" (ECF Doc. 19-2, Exhibit C at 00:00:02) — an admission that he knew there was no criminal activity. A police stop without reasonable suspicion of criminal activity violates the Fourth Amendment.

**Interference with lawful professional activity and obstruction of the administration of law.**

Lt. Rivers told Mr. Lee not to return to the residence — "**Don't go to that house**" — and repeated this instruction multiple times. (ECF Doc. 19-2, Exhibit C at 00:00:02.) Mr. Lee explained to Lt. Rivers that he was legally required to make three attempts at service. The incident report confirms this: "**The server responded by telling me that he was required to make three attempts at serving the documents and I reiterated that the resident does not want him on his property**." (ECF Doc. 19-2, Exhibit B at p. 2.) Mr. Lee explained his legal obligations. Lt. Rivers overrode them. A police officer directing a process server not to perform his legally required duties is interference with the administration of justice. Service of process is part of the administration of law. Interfering with lawful service of process may also constitute a violation of N.J.S.A. 2C:29-1, which provides that a person commits an offense if he "**purposely obstructs, impairs or perverts the administration of law or other governmental function**." The coordinated effort to stop Mr. Lee from serving legal papers in pending litigation — initiated by the Port Authority, relayed through the Cedar Grove Police Chief, and carried out by Lt. Rivers — constitutes obstruction of the administration of law.

**Instruction to falsify a sworn legal document.**

Lt. Rivers instructed Mr. Lee: "**Okay, then say you did it because — go through the attorneys.**" (ECF Doc. 19-2, Exhibit C at 00:01:14.) An affidavit of service is a sworn document filed with the court. Lt. Rivers instructed a citizen to falsely represent to a court that service had been completed when it had not. Lt. Rivers also directed Mr. Lee on what to write in his records: "**Okay, put your notes in and say They don't want you on the property. I mean, just go through the attorneys.**" (ECF Doc. 19-2, Exhibit C at 00:01:14.) This directed Mr. Lee to document a false narrative — that he had been on the property and was told to leave — when in fact he was on a public road.

**Police Intimidation Orchestrate by Kevin O'Toolen**.

Mr. Lee — a Black American man — was stopped by an armed police officer on a public road, told not to perform his job, and instructed to falsify a legal document. Mr. Lee has communicated to Plaintiff that he believes part of the reason he was stopped and treated this way was because he is Black.

Defendant O'Toole's counsel does not address any of these violations. Not one.

## II. THE CEDAR GROVE POLICE LIED ABOUT THE JUSTIFICATION FOR THE STOP

Lt. Rivers wrote on the official incident report (Case #26-04573) that the process server was "**refusing to leave the property**." (ECF Doc. 19-2, Exhibit B at p. 2.) The officer's own body-worn camera footage proves this statement was false:

- Mr. Lee was in his vehicle on a public road — not on anyone's property. Lt. Rivers' own incident report confirms he found Mr. Lee "**on Skytop at the intersection of Fairview Avenue**." (ECF Doc. 19-2, Exhibit B at p. 2.)

- Mr. Lee told Lt. Rivers he would not trespass: "**I'm not going to try to trespass and knock those doors down.**" (ECF Doc. 19-2, Exhibit C at 00:00:56.)

- Lt. Rivers confirmed Mr. Lee was on a public street: "**just give me a favor, back away from the stop sign. Just back up a little bit, make it legal**." (ECF Doc. 19-2, Exhibit C at 00:03:37.)

- Lt. Rivers admitted the stop had no law enforcement purpose: "**I know what you do. I know what you do. I'm just passing it on**." (ECF Doc. 19-2, Exhibit C at 00:01:45.)

- Lt. Rivers acknowledged it was "**a civil thing**." (ECF Doc. 19-2, Exhibit C at 00:00:02.)

The statement that Mr. Lee was "**refusing to leave the property**" was false when Lt. Rivers wrote it. The officer's own body-worn camera proves it. The false statement in the incident report may constitute a violation of N.J.S.A. 2C:28-4, which makes it a crime to furnish false information to law enforcement or to include a false statement in an official law enforcement document. Defendant O'Toole's counsel is a former top New Jersey law enforcement official who served as the First Assistant Attorney General and Director of the State Division of Consumer Affairs and like many of the attorneys for the defendants worked for Governor Chris Christie and should know writing a fabricated justification for a police stop on an official incident report is **not a minor discrepancy** — it is a potential **criminal act.** This is one of the bases for the FBI criminal referral Plaintiff submitted on March 30, 2026.

