**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILLIAM BROWN JR.,<br><br>Plaintiff,<br><br>v.<br><br>MCCARTER & ENGLISH, LLP; THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; KEVIN J. O'TOOLE (in his personal and professional capacities); PATRICK DONOVAN (in his personal and professional capacities); JOHN DOES 1-10 (fictitious individuals or entities who have liability to Plaintiff for any of the causes of action contained herein),<br><br>Defendants. | Civil Action No.<br>2:26-cv-02808-JXN-AME |

**REPLY BRIEF IN SUPPORT OF DEFENDANT KEVIN J. O'TOOLE'S MOTION TO DISMISS COUNTS XII THROUGH XVIII OF THE FIRST AMENDED COMPLAINT**

Thomas R. Calcagni
Walter R. Krzastek
Luke J. O'Brien
**CALCAGNI & KANEFSKY LLP**
1085 Raymond Blvd., 18th Floor
Newark, New Jersey 07102
(862) 397-1796
tcalcagni@ck-litigation.com

*Attorneys for Defendant Kevin J. O'Toole*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........................................................................ ii

PRELIMINARY STATEMENT ........................................................................1

ARGUMENT ........................................................................................1

I. PLAINTIFF'S CONCLUSORY ALLEGATIONS FAIL TO STATE A CLAIM ........................................................................1

II. PLAINTIFF'S 42 U.S.C. § 1983 AND NJCRA CLAIMS FAIL ................3

III. PLAINTIFF'S § 1983 AND CIVIL CONSPIRACY CLAIMS FAIL.......11

IV. PLAINTIFF'S TORTIOUS INTERFERENCE CLAIMS FAIL...............12

V. PLAINTIFF'S IIED CLAIM FAILS ........................................................14

CONCLUSION ........................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Board of County Commissioners v. Umbehr*,
518 U.S. 668 (1996).....3

*Cole v. Encapera*,
758 F. App'x 252 (3d Cir. Dec. 28, 2018).....15

*Fox v. DGMB Casino*,
2020 WL 4745281 (N.J. App. Div. Aug. 17, 2020).....15

*Hauptmann v. Wilentz,*
570 F. Supp. 351 (D.N.J. 1983).....11

*Hill v. N.J. Dep't of Corrections Com'r Fauver*,
342 N.J. Super. 273 (App. Div. 2001).....14

*Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*,
729 F. Supp. 1035 (D.N.J. 1990).....13

*McLaughlin v. Watson*,
271 F.3d 566 (3d Cir. 2001).....4, 6, 7

*Miller v. Mitchell*,
598 F.3d 139 (3d Cir. 2010).....3, 4

*Monteiro v. City of Elizabeth*,
436 F.3d 397 (3d Cir. 2006).....7, 8

*O'Hare Truck Service, Inc. v. City of Northlake*,
518 U.S. 712 (1996).....3

*Pennsylvania ex rel. Zimmerman* v. *PepsiCo, Inc.*,
836 F.2d 173 (3d Cir. 1988).....14

*Perry v. Sinderman*,
408 U.S. 593 (1972).....3

*Porter v. Pa. Dep't of Corr.*,
974 F.3d 431 (3d Cir. 2020).....6

*R.C. Maxwell Co. v. Borough of New Hope*,
735 F.2d 85 (3d Cir. 1984) ....................8

*Schleig v. Borough of Nazareth*,
695 F. App'x 26 (3d Cir. 2017) ....................5, 6

*Shaw by Strain v. Strackhouse*,
920 F.2d 1135 (3d Cir. 1990) ....................9

*Taylor v. Metzger*,
152 N.J. 490 (1998) .................... 14, 15

*Trent v. County of Somerset*,
2024 WL 4144403 (3d Cir. Sept. 11, 2024) ....................6

*Zaloga v. Borough of Moosic*,
841 F.3d 170 (3d Cir. 2016) .................... passim

**<u>Statutes</u>**

42 U.S.C. § 1983 .................... passim

New Jersey Civil Rights Act ....................3, 8

## PRELIMINARY STATEMENT[1]

Plaintiff's opposition to Chairman O'Toole's motion to dismiss confirms the deficiency of the FAC, which Plaintiff mostly ignores in favor of the conspiratorial and logically-unrelated allegations in his many letters and declarations. But Plaintiff cannot amend the FAC through an opposition brief, and his improper attempt to do so serves only to demonstrate the futility of amendment. For the reasons below, the claims against Chairman O'Toole should be dismissed with prejudice.

