**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WILLIAM BROWN, JR., Plaintiff, v. MCCARTER & ENGLISH, LLP, *et al.*, Defendants. | Civil Action No. 26-2808 (JXN)(AME) **OPINION** |

**NEALS**, District Judge

*Pro se* Plaintiff William Brown, Jr.'s ("Plaintiff") Amended Complaint has two parts. First, Plaintiff claims his former employer, McCarter & English, LLP ("McCarter"), discriminated against him for being a veteran. Plaintiff initially sued McCarter through counsel in state court. Second, Plaintiff alleges McCarter, the Port Authority of New York and New Jersey ("Port Authority"), Port Authority Chairman Kevin O'Toole ("O'Toole"), and Port Authority employee Patrick Donovan ("Donovan") (collectively, "Defendants") retaliated against Plaintiff for suing McCarter. Plaintiff claims he had a $40,000 per year contract with the Navy SEAL Foundation ("Foundation") to organize the annual NYC SEAL Swim ("Swim"). In Plaintiff's telling, Defendants threatened to withdraw Port Authority support for the Swim if Plaintiff participated. As a result, the Foundation terminated its contract with Plaintiff.

Plaintiff moved to disqualify O'Toole Scrivo—a law firm O'Toole manages—as counsel for McCarter. (ECF No. 19.)[1] McCarter moves to dismiss the Amended Complaint in part. (ECF No. 23.)[2] The Port Authority and Donovan (together, "Port Authority Defendants") also move to

[1] To which McCarter opposed (ECF No. 35), and Plaintiff replied (ECF No. 43).

[2] To which Plaintiff opposed (ECF No. 36), and McCarter replied (ECF No. 41).

dismiss the Amended Complaint (ECF No. 24),[3] as does O'Toole. (ECF No. 25).[4] The Court has carefully considered the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure[5] 78 and Local Civil Rule 78.1. For the reasons set forth below, Plaintiff's motion to disqualify is **DENIED**; and the motions to dismiss filed by McCarter, the Port Authority Defendants, and O'Toole are **GRANTED**.

## I. BACKGROUND

### A. McCarter Hires Plaintiff, a Veteran, as a Career Staff Associate

Plaintiff served as a Navy SEAL during the Global War on Terror. (Am. Compl. ¶ 27, ECF No. 1-2.) After his service, Plaintiff became an attorney and an outspoken "veteran advocate." (*Id.* ¶¶ 38–39.) Plaintiff founded and organized the Foundation's "Swim across the Hudson River, a large-scale, high-profile charity event that raises funds and awareness for Navy SEALs, veterans. Gold Star families, 9/11 survivors. police officers, and firefighters." (*Id.* ¶ 40.) Plaintiff "earned approximately $40,000" a year from the Foundation for organizing the Swim. (*Id.* ¶ 41.)

Plaintiff worked at McCarter as a Career Staff Associate in the Bankruptcy Group from 2017 to 2024. (*Id.* ¶¶ 61, 288.) According to Plaintiff, Career Staff Associates are "distinct" from regular associates. (*Id.* ¶ 64.) Yet "[d]espite performing substantially similar work as regular Associates—and in some cases performing work at the level of equity partners," Plaintiff alleges McCarter paid him "at a rate substantially lower than regular Associates." (*Id.* ¶ 66.) In 2023, Plaintiff made $100,000 per year as a sixth-year Career Staff Associate; a first-year Regular Associate made $170,000 per year. (*Id.* ¶ 67.) Plaintiff alleges McCarter hired non-veterans "in positions like Plaintiff's Career Associates or Staff Attorney role," and promoted several to

---

[3] To which Plaintiff opposed (ECF No. 37), and the Port Authority Defendants replied (ECF No. 44).

[4] To which Plaintiff opposed (ECF No. 38), and O'Toole replied (ECF No. 42).

[5] "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

Regular Associate or Special Counsel positions. (*Id.* ¶¶ 68–69.) Yet McCarter never promoted Plaintiff to a Regular Associate. (*Id.* ¶ 70.) And McCarter hired less experienced Regular Associates with "lower performance evaluation scores" than Plaintiff. (*Id.* ¶ 69.)

Plaintiff claims McCarter did not promote him to a Regular Associate or pay him as a Regular Associate "because of his status as a military veteran, his outspoken advocacy for veterans' rights, and his willingness to express views that conflicted with" McCarter leadership's purported political ideology. (*Id.* ¶ 70.) Specifically, Plaintiff asserts that McCarter leadership "actively promoted controversial progressive political causes through firm-wide communications, including support for Black Lives Matter, Critical Race Theory, narratives of systemic racism, and gender fluidity." (*Id.* ¶¶ 72–73.)

### B. McCarter Allegedly Discriminates Against Plaintiff for Being a Veteran

#### ***i. Comments***

Plaintiff alleges he experienced harassment at McCarter. (*Id.* ¶¶ 80–108.) First, in 2019, Plaintiff claims a McCarter partner asked him, unprompted, how many people he killed. (*Id.* ¶ 80.) Plaintiff found the question highly offensive. (*Id.* ¶ 82.) The partner later apologized and donated $1000 to the Swim. (*Id.* ¶¶ 84–85.)

Also in 2019, Plaintiff claims a different partner "sexually harassed Plaintiff based on his status as a veteran." (*Id.* ¶ 87.) While Plaintiff was at a work dinner, the partner "approached Plaintiff from behind, grabbed Plaintiff's waist without consent," and said something along the lines of "you can afford to eat all this because you're a strong healthy man." (*Id.* ¶ 89.) In Plaintiff's view, the partner was referring to Plaintiff's physical appearance based on his past status as a Navy SEAL veteran. (*Id.* ¶ 90.) Plaintiff claims he reported the incident, but McCarter did nothing. (*Id.* ¶¶ 92–93.)

A separate incident involved a Bankruptcy partner's email. That partner organized yearly cabin retreats for Bankruptcy Group attorneys, including Plaintiff. (*Id.* ¶¶ 97–98.) Plaintiff claims that, during the retreats, he was "exposed to racial remarks and wildly inappropriate behavior." (*Id.* ¶ 100.) After one retreat, the organizing partner "sent an email to attendees" that described hearing Plaintiff's "war stories" at the cabin. (*Id.* ¶ 105.) Plaintiff claims the email "made a mockery of Plaintiff s military service." (*Id.*)

And on November 6, 2023, Plaintiff contends that an attorney at McCarter emailed Plaintiff a New York Times article portraying "Iraq War veterans as mentally 'damaged.'" (*Id.* ¶¶ 216–18.)

***ii. Exclusion***

Plaintiff alleges McCarter excluded him from its Diversity, Equity and Inclusion ("DEI") Committee, despite his veteran status. (*Id.* ¶¶ 109–10.) Plaintiff avers that McCarter also excluded him from "annual Diversity Retreats," though he was one of only a few veterans at the firm. (*Id.* ¶¶ 117–20.) Plaintiff also notes McCarter participated in the Mansfield Certification program, an initiative Plaintiff characterizes as part of a "for-profit DEI consultancy business." (*Id.* ¶ 121.) According to Plaintiff, "[t]he Mansfield Certification program requires participating law firms to ensure that talent pools for promotions and leadership opportunities comprise at least 30% 'underrepresented' racial and other groups." (*Id.* ¶ 126.) But, in Plaintiff's telling, the Mansfield Certification program's initiatives did not include veterans as an underrepresented group. (*Id.* ¶ 127.)

While the DEI Committee "sent numerous firm-wide emails promoting, celebrating, and commemorating various causes and historical events," it did not commemorate the twenty-first anniversary of the September 11th attacks. (*Id.* ¶¶ 130–31.) Nearly a month later, on October 5, 2022, Plaintiff replied to a DEI Committee email commemorating "LGBT History Month,

inquiring why [McCarter] had not sent an email honoring and remembering those lost during the September 11 attacks, and asking whether there were any veterans serving on the DEI Committee." (*Id.* ¶ 132.) No one responded. (*Id.* ¶ 133.) So, Plaintiff sent another email to each member of the DEI Committee asserting "the Firm sent the wrong message by not sending out an email honoring and remembering those lost on 9/11." (*Id.* ¶ 134.) A DEI Committee member responded, stating "I'm a little confused as to why you are writing in October about the posts honoring 9/11, in response to our LGBTQA history acknowledgement" and that "your email timing certainly sends, a message to me, as one of the few out attorneys at the firm." (*Id.* ¶ 137.) In Plaintiff's telling, the response insinuated that homophobia motived his email, rather than concern as a veteran. (*Id.* ¶ 138.) After Plaintiff complained about the exchange to a Bankruptcy partner and demanded a seat on the DEI Committee, the Bankruptcy partner allegedly replied he "didn't know what [Plaintiff] was talking about," "justified" McCarter's "failure to commemorate September 11 by praising the firm's pro bono program for veterans," and stated that "the Firm doesn't have to send out an email to acknowledge the 9/11 attacks." (*Id.* ¶ 152.)

In September 2022, a fellow Navy SEAL veteran reached out to Plaintiff about potential representation in a matter.[6] (*Id.* ¶¶ 157–69.) According to Plaintiff, however, McCarter refused to represent the veteran. (*Id.*)

And in 2023, Plaintiff claims Rutgers Law School disinvited Plaintiff from the school's Annual Law Firm Night at McCarter's direction. (*Id.* ¶ 191.) Rutgers claimed there was a miscommunication (*id.* ¶ 198); Plaintiff claims the disinvitation was due to his veteran status (*id.* ¶ 194). Either way, Plaintiff attended the event. (*Id.* ¶ 199.)

[6] Plaintiff identifies the Navy SEAL by name and discloses information the Navy SEAL provided related to the potential representation. The Court will not publish what the Navy SEAL, a prospective client, divulged to Plaintiff while seeking representation on a matter. *See* N.J. RPC 1.18(a) and (d).

### *iii. Social Media Posts*

McCarter has a social media networking policy ("Policy"). (*See* McCarter Ex. 1 ("Policy"), ECF No. 23-3.) The Policy states, in relevant part:

> Do not express personal opinions about other people, especially other lawyers, judges, politicians, clients and firm personnel, or about potentially controversial topics such as politics and religion, or offer referrals, endorsements, or recommendations for or about others. Take care not to criticize firm lawyers when discussing cases in which firm lawyers participated.

(Policy at 2.[7]) Additionally, the Policy warned:

> All firm personnel, including partners, associates, "of counsel," staff lawyers, law clerks, paralegals, and staff are subject to sanctions for violations of this [P]olicy. Consequences may include such measures as a fine, termination of employment or expulsion from the firm, and any other action deemed appropriate by the Executive Committee under the circumstances.

(*Id.* at 3.)

Plaintiff claims that, in 2022 and 2023, McCarter directed him to remove social media posts because he is a veteran. First, in December 2022, Plaintiff made a LinkedIn post ("Third Circuit Post") "memorializing his visit to the Third Circuit Court of Appeals and his experience observing oral arguments." (Am. Compl. ¶ 173.) The Third Circuit Post included a picture Plaintiff took of himself during oral argument. (*See id.* ¶ 176.) The next day, a Bankruptcy partner allegedly told Plaintiff he "should not have taken pictures of the courtroom or made the LinkedIn post," and requested Plaintiff remove the post. (*Id.* ¶¶ 174–75.) Plaintiff claims the request discriminated against Plaintiff's veteran status, as his post "expressed Plaintiff[’s] admiration for the signatories

[7] "To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "However, an exception to the general rule is that a ‘document integral to or explicitly relied upon in the complaint’ may be considered ‘without converting the motion to dismiss into one for summary judgment.’" *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)). Here, Plaintiff expressly references the Policy. (*See* Am. Compl. ¶ 182.)

of the U.S. Constitution, many of whom were veterans who had risked their lives for the nation's freedoms." (*Id.* ¶ 177.) Yet that same day, a different McCarter attorney made a LinkedIn post celebrating Judge Padin's investiture, which included a picture of a Third Circuit courtroom. (*See id.* ¶ 179; McCarter Ex. 2, ECF No. 23-3.) Plaintiff claims McCarter's "inconsistent application of [its] social media policy was an act of illegal, bias-based harassment against Plaintiff based on military veteran status." (*Id.* ¶ 182.)

Next, in the fall of 2023, Plaintiff made a LinkedIn post featuring a clip from the Rambo movie "First Blood" ("Rambo Post"), writing:

> Sometimes movies reflect reality. The Sheriff who tried to pressure the war Veteran to leave Hope Town reminds me of similar patterns I see being played out today. So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves.