And now, rather than address the false statement in the incident report, Defendant O'Toole's counsel attacks the credibility of the man whose rights were violated — calling his sworn affidavit "**blatantly false**." (ECF Doc. 33 at 1.) Mr. Lee is the victim. His civil rights were violated. The police lied about why they stopped him. And the Chairman's attorney is attacking the credibility of the victim to distract from the documented misconduct.

## III. POINT-BY-POINT REBUTTAL

Defendant O'Toole's counsel makes several assertions that are contradicted by the record.

1. "**The process server never identified himself**." (ECF Doc. 33 at 1.)

This is true for the first visit. But it does not justify what happened next. After the process server left, someone — upon information and belief, Chairman O'Toole — activated a chain of governmental power: from the Port Authority to the Cedar Grove Police Chief to a patrol officer. The response to an unidentified visitor is to call 911 or the local police non-emergency line. The response was not to have a bi-state governmental agency call the Police Chief directly, provide a false justification, and give specific instructions about where to redirect service.

- This is not a homeowner calling police — that is an institutional response coordinated through governmental channels.

3

*2.* "**Chairman O'Toole was cordial and fully responded.**" (ECF Doc. 33 at 1.)

Chairman O'Toole answered the door, spoke with the process server, and then — when the process server returned — refused to answer. Between the two visits, the Port Authority called the Cedar Grove Police Chief.

- If Chairman O'Toole felt no concern during the first visit — cordially answering questions — what changed between the first and second visits that required calling the Port Authority?

3. **The process server's affidavit is "blatantly false."** (ECF Doc. 33 at 1-2.)

Defendant O'Toole's counsel claims the affidavit is false because it states Mr. Lee "**said out loud, Mr O'toole, I have important documents for you**" but the video shows "**he said no such thing**." Mr. Lee's affidavit is a sworn account of the full encounter across both visits. The second visit video transcript confirms Mr. Lee called out: "**If you can hear me, Mr. O'Toole, I have to come back anyway**." (ECF Doc. 19-2, Exhibit F at 00:00:55.) Any minor discrepancy in phrasing between a sworn affidavit and a video transcript does not make the affidavit "**blatantly false**" — particularly when the officer's own incident report contains a demonstrably false statement that the process server was "**refusing to leave the property**."

- Defendant O'Toole's counsel attacks the process server's affidavit while ignoring the police officer's false report. The Court should consider which document contains the more consequential falsehood.

4. **The "security" framing. (ECF Doc. 33 at 2.) Defendant O'Toole's counsel invokes "a world understandably on high alert, where CEOs and public servants alike are hunted down and assassinated" to justify calling police. But Defendant O'Toole's own counsel concedes that Chairman O'Toole "may have suspected the individual could be a process server (despite his failure to identify himself as such)."** (ECF Doc. 33 at 2.)

This concession — made by counsel in a filing with this Court — is now part of the record. It is fatal to the security narrative. If Chairman O'Toole suspected it was a process server — not a threat — then activating a chain of governmental power from the Port Authority to the Cedar Grove Police Chief to a patrol officer was not a security response. A process server is not an assassin. And the Port Authority's own General Counsel accepted service by email the same day — proving the police stop was entirely unnecessary. Moreover, if this were a legitimate security call, there would be a contemporaneous CAD entry. The incident report admits: "**A CAD entry was not made at the time**." (ECF Doc. 19-2, Exhibit B at p. 2.) If a homeowner called police about a genuine security concern — an unknown person repeatedly approaching their family home — the responding officer would create a contemporaneous record.

- The absence of a CAD entry is consistent with an off-the-books errand performed as a personal favor for a powerful political figure, not a legitimate law enforcement response to a security threat.

5. **"The exact opposite of obstruction."** (ECF Doc. 33 at 2.)

Defendant O'Toole's counsel argues that the Port Authority's same-day acceptance of service proves there was no obstruction. The opposite is true. The Port Authority knew exactly how to accept service properly — Amy Fisher did it with a two-sentence email.

- The fact that the Port Authority also called the Cedar Grove Police Chief, provided a false justification, and had a police officer stop Mr. Lee on a public road proves the police stop served a different purpose than accepting service. Both things happened on the same day. One was proper. The other was not.

6. **Plaintiff should have requested waiver of service.** (ECF Doc. 33 at 2 & n.3.)

Defendant O'Toole's counsel cites Rule 4(d) and argues Plaintiff should have "**simply asked the Port Authority to accept service**" rather than sending a process server. Personal service is the default method under the rules. There is nothing improper about sending a process server to a defendant's home. Rule 4(d) incentivizes waiver — it does not prohibit personal service.