## ARGUMENT

### I. PLAINTIFF'S CONCLUSORY ALLEGATIONS FAIL TO STATE A CLAIM

As underscored in Chairman O'Toole's opening brief, the FAC lacks sufficient factual detail to plausibly state any viable claim against him. (Ob7-9.) Rather than address those deficiencies in the operative pleading, Plaintiff diverts to a laundry list of "specific facts about Chairman O'Toole" cobbled from his serial letter-writing campaign and relating to events and newly-conjured conspiracy theories that post-date the FAC, bear no logical relationship to the allegations in the FAC, and are not properly before the Court on this motion to dismiss ("L"). (Pb15-16.) Even a cursory review of his list, or of Plaintiff's "Statement of Facts," reveals the inescapable truth that Plaintiff's long-winded complaint actually only alleges two

---

[1] Capitalized terms not defined herein have the same meanings set forth in Chairman O'Toole's opening brief. Citations to "Ob_" and "Pb_" refer to Chairman O'Toole's opening brief (ECF 25-1) and Plaintiff's opposition brief (ECF 38), respectively.

real facts about Chairman O'Toole – that he accepted a paddle from the NSF and was once referenced in a text exchange between Donovan and Plaintiff – neither of which, alone or together, sufficiently state a plausible claim.[2]

The remaining so-called facts are nothing more than rank speculation and harassing character attacks about events that appear nowhere in the FAC or just unremarkable background information. They include an outlandish and disparaging conspiracy theory regarding evasion of service that deliberately ignores that service was promptly accepted (L##1-3, 9, 11, 14-17); a biased opinion by an estranged, vindictive family member of the Chairman, which, even were it properly before the Court (which it is not), could never come close to being evidentiarily admissible (L#8); a blatantly false and uninformed allegation about the reasons underlying this firm's representation of the Chairman (L#10); mundane background information (L##5, 6, 13); and lastly a bald allegation, so obviously unsupported by any factual content, that Chairman O'Toole "directed, ratified, or approved" Donovan's text message to him (L#12). This concocted collection of the irrelevant and extraneous does not salvage the FAC. It does not support his naked, conclusory speculation, bolster his deficient "upon information and belief" allegations, or change the reality that the FAC is devoid of any factual nexus at all involving Chairman O'Toole.

[2] Plaintiff devotes little over 2 pages in the "Statement of Facts" of his overlength brief to allegations in the FAC, yet over 7 pages, along with over 100 pages of improper exhibits, to post-filing events with no rational connection to the FAC.

(Pb17.) As should be plain, any amendment allowing Plaintiff to add this immaterial information to yet another amended complaint and continue his crusade of harassment against Chairman O'Toole would be futile and should not be permitted.

## II. PLAINTIFF'S 42 U.S.C. § 1983 AND NJCRA CLAIMS FAIL

Chairman O'Toole amply demonstrated in his opening brief that Plaintiff fails to state plausible 42 U.S.C. § 1983 and NJCRA claims against him on both qualified immunity and substantive grounds (Ob9-17.) Plaintiff's arguments opposing dismissal of these claims are plagued by numerous legal and factual errors.