(*Id.* ¶ 204.) The next day, McCarter attorneys, including the Firmwide Managing Partner, expressed McCarter's "displeasure" with the Rambo Post, particularly because First Blood is a movie depicting violence. (*Id.* ¶ 209.) Plaintiff alleges an attorney present "implied that Plaintiff was mentally unstable and expressed concern that Plaintiff might hurt someone." (*Id.* ¶ 211.) Plaintiff asserts this "baseless implication of violent intent invoked harmful media stereotypes of veterans as mentally damaged and dangerous, unstable victims of PTSD." (*Id.* ¶ 212.)

***iv. Work Assignments***

Plaintiff alleges that, after he began publicly advocating for veteran fair pay and equal opportunities, McCarter "inexplicably altered the nature of his work assignments." (*Id.* ¶ 229.) Before 2021, Plaintiff primarily worked on bankruptcy and commercial litigation matters. (*Id.* ¶ 230.) However, from 2021 through 2023, McCarter assigned Plaintiff "a high-volume caseload defending allegations of child sexual abuse against the Catholic Church and its dioceses." (*Id.* ¶ 231.) Plaintiff allegedly told his supervisors he "struggled with the moral dilemma of defending

child sexual abuse matters," and requested different assignments. (*Id.* ¶¶ 233–34.) McCarter did not follow up on Plaintiff's request. (*Id.* ¶ 240.) Plaintiff contends that McCarter assigned him child sexual abuse cases to "pressure Plaintiff to resign . . . rather than continue to advocate for veterans' rights and equal treatment." (*Id.* ¶ 245.)

### C. Plaintiff Attends a Performance Review

On December 14, 2023, Plaintiff attended his annual performance review. (*Id.* ¶ 252.) He received positive feedback and a $15,000 raise. (*Id.* ¶¶ 253–54.) During the meeting, Plaintiff allegedly stated "it was a disgrace that he was one of the few veterans at [McCarter] and that after six years of performing fully and competently in his position, Plaintiff still received substantially less compensation than a non-veteran first-year Associate." (*Id.* ¶ 256.) Plaintiff asked McCarter to give him "specific steps he could take to become a regular Associate" or offer a severance package. (*Id.* ¶¶ 257–58.) Soon after, McCarter offered Plaintiff a four-month severance package and stated it would "get back to him" about what steps he could take to become a Regular Associate. (*Id.* ¶ 259.)

### D. Less Than Two Weeks Later, McCarter Fires Plaintiff

On December 22, 2023, Plaintiff posted the following on LinkedIn:

> I was a first responder to two suicide bombings in Iraq and those experiences had an impact on my perspective. There are many beautiful and tolerant Muslims but the textual language within the Quran is far from tolerant.
>
> In the 90's the promotion of antisocial values and the glorification of violence and drugs portrayed in gangsta rap had a huge negative influence on many young and easily impressionable American black youth.
>
> The pursuit of negative values leads to a trap, with the real result being a great loss of not even beginning to maximize one's personal growth potential.
>
> It's my opinion that there's also a radical culture within the Islamic world that promotes antisocial values and glorifies violence. This has had a devastating impact on thousands of young and very easily influenced lives.

> The internet and the ease of travel transversed us all into an increasingly smaller and greater connected global society. As a global society we need to use the internet and our educational institutions to promote unity and self and collective societal improvement. These are the cornerstone steps we need to take in order to maximize our individual and collective growth potential. The alternative to taking these proactive steps is that as a global society, like the young woman depicted in this video we have the potential to destroy ourselves.

(*Id.* ¶ 278.) The next day, Plaintiff emailed McCarter leadership "regarding his concerns about being assigned a disproportionate volume of child sexual abuse defense cases" and "that he was an Iraq War veteran and Navy SEAL, that he was the President of [Veteran Alumni of Rutgers University], that freedom of speech was very important to him, and that he had been discriminated against." (*Id.* ¶¶ 282–83.)

Four days later, on December 27, 2023, McCarter terminated Plaintiff during a meeting with McCarter's Firmwide Deputy Managing Partner and Chief Human Resources Officer. (*Id.* ¶ 287.) The Deputy Managing Partner explained the Firm was terminating Plaintiff because, despite warning Plaintiff about making "controversial" social media posts, Plaintiff's December 22, 2023 LinkedIn post "promoted negative stereotypes of Muslims and Black Americans." (*Id.* ¶ 288.)

### E. Plaintiff Sues McCarter

Plaintiff sued McCarter in New Jersey Superior Court on December 24, 2024. (*See* Compl., ECF No. 1-1.) The Complaint, originally filed through counsel, included claims for whistleblower retaliation, in violation of the Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-3, and unlawful termination, in violation of *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58 (1980). (*See generally id.*) O'Toole Scrivo, a law firm, represented McCarter. (*See* Port Auth. Ex. A ("State Docket"), ECF No. 24-3.) The Superior Court judge dismissed most of the Complaint without prejudice. (*See* ECF No. 2-1 ("Super. Ct. Op.").)

**F. The Port Authority Allegedly Retaliates Against Plaintiff**

O'Toole is the Port Authority's Chairman and O'Toole Scrivo's managing partner. (Am. Compl. ¶¶ 303–07.) O'Toole's son works at McCarter. (*Id.* ¶ 308.) So, Plaintiff alleges O'Toole has "family, business, and political ties" to McCarter and an interest in protecting McCarter from liability. (*Id.* ¶¶ 307–09.)

Before Plaintiff sued McCarter, the Port Authority "historically provided support and resources for the . . . Swim." (*Id.* ¶ 312.) Plaintiff claims this changed after he sued McCarter. First, Donovan (a Port Authority employee involved in planning the Swim) excluded Plaintiff from a Foundation ceremony O'Toole attended in September 2024. (*Id.* ¶¶ 316–19.) Then, in 2025, Donovan allegedly kept Plaintiff off a conference call related to planning the Swim. (*Id.* ¶ 324.) Also in 2025, Donovan warned Plaintiff he "cannot post, send, or do anything else negative towards [O'Toole] or his firm," otherwise, Donovan would "be out of the [Swim] along with all Port Authority assets and access to the [World Trade Center]." (*Id.* ¶ 342.)

According to Plaintiff, in 2026, unnamed Port Authority officials "informed the [Foundation] that it would not support the [Swim] if Plaintiff participated." (*Id.* ¶ 351.) Consequently, Plaintiff alleges the Foundation "terminated its contract with Plaintiff and withdrew from participating in the 2026 [Swim]." (*Id.* ¶ 352.)

**G. Plaintiff Adds the Port Authority, Donovan, and O'Toole to the Lawsuit**

On February 16, 2026, Plaintiff, proceeding *pro se*, filed a 500-paragraph, 108-page Amended Complaint against Defendants. (*See* Am. Compl.) The Amended Complaint asserts eleven claims against McCarter: (1) discrimination in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301, *et seq.* ("Count I"); (2) retaliation in violation of USERRA ("Count II"); (3) a hostile work environment in violation

of USERRA ("Count III"); (4) retaliation in violation of CEPA ("Count IV"); (5) wrongful discharge in violation of New Jersey's public policy of protecting veterans ("Count V"); (6) wrongful discharge in violation of New Jersey's public policy of protecting free speech ("Count VI"); (7) discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-12(a) ("Count VII"); (8) a hostile work environment in violation of NJLAD ("Count VIII"); (9) a violation of the Diane B. Allen Equal Pay Act, N.J.S.A. 10:5-12(t) ("Count IX"); (10) intentional infliction of emotional distress ("Count X"); and (11) breach of the implied covenant of good faith and fair dealing ("Count XI").

The Amended Complaint levies five claims against the Port Authority, Donovan, and O'Toole: (1) First Amendment retaliation, in violation of 42 U.S.C. § 1983 ("Count XII"); (2) violation of the New Jersey Civil Rights Act ("NJCRA"), N.J.S.A. 10:6-1, *et seq.* ("Count XIV"); (3) tortious interference with contract ("Count XV"); (4) tortious interference with prospective economic advantage ("Count XVI"); and (5) intentional infliction of emotional distress ("Count XVII").

The Amended Complaint also includes two claims against all Defendants: (1) conspiracy to violate civil rights, in violation of § 1983 ("Count XIII"); and (2) civil conspiracy ("Count XVIII").

Defendants timely removed.[8] (*See* Notice of Removal.)

### H. Plaintiff Moves to Disqualify; Defendants Move to Dismiss

On March 31, 2026, Plaintiff moved to disqualify O'Toole Scrivo from representing McCarter, arguing O'Toole Scrivo has an irreconcilable conflict of interest under New Jersey Rule

[8] The Court notes it has jurisdiction under 28 U.S.C. §§ 1331 and 1367. Venue is proper under 28 U.S.C. § 1441(a).

of Professional Conduct[9] 1.7(a)(2). (*See* Mot. to Disqualify, ECF No. 19.) McCarter opposed (McCarter Opp'n, ECF No. 35), and Plaintiff replied (Pl. Reply, ECF No. 43).

McCarter then moved to dismiss all claims raised against it in the Amended Complaint, except Counts II and III. (McCarter Mot. to Dismiss ("MTD"), ECF No. 23.) Plaintiff opposed (Pl. Opp'n to McCarter MTD, ECF No. 36), and McCarter replied (McCarter Reply, ECF No. 41). The Port Authority Defendants moved to dismiss all claims raised against them. (Port Auth. MTD, ECF No. 24.) Plaintiff opposed (Pl. Opp'n to Port Authority MTD, ECF No. 37), and the Port Authority Defendants replied (Port Authority Reply, ECF No. 44). Likewise, O'Toole moved to dismiss the claims raised against him. (O'Toole MTD, ECF No. 25.) Plaintiff opposed (Pl. Opp'n to O'Toole MTD, ECF No. 38), and O'Toole replied (O'Toole Reply, ECF No. 42).

## II. LEGAL STANDARD

### A. Motions to Disqualify

The Court "may use its inherent disciplinary power over the advocates appearing before it to disqualify an attorney." *In re Boy Scouts of Am.*, 35 F.4th 149, 159 (3d Cir. 2022) (citing *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984)). "Because the power to disqualify stems from a court's authority to supervise the attorneys appearing before it, a decision about whether to use that power is discretionary and 'never is automatic.'" *Id.* at 160 (quoting *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980)). "Even when an ethical conflict exists (or is assumed to exist), a court may conclude based on the facts before it that disqualification is not an appropriate remedy." *Id.*

New Jersey's RPCs govern the conduct of attorneys who appear before this Court. *See Chang v. Able C&C Co.*, 778 F. Supp. 3d 654, 663 (D.N.J. 2025); L. Civ. R. 103.1(a). The party

[9] "RPC" or "RPCs" hereinafter refer to the New Jersey Rules of Professional Conduct.

moving to disqualify an attorney must show disqualification is warranted, either because (a) the attorney violated an RPC, or (b) "sufficient doubt exists as to the propriety of further representation." *Minchin v. Ascend Wellness Holdings, Inc.*, 834 F. Supp. 3d 514, 519 (D.N.J. 2026) (citation omitted). This is a "heavy burden" with "a high standard of proof." *Chang*, 778 F. Supp. 3d at 665. The Court "closely scrutinize[s]" the facts the moving party asserts "to prevent unjust results." *Minchin*, 834 F. Supp. 3d at 519 (citation omitted). Disqualification is a "a drastic measure which courts should hesitate to impose except when absolutely necessary." *Id.* (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993)). Courts view disqualification motions skeptically "out of concern that they are made tactically to separate a litigant from its counsel of choice." *Id.* (citation omitted).

**B. Motions to Dismiss**

Rule 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court conducts a three-step inquiry in evaluating a motion to dismiss under Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the Court identifies "the elements a plaintiff must plead to state a claim." *Iqbal*, 556 U.S. at 675. Second, the Court accepts all plaintiff's well-pleaded factual allegations as true and "construe[s] the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). The Court, however,

disregards "legal conclusions and recitals of the elements of a cause of action supported by mere conclusory statements." *Davis v. Wells Fargo*, 824 F.3d 333, 341 (3d Cir. 2016). Third, the Court considers "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679).