- Plaintiff had no prior relationship with the Port Authority's General Counsel and no reason to know the Port Authority would agree to accept service before the attempt was made.

7. **Plaintiff sent the process server to Donovan's home after service was accepted.** (ECF Doc. 33 at 2.)

Amy Fisher's email accepting service was sent at 3:50 PM on Saturday, February 28. Ms. Fisher stated the Port Authority would accept service at its offices and "**[w]ould suggest service during business hours**." Plaintiff forwarded Ms. Fisher's email to the process server at 10:14 PM that Saturday night. The process server attempted to serve Donovan at his home the following day — Sunday, March 1 — before the Port Authority offices were open for business hours. On Monday morning, March 2, Plaintiff sent the process server detailed updated instructions redirecting all service to the Port Authority offices and stating: "**Please disregard the prior residential addresses for O'Toole and Donovan**." All subsequent service was completed at the Port Authority offices on March 2 and March 3.

- The Sunday attempt was a process server working a weekend assignment before receiving updated instructions — not harassment.

8. **The process server incident has "absolutely nothing to do" with the claims.** (ECF Doc. 33 at 2.)

The process server incident has everything to do with the claims. It is direct evidence that the Port Authority — the agency Chairman O'Toole chairs — used governmental power to interfere with this litigation. It is direct evidence that the ethical screen implemented by O'Toole Scrivo failed eleven days after implementation. And it is direct evidence of the same pattern of retaliatory conduct alleged in the Amended Complaint: using governmental power to punish Plaintiff for exercising his constitutional rights. Notably, Defendant O'Toole's own Motion to Dismiss brief (ECF Doc. 25-1) discusses the process server incident and Plaintiff's allegations about it at length.

- If the process server incident truly has "**absolutely nothing to do**" with the claims, Defendant O'Toole's counsel would not have addressed it in his dispositive motion. The fact that he did — and now files a separate letter further addressing it — confirms its relevance.

9. **The RPC 3.4(g) accusation.** (ECF Doc. 33 at 2 n.2.)

Defendant O'Toole's counsel accuses Plaintiff of violating RPC 3.4(g) by filing the FBI criminal referral. This accusation is meritless. Plaintiff submitted a referral to law enforcement requesting investigation of potential federal criminal violations documented in the record. The decision whether to investigate or prosecute rests entirely with the FBI and the U.S. Attorney's Office. Under In re Helmer, 237 N.J. 70, 86 (2019), the New Jersey Supreme Court held that "**the ultimate decisions rested with the prosecutors**" and declined to impose discipline on an attorney who encouraged a criminal prosecution while civil litigation was pending.

- Plaintiff's referral was based on documented evidence of potential criminal conduct — not leverage. The primary subjects are non-parties: Lt. Rivers, Chief Pumphrey, and an unidentified Port Authority employee. Defendant O'Toole's counsel cites no authority for his accusation because none supports it.

5

**10. Defendant O'Toole's counsel editorializes the process server's words to make him sound threatening.**

Defendant O'Toole's counsel describes the process server as having "**sneeringly muttered 'Oh, I see. Okay'**" and claims the process server "**threatened to come back yet again**." (ECF Doc. 33 at 1.) The actual transcript shows the process server saying "**Oh, I see. Okay**" (ECF Doc. 19-2, <u>Exhibit F</u> at 00:00:32) and "**If you can hear me, Mr. O'Toole, I have to come back anyway**." (ECF Doc. 19-2, <u>Exhibit F</u> at 00:00:55.) The word "**sneeringly**" does not appear in any transcript — it was invented by counsel.

- The process server explaining his legal obligation to make multiple service attempts is not a "**threat**." Characterizing it as one is the same kind of mischaracterization as the incident report's false claim that the process server was "**refusing to leave the property**" — taking lawful, routine conduct and reframing it as misconduct.

**11. The process server was not "lingering" — he was completing his professional notes on a public road. Defendant O'Toole's counsel characterizes the process server as having "lingered nearby."** (ECF Doc. 33 at 1.)

The incident report confirms Lt. Rivers found Mr. Lee at the intersection of Skytop Road and Fairview Avenue — down the road from Chairman O'Toole's residence. (ECF Doc. 19-2, <u>Exhibit B</u> at p. 2.)

- Mr. Lee was in his vehicle on a public road completing his professional notes after an unsuccessful service attempt, as any process server would. Completing notes after a service attempt is standard professional practice — not "**lingering**."