*First,* Plaintiff erroneously claims that the unconstitutional conditions doctrine "defeats qualified immunity." (Pb18-20.) But his reliance on this theory misses the mark and ignores the actual allegations in his own complaint. For starters, none of the cases relied on by Plaintiff involved qualified immunity. *Perry v. Sinderman*, 408 U.S. 593 (1972), *O'Hare Truck Service, Inc. v. City of Northlake*, 518 U.S. 712 (1996), and *Board of County Commissioners v. Umbehr*, 518 U.S. 668 (1996), all stand for the unremarkable proposition that a public entity cannot terminate a public employee or contractor in retaliation for the exercise of First Amendment rights, while *Miller v. Mitchell*, 598 F.3d 139, 151 (3d Cir. 2010), stands for the separate premise that "[g]overnment action that requires stating a particular message favored by the government violates the First Amendment right to refrain from speaking." In *Miller*, to avoid prosecution, a minor was required to attend an

education program and write a paper explaining why sexting was wrong. The court found that a First Amendment retaliation claim based on "threatened prosecution" unless the minor attended the program was not "viable" and presented a "timing problem" because the threat was not "'in response to' and 'because of' the exercise of a right not to attend the program." *Id.* at 148.[3] Such "broad general propositions," like those relied on by Plaintiff, are at "too high a level of abstraction" to be helpful in the qualified immunity context. *Zaloga v. Borough of Moosic*, 841 F.3d 170, 175 (3d Cir. 2016).

Rather, to meet the "exacting standard" to defeat qualified immunity, Plaintiff must show a violation of a clearly established constitutional right in a "'particularized sense.'" *Id.* (citation omitted). In other words, "sufficient precedent" must exist "at the time of action, *factually similar to the plaintiff's allegations,* to put defendant on notice that his or her conduct is constitutionally prohibited." *McLaughlin v. Watson*, 271 F.3d 566, 572 (3d Cir. 2001) (emphasis added). The starting place for this analysis is the FAC. There, Plaintiff alleges that he "engaged in protected speech by filing this lawsuit and making public statements regarding his

[3] To the extent Plaintiff now claims Donovan's alleged threat to withdraw from the NYC SEAL Swim if Plaintiff criticized Chairman O'Toole or O'Toole Scrivo by itself is an adverse action, that theory suffers from the same timing defect in *Miller* because the purported threat was not "in response to" and "because of" Plaintiff exercising free speech. Rather, as Plaintiff acknowledges, he had not yet "spoke[n] publicly" about the Chairman or O'Toole Scrivo at that time. (ECF 37-1, ¶22.)

treatment by Defendant McCarter" and that "the Navy SEAL Foundation withdrew from the NYC SEAL Swim Plaintiff [stet.], causing $40,000 in annual income loss" due to the Port Authority Defendants' alleged retaliation. (FAC ¶¶ 454, 457.) Plaintiff thus in a "particularized sense" has alleged that the Port Authority Defendants retaliated against him by influencing a third party, the NSF, to terminate its contractual relationship with him.[4] As shown in the opening brief (Ob11-14), the established law in an analogous factual setting is clear that such alleged conduct does not violate the First Amendment. *See, e.g.*, *Zaloga*, 841 F.3d at 177 ("it has never been established that a governmental official who does not himself retaliate but instead pressures another individual to retaliate . . . can be held personally liable").

*Second,* Plaintiff's claim that "direct threats overcome qualified immunity" misstates Third Circuit law. In making this argument, Plaintiff misleadingly cuts short a quote from *Schleig v. Borough of Nazareth*, 695 F. App'x 26, 32 (3d Cir. 2017), a non-precedential opinion. Plaintiff's brief reads: "In *Schleig v. Borough of Nazareth*, the Third Circuit held that '*Zaloga* plainly does not stand for the

---

[4] Plaintiff's attempt to support this false allegation through improper declarations and exhibits serves only to underscore its implausibility. For example, the October 1, 2015 email chain between Plaintiff and the NSF's CEO, Robin King (ECF 37-1, Ex. A) includes an email from Plaintiff himself describing rancorous disagreements between himself and King in connection with the 2025 swim and making multiple references to a verbal altercation in which King allegedly "cursed [Brown] out at the WTC at the end of the swim because [Brown] didn't call [her] up to speak" and "verbally tore into [Brown] at the WTC." One need not resort to unfounded conspiracy theories to understand why the NSF terminated the relationship.