Courts give "greater leeway to *pro se* litigants." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013). "This does not extend to *pro se* litigants who are attorneys." *Wong v. Ramnanan*, No. 22-1586, 2026 WL 1492747, at *5 (D.N.J. May 28, 2026); *see also Khawam v. Allen*, No. 23-22465, 2025 WL 654107, at *6 (D.N.J. Feb. 27, 2025) ("[A]lthough Plaintiff proceeds *pro se* in this action, as an attorney, he is a litigant with substantial legal training, and the Court, therefore, will not afford him the same leniency to which non-attorney *pro se* litigants are entitled."); *Turner v. N.J. State Police*, No. 08-5163, 2017 WL 1190917, at *7 (D.N.J. Mar. 29, 2017) ("Attorney *pro se* litigants are not accorded the same consideration as *pro se* litigants who lack substantial legal training."); *Allen v. Aytch*, 535 F.2d 817, 821 n.21 (3d Cir. 1976) (declining to liberally construe complaint drafted by third-year law student *pro se* litigant).

## III. <u>DISCUSSION</u>

### A. The Disqualification Motion

Plaintiff seeks to disqualify O'Toole Scrivo under RPC 1.7(a), which prohibits a lawyer from representing a client "if the representation involves a concurrent conflict of interest." N.J. RPC 1.7(a). A concurrent conflict of interest exists if:

> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer.

N.J. RPC 1.7(a).

Plaintiff offers nine reasons why there is a significant risk that O'Toole's personal interests will limit his firm's representation of McCarter. (*See* Pl.'s Moving Br. at 22–23, ECF No. 19-1.) None has merit.

***First***, Plaintiff asserts a conflict exists because O'Toole is a defendant in this action. This is unpersuasive. If suing O'Toole automatically created a conflict, "adversaries might strategically name opponent's counsel as a party to an action as a prelude to a motion to disqualify." *Pu v. Greenthal Mgmt. Corp.*, No. 08-10084, 2009 WL 648898, at *9 (S.D.N.Y. Mar. 10, 2009). More to the point, Plaintiff offers nothing to suggest O'Toole Scrivo would be liable for O'Toole's conduct. O'Toole Scrivo is an LLC. A corporation "is a separate entity from its shareholders." *State, Dep't of Env't Prot. v. Ventron Corp.*, 94 N.J. 473, 500 (1983). Courts may hold shareholders liable for the acts of the corporation only "to prevent an independent corporation from being used to defeat the ends of justice to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." *Id.* (citations omitted). Theoretically, a court could do the inverse and hold a corporation liable for the acts of a shareholder, but no New Jersey case "recognizes reverse veil piercing as a cognizable claim." *Sparks v. Teva Pharm. USA, Inc.*, No. 25-630, 2026 WL 1959349, at *12 (D.N.J. June 29, 2026). And Plaintiff does not allege O'Toole did any complained-of act *in his capacity as a member of O'Toole Scrivo*. So, O'Toole's theoretical personal liability does not give his firm "a direct stake in the outcome of this matter." *CPR Assocs., Inc. v. Se. Pa. Chapter of Am. Heart Ass'n*, No. 90-3758, 1990 WL 116613, at *3 (E.D. Pa. Aug. 7, 1990).

***Second***, Plaintiff hypothesizes, without evidence, that O'Toole Scrivo's "optimal strategy" in this litigation would be to argue that O'Toole retaliated against Plaintiff on his own, without McCarter's involvement. (Pl.'s Moving Br. at 23.) This is entirely speculative. "Because of the virtually limitless cases in which a 'conflict' may theoretically arise when a lawyer's self-interest

is implicated, there is a very real danger of analyzing these issues not on fact but on speculation and conjecture." *Essex Cnty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 418, 432 (D.N.J. 1998). Plaintiff has not identified, and the Court has not observed, any divergence in O'Toole and McCarter's interests. To the contrary, O'Toole and McCarter have a common joint defense—that they did not engage in unlawful conduct. So, there is not a significant risk that O'Toole's interests will materially limit his firm's representation of McCarter.

***Third***, Plaintiff argues O'Toole has motive to protect McCarter because his son works at McCarter. Where O'Toole's son works is irrelevant. Plaintiff did not sue O'Toole's son. And if O'Toole's son motivated O'Toole to protect McCarter, O'Toole's interests would *align*, not *conflict*, with McCarter's.

***Fourth***, Plaintiff claims O'Toole has a motive to protect McCarter because O'Toole Scrivo profits from representing McCarter. Lawyers may profit from representing clients.[10] It does not provide a basis upon which to disqualify counsel.

***Fifth***, Plaintiff asserts O'Toole had a motive to protect McCarter because O'Toole Scrivo was "an instrumentality of the alleged conspiracy." (Pl.'s Moving Br. at 23.) If so, O'Toole and McCarter's interests would be aligned. Both would have a motivation to dismiss the lawsuit as baseless. In any event, the Court declines to speculate about O'Toole Scrivo's role in Plaintiff's supposed conspiracy. Plaintiff did not sue O'Toole Scrivo, nor does the Amended Complaint make any allegation about the firm's conduct.

***Sixth***, Plaintiff alleges, in cursory fashion, that an incident involving Plaintiff's process server confirms a conflict exists between O'Toole and McCarter. Briefly, Plaintiff hired a process server to serve O'Toole at his home with the Amended Complaint. (*See* Brown Decl. ¶¶ 16–17,

---

[10] This has been the case for a considerable period. *See* WILLIAM FORSYTH, THE HISTORY OF LAWYERS 359 (1875) (noting that Roman Emperor Claudius prohibited lawyers from charging fees of more than 10,000 sesterces).

ECF No. 19-2.) O'Toole answered the door. (*Id.* ¶ 17.) The process server asked if Donovan was home. (*Id.*) O'Toole said "no." (*Id.*) The process server later returned to O'Toole's home and knocked on the door, but no one answered. (*Id.*) The Port Authority then called the Cedar Grove police, requesting an officer inform the process server that he should serve paperwork to Port Authority headquarters. (*Id.* ¶ 18.) Plaintiff does not elaborate and the record is unclear, however, as to the connection between this incident and Plaintiff's disqualification motion.

***Seventh***, Plaintiff states that a declaration from O'Toole's sister, a captain in the Cedar Grove Police Department, confirms O'Toole uses "governmental power for personal retaliation." (Pl.'s Moving Br. at 23.) The Court cannot discern the relationship between this declaration and Plaintiff's disqualification motion.

***Eighth***, Plaintiff claims there is a conflict because the Port Authority retained separate counsel for O'Toole. Plaintiff fails to explain how this implies a conflict. "The mere fact that parties . . . retained separate counsel . . . hardly equates to the express creation of an adverse relationship in a document where the overall focus is a joint effort against a common opponent." *Ford Motor Co. v. Edgewood Props., Inc.*, No. 06-1278, 2011 WL 5080347, at *8 n.9 (D.N.J. Oct. 25, 2011). Plaintiff does not show how the *Port Authority* retaining separate counsel for *O'Toole* creates a conflict with O'Toole Scrivo representing *McCarter*.

***Ninth***, Plaintiff asserts O'Toole Scrivo "cannot provide McCarter with undivided loyalty" because Plaintiff filed complaints against O'Toole with the Federal Bureau of Investigation and the Port Authority's inspector general.[11] But *Plaintiff* made those complaints, which have not been

[11] Plaintiff cites *Harish v. Arbit*, No. 21-11088, 2025 WL 354434 (D.N.J. Jan. 31, 2025), for the proposition that O'Toole Scrivo "cannot provide McCarter with undivided loyalty when its managing partner faces potential criminal exposure in the very case the firm is defending." (Pl.'s Moving Br. at 23.) He claims *Harish* quotes *State ex rel. S.G.*, 175 N.J. 132, 139 (2003). (*Id.*) *Harish* does not cite or quote *S.G. See Harish*, 2025 WL 354434 at *1–14.

Moreover, neither *Harish* nor *S.G.* stand for the proposition that a firm cannot provide a client "with undivided loyalty when its managing partner faces potential criminal exposure in the very case the firm is defending."

adjudicated. The Court declines to let Plaintiff use his own litigation conduct to disqualify his opponent's counsel. *Minchin*, 834 F. Supp. 3d at 519.

Aside from speculation, conjecture, and his own tactical litigation decisions, Plaintiff does not meet the "heavy burden" of showing a significant risk that O'Toole's personal interests will limit his firm's representation of McCarter. *Chang*, 778 F. Supp. 3d at 665. Accordingly, Plaintiff's motion to disqualify O'Toole Scrivo (ECF No. 19) is **DENIED**.

### B. The Claims Against McCarter (Counts I, IV, V, VI, VII, VIII, IX, X, XI)

#### *i. NJLAD Claims (Counts VII, VIII, IX)*

Plaintiff asserts NJLAD claims for discrimination (Count VII), hostile work environment (Count VIII), and unequal pay (Count IX) based on his veteran status. (Am. Compl. ¶¶ 418–42.) To state an NJLAD claim, a plaintiff must show: "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016).

McCarter argues Plaintiff fails at the first element—protected class membership—because NJLAD did not protect veterans when Plaintiff worked at McCarter, and NJLAD's 2026 amendment ("2026 Amendment") extending protections to veterans does not apply retroactively. The Court agrees.

When Plaintiff worked at McCarter, NJLAD made it unlawful:

---

(Pl.'s Moving Br. at 23.) In *Harish*, Magistrate Judge Espinosa disqualified the defendants' attorneys for violating RPCs 1.8(f) and 5.4(c) by improperly accepting payment from a third party. *See id.* at *6–14. *Harish* did not discuss whether a managing partner's liability creates a conflict under RPC 1.7. In *S.G.*, the New Jersey Supreme Court held a law firm could not "represent a defendant accused of shooting and killing another of the firm's clients." *S.G.*, 175 N.J. at 134.

As a litigant, Plaintiff certified his "legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." Fed. R. Civ. P. 11(b)(3). As a New Jersey attorney, Plaintiff has a duty of candor to this Court. *See* N.J. RPC 3.3.

> For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, pregnancy or breastfeeding, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, *or because of the liability for service in the Armed Forces of the United States* or the nationality of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment[.]

N.J.S.A. 10:5-12(a) (2026) (emphasis added). Liability for service in the Armed Forces meant:

> subject to being ordered as an individual or member of an organized unit into active service in the Armed Forces of the United States by reason of membership in the National Guard, naval militia or a reserve component of the Armed Forces of the United States, or subject to being inducted into such armed forces through a system of national selective service.

N.J.S.A. 10:5-5(f) (2024).

On January 20, 2026, however, New Jersey amended NJLAD to make it unlawful for an employer, "because of an individual's service in the Armed Forces of the United States . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.J.S.A. 10:5-12(a) (current); *see also* P.L. 2025, c. 307, § 7. Service in the Armed Forces of the United States means "being in active service in any branch of the Armed Forces of the United States or National Guard, or having been discharged or released from active service in any branch of the Armed Forces of the United States or National Guard." N.J.S.A. 10:5-5(zz).

In short, when Plaintiff worked at McCarter from 2017 to 2023, NJLAD did not protect veterans. Now it does. So, Plaintiff can only state an NJLAD veterans discrimination claim if the 2026 Amendment applies retroactively to Plaintiff's 2017 to 2023 employment.

New Jersey courts presume "that substantive statutory amendments apply prospectively." *J.H. v. Warren Hills Bd. of Educ.*, 265 N.J. 140, 166 (2026). The presumption is based on "long-held notions of fairness and due process." *Johnson v. Roselle EZ Quick LLC*, 226 N.J. 370, 387 (2016). Although "everyone is presumed to know the law, no one is expected to anticipate a law

that has yet to be enacted." *Id.* (quoting *Maeker v. Ross*, 219 N.J. 565, 578 (2014)). But as with any rule, there are exceptions.

"To determine whether a substantive statute should be applied retroactively, [New Jersey courts] employ a two-part test." *J.H.*, 265 N.J. at 157. First, the Court considers "whether the Legislature intended to give the statute retroactive application." *Id.* (citation omitted) Second, the Court examines whether retroactively applying the statute would cause "either an unconstitutional interference with vested rights or a manifest injustice." *Id.* (citation omitted).