**12. Defendant O'Toole's counsel complains about the process server's recording — essentially objecting to the existence of evidence.**

Defendant O'Toole's counsel objects that Plaintiff deployed "**a process server equipped with a bodycam to the individual defendants' homes on a weekend**." (ECF Doc. 33 at 2.) The process server's recording is what produced the evidence that contradicts the incident report. Without it, the false statement that the process server was "**refusing to leave the property**" would stand unchallenged.

- Defendant O'Toole's counsel is not objecting to misconduct — he is objecting to the existence of a record that documents misconduct.

**13. The Port Authority's own Motion to Dismiss concedes the text was about suppressing speech critical of O'Toole.**

The Port Authority's brief characterizes Donovan's text as "threatening to withdraw Port Authority support for the NYC SEAL Swim unless plaintiff refrained from making any public statements critical of O'Toole or his law firm." (ECF Doc. 24-1 at 2.) Even the Port Authority's own counsel frames the text as conditioning governmental support on Plaintiff's silence about O'Toole and his firm.

- This is an admission — from the Port Authority's own lawyers — that the text was about protecting O'Toole personally, not any legitimate governmental interest.

- Defendant O'Toole's counsel's attempt to reframe the process server stop as a "**security**" response must be evaluated against this backdrop: the Port Authority's own brief concedes the retaliatory motive.

14. **The NBC New York story was an independent investigation — not a "hit piece."**

Defendant O'Toole's counsel dismisses the NBC story as a "**sensationalized**" "**hit piece**" that Plaintiff "**orchestrated**." (ECF Doc. 33 at 1.) NBC New York's I-Team is an independent investigative unit of a major news organization. The I-Team independently reviewed the incident report, body-worn camera footage, and Captain O'Toole's Declaration before airing the story. The fact that a major news organization independently investigated and aired the story is itself evidence that the allegations are being taken seriously by entities beyond Plaintiff.

- Dismissing independent investigative journalism as a "**hit piece**" does not make the documented facts go away. Nor does it address the false statement in the incident report, the instruction to falsify a sworn document, or Captain O'Toole's sworn Declaration.

15. **Defendant O'Toole's counsel calls Captain O'Toole's allegations "bizarre and false" — without engaging with a single one**.

In footnote 2 of ECF Doc. 33, counsel dismisses Captain O'Toole's Declaration as "**bizarre and false allegations relating to service of process and a family dispute between Chairman O'Toole and his sister, none of which is relevant.**" (ECF Doc. 33 at 2 n.2.) But counsel does not explain why any specific allegation is false. He does not address the loyalty oath Lt. Rivers was required to swear. He does not address the overnight police postings at Chairman O'Toole's residence and law firm. He does not address the arrest of John O'Toole through Chief Pumphrey. He does not address the fabricated justifications for blocking Captain O'Toole's promotion.

- Defendant O'Toole's counsel does not address the threatening text messages.

- Defendant O'Toole's counsel does not address the two interviews by the New Jersey Attorney General's Office.

- A blanket denial without engaging with any specific allegation in a sworn Declaration from a 25-year law enforcement veteran is not a rebuttal — it is an evasion.

## IV. THIS IS A PATTERN OF GOVERNMENT ABUSE — AND DEFENDANT O'TOOLE IS A LICENSED ATTORNEY

The conduct documented on February 28, 2026 is not an isolated incident. It is part of a pattern of using governmental power for personal retaliation that has been independently confirmed under oath by Captain Eileen O'Toole — Defendant O'Toole's own sister and a 25-year law enforcement veteran. (ECF Doc. 19-2, Exhibit D.)

The Court should note that Defendant Kevin J. O'Toole is himself a licensed New Jersey attorney. Under N.J. R. Prof'l Conduct 8.4(d), it is professional misconduct for a lawyer to "**engage in conduct that is prejudicial to the administration of justice.**" If Defendant O'Toole orchestrated the use of the Port Authority and the Cedar Grove Police Department to stop a professional process server from serving legal papers in pending litigation — while the officer lied about the justification on the official incident report and instructed the process server to falsify a sworn legal document — that conduct is prejudicial to the administration of justice. Service of process is a foundational function of the judicial system. A licensed attorney who uses governmental power to obstruct that function does not merely violate a party's civil rights — he undermines the integrity of the legal system he is sworn to uphold.