proposition that an official is free to threaten.'" (Pb20.) Plaintiff omits the remainder of the sentence stating that an official is not "free to threaten to terminate or physically harm an employee because the official is speaking his mind." 695 F. App'x at 32. *Schleig*, unlike this case, involved a death threat leading the court to pronounce that "no reasonable officer could think that it was lawful to threaten to injure or kill an employee because of that employee's participation in a labor union." *Id.* at 31. Plainly, *Schleig* is not factually analogous to this case and does not provide clearly established precedent in a particularized sense that could overcome qualified immunity. And besides this clear factual dissimilarity, another non-precedential Third Circuit case relied on by Plaintiff, *Trent v. County of Somerset*, 2024 WL 4144403 (3d Cir. Sept. 11, 2024), makes the obvious point that *Schleig* in particular, and other non-precedential Third Circuit opinions more generally, "cannot clearly establish any rights" for a qualified immunity analysis, since a case's "'not precedential status . . . renders it *useless* as precedent.'" *Id.* at *6 n.5 (emphasis added) (quoting *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 451 (3d Cir. 2020)).

*Third*, Plaintiff's attempt to distinguish *McLaughlin* and *Zaloga* fails. As Plaintiff's argument goes, *McLaughlin* and *Zaloga* are distinguishable because Chairman O'Toole "was part of the decision-making body that took adverse action." (Pb21.) But *McLaughlin* and *Zaloga* involve public officials allegedly pressuring a third party to take adverse action, which is exactly what Plaintiff has alleged here –

"[a]s a direct result" of the Port Authority Defendants' retaliation "the Navy SEAL Foundation withdrew from the NYC SEAL Swim." (FAC ¶ 457.) Despite how he may want to now recast his allegation, nowhere in the FAC does he allege (as such an allegation would be demonstrably false) that Chairman O'Toole was part of the NSF's decision-making body.[5] And nowhere in the FAC does Plaintiff allege that the PANYNJ took any direct adverse action against him or deprived him of a government benefit, let alone adverse action involving the Chairman. While Plaintiff loosely argues that the agency "withdrew support from the NYC SEAL Swim" (Pb22), his description of *how* the PANYNJ allegedly withdrew support makes clear he is complaining of indirect action and the alleged exertion of influence on the NSF:

> **The Port Authority's Withdrawal of Support.** Following Donovan's threat, Port Authority officials informed the Navy SEAL Foundation ("NSF") that the Port Authority would not support the 2026 NYC SEAL Swim if Plaintiff participated. (FAC ¶ 351). The NSF terminated its contract with Plaintiff and withdrew from the 2026 swim. (FAC ¶ 352). Plaintiff lost $40,000 in annual income. (FAC ¶ 354).

(Pb4.) As such, *McLaughlin, Zaloga,* and the line of cases involving government officials' exertion of influence over third parties are squarely on point.

*Fourth*, Plaintiff's invocation of *Monteiro v. City of Elizabeth*, 436 F.3d 397 (3d Cir. 2006), is similarly unavailing. (Pb22-23.) That case provides that "when qualified immunity depends on disputed issues of fact, those issues must be

[5] Plaintiff's new, post-FAC allegation regarding the Battery Park City Authority (Pb10-12) – over which the PANYNJ has no control – fails for the same reason.

determined by the jury." 436 F.3d at 405. At the heart of the dispute in *Monteiro* was the motivation behind the Elizabeth Council President's ejection of a councilmember from a public meeting. *Id.* at 403. No such disputed fact issues need be resolved here for Chairman O'Toole's qualified immunity defense, because even accepting all of Plaintiff's implausible allegations as true, he has not alleged the violation of any "clearly established right," as required. (Ob10-14.)