The Court begins and ends at step one. To determine the Legislature's intent to retroactively apply a statute, the Court may "consider any explicit or implicit expression of such intent, the nature of the legislative enactment, and the reasonable expectations of the parties." *Id.* at 160. The Legislature "may convey its intent that a statute operate retroactively by explicitly stating so 'in the language of the statute or in the pertinent legislative history.'" *Id.* (quoting *Maia v. IEW Constr. Grp.*, 257 N.J. 330, 350 (2024)). Here, the 2026 Amendment states it "shall take effect immediately." P.L. 2025, c. 307, § 9. The "phrase 'shall take effect immediately' has been interpreted to 'bespeak an intent contrary to, and not supportive of, retroactive application.'" *State ex rel. Edelweiss Fund, LLC v. JPMorgan Chase & Co.*, 264 N.J. 508, 521 (2026) (quoting *Pisack v. B & C Towing, Inc.*, 240 N.J. 360, 371 (2020)); *State v. Lane*, 251 N.J. 84, 96 (2022) ("[W]e have repeatedly construed language stating that a provision is to be effective immediately, or effective immediately on a given date, to signal prospective application."); *State v. Rosado*, 475 N.J. Super. 266, 276 (App. Div. 2023) ("Our Supreme Court has consistently held that an amendment that is to take effect immediately is to be applied only prospectively."). Moreover, nothing in the legislative history indicates the Legislature intended for the 2026 Amendment to apply retroactively. *See, e.g.*, S.B. 3800, 221st Leg., Reg. Sess. (N.J. 2024); S. Mil. & Veterans

Affs. Comm. Statement to S.B. 3800, 221st Leg., Reg. Sess. (N.J. 2024). "[W]hen the legislative intent does not explicitly or implicitly indicate retroactive application of statutes, we are hesitant to do so." *Maia*, 257 N.J. at 351–52.

The Legislature may also "signal an intent for a statute to apply retroactively when it is 'ameliorative' or 'curative' in nature." *J.H.*, 265 N.J. at 164. An ameliorative or curative statute seeks "to remedy a perceived imperfection in or misapplication of a statute," rather than "to alter the intended scope or purposes of the original act." *Id.* (quoting *Maia*, 257 N.J. at 351). The 2026 Amendment is not curative. It does not clarify existing law. Instead, it expressly adds new substantive rights for veterans. This was the Legislature's intent. As the Senate Military and Veterans' Affairs Committee understood, the Amendment "*broadens* [NJLAD] to specifically bar discrimination against persons currently serving in the military and military veterans" and "defines [an] *additional* protected class of persons." S. Mil. & Veterans Affs. Comm. Statement to S.B. 3800, 221st Leg., Reg. Sess. (N.J. 2024) (emphasis added).

Faced with the plain language of the Amendment, Plaintiff focuses exclusively on "the reasonable expectations of the parties." *J.H.*, 265 N.J. at 160. According to Plaintiff, the Legislature enacted the 2026 Amendment because of his advocacy. (Am. Compl. ¶ 422.) His focus is misplaced. "Only if there is no clear expression of legislative intent concerning retroactivity will the court look at the controlling law at the relevant time and consider the parties reasonable expectations as to the law, which may warrant retroactive application." *J.H.*, 265 N.J. at 164 (cleaned up). Here, the plain text of the 2026 Amendment expresses the Legislature's clear intent for the Amendment to apply only prospectively. *See Edelweiss Fund*, 264 N.J. at 521. Accordingly, the Court need not consider the reasonable expectations of the parties. And so, the Court concludes

the 2026 Amendment, which makes veterans a protected category, does not apply retroactively to Plaintiff's employment.[12]

Because NJLAD did not protect veterans when Plaintiff worked for McCarter, Counts VII, VIII, and IX of the Amended Complaint are **DISMISSED *with prejudice*.**[13]

#### *ii. USERRA Discrimination (Count I)*

Count I of the Amended Complaint claims McCarter discriminated against Plaintiff based on his veteran status, in violation of USERRA. Congress enacted USERRA "to prohibit discrimination against persons because of their service in the uniformed services." 38 U.S.C. § 4301(a)(3). Under USERRA, an employer cannot deny a veteran "initial employment,

---

[12] Plaintiff also claims, in cursory fashion, that his veteran status is "so closely associated with" his identity that McCarter's treatment of him constitutes associational discrimination under NJLAD. (Am. Compl. ¶ 420.) This threadbare point warrants only brief discussion.

First, Plaintiff's opposition did not address McCarter's argument that he does not state a claim for associational discrimination. (*Compare* McCarter Moving Br. at 13–14, ECF No. 23-1, *with* Pl.'s Opp'n Br. at 30–31, ECF No. 36.) It is not the Court's job "to make the parties' arguments for them." *Sang Geoul Lee v. Won Il Park*, 720 F. App'x 663, 666 (3d Cir. 2017). Plaintiff's failure to respond to McCarter concedes the point. *Id.* ("[Plaintiff's] failure to respond to the pertinent opposition-brief argument acts as a concession of that argument.")

In any event, the Court agrees with McCarter. Associational discrimination means discriminating against someone "closely associated with" a member of a protected group. *Calabotta v. Phibro Animal Health Corp.*, 460 N.J. Super. 38, 58 (App. Div. 2019). Plaintiff does not allege McCarter discriminated against him for closely associating with a member of a protected group. Instead, Plaintiff asserts his identity as a veteran was functionally equivalent to a protected class. Plaintiff cites no caselaw supporting this novel theory of liability. The "legislature says what it means and means what it says in a statute." *Dodd v. United States*, 545 U.S. 353, 353 (2005). Courts will not add words "the Legislature pointedly omitted in drafting its own enactment." *DiProspero v. Penn*, 183 N.J. 477, 492 (2005). NJLAD sets forth an exclusive list of protected characteristics. *See* N.J.S.A. 10:5-12(a). The "functional equivalent of a protected characteristic" is not on that list. The Court will not add those words to the NJLAD.

[13] After dismissing a claim under Rule 12(b)(6), the Court "must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips*, 515 F.3d at 236 (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)). An amendment is futile if it "advances a claim that is legally insufficient on its face." *Pharm. Sales & Consulting Corp. v. J.W.S. Delavau Co.*, 106 F. Supp. 2d 761, 764 (D.N.J. 2000). Plaintiff's NJLAD claims fail as a matter of law because NJLAD did not protect veterans when Plaintiff worked at McCarter.

reemployment, retention in employment, promotion, or any benefit of employment" because of their military service. 38 U.S.C. § 4311(a).

Courts apply "a two-step burden-shifting framework" to analyze USERRA discrimination claims. *Murphy v. Radnor Township*, 542 F. App'x 173, 176 (3d Cir. 2013). First, the plaintiff must show their military service was a "substantial or motivating factor in the adverse employment action." *Id.* (citation omitted). Military service is a motivating factor "if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Id.* at 177 (citation omitted). An adverse employment action must cause "some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). The Court may "reasonably infer discriminatory motivation under USERRA from a variety of factors," including:

> proximity in time between the employee's military activity and the adverse employment action, inconsistencies between the proffered reason and other actions of the employer, an employer's expressed hostility towards members protected by the statute together with knowledge of the employee's military activity, and disparate treatment of certain employees compared to other employees with similar work records or offenses.

*Murphy*, 542 F. App'x at 177–78 (citation omitted). If the plaintiff meets their initial burden, the employer "must prove that it would have taken the adverse action for non-discriminatory reasons, regardless of the employee's military service." *Id.* at 177.

Plaintiff asserts, because of his veteran status, McCarter (1) paid him less than Regular Associates (Am. Compl. ¶¶ 65–68); (2) did not promote him to a Regular Associate (*id.* ¶ 70); (3) "excluded [him] from professional development opportunities" (*id.* ¶ 3); (4) assigned him many child sexual abuse cases (*id.* ¶¶ 229–48); and (5) fired him.

**a. Compensation**

First, Plaintiff asserts that, "[d]espite performing substantially similar work as regular Associates—and in some cases performing work at the level of equity partners—Plaintiff was compensated at a rate substantially lower than regular Associates." (Am. Compl. ¶ 66.) Plaintiff's threadbare allegation of unequal treatment does not give rise to an inference of discrimination.

To plead discrimination, a plaintiff may allege "that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *Phillips v. Starbucks Corp.*, 624 F. Supp. 3d 530, 540 (D.N.J. 2022) (citation omitted). "While 'similarly-situated' does not necessarily mean identically situated, the plaintiff must nevertheless be similar in 'all relevant respects.'" *Id.* (citation omitted). Courts consider whether the plaintiff and the other individuals "had similar job responsibilities, were subject to the same standards, worked for the same supervisors, and engaged in comparable misconduct." *Ewell v. NBA Props., Inc.*, 94 F. Supp. 3d 612, 624 (D.N.J. 2015). At the pleading stage, Plaintiff need not "plead detailed factual allegations," but "must allege some facts that plausibly allege 'an inference of discrimination.'" *Dzibela v. BlackRock Inc.*, No. 23-2093, 2024 WL 4349813, at *11 (D.N.J. Sept. 30, 2024) (citation omitted).

Plaintiff's allegations of unequal treatment are "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678. Plaintiff does not provide "any characteristics of those individuals" whom McCarter allegedly paid more. *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 (3d Cir. 2010). At most, Plaintiff asserts he made less than Regular Associates. (Am. Compl. ¶ 66.) But Plaintiff was a Career Staff Associate, a role "distinct from the position of 'regular Associate.'" (*Id.* ¶ 65.) Faced with the difference, Plaintiff simply concludes he was similarly situated to Regular Associates. (*Id.* ¶ 66.) But the Court need not credit this bare legal conclusion

as true. *Iqbal*, 556 U.S. at 678. Moreover, Plaintiff does not allege he made less than a similarly situated *non-veteran* Regular Associate. *Phillips*, 624 F. Supp. 3d at 540. Thus, Plaintiff's assertion that he made less than Regular Associates does not plausibly permit an inference of discrimination.

**b. Failure to Promote**

Second, Plaintiff asserts McCarter promoted non-veteran Staff Attorneys to Regular Associate, but not Plaintiff. His assertion fails for the same reasons stated above—Plaintiff does not identify how any of those non-veteran Staff Attorneys were similarly situated to him, or even whether Staff Attorney is a similar position to Career Staff Associate. *See Golod*, 403 F. App'x at 702 (dismissing discrimination claim where Plaintiff "did not provide any characteristics of those individuals who received the promotions to which she alleges she was entitled.").

Further, Plaintiff does not allege he applied for a promotion to Regular Associate or expressed interest in the position until two weeks before he got fired. While failing to apply for a promotion is generally "fatal to a failure to promote claim, many courts have overlooked this failure in certain cases, such as when the promotional system did not involve a formal application process and when a plaintiff's attempts to apply for a promotion have been rebuffed." *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 331 (D.N.J. 1995). None of those exceptions apply. Plaintiff does not claim McCarter had an informal promotional system, *id.*; that he previously applied for a promotion, *id.*; that he "did everything reasonably possible to make known to [McCarter] of his . . . interest in such employment," *Newark Branch, N.A.A.C.P. v. Town of Harrison*, 907 F.2d 1408, 1415 (3d Cir. 1990); that he "was deterred from applying for [Regular Associate] by [McCarter's] discriminatory practices and would have applied for the position but for those practices," *id.*; or that he "had a real and genuine interest in [Regular Associate] employment with [McCarter] but reasonably believed that a formal application would be futile," *id.*

To the contrary, Plaintiff alleges he first broached the subject of getting promoted to Regular Associate at his December 14, 2023 performance review, when he requested "specific steps he could take to become a regular Associate" or the offer of a severance package. (Am. Compl. ¶ 257.) But McCarter employees stated they would "get back to him" about what steps he could take to become a regular Associate." (*Id.* ¶ 259.) And, according to Plaintiff, McCarter's Chief Human Resources Officer said she "had been 'working on ways' Plaintiff could become a regular Associate" before he was terminated. (*Id.* ¶ 262.)

Because Plaintiff does not adequately allege (a) McCarter promoted similarly situated non-veteran employees to Regular Associate, but not Plaintiff; or (b) McCarter did not promote Plaintiff to Regular Associate because he was a veteran, McCarter's failure to promote Plaintiff does not give rise to an inference of discrimination.

**c. Denial of Professional Opportunities**

Third, Plaintiff alleges McCarter excluded him from unspecified "professional development opportunities afforded to others." (Am. Compl. ¶ 3.) Plaintiff also claims McCarter excluded Plaintiff from the firm's annual Diversity Retreat. (*Id.* ¶ 109.) Neither assertion raises an inference of discrimination.