Captain O'Toole states under oath that Defendant O'Toole "**has used the Port Authority Police as personal protection on many occasions, to the point of overnight postings of officers outside of his house and his law firm**" and that "**the use of police resources for Kevin O'Toole's personal benefit was not related to any apparent legitimate law enforcement function.**" (ECF Doc. 19-2, Exhibit D, paragraphs 10-11.)

Captain O'Toole states that Defendant O'Toole made "**Officer Rivers swear his loyalty to him if he was hired on the force.**" (ECF Doc. 19-2, Exhibit D, paragraph 12.) This is the same Lt. Rivers who stopped Mr. Lee, lied on the incident report, and instructed Mr. Lee to falsify a sworn document.

Captain O'Toole states that Defendant O'Toole "**had [their brother] John arrested in Pennsylvania based upon charges filed by the Cedar Grove Police Department — which were handled directly through Chief Pumphrey**." (ECF Doc. 19-2, Exhibit D, paragraph 38.) This is the same Chief Pumphrey who dispatched Lt. Rivers to stop Mr. Lee.

Captain O'Toole states that following a family dispute, Defendant O'Toole "**sent a barrage of threatening text messages**" including threats to "**schedule an internal investigation**," demands for "**a psychological exam**," and orders to "**quit your job in Caldwell that we secured for you**." (ECF Doc. 19-2, Exhibit D, paragraphs 17-22.) When Defendant O'Toole blocked Captain O'Toole's promised promotion to Chief of Police, he fabricated the justification — telling their father she was "**insubordinate**" and had "**misappropriated the Chief of Police's vehicle.**" Captain O'Toole states under oath: "**The allegations were false**." (ECF Doc. 19-2, Exhibit D, paragraphs 28-30.)

The pattern is identical: threatening text messages, fabricated justifications, abuse of governmental relationships, and retaliation against anyone who opposes him. Port Authority employee Patrick Donovan sent Plaintiff a threatening text message. The Cedar Grove Police Department fabricated a justification on the incident report. The Port Authority used its governmental power to call local police. And Defendant O'Toole's counsel now attacks the credibility of the victim.

Captain O'Toole confirms: "**the actions Kevin O'Toole has taken against Mr. Brown — including the use of a Port Authority employee to send threatening text messages, the withdrawal of Port Authority support from a charity event for veterans and 9/11 survivors, and the use of the Cedar Grove Police to stop a process server at Kevin O'Toole's residence — are entirely consistent with what I believe to be the pattern of retaliatory conduct I have personally experienced and witnessed over many years.**" (ECF Doc. 19-2, Exhibit D, paragraph 43.)

Defendant O'Toole's counsel does not address Captain O'Toole's Declaration anywhere in his letter — other than to dismiss it in a footnote as "**bizarre and false**" without engaging with a single specific allegation.

## V. POST-FILING DEVELOPMENTS CONFIRM THE PATTERN

Two significant developments since the filing of the Motion to Disqualify further confirm the pattern of retaliatory conduct:

**The Port Authority withdrew from Chairman O'Toole's defense.**

On April 8, 2026, the Port Authority Law Department attorneys who had represented Chairman O'Toole — Cheryl Alterman and Megan Lee — were terminated as his counsel. (ECF Doc. 22.) Chairman O'Toole was required to retain private personal counsel at Calcagni & Kanefsky LLP at his own expense. (ECF Docs. 20, 21.) Under the Port Authority By-Laws, Art. XI, paragraph 4, the Port Authority "**shall not indemnify and save harmless or pay under this Article XI where the injury or damage resulted from actual fraud, actual malice, willful misconduct or intentional wrongdoing.**" The Port Authority initially retained separate counsel for Chairman O'Toole rather than allowing O'Toole Scrivo to represent him — the first recognition of the conflict. Now, the Port Authority has withdrawn entirely. The withdrawal is consistent with a determination that Chairman O'Toole's conduct falls outside the scope of indemnification. This directly undercuts the "**security**" narrative — if calling police on a process server were truly "**common-sense protocol**," the Port Authority would have no reason to withdraw from the Chairman's defense.

**The Battery Park City Authority denied the 2026 NYC SEAL Swim permit.**

On April 7, 2026, BPCA denied the permit for the 2026 NYC SEAL Swim — a charity event for 9/11 survivors, Gold Star families, Navy SEALs, veterans, police officers, and firefighters that BPCA has supported for seven consecutive years without incident. In seven years, BPCA has never denied a permit for this event. Critically, Patrick Donovan — the Port Authority employee who sent Plaintiff the threatening text message and a named defendant in this action — was copied on the denial email, despite not being on Plaintiff's original permit request emails to BPCA or on Commander Jimmy May's emails to BPCA. This is precisely the retaliatory influence Plaintiff alleged in his court filings and FOIL request to BPCA.