*Fifth*, Plaintiff's lengthy diatribe about service of process is incoherent and far from "devastating to the qualified immunity defense." (Pb23-24.) It has no relation to qualified immunity or Plaintiff's alleged claims at all.[6]

*Finally*, as set forth in the opening brief (Ob14-17), on a substantive level, Plaintiff fails to plead a plausible §1983 or NJCRA claim against Chairman O'Toole for at least three independently dispositive reasons. First, under *Zaloga, McLaughin,* and *R.C. Maxwell*, Plaintiff does not allege a retaliatory act that violates the First

---

[6] Relatedly, Plaintiff's decree of an "irrevocable concession" in counsel's earlier letter to the Court is equally nonsensical. That Chairman O'Toole "*may* have suspected the individual *could* be a process server (despite his failure to identify himself as such)" (ECF 33 at 2 (emphases added)) does nothing to undermine his well-justified caution when the unknown caller to the family home never revealed his identity or purpose and, even after being told that the person he was looking for did not live at the address, continued loitering, repeatedly rang the doorbell, and threatened to come back yet again. No doubt, Plaintiff will continue to distract with the irrelevant and immaterial in his desperate attempt to keep his sinking lawsuit afloat, even if it means continually taking aim at the good character of the Chairman and other defendants. His fixation with service of process, despite service being promptly accepted, is just more of Plaintiff's straw clutching.

Amendment. Rather than dispute that issue, Plaintiff misstates Chairman O'Toole's position, claiming he "argues that the Port Authority's support was 'voluntary' and therefore its withdrawal is not an adverse action." (Pb25.) That is incorrect. The alleged withdrawal of support, as pled, involved purportedly influencing the NSF to terminate its relationship with Plaintiff. As made clear in the moving brief, even were Plaintiff's allegation true (which it is not), pressuring a third party in the manner alleged does not constitute an actionable retaliatory act. (Ob11-14.)

Second, despite Plaintiff's argument to the contrary, the FAC does not plead any facts that plausibly demonstrate that Chairman O'Toole had any personal involvement in the alleged adverse action, further sinking his claim. *See Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990). The FAC simply contains no specific, non-speculative allegations tying Chairman O'Toole to Donovan's text message or the NSF's decision to terminate its relationship with Plaintiff. Plaintiff's illogical reliance on bad blood between Chairman O'Toole and his spiteful sister, his cockeyed conspiracy theory about service of process, and the retention of this firm to represent Chairman O'Toole as "evidence of Chairman O'Toole's personal involvement" is absurd and does not save the fatally-flawed FAC.

Third, Plaintiff cannot demonstrate a causal link between the alleged adverse action and his protected conduct. In the FAC, Plaintiff asserts in conclusory fashion that he was retaliated against for filing the lawsuit against McCarter and speaking

out against the firm. (FAC ¶¶ 3-4.) Notably, nowhere in the FAC does Plaintiff ever allege that Donovan (or anyone else at the PANYNJ) ever demanded that Plaintiff discontinue his lawsuit or cease making public statements about McCarter. Straining to show some level of causality, Plaintiff nonetheless argues that Donovan's text itself demonstrates "[t]he nexus between the protected activity and the retaliatory threat." (Pb4.) But how? Nothing about the text even alludes to the lawsuit or McCarter. Maybe Plaintiff is trying to distort the "protected activity" he has pleaded to now include public criticism of the law firm retained by McCarter to defend it, but that is plainly not what is alleged in the FAC. (FAC ¶ 3 ("his protected communications alleging unlawful discrimination against, and unequal pay for military veterans").) Plaintiff, for his part, even seems confused about his position. In his declaration in opposition to the motion (which, of course, is improper and should be stricken from the record), Plaintiff states that he did not speak out publicly against Chairman O'Toole and O'Toole Scrivo until *after* the NSF terminated his agreement (ECF 37-1, ¶22), which capsizes any claim that speaking out against Chairman O'Toole or his firm caused the adverse action complained of in the FAC – namely, NSF's termination of his contract and its withdrawal from the swim.[7]

[7] Plaintiff concedes that his official capacity claims against Chairman O'Toole are duplicative of his claims against the PANYNJ and should be dismissed. (Pb30.)