To start, Plaintiff does not identify any "professional development opportunities" from which McCarter excluded him. (*See generally* Am. Compl.) Plaintiff must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. Because he does not, the Court disregards Plaintiff's vague, cursory allegations about being excluded from unknown professional development opportunities.

Next, Plaintiff fails to show how being excluded from McCarter's annual Diversity Retreat caused "some harm respecting an identifiable term or condition of employment." *Muldrow*, 601

U.S. at 355. The Amended Complaint does not link the Diversity Retreat to any identifiable term of Plaintiff's employment. Plaintiff does not allege "his job, salary, benefits, hours, perks, prestige, opportunities, or the like were tied to" attending the Diversity Retreat. *Gabriel v. DSM Biomedical, Inc.*, 187 F.4th 77, 81 (3d Cir. 2026). Nor does Plaintiff show McCarter did not invite him to the Diversity Retreat *because he was a veteran*. Plaintiff does not explain what the Diversity Retreat is, how many people attended, how they were selected, and whether Plaintiff asked to attend. The Court will not fill in the blanks. Without more, Plaintiff fails to show his exclusion from the Diversity Retreat was adverse or connected to being a veteran.

**d. Work Assignments**

Fourth, Plaintiff notes McCarter assigned him many child sexual abuse cases instead of bankruptcy work. (Am. Compl. ¶¶ 229–48.) Adverse employment actions "can include, among other things, the assignment of undesirable work, interference with the employee's performance, and unwarranted or threatened discipline." *Guardado v. Kiss Distrib. Corp.*, No. 25-649, 2026 WL 1078770, at *4 (D.N.J. Apr. 21, 2026).

But Plaintiff does not allege McCarter assigned him child sexual abuse cases *because he was a veteran*. Rather, Plaintiff claims McCarter gave him the cases because he "recently complained publicly about pay inequality for veterans." (*Id.* ¶ 243.) Plaintiff, in other words, argues McCarter assigned him child sex abuse cases as *retaliation*, not *because he was a veteran*. Retaliation and discrimination are different claims under different statutory provisions with different standards. *See* 38 U.S.C. §§ 4311(a)–(b). Specifically, USERRA provides:

> An employer may not discriminate in employment against or take any adverse employment action or other retaliatory action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter, (2) has testified or otherwise made a statement in or in connection with any proceeding under this chapter, (3) has assisted or otherwise participated in an investigation under this chapter, or (4) has exercised a right provided for in this

> chapter. The prohibition in this subsection shall apply with respect to a person regardless of whether that person has performed service in the uniformed services.

38 U.S.C. § 4311(b).

Count II of the Amended Complaint is a claim for USERRA retaliation. McCarter does not seek to dismiss that claim. (*See* McCarter Moving Br. at 3.) So, while Plaintiff's work assignment allegations may support a *retaliation* claim against Plaintiff for demanding equal pay for veterans, he does not claim that McCarter assigned him unpleasant cases *for being a veteran*.

**e. Termination**

Finally, Plaintiff cursorily asserts his termination was discriminatory. But, as before, Plaintiff does not claim McCarter fired him because he was a veteran; Plaintiff alleges he was terminated in "retaliation for [his] protected complaints about discrimination, unequal pay, and hostile work environment." (Am. Compl. ¶ 291.) While Plaintiff's allegations might support a USERRA *retaliation* claim, he does not adequately plead a *discrimination* claim.

As Plaintiff does not adequately allege (1) he suffered an adverse employment action (2) because he is a veteran,[14] Count I of the Amended Complaint is **DISMISSED *without prejudice***.

***iii. CEPA Claim (Count IV)***

New Jersey enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Dzwonar v. McDevitt*, 177 N.J. 451, 461 (2003) (quoting *Abbamont v.*

[14] In his opposition brief, Plaintiff argues a "cat's paw" theory of liability supports his discrimination claim. Under such a theory, "if a non-decision maker's discriminatory act serves as the proximate cause for the ultimate adverse employment action, then employer liability can attach." *Lamb v. Montgomery Township*, 734 F. App'x 106, 113 (3d Cir. 2018). Plaintiff did not allege any facts supporting a cat's paw theory of liability. He cannot use his opposition brief to amend his complaint. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).

*Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 431 (1994)). To state a CEPA claim, the plaintiff must show:

> (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Id.* at 462.

A CEPA plaintiff should "identify a law, or a rule or regulation promulgated pursuant to law, or a clear mandate of public policy [he or she] reasonably believes the defendant violated." *Paskas v. United Parcel Serv., Inc.*, No. 23-1162, 2024 WL 4345208, at *5 (D.N.J. Sept. 30, 2024), *aff'd,* No. 24-2997, 2025 WL 3562735 (3d Cir. Dec. 12, 2025). But the Court "can, on its own, identify the law or policy that might have been implicated by the challenged conduct so long as the plaintiff alleges sufficient details." *Avetzuk v. Hertz Corp.*, No. 23-22568, 2025 WL 559845, at *4 (D.N.J. Feb. 20, 2025). Therefore, "it is critical to identify the evidence that an aggrieved employee believes will support the CEPA recovery with care and precision." *Battaglia v. United Parcel Serv., Inc.*, 214 N.J. 518, 559 (2013). "Vague and conclusory complaints, complaints about trivial or minor matters, or generalized workplace unhappiness are not the sort of things that the Legislature intended to be protected by CEPA." *Id.*

Moreover, the plaintiff need not "show that a law, rule, regulation or clear mandate of public policy actually would be violated if all the facts he or she alleges are true." *Dzwonar*, 177 N.J. at 464. Rather, they must allege facts supporting "an objectively reasonable belief that a violation has occurred." *Id.* A plaintiff has an objectively reasonable belief a violation has occurred when "there is a substantial nexus between the complained-of conduct and a law or public policy identified by the court or the plaintiff." *Id.* In other words, "there must be a close relationship

between the alleged misconduct and the supposedly violated law or public policy." *Avetzuk*, 2025 WL 559845, at *4. Correspondingly, the plaintiff must "allege—with 'a minimum amount of specificity'—the ways in which law or public policy, as relevant, were violated, thereby linking the challenged conduct to a violation of law or public policy and establishing the requisite nexus." *Ho-Ho-Kus, Inc. v. Sucharski*, No. 23-1677, 2024 WL 4647964, at *9 (D.N.J. Nov. 1, 2024).

To engage in whistleblowing activity, the employee must sufficiently express their "disagreement with a corporate policy, directive, or decision based on a clear mandate of public policy . . . . to support the conclusion that the resulting discharge violates the mandate of public policy and is wrongful." *Tartaglia v. UBS PaineWebber Inc.*, 197 N.J. 81, 109 (2008). The plaintiff "must show that they specifically communicated their belief that the complained-of conduct was illegal; mere concerns that a law 'might at some point in the future be violated if certain precautions are not taken' will not suffice." *Sucharski*, 2024 WL 4647964, at *8 (citation omitted). The plaintiff, moreover, must support their allegations with "sufficient facts, such as dates, times, locations, and the mediums through which the communication(s) regarding the plaintiff's reasonable belief of a legal violation occurred." *Id.* "Baseless complaints or expressions of purely personal views about the meaning of public policies will not meet the test for a 'clear mandate' regardless of the manner or mode in which they are voiced." *Tartaglia*, 197 N.J. at 109.

To establish a causal connection between whistleblowing activity and termination, the plaintiff "must show that the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" *Cohen v. BH Media Grp., Inc.*, 419 F. Supp. 3d 831, 856 (D.N.J. 2019) (quoting *Choy v. Comcast Cable Commc'ns, LLC*, 629 F. App'x 362, 365 (3d Cir. 2015)). To do so, the plaintiff may offer "direct evidence of retaliation or circumstantial evidence that justifies an inference of retaliation." *Choy*, 629 F. App'x at 365. The plaintiff can circumstantially establish

causation through "(i) 'an unusually suggestive temporal proximity' between the protected conduct and the allegedly retaliatory action or (ii) 'a pattern of antagonism coupled with timing.'" *Paskas*, 2024 WL 4345208, at *7. But "the mere fact that an adverse employment action occurs after the protected activity will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two." *Young v. Hobart W. Grp.*, 385 N.J. Super. 448, 467 (App. Div. 2005) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997)). "Only where the facts of the particular case are so 'unusually suggestive of retaliatory motive' may temporal proximity, on its own, support an inference of causation." *Id.* (quoting *Krouse*, 126 F.3d at 503). "Where the timing alone is not 'unusually suggestive,' the plaintiff must set forth other evidence to establish the causal link." *Id.* Even where the plaintiff alleges causation, a "legitimate intervening event" can sever the connection between cause and effect. *Mirena v. Exec. Jet Mgmt., Inc.*, 760 F. Supp. 3d 224, 232 (D.N.J. 2024) (quoting *Wiest v. Tyco Elecs. Corp.*, 812 F.3d 319, 330 (3d Cir. 2016)).

Plaintiff asserts McCarter fired him after he (a) registered his dissatisfaction about McCarter not commemorating 9/11 in October 2022 emails to the DEI Committee; (b) complained about being assigned child sexual assault cases in unspecified emails to supervisors; (c) made the Rambo Post; (d) sent a December 23, 2023 email objecting to his work assignments and the removal of his Third Circuit Post; and (e) claimed he was not being paid fairly in his December 14, 2023 performance review. The complaints, taken individually or collectively, do not satisfy CEPA's elements.

**a. The 9/11 Commemoration**

To start, Plaintiff fails to identify any law, rule, or policy McCarter violated in not commemorating 9/11. Nor can the Court to identify such a law, rule, or policy on its own. CEPA

does not protect an employee who "engages in grousing or complaining about matters falling short of a 'clear mandate of public policy.'" *Tartaglia*, 197 N.J. at 109. Even if Plaintiff reasonably believed McCarter's failure to commemorate 9/11 violated an unspecified law, rule, or policy, he did not specifically communicate that belief to McCarter. Rather, Plaintiff stated "it disappointed [him] that the firm did not also honor those lost on 9/11 last month or the year before." (*See* Am. Compl. at *127.) An employee's "expression of purely personal viewpoints" is not whistleblowing. *Tartaglia*, 197 N.J. at 109.

**b. The Work Assignments**

Similarly, Plaintiff did not sufficiently communicate his belief that being assigned child sexual assault cases violated a law, regulation, or clear mandate of public policy. Plaintiff objected based on his "conflicting emotions such assignments produced, concerns regarding the morality of the work, and his conflicting role as a father." (Am. Compl. ¶ 238.) Voicing moral objections is not whistleblowing. *Tartaglia*, 197 N.J. at 109.

**c. The Rambo Post**

Nor does the Rambo Post sufficiently express disagreement with McCarter's conduct. The Rambo Post vaguely states that:

> So many of us are paid substantially less for the same work as others and then pressured out and denied opportunities when we speak up for ourselves.

(*Id.* ¶ 204.) Plaintiff, however, did not name McCarter, identify any conduct McCarter engaged in, or assert that *Plaintiff* was paid substantially less for his work, pressured out of his work, or denied opportunities. Instead, he advanced "[v]ague and conclusory complaints" about generalized unequal treatment of veterans. *Battaglia*, 214 N.J. at 559.

**d. The December 23, 2023 Email**

Likewise, the December 23, 2023 email is not whistleblowing. The email allegedly expressed Plaintiff's "concerns about being assigned a disproportionate volume of child sexual abuse defense cases," (Am. Compl. ¶ 282), and asserted that McCarter "discriminated against" Plaintiff by forcing him to remove the Third Circuit Post, (*id.* ¶ 283).

But Plaintiff did not specifically communicate his belief that his work assignments violated the law. *Sucharski*, 2024 WL 4647964, at *8 (citation omitted). Instead, Plaintiff vaguely claims he expressed "concerns" about his assignments. (Am. Compl. ¶ 282.) Plaintiff does not identify what those concerns were, and therefore, fails to allege "sufficient facts" about his expression of disagreement. *Sucharski*, 2024 WL 4647964, at *8. And, while the December 23, 2023 email rehashes Plaintiff's dispute over the Third Circuit Post, a workplace social media policy is not a law, rule, regulation, or source of public policy. *See Dzwonar*, 177 N.J. at 469. A complaint about a minor matter, like removing a social media post, is not what "the Legislature intended to be protected by CEPA." *Battaglia*, 214 N.J. at 559. So, Plaintiff fails to show the December 23, 2023 email was an act of whistleblowing.