The Port Authority's retaliatory influence has now extended to the agency that works most closely with the Port Authority at the World Trade Center site — denying a Navy SEAL lead charity event for 9/11 survivors and veterans' access to the **very site where 2,977 Americans were murdered that caused Plaintiff and many other SEALs and Veteran to go to war for our great nation.**

Plaintiff remembers the thousands of beautiful Americans the NYC SEAL Swim has helped on so many levels.

## VI. CEDAR GROVE IS WITHHOLDING RECORDS THAT ARE DIRECTLY RELEVANT TO THE PENDING MOTIONS

On April 17, 2026, Plaintiff filed a Verified Complaint and Order to Show Cause against the Township of Cedar Grove in Essex County Superior Court (Docket No. ESX-L-003201-26) to compel production of government records responsive to two supplemental OPRA requests that have been deemed denied as a matter of law. Plaintiff respectfully advises the Court of this development because the records sought are directly relevant to both the pending Motion to Disqualify (ECF Doc. 19) and the pending Motions to Dismiss (ECF Docs. 23, 24, 25).

**Relevance to the Motion to Disqualify.**

The records sought include CAD system audit trails and incident report metadata that would determine when the incident report was actually created — confirming or refuting whether it was backdated after Plaintiff's OPRA request. They include the complete unedited body-worn camera footage with the pre-activation buffer — confirming or refuting whether the footage was edited to remove the phone call from Chief Pumphrey dispatching Lt. Rivers. They include records of overnight police postings at Chairman O'Toole's residence and O'Toole Scrivo's offices — confirming or refuting Captain O'Toole's sworn statement about the pattern of personal use of police resources. And they include communications between Chief Pumphrey and Chairman O'Toole — establishing the scope of the relationship between Defendant O'Toole and the Cedar Grove Police Department. Each of these categories of records bears directly on whether the ethical screen implemented by O'Toole Scrivo failed and whether Defendant O'Toole's personal interests are driving governmental interference with this litigation.

**Relevance to the Motions to Dismiss**.

The defendants' central argument in the Motions to Dismiss is that Plaintiff's claims are "**conclusory**" and "**speculative**." The records sought from Cedar Grove could transform those claims from allegations into documented facts. Chief Pumphrey's telephone records would identify the specific Port Authority individual who initiated the police response — establishing the chain of command from the Port Authority to the Cedar Grove Police. GPS/AVL tracking records would show Lt. Rivers' exact route of travel — including whether he stopped at Chairman O'Toole's residence. The CAD audit trail would show whether the incident report was created contemporaneously or after Plaintiff's OPRA request put the Township on notice. And the unedited BWC footage would show whether the most incriminating evidence — the phone call dispatching Lt. Rivers — was removed before production.

**Two law enforcement professionals — Captain Eileen O'Toole and Sergeant Michael Kraynanski — have independently concluded that the incident report was likely backdated and the body-worn camera footage was likely edited before production**. Sergeant Kraynanski has filed a formal internal affairs complaint with the Cedar Grove Police Department regarding Lt. Rivers' conduct. Cedar Grove has refused to produce a single responsive record despite two deemed denials under N.J.S.A. 47:1A-5(i), forcing Plaintiff to file a lawsuit to obtain them.

**The defendants argue Plaintiff's claims are speculative.** The evidence that could prove otherwise is being actively withheld by a municipality whose police department wrote a false justification on the official incident report — a statement that may violate N.J.S.A. 2C:28-4 — whose officers' coordinated interference with lawful service of process may violate N.J.S.A. 2C:29-1 — and whose conduct is now the subject of a formal internal affairs complaint, an FBI criminal referral, and a Port Authority Inspector General complaint.

Respectfully submitted,
/s/ William Brown
William (SEAL) Brown Jr., Esq.
Plaintiff Pro Se
william.brown@parlatorelawgroup.com

cc: Thomas P. Scrivo, Esq. / Michael J. Dee, Esq. / Joseph R. Marsico, Esq.
O'Toole Scrivo, LLC — via CM/ECF

Thomas R. Calcagni, Esq. / Walter R. Krzastek, Esq. / Luke J. O'Brien, Esq.
Calcagni & Kanefsky LLP — via CM/ECF

Cheryl Alterman, Esq. / Megan Lee, Esq.
Port Authority Law Department — via CM/ECF