## III. PLAINTIFF'S § 1983 AND CIVIL CONSPIRACY CLAIMS FAIL

As the opening brief demonstrates, the supposed conspiratorial agreement between and among Chairman O'Toole and the other defendants is alleged entirely in conclusory terms and devoid of factual detail from which an agreement can be reasonably inferred.[8] (Ob19-20, 30.) In opposition, Plaintiff claims that the circumstantial evidence of a conspiratorial agreement is "substantial" and he offers a full page, single-spaced list of the so-called evidence. (Pb31.) This list, however, only confirms the fatal flaw in the FAC as it largely just repeats Plaintiff's bizarre and irrelevant allegations regarding service of process and Chairman O'Toole's estranged sister and does not in any way demonstrate an agreement between anybody concerning the events complained of in the FAC. The only two list items that actually appear in the FAC (L##5, 7) are equally immaterial and unsupportive. That Chairman O'Toole is the Chairman of the Port Authority Board of Commissioners, the managing partner of O'Toole Scrivo, and has a son who works for McCarter does not come close to providing "sufficient particularity that [Defendants] reached some understanding or agreement, or plotted, planned and conspired together, to deprive [Plaintiff] of a federal right." *Hauptmann v. Wilentz,* 570 F. Supp. 351, 374 (D.N.J. 1983) (internal quotations omitted). It is just basic background not remotely

[8] The conspiracy claims must also be dismissed because Chairman O'Toole is immune from Plaintiff's §1983 conspiracy claim (Ob18), and Plaintiff does not plausibly allege an underlying predicate constitutional violation or tort. (Ob18, 29.)

suggestive of a conspiratorial agreement. The other reference to the FAC (L#7) is a double hearsay allegation pled "upon information and belief" that "Joe Palermo informed Plaintiff that Donovan told him directly that if Plaintiff was part of the NYC SEAL Swim, the event would not happen." (Pb31; FAC ¶ 347.) This double hearsay, upon information and belief statement, even if credited (it should not be), provides no basis to infer, much less plausibly allege, a conspiratorial agreement involving the Port Authority Defendants and McCarter.

## IV. PLAINTIFF'S TORTIOUS INTERFERENCE CLAIMS FAIL

Plaintiff's tortious interference with contract claim fails because, as Plaintiff admits (Pb34), the NSF did not breach its alleged contract with him. Plaintiff responds to this fatal flaw by contending that his tortious interference claim should be analyzed under principles governing tortious interference with prospective economic advantage. (Pb34.) By doing so, he concedes the point. Without an alleged breach, Plaintiff cannot maintain a claim for tortious interference *with contract* and Count XV of the FAC must be dismissed. His tortious interference with prospective economic advantage claim (Count XVI), in turn, fails for the following independently dispositive reasons (which apply equally to Count XV).

*First*, Plaintiff does not dispute that a person cannot intentionally interfere with a contract or prospective economic relationship he knows nothing about. *See Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035,

1051 (D.N.J. 1990). Instead, he maintains that Chairman O'Toole's knowledge of the NSF economic relationship was plausibly alleged. In doing so, he relies largely on allegations about what *Donovan* knew – and, even as to Donovan, fails to plausibly explain why Donovan would know or assume that Plaintiff, a lawyer in private practice, was receiving compensation for his role in helping to organize a one-day charity event. (Pb33.) As for Chairman O'Toole specifically, Plaintiff's only response is that the acceptance of a paddle from the NSF at a Port Authority ceremony somehow suggests the Chairman's "personal awareness" of Plaintiff's role as the founder of the charitable event. (Pb33.) But Plaintiff did not attend the ceremony (FAC ¶ 317) and does not dispute that he never met Chairman O'Toole, so no such inference follows. And even if Plaintiff could credibly maintain that Chairman O'Toole by attending the ceremony somehow knew of Plaintiff's role as the alleged founder of the event – which he cannot – nothing about that alleged knowledge would lead to the inference that Chairman O'Toole also knew of Plaintiff's alleged commercial relationship with the NSF. (Ob21-22.)