**e. The Performance Review**

During his December 14, 2023 performance review, Plaintiff allegedly stated "it was a disgrace that he was one of the few veterans at [McCarter] and that after six years of performing fully and competently in his position, [he] still received substantially less compensation than a non-veteran first-year Associate." (Am. Compl. ¶ 256.) Assuming, without deciding, that (a) Plaintiff had an objectively reasonable belief that the difference between his pay as a Career Staff Associate and the pay of a non-veteran in a different position amounted to illegal pay

discrimination, and (b) Plaintiff sufficiently expressed that belief to McCarter,[15] Plaintiff still fails to demonstrate a causal link between his complaint and termination.

Plaintiff argues the proximity between his December 14, 2023 performance review, December 23, 2023 email, and December 27, 2023 termination are "unusually suggestive." (*See* Am. Compl. ¶ 292.) They are not. The nearly two-week lapse between Plaintiff's performance review and his termination is not, by itself, unusually suggestive, particularly where Plaintiff made the LinkedIn post leading to his termination nearly a week *after* his performance review. *See Martone*, 2020 WL 3969919, at *5 (finding ten-day gap not unusually suggestive). The four days between Plaintiff's email and his termination are not unusually suggestive because, as discussed above, he fails to show the December 23, 2023 email constituted whistleblowing. And the Amended Complaint does not plausibly allege a pattern of antagonism or other evidence connecting Plaintiff's performance review to his termination. Rather, Plaintiff asserts, in conclusory fashion, that he complained about his pay, and two weeks later, he was fired. That is plainly not enough to state a CEPA claim. Accordingly, Count IV is **DISMISSED *without prejudice***.

[15] It is also unclear from the pleadings whether Plaintiff sufficiently expressed his objection to McCarter. The complained-of activity must "pose a threat of public harm, not merely private harm or harm only to the aggrieved employee." *Mehlman v. Mobil Oil Corp.*, 153 N.J. 163, 188 (1998). In other words, "the dispute between employer and employee must be more than a private disagreement." *Maw v. Advanced Clinical Commc'ns, Inc.*, 179 N.J. 439, 445 (2004). To be sure, Plaintiff stated he was one of the few veterans working at McCarter and that he made substantially less than a non-veteran first-year Regular Associate. But his objection "wholly focused" on his own compensation and position. *Specht v. Suarez*, 798 F. Supp. 3d 485, 494 (D.N.J. 2025). Indeed, Plaintiff "requested that [McCarter] provide *him* with specific steps *he* could take to become a regular Associate" or offer "a severance package to help *him* evaluate *his* options and determine *his* next steps." (Am. Compl. ¶¶ 257–58 (emphasis added).) Plaintiff, in other words, described "how he, himself, was assertedly treated." *Specht*, 798 F. Supp. 3d at 494. And he "prop[ped] open the door for further conversation" about his salary and title. *Id.* It is unnecessary to decide Plaintiff's CEPA claim on this basis, however, because it fails for other reasons described *infra*.

### *iv.* Pierce *Claims (Counts V and VI)*

*Pierce v. Ortho Pharmaceutical Corp.* provides an employee with "a cause of action for wrongful discharge when the discharge is contrary to a clear mandate of public policy." 84 N.J. at 72. "The sources of public policy include legislation; administrative rules, regulations or decisions; and judicial decisions." *Id.* "Absent legislation, the judiciary must define the cause of action in case-by-case determinations." *Id.* The public policy mandate must "be clearly identified and firmly grounded." *MacDougall v. Weichert*, 144 N.J. 380, 391 (1996). "A vague, controversial, unsettled, and otherwise problematic public policy does not constitute a clear mandate." *Id.* at 392. The employee has the burden of identifying "a clear expression of public policy." *Pierce*, 84 N.J. at 73.

Plaintiff argues his termination violated New Jersey's public policies of preventing anti-veteran employment discrimination, and of protecting free speech under the New Jersey Constitution. Neither claim has merit as alleged.

To start, Plaintiff's veteran discrimination *Pierce* claim (Count V) is based on the same facts as his USERRA and NJLAD discrimination claims. Where "the sources of public policy [the plaintiff] relies on are coterminous with his [or her] statutory claims, he [or she] cannot advance a separate common law public policy claim." *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 73 (3d Cir. 1996). Here, Plaintiff's veteran discrimination *Pierce* claim "would not protect any additional interest beyond the protections" of USERRA. *Petti v. Ocean Cnty. Bd. of Health*, 831 F. App'x 59, 65 (3d Cir. 2020). Accordingly, Count V of the Amended Complaint is **DISMISSED *with prejudice*** as duplicative of Plaintiff's USERRA claims.[16]

[16] Even if Count V was not duplicative of Plaintiff's USERRA claims, Plaintiff would nonetheless fail to state a *Pierce* claim. CEPA and *Pierce* claims "are similar." *Tartaglia*, 197 N.J. at 106. Both claims require the employee to make a "sufficient expression" of "disagreement with a corporate policy, directive, or decision based on a clear mandate of public policy . . . . to support the conclusion that the resulting discharge violates the mandate of public policy and is wrongful." *Id.* at 109. "One key difference is that *Pierce* claims require an actual violation of the 'clear mandate of public policy,' while CEPA requires a reasonable belief of such a violation." *Arterbridge v. Wayfair LLC*, No. 22-

Plaintiff's "free speech" *Pierce* claim (Count VI) does not identify a clear mandate of public policy. "No New Jersey court has held that a private entity that encroaches upon a private individual's constitutional rights to free speech has violated a clear mandate of public policy . . . ." *McVey v. AtlantiCare Med. Sys. Inc.*, 472 N.J. Super. 278, 289 (App. Div. 2022). Rather, because Plaintiff was "a private employee who was terminated by [his] private employer, [he] cannot rely upon the freedom of speech provisions of the United States and New Jersey Constitutions to support a *Pierce* claim." *Id.* at 289–90. Accordingly, Plaintiff's free-speech *Pierce* claim fails as a matter of law.[17] Counts V and VI of the Amended Complaint, therefore, are **DISMISSED *with prejudice***.

***v. Breach of Implied Covenant (Count XI)***

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997). The implied covenant prohibits either party from doing "anything which will have the effect of destroying or injuring the

---

1547, 2023 WL 3243986, at *4 (3d Cir. May 4, 2023) (citation omitted). For the reasons stated *supra*, Plaintiff fails to adequately allege discrimination in violation of USERRA or NJLAD.

[17] Plaintiff argues *McVey* does not apply because (a) Plaintiff's speech is inseparable from his veteran status; (b) this case involves selective enforcement; (c) *McVey* is a non-binding Appellate Division decision; and (d) NJLAD's 2026 Amendment confirms "veteran protection" is a clear mandate of public policy. These arguments lack merit.

First, it is irrelevant that Plaintiff's speech related to his veteran status. "Under New Jersey law, a private entity may only be liable for a violation of free speech rights where they use their ownership of a traditionally public area to suppress certain types of speech." *Point Du Jour v. Flix Bus SE*, No. 25-2601, 2026 WL 2150585, at *5 (D.N.J. July 27, 2026). Plaintiff does not allege McCarter used its ownership of a traditionally public area to suppress Plaintiff from talking about veterans' issues.

Second, McCarter's allegedly selective enforcement has no bearing on (a) whether McCarter is a state actor, and (b) if not, whether McCarter used its ownership of a traditionally public place to suppress certain types of speech.

Third, Appellate Division decisions are "instructive as to this Court's understanding of New Jersey law." *Gov't Emps. Ins. Co. v. Caring Pain Mgmt. PC*, No. 22-5017, 2025 WL 2017255, at *6 (D.N.J. July 18, 2025). *McVey* simply applied the well-established rule that only the government (or, under the New Jersey Constitution, the private owner of a traditionally public space) can violate an individual's free-speech rights. Plaintiff identifies no case standing for the opposite conclusion.

Fourth, Plaintiff cannot use his opposition brief to replead his free-speech *Pierce* claim as a veteran protection *Pierce* claim. *Zimmerman*, 836 F.2d at 181. Even if he could, Count VI would duplicate Count V.

right of the other party to receive the fruits of the contract." *Id.* (citation omitted). To state a claim for breach of the implied covenant, the plaintiff must show:

> (1) a contract exists between the parties; (2) the plaintiff performed under the terms of the contract; (3) the defendant acted in bad faith with the purpose of depriving the plaintiff of rights or benefits under the contract; and (4) the defendant's actions caused the plaintiff to sustain damages.

*Luongo v. Vill. Supermarket, Inc.*, 261 F. Supp. 3d 520, 531–32 (D.N.J. 2017). "Breach of the implied covenant of good faith and fair dealing is not a free-standing cause of action; such a covenant is an implied covenant *of a contract.*" *Id.* at 532. Accordingly, "a breach of the implied covenant cannot occur in the absence of a contractual agreement." *Lee v. ElectrifAi, LLC*, No. 23-2239, 2024 WL 4182541, at *16 (D.N.J. Sept. 13, 2024).

Plaintiff contends McCarter "breached the implied covenant by discriminating against [him], subjecting him to a hostile work environment, retaliating against him, paying him substantially less, denying him advancement, assigning him repugnant work, and terminating him under false pretenses." (Am. Compl. ¶ 450.)

But Plaintiff does not allege he had an express or implied contract with McCarter. At most, Plaintiff asserts that, under New Jersey law, "every employment relationship contains an implied covenant of good faith and fair dealing." (*Id.* ¶ 449.) This premise is misguided. "New Jersey courts have uniformly 'rejected the proposition that there is an implied covenant of good faith and fair dealing between an employer and employee in an at-will situation.'" *D'Alessandro v. Varible Annuity Life Ins. Co. (VALIC)*, No. 89-2052, 1990 WL 191914, at *5 (quoting *Carney v. Dexter Shoe Co.*, 701 F. Supp. 1093, 1103 (D.N.J. 1988)); *see also Lee*, 2024 WL 4182541, at *16.

While an at-will employment relationship does not, by and of itself, give rise to an implied covenant, an implied covenant "attaches to those aspects of an at-will employment relationship which are governed by some contractual terms." *Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 390 (D.N.J.

1999). Such terms may arise if "an employment manual containing job-security and termination procedures could reasonably be understood by an employee to create binding duties and obligations between the employer and its employees." *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 399 (1994) (citing *Woolley v. Hoffmann-La Roche, Inc.*, 99 N.J. 284, 297–98 (1985)). Likewise, contract terms can arise from "representations made to a particular employee." *Troy v. Rutgers*, 168 N.J. 354, 367 (2001) (citing *Shebar v. Sanyo Bus. Sys. Corp.*, 111 N.J. 276, 288 (1988)). But the Amended Complaint does not identify any term in McCarter's employment manual or any specific representations made to Plaintiff sufficient to form a contract.[18] Accordingly, Count XI of the Amended Complaint is **DISMISSED *without prejudice***.

***vi. Intentional Infliction of Emotional Distress (Count X)***

To state a claim for intentional infliction of emotional distress, the plaintiff must show "(1) intentional conduct; (2) the conduct was extreme and outrageous; (3) the conduct proximately caused plaintiff's emotional distress; and (4) the emotional distress was severe." *DeAngelis v. Hill*,

---

[18] Plaintiff argues McCarter's social media policy and statement that it "would 'get back to him' about what specific steps Plaintiff could take to become a regular Associate" give rise to implied contractual obligations. (Pl.'s Opp'n at 35–36.) But Plaintiff did not plead either theory in the Amended Complaint. He cannot do so now in his opposition brief. *Zimmerman*, 836 F.2d at 181.

In any event, Plaintiff's arguments lack merit. First, Plaintiff characterizes the Policy as a "graduated enforcement scheme" creating the "reasonable expectation that McCarter would follow progressive discipline before terminating an employee." (Pl.'s Opp'n at 36.) But the plain language of the Policy does not impose progressive discipline. It states "[c]onsequences *may* include such measures as a fine, termination of employment or expulsion from the firm, and any other action deemed appropriate by the Executive Committee under the circumstances." (Policy at 3 (emphasis added).) Even if that provision gave rise to a contractual obligation, Plaintiff does not allege how McCarter breached the Policy.