*Second*, Plaintiff has not plausibly alleged Chairman O'Toole took any action to intentionally interfere with his economic relationship with the NSF, let alone that he acted with malice. (Ob24.) Plaintiff's response that Chairman "O'Toole's personal financial interest – protecting his firm's client and his son's employer – are not legitimate justifications for interfering with Plaintiff's contract with the NSF"

relates to a purely invented and illogical motive and does not demonstrate malice or that Chairman O'Toole performed any intentional act at all. (Pb35.)

## V. PLAINTIFF'S IIED CLAIM FAILS

Plaintiff's opposition brief likewise fails to save his fatally-flawed IIED claim.

To start, the FAC does not even allege the requisite intent (Ob25), and Plaintiff cannot cure that pleading deficiency by arguing in his brief that Chairman O'Toole acted recklessly, let alone based on alleged conduct that itself is not in the FAC. *See Pennsylvania ex rel. Zimmerman v. PepsiCo*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (citation omitted)).

Similarly, as to the "extreme and outrageous" conduct element, Plaintiff's argument that the opening brief "evaluates the conduct in isolation, rather than in totality" (Pb35) is misplaced criticism that this motion, appropriately, focuses on the allegations in the FAC rather than the illogical and unrelated allegations in Plaintiff's conspiracist letter writing. Regardless, even those extraneous allegations would not satisfy the "elevated threshold" for extreme and outrageous conduct (Ob26 (citation omitted)), as shown by the easily distinguishable cases Plaintiff relies on.[9]

---

[9] *Taylor v. Metzger*, 152 N.J. 490, 508-21 (1998) (county sheriff used atrocious racial slur to refer to African-American employee); *Hill v. N.J. Dep't of Corrections Com'r Fauver*, 342 N.J. Super. 273, 297-98 (App. Div. 2001) (involved a conspiracy to file knowingly false allegations of sexual assault); *Fox v. DGMB Casino*, 2020

As to the "severe" emotional distress element (Ob28-29), Plaintiff points to alleged symptoms of emotional distress that – both temporally and as pled – are tied to his allegations against McCarter, specifically. (Pb38.) Paragraphs 300 to 302 of the FAC, for example, allege distress "inflicted on him by [McCarter]" and therapy to deal with distress "caused by [McCarter]" or "exacerbated by [McCarter]," including "adventure therapy" through "patriotic athletic events" – ostensibly including the NYC SEAL Swim itself. (FAC ¶¶ 300-32.) The alleged therapy with "Pam Arnell at 22Zero" (Pb38), for its part, appears nowhere in the FAC. And in any event, a plaintiff's rote allegations that he has sought therapy of one form or another are not enough to satisfy the severe emotional distress prong of an IIED claim, which requires allegations of a "severe *and disabling* emotional or mental condition" – plausibly caused by defendant – "which may be generally recognized and diagnosed by professionals trained to do so." *Taylor*, 152 N.J. at 515 (emphasis added). Plaintiff falls far short of that standard here.

## **CONCLUSION**

For these reasons, Chairman O'Toole respectfully requests that the Court grant this motion and dismiss Counts XII through XVIII of the FAC with prejudice.

---

WL 4745281, at *8 (N.J. App. Div. Aug. 17, 2020) (involved requests to falsify government reports and sexist remarks and plans geared to weed out women employees); *Cole v. Encapera*, 758 F. App'x 252 (3d Cir. Dec. 28, 2018) (did not involve IIED claim or New Jersey law).

Dated: May 11, 2026

Respectfully submitted,

By: */s/ Thomas R. Calcagni*

Thomas R. Calcagni
Walter R. Krzastek
Luke J. O'Brien
**CALCAGNI & KANEFSKY LLP**
1085 Raymond Boulevard, 18th Floor
Newark, New Jersey 07102
(862) 397-1796
tcalcagni@ck-litigation.com

*Attorneys for Defendant Kevin J. O'Toole*