McCarter's assurance that it would "get back to him" about specific steps to become a Regular Associate, as pled, does not give rise to an enforceable contract. "Under New Jersey law, a binding contract requires four things: an offer and acceptance, consideration, a meeting of the minds, and sufficiently definite terms." *Noble v. Samsung Elecs. Am., Inc*, 682 F. App'x 113, 116 (3d Cir. 2017). "An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Restatement (Second) of Contracts* § 24 (1981). "Since an offer is usually, if not always, a promise, a mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer." 1 *Williston on Contracts* § 4:9 (4th ed.). Here, McCarter expressed a general willingness to provide Plaintiff with steps he could take to become a regular Associate. McCarter did *not* promise to make Plaintiff a Regular Associate.

180 N.J. 1, 20 (2004). The complained-of conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366 (1988) (citation omitted). Extreme and outrageous conduct does not include "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Taylor v. Metzger*, 152 N.J. 490, 509 (1998) (citation omitted). Severe emotional distress "means any type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Id.* at 515 (citation omitted). "It is not enough to establish that a party is acutely upset by reason of the incident. In order to be actionable, the claimed emotional distress must be sufficiently substantial to result in physical illness or serious psychological [conditions]." *Aly v. Garcia*, 333 N.J. Super. 195, 204 (App. Div. 2000). "Complaints such as lack of sleep, aggravation, headaches and depression have been frequently deemed insufficient as a matter of law." *Innes v. Marzano-Lesnevich*, 435 N.J. Super. 198, 237 (App. Div. 2014).

Measured against this standard, the Amended Complaint fails on several fronts. First, aside from a lone conclusory assertion (*see* Am. Compl. ¶ 444), Plaintiff does not allege McCarter *intended* to cause him emotional distress.

Second, Plaintiff fails to identify any conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley*, 111 N.J. at 366. Plaintiff asserts McCarter's "conduct was extreme and outrageous," (Am. Compl. ¶ 445), but this "conclusory statement is not supported by any factual allegations." *Lee*, 2024 WL 4182541, at *13. "In New Jersey, it is 'extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of

emotional distress.'" *Sanchez v. SunGard Availability Servs. LP*, 362 F. App'x 283, 288 (3d Cir. 2010) (quoting *Griffin v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 23–24 (App. Div. 2001)). Even "allegations of sexual harassment, discrimination, or improperly motivated discharge, cannot alone provide the basis for an intentional infliction of emotional distress claim." *Marrero v. Camden Cnty. Bd. of Soc. Servs.*, 164 F. Supp. 2d 455, 479 (D.N.J. 2001). And "claims regarding employment decisions fail to state a claim as for intentional infliction of emotional distress as a matter of law." *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 348 (D.N.J. 2006). The slights, insults, and routine employment decisions Plaintiff alleges, taken as true, might be unpleasant, unfair, or even discriminatory—but they are not extreme or outrageous.

Third, Plaintiff does not adequately allege severe emotional distress. Plaintiff claims he experienced "loss of sleep, weight gain and weight loss, headaches, and indigestion." (Am. Compl. ¶ 300.) But "[c]omplaints such as lack of sleep, aggravation, headaches and depression have been frequently deemed insufficient as a matter of law." *Innes*, 435 N.J. Super. at 237. That is exactly what Plaintiff claims he suffers from. (Am. Compl. ¶ 300.)

Accordingly, Plaintiff fails to state a claim for intentional infliction of emotional distress against McCarter, and Count X of the Amended Complaint is **DISMISSED *without prejudice***.

### C. The Claims Against the Port Authority Defendants and O'Toole (Counts XII, XIV, XV, XVI, XVII)

#### *i. First Amendment Retaliation (Counts XII and XIV)*

Plaintiff brings a First Amendment retaliation claim against the Port Authority, Donovan, and O'Toole under 42 U.S.C. § 1983 (Count XII) and the NJCRA (Count XIV). (*See* Am. Compl. ¶¶ 452–59, 469–74.) "§ 1983 and NJCRA claims use the same analysis." *Parrish v. Hudson Sch.*, No. 25-17986, 2026 WL 1328364, at *4 (D.N.J. May 13, 2026) (citing *Gormley v. Wood-El*, 218

N.J. 72, 112–13 (2014)). To state a § 1983 claim, the plaintiff must show: (1) someone deprived the plaintiff of a right, and (2) the person who deprived plaintiff of the right acted under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

Retaliating against someone for "the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *Morales v. Maxwell*, 600 F. Supp. 3d 497, 518 (D.N.J. 2022) (quoting *White v. Napoleon*, 897 F.2d 103, 111–12 (3d Cir. 1990)). To state a First Amendment retaliation claim, the plaintiff must show "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Id.* at 518 (quoting *Zimmerlink v. Zapotsky*, 539 F. App'x 45, 48 (3d Cir. 2013)).

Plaintiff claims the Port Authority, Donovan, and O'Toole threatened to withdraw Port Authority support for the Swim because Plaintiff sued McCarter. (Am. Compl. ¶¶ 452–57.) Specifically, Plaintiff points to Donovan's 2025 text message, wherein Donovan stated: "Please be aware though that you cannot post, send or do anything else negative towards [O'Toole] or his firm. If you do I will be out of the event along with all Port Authority assets and access to the [World Trade Center]." (*Id.* ¶ 341.) And later, Plaintiff claims the Foundation withdrew from the Swim, costing Plaintiff $40,000. (*Id.* ¶ 457.)

**a. O'Toole**

"A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* "Allegations of

participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Id.*

Plaintiff does not allege, with any particularity, that O'Toole participated in the purported retaliation against Plaintiff or knew about it and did nothing. At most, Plaintiff claims O'Toole and Donovan once appeared together at a Foundation Ceremony, which "support[s] the inference" that O'Toole told Donovan to threaten Plaintiff. (*Id.* ¶ 319.) But this is precisely the kind of threadbare conclusion the Court disregards on a motion to dismiss. *Iqbal*, 556 U.S. at 678.

Even if Plaintiff had alleged O'Toole's personal involvement, he fails to identify any retaliatory action O'Toole engaged in that was "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." *Morales*, 600 F. Supp. 3d at 518. O'Toole's purported retaliatory conduct took "the form of [his] own speech." *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017). "In such circumstances [courts] employ a more specific test to determine whether the official's speech amounts to a retaliatory act." *Id.* Courts ask whether there was "a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." *Id.* (quoting *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001)). "[S]trongly urging or influencing, but not 'coercing' a third party to take adverse action affecting a plaintiff's speech [does] not violate [a] plaintiff's constitutional rights." *McLaughlin*, 271 F.3d at 573 (quoting *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88–89 (3d Cir. 1984)). So, even if Plaintiff had adequately alleged O'Toole's personal involvement, the bare act of urging another party to retaliate against Plaintiff does not amount to First Amendment retaliation. Accordingly, Counts XII and XIV of the Amended Complaint are **DISMISSED** ***without prejudice*** as to O'Toole.

**b. Donovan**

Plaintiff claims Donovan retaliated against him in two ways: first, by threatening to withdraw Port Authority support for the Swim, and second, by getting the Foundation to withdraw from the event.

The Court begins with Plaintiff's assertion that Donovan somehow forced the Foundation to withdraw from the event. The Amended Complaint does not identify how Donovan had any involvement in the Foundation's decision to withdraw from the Swim. Plaintiff simply does not allege Donovan's participation "with appropriate particularity." *Rode*, 845 F.2d at 1207. Moreover, "strongly urging or influencing, but not 'coercing' a third party to take adverse action affecting a plaintiff's speech [does] not violate [a] plaintiff's constitutional rights." *McLaughlin*, 271 F.3d at 573 (quoting *R.C. Maxwell Co.*, 735 F.2d at 88–89). Correspondingly, Plaintiff does not identify how Donovan purportedly coerced the Foundation.

Next, Plaintiff does not adequately allege Donovan threatened him in 2025 *because* Plaintiff sued McCarter in 2024. "The third element of a retaliation claim requires a causal link between a plaintiff's constitutionally protected activity and the retaliatory act." *Mirabella*, 853 F.3d at 651. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). "Specifically, it must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* To establish causation, a plaintiff may show (1) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action"; (2) "a pattern of antagonism coupled with timing to establish a causal link"; or (3) the "evidence gleaned from the record as a whole" permits the factfinder to infer causation. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

Moreover, the plaintiff must show the defendant was "aware of the protected conduct." *Ambrose v. Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).

Here, the year-long gap between Plaintiff's 2024 lawsuit and Donovan's 2025 text is not "unusually suggestive." *See Kriss v. Fayette County*, 504 F. App'x 182, 188 (3d Cir. 2012) ("[Plaintiffs] cited, and we have found, no cases where a gap of more than even two months was found to be unusually suggestive.").

Nor does Plaintiff adequately allege a pattern of antagonism plus timing. To do so, Plaintiff "would need to show 'actual antagonistic conduct or animus' in 'the intervening period' between the protected activity and the retaliation." *Id.* (citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)). But Plaintiff identifies exactly one incident: Donovan's failure to invite Plaintiff to a Swim planning meeting at some point in 2025. A singular event occurring a year after Plaintiff sued McCarter is not a pattern. *Cf. Scrip v. Seneca*, 651 F. App'x 107, 111 (3d Cir. 2016) ("[T]wo unspecified disciplinary actions over a period of more than seventeen months do not create a 'pattern of antagonism.'"); *Roseberry v. City of Philadelphia*, 716 F. App'x 89, 92 (3d Cir. 2017) ("Here, the record reveals nothing more than isolated events, occurring over a three-year period."). Nor does the Amended Complaint allege Plaintiff's exclusion from the meeting had any connection to his lawsuit. Rather, Donovan explained: "I don't need you on the call tomorrow, I've already spoken to both parties and this is to just iron out the last details. You sometimes bring additional and unnecessary topics and dramatics to these conversations that leaves a bad taste with people." (Am. Compl. ¶ 327.)

Nothing else in the Complaint, taken as true and viewed in the light most favorable to Plaintiff, supports an inference that Donovan threatened to withdraw the Port Authority from the Swim because Plaintiff sued McCarter. Again, the only intervening allegation between Plaintiff's

2024 lawsuit and Donovan's 2025 text is that Donovan excluded Plaintiff from a Swim planning meeting. But Donovan's stated reasons have nothing to do with the lawsuit. Indeed, the Amended Complaint does not allege Donovan was even aware of the lawsuit before Plaintiff added him to it. Therefore, Counts XII and XIV of the Amended Complaint are **DISMISSED** ***without prejudice*** as to Donovan.[19]

**c. Port Authority**

§ 1983 claims "against the Port Authority are analyzed under a municipal liability framework." *Galicki v. New Jersey*, No. 14-169, 2016 WL 4950995, at *7 (D.N.J. Sept. 15, 2016) (citing *Mack v. Port Auth. of N.Y. & N.J.*, 225 F. Supp. 2d 376, 383 n.7 (S.D.N.Y. 2002)). A municipality "is not vicariously liable for the unconstitutional conduct of its employees." *Hightower v. City of Philadelphia*, 130 F.4th 352, 355 (3d Cir. 2025). Instead, to state a § 1983 claim against a municipality, the plaintiff must show the municipality's "choices were the 'moving force' behind the constitutional violation." *Id.* at 356. To show a municipality's choices were the "moving force" behind a constitutional violation, the plaintiff must show the municipality either "(1) had an unconstitutional policy or custom or (2) was deliberately indifferent to [the plaintiff's] rights." *Id.* A policy is "an "official proclamation, policy or edict by a decisionmaker possessing final authority." *Id.* A custom is a practice "so persistent and widespread as to practically have the force of law." *Id.* Deliberate indifference means "a municipal actor disregarded a known or obvious consequence of his action." *Id.* at 357 (citation omitted).

---

[19] Both O'Toole and Donovan assert they have qualified immunity for allegedly retaliating against Plaintiff. (*See* O'Toole Mot. at 9–14; Port Auth. Mot. at 11–12.) But, because Plaintiff does not adequately allege First Amendment retaliation against either defendant, "there is no need to examine whether [O'Toole or Donovan] are entitled to qualified immunity." *Caissie v. City of Cape May*, 619 F. Supp. 2d 110, 126 (D.N.J. 2009).

Plaintiff's § 1983 claim against the Port Authority fails because Plaintiff does not show O'Toole or Donovan violated his constitutional rights. A plaintiff cannot state a § 1983 claim "against a municipal corporation based on the actions of one of its officers when . . . the officer inflicted no constitutional harm." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Peters v. Brown*, 793 F. App'x 118, 126 (3d Cir. 2019) ("The municipal liability claim . . . fails because there was no underlying constitutional violation by the . . . police defendants."). In any event, Plaintiff does not identify any Port Authority policy or custom causing the violation of his constitutional rights. Nor does he adequately allege the Port Authority was deliberately indifferent to his rights.

Therefore, Counts XII and XIV of the Amended Complaint are **DISMISSED *without prejudice*** as to the Port Authority.

***ii. Tortious Interference (Counts XV and XVI)***

To state a claim for tortious interference, the plaintiff must allege "(1) the existence of the contract or the prospective economic relationship; (2) interference which was intentional and with malice; (3) the loss of the contract or prospective gain as a result of the interference; and (4) damages." *Essex Motors, Inc. v. Netflix, Inc.*, No. 25-17230, 2026 WL 2240567, at *4 (D.N.J. Aug. 4, 2026) (citation omitted). "The 'only' distinction between a tortious interference with a contractual relationship claim and a tortious interference with a prospective economic relations claim is the specific protectable right the plaintiff must allege, i.e., 'a contract' or 'a prospective economic or contractual relationship or reasonable expectation thereof.'" *Nat'l Trench Safety Inc. v. US Shoring Inc.*, No. 25-7875, 2026 WL 821339, at *6 (D.N.J. Mar. 25, 2026) (citation omitted).

Plaintiff alleges (1) he had an existing contractual and prospective economic relationship with the Foundation, whereby he made $40,000 per year to organize the Swim, (Am. Compl. ¶

338); (2) Port Authority officials "informed the [Foundation] that it would not support the 2026 [Swim] if Plaintiff participated in the event," (*id.* ¶ 351); (3) the Foundation withdrew from the Swim, (*id.* ¶ 352); and (4) as a result, Plaintiff lost his $40,000 per year contract, (*id.* ¶ 354).

Plaintiff's tortious interference claims, however, fall short in several respects. First, Plaintiff does not allege Donovan or O'Toole knew Plaintiff had a $40,000 per year contract or an expectation of receiving more contracts with the Foundation. "Actual knowledge of the contract with which a defendant supposedly interfered is a prerequisite to making out a claim for tortious interference." *Mylan Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013). To be sure, Plaintiff claims Defendants knew he organized the Swim. (Am. Compl. ¶¶ 40, 332.) But Plaintiff does not allege Donovan or O'Toole knew Plaintiff had a *$40,000 per year contract* with the Foundation to organize the Swim. A party cannot interfere with an economic relationship they know nothing about.

Moreover, Plaintiff does not identify what O'Toole or Donovan did to interfere with Plaintiff's Foundation contract. Instead, Plaintiff claims unnamed, unidentified Port Authority officials—not O'Toole or Donovan—told the Foundation the Port Authority would withdraw from the Swim if Plaintiff participated. (Am. Compl. ¶ 351.) At best, Plaintiff surmises that Donovan's text and O'Toole's position mean both defendants interfered with his contract. But this is nothing "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

And, even if the Court were to assume—absent any allegation—that O'Toole and/or Donovan told the Foundation that the Port Authority would withdraw if Plaintiff participated in the Swim, Plaintiff fails to show either defendant acted maliciously. Malice does not literally require proof of "ill will toward the plaintiff." *Printing Mart-Morristown v. Sharp Elecs. Corp.*,

116 N.J. 739, 751 (1989) (citation omitted). Plaintiff must instead show the defendant acted "intentionally and without justification or excuse." *Id.* "[M]alicious acts are determined on a case-by-case basis." *Id.* at 756. This is a "flexible" standard. *Id.* at 757. But "the ultimate inquiry is whether the conduct was 'both injurious and transgressive of generally accepted standards of common morality or of law.'" *Id.* (citation omitted). "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal and thereby interferes with a competitor's economic advantage." *Lamorte Burns & Co. v. Walters*, 167 N.J. 285, 307 (2001). Plaintiff does not adequately allege O'Toole or Donovan acted in a fraudulent, dishonest, or illegal manner. He simply asserts that they did. (Am. Compl. ¶¶ 479, 485.) But a bare legal conclusion will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. Therefore, Counts XV and XVI of the Amended Complaint are **DISMISSED** ***without prejudice***.

***iii. Intentional Infliction of Emotional Distress (XVII)***

The Amended Complaint includes a claim for intentional infliction of emotional distress against Donovan, the Port Authority, and O'Toole. It fails for similar reasons as his emotional distress claim against McCarter.

First, Plaintiff does not adequately allege the Port Authority, Donovan, or O'Toole intended to cause Plaintiff emotional distress. Second, Plaintiff identifies no conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Buckley*, 111 N.J. at 366. As before, Plaintiff asserts Defendants' "conduct was extreme and outrageous," (Am. Compl. ¶ 489), but his "conclusory statement is not supported by any factual allegations." *Lee*, 2024 WL 4182541, at *13. Third, unlike Plaintiff's emotional distress claim against McCarter, the Amended Complaint includes no allegation about the physical or psychological effects of

Donovan, O'Toole, or the Port Authority's alleged conduct. So, Plaintiff has not shown he suffered "physical illness or serious psychological [conditions]." *Aly*, 333 N.J. Super. at 204. Therefore, Count XVII of the Amended Complaint is **DISMISSED *without prejudice***.

**D. The Conspiracy Claims Against All Defendants (Counts XIII and XVIII)**

Count XIII claims Defendants engaged in a conspiracy to violate Plaintiff's civil rights, in violation of § 1983. Count XVIII asserts a civil conspiracy. Both claims allege Defendants conspired to silence Plaintiff, punish him for filing this lawsuit, deter him from pursuing claims, and protect McCarter from liability. (*See* Am. Compl. ¶¶ 466, 497.)

The elements of a § 1983 conspiracy and a civil conspiracy are "essentially the same." *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 294 n.15 (3d Cir. 2018). To prevail on a civil rights conspiracy claim, the plaintiff must "prove that persons acting under color of state law 'reached an understanding' to deprive him of his constitutional rights." *Id.* at 293–94 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970)). After the plaintiff "establishes that the object of the conspiracy was the deprivation of a federally protected right," he or she "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Id.* at 295 (citation omitted).

Plaintiff's conspiracy claims fail on both fronts. First, Plaintiff offers no evidence of a conspiracy. To show a conspiracy, the plaintiff must show "the state actors named as defendants in the complaint somehow reached an understanding to deny the plaintiff his rights, and in the absence of direct proof, that meeting of the minds or understanding or agreement to conspire can be inferred from circumstantial evidence." *Id.* (cleaned up). Circumstantial evidence can include proof the alleged conspirators "did or said something to create an understanding, the approximate time when the agreement was made, the specific parties to the agreement, the period of the

conspiracy, or the object of the conspiracy." *Id.* (cleaned up). A plaintiff "must allege with sufficient particularity that the [defendants] reached some understanding or agreement, or plotted, planned and conspired together, to deprive plaintiff of a federal right." *Hartfelder v. N.J. State Police*, No. 16-5461, 2017 WL 3184173, at *3 (D.N.J. July 26, 2017) (alteration in original) (quoting *Hauptmann v. Wilentz*, 570 F. Supp. 351, 375 (D.N.J. 1983)). A conspiracy plaintiff may not rely on "his or her own suspicion and speculation" to prove a meeting of the minds. *Est. of Martin v. U.S. Marshals Serv. Agents*, 649 F. App'x 239, 244 (3d Cir. 2016).

The Amended Complaint offers no evidence of a conspiracy with sufficient particularity. Plaintiff claims a conspiracy existed because (1) O'Toole manages O'Toole Scrivo, (Am. Compl. ¶ 305); (2) O'Toole Scrivo represents McCarter, (*id.* ¶ 303); (3) O'Toole is the Port Authority chairman, (*id.* ¶ 306); and (4) O'Toole has ties to and an interest in protecting McCarter from liability, (*id.* ¶ 307). Missing from the Amended Complaint, however, is any allegation about who the alleged conspirators were, what they said or did to create a conspiracy, when they did so, how long they conspired for, or the object of the conspiracy. *See Jutrowski*, 904 F.3d at 295.

Even if Plaintiff adequately alleged a meeting of the minds, Plaintiff must also show "an actual underlying constitutional violation" of his rights. *Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020). As discussed at length above, Plaintiff fails to do so. Thus, Counts XIII and XVIII of the Amended Complaint are **DISMISSED** ***without prejudice***.

### E. The Amended Complaint is Excessively Prolix and Overlong

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[J]udging the sufficiency of a pleading is a context-dependent exercise." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010). The Court must assess the "circumstances surrounding the particular pleading, including

the nature of the action, the sort of relief being sought, the availability of information, and other practical considerations." *Garrett v. Wexford Health*, 938 F.3d 69, 93 (3d Cir. 2019).

There is "no single 'proper length' for stating a particular claim." *Id.* "The level of factual detail will vary with the complexity of the claim asserted." *Id.* But a complaint's "excessive length compounded by a lack of clarity should deem it unacceptable." *Coffey v. Sussex Cnty. Cmty. Coll.*, No. 25-1264, 2026 WL 265547, at *4 (D.N.J. Feb. 2, 2026) (citation omitted). A district court "acts within its discretion when it dismisses an excessively prolix and overlong complaint." *Garrett*, 938 F.3d at 93.

The 500-paragraph, 108-page Amended Complaint is "unnecessarily complicated and verbose," *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 703 (3d Cir. 1996), with dense page-long paragraphs full of legal conclusions, (*see, e.g.*, Am. Compl. ¶¶ 5–7); allegations bearing little relevance to this action (*see, e.g.*, *id.* ¶ 30 (describing Navy SEAL Ethos)); and scores of blurry full-page photographs that duplicate or do not pertain to Plaintiff's written allegations, (*id.* ¶¶ 54–55, 73, 119, 146, 294, 296, 316). "Neither this Court, nor any party, should have to wade through endless pages of narrative to discern the causes of action asserted and the relief sought." *Coffey*, 2026 WL 265547, at *4 (citation omitted). Had the Court not dismissed the Amended Complaint on the bases described above, the Court would have been well within its discretion to dismiss for failure to comply with Rule 8(a). *See, e.g.*, *id.* at *4 (dismissing 124-page 507-paragraph Amended Complaint); *Westinghouse*, 90 F.3d at 703 (240-page 600-paragraph complaint); *Hildebrandt v. SiParadigm LLC*, No. 23-21835, 2025 WL 3776801, at *4 (D.N.J. Dec. 31, 2025) (229-page 1,734-paragraph complaint); *Okogun v. Trs. of Princeton Univ.*, No. 23-2402, 2024 WL 1427585, at *2 (3d Cir. Apr. 3, 2024) (dismissing complaint consisting of "160 dense pages, spanning five years and discussing dozens of incidents, individuals, and seemingly unrelated observations.");

*Good v. I.R.S.*, 629 F. App'x 185, 186–87 (3d Cir. 2015) (dismissing 92-page complaint with "few factual allegations.").

Accordingly, should Plaintiff file an amended pleading, he must provide a short and plain statement of the claim. Fed. R. Civ. P. 8(a)(2)

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion to disqualify McCarter (ECF No. 19) is **DENIED**; and the motions to dismiss filed by McCarter (ECF No. 23), the Port Authority Defendants (ECF No. 24), and O'Toole (ECF No. 25) are **GRANTED**.

The following Counts of the Amended Complaint are **DISMISSED *without prejudice***: Counts I (USERRA—Discrimination); IV (CEPA); X (IIED); XI (Breach of Implied Covenant); XII (§ 1983—First Amendment Retaliation); XIII (§ 1983 Conspiracy); XIV (NJCRA); XV (Tortious Interference With Contract); XVI (Tortious Interference With Prospective Economic Advantage); XVII (IIED); and XVIII (Civil Conspiracy)

The following Counts are **DISMISSED *with prejudice***: Counts V (*Pierce*—Veteran Discrimination); VI (*Pierce*—Free Speech); VII (NJLAD—Discrimination); VIII (NJLAD—Hostile Work Environment); and IX (NJLAD—Pay Discrimination).

Plaintiff shall have thirty (30) days to file a second amended complaint addressing the deficiencies identified herein. Should Plaintiff fail to do so, dismissal may be with prejudice. An appropriate Order accompanies this Opinion.

**DATED: 10/30/2026**

**JULIEN XAVIER NEALS**
**United States District Judge**